# EXHIBIT 3

1       WATERHOUSE - 10-19-21

2     IN THE UNITED STATES BANKRUPTCY COURT
      FOR THE NORTHERN DISTRICT OF TEXAS
3          DALLAS DIVISION
   ------------------------------
4  IN RE:

5                  Chapter 11
   HIGHLAND CAPITAL
6  MANAGEMENT, L.P.,      CASE NO.
                  19-34054-SGI11
7
        Debtor.
8  ------------------------------
   HIGHLAND CAPITAL MANAGEMENT, L.P.,
9
        Plaintiff,
10  vs.                  Adversary
                       Proceeding No.
11  HIGHLAND CAPITAL MANAGEMENT    21-03000-SGI
   FUND ADVISORS, L.P.; NEXPOINT
12  ADVISORS, L.P.; HIGHLAND
   INCOME FUND; NEXPOINT
13  STRATEGIC OPPORTUNITIES FUND;
   NEXPOINT CAPITAL, INC.; and
14  CLO HOLDCO, LTD.,

15        Defendants.
   ------------------------------
16

17       REMOTE VIDEOTAPED DEPOSITION OF

18         FRANK WATERHOUSE

19         October 19, 2021

20

21

22

23

24  Reported by:  Susan S. Klinger, RMR-CRR, CSR

25  Job No: 201195

Page 2

```
 1        WATERHOUSE - 10-19-21
 2
 3
 4        October 19, 2021
 5        9:30 a.m.
 6
 7
 8
 9     Remote Deposition of FRANK WATERHOUSE,
10   held before Susan S. Klinger, a Registered
11   Merit Reporter and Certified Realtime Reporter
12   of the State of Texas.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1        WATERHOUSE - 10-19-21
 2   A P P E A R A N C E S:
 3   (All appearances via Zoom.)
 4   Attorneys for the Reorganized Highland Capital
 5   Management:
 6       John Morris, Esq.
 7       Hayley Winograd, Esq.
 8       PACHULSKI STANG ZIEHL & JONES
 9       780 Third Avenue
10       New York, New York 10017
11   Attorneys for the Witness:
12       Debra Dandeneau, Esq.
13       Michelle Hartmann, Esq.
14       BAKER McKENZIE
15       1900 North Pearl Street
16       Dallas, Texas 75201
17   Attorneys for NexPoint Advisors, LP and
18   Highland Capital Management Fund Advisors,
19   L.P.:
20       Davor Rukavina, Esq.
21       An Nguyen, Esq.
22       MUNSCH HARDT KOPF & HARDD
23       500 North Akard Street
24       Dallas, Texas 75201-6659
25
```

Page 4

```
 1        WATERHOUSE - 10-19-21
 2   Attorneys for Jim Dondero, Nancy Dondero, HCRA,
 3   and HCMS:
 4       Deborah Deitsch-Perez, Esq.
 5       Michael Aigen, Esq.
 6       STINSON
 7       3102 Oak Lawn Avenue
 8       Dallas, Texas 75219
 9
10   Attorneys for Dugaboy Investment Trust:
11       Warren Horn, Esq.
12       HELLER, DRAPER & HORN
13       650 Poydras Street
14       New Orleans, Louisiana 70130
15
16   Attorneys for Marc Kirschner as the trustee for
17   the litigation SunTrust:
18       Deborah Newman, Esq.
19       QUINN EMANUEL URQUHART & SULLIVAN
20       51 Madison Avenue
21       New York, New York 10010
22
23   Also Present:
24       Ms. La Asia Canty
25
```

Page 5

```
 1        WATERHOUSE - 10-19-21
 2          I N D E X
 3
 4   WITNESS                    PAGE
 5   FRANK WATERHOUSE
 6   EXAMINATION BY MR. MORRIS        10
 7   EXAMINATION BY MR. RUKAVINA       256
 8   EXAMINATION BY MS. DEITSCH-PEREZ    352
 9   EXAMINATION BY MR. MORRIS        377
10   EXAMINATION BY MR. RUKAVINA       387
11   EXAMINATION BY MS. DEITSCH-PEREZ    393
12
13          E X H I B I T S
14   No.                       Page
15   Exhibit 2  NPA et al Amended Complaint   142
16   Exhibit 33 6/3/19 Management        91
17          Representation
18   Exhibit 34 HCMLP Consolidated Financial   94
19          Statements
20   Exhibit 35 HCMFA Incumbency Certificate  151
21   Exhibit 36 Email string re 15(c)     170
22   Exhibit 39 HCMLP Operating Results 2/18  226
23   Exhibit 40 Summary of Assets and      236
24          Liabilities
25   Exhibit 41 12/19 Monthly Operating Report 258
```

1          WATERHOUSE - 10-19-21
2  Exhibit 45 HCMFA Consolidated Financial    135
3          Statements
4  Exhibit 46 NexPoint 2019 Audited        218
5          Financials
6
7  Exhibit A1 Emails 11/25          328
8  Exhibit A2 Emails 12/31          338
9  Exhibit A6 Emails 1/12          341
10 Exhibit A7 Promissory Notes          297
11 Exhibit A9 Email, 8/31          307
12 Exhibit A10 Acknowledgment from HCMLP      302
13 Exhibit A11 HCMLP Schedule 71A        309
14
15
16
17
18
19
20
21
22
23
24
25

1          WATERHOUSE - 10-19-21
2          P R O C E E D I N G S
3          VIDEOGRAPHER: Good morning,
4  Counselors. My name is Scott Hatch. I'm a
5  certified legal videographer in association
6  with TSG Reporting, Inc.
7          Due to the severity of COVID-19 and
8  following the practice of social
9  distancing, I will not be in the same room
10 with the witness. Instead, I will record
11 this videotaped deposition remotely. The
12 reporter, Susan Klinger, also will not be
13 in the same room and will swear the witness
14 remotely.
15         Do all parties stipulate to the
16 validity of this video recording and remote
17 swearing, and that it will be admissible in
18 the courtroom as if it had been taken
19 following Rule 30 of the Federal Rules of
20 Civil Procedures and the state's rules
21 where this case is pending?
22         MR. HORN: Yes.
23         MS. DANDENEAU: Yes.
24         MR. MORRIS: Yes. John Morris. I
25 would just try to do a negative notice

1          WATERHOUSE - 10-19-21
2  here, as we did yesterday. If anybody has
3  a problem with what was just stated, can
4  you state your objection now?
5          Okay. No response, so everybody
6  accepts the stipulation and the instruction
7  that was just given.
8          VIDEOGRAPHER: Thank you. This is
9  the start of media labeled Number 1 of the
10 video recorded deposition of Frank
11 Waterhouse In Re: Highland Capital
12 Management, L.P., in the United States
13 Bankruptcy Court for the Northern District
14 of Texas, Dallas Division, Case Number
15 21-03000-SGI.
16         This deposition is being held via
17 video conference with participants
18 appearing remotely due to COVID-19
19 restrictions on Tuesday, October 19th, 2021
20 at approximately 9:32 a.m. My name is
21 Scott Hatch, legal video specialist with
22 TSG Reporting, Inc. headquartered at 228
23 East 45th Street, New York, New York. The
24 court reporter is Susan Klinger in
25 association with TSG Reporting.

1          WATERHOUSE - 10-19-21
2          Counsel, please introduce
3  yourselves.
4          MR. MORRIS: John Morris, Pachulski
5  Stang Ziehl & Jones for the reorganized
6  Highland Capital Management, L.P., the
7  plaintiff in these actions.
8          MS. DANDENEAU: Deborah Dandeneau
9  from Baker McKenzie. My partner, Michelle
10 Hartmann, is also in the room with me,
11 representing Frank Waterhouse individually.
12         MS. DEITSCH-PEREZ: Deborah
13 Deitsch-Perez from Stinson, LLP,
14 representing Jim Dondero, Nancy Dondero,
15 HCRA, and HCMS.
16         MR. HORN: Warren Horn with Heller,
17 Draper & Horn in New Orleans representing
18 Dugaboy Investment Trust.
19         MR. RUKAVINA: Davor Rukavina with
20 Munsch Hardt Kopf & Harr in Dallas
21 representing NexPoint Advisors, LP and
22 Highland Capital Management Fund Advisors,
23 L.P.
24         MR. AIGEN: Michael Aigen from
25 Stinson, and I represent the same parties

1         WATERHOUSE - 10-19-21
2  as Deborah Deitsch-Perez.
3      MS. NEWMAN: This is Deborah Newman
4  from Quinn Emanuel. We represent the
5  litigation -- Marc Kirschner as the trustee
6  for the litigation SunTrust.
7      MR. MORRIS: I think that is
8  everybody.
9      VIDEOGRAPHER: Thank you. Will the
10  court reporter please swear in the witness.
11        FRANK WATERHOUSE,
12 having been first duly sworn, testified as
13 follows:
14         EXAMINATION
15 BY MR. MORRIS:
16    Q.  Please state your name for the
17 record.
18    A.  My name is Frank Waterhouse.
19    Q.  Good morning, Mr. Waterhouse. I'm
20 John Morris, as you know, from Pachulski Stang
21 Ziehl & Jones. You understand that my firm and
22 I represent Highland Capital Management, L.P.;
23 is that right?
24    A.  Yes.
25    Q.  Okay. And do you understand that

1         WATERHOUSE - 10-19-21
2  we're here today for your deposition in your
3  individual capacity?
4    A.  Yes.
5    Q.  Did you review and -- did you
6  receive and review a subpoena that Highland
7  Capital Management, L.P., served upon you?
8    A.  Yes.
9    Q.  You have been deposed before; right?
10    A.  Yes.
11    Q.  How many times have you been
12 deposed?
13    A.  About three or four times.
14    Q.  Okay. And I defended you in one
15 deposition; isn't that right?
16    A.  That is correct.
17    Q.  So the general ground rules for this
18 deposition are largely the same as the
19 depositions you have given before. And that is
20 I will ask you a series of questions, and it is
21 important that you allow me to finish my
22 question before you begin your answer; is that
23 fair?
24    A.  Yes.
25    Q.  And it is important that I allow you

1         WATERHOUSE - 10-19-21
2  to finish your answers before I begin a
3  question, but if I fail to do that, will you
4  let me know?
5    A.  I can certainly do that.
6    Q.  Okay. Do you understand that this
7  deposition is being videotaped?
8    A.  Yes.
9    Q.  You understand that I may seek to
10 use portions of the videotape in a court of
11 law?
12    A.  I did not know that, until you just
13 said that.
14    Q.  Okay. And you are aware of that now
15 before the deposition begins substantively; is
16 that right?
17    A.  Yes.
18    Q.  So unlike I think the other
19 depositions that you have given, this one is
20 being given remotely. So that presents some
21 unique challenges, at least as compared to a
22 deposition that is taken in-person.
23      From time to time we're going to put
24 documents up on the screen, Mr. Waterhouse.
25 And it is important that I give you the

1         WATERHOUSE - 10-19-21
2  opportunity to review any portion of the
3  document that you think you need in order to
4  fully and completely answer the question.
5      So I would ask you to let me know if
6  there is a portion of a document that you need
7  to see in order to fully and completely answer
8  the question. Can you do that for me?
9    A.  Yes.
10     MS. DANDENEAU: Mr. Morris, I would
11 just note that we do have hard copies of
12 the documents that you sent, so if you can
13 just refer to the exhibit number as
14 reflected in the documents that you sent,
15 Mr. Waterhouse will be able to look at the
16 hard copies of those documents.
17     MR. MORRIS: I appreciate that,
18 and -- and I will encourage him to do so.
19 There will be other documents that we did
20 not send to you that we'll be using today
21 though.
22    Q.  Okay. With that as background, if
23 there is anything that I ask you, sir, that you
24 don't understand, will you let me know?
25    A.  Yes.

WATERHOUSE - 10-19-21

1
2  Q.  Okay.  Are you currently employed?
3  A.  Yes.
4  Q.  By whom?
5  A.  The Skyview Group.
6  Q.  When did you become employed by the
7  Skyview Group?
8  A.  I believe March 1st of 2021.
9  Q.  Do you have a title at Skyview?
10  A.  Yes.
11  Q.  What is your title?
12  A.  My title is chief financial officer.
13  Q.  Do you report to anybody in your
14  role as CFO?
15  A.  I don't, no.
16  Q.  No.  Is there a president or a CEO
17  of Skyview?
18  A.  Yes.
19  Q.  Who is that?
20  A.  That is Scott Ellington.
21  Q.  But you don't report to
22  Mr. Ellington; is that right?
23  A.  I don't think so.
24  Q.  Does Skyview Group --
25  MS. DANDENEAU:  Excuse me, we --

WATERHOUSE - 10-19-21

1
2  A.  I -- I -- I might.  I just -- I
3  don't recall.
4  Q.  Okay.  Does Skyview Group provide
5  any services to any entity directly or
6  indirectly owned or controlled by Jim Dondero?
7  A.  Yes.
8  Q.  Can you name -- is that pursuant to
9  written contracts?
10  A.  Yes.
11  Q.  And do you know how many contracts
12  exist?
13  A.  Approximately six or so.
14  Q.  And is the Skyview Group made up of
15  individuals who were formerly employees of
16  Highland Capital Management, L.P.?
17  A.  No.
18  Q.  Do you know how many -- how many --
19  how many employees does Skyview have?
20  A.  Approximately 35.
21  Q.  And can you tell me how many of
22  those 35 are former officers, directors, or
23  employees of Highland Capital Management, L.P.?
24  A.  I don't know the exact number.
25  Q.  Is it more than 20?

WATERHOUSE - 10-19-21

1
2  A.  Yes.
3  Q.  Is it more than 30?
4  A.  I don't know.
5  Q.  Can you tell me what portion of
6  Skyview -- Skyview's revenue is derived from
7  entities that are directly or indirectly owned
8  or controlled by Jim Dondero?
9  MS. DANDENEAU:  Mr. Morris, I mean,
10  you called Mr. Waterhouse here individually
11  for purposes of his testimony in connection
12  with the noticed litigation.  I have given
13  you some leeway to ask him some background
14  information about Skyview Group, but this
15  is not a substitute for a deposition in
16  connection with any other pending disputes
17  that exist.  And -- and we agreed to accept
18  the subpoena on the basis of he -- this is
19  testimony that he is giving in connection
20  with the noticed litigation.
21  I really think that you are now
22  going a little bit far afield from the
23  purpose of this deposition.
24  MR. MORRIS:  Okay.  It is -- I'm not
25  intending to use these -- the answers to

WATERHOUSE - 10-19-21

1
2  these questions for any purpose other than
3  this litigation.  I think you understand
4  fully why I'm asking the questions, and I
5  just have a couple more, if you will bear
6  with me.
7  MS. DANDENEAU:  Okay.
8  MS. DEITSCH-PEREZ:  Can we have an
9  agreement that an objection by one is an
10  objection for any other party here?
11  MR. MORRIS:  Sure.  I would -- I
12  would encourage that, sure.
13  MS. DEITSCH-PEREZ:  Thank you.
14  MR. MORRIS:  It can't be sustained
15  or overruled more than one time, so...
16  Q.  Mr. Waterhouse, can you answer my
17  question, please.
18  MS. DANDENEAU:  Do you want to
19  repeat it, Mr. Morris, for his benefit?
20  MR. MORRIS:  Sure.
21  Q.  Can you -- can you tell me the
22  approximate portion of Skyview's revenue that
23  is derived from entities that are directly or
24  indirectly owned or controlled by Mr. Dondero?
25  A.  I don't know the exact number.

Page 18

WATERHOUSE - 10-19-21

1
2  Q.  Is it more than 75 percent?
3  A.  Yes.
4  Q.  Is it more than 90 percent?
5  A.  I don't know.
6  Q.  Okay.  Can I refer to Highland
7  Capital Management, L.P., as Highland?
8  A.  Yes.
9  Q.  All right.  And you previously
10 served as Highland's CFO; correct?
11 A.  Yes.
12 Q.  When did you join Highland?
13 A.  I don't recall the exact date.
14 Q.  Can you tell me what year?
15 A.  2006.
16 Q.  When did you -- in what year did you
17 become Highland's CFO?
18 A.  I don't recall the exact date.
19 Q.  I'm not asking you for the exact
20 date.  I'm asking you if you recall the year in
21 which you were appointed CFO.
22 A.  I don't recall the exact year.
23 Q.  Can you tell me which years it is
24 possible that you were appointed to CFO of
25 Highland?

Page 19

WATERHOUSE - 10-19-21

1
2  A.  2011 or 2012.
3  Q.  Did you serve as Highland's CFO on a
4  continuous basis from in or around 2011 or 2012
5  until early 2021?
6  A.  Yes.
7  Q.  During that entire time you reported
8  directly to Jim Dondero; correct?
9  A.  I -- I don't know.
10 Q.  Is there anybody else you reported
11 to -- withdrawn.
12     Did you report to Mr. Dondero for
13 some portion of the time that you served as
14 CFO?
15 A.  Yes.
16 Q.  Is there a portion of time that you
17 don't recall who you reported to?
18 A.  Yes.
19 Q.  What portion of time do you have in
20 your mind when you can't recall who you
21 reported to?
22 A.  From the 2011 to -- for
23 approximately a year or two.
24 Q.  Okay.  So is it fair to say that you
25 reported to Mr. Dondero in your capacity as CFO

Page 20

WATERHOUSE - 10-19-21

1
2  from at least 2014 until the time you left
3  Highland?
4      MS. DANDENEAU:  Objection to form.
5  A.  I don't want to speculate the exact
6  or what year that changed or -- so I would like
7  to stick with my testimony.
8  Q.  Can you recall when you began
9  reporting to Mr. Dondero?
10 A.  I don't recall.
11 Q.  Can you -- can you give me an
12 estimate of what year you think you might have
13 began reporting to Mr. Dondero?
14 A.  I will go back to my prior
15 testimony.
16 Q.  Okay.  There is no -- you have no
17 ability to tell me when you began reporting to
18 Mr. Dondero.
19     Do I have that right?
20     MS. DANDENEAU:  Objection to form.
21 A.  I don't recall.
22 Q.  Okay.  Do you recall who you might
23 have reported to before you began reporting to
24 Mr. Dondero?
25 A.  Yes.

Page 21

WATERHOUSE - 10-19-21

1
2  Q.  Who might you have reported to in
3  your capacity as CFO before you started
4  reporting to Mr. Dondero?
5  A.  That would have been Patrick Boyce.
6  Q.  Are you aware that Highland filed
7  for bankruptcy on October 19th, 2019?
8  A.  Yes.
9  Q.  And we refer to that as the petition
10 date?
11 A.  Yes.
12 Q.  Okay.  Do you hold any professional
13 licenses, sir?
14 A.  Yes.
15 Q.  Can you tell me what professional
16 licenses you hold?
17 A.  I'm a certified public accountant.
18 Q.  Okay.  Anything else?
19 A.  No.
20 Q.  Do you have any other professional
21 licenses or certificates?
22 A.  When you say "professional license,"
23 that is not education?
24 Q.  Tell me -- sure.  Anything other
25 than a driver's license.

Page 22

WATERHOUSE - 10-19-21
1
2     Do you have any other license or
3  certificate or certification?
4     A.   Are you asking, like, where I went
5  to school and the --
6     Q.   I am not.  I am not.  I didn't say
7  education.  I didn't ask about degrees.
8        Do you know what a license is?
9     A.   Well, yeah, I mean, a license is
10  something you get after you receive a certain
11  level of proficiency.
12     Q.   Do you have any licenses or
13  certifications other than your CPA?
14        MS. DANDENEAU:  Objection, form.
15     I assume you mean professional
16  licenses, Mr. Morris; correct?
17     Q.   Can you answer my question, sir?
18     A.   Mr. Morris, I'm thinking.  I
19  don't -- I don't think I have any others.
20     Q.   Are you familiar with an entity
21  called Highland Capital Management Fund
22  Advisors?
23     A.   Yes.
24     Q.   Were you ever -- can we refer to
25  that entity as HCMFA?

Page 23

WATERHOUSE - 10-19-21
1
2     A.   Yes.
3     Q.   Were you ever employed by HCMFA?
4     A.   Not that I recall.
5     Q.   Were you ever -- did you ever hold
6  the title of an officer or director of HCMFA?
7     A.   Yes.
8     Q.   What title did you hold?
9     A.   Treasurer.
10     Q.   When did you become the treasurer of
11  HCMFA?
12     A.   I don't recall.
13     Q.   Can you tell me the year?
14     A.   I don't -- I don't know the year.
15     Q.   Can you approximate the year in
16  which you became the treasurer of HCMFA?
17     A.   I don't know.
18     Q.   Can you tell me if it was before or
19  after 2016?
20     A.   I don't recall.
21     Q.   Are you still the -- do you know if
22  you're still the treasurer of HCMFA today?
23     A.   Today, I am the acting treasurer for
24  HCMFA.
25     Q.   Is there a distinction between

Page 24

WATERHOUSE - 10-19-21
1
2  treasurer and "acting treasurer?
3     A.   I said "acting treasurer" as I am an
4  employee of Skyview, as you previously
5  stated -- or asked.
6     Q.   But you are the treasurer of HCMFA
7  today; correct?
8     A.   I am -- I am the acting treasurer
9  for HCMFA.
10     Q.   How did you become the treasurer of
11  HCMFA?
12     A.   Are you asking how I became the
13  treasurer of HCMFA today?
14     Q.   How did you become appointed to
15  serve as the treasurer of HCMFA?
16     A.   Well, in -- in -- in what time
17  capacity?
18     Q.   The first time that you were
19  appointed.
20     A.   First time.  I believe I was asked
21  to serve as treasurer for HCMFA the first time.
22     Q.   By who?  Who asked you to do that?
23     A.   I don't recall.
24     Q.   Is there anything that would refresh
25  your recollection as to who appointed you as

Page 25

WATERHOUSE - 10-19-21
1
2  the treasurer of CF- -- HCMFA for the first
3  time?
4     A.   I don't -- I mean, there would be
5  some documents, some legal documents.  I don't
6  know where those are.
7     Q.   How many times have you been
8  appointed the treasurer of HCMFA?
9     A.   I don't know.
10     Q.   Was it more than once?
11     A.   I don't know.
12     Q.   Can you tell me any period of time
13  since 2016 that you did not hold the title of
14  treasurer of HCMFA?
15        MS. DANDENEAU:  Objection to form.
16     A.   I don't recall.
17     Q.   What are your duties and
18  responsibilities as the treasurer of HCMFA?
19     A.   My duties are to do the best job
20  that I can as the -- as an accountant and
21  finance guy.
22     Q.   What specific duties and
23  responsibilities do you have as the treasurer
24  of HCMFA?
25     A.   My duties are to do the best job

Page 26

WATERHOUSE - 10-19-21

1    that I can as the accounting and finance person
2    for HCMFA.
3    Q.   As the accounting and finance person
4    for HCMFA, do you have any particular areas of
5    responsibility?
6    A.   Yeah, it is to manage the accounting
7    and finance function for HCMFA.
8    Q.   Would that include -- do you have
9    responsibility for overseeing HCMFA's annual
10   audit?
11   A.   Can I please elaborate on my prior
12   question?
13   Q.   Of course. You -- you are giving
14   answers. I'm asking questions.
15   A.   Okay. Yes, so the -- it -- like I
16   said, it is to manage the accounting finance
17   aspect, but I am, as we discussed, the
18   treasurer. That is -- being treasurer is what
19   gives me that -- that management function.
20   Q.   Does anybody report to you in your
21   capacity as treasurer of HCMFA?
22   A.   I don't believe so.
23   Q.   Does HCMFA have a chief financial
24   officer?

Page 27

WATERHOUSE - 10-19-21

1    A.   I don't -- I don't know.
2    Q.   You don't know?
3    You're the treasurer of HCMFA but
4    you don't know if HCMFA has a chief financial
5    officer.
6    Do I have that right?
7    A.   That's right.
8    Q.   Okay. Have you heard of a company
9    called NexPoint Advisors?
10   A.   Yes.
11   Q.   We will refer to that as NexPoint.
12   Okay?
13   A.   Okay.
14   Q.   Were you ever employed by NexPoint?
15   A.   I don't recall.
16   Q.   Did you ever hold any title with
17   respect to the entity known as NexPoint?
18   A.   Yes.
19   Q.   What titles have you held in
20   relation to NexPoint?
21   A.   Treasurer. I think it was only
22   treasurer.
23   Q.   Can you tell me the approximate year
24   you became the treasurer of NexPoint?

Page 28

WATERHOUSE - 10-19-21

1    A.   I don't know.
2    Q.   Are you still the treasurer of
3    NexPoint today?
4    A.   I am the acting treasurer for
5    NexPoint.
6    Q.   When did your title change from
7    treasurer to acting treasurer?
8    A.   I don't know.
9    Q.   Did your duties and responsibilities
10   change at all when your title was changed from
11   treasurer to acting treasurer?
12   A.   I don't -- I don't believe so.
13   Q.   Why did --
14   A.   I still manage the finance and
15   accounting function for NexPoint.
16   Q.   Why did your title change from
17   treasurer to acting treasurer?
18   A.   I don't -- I'm using the term
19   "acting treasurer" as I'm a Skyview employee.
20   I don't -- I don't know -- again, I am a -- as
21   I am the Skyview employee.
22   Q.   Okay.
23   A.   And we -- we provide officer
24   services.

Page 29

WATERHOUSE - 10-19-21

1    Q.   And you serve as an officer of
2    HCMFA; correct?
3    A.   I think we went over that with my
4    testimony. Yes, I'm the acting treasurer for
5    HCMFA.
6    Q.   And you are an officer of NexPoint;
7    correct?
8    A.   I think -- I am the acting treasurer
9    for NexPoint Advisors.
10   Q.   And -- and who appointed you acting
11   treasurer of NexPoint Advisors?
12   A.   I don't recall specifically.
13   Q.   Do you have any recollection of who
14   might have appointed you the treasurer of
15   NexPoint?
16   A.   I mean, it -- it -- I don't recall
17   exactly who it was.
18   Q.   Who were the possibilities?
19   MS. DEITSCH-PEREZ: Object to the
20   form.
21   Q.   You can answer.
22   A.   Someone in the legal group for
23   NexPoint. The other officers as well.
24   Q.   Have you heard of a company called

Page 30

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2 Highland Capital Management Services, Inc.?
3    A.   Yes.
4    Q.   We will refer to that as HCMS.
5 Okay?
6    A.   HCMS. Okay.
7    Q.   Were you ever employed by HCMS?
8    A.   No.
9    Q.   Have you ever held any titles in
10 relation to HCMF -- I apologize -- HCMS?
11    A.   Yes.
12    Q.   What titles have you held in
13 relation to HCMS?
14    A.   Treasurer and acting treasurer.
15    Q.   When did you first become treasurer
16 or acting treasurer of HCMS?
17    A.   I don't recall the exact dates.
18    Q.   Can you recall -- can you
19 approximate the year that you became the
20 treasurer of HCMS?
21    A.   I don't -- I don't know.
22    Q.   Are you still the treasurer of HCMS
23 today?
24    A.   I am the acting treasurer for HCMS.
25    Q.   And are your duties and

Page 31

1       WATERHOUSE - 10-19-21
2 responsibilities as the acting treasurer for
3 HCMS and the acting treasurer for NexPoint the
4 same as your duties and responsibilities in
5 your role as the acting treasurer of HCMFA?
6    A.   More or less.
7    Q.   Have you ever heard of a company
8 called HCRE Partners, LLC?
9    A.   Yes.
10    Q.   And do you understand that that
11 entity is now known today as NexPoint Real
12 Estate Partners?
13    A.   I did not know that.
14    Q.   All right. Can we refer to HCRE
15 Partners as HCRE?
16      MS. DANDENEAU: Objection to form.
17      Did you mean NexPoint Real Estate
18 Partners, Mr. Morris?
19      MR. MORRIS: No.
20      MS. DANDENEAU: Oh.
21      MR. MORRIS: He said he wasn't
22 familiar that it was succeeded by that
23 entity. So --
24      MS. DANDENEAU: Okay.
25      MR. MORRIS: -- let's go with what

Page 32

1       WATERHOUSE - 10-19-21
2 the witness knows.
3    Q.   You're familiar with an entity
4 called HCRE Partners, LLC; correct?
5    A.   Yes.
6    Q.   Okay. So that is the entity that we
7 will refer to as HCRE. If you're aware of any
8 successor, that is great. If not, let's just
9 define it as such.
10      Have you ever been employed by HCRE
11 or any entity that you know to have succeeded
12 HCRE?
13    A.   No.
14    Q.   Did you ever serve as an officer or
15 director of HCRE or any successor?
16    A.   Not that I recall.
17    Q.   Okay. Can we refer to NexPoint and
18 HCMFA as the advisors?
19    A.   Yes.
20    Q.   In general, the advisors provided
21 investment advisory services to certain retail
22 funds; correct?
23    A.   Yes.
24    Q.   And we will refer to the retail
25 funds that are served by the advisors

Page 33

1       WATERHOUSE - 10-19-21
2 collectively as the retail funds; is that okay?
3    A.   Okay.
4    Q.   Each of the retail funds is governed
5 by a board; correct?
6    A.   Yes.
7    Q.   And do you know the people who serve
8 on the boards of the retail funds?
9      MS. DANDENEAU: Objection to form.
10    A.   I don't know all of them.
11    Q.   Do you know whether the same people
12 serve on the board of each of the retail funds
13 as we've defined that term?
14    A.   Which -- so when you say "retail
15 funds" -- again, I want to be -- what retail
16 funds are you referring to, because there are
17 -- there are several distinctions?
18      What retail funds are you using when
19 you refer to them?
20    Q.   That is why -- that is why I tried
21 to define the terms. So let me do it again.
22      Retail funds for the purposes of
23 this deposition means any retail fund to which
24 either of the advisors provides advisory
25 services. Okay?

Page 34

1      WATERHOUSE - 10-19-21
2    A.   Okay.
3    Q.   Okay.  So do you know whether the
4  same people serve on the board of each of the
5  retail funds?
6    A.   I don't know.
7    Q.   Were you ever employed by any of the
8  retail funds?
9    A.   No.
10   Q.   No?
11   A.   No.
12   Q.   Okay.  Do you have any title with
13  respect to any of the retail funds?
14   A.   Yes.
15   Q.   What titles do you hold --
16  withdrawn.
17      Do you have the same titles with
18  respect to all of the retail funds or do
19  they -- or just something else?
20      MS. DANDENEAU:  Objection to form.
21   Q.   Withdrawn.
22      Do you have the same title with
23  respect to each of the retail funds?
24   A.   No.
25   Q.   Tell me which title you have with

Page 35

1      WATERHOUSE - 10-19-21
2  respect to each retail fund.
3      Actually, let's do it a different
4  way.  I withdraw the question.
5      Can you give me one title you have
6  in relation to any retail fund?
7    A.   Yes.
8    Q.   What title -- what title can you
9  give me?
10   A.   Principal executive officer.
11   Q.   Do you serve as principal executive
12  officer for each of the retail funds?
13   A.   No.
14   Q.   Can you identify for me the retail
15  funds in which you serve as the principal
16  executive officer?
17   A.   Yes.  Highland Funds 1, Highland
18  Funds 2, Highland Income Fund, Highland Global
19  Allocation Fund.
20   Q.   I'm sorry, you said "Global
21  Allocation Fund"?
22   A.   Yes.
23      VIDEOGRAPHER:  Excuse me,
24  Mr. Morris.  This is the videographer.  I'm
25  concerned about the lighting in the

Page 36

1      WATERHOUSE - 10-19-21
2  witness' camera.
3      Do you want to go off the record and
4  make some adjustments?
5      MR. MORRIS:  Sure, but just for this
6  purpose.  I don't want to take a break.  We
7  just started.
8      MS. DANDENEAU:  Yeah, that is fine.
9  That is fine.  We're going to put you on
10  mute.
11      MR. MORRIS:  All right.
12      MS. DANDENEAU:  I'm going to try to
13  open up some of the shades.
14      VIDEOGRAPHER:  We're going off the
15  record at 10:08 a.m.
16   (Recess taken 10:08 a.m. to 10:11 a.m.)
17      VIDEOGRAPHER:  We are back on the
18  record at 10:11 a.m.
19   Q.   Mr. Waterhouse, when did you become
20  the principal executive officer of the four
21  retail funds that you just identified?
22   A.   I don't recall.
23   Q.   Do you recall the approximate year
24  that you became the principal executive officer
25  of the four funds?

Page 37

1      WATERHOUSE - 10-19-21
2    A.   2021.
3    Q.   Did you ever hold any title with
4  respect to any of the four funds you have just
5  identified other than principal executive
6  officer?
7    A.   I don't recall.
8    Q.   Is it possible that you held a
9  position or a title with the four funds you
10  just identified prior to 2021?
11   A.   Yes.
12   Q.   But you don't recall if you did or
13  not; do I have that right?
14   A.   No.  You -- I thought you asked, did
15  I hold other titles.
16   Q.   Did you hold any title at the four
17  retail funds for which you now serve as
18  principal executive officer at any time prior
19  to 2021?
20   A.   Yes.
21   Q.   What titles did you hold?
22   A.   I don't recall all the titles.
23   Q.   Do you recall any of the titles?
24   A.   Yes.
25   Q.   What titles do you recall holding at

Page 38

WATERHOUSE - 10-19-21

1 those four retail funds before 2021?

2    A.   Principal executive officer.

3    Q.   Were you the principal executive

4 officer of the four retail funds that you have

5 identified?

6    A.   Sorry, could you repeat the

7 question?

8    Q.   Were you the principal executive

9 officer for each of the four retail funds that

10 you have identified?

11    A.   Yes.

12    Q.   When did you become the principal

13 executive -- withdrawn.

14      Can you give me the approximate year

15 that you became the principal executive officer

16 for each of the four retail funds you've

17 identified?

18    A.   I don't recall.

19    Q.   What are your duties and

20 responsibilities as the principal executive

21 officer of these four retail funds?

22    A.   It is to manage the finance and

23 accounting positions.

24    Q.   So at the same time you serve as the

Page 39

WATERHOUSE - 10-19-21

1 treasurer of the advisors, you also serve as

2 the principal executive officer of these four

3 retail funds; correct?

4    A.   Yes.

5    Q.   Did you ever hold any title with

6 respect to any other retail fund?

7    A.   Not that I recall.

8    Q.   During the period that you served as

9 Highland's CFO, from time to time Highland

10 loaned money to certain of its officers and

11 employees; correct?

12    A.   Yes.

13    Q.   During the period that you served as

14 Highland's CFO, from time to time Highland

15 loaned money to certain --

16    A.   Let me -- let me retract that,

17 sorry, that -- you asked during the time I was

18 CFO, Highland loaned moneys to employees. I

19 don't -- I don't recall that during my tenure

20 of CFO.

21    Q.   You have no recollection during the

22 time that you were the CFO of Highland of

23 Highland ever loaning any money to any officer

24 or director of Highland?

Page 40

WATERHOUSE - 10-19-21

1    A.   I don't recall during my tenure of

2 Highland or my -- as CFO of Highland -- yeah,

3 if there are any loans as CFO of Highland.

4    Q.   I'm just talking about officers and

5 employees right now. You have no recollection

6 of Highland ever making a loan to any of its

7 officers or employees during the time that you

8 served as CFO. Do I have that right?

9    MS. DANDENEAU: Objection to form.

10    A.   So I thought you were saying

11 officers and employees as CFO, right, so there

12 were -- I mean, okay, yes.

13    Q.   I would ask you to listen carefully

14 to my question. If I -- if I'm not clear, let

15 me know, but I'm really trying to be as clear

16 as I can.

17    A.   I'm listening as carefully as I can,

18 and you are asking very specific questions in a

19 timeline. And I'm trying to answer your

20 questions as specifically as I can, and I

21 apologize if -- if I'm going back. I am -- you

22 are asking very specific questions. Thank you.

23    Q.   During the period that you served as

24 Highland's CFO, from time to time Highland

Page 41

WATERHOUSE - 10-19-21

1 loaned money to certain corporate affiliates;

2 correct?

3    MS. DANDENEAU: Objection to form.

4    A.   What are corporate affiliates?

5    Q.   How about the ones that are in

6 Highland's audited financial statements under

7 the section entitled Loans to Affiliates. Why

8 don't we start with those. Do you have any

9 understanding of what the phrase "affiliates"

10 means?

11    MS. DANDENEAU: Objection to form.

12    A.   I understand what affiliates are,

13 yet affiliates can have different meanings in

14 different contexts, so...

15    Q.   Why don't you -- why don't you tell

16 me what your understanding of the term

17 "affiliate" is in relation to Highland Capital

18 Management, L.P.

19    A.   Is that a -- it depends on the

20 context.

21    Q.   How about the context of making

22 loans?

23    MS. DANDENEAU: Objection to form.

24    A.   I didn't make the determination of

Page 42

1    WATERHOUSE - 10-19-21
2  who an affiliate was or is at the time those --
3  I didn't -- that wasn't my job to make a
4  determination of who an affiliate is.
5    Q.   All right.  So as the CFO of
6  Highland, do you have any ability right now to
7  tell me which companies that were directly or
8  indirectly owned and/or controlled by
9  Mr. Dondero in whole or in part received loans
10  from Highland Capital Management, L.P.?
11    MS. DANDENEAU:  Objection to form.
12    MS. DEITSCH-PEREZ:  Objection, form.
13    A.   Yes.
14    Q.   Okay.  Identify every entity that
15  you can think of that was directly or
16  indirectly owned and/or controlled by
17  Mr. Dondero in whole or in part that received a
18  loan from Highland Capital Management, L.P.
19    MR. RUKAVINA:  Objection, legal
20    conclusion.
21    A.   NexPoint Advisors, Highland Capital
22  Management Fund Advisors, HCM Services,
23  Dugaboy.  Sorry, I don't think -- Dugaboy
24  doesn't fit that definition.  You said owned
25  and controlled.  I don't think that that

Page 43

1    WATERHOUSE - 10-19-21
2  definition --
3    Q.   I said owned and/or controlled.
4    A.   I don't -- again, I'm not -- I'm not
5  the legal expert.  I don't think it controls --
6  he controls Dugaboy, so again, I'm not the
7  legal person.
8    Q.   I'm not asking you for a legal
9  conclusion, sir.  I'm asking you for your
10  knowledge, okay, as the CFO -- the former CFO
11  of Highland Capital Management, other than
12  NexPoint, HCMFA, and HCMF -- HCMS, can you
13  think of any other entities that were owned
14  and/or controlled directly or indirectly in
15  whole or in part by Jim Dondero who received a
16  loan from Highland Capital Management, L.P.?
17    MS. DANDENEAU:  Objection to form.
18    A.   HCRE.
19    Q.   Any others?
20    A.   That is -- that is all I can think
21  of.
22    Q.   And you're aware that from time to
23  time while you were the CFO, Highland loaned
24  money to Jim Dondero; correct?
25    A.   Yes.

Page 44

1    WATERHOUSE - 10-19-21
2    Q.   Okay.  Can we refer to the four
3  entities that you just named and Mr. Dondero as
4  the affiliates?
5    A.   So that would be Jim Dondero,
6  NexPoint Advisors, Highland Capital Management
7  Fund Advisors, and HCRE.
8    Q.   And HCMS?
9    A.   And HCMS, okay.
10    Q.   And can we refer to the loans that
11  were given to each of those affiliates as the
12  affiliate loans?
13    A.   Yes.
14    Q.   And is it fair to say that each of
15  the affiliates were the borrowers under the
16  affiliate loans as we're defining the term?
17    MR. RUKAVINA:  Objection, legal
18    conclusion.
19    A.   The borrowers are whoever were on
20  the notes.  I don't -- I don't know.  I'm not
21  the legal person.
22    Q.   But you --
23    A.   I don't know.
24    Q.   You do know, as Highland's former
25  CFO, that each of the affiliates that you have

Page 45

1    WATERHOUSE - 10-19-21
2  identified tendered notes to Highland; correct?
3    MR. RUKAVINA:  Hey, John, will you
4    just give me a running objection to legal
5    conclusion to HCM --
6    MR. MORRIS:  No.  No, if you want to
7    object --
8    MR. RUKAVINA:  I will object every
9    time.  Object to legal conclusion.
10    MR. MORRIS:  That is fine.
11    A.   Sorry, can you repeat the question?
12    Q.   Are you aware that each of the --
13  that each of the affiliates, as we have defined
14  the term, gave to Highland a promissory note in
15  exchange for the loans?
16    MR. RUKAVINA:  Objection to the
17    extent that calls for a legal conclusion.
18    A.   I don't.
19    Q.   No, you don't know that?
20    A.   No, they didn't -- you said they
21  exchanged a promissory note for a loan.  I
22  don't -- I don't understand that question, so I
23  said no.
24    Q.   At the time of the bankruptcy
25  filing, did Highland have in its possession

WATERHOUSE - 10-19-21
2 promissory notes that were signed by each of
3 the affiliates?
4    A.   Yes.
5    Q.   To the best of your knowledge,
6 during the time that you served as Highland's
7 CFO, did Highland disclose to its outside
8 auditors all of the loans that were made to
9 affiliates?
10    MR. RUKAVINA:  Objection, that calls
11 for a legal conclusion.
12    MS. DEITSCH-PEREZ:  I also couldn't
13 hear you, John, because there was some
14 garbling on -- on the -- on the call.
15    MR. MORRIS:  Folks, I've got to tell
16 you this is not going well, and I'm
17 reserving my right --
18    MS. DANDENEAU:  John, it was just
19 the end of that question.  It was just the
20 end of that question.  I couldn't hear it
21 either.  Sorry, if you could repeat it,
22 please.
23    MR. MORRIS:  That is less than an
24 hour into this, but folks are trying to run
25 out the clock, and so I'm just going to

WATERHOUSE - 10-19-21
2 state that now.
3    MS. DANDENEAU:  You know, and,
4 Mr. Morris, I really object to that.  I
5 mean --
6    MR. MORRIS:  Okay.
7    MS. DANDENEAU:  -- Mr. Waterhouse
8 just told you he's trying to listen to your
9 questions and answer them carefully, and
10 you have no basis for saying that.
11    MR. MORRIS:  Okay.
12    MS. DANDENEAU:  This does not --
13 this is not an experienced witness, so he's
14 trying to do the best he can.
15    Q.   Mr. Waterhouse, during the time that
16 you served as Highland's CFO, did Highland
17 disclose to its outside auditors all of the
18 loans that it made to each of the affiliates
19 that you have identified?
20    MR. RUKAVINA:  Objection, legal
21 conclusion.
22    A.   Yes.
23    Q.   To the best of your knowledge, while
24 you were Highland's CFO, were all of the
25 affiliate loans described in Highland's audited

WATERHOUSE - 10-19-21
2 financial statements?
3    MR. RUKAVINA:  Objection, legal
4 conclusion.
5    A.   When an audit was performed, any
6 loans that were made by Highland to the
7 affiliates were disclosed to auditors.
8    Q.   Are you aware of any loan that was
9 made to any affiliate that was not disclosed to
10 the auditors?
11    A.   I'm not aware.
12    Q.   To the best of your knowledge, did
13 each of the affiliates who were --
14 (inaudible) -- loaned from Highland execute a
15 promissory note in connection with that loan?
16    MR. RUKAVINA:  Objection, legal
17 conclusion.
18    A.   Sorry, you -- halfway through the
19 question it got muffled.
20    Can you repeat that again?
21    Q.   To the best of your knowledge, did
22 every affiliate execute a promissory note in
23 connection with each loan that it obtained from
24 Highland?
25    MR. RUKAVINA:  Objection, legal

WATERHOUSE - 10-19-21
2 conclusion.
3    A.   Yes.
4    Q.   You are not aware of any loan that
5 any affiliate ever obtained from Highland where
6 the affiliate did not give a promissory note in
7 return; is that fair?
8    A.   Yes, I'm not aware.
9    Q.   And to the best of your knowledge,
10 did Highland loan to each affiliate an amount
11 of money equal to the principal amount of each
12 promissory note?
13    MR. RUKAVINA:  Objection, legal
14 conclusion.
15    A.   Yes.
16    Q.   During the time that you served as
17 CFO, did Highland ever loan money to
18 Mark Okada?
19    A.   I -- I don't recall.
20    Q.   Did you ever see any promissory
21 notes executed by Mark Okada?
22    A.   I don't recall.
23    Q.   Do you know if Highland ever forgave
24 any loan that it ever made to Mr. Okada?
25    A.   I don't recall.

Page 50

1 WATERHOUSE - 10-19-21

2 Q. Do you recall if Mr. Okada paid back

3 all principal and interest due and owing under

4 any loan he obtained from Highland?

5  MS. DEITSCH-PEREZ: Objection to

6 form.

7  MS. DANDENEAU: Objection to form.

8 A. I don't recall.

9 Q. Do you recall whether -- during your

10 time as CFO, whether Highland ever loaned money

11 to Jim Dondero?

12 A. Yes.

13 Q. To the best of your knowledge, did

14 Mr. Dondero sign and deliver to Highland a

15 promissory note in connection with each loan

16 that he obtained from Highland?

17 A. If you are referring to the

18 promissory notes that, you know, part of

19 Highland's records, yes.

20 Q. Okay. You're not aware of any loan

21 that Mr. Dondero took from Highland that wasn't

22 backed up by -- by a promissory note with a

23 face -- with a principal amount equal to the

24 amount of the loan; correct?

25 A. Am I aware that Jim Dondero took a

Page 51

1 WATERHOUSE - 10-19-21

2 loan?

3 Q. Without giving a -- let me ask a

4 better question. I'm sorry, Mr. Waterhouse.

5  Are you aware of any loan that

6 Mr. Dondero obtained from Highland where he

7 didn't give a promissory note in return?

8 A. I'm not aware.

9 Q. During the time that you served as

10 Highland's CFO, did Highland ever forgive any

11 loans, in whole or in part, that it made to

12 Mr. Dondero?

13 A. Not that I'm aware.

14 Q. At the time that you served as

15 Highland's CFO, did Highland ever forgive any

16 loan, in whole or in part, that it made to any

17 affiliate as we've defined the term today?

18 A. Not that I'm aware.

19 Q. During the time that you served as

20 Highland's CFO, did Highland ever forgive, in

21 whole or in part, any loan that it ever made to

22 any officer or employee?

23 A. Highland forgave loans to officers

24 and employees. It may not have been at the

25 time when my title was CFO.

Page 52

1 WATERHOUSE - 10-19-21

2 Q. Okay. And so I appreciate the

3 distinction.

4  Is it fair to say that, to the best

5 of your knowledge, Highland did not forgive a

6 loan that it made to an officer or employee

7 after 2013?

8  MS. DANDENEAU: Objection to form.

9 A. I don't recall.

10 Q. To the best of your knowledge, did

11 Highland disclose to its auditors every

12 instance where it forgave, in whole or in part,

13 a loan that it had made to one of its officers

14 or employees?

15 A. No.

16 Q. Can you think of -- can you -- can

17 you identify any loan to an officer or employee

18 that was forgiven by Highland, in whole or in

19 part, that was not disclosed to Highland's

20 outside auditors?

21 A. Look, I don't recall all of the

22 loans and the loan forgiveness. I just know as

23 part of the audit process there is a

24 materiality concept.

25  So if there were loans to employees

Page 53

1 WATERHOUSE - 10-19-21

2 that were of -- you know, that were deemed

3 immaterial, those items may not have been

4 disclosed by the team to the auditors.

5 Q. I appreciate that.

6  Do you have an understanding as to

7 what the level of materiality was?

8 A. I don't recall.

9 Q. As the CFO of Highland, to the best

10 of your knowledge, did Highland disclose to its

11 outside auditors every loan that was forgiven,

12 in whole or in part, that was material as that

13 term was defined by the outside auditors?

14 A. Yes.

15 Q. And do you recall where -- do you

16 recall where the definition of materiality can

17 be found for -- for this particular purpose?

18  MS. DANDENEAU: Objection to form.

19 A. No. You -- I don't determine

20 materiality.

21 Q. Okay. I'm just asking you if you

22 can help me understand where it is, but I think

23 we will find it in a few minutes.

24  You are aware that Highland has

25 commenced lawsuits against each of the

Page 54

WATERHOUSE - 10-19-21

1  affiliates, as we've defined the term, to
2  affiliates, as we've defined the term, to
3  collect under certain promissory notes; is that
4  right?
5  A. Yes.
6  Q. And are you familiar with the notes
7  that are issue -- at issue in the lawsuits?
8  MS. DANDENEAU: Objection to form.
9  A. Generally familiar.
10  Q. Can we refer to the lawsuits that
11  Highland has commenced against the affiliates
12  collectively as the lawsuits?
13  A. Yes. And, again, the affiliates are
14  NexPoint, HCMFA, HCMS, and HCRE.
15  Q. And Mr. Dondero?
16  A. Okay. See, that is a new -- and now
17  Mr. Dondero is included in your affiliate
18  definition.
19  Q. I just --
20  A. I thought affiliates -- I thought
21  affiliates were just the four prior entities,
22  so I just want to be clear.
23  Q. I appreciate that. So let's --
24  let's keep them separate and let's refer to the
25  four corporate entities as the affiliates, and

Page 55

WATERHOUSE - 10-19-21

1  Mr. Dondero we will call Mr. Dondero. Okay?
2  A. Okay. Thank you. As you can see,
3  Mr. Morris, there is a lot of entities -- a lot
4  here. I just want to be clear.
5  Q. Okay. Now, the affiliates of
6  Mr. Dondero signed promissory notes that are
7  not subject to the lawsuit.
8  Do you understand that?
9  MS. DANDENEAU: Objection to form.
10  A. The affiliates and Mr. Dondero
11  signed --
12  Q. You know what? I will skip it.
13  That is okay. Okay.
14  From time to time while you were
15  Highland's CFO, payments were applied against
16  principal and interests that were due under the
17  notes that were tendered by the affiliates and
18  Mr. Dondero; correct?
19  MR. RUKAVINA: Objection to the
20  extent that calls for a legal conclusion.
21  A. Yes.
22  Q. Did Highland have a process where --
23  whereby payments would be applied against
24  principal and interest against the notes that

Page 56

WATERHOUSE - 10-19-21

1  were given by the affiliates and Mr. Dondero?
2  A. Yes.
3  Q. Can you describe the process for me?
4  A. The process, payment should be
5  applied as laid out in the -- in the promissory
6  note.
7  Q. From time to time were payments made
8  that were not required under the promissory
9  notes?
10  MS. DANDENEAU: Objection to form.
11  A. Yes.
12  Q. Who was responsible for deciding
13  when and how much the payments would be made
14  with respect to each of the notes that were
15  issued by the affiliates and Mr. Dondero?
16  A. Who was responsible for deciding how
17  much was paid prior to the due date?
18  Q. Yes.
19  A. I don't know.
20  Q. Did you approve of each payment that
21  was made against principal and interest on the
22  notes that were given by the affiliates and
23  Mr. Dondero?
24  MS. DANDENEAU: Objection to form.

Page 57

WATERHOUSE - 10-19-21

1  A. Did I approve the payments? I
2  approve -- I approve -- if there was cash -- if
3  there was cash being repaid on a note payment,
4  yes, I approved in the general sense of being
5  made aware of the payment and the amount.
6  Q. And are you the person who
7  authorized Highland's employees to effectuate
8  those payments?
9  A. Yes.
10  Q. When you gave the instruction to
11  effectuate the payment, did you obtain
12  Mr. Dondero's prior approval?
13  A. I mean, it -- I mean, it -- it
14  depends.
15  Q. Can you think of any instance where
16  you directed Highland's employees to make a
17  payment of principal or interest against any
18  note that was tendered by an affiliate or
19  Mr. Dondero that Mr. Dondero did not approve of
20  in advance?
21  A. I can't recall specifically.
22  Q. Can you identify -- withdrawn.
23  Did Mr. Dondero ever tell you that a
24  payment that was made against principal and

Page 58

1          WATERHOUSE - 10-19-21
2  interest due under one of the notes that was
3  tendered by an affiliate or himself should not
4  have been made?
5     A.  Yes.
6     Q.  Can you identify the payment for me?
7     A.  It would be for -- for NexPoint
8  Advisors.
9     Q.  Okay.  And when did Mr. Dondero tell
10 you that a payment that you had initiated on
11 behalf of NexPoint should not have been made?
12    A.  I wasn't initiating payment.  It was
13 in the context of the -- I think you used this
14 term, "the advisors," so NexPoint Advisors and
15 Highland Capital Management Fund Advisors had
16 overpaid on certain agreements with Highland
17 Capital Management, L.P. and as a part of that
18 process, the advisors -- what I was told at the
19 time were in talks and negotiations and
20 discussions with Highland Capital Management,
21 L.P., on offsets in relation to those
22 overpayments.
23    Q.  When did this conversation take
24 place?
25        MS. DANDENEAU:  Objection to form.

Page 59

1          WATERHOUSE - 10-19-21
2     A.  I don't recall specifically.
3     Q.  Do you recall what year it was?
4     A.  Yes.
5     Q.  What year did the conversation with
6  Mr. Dondero take place that you just described?
7     A.  2020.
8     Q.  Okay.  Do you remember if it was
9  December 2020?
10    A.  It -- it -- I don't -- I don't
11 recall what month specifically, but it would
12 have been November or December.
13    Q.  And we're talking here about a
14 payment of principal and/or interest that was
15 due -- withdrawn.
16        We're talking here about a payment
17 of principal and interest that was applied
18 against NexPoint's note; correct?
19        MS. DANDENEAU:  Objection to form.
20    A.  I don't recall what that payment
21 consisted of.
22    Q.  Is it possible that the payment you
23 have in mind related to the shared services
24 agreement?
25        MS. DANDENEAU:  Objection to form.

Page 60

1          WATERHOUSE - 10-19-21
2     A.  No.
3     Q.  Are you certain that the payment --
4  that the payment that you have in mind related
5  to the promissory note that NexPoint issued in
6  favor of Highland?
7         MS. DANDENEAU:  Objection to form.
8     A.  Yes.
9     Q.  Okay.  Other than that one payment,
10 can you identify any other instance where
11 Mr. Dondero told you that a payment should not
12 have been applied against principal and
13 interest under any promissory note tendered by
14 any affiliate or Mr. Dondero?
15        MS. DANDENEAU:  Objection to form.
16        MS. DEITSCH-PEREZ:  Objection to
17 form.
18    A.  Not that I recall.
19    Q.  Thank you very much.
20        Do you know if Mr. Dondero approved
21 in advance of each loan made to each affiliate
22 and himself during the time that you were the
23 CFO?
24        MS. DEITSCH-PEREZ:  Object to the
25 form.

Page 61

1          WATERHOUSE - 10-19-21
2     A.  Yes, generally.
3     Q.  Can you identify any loan that was
4  ever made to an affiliate or to Mr. Dondero
5  that Mr. Dondero did not approve of in advance?
6     A.  Other than the ones that are in
7  dispute, I'm not aware.
8     Q.  Do you believe that Mr. Dondero did
9  not approve of each of the loans that are in
10 dispute in advance of the time that the loan
11 was made?
12        MS. DANDENEAU:  Objection to form.
13    A.  Given what is in the dispute, you
14 know, and -- and -- and the way things might --
15 yeah, I mean...
16    Q.  I am not asking about the dispute,
17 and it was probably my mistake to follow you
18 there.
19        Were you aware of every loan made by
20 Highland to each of its affiliates and
21 Mr. Dondero while you were the CFO at the time
22 each loan was made?
23    A.  Was I aware of every loan, yes.
24    Q.  Okay.  And if you put yourself back
25 in time, do you recall that any of the loans

Page 62

WATERHOUSE - 10-19-21
1
2 that were made to one of the affiliates or
3 Mr. Dondero during the time that you were the
4 CFO was made without Mr. Dondero's prior
5 knowledge and approval?
6    A.   Not that I recall.
7    Q.   Thank you.  In fact, do you -- as
8 the CFO, would you have allowed Highland to
9 loan money to an affiliate or to Mr. Dondero
10 without obtaining Mr. Dondero's prior approval?
11       MS. DANDENEAU:  Objection to form.
12    A.   I can't -- there was so many times
13 over the years, I can't speak for every single
14 one, but generally, yes, I -- I spoke to him.
15    Q.   You -- you never -- you never --
16 withdrawn.  I will just take that.
17       Can you recall any payment that was
18 ever made against principal and interest on a
19 note that was issued in favor of Highland by an
20 affiliate or Mr. Dondero that you personally
21 did not know about in advance?
22    A.   There are so many through the years,
23 I don't -- I don't -- I don't recall every
24 single one.
25    Q.   Okay.  Can you identify any payment

Page 63

WATERHOUSE - 10-19-21
1
2 that was made against principal and interest on
3 any note tendered by any affiliate or
4 Mr. Dondero that you didn't know about in
5 advance?
6    A.   I don't recall.
7    Q.   Other than Mr. Dondero -- withdrawn.
8       Did anybody at Highland have the
9 authority to make a payment against principal
10 and interest due under a loan given to the
11 affiliates and Mr. Dondero without your
12 knowledge and approval?
13       MS. DANDENEAU:  Objection to form.
14    A.   Sorry, there was -- to make a
15 payment on an affiliate loan, what you are
16 saying would it require my knowledge and
17 approval, yes.
18    Q.   Okay.  I appreciate that.  Thank
19 you.
20       Did anybody at Highland have the
21 authority, to the best of your knowledge, to
22 effectuate a loan to an affiliate without
23 Mr. Dondero's prior knowledge and approval?
24       MS. DANDENEAU:  Objection to form.
25    A.   I can't speak for all, but

Page 64

WATERHOUSE - 10-19-21
1
2 generally, yes.
3    Q.   Did you personally communicate with
4 Mr. Dondero to let him know each time a payment
5 of principal or interest was being made against
6 any note that was tendered by an affiliate or
7 Mr. Dondero to Highland?
8    A.   I don't -- are you saying, did I let
9 Mr. Dondero know if a payment was made on any
10 affiliate or loan to Mr. Dondero?  I mean,
11 not -- not every -- no.
12    Q.   Let me ask it this way:  Did you
13 have a practice of informing Mr. Dondero when
14 payments were made against principal and
15 interest on any note that was tendered by an
16 affiliate or Mr. Dondero?
17       MS. DEITSCH-PEREZ:  Objection to
18 form.
19       MS. DANDENEAU:  Objection to form.
20    A.   No, I did not.
21    Q.   Did Mr. Dondero ever tell you that a
22 payment of principal or interest had been made
23 against a note that was tendered by an
24 affiliate or himself that he had been unaware
25 of?

Page 65

WATERHOUSE - 10-19-21
1
2    A.   Not that I recall.
3    Q.   Are you aware that Mr. Dondero and
4 the affiliates -- withdrawn.
5       Are you aware that Mr. Dondero
6 NexPoint, HCRE, and HCMS all contend that they
7 do not have to pay on any of the notes they
8 issued because they are subject to an oral
9 agreement between Mr. Dondero and Nancy
10 Dondero, in her capacity as the trustee of the
11 Dugaboy Investment Trust?
12       MS. DANDENEAU:  Objection to form.
13    A.   I didn't -- I didn't -- I didn't
14 know that it was all notes.
15    Q.   Okay.  Are you -- did you ever learn
16 that there was an oral agreement between Jim
17 Dondero and Nancy Dondero pertaining to any
18 notes issued by any affiliate or Mr. Dondero?
19       MS. DEITSCH-PEREZ:  Object to the
20 form.
21    A.   Yes.
22    Q.   Do you have any understanding as to
23 the terms of that agreement?
24    A.   Yes.
25    Q.   What is your understanding of the

Page 66

1      WATERHOUSE - 10-19-21
2  terms of the agreement?
3      A.   That there were certain milestones
4  that had to be reached.
5      Q.   Do you have any understanding of the
6  terms of the agreement between Mr. Dondero and
7  Nancy Dondero concerning any of the notes
8  issued by the affiliates or Mr. Dondero other
9  than that there have to be milestones reached?
10     MS. DEITSCH-PEREZ:  Object to the
11     form.
12     A.   There are milestones, I found out
13  yesterday, or there was some --
14     MS. DANDENEAU:  Okay.  I'm just
15     going to object to the extent that you
16     learned anything in conversations with
17     counsel, please don't reveal -- that is
18     privileged, and don't reveal any privileged
19     communications.
20     THE WITNESS:  Okay.
21     A.   So I'm not aware of anything else.
22     Q.   Do you know what the milestones
23  were?
24     MS. DANDENEAU:  Objection to form.
25     A.   I don't.

Page 67

1      WATERHOUSE - 10-19-21
2      Q.   Do you know anything about -- do you
3  know what promissory notes the agreement
4  covered?
5      A.   I don't.
6      Q.   Do you know if -- if Jim and Nancy
7  Dondero entered into one agreement or more than
8  one agreement?
9      MS. DEITSCH-PEREZ:  Object to the
10     form.
11     A.   I don't know.
12     Q.   Do you know if the agreement is in
13  writing?
14     A.   I don't know.
15     Q.   How did you learn of the existence
16  of the agreement?
17     MS. DANDENEAU:  Objection to form.
18     Again --
19     A.   I don't -- I don't recall who told
20  me.
21     Q.   You have no recollection of who told
22  you about this agreement between Jim and Nancy
23  Dondero?
24     MS. DEITSCH-PEREZ:  Object to the
25     form.

Page 68

1      WATERHOUSE - 10-19-21
2      A.   I don't recall.
3      Q.   Do you recall how you learned of the
4  agreement?
5          Was it in a meeting?  Was it in a
6  phone call?  Was it in an email?
7      A.   I don't recall.
8      Q.   Do you recall when you learned of
9  the agreement?
10     A.   Not specifically.
11     Q.   Do you recall what year you learned
12  of the agreement?
13     A.   In -- look, I mean, there are so
14  many notes.  I may be getting -- I believe it
15  was 2020.
16     Q.   All right.  I'm not asking about
17  notes, sir.  I'm asking about the agreement
18  that you testified you knew about between Jim
19  and Don- -- Nancy Dondero.  Okay.
20         Do you understand my question now?
21  Should I ask my question again?
22     A.   Yeah, sure.  Go ahead.
23     Q.   I'm going to use the word
24  "agreement" to refer to the agreement that
25  Mr. Dondero and Nancy Dondero entered into

Page 69

1      WATERHOUSE - 10-19-21
2  where you understood that certain milestones
3  had to be reached.  Okay?
4      A.   Uh-huh.
5      MS. DANDENEAU:  Objection.
6      MS. DEITSCH-PEREZ:  Object to the
7      form.
8      MR. MORRIS:  Just defining a term,
9      what is the objection.
10     MS. DEITSCH-PEREZ:  The objection --
11     MR. MORRIS:  I will move on.  I will
12     move on.
13     MS. DEITSCH-PEREZ:  John --
14     Q.   Sir, are you okay with that
15  definition of agreement?
16     A.   Okay.
17     Q.   Okay.  So you don't recall who --
18  who informed you of the existence of the
19  agreement; is that right?
20     A.   I don't recall.
21     Q.   You don't recall who told you the
22  terms of the agreement.
23         Do I have that right?
24     A.   Correct.
25     Q.   And you don't recall if you learned

Page 70

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    about the agreement in a meeting, through an
3    email, or through a phone call.
4        Do I have that right?
5    A.    I don't recall.
6    Q.    Can you tell me when you learned of
7    the agreement?
8    A.    I don't -- I don't -- I don't
9    remember specifically.
10   Q.    Can you tell me if you learned of
11   the agreement before or after the petition
12   date?
13   A.    It would have been -- it would have
14   been after.
15   Q.    Can you tell me if you learned of
16   the agreement before or after January 9th,
17   2020?
18   A.    It would have been after.
19   Q.    Can you tell me if you learned of
20   the agreement before or after you left Highland
21   Capital Management in February of 2021?
22   A.    I don't -- I don't -- I don't know.
23   Q.    It is possible that you learned of
24   it while you were a Highland employee.
25       Do I have that right?

Page 71

1    WATERHOUSE - 10-19-21
2    A.    I don't remember the -- I mean, it
3    was sometime in 2021. I don't remember when.
4    Q.    All right. So to the best of your
5    recollection, it was in 2021 but you don't
6    recall if it was before or after you ceased to
7    be a Highland employee.
8        Do I have that right?
9    A.    Yeah, I mean, it was -- it was
10   likely after I was -- after I left Highland
11   because, if I put myself back into the last
12   days of -- of 2021, it was -- you know, the
13   communications with Mr. Dondero were -- were --
14   were -- there weren't as many communications
15   because of the circumstances.
16   Q.    And so based on that you believe
17   that it is most likely that you learned of this
18   agreement sometime after you left Highland
19   employment?
20   A.    I wouldn't use the term "most
21   likely." I don't recall specifically. I don't
22   recall.
23   Q.    Do you recall ever telling Jim Seery
24   about this agreement?
25   A.    No, I don't -- I didn't tell

Page 72

1    WATERHOUSE - 10-19-21
2    Jim Seery.
3    Q.    Did you tell anybody at DSI about
4    this agreement?
5    A.    No.
6    Q.    Did you tell any of Highland's
7    independent directors about this agreement?
8    A.    No.
9    Q.    Did you tell anybody at Pachulski
10   Stang Ziehl & Jones about this agreement?
11   A.    No.
12   Q.    Did you tell any employee of
13   Highland about this agreement?
14   A.    No.
15       MS. DANDENEAU: Mr. Morris, it has
16   been an hour and a half. Is this a good
17   time for a break?
18       MR. MORRIS: Sure.
19   Q.    Mr. Waterhouse, I will just remind
20   you that during the break please don't speak
21   with anybody about the deposition, the
22   substance of your testimony or anything else
23   concerning the deposition. Okay?
24   A.    Yes.
25       MR. MORRIS: So it is 11:02. We're

Page 73

1    WATERHOUSE - 10-19-21
2    at 11:02 your time. Let's come back, I
3    guess, at 15 -- at 11:15 your time.
4        VIDEOGRAPHER: We're going off the
5    record at 11:02 a.m.
6    (Recess taken 11:02 a.m. to 11:20 a.m.)
7        VIDEOGRAPHER: We are back on the
8    record at 11:20 a.m.
9    Q.    Mr. Waterhouse, did you speak with
10   anybody during the break about this deposition?
11   A.    No.
12       MS. DANDENEAU: Other than -- other
13   than his counsel.
14   Q.    Did you speak to your counsel about
15   the substance of your deposition today?
16   A.    No, I didn't bring it up.
17   Q.    I didn't ask you if you brought it
18   up. I asked you if you had any conversation
19   with your lawyer about the substance of your
20   deposition.
21       MS. DANDENEAU: Yes, he did.
22   Q.    Can you tell me what the -- you
23   discussed?
24       MS. DANDENEAU: No, I object to
25   that. He's not going to answer. That is a

Page 74

1    WATERHOUSE - 10-19-21
2 privileged conversation.
3    MR. MORRIS: So I just want to make
4 sure that I understand. During the break
5 you spoke with your client about the
6 substance of this deposition; is that
7 right?
8    MS. DANDENEAU: Yes, John.
9    MR. MORRIS: And you refuse -- you
10 refuse to let your client tell me what was
11 discussed; is that right?
12    MS. DANDENEAU: That's correct.
13    MR. MORRIS: You know, I had given
14 the instruction prior to the break not to
15 speak with counsel. I would have
16 appreciated --
17    MS. DANDENEAU: No, you didn't --
18 actually, that is not true, Mr. Morris.
19 You said not to speak with anyone. We
20 never have interpreted that to mean
21 conversations with counsel. That's never
22 been -- I have never, ever heard that
23 instruction.
24    MR. MORRIS: Okay. We will -- we
25 will -- we will deal with it when and if we

Page 75

1    WATERHOUSE - 10-19-21
2 have to.
3    Q.    Mr. Waterhouse, after learning about
4 the agreement, did you ask anybody if the
5 agreement was reflected in a writing?
6    MS. DANDENEAU: Objection to form.
7    A.    No.
8    Q.    Did you ask anybody if the terms of
9 the agreement were memorialized anywhere?
10    MS. DANDENEAU: Objection to form.
11    MR. MORRIS: What is the --
12    A.    No.
13    MS. DANDENEAU: Well, because you
14 keep talking about this agreement and I --
15 I -- I think, Mr. Morris, that is really
16 not clear what you mean by "the agreement."
17 And maybe you can just go back and restate
18 what that is.
19    MR. MORRIS: Okay. Your client has
20 agreed with me twice on the definition, but
21 I will try one more time.
22    Q.    Mr. Waterhouse, do you understand
23 that when I use the term "agreement," I'm
24 referring to the agreement between Jim and
25 Nancy Dondero concerning certain promissory

Page 76

1    WATERHOUSE - 10-19-21
2 notes where you learned that one of the terms
3 of the agreement was milestones reached?
4    A.    Okay.
5    Q.    And did you understand that that was
6 the -- the agreement that we were referring to
7 every time we used the word "agreement" in this
8 deposition?
9    A.    I don't know anything about this
10 agreement. So, look, I do -- it -- I don't
11 know whether --
12    Q.    Let's -- let's try this again.
13    A.    Yeah. Look, I don't know what this
14 agreement relates.
15    MS. DEITSCH-PEREZ: John, John --
16    Q.    Let me try --
17    MS. DEITSCH-PEREZ: John, please let
18 the witness finish.
19    MR. MORRIS: Please stop. Please
20 stop. Please stop talking.
21    MS. DEITSCH-PEREZ: No, you stop.
22 Let the witness --
23    MR. MORRIS: Stop talking.
24    MS. DEITSCH-PEREZ: -- finish -- you
25 interrupted him.

Page 77

1    WATERHOUSE - 10-19-21
2    MR. MORRIS: You know what, you
3 guys, this is really wrong. It is really,
4 really wrong. Okay?
5    I had the witness agree not once,
6 but twice to the definition of agreement.
7 Okay? I'm going to try and do it a third
8 time.
9    MS. DANDENEAU: No, but, please,
10 John, really --
11    MR. MORRIS: No, please stop
12 talking. Please. It is my deposition.
13 Object to questions.
14    MS. DANDENEAU: No, but also you
15 instructed him that -- that if you were
16 going -- if you were interrupting him, that
17 he should remind you that you're
18 interrupting him and -- and --
19    MR. MORRIS: Let him do that. Let
20 him do that.
21    MS. DANDENEAU: Okay. Well, you --
22    MR. MORRIS: Please stop talking.
23    A.    Okay. I don't know any of the
24 details of these agreements. I don't know
25 anything about them. I heard -- someone -- I

Page 78

1      WATERHOUSE - 10-19-21
2  don't know who, I don't know when, as you
3  asked, sometime in '21, someone told me about
4  this -- or I don't honestly know -- I don't
5  even recall exactly how I was made aware of
6  this, but I was. I don't know -- I don't know
7  any of these details, and I'm getting -- again,
8  there is, you know, I -- I -- I had a passing
9  conversation with -- with Jim at some point
10 on -- on some -- on the executive comp, and I'm
11 getting confused of what is what, because
12 again, I don't know any of these details.
13     Q.   Okay. Let me try again,
14 Mr. Waterhouse, and I apologize.
15         Are you aware of any agreement
16 between Jim Dondero and Nancy Dondero
17 concerning any promissory note that was given
18 to Highland by any affiliate or Mr. Dondero?
19     MS. DEITSCH-PEREZ: Object to the
20     form.
21     A.   I've heard of an agreement. That
22 is -- that is -- I mean, if you are using aware
23 as heard, sure.
24     Q.   And you understand that one of the
25 terms of the agreement is that it was based on

Page 79

1      WATERHOUSE - 10-19-21
2  milestones that had to be reached; is that
3  right?
4      MS. DANDENEAU: Objection to form.
5      A.   That was one of the words that was
6  used when I heard about it, yes.
7      Q.   And when you heard about this
8  agreement that had a term in it concerning
9  milestones reached, did you ask the person who
10 was telling you about the agreement whether or
11 not it was in writing?
12     A.   I did not.
13     Q.   Did you ask any questions at all?
14     MS. DANDENEAU: Objection to form.
15     A.   Not that I recall.
16     Q.   But do you understand that going
17 forward, we're going to refer to the agreement
18 as the agreement that you just described that
19 you were --
20     MS. DANDENEAU: Object to the form.
21     A.   Yes.
22     Q.   Okay. You don't have any personal
23 knowledge concerning the terms of the
24 agreement; correct?
25     MS. DEITSCH-PEREZ: Object to the

Page 80

1      WATERHOUSE - 10-19-21
2  form.
3      Q.   You can answer.
4      A.   I don't -- I heard about the
5  agreement. I don't know anything -- I heard
6  there was an agreement. That is -- again, as I
7  testified before -- I said before, heard about
8  it, don't know the details. I believe it was
9  sometime this year.
10     Q.   Do you have any personal knowledge
11 about the terms of the agreement, sir?
12     MS. DANDENEAU: Objection to form.
13     A.   Other than what I have previously
14 discussed, I don't -- I don't know.
15     Q.   Did -- did Mr. Dondero tell you
16 about the existence of the agreement?
17     A.   I don't recall.
18     Q.   Do you recall the source of your
19 information when you learned about the
20 agreement?
21     A.   No, I don't -- I don't recall. I
22 don't remember. I just -- I heard about it
23 generally. I don't remember -- I don't
24 remember who, how, if, how. I don't remember.
25     Q.   You know, Mr. Waterhouse, I just

Page 81

1      WATERHOUSE - 10-19-21
2  want to be clear that I never would have asked
3  you to appear at this deposition if your name
4  hadn't been included in responses to discovery
5  as to somebody with knowledge about the -- who
6  was told about the existence of the agreement.
7         That is what prompted me to do this,
8  and I really do feel compelled to tell you that
9  I otherwise would never have called you as a
10 witness. So I regret that you're being put
11 through this today. I had no intention of
12 burdening you or taking your time, but that is
13 the reason that we issued the subpoena is
14 because certain of the defendants identified
15 you as somebody --
16     MS. DEITSCH-PEREZ: Mr. Morris, you
17     are here to ask questions, not to have --
18     MR. MORRIS: I feel badly for the
19     guy. I really do.
20     MS. DEITSCH-PEREZ: I'm sure you do.
21     MR. MORRIS: I do. Stop.
22     MS. DEITSCH-PEREZ: You stop.
23     MR. MORRIS: I'm allowed.
24     MS. DEITSCH-PEREZ: No, you're not
25     allowed to have a chat with the witness.

Page 82

WATERHOUSE - 10-19-21
1
2    Q.   Okay.  Well, I hope that you
3  appreciate what I'm saying here,
4  Mr. Waterhouse.
5        MS. DANDENEAU:  All right.  Let's go
6  ahead and ask questions, and again, you're
7  entitled to probe his -- his knowledge
8  of -- whatever knowledge he has about
9  this -- this agreement and --
10       MR. MORRIS:  That is what I'm doing.
11       MS. DANDENEAU:  -- he will answer
12  the questions to the best that he can.
13       MR. MORRIS:  That is what I'm doing.
14    Q.   Mr. Waterhouse, I take it you do not
15  know which promissory notes issued by which
16  affiliates or Mr. Dondero are the subject of
17  this agreement; do I have that right?
18    A.   Yes, I don't -- I don't know.
19    Q.   Do you know of any way to determine
20  which promissory notes issued by the affiliates
21  and Mr. Dondero are the subject of this
22  agreement other than asking Jim or Nancy
23  Dondero?
24       MS. DANDENEAU:  Objection to form.
25    A.   I don't know.

Page 83

WATERHOUSE - 10-19-21
1
2    Q.   Did you ever make --
3    A.   I don't know anything about these
4  agreements.
5    Q.   Did you ever make any effort to
6  determine which promissory notes are subject to
7  this agreement?
8    A.   No.
9    Q.   Did you ever ask anybody which
10  promissory notes are subject to this agreement?
11    A.   No.
12    Q.   Do you know if there is a list
13  anywhere of the promissory notes that are
14  subject to this agreement?
15    A.   I'm not aware.
16    Q.   Have you ever seen the terms of the
17  agreement written down anywhere?
18    A.   No.
19    Q.   Have you ever asked anybody whether
20  the terms of the agreement were written down
21  anywhere?
22    A.   I have not.
23    Q.   Did learning about the agreement
24  cause you to do anything in response?
25       MS. DANDENEAU:  Objection to form.

Page 84

WATERHOUSE - 10-19-21
1
2    A.   No.
3    Q.   Did anybody ever describe to you the
4  nature of the milestones that you referred to
5  earlier?
6    A.   No, I don't -- I don't have any
7  details of this.
8    Q.   That is fine.
9        PricewaterhouseCoopers served as
10  Highland's outside auditors prior to the
11  petition date; correct?
12    A.   Yes.
13    Q.   You refer to PricewaterhouseCoopers
14  as PwC?
15    A.   Yes.
16    Q.   PricewaterhouseCoopers audited
17  Highland's financial statements on an annual
18  basis; correct?
19    A.   During my -- during my time as -- as
20  CFO, yes, PricewaterhouseCoopers was the
21  auditor.
22    Q.   Do you know why Highland had its
23  annual financial statements audited each year?
24    A.   Generally.
25    Q.   Tell me your general understanding

Page 85

WATERHOUSE - 10-19-21
1
2  as to the reason why Highland had its annual
3  financial statements audited each year.
4    A.   From -- from time to time, they were
5  used -- or asked for, as part of diligence or
6  transactions or -- or things of that nature.
7    Q.   And were they given to third parties
8  for purposes of diligence or transactions from
9  time to time?
10    A.   As far as I'm aware, yes.
11    Q.   And was it your understanding as the
12  CFO that the third parties who received the
13  financial statements in diligence or
14  transactions was going to rely on those?
15       MS. DANDENEAU:  Objection to form.
16    A.   I don't know -- I don't know gen --
17  I don't know specifically what they were going
18  to rely on.  You know, we would get requests
19  for audited financial statements.  I don't know
20  what they were relying on.
21    Q.   And --
22    A.   You would have to ask them.
23    Q.   Did you personally play a role in
24  PwC's annual audit and the conduct of the
25  audit?

1    WATERHOUSE - 10-19-21
2    MS. DANDENEAU:  Objection to form.
3    A.   During my tenure as CFO, I played a
4 very minimal role.
5    Q.   What was the minimal role that you
6 played?
7    A.   You know, again, it was -- it was to
8 check in with the team, to make sure that, you
9 know, audit -- the deadlines were being hit,
10 information was being presented to the auditors
11 in a -- in a timely fashion, but, you know,
12 other than that, it was a very capable team
13 that are still current employees of Highland
14 and, you know, they -- they conducted 99
15 percent of -- look, I don't want to give
16 percentages.  I mean, this is -- but I -- I --
17 I played a minimal role towards the end.
18         Before during my earlier years as
19 CFO, I did more, and then as time went on, I
20 did less in it.
21    Q.   Okay.  Was there a person at
22 Highland who was responsible for overseeing
23 Highland's participation in PwC's audit during
24 the time that you were the CFO?
25    A.   Yeah.  I mean, there was -- there

1 was a -- there was a point -- it varies.  It
2 varies by year, in function, in time and, you
3 know, depending on the request, but yes, I
4 mean, there is -- there is -- there is
5 generally a point person of communication.
6    Q.   And who was the point person from
7 2016 until the time you left Highland?
8    A.   I don't -- I don't know
9 specifically, but it would have been, you
10 know -- you know, someone on the corporate
11 accounting team.
12    Q.   And was there a head of the
13 corporate accounting team?
14    A.   Yes, so -- yes.
15    Q.   Who was the head of corporate
16 accounting for the five years prior to the time
17 you left Highland?
18    A.   I don't -- if you're asking from
19 2016 on, I don't -- it was Dave Klos, but,
20 again, there was -- there was changes to the
21 team and the reporting structure.  I don't
22 remember exactly when that happened during --
23 you know, over the last -- since 2016.
24    Q.   Did the folks who participated and

1    WATERHOUSE - 10-19-21
2 ran the audit all report to you, directly or
3 indirectly?
4    A.   Yes.
5    Q.   And did you have any responsibility
6 for making sure that the audit report was
7 accurate before it was finalized?
8    A.   Yeah.  I mean, you know, that --
9 that is -- my responsibility to the auditors
10 was -- again, is -- and the CFO is to -- we are
11 providing accurate financial statements; right?
12         And -- and -- and as part of any
13 audit, we disclose all relevant information as
14 part of any audit.
15    Q.   Okay.  And as the CFO, did you take
16 steps to make sure that the audit report was
17 accurate?
18    A.   I mean, I would say in a general
19 sense, yes.  But, again, I mean, I had a
20 very -- I had a very capable and competent
21 team.  I wasn't managing them.
22         You know, part of what I do is I let
23 the team -- I want managers to grow.  I want
24 managers to have rope.  And that is -- you
25 know, I'm not a stand-behind-you type of guy.

1    WATERHOUSE - 10-19-21
2 If you -- if you talk to my team members, I'm
3 not micromanaging people.  I want people to
4 learn and grow in their function so they can go
5 on and do bigger and better things with their
6 careers.
7         And so, yes, generally I was
8 responsible for it, but I wanted the team to
9 learn and grow and be responsible for the bulk
10 of the audit.
11    Q.   Did you personally review each audit
12 report before it was finalized to satisfy
13 yourself that it was accurate?
14    A.   I don't -- I don't recall, you know,
15 for every single -- we're talking 2016, there
16 would have been three years, 2016 to '17, '18.
17 I don't -- we're -- we're going back
18 five years-plus.  I don't -- you know, I don't
19 recall.
20    Q.   Did you have a practice that you
21 employed to make sure that you were satisfied
22 that Highland's audit reports were true and
23 accurate to the best of your knowledge?
24    A.   I mean, our -- the practice was set
25 up with our -- the -- the practice to put

Page 90

1      WATERHOUSE - 10-19-21
2  together accurate audited or accurate financial
3  statements is to your control environment.
4      So, you know, the -- so the practice
5  was to maintain a stable control environment
6  which then the output -- is accurate
7  financial statements.
8      So -- so, you know, if I was
9  comfortable that the control environment was
10  operating, then, you know, that would dictate
11  how I would -- you know, what I might or might
12  not do in a given year.
13     Q. Okay. Do you recall ever being
14  uncomfortable with the control environment
15  during the period that you served as CFO?
16     A. Yeah. I mean, look, yes, there are
17  times -- you know, nothing is perfect. So
18  there were -- there were times when, yes, you
19  know -- there are times I learned I was
20  uncomfortable with the control environment, and
21  that is part of the management of the process
22  and having, you know -- and -- and working
23  through whatever obstacles present themselves.
24     Q. Okay. Were you ever uncomfortable
25  with the control process as it related to

Page 91

1      WATERHOUSE - 10-19-21
2  reporting and disclosures of loans to
3  affiliates and Mr. Dondero?
4      MS. DANDENEAU: Objection to form.
5      A. I don't -- I don't recall --
6      Q. So you don't recall --
7      A. -- the --
8      MS. DANDENEAU: Mr. Morris --
9      A. I don't recall being uncomfortable.
10  But, again, we're going back several years. I
11  don't -- you know, the practice in an audit is
12  to disclose all information to the auditors.
13  And I don't -- I don't recall.
14     Q. As part of the process of the audit,
15  did you sign what is sometimes referred to as a
16  management representation letter?
17     A. Yes.
18     MR. MORRIS: Can we put up on the
19  screen a document that we have premarked as
20  Exhibit 33.
21     (Exhibit 33 marked.)
22     MS. DANDENEAU: Mr. Morris, that is
23  not in the binder; correct?
24     MR. MORRIS: Correct.
25     Q. So you will see, Mr. Waterhouse,

Page 92

1      WATERHOUSE - 10-19-21
2  this is a letter dated June 3rd. And if we
3  could go to the signature page.
4      And do you see that you and
5  Mr. Dondero signed this document?
6      A. Yes.
7      Q. That is your signature; right?
8      A. Yes.
9      MR. MORRIS: Okay. Can you go back
10  to the top.
11     MS. DANDENEAU: Mr. Morris, can you
12  have somebody post this in the chat so that
13  we have can have a copy of this, please.
14     MR. MORRIS: Yeah, sure. Asia, can
15  you do that, please.
16     Q. Okay. Do you see at the bottom of
17  the second paragraph there is a reference to
18  materiality?
19     A. Yes.
20     Q. Okay. It says, Materiality used for
21  purposes of these representations is
22  $1.7 million.
23     Do you see that?
24     A. I do.
25     Q. And did PwC set that level of

Page 93

1      WATERHOUSE - 10-19-21
2  materiality?
3      A. Yes.
4      Q. And for purposes of the audit, did
5  PwC set the level of materiality each year?
6      A. Yes.
7      Q. Did that number change over time?
8      A. I'm not aware of what materiality is
9  every single year, so -- but, you know, this
10  number would likely fluctuate.
11     Q. Okay. I'm going to go back to a
12  question I asked you earlier today. And that
13  is in connection -- this letter is issued in
14  connection with the audit for the period ending
15  12/31/2018; correct?
16     A. Yes.
17     Q. Okay. And is it fair to say that if
18  any -- actually, withdrawn. I'm going to take
19  it outside of this.
20     If Highland ever forgave the loan to
21  any affiliate or any of its officers or
22  employees, in whole or in part, to the best of
23  your knowledge, would that forgiveness have
24  been disclosed in the audited financial
25  statements if it exceeded the level of

WATERHOUSE - 10-19-21

1
2 materiality that PwC established?
3     MS. DANDENEAU: Objection to form.
4     A. So, again, during my tenure as CFO,
5 and -- Highland -- it was -- it is required to
6 disclose any affiliate loans that are in excess
7 of materiality.
8     Now, the forgiveness of those loans
9 may or may not -- I mean, since materiality
10 fluctuates every year, a -- you know, if a loan
11 was forgiven, it may or may not, you know --
12 and, look, I would want to consult the guidance
13 around this.
14     It is not something we do -- you
15 know, it is not -- you know, GAAP can be and
16 disclosures can be very specialized so, again,
17 we want to consult the guidance. But, we're
18 going to see if and what would need to be disclosed if
19 it were deemed immaterial.
20     Q. Did you and Mr. Dondero sign
21 management representation letters of this type
22 in each year in which you served as Highland's
23 CFO?
24     A. I -- I -- I will speak for myself.
25 I signed them. There may have been others that

WATERHOUSE - 10-19-21

1
2 signed as well. I don't -- I don't recall.
3     Q. But to the best of your knowledge,
4 you, personally, signed a management
5 representation letter in connection with
6 Highland's audit each year that you served as
7 the CFO; correct?
8     A. I would say generally speaking,
9 Mr. Morris. I don't recall for every single
10 year, you know, generally, but I would want to
11 refer to all the rep letters and see who signed
12 them.
13     Q. Do you recall Highland having its
14 financial statements audited in any year during
15 the period that you were a CFO where you didn't
16 sign the management representation letter?
17     A. I don't recall. But, John, we're
18 going back five, six, seven, eight, nine,
19 decade. I don't -- I don't remember.
20     Q. I don't want to go back that many
21 decades, but I'm just asking you if you recall
22 that there was you didn't sign it?
23     A. I -- I -- I don't, but my memory
24 is -- again, I -- I -- I can't tell you what I
25 did in 2012. I mean, I think generally, yes,

WATERHOUSE - 10-19-21

1
2 but I don't -- I don't know for sure, and I
3 would want to rely on the document.
4     Q. Let me ask the question a little bit
5 differently then.
6     Do you have any reason to believe
7 that Highland had its annual financial audit
8 and you did not sign a management
9 representation letter in connection with that
10 audit?
11     MS. DANDENEAU: Objection to form.
12     A. I don't believe it would, but,
13 again, I would want to -- I don't recall and I
14 would want to confirm it to -- to make, you
15 know, an affirmative -- to give an affirmative
16 answer.
17     Q. Do you know whether PwC required
18 management to sign management representation
19 letters?
20     MS. DANDENEAU: Objection to form.
21     A. Yes. I mean, it -- management
22 representation letters are signed by
23 management.
24     Q. Okay. And do you know -- do you
25 have any understanding as to why PwC requires

WATERHOUSE - 10-19-21

1
2 management to sign management representation
3 letters?
4     MS. DEITSCH-PEREZ: Object to the
5 form.
6     A. I don't know why PwC's -- what PwC's
7 specific practice is. I know generally what
8 management representation letters are.
9     Q. Okay. Do you personally -- I'm not
10 asking about PwC. I'm asking for you -- I'm
11 asking about you, do you have an understanding
12 as to why the auditor asks for management
13 representation letters?
14     A. Okay. So you're asking me in my
15 personal capacity, yes, I have a general
16 understanding of why.
17     Q. Can you give me the general
18 understanding that you have as to why
19 management representation letters are required?
20     A. They are -- they are required to --
21 they are -- they are one of the items required
22 in an audit to help verify completeness.
23     Q. Do you have any -- any other
24 understanding as to why management
25 representation letters are required?

WATERHOUSE - 10-19-21

2  A.  That is -- that is -- other than

3  what I said, it is -- it is -- it is required

4  so -- to ensure that the -- you know, there

5  is -- there is completeness in what is being

6  audited.

7  Q.  Did you -- did you have a practice

8  whereby you and Mr. Dondero conferred about the

9  management representation letters before you

10  signed them?

11  A.  No.

12  Q.  Did you have a practice --

13  withdrawn.

14  Do you see just the next sentence

15  after the materiality, there is a sentence that

16  states:  We confirm, to the best of our

17  knowledge and belief, as of June 3rd, 2019, the

18  date of your report, the following

19  representations made to you during your audit.

20  Do you see that sentence?

21  A.  Yes.

22  Q.  Okay.  Did you understand when you

23  signed this letter that you were confirming the

24  representations that followed?

25  A.  When I signed this management

WATERHOUSE - 10-19-21

2  letter -- representation letter, yes.

3  Q.  Okay.  Did you discuss this letter

4  with Mr. Dondero before you signed it?

5  A.  I don't recall.

6  Q.  Do you recall if Mr. Dondero asked

7  you any questions before he signed the letter?

8  A.  I don't recall.

9  Q.  Do you recall if you asked

10  Mr. Dondero any questions before you signed

11  this letter?

12  A.  I don't recall.

13  Q.  Is it fair to say that Mr. Dondero

14  did not disclose to you the existence of the

15  agreement that we have -- as we've defined that

16  term prior to the time you signed this letter?

17  MS. DANDENEAU:  Objection to form.

18  A.  I don't think I understand the

19  question.  So, again, you are saying, did

20  Mr. Dondero not disclose to me the existence of

21  this letter?

22  Q.  No, I apologize.

23  Did Mr. Dondero disclose to you the

24  existence of the agreement prior to the time

25  you signed this letter on June 3rd, 2019?

WATERHOUSE - 10-19-21

2  A.  The agreement -- the agreement that

3  we talked about earlier?

4  Q.  Correct.

5  A.  Look, as I said earlier, the first

6  time I heard of this agreement was sometime

7  this year.

8  Q.  Okay.  Can we turn -- let's just

9  look at a couple of items on the list.  If we

10  can go to page 33416.  Do you see in Number 35

11  it talks about the proper recording or

12  disclosure in the financial statements of ND

13  relationships and transactions with related

14  parties.

15  Do you see that?

16  A.  I do.

17  Q.  As the CFO, do you have any

18  understanding as to whether Dugaboy is a

19  related party?

20  A.  I don't recall.

21  Q.  Do you know whether any of the

22  affiliates are related parties?

23  A.  If -- if it was NexPoint, HCMFA,

24  HCMS, HCRE, yeah, if -- if that is the

25  affiliate definition, and there.  In ASC 850 --

WATERHOUSE - 10-19-21

2  again, I mean, I haven't looked at ASC 850 in

3  quite some time, but, you know, if -- if there

4  is a control language, you know, ASC 850, would

5  that -- that section in GAAP would -- would

6  pick up and define what are related parties.

7  So, you know, like I said, if -- one

8  of the four entities I just described, if -- if

9  they are in that control definition of ASC 850,

10  they would be picked up in 35D.

11  Q.  Do you -- do you have any reason to

12  believe that they would be picked up in that

13  definition, based on your knowledge and

14  experience?

15  A.  I -- I believe that entities

16  controlled under GAAP are -- are affiliates.

17  Q.  Okay.  Would Mr. Dondero also

18  qualify as a related party for purposes of

19  Section 35D, to the best of your knowledge?

20  A.  Yeah, I don't -- I don't know.  I

21  would think -- I would have to read the code

22  section to see if someone personally -- is it

23  talking about related parties.  So, look, if

24  your own in control, yeah, I mean, I would have

25  to read the section.

Page 102

1     WATERHOUSE - 10-19-21
2     Q.   To the best of your knowledge, was
3 the existence of the agreement ever disclosed
4 to PwC?
5     A.   I'm not -- I'm not aware.
6     Q.   Do you recall if the agreement was
7 ever disclosed in Highland's audited financial
8 statements?
9     A.   I don't -- I don't remember if it
10 was in every Highland's audited financial
11 statements during my tenure.  We would have to
12 read the financial statements to see what was
13 disclosed, but I'm not -- I mean, as I sit here
14 today, I'm not aware.
15    Q.   That is all I'm asking for.
16    A.   I'm not aware.
17    Q.   Can we go to the next page, please,
18 and look at 36.  36 says, we have disclosed to
19 you the identity of the partnership's related
20 party relationships and all the related party
21 relationships and transactions of which we are
22 aware.
23        Do you see that?
24    A.   Yes.
25    Q.   To the best of your knowledge, as of

Page 103

1     WATERHOUSE - 10-19-21
2 June 3rd, 2019, did Highland disclose to PwC
3 the identity of the partnership's related
4 parties and all the related party relationships
5 and transactions of which it was aware?
6     A.   I mean, I can speak for myself as
7 signer of this representation letter.  I
8 disclosed what -- what, you know, what --
9 what -- what I knew.  Sorry, look, yes, so I --
10 I disclosed what I knew.
11    Q.   Okay.  Can we go to page 419.  Do
12 you see at the end there is a reference to
13 events that occurred since the end of the
14 fiscal year and the date of the letter?
15    A.   Yes.
16    Q.   And were you aware of that -- of
17 that provision of the management representation
18 letter before you signed the document?
19    A.   Yes.
20    Q.   Do you have an understanding as to
21 why PwC asked for that confirmation of that
22 particular part of the management
23 representation letter?
24    A.   It is -- it is -- it is just -- it
25 is a typical audit request.

Page 104

1     WATERHOUSE - 10-19-21
2     Q.   And do you understand -- do you have
3 an understanding that PwC wanted to know that
4 as of the date of the audit whether any
5 material changes had occurred since the end of
6 the fiscal year, using the definition of
7 materiality that is in this particular
8 management representation letter?
9     A.   It -- it is -- it is -- it is a --
10 it is as described.  It is just a poorly worded
11 question, so it is hard for me to say yes.
12    Q.   If I asked you this, I apologize,
13 but did you ever learn when the agreement was
14 entered into?
15    A.   I don't -- I don't -- like I said
16 before, I don't know or have any details of the
17 agreement.
18    Q.   Okay.  Did you ever ask anybody when
19 the agreement was entered into?
20    A.   I did not.
21    Q.   Let's look at the audited financial
22 statements.  We will put up on the screen a
23 document that has been premarked as Exhibit 34.
24        (Exhibit 34 marked.)
25        MS. DANDENEAU:  And again, if Ms. La

Page 105

1     WATERHOUSE - 10-19-21
2 Canty could please put that in the chat
3 room, that would be great.
4        MR. MORRIS:  I will assure you we
5 will put every document in the chat room.
6     Q.   Now, I'm just going to ask you
7 questions that are related to the provisions of
8 this report that concern the affiliate loans,
9 but again, Mr. Waterhouse, if there is any part
10 of the document that you need to see or that
11 you think you might need to see in order to
12 refresh your recollection to answer any of my
13 questions, will you let me know that?
14    A.   Yes.
15    Q.   Because this is a pretty lengthy
16 document, but do you see that the cover page
17 here is the Highland consolidated financial
18 statements for the period ending December 31st,
19 2018?
20    A.   Yes.
21    Q.   If we can go to -- I think it is the
22 next one, looking for PwC's signature line.
23        MS. CANTY:  I'm sorry, John, did you
24 say something?
25        MR. MORRIS:  Yes, can we turn the

Page 106

WATERHOUSE - 10-19-21

1   page. I think it is 215. Yes, stop right
2   there, just above -- I'm sorry, I want to
3   see just the date of the report.
4       Q.   Okay. Do you see at the bottom of
5   that page there, Mr. Waterhouse,
6   PricewaterhouseCoopers has signed this audit
7   report?
8       A.   Yes, I see their signature.
9       Q.   Okay. And it is the dated same day
10  as your management representation letter; is
11  that right?
12      A.   It is -- yes, it is the same day.
13      Q.   Was that the practice to sign the
14  management representation letter on the same
15  day that the audit report was signed?
16      A.   Yes, that is typical in every audit.
17      Q.   Can we just scroll down to the
18  balance sheet on the next page.
19          Do you see that there is a line
20  there that says, Notes and Other Amounts Due
21  from Affiliates?
22      A.   Yes.
23      Q.   Does that line, to the best of your
24  knowledge, include the amounts that were due

Page 107

WATERHOUSE - 10-19-21

1   under the affiliate under the notes signed by
2   the affiliates and Mr. Dondero?
3       MR. RUKAVINA: Objection to the
4   extent that calls for a legal conclusion.
5       A.   I mean, I would want to see the
6   detail and the build to this $173,398,000, but,
7   yes, I mean, if -- if -- given what we
8   discussed before, you know, it -- it should
9   capture that.
10      Q.   And -- and while you were the CFO of
11  Highland, were all notes held by Highland that
12  were issued by an affiliate or Mr. Dondero
13  carried as assets on Highland's balance sheets?
14      MS. DANDENEAU: Objection to form.
15      MS. DEITSCH-PEREZ: Object to form.
16      A.   I don't -- I don't know how else
17  they would be carried.
18      Q.   Okay. Can you think of any -- are
19  you aware of any promissory note issued by an
20  affiliate or Mr. Dondero that was not carried
21  on Highland's audited financial balance sheets?
22      A.   I'm -- I'm -- I'm not aware.
23      Q.   Okay. Are you aware of any category
24  of asset on Highland's balance sheet in which

Page 108

WATERHOUSE - 10-19-21

1   any of the promissory notes issued by an
2   affiliate or Mr. Dondero would have been
3   included?
4       MS. DANDENEAU: Objection to form.
5       A.   Sorry, am I aware of any asset of an
6   affiliate being included --
7       Q.   That -- let me -- let me try again.
8           Do you see there is a number of
9   different assets that are described on this
10  balance sheet?
11      A.   Yes.
12      Q.   One of the assets that is described
13  is Notes and Other Amounts Due from Affiliates;
14  right?
15      A.   Yes.
16      Q.   And it is reasonable to conclude
17  that the notes from the affiliates and
18  Mr. Dondero are included in that line item;
19  right?
20      A.   Yes, based on this description.
21  Again, I would want to see a build of this to
22  100 percent confirm, but based on the
23  description, the asset description, it is -- it
24  is likely.

Page 109

WATERHOUSE - 10-19-21

1       Now, does that mean absolute? I
2   don't know.
3       Q.   Do you have any reason to believe
4   that the promissory notes would have been
5   carried on the balance sheet in a category
6   other than Notes and Other Amounts Due from
7   Affiliates?
8       A.   If they were deemed -- no. If they
9   were deemed an affiliate, you know, under GAAP,
10  they should be carried in that line.
11  Otherwise, it would go into another line.
12      Q.   Okay. And do you see the total
13  asset base as of December 31st, 2018, was
14  approximately $1.04 billion?
15      A.   Yes.
16      Q.   Is my math correct that the Notes
17  and Other Amounts Due from Affiliates
18  constituted approximately 17 percent of
19  Highland's assets as of the end of 2018?
20      A.   Well, so how are you defining
21  Highland?
22      Q.   Highland Capital Management, L.P.,
23  the entity that this audit is subject to -- or
24  the subject of.

Page 110

WATERHOUSE - 10-19-21

1
2     A.   On a consolidated or unconsolidated
3 basis?
4     Q.   I'm looking at the balance sheet.
5 It is a consolidated balance sheet. Okay?
6          Does the Notes and Other Amounts Due
7 from Affiliates constitute approximately
8 17 percent of the total assets of Highland
9 Capital Management, L.P., on a consolidated
10 basis?
11         MS. DANDENEAU: Objection to form.
12     A.   I don't have a calculator in front
13 of me but I will take your math, if you are
14 taking the 173 divided by the billion.
15     Q.   Okay.
16     A.   If that is accurate, yes. But,
17 again, on a consolidated basis.
18     Q.   And on an unconsolidated basis the
19 percentage would be higher; correct?
20     A.   I -- no. I don't know.
21     Q.   Well, okay. That is fair.
22         MR. MORRIS: Can we turn to
23 page 241, please.
24     Q.   Do you see that this is a section of
25 the audit report that is entitled Notes and

Page 111

WATERHOUSE - 10-19-21

1
2 Other Amounts Due from Affiliates?
3     A.   Sorry, I can't see the -- the --
4     Q.   It is at the top.
5     A.   Notes and Other Amounts Due from
6 Affiliates, yes, I see that. I don't -- I
7 don't have a page number, but I'm on a page
8 that says at the top: Notes and Other Amounts
9 Due from Affiliates.
10     Q.   Okay. And that is the same title of
11 the line item on the balance sheet that we just
12 looked at; right? Notes and Other Amounts Due
13 from Affiliates?
14     A.   Yes.
15     Q.   And is it your understanding, based
16 on your experience and knowledge as the CFO,
17 that this is the section of the narrative that
18 ties into the line item that we just looked at?
19     A.   Yes.
20     Q.   And is this section of the audit
21 report intended to describe and disclose all of
22 the material facts concerning the Notes and
23 Other Amounts Due from Affiliates?
24         MS. DANDENEAU: Objection, form.
25     A.   This -- these notes -- these notes

Page 112

WATERHOUSE - 10-19-21

1
2 of the financial statements are -- the purpose
3 is to disclose any material items in relation
4 to that balance sheet line item.
5     Q.   Okay. And all of the information,
6 to the best of your knowledge, that is set
7 forth in this section of the audit report was
8 provided by Highland; correct?
9     A.   Yes, it would have been provided by
10 the corporate accounting team.
11     Q.   Okay. And the corporate accounting
12 team, did that team report to you in the
13 organizational structure?
14     A.   Yes.
15     Q.   And did you have any concerns about
16 the controls that were in place to make sure
17 that the information provided with respect to
18 Notes and Other Amounts Due from Affiliates was
19 accurate and complete?
20         MS. DANDENEAU: Objection to form.
21     A.   Not that I recall.
22     Q.   Okay. Do you recall ever being
23 concerned that any portion of the Notes and
24 Other Amounts Due from Affiliates in any audit
25 report was inaccurate, incomplete, or not

Page 113

WATERHOUSE - 10-19-21

1
2 reliable?
3     A.   I didn't -- I had concerns about,
4 you know, like I talked about before, of there
5 were -- there were potentially issues in the
6 control environment. But as far as it relates
7 to the audited financial statements, any -- the
8 team would work with the auditors to disclose
9 all -- all notes in Highland's possession.
10         And any -- any notes that were
11 deemed material by the auditor, right, these
12 were disclosed in these -- in this section, you
13 know, in -- in the notes to the consolidated
14 financial statements as you presented.
15     Q.   Do you recall ever having a
16 conversation with anybody at any time
17 concerning the accuracy of the section of audit
18 reports that relates to Notes and Other Amounts
19 Due from Affiliates?
20         MS. DANDENEAU: Objection to form.
21     A.   You know, as -- as -- I didn't have
22 direct conversations with
23 PricewaterhouseCoopers as I had, you know --
24 I -- I had the team that managed this.
25         Again, I wasn't anywhere chose to

Page 114

WATERHOUSE - 10-19-21

1 being the point person of this audit. And I
2 can't recall, you know, when -- you know, I
3 don't even know if I was ever the point person
4 during my tenure as CFO.
5        I don't know if PwC had any concerns
6 when they were performing those audit
7 procedures. They may have and they may have --
8 and it may not have been communicated to me. I
9 don't know.
10       MR. MORRIS: All right. I move to
11 strike.
12       Q. And I'm going to ask you to listen
13 carefully to my question.
14       Did you -- do you recall ever having
15 a conversation with anybody at any time
16 concerning the accuracy of the reporting
17 provided in the audited financial statement on
18 the topic of Notes and Other Amounts Due?
19       MS. DANDENEAU: Objection to form.
20       A. I don't recall for this, but that
21 doesn't mean that it didn't exist.
22       Q. Okay. But you have no reason to
23 believe, as you sit here right now, that you
24 ever discussed with anybody concerns over the

Page 115

WATERHOUSE - 10-19-21

1 accuracy of the section of the audit reports
2 called Notes and Other Amounts Due from
3 Affiliates; correct?
4        MS. DANDENEAU: Object to the form.
5        MS. DEITSCH-PEREZ: Objection to
6 form.
7        A. I don't recall having any
8 conversations. But, again, I mean, this is --
9 this is two years ago.
10       Q. I'm just asking for your
11 recollection, sir.
12       A. Yes.
13       Q. If you don't recall, this will --
14       A. Yeah.
15       Q. (Overspeak) -- if you don't
16 recall --
17       A. Yeah, I don't -- I don't recall.
18       Q. Do you know who was responsible for
19 drafting the audit report?
20       A. Are you asking for the actual Highland
21 employee responsible? I mean, it was
22 Highland's responsibility, so, I mean, that
23 is --
24       Q. Right.

Page 116

WATERHOUSE - 10-19-21

1        A. -- Highland's responsibility.
2 Highland's responsibility.
3        Q. Who, at Highland, was responsible
4 for drafting this section of the audit report?
5        A. I -- I don't know the answer to
6 that. Again, there was a team who worked on
7 this. And I don't know, you know, whether it
8 was the staff or the manager.
9        Again, this is where I let the teams
10 manage. And, you know, there may be a
11 corporate accountant who worked on this. I
12 just -- you know, I wasn't part of that process
13 to give that person experience. I don't know.
14       Q. Do you recall having any
15 communications with anybody at any time
16 concerning this section of the report?
17       A. Yeah, I don't recall.
18       Q. Do you recall whether you ever told
19 anybody at any time that any aspect of this
20 section of the report was inaccurate or
21 incomplete?
22       A. I don't recall.
23       Q. As you sit here today, do you have
24 any reason to believe that this section of the

Page 117

WATERHOUSE - 10-19-21

1 audit report is incomplete or inaccurate in any
2 way?
3        And I'm happy to give you a moment
4 to -- look at it, if you would like.
5        MS. DANDENEAU: Objection to form.
6        MS. DEITSCH-PEREZ: Same.
7        A. I mean, I would have to look at -- I
8 would have to look at the bill to the note
9 schedule to make sure I know you presented me
10 with materiality, but again, there might be a
11 note as of 12/31/18 that somehow was -- was
12 under materiality not disclosed. I don't -- I
13 don't know. I would need more information.
14       Q. Okay. But without more information,
15 you have no reason to believe anything this
16 section is inaccurate; correct?
17       MS. DANDENEAU: Objection to form.
18       A. I don't. I mean, you know, this was
19 part of the audit.
20       Q. Thank you. Now, you will see if we
21 could scroll just a little bit more that each
22 of the first five paragraphs concerns
23 specifically the four affiliates that we've
24 been discussing and Mr. Dondero.

Page 118

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2        MR. MORRIS: If we could go the
3    other way, La Asia. We don't need Okada.
4    We're going to have to thread the needle.
5    Okay. Good, perfect.
6        Q.  Do you see those five paragraphs
7    certain the four affiliates and Mr. Dondero as
8    we've been referring to today?
9        A.  Yes.
10       Q.  Okay. And do you see at the end of
11   every paragraph it states, quote: A fair value
12   of a partnership's outstanding notes receivable
13   approximates the carrying value of the notes
14   receivable?
15       A.  Yes, I see that.
16       Q.  Do you have an understanding of what
17   that means?
18       A.  Yes.
19       Q.  What is your understanding of that
20   sentence?
21       A.  It is the -- again, the -- the fair
22   value, right, which is -- which is what the --
23   what Highland could sell that asset for. This
24   statement is comparing the fair value of the
25   notes to the carrying value, so the carrying

Page 119

1    WATERHOUSE - 10-19-21
2    value is the line item that you showed me
3    earlier that is in Notes and Other Amounts Due
4    from Affiliates.
5        Q.  Okay. Is another way to say this is
6    that the fair market value of the notes equals
7    the principal amount and -- withdrawn.
8        Is the fair way to interpret this
9    that the fair market value of the notes equals
10   all remaining unpaid principal and interest due
11   under the notes?
12       MS. DANDENEAU: Object to the form.
13       MS. DEITSCH-PEREZ: Objection, form.
14       A.  I don't know the answer to that,
15   because I don't recall where -- where any --
16   where -- in what line item was the interest
17   component reported.
18       Q.  All right. Well, if we look in this
19   audit report, you will see in the middle of the
20   first paragraph, for example, it states that as
21   of December 31st, 2018, total interest and
22   principal due on outstanding promissory notes
23   was approximately $5.3 million.
24       Do you see that?
25       A.  I do.

Page 120

1    WATERHOUSE - 10-19-21
2        Q.  Is that the carrying value or the
3    fair value?
4        A.  That would be the carrying value --
5        Q.  And is the last --
6        A.  -- in my opinion.
7        Q.  Okay. And it is in your opinion as
8    the chief financial officer of Highland during
9    the period of time that you described; right?
10   It is an educated opinion?
11       A.  I'm reading this at face value. I'm
12   taking that as that is carrying value.
13       Q.  Okay. And does the last sentence
14   say that the carrying value is roughly
15   approximate to the fair market value?
16       MS. DANDENEAU: Objection to form.
17       MS. DEITSCH-PEREZ: Objection, form.
18       A.  Again, this note to the financial
19   statement is specific to notes and other
20   amounts due from affiliates.
21       Q.  Correct.
22       A.  If the interest component is
23   reported elsewhere on the balance sheet, you
24   know, it -- it could be off. Again, I
25   don't have the detail. I don't know, but yes,

Page 121

1    WATERHOUSE - 10-19-21
2    look, I mean, if you -- I mean, if you are
3    saying the 5.3 million is in the notes and
4    other amounts due from affiliates, then the
5    last statement is saying the fair value
6    approximates 5.3 million. That is what that
7    last sentence is saying.
8        Q.  Do you see in the middle of the
9    first paragraph -- not in the middle, the next
10   to last sentence there is a statement that the
11   partnership will not demand payment on amounts
12   that exceed HCMFA's excess cash availability
13   prior to May 31st, 2021.
14       Do you see that?
15       A.  I do.
16       Q.  Do you know when Highland agreed not
17   to demand payment as described in that
18   sentence?
19       A.  I don't know specifically.
20       Q.  Do you know why Highland agreed not
21   to demand payment on HCMFA's notes until May
22   2021?
23       A.  Yes.
24       Q.  Why was that decision made?
25       A.  You know, well, it -- it -- that

Page 122

WATERHOUSE - 10-19-21

1
2 decision was made as to not put HCMFA into a
3 position where it didn't have sufficient assets
4 to pay for the demand note.
5     Q.   And at the time the agreement was
6 entered into, pursuant to which the partnership
7 wouldn't demand payment, did HCMFA have
8 insufficient assets to satisfy the notes if a
9 demand had been made?
10     MS. DANDENEAU:  Objection to form.
11     A.   I don't have HCMFA's financial
12 statements in front of me as of 12/31/18.
13     Q.   Was there a concern that HCMFA would
14 be unable to satisfy its demands under the
15 notes if demand was made?
16     MS. DANDENEAU:  Objection to form.
17     A.   Well, there is -- I don't recall --
18 I mean, there is something, right, in place to
19 basically not demand payment until May 31, 2021
20 as detailed here.
21     Q.   And who made the decision to enter
22 into -- who made the decision on behalf of
23 Highland not to demand payment until May 31st,
24 2021?
25     A.   I'm trying to remember.  I don't

Page 123

WATERHOUSE - 10-19-21

1
2 remember exactly -- I don't remember if it was
3 myself or -- or Jim Dondero who -- who -- there
4 was -- there was something signed, from what I
5 recall, that -- that -- that backed up this
6 line item in the -- in the notes I'm -- look,
7 I'm, I'm --
8     Q.   We will get to that.
9     A.   You --
10     Q.   I'm just --
11     A.   You have -- I mean --
12     Q.   We're going to give that to you.
13 I'm going to give that to you.
14     A.   You -- you -- you have all the
15 documents.  I don't have the documents, and
16 that is what makes it so hard.  I don't have
17 any documents to prepare for this deposition;
18 right?  You have all -- I don't -- I don't -- I
19 don't remember, but, you know, again, it would
20 probably be myself or Jim.
21     Q.   Do you know if Highland received
22 anything in return for its agreement not to
23 make a demand for two years?
24     A.   I don't -- I don't think it referred
25 anything.

Page 124

WATERHOUSE - 10-19-21

1
2     Q.   And did you and Mr. Dondero discuss
3 HCMFA's ability to satisfy the notes if a
4 demand was made at the time this agreement was
5 entered into?
6     MS. DANDENEAU:  Objection to form.
7     A.   I don't -- I don't -- I don't recall
8 having a specific conversation, if I did, or --
9 or David Klos.
10     Q.   Okay.  I'm just asking if you recall
11 any conversations that you had.
12     A.   I don't recall.
13     Q.   Okay.  Do you know why Highland
14 loaned the money to HCMFA that is the subject
15 of the notes described in this paragraph?
16     A.   I don't remember specifically why
17 5.3 million was loaned.  I mean, I -- it would
18 have to be put in the context.
19     Q.   Do you have any recollection at all
20 as to why Highland ever loaned any money to
21 HCMFA?
22     A.   Yes.
23     MS. DANDENEAU:  Objection to form.
24     Q.   What do you remember about that?
25     A.   There was a Highland Global

Page 125

WATERHOUSE - 10-19-21

1
2 Allocation Fund, which was a -- a fund managed
3 by Highland Capital Management Fund Advisors.
4 There was a -- we -- I'm just telling you,
5 there was -- there was -- there was a -- a
6 ultimately a NAV error found in this fund while
7 it was an open-ended fund and, you know, there
8 were amounts owed by the advisor in -- in
9 relation to that NAV error.
10     There were also, for the same fund,
11 that same fund was ongoing an
12 open-end-to-close-end conversion, and as part
13 of that proposal, shareholders who voted for
14 the conversion received compensation from the
15 advisor.
16     Q.   All right.  Now, the events that
17 you're describing occurred in the spring of
18 2019; right?
19     A.   These started back -- I think, I
20 mean --
21     Q.   I apologize.
22     A.   -- that -- I mean, the answer to
23 that is no.
24     Q.   I apologize, the loans that were
25 made in connection with the events that you're

Page 126

WATERHOUSE - 10-19-21

1
2 describing occurred in May 2019; right?
3       MR. RUKAVINA: Objection to the
4    extent that calls for a legal conclusion.
5    A.   I don't recall specifically what
6 amounts of money were moved when, for what
7 purpose.
8    Q.   Okay. Fair enough. Going to the
9 next paragraph, do you recall that NexPoint
10 Advisors had obtained a number of loans from
11 Highland, and they rolled up those loans into
12 one note in approximately 2017?
13    A.   This is for NexPoint Advisors?
14    Q.   Yes.
15    A.   I -- I mean, I don't -- I don't
16 recall the NexPoint Advisors loan being a
17 roll-up loan, but --
18    Q.   Do you know why?
19    A.   But, look, if you have documents
20 that show -- I mean, look, I just don't recall.
21    Q.   Okay. That is fair. Do you know
22 why -- do you have any recollection as to why
23 Highland loaned money to NexPoint?
24    A.   Yes.
25    Q.   Why did High -- why do you recall --

Page 127

WATERHOUSE - 10-19-21

1
2 what is the reason you recall Highland lending
3 money to NexPoint?
4    A.   I mean, I was just -- I just -- I
5 just recall. I mean, I just -- I don't
6 remember why.
7    Q.   I understand. And I'm asking you if
8 you recall --
9    A.   Oh, why -- I thought you say --
10 NexPoint Advisors was launching a fund which
11 is -- I believe that the legal name is NexPoint
12 Capital, Inc. And it -- it provided a
13 co-invest into that fund.
14       And, from what I remember, the --
15 the -- that NexPoint borrowed money from
16 Highland at the time to make that co-invest.
17    Q.   So this was an investment that
18 NexPoint was required to make; is that right?
19       MS. DANDENEAU: Objection to form.
20    A.   I don't know if it was required to
21 make, I don't recall that, or if it just made
22 it.
23    Q.   Okay. But your recollection is that
24 NexPoint made an investment and they borrowed
25 money from Highland to finance the investment.

Page 128

WATERHOUSE - 10-19-21

1
2       Do I have that right?
3    A.   Yes.
4    Q.   How about HCRE? Do you know why
5 HCRE borrowed money from Highland?
6    A.   I don't remember specifically.
7    Q.   Do you remember generally?
8    A.   Generally, yeah -- I mean, yes.
9    Q.   Can you tell me your general
10 recollection as to why Highland loaned money to
11 HCRE?
12    A.   For -- for -- for investment
13 purposes.
14    Q.   So HCRE made the investment and it
15 obtained a loan, or loans, from Highland in
16 order to finance that investment or those
17 investments.
18       Do I have that right?
19    A.   I mean, I -- you know, generally.
20    Q.   Okay. How about Highland Management
21 Services, Inc.?
22       Do you have any recollection as to
23 why HCMS borrowed money from Highland?
24    A.   Generally.
25    Q.   What is your general recollection as

Page 129

WATERHOUSE - 10-19-21

1
2 to why HCMS borrowed money from Highland?
3    A.   For -- for investment purposes.
4    Q.   So it is the same thing, HCMS wanted
5 to make investments and it borrowed money from
6 Highland in order to finance those investments;
7 is that right?
8    A.   I mean, yes, generally. I mean, I
9 can't -- I don't -- on the services, there --
10 there are several loans in these schedules.
11 You know, I can't remember why every single one
12 of these were made, but I would say, yeah, I
13 mean, generally.
14    Q.   Okay. I appreciate that.
15       MR. MORRIS: Let's go to the page
16    with Bates No. 251. La Asia, are you
17    there?
18       MS. CANTY: Sorry, John. It went
19    out for a minute. Can you say that again.
20    I don't know what is going on.
21       MR. MORRIS: The page with Bates
22    No. 251, can we go to that.
23       MS. CANTY: Yes, sorry.
24       MR. MORRIS: Keep going to the
25    bottom. Yeah, there you go.

Page 130

1        WATERHOUSE - 10-19-21
2    Q.  Do you see, Mr. Waterhouse, that
3  there is a section there called Subsequent
4  Events?
5    A.  I do.
6    Q.  And does this relate to the last
7  sentence above the signature line on the
8  management representation letter that we talked
9  about earlier where you made the representation
10  that you disclosed subsequent events?
11    A.  I mean, it relates to it, but not in
12  its entirety.
13    Q.  Okay.
14        MR. MORRIS:  If we can scroll up to
15  capture the entirety of this section right
16  here.
17    Q.  And what do you mean by that, sir?
18        MR. MORRIS:  Yeah, right there.
19  Perfect.
20    A.  There are -- there are different
21  subsequent events in -- under GAAP.  So there
22  are -- and -- and -- so what we see in the
23  notes to the financial statements are one type
24  of subevent.
25    Q.  Okay.  And -- and would the type of

Page 131

1        WATERHOUSE - 10-19-21
2  subsequent event relating to affiliate loans be
3  captured in this section if they were -- if
4  they were made after the end of the fiscal year
5  and prior to the issuance of the audit report?
6    A.  Yes, if they were deemed material or
7  disclosable.
8    Q.  Okay.  I appreciate that.
9        Do you see the next to the last
10  entry there?  It says, Over the course of 2019
11  through the report date, HCMFA issued
12  promissory notes to the partnership in the
13  aggregate amount of $7.4 million?
14    A.  Yes.
15    Q.  And does that refresh your
16  recollection that those are the notes that
17  related to the NAV error that you mentioned
18  earlier?
19    A.  I don't -- I don't remember the
20  exact.  Again, there are -- I mentioned two
21  line items; right?
22    Q.  Yes.
23    A.  I mean, it was the GAAP conversion
24  process plus the -- the NAV error.  I don't
25  have the details.  I don't recall specifically

Page 132

1        WATERHOUSE - 10-19-21
2  if -- you know, what -- if that 7.4 million was
3  solely attributable to the NAV error.
4    Q.  Okay.  But there is no question that
5  Highland told PricewaterhouseCoopers that over
6  the course of 2019 HCMFA issued promissory
7  notes to the partnership in the aggregate
8  amount of $7.4 million; correct?
9    A.  In the course of the audit, we would
10  have produced all promissory notes in our
11  possession, including the ones that are
12  detailed here.
13    Q.  Do you recall that you signed the
14  two promissory notes that are referenced in
15  that provision?
16        MS. DANDENEAU:  Objection to form.
17    A.  I didn't recall initially but I've
18  been reminded.
19    Q.  Okay.  And -- and do you recall that
20  those notes are dated May 2nd and May 3rd,
21  2019?
22    A.  Yes.
23    Q.  So that was just a month before the
24  audit was completed; correct?
25    A.  Yes.  I think we had a June 3rd

Page 133

1        WATERHOUSE - 10-19-21
2  date, right, if -- if my memory serves me
3  right.
4    Q.  Yes, I will represent to you that
5  your memory is accurate in that regard.
6        Did anybody ever instruct you as the
7  CFO to correct this statement that we're
8  looking at in subsequent events?
9    A.  So let me understand.  You're saying
10  when I was CFO at Highland Capital did anyone
11  ever ask me to correct the -- over the course
12  of 2019 through the report date HCMFA issued
13  promissory notes, this statement?
14    Q.  Right.
15    A.  Not that I'm aware.
16    Q.  While you were the CFO of Highland,
17  did anybody ever tell you that that sentence
18  was wrong?
19    A.  Not that I'm aware.
20    Q.  Highland -- withdrawn.
21        HCMFA disclosed these notes in its
22  own audited financial statements; right?
23        MR. RUKAVINA:  Objection, form.
24    A.  I assume that these would be
25  material -- if these are material financial

Page 134

WATERHOUSE - 10-19-21

1
2 statements, yes, they -- they -- they should be
3 and they were likely disclosed.
4    Q.   Now, there is no statement
5 concerning the 2019 notes about the forbearance
6 that we looked at in the affiliated note
7 section of the report; right?
8       MS. DANDENEAU:  Objection to form.
9    Q.   I'll withdraw.  That was bad.
10      Do you recall when we were looking
11 at the paragraph concerning HCMFA earlier it
12 had that disclosure about the agreement whereby
13 Highland wouldn't ask for demand on the -- on
14 the HCMFA notes?
15   A.   Yes.
16   Q.   That forbearance disclosure is not
17 made with respect to the 2019 notes; right?
18   A.   Not -- look, not that I can recall,
19 unless -- unless it was done at a subsequent
20 day.
21   Q.   Right.  And it is not in the
22 subsequent event section that we're looking at
23 right now where the 2019 notes are described;
24 right?
25   A.   Right.  But this is through

Page 135

WATERHOUSE - 10-19-21

1
2 June 3rd.  It could have been done on June 4th.
3 I don't -- I don't -- I don't recall.
4    Q.   Okay.
5       MR. MORRIS:  Can we put up on the
6 screen the HCMFA audit report.  And while
7 we're --
8       MS. DANDENEAU:  What exhibit is
9 this?
10      MR. MORRIS:  La Asia, what number is
11 that?
12      MS. CANTY:  45.
13      MR. MORRIS:  So this will be marked
14 as Exhibit 45.
15      (Exhibit 45 marked.)
16      MS. CANTY:  Yeah, and I will put it
17 in the chat.
18      MS. DANDENEAU:  Thank you.
19   Q.   Okay.  All right.  Do you see that
20 this is the consolidated financial statements
21 for HCMFA for the period ending 12/31/18?
22   A.   Yes.
23   Q.   As the treasurer of HCMFA at the
24 time, did you have to sign a management
25 representation letter similar to the one that

Page 136

WATERHOUSE - 10-19-21

1
2 we looked at earlier for Highland?
3    A.   I would imagine I would have been
4 asked to.  I don't recall if I did.
5    Q.   Do you recall ever being asked by an
6 auditor to sign a management representation
7 letter and then not doing it?
8    A.   No.
9       MR. MORRIS:  Can we just scroll down
10 again.  I just want to see the date of the
11 document.
12   A.   I mean, let me -- you know, there
13 are different versions to management
14 representation letters I will qualify.
15      Yes, there are certain -- from time
16 to time auditors can make representations
17 that -- in the rep letter that is being
18 proposed that are inaccurate or out of scope or
19 things like that and they've asked for
20 signature.
21      In that context, yes.  I mean, you
22 know -- I mean, if I have been asked to sign
23 and make those representations and those
24 representations are invalid, yes, I would not,
25 I mean, I -- I wouldn't sign that.

Page 137

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  PricewaterhouseCoopers served
3 as HCMFA's outside auditors as well; correct?
4    A.   Yes.
5    Q.   Do you see that this audit report is
6 signed on June 3rd, 2019, just like the
7 Highland audit report?
8    A.   That is correct.
9    Q.   And did the process of -- of
10 preparing HCMFA's audit report, was that the
11 same process that Highland followed when it did
12 its audit report at this time?
13   A.   I mean, it is a different entity.
14 There are different assets.  You know, it --
15 it -- it is -- as you saw, Highland's
16 financials are on a consolidated basis.  This
17 is different, so it is under the same control
18 environment and team.
19   Q.   Okay.  I appreciate that.  So the
20 same control environment and team participated
21 in the preparation of the audit for Highland
22 and for HCMFA at around the same time; correct?
23   A.   Yes.
24      MR. MORRIS:  Can we go to page 17 of
25 the report.  I don't have the Bates number.

Page 138

WATERHOUSE - 10-19-21

2    Q.   Okay.  Do you see that just like
3  Highland's audited financial report, HCMFA's
4  audited financial report also has a section
5  related to subsequent events?
6    A.   Yes.
7    Q.   And am I reading this correctly that
8  just as Highland had done, HCMFA disclosed in
9  its audited financial report a subsequent event
10  that related to the issuance of promissory
11  notes to Highland in the aggregate amount of
12  $7.4 million in 2019?
13    A.   That is what I see in the report.
14    Q.   And you were the treasurer of HCMFA
15  at the time; right?
16    A.   Yes, to the best of my knowledge.
17    Q.   And did anybody ever tell you prior
18  to the time of the issuance of this audit
19  report that that sentence relating to HCMFA's
20  2019 notes was inaccurate or wrong in any way?
21    A.   Not that I recall.
22    Q.   As you sit here right now, has
23  anybody ever told you that that sentence is
24  inaccurate or wrong in any way?
25    A.   Not that I recall.

Page 139

WATERHOUSE - 10-19-21

2    Q.   I apologize if I asked you this
3  already, but has anybody ever told you at any
4  time that you are not authorized to sign the
5  promissory notes that are the subject of the
6  sentence we're looking at?
7    A.   Not that I recall.
8    Q.   Did anybody ever tell you at any
9  time that you had made a mistake when you
10  signed the promissory notes that are the
11  subject of this sentence?
12    A.   Say that again.  Did anyone ever say
13  that I made a mistake?
14    Q.   Let me ask the question again.
15      Did anybody ever tell you at any
16  time that you made a mistake when you signed
17  the two promissory notes in Highland's favor on
18  behalf of HCMFA in 2019?
19    A.   Not that I recall.
20      MR. MORRIS:  Let's just look at the
21  promissory notes quickly.  Can we please
22  put up Document Number 1, and so this is in
23  the pile that y'all have.  We'll just go
24  for a few more minutes and we can take our
25  lunch break.

Page 140

WATERHOUSE - 10-19-21

2    Q.   All right.  So I don't know if you
3  have seen this before, sir.  Do you see that
4  this is a complaint against HCMFA?
5    A.   Yes, I am looking at it on the
6  screen.
7    Q.   Okay.  And have you ever seen this
8  document before?
9    A.   I went through some of these
10  documents with my counsel here yesterday.
11      MR. MORRIS:  All right.  Can we go
12  to Exhibit 1 of this document.
13    Q.   Do you see Exhibit 1 is a
14  $2.4 million promissory note back in 2019?
15    A.   Yeah, I found it in the book.  Yes,
16  I have it here in front of me.
17    Q.   And this is a demand note, right, if
18  you look at Paragraph 2?
19    A.   I mean, it --
20    Q.   And this is a note where the maker
21  is HCMFA, and Highland is the payee; right?
22    A.   Yes.
23      MR. MORRIS:  And if we can scroll
24  down, can we just see Mr. Waterhouse's
25  signature.

Page 141

WATERHOUSE - 10-19-21

2    Q.   Is that your signature, sir?
3    A.   Yes, it is.
4    Q.   And did you sign this document on or
5  around May 2nd, 2019?
6    A.   I don't recall specifically signing
7  this, but this is my signature.
8    Q.   Okay.  And do you recall that
9  Highland transferred $2.4 million to HCMFA at
10  or around the time you signed this document?
11    A.   I don't recall specifically.  I
12  would want to, as I sit here today, go back and
13  confirm that, but again, presumably that --
14  that -- that did happen.
15    Q.   You wouldn't have signed this
16  document if you didn't believe that HCMFA
17  either received or was going to receive
18  $2.4 million from Highland; is that fair?
19    A.   I mean, it -- if -- if -- if there
20  wasn't a transfer of value, yeah, I mean, you
21  know, I would have no reason to -- to sign a
22  note.
23    Q.   And -- and Highland wouldn't have
24  given this note to PricewaterhouseCoopers if --
25  withdrawn.

Page 142

1        WATERHOUSE - 10-19-21
2        HCMFA wouldn't have given this note
3   to PricewaterhouseCoopers if it hadn't received
4   the principal value of -- of the note in the
5   form of a loan; correct?
6        MR. RUKAVINA: Objection, legal
7   conclusion, speculation and form.
8        A.  Again, we -- what we provided to PwC
9   were, as part of the audit, any promissory
10  notes executed and outstanding. You know, as a
11  part of the audit, they, you know, they -- they
12  have copies of all the bank statements,
13  things -- things of that sort.
14       MR. MORRIS: Okay. Can we go to
15  Exhibit 2.
16       (Exhibit 2 marked.)
17       Q.  Do you see that this is a promissory
18  note dated May 3rd, 2019 in the amount of
19  $5 million?
20       A.  Yes.
21       Q.  Do you believe this is also a demand
22  note if you look at Paragraph 2?
23       A.  Yes.
24       Q.  And do you see that HCMFA is the
25  maker, and Highland is the payee?

Page 143

1        WATERHOUSE - 10-19-21
2        A.  Yes.
3        Q.  And if we go to the bottom, can we
4   just confirm that that is your signature?
5        A.  Yes.
6        Q.  And together these notes are the
7   notes that are referred to in both in Highland and
8   HCMFA's audited financial reports in the
9   subsequent event sections; correct?
10       MS. DANDENEAU: Objection to form.
11       A.  They -- they -- they totaled
12  $7.4 million, so presumably, yes.
13       Q.  Okay. And you were authorized to
14  sign these two notes; correct?
15       MR. RUKAVINA: Objection, legal
16  conclusion.
17       A.  Yeah. I mean, I'm -- I was the
18  officer of -- of HCMFA. You know, I -- I'm not
19  the legal expert on -- on what that -- what
20  that confers to me or what it doesn't. I mean,
21  that is my signature on the notes.
22       Q.  And you believed you were authorized
23  to sign the notes; is that fair?
24       A.  I signed a lot of documents in my
25  capacity, just because it is operational in

Page 144

1        WATERHOUSE - 10-19-21
2   nature. So, you know, to me this was just
3   another document, to be perfectly honest.
4        Q.  Sir, would you have signed
5   promissory notes with the principal amount of
6   $7.4 million if you didn't believe you were
7   authorized to do so?
8        MS. DANDENEAU: Objection to form.
9        Q.  Are you frozen?
10       A.  No. I'm just -- you know, it is --
11  you know, again, I typically don't sign
12  promissory notes, and I don't recall why I
13  signed these, but -- you know, but I did.
14       Q.  All right. So listen carefully to
15  my question. Would you have ever signed
16  promissory notes with a face amount of
17  $7.4 million without believing that you were
18  authorized to do so?
19       A.  No. I mean, I'm -- I'm putting my
20  signature on there, so no.
21       Q.  Okay. And would you have signed two
22  promissory notes obligating HCMFA to pay
23  Highland $7.4 million without Mr. Dondero's
24  prior knowledge and approval?
25       MS. DEITSCH-PEREZ: Object to the

Page 145

1        WATERHOUSE - 10-19-21
2   form.
3        A.  You know, from -- from what I recall
4   around these notes, you know, I don't recall
5   specifically Mr. -- Mr. Dondero saying to -- to
6   make this a loan.
7        So my conversation with Mr. Dondero
8   around the culmination of the NAV error as
9   related to TerreStar which was a -- a -- I
10  think it was a year and a half process. I
11  don't know, it was a multi-month process, very
12  laborious, very difficult.
13       When we got to the end, I had a
14  conversation with Mr. Dondero on where to, you
15  know, basically get the funds to reimburse the
16  fund, and I recall him saying, get the money
17  from Highland.
18       Q.  And so he told you to get the money
19  from Highland; is that right?
20       A.  That is what I recall -- in my
21  conversation with him, that is -- that is what
22  I can recall.
23       Q.  Do you know who drafted these notes?
24       A.  I don't.
25       Q.  Did you ask somebody to draft the

Page 146

WATERHOUSE - 10-19-21

1
2 notes?
3    A.   I didn't ask -- I don't specifically
4 ask people to draft notes really.  I mean,
5 again, you know, the legal group at Highland is
6 responsible and has always been responsible for
7 drafting promissory notes.
8    Q.   So based on your -- based on the
9 practice, you believe that somebody from the
10 Highland's legal department would have drafted
11 these notes.  Do I have that right?
12        MS. DEITSCH-PEREZ:  Object to the
13    form.  John, I also asked you for the Word
14    versions of these notes so we could look at
15    the properties, and you have not provided
16    them.  Are you intending to?
17        MR. MORRIS:  No.
18    Q.   Can you answer my question, sir?
19    A.   Again, I --
20        MS. DANDENEAU:  Do you want him to
21    repeat it?
22    A.   Yeah, why don't you repeat it?
23    Q.   Sure.  Mr. Waterhouse, based on the
24 practice that you have described in your
25 understanding, do you believe that these notes

Page 147

WATERHOUSE - 10-19-21

1
2 would have been drafted by somebody in the
3 legal department?
4        MS. DEITSCH-PEREZ:  Object to the
5    form.
6    A.   Yes.
7    Q.   Okay.  And do you know who would
8 have instructed -- do you have any knowledge as
9 to who would have instructed the legal
10 department to draft these notes?
11        MS. DEITSCH-PEREZ:  Object to the
12    form.
13    A.   It was whoever was working -- I
14 mean, it was likely someone on the team.  I
15 mean, I don't remember exactly on every note or
16 every document, but, again, a lot of these
17 things of this nature -- they're operational in
18 nature -- were handled by the team.
19        The team knows to -- I mean, we
20 don't draft documents.  We're not lawyers.
21 We're not attorneys.  It is not what I do or
22 accountants do.
23        So they are always instructed to go
24 and -- and go to the legal team to get
25 documents like this drafted.  Also, when you go

Page 148

WATERHOUSE - 10-19-21

1
2 to the legal team, the -- you know, we always
3 loop in compliance.  And compliance -- when you
4 go to the legal team, compliance is part of
5 legal team.  They're made aware of -- of -- of
6 these types of transactions.
7    Q.   And do you believe that you had
8 the -- withdrawn.
9        Did you ever tell Mr. Dondero --
10 (inaudible) -- did you see those?
11    A.   Sorry.
12        MS. DEITSCH-PEREZ:  I did not hear
13    the end of that question.
14    Q.   Did you ever tell Mr. Dondero that
15 you signed these two notes?
16    A.   I don't recall ever -- no, I don't
17 recall having a conversation with him.
18    Q.   Did you ever discuss these two notes
19 with him at any time?
20    A.   The conversation, I recall, was what
21 I described earlier.  And that is the only time
22 I recall ever discussing this.
23    Q.   Okay.  But the corporate accounting
24 group had a copy of this -- of these two notes.
25 And pursuant to the audit process, the

Page 149

WATERHOUSE - 10-19-21

1
2 corporate accounting group gave the two notes
3 to PricewaterhouseCoopers in connection with
4 the audit; correct?
5        MS. DANDENEAU:  Objection to form.
6    A.   Yes.  I mean, that is -- yeah, I
7 mean, they -- unless the legal team can also
8 retain copies of items like this.  I mean, I
9 don't know everything that they would retain as
10 well.
11        The legal team would also, if they
12 had documents as part of audits, turn that over
13 to the auditors as well.  So it could have been
14 the corporate accounting team.  It could be
15 someone on the legal team.
16    Q.   All right.  So you didn't -- you
17 didn't draft this note; right?
18    A.   I -- I -- I did not.
19    Q.   But somebody at Highland did; is
20 that fair?
21        MS. DEITSCH-PEREZ:  Object to the
22    form.
23    A.   I don't know.  I mean, we can go to
24 the legal team.  I don't -- I'm not sitting
25 behind someone in legal.  Maybe they went to

Page 150

WATERHOUSE - 10-19-21

1 outside counsel. I have no idea.

2

3    Q.   Did you have any reason to believe

4 you weren't authorized to sign this note,

5 either of these two notes?

6    A.   I think I have already answered that

7 question.

8    Q.   Okay.  You didn't give these notes

9 to PricewaterhouseCoopers; correct?

10    MS. DANDENEAU:  Objection to form.

11    A.   I don't recall giving these to

12 PricewaterhouseCoopers.

13    Q.   And in the practice that you have

14 described, somebody in the corporate accounting

15 group would have given these two notes to

16 PricewaterhouseCoopers; correct?

17    MS. DANDENEAU:  Objection to form.

18    A.   I think I've answered that.  I said

19 either the corporate accounting team or maybe

20 the legal team.

21    MR. MORRIS:  Okay.  Why don't we

22    take our lunch break here.

23    VIDEOGRAPHER:  We're going off the

24    record at 1:04 p.m.

25    (Recess taken 1:04 p.m. to 1:49 p.m.)

Page 151

WATERHOUSE - 10-19-21

1

2    VIDEOGRAPHER:  We are back on the

3    record at 1:49 p.m.

4    Q.   Mr. Waterhouse, did you speak with

5 anybody during the break about the substance of

6 this deposition?

7    A.   I spoke to -- to Deb and Michelle.

8    Q.   About the substance of the

9 deposition?

10    A.   Yes.

11    Q.   Can you tell me what you talked

12 about?

13    MS. DANDENEAU:  No.  We object on

14    the basis of privilege.

15    Q.   Okay.  You are going to follow your

16 counsel's objection here?

17    A.   Yes.

18    Q.   Okay.

19    MR. MORRIS:  Can we put up on the

20    screen Exhibit 35.

21    (Exhibit 35 marked.)

22    Q.   Are you able to see that document,

23 sir?

24    A.   Yes.

25    Q.   Have you ever seen an incumbency

Page 152

WATERHOUSE - 10-19-21

1

2 certificate before?

3    A.   I have.

4    Q.   Do you have a general understanding

5 of what an incumbency certificate is?

6    A.   I have a general understanding.

7    Q.   What is your general understanding?

8    A.   You know, those -- my general

9 understanding is that the incumbency

10 certificate basically lists folks that can --

11 are like authorized signers.

12    Q.   Okay.  And do you see that this is

13 an incumbency certificate for Highland Capital

14 Management Fund Advisors, L.P.?

15    A.   Yes.

16    Q.   Okay.  And if we could scroll down

17 just a little bit, do you see that it's dated

18 effective as of April 11th, 2019?

19    A.   Yes, I see that.

20    Q.   Okay.  And is that your signature in

21 the middle of the signature block?

22    A.   Yes, it is.

23    Q.   And by signing it, did you accept

24 appointment as the treasurer of HCMFA effective

25 as of April 11th, 2019?

Page 153

WATERHOUSE - 10-19-21

1

2    A.   Again, I'm not the legal -- I don't

3 know if this makes me the treasurer or the

4 appointment.  I don't know -- I don't know

5 that, so I don't -- I don't know if that

6 document -- again, I think -- again, I'm not

7 the legal expert.  I think isn't there --

8 aren't there other legal documents that detail

9 who the officers are that could be incorporated

10 or things like that?  Again, I don't want to

11 play armchair attorney here.

12    Q.   I'm not asking you for a legal

13 conclusion.  I'm asking you for your knowledge

14 and understanding.  When you signed this

15 document, did you understand that you were

16 accepting an appointment as the treasurer of

17 HCMFA?

18    MS. DANDENEAU:  Objection to form.

19    MS. DEITSCH-PEREZ:  Objection, form.

20    A.   Again, I don't think this -- that

21 wasn't my understanding.  I don't think this

22 makes -- this document makes me the treasurer.

23    Q.   What do you think this document --

24 why did you sign this document?

25    MS. DEITSCH-PEREZ:  Objection to

Page 154

WATERHOUSE - 10-19-21

1 form.
2 MR. MORRIS: You're objecting to the
3 form of the question when I asked him why
4 did you sign the document? What is the
5 basis for the objection?
6 MS. DEITSCH-PEREZ: Because, John, I
7 think that it does call for a legal
8 conclusion other than -- with him saying
9 because somebody told me to sign this
10 document. But if you want to go there,
11 that is fine.
12 MR. MORRIS: Okay.
13 MS. DANDENEAU: I don't think --
14 he's already said he's not a lawyer.
15 MR. MORRIS: I'll allow the witness
16 to answer this question.
17 Q. Why did you sign this document, sir?
18 A. I mean, our -- our legal group would
19 bring by these incumbency certificates from
20 time to time. I have no idea why they're being
21 updated, and I was asked to sign.
22 Q. Did you ask anybody, what is this
23 document?
24 A. No.

Page 155

WATERHOUSE - 10-19-21

1 Q. Did anybody tell you why they needed
2 you to sign the document?
3 A. Not that I can recall.
4 Q. You testified earlier that you
5 understood that you served as the acting
6 treasurer for HCMFA; correct?
7 A. Yes.
8 Q. How did you become the acting
9 treasurer of HCMFA?
10 MS. DANDENEAU: Objection to form.
11 A. I don't -- I don't know the legal --
12 I don't know the legal mechanic of how I became
13 the acting treasurer.
14 Q. I'm not asking for the legal
15 mechanic. I'm asking you as the person who
16 is --
17 MS. DANDENEAU: John, you said --
18 MR. MORRIS: Stop.
19 MS. DANDENEAU: -- how did you
20 become the treasurer. That is --
21 MR. MORRIS: Please stop.
22 MS. DANDENEAU: That is a legal
23 question.
24 MR. MORRIS: I am not asking any

Page 156

WATERHOUSE - 10-19-21

1 legal questions, to be clear. I'm asking
2 for this witness' understanding as to how
3 he became the acting treasurer of HCMFA.
4 If he doesn't know, he can say he doesn't
5 know, but this legal stuff is nonsense, and
6 I really object to it.
7 Q. Sir, I'm asking you a very simple
8 question.
9 MS. DANDENEAU: Argumentative.
10 Q. You testified -- you testified that
11 you became the acting treasurer of HCM --
12 HCMFA; correct?
13 A. Yes.
14 Q. How did that happen?
15 MS. DANDENEAU: Again, object to
16 form.
17 MR. MORRIS: I can't wait to do this
18 in a courtroom. Good God.
19 Q. Go ahead, sir.
20 A. I don't know the exact process of
21 how that happened.
22 Q. Do you have any idea whether signing
23 this document was part of the process?
24 MR. MORRIS: You know what --

Page 157

WATERHOUSE - 10-19-21

1 MS. DANDENEAU: Objection.
2 MR. MORRIS: -- withdrawn. You guys
3 want to do this, I can't wait. I can't
4 wait. This is the craziest stuff ever.
5 MS. DANDENEAU: John, he said he's
6 not a lawyer, and you are asking him for a
7 legal conclusion, and he says he doesn't
8 know, and you persist.
9 MR. MORRIS: Okay.
10 MS. DANDENEAU: So you can ask these
11 questions --
12 MR. MORRIS: Did anyone -- please
13 stop talking.
14 MS. DANDENEAU: -- at another
15 point -- no, no, no, I'm entitled to talk,
16 too; right? If you're going to make these
17 accusations as if we're trying to stonewall
18 you, this is not the witness to ask that
19 question.
20 MR. MORRIS: I can't -- I can't
21 wait -- I can't wait to do this in a
22 courtroom. I will just leave it at that.
23 MS. DANDENEAU: That's right, I'm
24 sure you can't.

Page 158

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2       Q.   Did anyone ever tell you, sir, that
3   even though you were the acting treasurer of
4   HCMFA, that you were not authorized to sign the
5   two promissory notes that we looked at before
6   lunch?
7       A.   I'm not sure I understand the
8   question. I wasn't -- I mean, I'm -- I'm the
9   current acting treasurer.
10      Q.   Did anybody ever tell you at any
11  time that even though you were the acting
12  treasurer of HCMFA, that you were not
13  authorized to sign the two promissory notes
14  that we looked at before lunch?
15          MS. DANDENEAU: Objection to form.
16      A.   Not that I recall.
17      Q.   Did anybody ever tell you at any
18  time that you were not authorized to sign the
19  two promissory notes that we looked at before
20  lunch?
21      A.   Not that I recall.
22      Q.   Did anybody ever tell you at any
23  time that you should not have signed the two
24  promissory notes that we looked at before
25  lunch?

Page 159

1       WATERHOUSE - 10-19-21
2       A.   Not that I recall.
3       Q.   Did you ever tell anybody at any
4   time that you weren't authorized to sign the
5   two promissory notes that we looked at before
6   lunch?
7       A.   Not that I recall.
8       Q.   Did you ever tell anybody at any
9   time that you made a mistake when you signed
10  the two promissory notes that we looked at
11  before lunch?
12      A.   Not that I recall.
13      Q.   As you sit here right now, do you
14  have any reason to believe that you were not
15  authorized to sign the two documents that we
16  looked at before lunch?
17          MS. DANDENEAU: Objection to form.
18      A.   If -- if this is the -- the valid
19  incumbency certificate, I mean, this does --
20  this does detail who the signers are.
21      Q.   Okay. And looking at that document,
22  does that give you comfort that you were
23  authorized to sign the two promissory notes
24  that we looked at before lunch?
25          MS. DEITSCH-PEREZ: Object to the

Page 160

1   form.
2           MS. DANDENEAU: Objection, form.
3       A.   Yes.
4       Q.   As of October 20th -- withdrawn.
5           I'm trying to take your mind back to
6   a year ago, October 2020. Do you recall at
7   that time that the boards of the retail funds
8   were making inquiries about obligations that
9   were owed by the advisors to Highland in
10  connection with their 15(c) review?
11          MS. DANDENEAU: Objection to form.
12      A.   I don't -- I don't recall.
13      Q.   As of October 2020, you had no
14  reason to believe you weren't authorized to
15  sign the two promissory notes that we just
16  looked at; correct?
17          MS. DANDENEAU: Objection, form.
18          MS. DEITSCH-PEREZ: Objection to
19  form.
20      A.   I didn't think about it in October
21  of 2020, but I mean --
22      Q.   Did you have any reason to believe
23  at that time that you weren't authorized to
24  sign the two notes that we just looked at?

Page 161

1       WATERHOUSE - 10-19-21
2       A.   Not that I'm aware, no.
3       Q.   Did you have any reason to believe a
4   year ago that you made a mistake when you
5   signed those two notes?
6       A.   Not that I'm aware.
7       Q.   A year ago you believed that HCMFA
8   owed Highland the unpaid principal amounts that
9   were due under those two notes; correct?
10      A.   They're -- they're promissory notes
11  that were -- as you presented, that were --
12  that were executed. Whether they're valid or
13  if there's other reasons, I didn't -- I don't
14  know.
15      Q.   I'm not asking you whether they're
16  valid or not. I'm asking you for your state of
17  mind. A year ago you believed that HCMFA
18  was -- was obligated to pay the unpaid
19  principal amount under the two notes that you
20  signed; correct?
21      A.   Yeah, I'm -- I'm -- yes.
22      Q.   Thank you. Are you aware -- you're
23  aware that -- that in 2017, NexPoint issued a
24  note in favor of Highland in the approximate
25  amount of $30 million; correct?

Page 162

WATERHOUSE - 10-19-21

2 A. I'm -- I'm -- I'm generally aware.

3 Q. Okay. And are you generally aware

4 that from time to time, after the note was

5 issued by NexPoint, that moneys were applied to

6 principal and interest that were due under the

7 NexPoint note?

8 A. Yes, I'm generally aware.

9 Q. Okay. And did anybody ever tell you

10 that the payments that were made against the

11 NexPoint notes were made by mistake?

12 A. Yes.

13 Q. And is it the one payment that we

14 talked about earlier today?

15 A. We talked about a lot of things

16 today. What payment are we talking about?

17 Q. Okay. Who told you that any payment

18 made against the NexPoint note was made by

19 mistake?

20 A. D.C. Sauter.

21 Q. When did Mr. Sauter tell you that?

22 A. I don't -- I don't remember

23 specifically.

24 Q. Do you remember what payments --

25 A. Sometime -- sometime this year.

Page 163

WATERHOUSE - 10-19-21

2 Q. Sometime in 2021?

3 A. Yes.

4 Q. Do you remember what payment he was

5 referring to?

6 A. It was the -- the payment made in

7 January of 2021 or -- yeah, January of -- of

8 this -- January of 2021.

9 Q. Okay. So did anybody ever tell you

10 at any time that any payment that was made

11 against principal --

12 A. And -- and -- and -- hold on, and it

13 may have been other -- again, it may have been

14 that payment or -- or there may have been what

15 he was explaining, a misapplication of prior

16 payments as well.

17 Q. Can you -- can you give me any

18 specificity -- withdrawn.

19 Withdrawn. Can you tell me

20 everything that Mr. Sauter told you about --

21 about errors in relation to payments made

22 against principal and interest due under the

23 NexPoint note?

24 MS. DANDENEAU: Can I just --

25 MR. RUKAVINA: Hold on. Hold on.

Page 164

WATERHOUSE - 10-19-21

2 I'm going to object here, and I'm going to

3 instruct the witness not to answer

4 depending on the discussion that you had --

5 Mr. Waterhouse, I'm the lawyer for

6 NexPoint, and as everyone here knows, D.C.

7 Sauter is in-house counsel.

8 So if you and Mr. Sauter were having

9 a factual discussion and him preparing his

10 affidavit, et cetera, then go ahead and

11 answer that. But if you were having a

12 discussion as to our legal strategy in this

13 lawsuit, or anything having to do with

14 that, then do not answer that.

15 And if you need to talk to either

16 your counsel or me about that, then we need

17 to have that discussion now.

18 A. Okay. Yeah, I don't -- I don't

19 really know how to make that distinction, so

20 maybe I need to talk to counsel before I

21 answer, or if I can answer.

22 Q. Let me just ask you this question:

23 Did -- did you have any conversation with

24 Mr. Sauter about any payment of principal and

25 interest prior to the time that you left

Page 165

WATERHOUSE - 10-19-21

2 Highland's employment, or did it happen after

3 you left Highland's employment?

4 A. I don't -- I don't recall if -- I

5 don't recall. I mean, it was sometime in 2021.

6 I don't remember if it was before or after I

7 was let go from Highland.

8 Q. Okay. So -- so nobody told you

9 prior to 2021 that any error or mistake was

10 made in the application of payments against

11 principal and interest due on the NexPoint

12 note. Do I have that right?

13 A. Yeah, I don't -- I don't recall this

14 being in 2020.

15 Q. Okay. And it didn't happen in 2019;

16 correct?

17 A. I don't recall that happened.

18 Q. And it didn't happen in 2018;

19 correct?

20 A. I don't -- I don't recall that

21 happening.

22 Q. And it didn't happen in 2017;

23 correct?

24 A. I don't recall.

25 Q. But -- but you believe the

Page 166

1    WATERHOUSE - 10-19-21
2  conversation took place in 2021. You just
3  don't remember if it was before or after you
4  left Highland's employment. Do I have that
5  right?
6    A.  It was sometime this year. I
7  don't -- I don't remember.
8    Q.  Okay. Did you report this
9  conversation to Mr. Seery at any point?
10   A.  I don't believe so.
11   Q.  Did you report this conversation to
12 anybody at DSI at any time?
13   A.  I don't recall.
14   Q.  Do you have -- you don't have a
15 recollection of ever doing that; correct?
16   A.  Yeah, that's right. I don't recall
17 doing that.
18   Q.  Do you recall telling anybody at
19 Pachulski Stang about the conversation you
20 recall with Mr. Sauter?
21   A.  No, I don't -- I don't recall.
22   Q.  Did you tell any of the independent
23 board members about your conversation with
24 Mr. Sauter?
25   A.  I don't recall.

Page 167

1    WATERHOUSE - 10-19-21
2    Q.  Did you tell any of the employees at
3  Highland before you left Highland's employment
4  about this call that you had with Mr. Sauter?
5    MS. DANDENEAU: Objection to form.
6    A.  No, I don't -- no, I don't recall.
7    Q.  NexPoint -- to the best of your
8  knowledge, did NexPoint ever file a proof of
9  claim against Highland to try to recover moneys
10 that were mistakenly paid against the principal
11 and interest due under the note?
12   A.  Okay. Hold on. You are saying did
13 NexPoint Advisors file a proof of claim to
14 Highland for errors related to payments under
15 the NexPoint note to Highland?
16   Q.  Correct.
17   A.  I'm -- I'm -- I'm not -- I'm not
18 aware.
19   Q.  Are you aware --
20   A.  I'm not the legal person here, I
21 don't know.
22   Q.  I'm just asking for your knowledge,
23 sir.
24   A.  Yeah, I don't know. I'm not aware.
25   Q.  Are you aware of any claim of any

Page 168

1    WATERHOUSE - 10-19-21
2  kind that NexPoint has ever made to try to
3  recover the amounts that it contends were -- or
4  that Mr. Sauter contend were mistakenly applied
5  against principal and interest due under the
6  NexPoint note?
7    A.  I'm not aware.
8    MS. DANDENEAU: Objection to form.
9    Q.  Okay. The advisors' agreements with
10 the retail funds are subject to annual renewal;
11 correct?
12   A.  Yes.
13   Q.  And do you participate in the
14 renewal process each year?
15   A.  Yes.
16   Q.  What role do you play in the renewal
17 process?
18   A.  I'm -- I'm asked by the retail board
19 to walk-through the advisors financials.
20   Q.  And do you do that in the context of
21 a board meeting?
22   A.  Yes, it is -- yes, it is typically
23 done in a board meeting.
24   Q.  And do you recall the time --
25 does -- does the renewal process happen around

Page 169

1    WATERHOUSE - 10-19-21
2  the same time each year?
3    A.  Yes, it is -- it is around the same
4  time every year.
5    Q.  And what -- what time period of the
6  year does the renewal process occur?
7    A.  Approximately the September
8  timeframe.
9    Q.  During that process, in your
10 experience, does the board typically conduct
11 its own diligence and ask for information?
12   A.  Does the board ask for lots of -- I
13 mean, just -- I mean, lots of information as a
14 part of that -- that -- as part of that board
15 meeting and that process.
16   Q.  Okay. And do you recall that the
17 process in 2020 spilled into October?
18   A.  Yes. Yes.
19   Q.  And as part of the process in
20 2020, the retail board asked -- asked what are
21 referred to as 15(c) questions; right?
22   A.  I guess I don't want to be -- they
23 asked 15(c) -- are you saying they asked 15(c)
24 questions and this is why it went into October
25 or --

Page 170

1      WATERHOUSE - 10-19-21
2    Q.    No, I apologize.
3         Do you have an understanding of
4  what -- of what 15(c) refers to in the context
5  of the annual renewal process?
6    A.    Yes, generally.
7    Q.    All right.  What is your general
8  understanding of the term "15(c)" in the
9  context of the annual renewal process?
10    A.    I -- I think 15(c) is the section
11  that -- that -- you know, that -- that the
12  board has to evaluate every year, the retail
13  board.  They have to, you know, go through,
14  evaluate, and go through that approval process
15  on a yearly basis.
16    Q.    Okay.
17         MR. MORRIS:  Can we put up on the
18  screen Exhibit 36, please.
19         (Exhibit 36 marked.)
20         MR. MORRIS:  I guess let's just
21  start at the bottom so Mr. Waterhouse can
22  see what is here.
23    Q.    You see this begins with an email
24  from Blank Rome to a number of people.
25         MR. MORRIS:  And if we can scroll

Page 171

1      WATERHOUSE - 10-19-21
2  up -- keep going just a little bit.
3    Q.    You will see that there is an email
4  from Lauren Thedford to Thomas Surgent and
5  others where she reports that she was attaching
6  and reproducing below additional 15(c)
7  follow-up questions from the board.
8         Do you see that?
9    A.    Yes.
10    Q.    And do you see Question No. 2 asks
11  whether there are any material outstanding
12  amounts currently payable or due in the future
13  (e.g., notes) to HCMLP by HCMFA or NexPoint
14  Advisors or any other affiliate that provides
15  services to the funds?
16         Do you see that?
17    A.    Yes.
18    Q.    And -- and did you -- do you recall
19  that in -- in October of 2020 the retail boards
20  were asking for that information?
21    A.    I don't recall it, but there --
22  they're obviously asking in this email.
23    Q.    Okay.
24         MR. MORRIS:  Can we scroll up a
25  little bit, please.

Page 172

1      WATERHOUSE - 10-19-21
2    Q.    And then do you see that
3  Ms. Thedford includes you on the email string
4  on Tuesday, October 6th, at 5:52?
5    A.    Yes.
6    Q.    And she asks you and Dave Klos and
7  Kristin Hendrix for advice on that particular
8  Request No. 2 that I have just read; right?
9    A.    Yes.
10    Q.    Okay.  Can you tell me who
11  Ms. Thedford is?
12    A.    She was an attorney that was in the
13  legal group.
14    Q.    At Highland Capital Management,
15  L.P.?
16    A.    I'm -- I'm -- I'm -- I don't
17  remember if she was an employee of Highland or
18  any of the advisors.
19    Q.    Okay.  Do you know if she served as
20  the corporate secretary for both HCMFA and
21  NexPoint?
22    A.    Yes.
23    Q.    And -- okay.
24         Do you know whether Ms. Thedford
25  held any positions in relation to the retail

Page 173

1      WATERHOUSE - 10-19-21
2  funds as we defined that term?
3    A.    Yes.
4    Q.    What is your understanding of the
5  positions that Ms. Thedford held at the retail
6  funds?
7    A.    I -- I recall her being an officer.
8  I don't recall her title.
9    Q.    Okay.  Is still an officer at
10  any of the retail funds today?
11    A.    No.
12    Q.    Do you know when she ceased to be an
13  officer of the retail funds?
14    A.    Approximately.
15    Q.    And when did she approximately cease
16  to be an officer of the retail funds?
17    A.    It was in -- it was in early of
18  2021.
19    Q.    Okay.  Do you know when she became
20  an officer of the retail funds?
21    A.    I don't recall.
22    Q.    To the best of your recollection,
23  was she an officer of the retail funds in
24  October of 2020?
25    A.    I believe so.

Page 174

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2    Q.   Okay.  Do you know what title she
3  held in her capacity as an officer, if any?
4    A.   I told you I don't remember.
5    Q.   Okay.  So she sends this email to
6  you at 5:52 p.m. on October 6th.
7        And if we can scroll up to the
8  response, you responded a minute later with a
9  one-word answer: Yes.
10       Do you see that?
11   A.   Yes.
12   Q.   And -- and yes is -- yes was in
13  response to the retail board's Question No. 2,
14  right, whether there are any material
15  outstanding amounts currently payable or due in
16  the future?
17   A.   Yes.
18       MR. MORRIS:  And can we scroll up to
19   see what happened next.
20   Q.   So Ms. Thedford writes back to you a
21  few minutes later and she asks whether you
22  could provide the amounts.
23       Do you see that?
24   A.   Yes.
25   Q.   And then you respond further and you

Page 175

1        WATERHOUSE - 10-19-21
2  refer her to the balance sheet that was
3  provided to the board as part of the 15(c)
4  materials.
5        Do you see that?
6    A.   Yes.
7    Q.   And -- and did the advisors provide
8  to the board certain balance sheets in 2020 in
9  connection with the 15(c) review?
10   A.   Yes, they did.
11   Q.   Okay.  And were the amounts that
12  were outstanding or that were to be due in the
13  future by the advisors to Highland included in
14  the liability section of the balance sheet that
15  was given to the retail board?
16   A.   Yes.  Notes would be reflected as
17  liabilities.
18   Q.   Okay.  And --
19   A.   If I'm understanding your question
20  correctly.
21   Q.   You are.  And -- and -- and those
22  liabilities you -- you were -- you believed
23  were responsive to the retail board's question;
24  correct?
25   A.   Yes.

Page 176

1        WATERHOUSE - 10-19-21
2    Q.   Okay.  And then if we can scroll up,
3  you see Ms. Thedford responds to you
4  nine minutes later with a draft response.
5        Do you see that?
6    A.   Yes.
7    Q.   And she says that she is taking from
8  the 6/30 financials certain information about
9  amounts that were due to HCMLP and affiliates
10  as of June 30th, 2020.
11       Do you see that?
12   A.   I do.
13   Q.   Okay.  And did you believe, as the
14  treasurer of NexPoint and HCMFA and as the CFO
15  of Highland, that the information that
16  Ms. Thedford obtained from the 6/30 financials
17  was accurate and responsive in relation to the
18  retail fund board's question?
19   A.   I just want to make sure I
20  understand the question.
21       Are you saying that the financial
22  information provided to the retail board as
23  part of the 15(c) process, which included
24  financial statements as of June 30th of 2021,
25  did I feel like those were responsive to their

Page 177

1        WATERHOUSE - 10-19-21
2  questions?
3    Q.   Yes.
4    A.   Yes.
5    Q.   Thank you.
6        MS. DEITSCH-PEREZ:  John, it is not
7   in the chat yet.  Can you just make sure it
8   gets put in there.
9        MR. MORRIS:  Sure.
10       MS. CANTY:  I put it in there.  I
11   think maybe I just sent it directly, so let
12   me make sure it says to everyone.  But I
13   did put it in there.  I will try again.
14       MR. MORRIS:  Thank you, La Asia.
15       MS. DANDENEAU:  What number is it.
16       MR. MORRIS:  What, the Bates number?
17       MS. DEITSCH-PEREZ:  No, the --
18   this -- yeah, 36 is not in the chat.
19       MR. MORRIS:  Okay.  We'll get it.
20       MS. DANDENEAU:  I think that
21   Ms. Canty just sent it to me originally.
22   Sorry.
23       MR. MORRIS:  Okay.  We will get it
24   there.
25       MS. CANTY:  Okay.  It is there now

Page 178

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2  for everyone.
3        MS. DEITSCH-PEREZ: Got it. Thank
4  you.
5    Q.  Do you recall if the proposed
6  response that Ms. Thedford crafted was
7  delivered to the retail board with the -- with
8  the yellow dates having been completed?
9    A.  I don't know.
10       MR. MORRIS: Davor, I'm going to ask
11  that the advisors and -- the advisors of
12  both HCMFA and NexPoint produce to me any
13  report that was given to the retail board
14  concerning the promissory notes at issue,
15  including the obligations under the notes.
16   Q.  Do you know -- do you know if
17  ultimately NexPoint informed the retail board
18  in response to its question that NexPoint owed
19  Highland approximately 23 or $24 million?
20       MS. DANDENEAU: Objection to the
21  form.
22   A.  Sorry, are you asking, did NexPoint
23  tell the retail board that it owed Highland?
24   Q.  Let me ask a better question,
25  Mr. Waterhouse.

Page 179

1    WATERHOUSE - 10-19-21
2    Q.  Did -- do you know if anybody ever
3  answered the retail board's question that was
4  Number 2?
5    A.  I don't -- I can't say for sure.
6    Q.  Okay. Do you recall -- I think you
7  testified earlier that you walked through the
8  advisors' financials with the retail board;
9  correct?
10   A.  Yes.
11   Q.  And as part of that process, did you
12  disclose to the retail board the obligations
13  that NexPoint and HCMFA had to Highland under
14  promissory notes?
15   A.  The retail board, as I stated
16  earlier, receives financial information,
17  balance sheet, income statement information
18  from the advisors. That information is
19  provided to the retail board in connection with
20  the 15(c) process.
21       So any notes between the advisors
22  and the Highland would be -- anything would be
23  detailed in those financial statements.
24   Q.  Do you recall in 2020 ever speaking
25  with the retail board about the advisors'

Page 180

1    WATERHOUSE - 10-19-21
2  obligations under the notes to Highland?
3        MS. DANDENEAU: Objection to form.
4        MS. DEITSCH-PEREZ: Object to the
5  form.
6    A.  I don't recall specifically.
7    Q.  Do you have any general recollection
8  of discussing with the retail board the
9  advisors' obligations to Highland under the
10  notes that they issued?
11       MS. DANDENEAU: Object to the form.
12       MS. DEITSCH-PEREZ: Object to the
13  form.
14   A.  I just recall generally just -- it
15  is just -- I present the financial statements,
16  and if they have questions, I answer their
17  questions and walk them through.
18       I don't recall what they asked. I
19  don't recall where the discussion went. I
20  don't recall anything of that nature.
21   Q.  Okay. Do you know if anybody on
22  behalf of HCMF -- HCMFA ever told the retail
23  board that HCMFA had no obligations under the
24  two 2019 notes that you signed? Withdrawn.
25       Do you know whether anybody on

Page 181

1    WATERHOUSE - 10-19-21
2  behalf of HCMFA ever told the retail boards
3  that you weren't authorized to sign either of
4  the two 2019 notes?
5        MS. DANDENEAU: Objection to form.
6    A.  I'm not aware.
7    Q.  Are you aware of anybody on behalf
8  of HCMFA ever telling the retail boards that
9  your execution of the two 2019 notes was a
10  mistake?
11       MS. DANDENEAU: Objection to form.
12   A.  I'm not aware.
13   Q.  Are you aware of anybody on behalf
14  of HCMFA ever telling the retail boards that
15  HCMFA did not have to pay the amounts reflected
16  in the two notes that you signed in 2019?
17   A.  I'm not aware.
18   Q.  Do you know whether anybody ever
19  told the retail boards -- withdrawn.
20       Do you know whether anybody ever
21  told the retail boards that Highland has
22  commenced a lawsuit to recover on the two notes
23  that you signed in 2019?
24   A.  I'm not aware.
25   Q.  Are you aware of anybody informing

Page 182

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  the retail boards that Highland has sued to
3  recover on the NexPoint note?
4      A.  I'm not aware.
5      Q.  Do you know whether anybody ever
6  told the retail board that Highland had
7  declared a default with respect to the two
8  HCMFA notes that you signed in 2019?
9      A.  I'm not aware.
10     Q.  Are you aware of anybody ever
11 informing the retail boards that Highland had
12 declared a default under the NexPoint note?
13     A.  I'm not aware.
14     Q.  Are you aware of anybody telling the
15 retail board that Highland made a demand for
16 payment under the 2019 notes that you signed on
17 behalf of HCMFA?
18     A.  I'm not aware.
19     Q.  Let's -- let's see if there is a
20 response to Ms. Thedford's email, if we can
21 scroll up.
22         Do you see you responded to
23 Ms. Thedford five minutes after she provided
24 the draft response to you?
25     A.  Yes.

Page 183

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2      Q.  Okay.  And do you see that Dustin
3  Norris is copied on this email?
4      A.  Yes, he is.
5      Q.  Great.  Do you know whether
6  Mr. Norris held any positions at either of the
7  advisors as of October 6, 2020?
8      A.  I will go back to -- I'm not the
9  legal expert of what appoints you or how or
10 why, but you did see Dustin's name on the
11 incumbency certificate that you produced
12 earlier.
13     Q.  Do you know what his title was in
14 October of 2020?
15         MS. DANDENEAU:  Objection to form.
16     A.  I don't -- I don't recall.
17     Q.  Was he -- did he have a title with
18 each of the advisors, to the best of your
19 recollection?
20     A.  I don't recall.
21     Q.  Do you know why he is included on
22 this email string?
23     A.  I didn't add Dustin.  It looks like
24 Lauren did.  I don't know why she added him or
25 not.  You would have to ask her.

Page 184

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2      Q.  Does Mr. Norris play a role in
3  formulating the advisors' responses to the
4  questions asked by the retail board in
5  connection with the 15(c) annual review?
6          MS. DANDENEAU:  Objection to form.
7      A.  He -- Dustin Norris is there in the
8  board meetings.  But -- so he has a role, yes.
9      Q.  Okay.  And does Mr. Norris hold any
10 positions, to the best of your knowledge, in
11 relation to any of the retail funds?
12     A.  I don't -- I don't believe he does.
13     Q.  How about Mr. Post, do you know
14 whether Mr. Post holds any position in either
15 of the advisors?
16     A.  I mean, he -- he -- yes.
17     Q.  What is your understanding of the
18 positions that Mr. Post holds in relation to
19 the advisors?
20         MS. DANDENEAU:  Objection to form.
21     A.  He is an employee of NexPoint
22 Advisors.  He is also the chief compliance
23 officer for -- for NexPoint.
24     Q.  Who is the chief compliance officer
25 for HCMFA, if you know?

Page 185

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2          MS. DANDENEAU:  Objection to form.
3      A.  That would be Jason as well.
4      Q.  Okay.  Now, looking at your
5  response, you noted initially that nothing was
6  owed under shared services.  Do I have that
7  right in substance?
8      A.  Yeah.  I think I'm being responsive
9  to Lauren's question here, whether any of the
10 shared service invoices are outstanding.
11     Q.  Right.
12     A.  Yes.
13     Q.  And that is because -- and that is
14 because the retail the retail board has asked
15 for the disclosure of all material obligations
16 that were owed to HCMLP either then or in the
17 future; isn't that right?
18         MS. DANDENEAU:  Objection to form.
19     Q.  We can go back down and look.
20     A.  Look, I don't know if that's a
21 material item, I mean, again, but sure.
22     Q.  Okay.  But there were no shared
23 services outstanding; correct?
24         MS. DANDENEAU:  Objection to form.
25     A.  That is what this email seems to

Page 186

WATERHOUSE - 10-19-21

1 indicate.

2 Q. And you wouldn't have written it if
3 you didn't believe it to be true at the time;
4 correct?

5 A. Correct.

6 Q. And when you referred to shared
7 services outstanding, what you meant there was
8 that neither NexPoint nor HCMFA owed Highland
9 any money under the shared services agreements
10 that they had with Highland as of October 6th,
11 2020; right?

12 A. I don't know if it is as of October
13 6, 2020 or if it was from -- like through the
14 financials -- through the date of the
15 financials as of June 30.

16 Q. Okay. And then you noted that
17 HCMA -- the HCMFA note is a demand note; right?

18 A. Yes.

19 Q. And then you referred Ms. Thedford
20 to Kristin Hendrix for the term of the NexPoint
21 note. Do I have that right?

22 A. Yes.

23 Q. And then you refer to that agreement
24 that is referenced in the 2018 audited

Page 187

WATERHOUSE - 10-19-21

1 financials about Highland's agreement not to
2 make demand upon HCMFA until May 2021; correct?

3 A. Correct.

4 Q. And then -- and then the next thing
5 you write is that the attorneys think that BK
6 doesn't change that, but don't know for sure at
7 the end of the day.

8 Do you see that sentence?

9 A. Yes.

10 Q. Which attorneys were you referring
11 to?

12 A. I don't remember.

13 Q. Did you have a conversation with
14 attorneys concerning whether the bankruptcy
15 would change or alter in any way the agreement
16 not to make a demand under the HCMFA note?

17 A. Look, yeah, I mean, I don't
18 specifically remember, but generally, I mean,
19 it is in this email. I don't -- I don't -- I
20 don't -- I don't remember who I talked to or,
21 you know, was it inside counsel, outside
22 counsel, but obviously I talked to somebody.

23 Q. Do you have any recollection --

24 A. Well, I don't even know if it's --

Page 188

WATERHOUSE - 10-19-21

1 actually, it may not even have been me. I say
2 the attorneys in, you know, a lot of -- like I
3 talked about the team.

4 It could have been someone on the
5 team, like, hey, we need to run this down, and
6 maybe they talked to attorneys again and
7 relayed that information to me.

8 So I really don't know if I spoke or
9 someone else did or -- or, I mean, and maybe it
10 wasn't even from corporate accounting. Maybe
11 it was, you know, other -- I'm kind of
12 summarizing, you know, again, so I don't really
13 know -- I can't really say for sure. I don't
14 remember how I came about of this knowledge.

15 Q. I appreciate your efforts,
16 Mr. Waterhouse, but I will just tell you that
17 if I ask a question and you don't know the
18 answer or you don't recall, I'm happy to accept
19 that. I don't -- I don't want you to
20 speculate, so I want to be clear about that.
21 So I appreciate it.

22 Let me just ask you simply: Do you
23 know what attorneys -- can you identify any of
24 the attorneys who thought that the bankruptcy

Page 189

WATERHOUSE - 10-19-21

1 process didn't change the agreement?

2 A. I don't recall.

3 Q. Okay. Perfect.

4 And then let's look at the last
5 sentence. It says, quote: The response should
6 include, as I covered in the board meeting,
7 that both entities have the full faith and
8 backing from Jim Dondero, and to my knowledge
9 that hasn't changed.

10 Do you see that?

11 A. Yes.

12 Q. Okay. Prior to October 6th, 2020,
13 had you told the retail board that HCMFA and
14 NexPoint have the full faith and backing from
15 Jim Dondero?

16 A. Yes.

17 Q. Do you remember in the context in
18 which you told the retail board that?

19 A. I mean, generally, yes.

20 Q. Tell me what you recall.

21 A. So we were walking through the
22 financials from the advisors; right? So as I
23 described to you, you have got HCMFA and NPA.
24 And these -- the financials, you know, show

Page 190

WATERHOUSE - 10-19-21

1
2 they have liabilities on them that exceed
3 assets.
4        So the retail board has asked, okay,
5 you know, how -- you know, if -- if these
6 liabilities come due or they're payable, you
7 know, how does that come about?
8        And, you know, the response is,
9 well, the advisors have the -- the full faith
10 and backing from -- from Jim Dondero.
11    Q.   And how did you know that the
12 advisors had the full faith and backing from
13 Jim Dondero?  What was the basis for that
14 statement that you made to the retail board?
15    A.   I talked to Jim about it at some
16 point in the past.
17    Q.   And did you tell Mr. Dondero that
18 you were going to inform the retail board that
19 the advisors had his full faith and backing
20 before you actually told that to the retail
21 board?
22    A.   I don't recall having that
23 conversation.
24    Q.   Do you recall if you ever informed
25 Mr. Dondero that you had disclosed or told the

Page 191

WATERHOUSE - 10-19-21

1
2 retail board that the advisors had the full
3 faith and backing of Mr. -- Mr. Dondero?
4        MS. DEITSCH-PEREZ:  Object to the
5 form.
6    A.   I don't recall discussing that with
7 him at the time.
8    Q.   When you told this to the board, was
9 Mr. Dondero participating in the discussion?
10    A.   Not that I recall.
11    Q.   Withdrawn.  Was it not -- withdrawn.
12        Do you recall whether -- when you
13 covered this issue with the board, was that in
14 a -- a Zoom call or a Webex call?  Was it a
15 telephone call?  Was it in-person?  Like where
16 were you physically in relation to the board?
17    A.   I believe I was at home.
18    Q.   Okay.  Can you identify every person
19 that you recall who was present for this
20 disclosure other than -- other than the board
21 members themselves?
22        MS. DEITSCH-PEREZ:  Object to the
23 form.
24    A.   I don't recall everyone on the call.
25    Q.   Can you identify anybody who was on

Page 192

WATERHOUSE - 10-19-21

1
2 the call?
3    A.   Other than the board members?
4    Q.   Yes.
5    A.   Lauren Thedford.  I mean, there
6 are -- there are many -- my section is just one
7 of many sections that are just -- you know, as
8 you can appreciate, this is a long board
9 meeting.
10        I can't recall specifically, really
11 even generally, or who was on when this was
12 discussed.  But Lauren was typically on for the
13 entire time.
14    Q.   I apologize if I asked you this, but
15 do either of Mr. Norris or Mr. Post hold any
16 positions relative to the retail funds?
17    A.   I think you asked me this already,
18 John.
19    Q.   Okay.  I just don't recall.  Can you
20 just refresh my recollection if I did, in fact,
21 ask you the question?
22    A.   I don't believe -- if we can go
23 back.  I don't believe Mr. Norris has a title
24 at the retail funds.  Mr. -- and Mr. Post is
25 the CCO of the advisor, the advisors.

Page 193

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Do you know if either of them
3 have a position with the retail board -- with
4 the retail funds?
5    A.   I don't believe Mr. Norris has a
6 position with the retail funds.
7    Q.   All right.  What about Mr. Post?
8    A.   Mr. Post is the CCO of the advisors.
9    Q.   Okay.  Does he hold any position --
10    A.   I don't believe so.
11    Q.   -- with the retail funds?
12    A.   I don't believe so.
13    Q.   Okay.
14    A.   I don't know if being the CCO for
15 the advisor conveys something for the retail
16 funds.  Again, I am not -- that is the legal
17 compliance part of it.  I don't know.
18    Q.   Why did you tell the retail board
19 that the advisors have the full faith and
20 backing from Mr. Dondero?
21        MS. DANDENEAU:  Objection to form.
22    A.   It is -- it is -- it is what has
23 been discussed with them prior.
24    Q.   And were you -- were you trying to
25 give them comfort that even though the

Page 194

1      WATERHOUSE - 10-19-21
2  liabilities exceeded the assets that the
3  advisors would still be able to meet their
4  obligations as they become due?
5      MS. DANDENEAU: Objection to form.
6      MS. DEITSCH-PEREZ: Object form.
7      A.  I -- I can't -- I don't remember
8  specifically the conversation, but generally --
9  you know, generally, yes.  And that is why --
10  but, you know, again, in this email saying, you
11  know, I am sure I qualified it with the retail
12  board, you know, as I said I like -- you know,
13  to my knowledge, that hasn't changed.  But,
14  again, generally -- generally that is what I
15  remember.
16      Q.  Okay.  Do you recall if in the
17  advisors' response to the retail board's
18  question if the response included any statement
19  concerning Mr. Dondero and -- and the full
20  faith and backing that he was giving to the
21  advisors?
22      MS. DEITSCH-PEREZ: Object to the
23  form.
24      A.  I don't -- I don't remember
25  specifically what was provided.

Page 195

1      WATERHOUSE - 10-19-21
2      Q.  Okay.
3      A.  And I don't really -- I don't really
4  remember generally either.
5      Q.  Okay.
6      MR. MORRIS: So -- so, again, I'm
7  just going to ask Mr. Rukavina if your
8  clients can produce as soon as possible the
9  15(c) response, the written response that
10  the advisors made, if any, to the board's
11  Question No. 2.
12      I'm not looking for the whole
13  response, but I certainly want the response
14  to Question No. 2.
15      Q.  Do you have a general understanding
16  as to the amount by which -- withdrawn.
17      Did -- did the assets of --
18  withdrawn.
19      Did the liabilities of HCMFA exceed
20  its assets in 2020?
21      MS. DANDENEAU: Objection to form.
22      MS. DEITSCH-PEREZ: Objection, form.
23      A.  I believe I have already answered
24  that question earlier, I think.  I believe I
25  said yes.

Page 196

1      WATERHOUSE - 10-19-21
2      Q.  Okay.  And did the liabilities of
3  NexPoint exceed its assets in 2020?
4      MS. DEITSCH-PEREZ: Objection to
5  form.
6      A.  I don't believe so.
7      Q.  Okay.  So -- so it was only one of
8  the two advisors who had liabilities that
9  exceeded the value of the assets.
10      Do I have that right?
11      MS. DEITSCH-PEREZ: Objection to
12  form.
13      MS. DANDENEAU: Form.
14      A.  Yes.
15      Q.  And do you know, ballpark, the
16  amount by which the value of HCMFA's
17  liabilities exceeded their assets in 2020?
18      MS. DANDENEAU: Objection to form.
19      A.  I don't -- I don't recall.
20      MR. MORRIS: I had specifically
21  requested in discovery the audited
22  financial reports for both advisors and
23  NexPoint.  I think I may have gotten one
24  for NexPoint but I'm still waiting for the
25  balance.  And I'm going to renew my request

Page 197

1  for those documents too.
2      Q.  Let's go to the next exhibit, which
3  is Number 10.  So I think it is in your stack,
4  Mr. Waterhouse.
5      MR. MORRIS: And we can take the one
6  down from the screen and put up Number 10
7  for everybody.
8      (Exhibit 10 marked.)
9      Q.  And I don't know if you have ever
10  seen this before, but I'm really putting it up
11  on the screen for purposes of turning to the
12  very last page of the document.
13      So this is a document that we have
14  been -- that we premarked as Exhibit 10.  And
15  we're turning to the last page of the document,
16  which is a document that was filed in the
17  adversary proceeding 21-3004.  And -- no, I
18  apologize, I think we -- right there.  Perfect.
19      And it is page 31 of 31.
20      MR. MORRIS: I think there may have
21  been some something erroneously stapled to
22  the hard copy that I gave you folks, but
23  I'm looking for page 31 of 31 in the
24  document that begins with the first page of

Page 198

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    Exhibit 10.
3    Q.   Do you have that, Mr. Waterhouse?
4    A.   I don't have it yet. I'm looking.
5    Q.   All right. If you look at the top
6    right-hand corner, you will see it says page
7    hopefully something of 31?
8    A.   Yes, I've got it now.
9    Q.   Okay. You have got 31 of 31. You
10   can take a moment to read that, if you would
11   like.
12   A.   (Reviewing document.) Okay.
13   Q.   Have you ever seen this before?
14   A.   I don't know if I have seen this
15   specific document, but, you know, I've --
16   I'm -- I'm aware of it.
17   Q.   And is this the document that you
18   had in mind when you sent that email to
19   Ms. Thedford that we just looked at where you
20   said that Highland had agreed not to make a
21   demand upon HCMFA until May 2021?
22   A.   Honestly, I don't -- it wasn't this
23   document. I mean, it's something like this,
24   yes. I mean, yes.
25   Q.   Well --

Page 199

1    WATERHOUSE - 10-19-21
2    A.   It is something like this, but I
3    don't think it was this specific document.
4    Q.   Well, but this document does say in
5    the last sentence that Highland agreed not to
6    seek -- not to demand payment from HCMFA prior
7    to May 31, 2021; right?
8    A.   Yes.
9    Q.   And are you aware of any other
10   document that was ever created pursuant to
11   which Highland agreed not to demand payment on
12   amounts owed by HCMFA before May 31, 2021?
13   A.   Hold on. Are you asking, am I aware
14   of a document that by HCMFA that basically says
15   otherwise?
16   Q.   No. Let me try again.
17   Are you aware of any other document
18   pursuant to which -- pursuant to which Highland
19   agreed not to make a demand on HCMFA until May
20   31st, 2021?
21   A.   I'm -- I think there was something
22   in connection with -- with the -- with the
23   audit that basically says the same thing.
24   Q.   Okay. And do you think that the
25   audit is referring to this particular document?

Page 200

1    WATERHOUSE - 10-19-21
2    A.   I don't know.
3    Q.   All right. This document is dated
4    April 15, 2019. Do you see that?
5    A.   I do.
6    Q.   And do you remember that the audit
7    was completed on June 3rd, 2019?
8    A.   Yes.
9    Q.   And do you recall that the audited
10   financials -- and I'm happy to pull them up if
11   you would like, but do you recall that the
12   audited financials included a reference to the
13   agreement pursuant to which Highland agreed not
14   to make a demand until May 31st, 2021?
15   A.   Yes, I remember.
16   Q.   And as part of the process, would
17   you have expected the corporate accounting team
18   to have provided a copy of this document to
19   PwC?
20   MS. DANDENEAU: Objection to form.
21   A.   Yes, I would have expected something
22   like this, or again, you know, some document
23   that basically states -- states the deferral
24   till May 31 of 2020.
25   Q.   Okay.

Page 201

1    WATERHOUSE - 10-19-21
2    A.   May 31 of 2021, excuse me.
3    Q.   And this document states the
4    deferral that you just described; correct?
5    A.   It does.
6    Q.   And this document states the
7    deferral that was described in the audited
8    financial statements that we looked at before;
9    correct?
10   A.   It does.
11   MR. MORRIS: Okay. Can we scroll
12   down just a little bit to see who signed on
13   behalf of the acknowledgment there.
14   Q.   Okay. So Mr. Dondero signed this
15   document on behalf of both HCMFA and Highland;
16   do you see that?
17   A.   I do.
18   Q.   Okay. Did you discuss this document
19   or the -- withdrawn.
20   Did you discuss the concept of the
21   deferral with Mr. Dondero in the spring of
22   2019?
23   A.   I think I testified I don't recall.
24   Q.   Okay. Do you know whose idea it was
25   to issue the acknowledgment in this form?

Page 202

1          WATERHOUSE - 10-19-21
2     A.   I don't recall.
3          MR. MORRIS:  Can we scroll back up
4    to the document, please.
5     Q.   Do you see in the beginning it says,
6    reference is made to certain outstanding
7    amounts loaned from Highland to HCMFA for
8    funding ongoing operations.
9          Do you see that?
10    A.   Yes.
11    Q.   And were you aware as the CFO of
12   Highland and as the treasurer of HCMFA that as
13   of April 15, 2019, Highland had made certain
14   loans to HCMFA to fund HCMFA's ongoing
15   operations?
16    A.   Yes.
17    Q.   And were you aware that those loans
18   were payable on demand and remained outstanding
19   as of December 31st, 2018?
20    A.   Yes.
21    Q.   And were you aware that those
22   amounts were payable on demand, and they
23   remained outstanding as of April 15, 2019?
24        MS. DEITSCH-PEREZ:  Object to the
25   form.

Page 203

1          WATERHOUSE - 10-19-21
2     A.   Well, this -- this document dated
3    April 15, 2019 says they have been deferred to
4    May 31, 2021.
5     Q.   Right. But I'm just sticking to the
6    first paragraph where they refer to the
7    outstanding amounts.  And in the end it says
8    the -- it remained outstanding on December
9    31st, 2018, and I think you told me that you
10   understood that, and then I'm just trying to
11   capture the last piece of it.
12        Did you understand that there were
13   amounts outstanding from the loan that Highland
14   made to HCMFA to fund ongoing operations as of
15   April 15th, 2019?
16    A.   Yes.
17    Q.   Thank you. Let's look at the next
18   sentence.  HCMFA expects that it may be unable
19   to repay such amounts should they become due
20   for the period commencing today and continuing
21   through May 31st, 2021.
22        Do you see that?
23        MS. DANDENEAU:  Objection to form.
24    A.   I do.
25    Q.   As the CFO -- withdrawn.

Page 204

1          WATERHOUSE - 10-19-21
2          As the treasurer of HCMFA, did you
3    believe that -- do you believe that statement
4    was true and accurate at the time it was
5    rendered?
6     A.   I mean, it -- it -- the answer to
7    that is I really didn't have any -- I didn't
8    have an opinion really.
9     Q.   Did you do anything to educate
10   yourself in April of 2019 on the issue of
11   whether HCMFA could repay the amounts that it
12   owed to Highland should they become due?
13    A.   I don't believe so.
14    Q.   Did you at any time form any
15   opinions as to HCMFA's ability to repay all
16   amounts due to Highland should they become due?
17    A.   Not really. I guess I don't...
18    Q.   Well, you told the retail board that
19   HCMFA's liabilities exceeded their assets in
20   2020; correct?
21    A.   Yes.
22    Q.   Based on the work that you did to
23   prepare for the retail board, did you form any
24   view as to whether HCMFA would be unable to
25   repay the amounts that it owed to Highland

Page 205

1          WATERHOUSE - 10-19-21
2    should they become due?
3        MS. DANDENEAU:  Objection to form.
4     A.   I mean, I -- when you look at that,
5    to answer you, completely, you know, again,
6    if -- the response I gave the retail board was,
7    you know, the -- the advice -- HCMFA advisors
8    have the -- have the full faith and backing of
9    Jim Dondero.  So I didn't form an opinion of
10   whether the advisor could pay it or not.
11    Q.   Did you form any view as to whether
12   the advisors could repay the amounts that it
13   owed to Highland should they become due without
14   the full faith and backing of Mr. Dondero?
15        MS. DANDENEAU:  Objection to form.
16        MS. DEITSCH-PEREZ:  Form.
17    A.   I mean, if you -- if you -- if you
18   take that last statement out, I mean, it would
19   be difficult for HCMFA to pay back demand notes
20   at that time.
21    Q.   And it was precisely for that reason
22   that you told the retail board that -- that the
23   retail -- that the advisors had the full faith
24   and backing of Mr. Dondero; correct?
25        MS. DANDENEAU:  Objection to form.

Page 206

WATERHOUSE - 10-19-21

2 A. I mean, yes, as the mouthpiece, I
3 was relaying information.
4 Q. Okay. And you relayed that
5 information with the knowledge and approval of
6 Mr. Dondero; correct?
7 MS. DEITSCH-PEREZ: Object to the
8 form.
9 A. As I stated in the email, I don't
10 believe, and I think I testified I don't
11 believe I had conversations with Mr. Dondero at
12 the time of that board meeting.
13 Q. Did you tell the retail board that
14 the advisors had the full faith and backing of
15 Mr. Dondero without Mr. Dondero's prior
16 approval?
17 A. Yeah, I -- I -- yes, I'm -- like I
18 said, I think I testified earlier, I'm sure I
19 qualified it as well.
20 Q. What do you mean by that?
21 MS. DANDENEAU: Objection to form.
22 A. Again -- again, like I said in the
23 email, it has the full faith and backing of Jim
24 Dondero unless that has changed.
25 Q. Actually that is not what you said,

Page 207

WATERHOUSE - 10-19-21

2 so let's put the email back up.
3 A. It is -- it is -- it is in the
4 email.
5 Q. Let's put the email back up. You
6 didn't say unless it has changed. You said you
7 believe it hasn't changed; right?
8 A. Okay. And to my knowledge that
9 hasn't changed, that is what it says.
10 Q. That's right.
11 A. But, again, I mean, that is -- I
12 don't know everything. And I'm not in every
13 conversation. I'm not -- to presume that I am,
14 is -- and you have to put myself -- as you
15 started this out, Mr. Morris, I was at home in
16 October of 2020 with COVID -- or, you know,
17 under these COVID times that we described is
18 very difficult.
19 We have all been working at home for
20 really the first time ever, undergoing
21 processes, procedures, control environments
22 that have been untested, and there is poor
23 communication.
24 So I am relaying, as I'm telling you
25 now, what is in the email. And unless

Page 208

WATERHOUSE - 10-19-21

2 something has changed -- to my knowledge, it
3 hasn't changed, but it could have changed.
4 Q. When you say that the advisors have
5 the full faith and backing from Mr. Dondero,
6 did you intend to convey that, to the extent
7 the advisors were unable to satisfy their
8 obligations as they become due, Mr. Dondero
9 would do it for them?
10 MS. DANDENEAU: Object to the form.
11 MS. DEITSCH-PEREZ: Object to the
12 form.
13 And, John, we have given you a lot
14 of leeway here but this does not seem
15 relevant to this case. You seem sort of
16 taking a complete sort of diversion into
17 the allegations and the complaint just
18 filed on Friday, and so I would ask you to
19 move on because --
20 MR. MORRIS: And I will tell you --
21 I will tell you that I have never read that
22 complaint cover-to-cover. I have nothing
23 to do with the prosecution of those claims.
24 And this issue that we're talking about
25 right now is related solely to the

Page 209

WATERHOUSE - 10-19-21

2 promissory notes that your clients refuse
3 to pay.
4 So I'm going to continue to ask my
5 questions, and I would ask the court
6 reporter to read back my last question.
7 (Record read.)
8 MS. DEITSCH-PEREZ: And then I
9 believe there were objections to form.
10 Q. You can answer the question.
11 A. Yes.
12 Q. Thank you very much, sir.
13 MR. MORRIS: Can we go back to the
14 other document, please?
15 Q. Mr. Waterhouse, do you know if this
16 document was ever shared with the retail board?
17 A. I don't recall.
18 Q. Did you ever share it with the
19 retail board?
20 A. I don't recall.
21 Q. Did you ever tell the retail board
22 about the substance of this document?
23 A. I don't recall.
24 Q. Did you ever tell the retail board
25 that Highland had agreed not to make a demand

Page 210

1      WATERHOUSE - 10-19-21
2  against HCMFA until May 2021?
3      A.  I don't recall.
4      Q.  Do you know whether anybody on
5  behalf of the advisors ever informed the retail
6  board that Highland had agreed on April 15,
7  2019, not to make a demand against HCMFA under
8  the promissory notes?
9      A.  I don't recall.
10     Q.  Did you instruct Ms. Thedford or
11 anybody else responding to the retail board's
12 15(c) inquiry to disclose this document?
13     A.  Did I instruct Ms. Thedford or
14 anyone else to -- to -- to produce this, to
15 disclose this document?  Is that what you -- I
16 just want to make sure.
17     Q.  Uh-huh.
18     A.  Yeah, I don't -- I don't recall.
19     Q.  Did you instruct anybody to inform
20 the retail board, in response to their question
21 as part of the 15(c) process, to -- to tell the
22 retail board about Highland's agreement not to
23 make a demand until 2021?
24     MS. DANDENEAU:  Objection to form.
25     A.  I don't recall.

Page 211

1      WATERHOUSE - 10-19-21
2      Q.  Did you ever inform PwC that HCMFA's
3  liabilities exceeded its assets?
4      MS. DANDENEAU:  Object to the form.
5      A.  I don't -- I don't think I told
6  them.  I mean, they -- they audited the
7  financial statements.
8      Q.  Did -- do you know if anybody on
9  behalf of Highland ever informed
10 PricewaterhouseCoopers that HCMFA may be unable
11 to repay amounts owing to Highland, should they
12 become due?
13     MS. DANDENEAU:  Objection to form.
14     A.  Yes.  Again, I think I testified
15 earlier that -- that this was communicated to
16 the auditors.
17     Q.  Ideally --
18     A.  I don't know who exactly did that.
19 I don't recall doing it, but, yeah, it was --
20 it was communicated.  And that is why -- I
21 mean, there is a disclosure in the financial
22 statements; right?
23     Q.  There is, and that disclosure
24 relates to the last sentence of this document;
25 correct?

Page 212

1      WATERHOUSE - 10-19-21
2      A.  Yes.
3      Q.  Do you recall looking in the
4  document and seeing anything that was disclosed
5  with respect to the sentence above that?
6      A.  No.
7      Q.  Do you know whether anybody on
8  behalf of Highland ever informed
9  PricewaterhouseCoopers that HCMFA expects that
10 it may be unable to repay amounts due and owing
11 to Highland should they become due?
12     MS. DEITSCH-PEREZ:  Object to the
13 form.  I think that is the third time.
14     A.  I don't recall.  Again, as I said,
15 we -- all of this was given to the auditors.
16     Q.  Do you know if Highland received
17 anything of value in exchange for its agreement
18 not to demand payment on amounts owed by HCMFA
19 prior to May 31st, 2021?
20     MS. DEITSCH-PEREZ:  Object to the
21 form.  That is the second time.
22     MS. DANDENEAU:  Object to the form.
23     A.  I have answered this question.
24     MR. RUKAVINA:  Hold on.  Object to
25 legal conclusion.  Go ahead.

Page 213

1      WATERHOUSE - 10-19-21
2      A.  I have answered this question
3  before.
4      Q.  And the answer was no?
5      A.  I'm not aware.
6      Q.  Now, this acknowledgment can't
7  possibly apply to the two notes that you signed
8  on behalf of HCMFA because those notes were
9  signed on May 2nd and May 3rd, 2019; is that
10 right?
11     MS. DANDENEAU:  Objection to form.
12     A.  Unless there is a drafting error.
13     Q.  Okay.  Are you aware of a drafting
14 error?
15     A.  I'm not aware.  I didn't -- I wasn't
16 part of -- I didn't sign this note or this
17 acknowledgment.  I didn't draft it.
18     Q.  But you do see it is dated April 15,
19 2019; right?
20     A.  Yes.
21     Q.  And this was a document that was
22 actually included by the advisors in a pleading
23 they filed with the Court; right?
24     MR. RUKAVINA:  Well, I don't know
25 that so I object to form.

Page 214

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  Q.  Okay.  Let's go to the first page of
3  the document and just confirm that.
4      MR. AIGEN:  Mr. Morris, I just note
5  that you already said there was some error
6  with the document that is listed as
7  exhibit --
8      MR. MORRIS:  No.  No, no, no.
9      MS. DEITSCH-PEREZ:  Oh, okay.
10     MR. MORRIS:  What I said is that
11 there is a few pages that were mistakenly
12 stapled to the end of the document.
13     MS. DEITSCH-PEREZ:  Okay.
14     MR. MORRIS:  There is no problem
15 with this document.
16     MS. DEITSCH-PEREZ:  And just so
17 we're clear that the document -- the pages
18 that start with defendant's amended answer
19 are not intended to be part of this
20 document?
21     MR. MORRIS:  That's correct.
22     MS. DEITSCH-PEREZ:  And that the --
23 but it is your representation that the rest
24 of the document is -- is -- is correct
25 because we don't -- we don't have any way

Page 215

1  of verifying that, we're just --
2      MR. MORRIS:  You do, actually.  You
3  could just go to Docket No. 21-3004.
4      MS. DEITSCH-PEREZ:  If you want to
5  stop this deposition so we can go and pull
6  that document up, we're happy to do it.  So
7  I am just asking you for your
8  representation.
9      MR. MORRIS:  Sure.  I gave that.
10     MS. DEITSCH-PEREZ:  Okay.
11     Q.  So do you see that this is a
12 document that was actually filed with the Court
13 by Highland Capital Management Fund Advisors?
14     A.  No.  I get with the first page in
15 the section.  Maybe I'm looking at the wrong
16 thing.  It says, Highland Capital Management.
17     Q.  Don't worry about it.  Don't worry
18 about it.
19     A.  Maybe I went back -- okay.
20     MR. MORRIS:  All right.  Can we put
21 up on the screen Exhibit 2.
22     (Exhibit 2 marked.)
23     MR. MORRIS:  I think it is
24 Exhibit 1.
25

Page 216

1  WATERHOUSE - 10-19-21
2      MS. DANDENEAU:  I'm sorry, John, did
3  you say Exhibit 2 or Exhibit 1?
4      MR. MORRIS:  It is Exhibit 2 in the
5  binders so it is premarked Exhibit 2.  And
6  now I'm asking -- right there -- going to
7  Exhibit 1 to the document that was marked
8  as Exhibit 2.
9      MS. DANDENEAU:  Got it.  In the
10 binder there is no --
11     MS. DEITSCH-PEREZ:  There is no
12 Exhibit 1.
13     MR. MORRIS:  All right.  So look at
14 the one on the screen.
15     Q.  Do you see, Mr. Waterhouse, that
16 this is a promissory note dated May 31st, 2017,
17 in the approximate amount of $30.7 million?
18     A.  Yes.
19     Q.  And do you see that the maker of the
20 note is NexPoint?
21     A.  Yes.
22     Q.  And that Highland is the payee; is
23 that right?
24     A.  Yes.
25     Q.  Okay.  And do you see in Paragraph 2

Page 217

1  WATERHOUSE - 10-19-21
2  this is an annual installment note?
3      A.  Can you scroll down.
4      Q.  Sure.
5      MR. MORRIS:  Can we scroll down --
6  yeah, there you go.
7      A.  Right there, yeah.  Yes.
8      MR. MORRIS:  And can we scroll down
9  to the signature line.
10     Q.  And do you recognize that as
11 Mr. Dondero's signature?
12     A.  Yes.
13     Q.  And is this the promissory note that
14 we talked about earlier where NexPoint had made
15 certain payments in the aggregate amount of
16 about 6 to $7 million against principal and
17 interest?
18     A.  I don't recall discussing the
19 aggregate principal amounts of 6 to $7 million,
20 but -- so I don't -- I don't recall that prior
21 discussion with those amounts.
22     Q.  All right.  Let's take a look.
23 NexPoint always included this promissory note
24 as a liability on its audited financial
25 statements; right?

Page 218

WATERHOUSE - 10-19-21

1
2  A.  Yes.
3  Q.  And NexPoint had its financial
4  statements audited; isn't that correct?
5  A.  Yes.
6  Q.  And was the process of NexPoint's
7  audit similar to the process you described
8  earlier for Highland and HCMFA?
9  A.  Yes, it is similar.
10  Q.  Okay.
11     MR. MORRIS:  Can we put up
12  NexPoint's audited financials and let
13  everybody know what exhibit number it is,
14  La Asia?
15     MS. CANTY:  It is going to be
16  Exhibit 46.
17     (Exhibit 46 marked.)
18  Q.  And do you see, sir, that we've put
19  up NexPoint Advisors' consolidated financial
20  statements and supplemental information for the
21  period ending December 31st, 2019?
22  A.  Yes.
23  Q.  Did you participate in the process
24  whereby these audited financial statements were
25  issued?

Page 219

WATERHOUSE - 10-19-21

1
2  A.  I didn't participate directly, as
3  I've described before, about the -- the team
4  performing the audit.
5  Q.  Do you recall when the audit of
6  NexPoint's financial statements for the period
7  ending December 31st, 2019 was completed?
8  A.  Yes.
9  Q.  And when do you recall it being
10  completed?
11  A.  In January of 2021.
12  Q.  Do you know why the 2019 audit
13  report wasn't completed until January of 2021?
14  A.  Yes.
15  Q.  Why was the NexPoint audit report
16  for the period ending 12/31/19 not completed
17  until January 2021?
18  A.  Because we had to deal with working
19  from home from -- with COVID, and on top of all
20  of our daily responsibilities and job duties
21  at -- at providing -- at Highland providing
22  services to NexPoint, we had to do all of this
23  extra work for a bankruptcy that was filed in
24  October of 2019.
25     MR. MORRIS:  Can we go to the

Page 220

WATERHOUSE - 10-19-21

1
2  balance sheet on page 3?  Okay.  Stop right
3  there.
4  Q.  Do you see under the liabilities
5  section, the last item is note payable to
6  affiliate?
7  A.  Yes.
8  Q.  And is that the note that we just
9  looked at?
10     MS. DANDENEAU:  Objection to form.
11  Q.  Withdrawn.
12     Is that the approximately
13  $30 million note that we just looked at that
14  was dated from 2017?
15     MS. DANDENEAU:  Objection to form.
16  A.  I believe no.
17  Q.  Okay.  You're not aware of any other
18  note that was outstanding from NexPoint to
19  Highland as of the end of the year 2019, other
20  than that one $30 million note; right?
21  A.  I don't recall.
22  Q.  And as of the end of 2019, the
23  principal amount that was due on the note was
24  approximately $23 million; right?
25     MS. DEITSCH-PEREZ:  Object to the

Page 221

WATERHOUSE - 10-19-21

1
2  form.
3  A.  Approximately.
4  Q.  And does that refresh your
5  recollection that between the time the note was
6  executed and the end of 2019, that NexPoint had
7  paid down approximately $7 million?
8  A.  Yes.  If we are just doing the math,
9  yes.
10  Q.  Okay.  Did NexPoint complete its
11  audit from 2020?
12  A.  Sorry, you kind of broke up.  Do
13  NexPoint complete?
14  Q.  The audit of its financial
15  statements for the period ending December 31st,
16  2020?
17  A.  No.
18  Q.  No, it's not complete?
19  A.  No, it is not complete.
20  Q.  Did HCMFA complete its audit for the
21  year ending December 31st, 2020?
22  A.  No.
23     MR. MORRIS:  Can we go to page 15,
24  please, the paragraph at the bottom.
25  Q.  Do you see that NexPoint has

Page 222

WATERHOUSE - 10-19-21

1           WATERHOUSE - 10-19-21
2 included under notes payable to Highland a
3 reference to the amounts that were outstanding
4 as of the year-end 2019 under the note that we
5 looked at just a moment ago?
6    A.   Yes.  Are you talking about the
7 second paragraph?
8    Q.   I'm actually talking about first
9 paragraph.  Do you understand that the first
10 paragraph is a reference to the 2017 note, and
11 the amounts that were -- the principal amount
12 that was outstanding as of the end of 2019?
13       MS. DANDENEAU:  Objection to form.
14   John, do you mean the first paragraph of
15   that page?
16       MR. MORRIS:  No, the first paragraph
17   under notes payable to Highland.
18    A.   Yeah, I see the paragraph, and
19 again, this is what I answered earlier.  I
20 believe so, just because I don't -- again, this
21 is a number in a balance sheet, and without
22 matching it up and seeing the detail with the
23 schedule like I kind of talked about for
24 Highland's financial statements, it is a little
25 bit more difficult to tie everything in

Page 223

WATERHOUSE - 10-19-21

1           WATERHOUSE - 10-19-21
2 perfectly together.
3    Q.   Okay.  But you're not aware of any
4 note that was outstanding at the end of 2019
5 from NexPoint to Highland other than whatever
6 principal was still due and owing under the
7 $30 million note issued in 2017; correct?
8    A.   Well, it -- I don't -- there is
9 reference in the second paragraph.  I don't --
10 I don't -- I don't recall what that is
11 referring to, so I don't -- I don't know.
12    Q.   Well, if you listen carefully to my
13 question, right, I'm asking about notes that
14 were outstanding at the end of 2019, and if we
15 look at the paragraph you just referred to, it
16 says that during the year there were new notes
17 issued totaling $1.5 million, but by the end of
18 the year, no principal or interest was
19 outstanding on the notes.
20    Do you see that?
21    A.   Oh, I do, yes.
22    Q.   So does that refresh your
23 recollection that there were no notes
24 outstanding from NexPoint to Highland other
25 than the principal remaining under the original

Page 224

WATERHOUSE - 10-19-21

1           WATERHOUSE - 10-19-21
2 $30 million 2017 note that we looked at a
3 moment ago?
4    A.   Well, we're at the bottom of the
5 page.  Is there anything on page 16?
6    Q.   That is a fair question, sure.  That
7 is it.
8    A.   Okay.  So it appears that that is
9 the only note that is detailed in the notes in
10 the financial statement.
11    Q.   And you don't have any memory of any
12 other note other than the 2017 note, right,
13 being outstanding as of the end of the year?
14    A.   I deal with thousands of
15 transactions every year.  I don't really have a
16 very specific memory for what exactly was
17 outstanding.
18       MR. MORRIS:  Why don't we take a
19   break now.  We've been going for a little
20   while.  It's 3:26.  Let's come back at
21   3:40.
22       VIDEOGRAPHER:  We're going off the
23   record at 3:26 p.m.
24   (Recess taken 3:26 p.m. to 3:39 p.m.)
25       VIDEOGRAPHER:  We are going back on

Page 225

WATERHOUSE - 10-19-21

1           WATERHOUSE - 10-19-21
2 the record at 3:39 p.m.
3    Q.   All right.  Mr. Waterhouse, we -- I
4 don't think we have a lot more here.
5    To the best of your knowledge and
6 recollection, were all affiliate loans and all
7 loans made to Mr. Dondero recorded on
8 Highland's books and records as assets of
9 Highland?
10       MS. DANDENEAU:  Object to the form,
11   asked and answered.
12    A.   To my knowledge, yes.
13    Q.   Okay.  Can you recall any loan to
14 any affiliate or Mr. Dondero that was not
15 recorded on Highland's books and records as an
16 asset?
17    A.   Like during my time as CFO?  I don't
18 recall.
19    Q.   How about after the time that you
20 were CFO?  Did you recall that there was a loan
21 by Highland to an affiliate or to Mr. Dondero
22 that hadn't been previously recorded on
23 Highland's books as an asset?
24       MS. DANDENEAU:  Objection to form.
25    A.   I guess I don't understand the

Page 226

1      WATERHOUSE - 10-19-21
2   question. I left Highland as of -- I'm not
3   aware of -- I left Highland in February --
4   probably the last day of February of 2021.
5      Q.   Okay.
6      A.   I'm not -- I'm not aware of any --
7   I'm not aware of anything past that date.
8      Q.   Okay. While you were the CFO at
9   Highland, did Highland prepare in the ordinary
10  course of business a document that reported
11  operating results on a monthly basis?
12     A.   Yes.
13     Q.   And are you generally familiar with
14  the monthly operating reports?
15     A.   Yeah. You are referring to the
16  reports that we filed to the Court every month?
17     Q.   I apologize, I'm not. I'm taking
18  you back to the pre-petition period. There was
19  a report that I have seen that I'm going to
20  show you, but I'm just asking for your
21  knowledge.
22     MR. MORRIS: Let's put it up on the
23  screen, Exhibit 39.
24     (Exhibit 39 marked.)
25     Q.   Do you see this is a document that

Page 227

1      WATERHOUSE - 10-19-21
2   is called operating results?
3      A.   Yeah, that's the title of it.
4      Q.   Okay. And was a report of operating
5   results prepared by Highland on a monthly basis
6   during the time that you served as CFO?
7      A.   No.
8      Q.   Are you familiar with a document of
9   this type? And we can certainly look at the
10  next page or two to refresh your recollection.
11     A.   I'm just looking at the title. I
12  don't really -- again, as I discussed before, I
13  don't have any records or documents or emails
14  or appointments or anything that I was able to
15  use prior to -- prior to this deposition, so
16  I'm doing the best I can.
17     Q.   Okay. You don't need to apologize.
18  I'm just asking you if you are familiar with
19  the document called Operating Results that was
20  prepared on a monthly basis at Highland?
21     MS. DEITSCH-PEREZ: Object to the
22  form.
23     Q.   If you're not, you're not.
24     A.   I don't believe this was prepared on
25  a monthly basis.

Page 228

1      WATERHOUSE - 10-19-21
2      Q.   Okay. Do you see that this one
3   is -- is dated February 2018?
4      A.   Yes.
5      Q.   Do you have -- do you believe --
6   have you ever seen a document that was
7   purporting to report operating results for
8   Highland?
9      MS. DANDENEAU: Objection to form.
10     A.   Yes.
11     Q.   Okay. And when you say that you
12  don't believe it was produced on a monthly
13  basis, was it produced on any periodic bases to
14  the best of your recollection?
15     A.   I believe it was -- it was prepared
16  on an annual basis.
17     Q.   Okay.
18     MR. MORRIS: Can we look at the next
19  page.
20     Q.   Do you see that there is a statement
21  here called: Significant items impacting
22  HCMLP's balance sheet?
23     And it is dated February 2018.
24     A.   Yes.
25     Q.   Do you recall that there was a

Page 229

1      WATERHOUSE - 10-19-21
2   report that Highland prepared that identified
3   significant items impacting the balance sheet?
4      A.   A report that was prepared.
5      Q.   Let me ask a better question: Did
6   Highland prepare reports to the best of your
7   recollection that identified significant items
8   that impacted its balance sheet?
9      A.   Well, so Highland prepared a -- a
10  monthly close package. And maybe I'm
11  getting -- and -- and maybe change names at one
12  time or maybe I'm just -- again, just
13  misremembering -- but in that, yes, there is a
14  page that would detail just changes in -- you
15  know, just changes month over month on the
16  balance sheet.
17     Q.   Okay. And maybe it is my fault.
18  Maybe I didn't know the proper name for it.
19  But let's use the phrase "monthly close
20  package."
21     Did Highland prepare a monthly close
22  package in the ordinary course of business
23  during the time that you served as CFO?
24     MS. DANDENEAU: Objection to form.
25     A.   Yes.

Page 230

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2   Q. And did the monthly close package
3   that Highland prepared include information
4   concerning significant items that impacted
5   Highland's balance sheet?
6   A. Yes, it had a page like that is --
7   that is on the screen that detailed items
8   like -- of that nature.
9   Q. And do you know who -- was there
10  anybody at Highland who was responsible for
11  overseeing the preparation of the monthly
12  reporting package?
13  A. That would have been -- again, it
14  varies over time during my tenure as CFO.
15  It -- it varied over -- over time, but -- but
16  typically a -- a corporate accounting manager.
17  Q. And who were the corporate
18  accounting managers during your tenure as CFO?
19  A. It would have been Dave Klos and
20  Kristin Hendrix.
21  Q. And did the corporate accounting
22  manager deliver to you drafts of the monthly
23  close package before it was finalized?
24  A. Sometimes.
25  Q. Was that the practice even if there

Page 231

1   WATERHOUSE - 10-19-21
2   were exceptions to the practice?
3   A. The practice meaning that they
4   sometimes lured them to me?
5   Q. That that was the expectation even
6   if circumstances prevented that from happening
7   from time to time.
8   MS. DEITSCH-PEREZ: Object to the
9   form.
10  A. I -- I would say it started out that
11  way but over the years it -- it was not
12  enforced.
13  Q. Okay. So you were -- you reviewed
14  and approved monthly -- monthly reporting
15  packages for a certain period of time and then
16  over time you stopped doing that.
17  Do I have that right?
18  MS. DANDENEAU: Objection to form.
19  A. Yes, I mean, if you're talking about
20  a formal meeting where we sit down and go
21  through and approve it. I would say that was
22  standard practice a decade -- you know, early
23  on. And as time went on that -- that -- that
24  practice wasn't followed.
25  Q. Okay.

Page 232

1   WATERHOUSE - 10-19-21
2   A. And, quite frankly, I don't even
3   know if these were -- these were sent to me
4   even in any capacity.
5   Q. What was the purpose of preparing
6   the monthly reporting package -- withdrawn.
7   What was the purpose of preparing
8   the monthly close package?
9   MS. DEITSCH-PEREZ: Object to the
10  form.
11  A. The -- the original purpose was so
12  that it would just -- it would be a report that
13  was reviewed monthly with senior management.
14  Q. Who was included in the idea of
15  senior management?
16  A. You know, I think originally when
17  this was conceived that would have been like
18  Jim Dondero and Mark Okada.
19  Q. Were monthly reporting -- withdrawn.
20  Were monthly close packages prepared
21  to the best of your knowledge until the time
22  you left Highland?
23  A. To my knowledge -- I don't know,
24  actually. I mean, to my knowledge, I believe
25  it was being -- that still being done. I

Page 233

1   WATERHOUSE - 10-19-21
2   don't know because, again, I wasn't reviewing
3   them. I hadn't reviewed a close package for --
4   for a long time. But I believe the standard
5   practice that was still being carried out.
6   Q. Did you ever have any discussions
7   with the debtor's independent board concerning
8   any promissory notes that were issued by any of
9   the affiliates or Mr. Dondero?
10  A. I can't -- I can't -- I can't recall
11  specifically.
12  Q. Did you speak with the independent
13  board from time to time?
14  A. Yes, from -- from -- from time to
15  time I had discussions with the independent
16  board members, you know, either -- either, you
17  know, by themselves or wholly, you know, as --
18  as a -- as a combined work.
19  Q. Okay. Before we talk about
20  Mr. Seery, do you recall ever having a
21  conversation with Mr. Nelms or Mr. Dubel
22  concerning any promissory note that was
23  rendered by one of the affiliates or
24  Mr. Dondero to Highland?
25  A. I don't recall any conversations

Page 234

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2  specifically.
3     Q.  Do you know if the topic was ever
4  discussed, even if you don't remember it
5  specifically?
6     MS. DANDENEAU:  Objection to form.
7     A.  It -- it -- it may have.  I don't
8  know.  I don't recall.
9     Q.  Do you recall ever discussing any
10  promissory note issued by any of the affiliates
11  or Mr. Dondero with James Seery?
12     A.  I don't -- I don't recall
13  specifically.
14     Q.  Do you recall generally ever
15  discussing the topic of promissory notes issued
16  by any of the affiliates or Mr. Dondero to
17  Highland with Mr. Seery?
18     A.  Nothing -- nothing is really jumping
19  out at me.
20     Q.  Do you recall if you ever told
21  Mr. Seery that any of the affiliates or
22  Mr. Dondero didn't have an obligation to pay
23  all amounts due and owing under their notes?
24     A.  I don't recall having that
25  conversation.

Page 235

1    WATERHOUSE - 10-19-21
2     Q.  Did you ever tell Mr. Seery that you
3  had any reason to believe that the amounts
4  reflected in the notes issued by the affiliates
5  and Mr. Dondero were invalid for any reason?
6     A.  I don't -- I don't recall.
7     Q.  Did you tell Mr. Dondero -- did you
8  tell Mr. Seery that you thought the promissory
9  notes issued by the advisors and Mr. Dondero
10  that were outstanding as of the petition date
11  were assets of the estate?
12     A.  I don't recall having a specific
13  conversation about those -- you know, those
14  notes outstanding as -- as of the petition date
15  being assets on the estate.  I mean, we put
16  together -- you know, they're in the books and
17  records of the financial statements.  I don't
18  recall having a specific conversation.
19     Q.  Did you ever prepare any documents
20  that were delivered to Mr. Seery that concerned
21  the promissory notes issued by any of the
22  affiliates or Mr. Dondero?
23     MS. DANDENEAU:  Objection to form.
24     A.  Did I produce any that concerned --
25  you mean did I just -- did I give Mr. Seery

Page 236

1    WATERHOUSE - 10-19-21
2  anything that -- that said I have concerns over
3  these notes?
4     Q.  No.  Let me try again.  Maybe it was
5  my question.
6     Did you ever give Mr. Seery any
7  information concerning any of the notes that
8  were issued by any of the affiliates or
9  Mr. Dondero?
10     MS. DANDENEAU:  Objection to form.
11     A.  I don't recall if I did or not.  I
12  don't -- I don't remember.  I mean, you have my
13  emails.  You may have asked.  Again, I don't --
14  I don't know.
15     MR. MORRIS:  Can we put up the
16  document that has been premarked as Exhibit
17  39?
18     MS. DANDENEAU:  John, that is this
19  document, isn't it?
20     MR. MORRIS:  Oh, yeah, it might be,
21  as a matter of fact.  Let's go to Number
22  40.
23     (Exhibit 40 marked.)
24     Q.  During the bankruptcy,
25  Mr. Waterhouse, did you prepare documents that

Page 237

1    WATERHOUSE - 10-19-21
2  were filed with the bankruptcy court?
3     A.  I didn't -- I didn't prepare them
4  personally.
5     Q.  Did people prepare them under your
6  direction?
7     A.  Yes.  There were members of the team
8  that prepared them, and they worked in -- you
9  know, there were members of DSI that were
10  involved in the process as well.
11     Q.  To the best of your knowledge, did
12  DSI rely on the employees of Highland for the
13  information that they used to prepare the
14  bankruptcy filings?
15     A.  Yes.  The books and records were
16  with the Highland personnel.
17     Q.  Okay.  And do you see on the screen
18  here, there is a document that we have marked
19  as Exhibit 40 that is -- that is titled Summary
20  of Assets and Liabilities?
21     A.  Uh-huh.
22     Q.  Okay.  And do you recall reviewing
23  any summary of assets and liabilities before it
24  was filed with the bankruptcy court?
25     A.  Yes, I recall reviewing this at a

Page 238

WATERHOUSE - 10-19-21

1  high level.
2  Q.  And did you believe that it was
3  accurate at the time it was filed?
4  A.  I didn't have any other reason to
5  believe otherwise.
6  Q.  Okay.  Do you see that the total
7  value of all properties listed in Part 1 is
8  approximately $410 million?
9  MS. DEITSCH-PEREZ:  Objection to
10  form.
11  A.  Yes, it is in 1c.
12  A.  Yes.
13  A.  Yes, I see that.
14  Q.  Okay.  If we go to the second page,
15  now I think I may just have excerpts here, just
16  so everybody is clear, but if we scroll down to
17  the second page, you will see that there is
18  a -- a little further.  There you go.  You will
19  see there is a reference to Item 71, notes
20  receivable.
21  Do you see that?
22  A.  I do.
23  Q.  And that was a reference to the
24  notes receivable from the affiliates and

Page 239

WATERHOUSE - 10-19-21

1  Mr. Dondero, among others; is that right?
2  MS. DANDENEAU:  Objection to form.
3  A.  Yes.  The affiliate notes and the
4  Dondero notes were in this amount, but they
5  weren't -- again, like you said, and among
6  others.
7  Q.  Okay.  We will look at the
8  specificity because I'm not playing gaming
9  here, but do you know if the $150 million of
10  notes receivable was included within the
11  $410 million of total value of the debtor's
12  assets?
13  MS. DANDENEAU:  Objection to form.
14  A.  I -- I -- I believe so.
15  Q.  Right.  And so is it fair to say
16  that as of the date this document was prepared,
17  the notes receivable were more than one-third
18  of the value of the debtor's assets?
19  MS. DEITSCH-PEREZ:  Object to the
20  form.
21  MS. DANDENEAU:  Object to the form.
22  A.  Again, if you are just taking the
23  math, 150 divided by whatever the $400 million
24  number is above, then yes, you get there.

Page 240

WATERHOUSE - 10-19-21

1  Q.  Okay.
2  A.  You know, but as of the time of this
3  filing, that is what was put in this filing,
4  right, but, you know, I mean, numbers --
5  numbers change, facts and circumstances change.
6  Q.  But as the CFO of Highland, the
7  debtor in bankruptcy, did you believe that this
8  number accurately reflected the total amount
9  due under the notes receivable?
10  A.  That is what we had in our books and
11  records.
12  Q.  Okay.  And did you believe as the
13  CFO that the books and records accurately
14  reported the then value of the debtor's assets?
15  MS. DANDENEAU:  Objection to form.
16  A.  We didn't -- as part of this filing,
17  there was no fair value measurement or
18  anything.  These were just accounting entries
19  for the promissory notes.  There is no analysis
20  for impairment or fair market value adjustments
21  or anything of that nature.  This is purely
22  taking numbers and putting them in our form.
23  Q.  Did you do any impairment analysis
24  at any time while you were employed by

Page 241

WATERHOUSE - 10-19-21

1  Highland?
2  A.  Yes, we did do impairment analysis
3  on -- on assets.
4  Q.  Okay.  Did you ever do an impairment
5  analysis on any of the promissory notes that
6  were given to Highland by any of the affiliates
7  or Mr. Dondero?
8  A.  Not that I recall.
9  Q.  Under what circumstances do you
10  prepare impairment analyses?
11  A.  As -- as -- if you're preparing
12  financials in accordance with GAAP, generally
13  accepted accounting principles, if you're
14  preparing full GAAP financials, you should be
15  preparing -- you should be undergoing on a
16  periodic basis any fair market value
17  adjustments to assets.
18  As I was instructed at the time of
19  the petition date, we weren't producing GAAP
20  financials.  So this wasn't something I was
21  worried about nor concerned about.
22  Q.  Okay.  Were NexPoint and HCMFA and
23  Highland's audited financial statements
24  prepared in accordance with GAAP?

Page 242

WATERHOUSE - 10-19-21

2  A.  The audited financials -- yes,
3  audited financial statements are prepared in
4  accordance with GAAP.
5  Q.  Do you recall whether any of
6  Highland or HCMFA or NexPoint ever made a fair
7  market value adjustment to any of the notes
8  issued by any of the affiliates or Mr. Dondero
9  to Highland?
10  A.  I do not recall that happening, but
11  the -- it is because under -- under GAAP,
12  the -- the treatment of liabilities is
13  different than assets.
14  Q.  Okay.  So then let's just focus on
15  Highland's audited financial statements.
16  The last audited financial
17  statements were for the period ending December
18  31st, 2018; correct?
19  A.  That is my understanding.
20  Q.  And you had -- you had an obligation
21  to disclose anything to PricewaterhouseCoopers
22  concerning any subsequent events between the
23  end of 2018 and June 3rd, 2019; correct?
24  MS. DANDENEAU:  Objection to form.
25  MS. DEITSCH-PEREZ:  Form.

Page 243

WATERHOUSE - 10-19-21

2  A.  Correct.
3  Q.  Okay.  To the best of your
4  knowledge, as Highland's CFO, did Highland ever
5  make any fair market value adjustments to any
6  of the promissory notes that were carried on
7  its balance sheet and that were issued by any
8  of the affiliates or Mr. Dondero?
9  A.  I think I answered that question
10  earlier.  I don't recall doing that for any of
11  the -- those -- those notes.  So it would have
12  included the audit for the -- for the 2018
13  period.
14  Q.  Okay.
15  MR. MORRIS:  Can we go to the next
16  page.
17  Q.  Do you see this is a note a list of
18  notes receivable?  Do you see that?
19  A.  Yes, I do.
20  Q.  And do you see that this ties into
21  the page that we were just looking?
22  A.  I'm sorry, can we go back to the
23  prior page?  I mean, it was at 150,331,222.  It
24  was on the prior page.  Next page.  Yes, it
25  agrees.

Page 244

WATERHOUSE - 10-19-21

2  Q.  Okay.  So now let's look at that
3  schedule.  So this was the face amount of all
4  of the promissory notes that Highland held at
5  the time this document was filed with the
6  bankruptcy court; right?
7  A.  Yes.
8  Q.  There is a footnote there that says,
9  doubtful or uncollectible accounts are
10  evaluated at year-end.
11  Do you see that?
12  A.  I do.
13  Q.  Okay.  And is it fair to say that as
14  of the year-end 2018, the year before this,
15  that to the extent any of these notes were
16  outstanding at that time, they weren't deemed
17  to be doubtful or uncollectible?
18  A.  Yeah.  For the 2018 audit, there
19  weren't any -- there weren't any adjustments to
20  fair value.
21  Q.  Okay.  And during the bankruptcy, do
22  you recall that Highland subsequently reserved
23  for the Hunter Mountain Investment Trust note?
24  A.  Yes.
25  Q.  Why did Highland -- were you

Page 245

WATERHOUSE - 10-19-21

1  involved in the decision to reserve the Hunter
2  Mountain Investment Trust note?
3
4  A.  I was not.
5  Q.  Do you know why Highland decided to
6  reserve for the Hunter Mountain Investment
7  Trust note?
8  A.  I don't know yet decision was made.
9  I believe it was made by someone at DSI.
10  Q.  Okay.  I'm just asking if you know
11  why.
12  Did you ever ask anyone why they
13  reserved for that particular note?
14  A.  I don't recall.
15  Q.  Do you know whether the debtor
16  reserved for any other note on this list during
17  the bankruptcy?
18  A.  Again, I don't recall.  I wasn't
19  part of any process of -- again, like any fair
20  value adjustments or anything to that degree.
21  Like I said, a lot of that was done by DSI and
22  it was kind of out of our court.
23  Q.  Okay.  Do you know if any note
24  receivable on this list was ever deemed by the
25  debtor to be doubtful or uncollectible?

Page 246

1 WATERHOUSE - 10-19-21
2 A. I don't -- I don't have a
3 recollection of every filing, so I don't know.
4 Q. Did you ever have a discussion with
5 anybody at any time about whether any of the
6 notes receivable on this list should be deemed
7 to be doubtful or uncollectible?
8 A. No. As I previously stated, we were
9 told we didn't have to keep GAAP financials.
10 We weren't having -- you know, there is no
11 underlying audits being performed, so I mean,
12 it wasn't something I worried about.
13 MR. MORRIS: I move to strike.
14 Q. Did you ever have a conversation
15 with anybody about any of the notes receivable
16 and whether they should be deemed to be
17 doubtful or uncollectible? Did you have the
18 conversation, yes or no?
19 MS. DANDENEAU: Objection to form.
20 A. I don't recall.
21 Q. Do you recall ever telling anybody
22 that you believed any of the notes receivable
23 on this list should be doubtful -- should be
24 deemed to be doubtful or uncollectible?
25 MS. DANDENEAU: Objection to form.

Page 247

1 WATERHOUSE - 10-19-21
2 A. I don't recall. I mean, it may have
3 happened, you know, again, when we initially
4 getting DSI up to speed and going through
5 financials, it may have happened, but I don't
6 recall specifically.
7 Q. While you were the CFO of Highland
8 during the time that the company was in
9 bankruptcy, did you have any reason to believe
10 that any of the notes receivable on this list
11 other than Hunter Mountain Investment Trust
12 should have been characterized as doubtful or
13 uncollectible?
14 MS. DANDENEAU: Objection to form.
15 MS. DEITSCH-PEREZ: Form.
16 A. I didn't know. I didn't form an
17 opinion. Bankruptcy was new to me. It still
18 is new to me, even after going through this.
19 So I really didn't know what to expect nor
20 really -- you know, I didn't know.
21 MR. MORRIS: I move to strike.
22 Q. During the period of Highland's
23 bankruptcy when you were serving as CFO, did
24 you have any reason to believe any of the notes
25 on this list were doubtful or uncollectible?

Page 248

1 WATERHOUSE - 10-19-21
2 MS. DEITSCH-PEREZ: This is like the
3 fifth time you've asked it. Object to the
4 form.
5 MR. MORRIS: I'm moving to strike,
6 if you haven't noticed, because he's not
7 answering the question.
8 MS. DEITSCH-PEREZ: He was answering
9 the question, you just didn't like it, like
10 the answer.
11 MR. MORRIS: Good Lord.
12 Q. Go ahead, Mr. Waterhouse.
13 A. Again, I don't -- we brought up a
14 myriad of issues at the start of the bankruptcy
15 case. I don't recall if this was one of them,
16 but, again, there are a lot of things we
17 couldn't change. Even, you know, I was told
18 status quo, blah, blah, blah, right, there is a
19 stay, you can't -- you know, I don't recall
20 specifically, but that doesn't mean it didn't
21 happen.
22 MR. MORRIS: I move to strike.
23 Q. During the time that Highland was in
24 bankruptcy and you served as CFO, did you have
25 any reason to believe that any of the notes

Page 249

1 WATERHOUSE - 10-19-21
2 receivable on this list were doubtful or
3 uncollectible?
4 MS. DEITSCH-PEREZ: Object to the
5 form.
6 A. Potentially.
7 Q. Did you ever tell anybody that?
8 A. As I just stated like five times,
9 yes, we -- at the beginning after filing and we
10 were getting DSI and others up to speed, you
11 know, we had a myriad of discussions of a lot
12 of things and this was likely one of them. I
13 don't -- but I don't recall specifically we
14 talked --
15 Q. I don't want to know -- I don't want
16 to know what was --
17 MS. DEITSCH-PEREZ: Wait, wait.
18 Excuse me. Mr. Morris, you did not let him
19 finish his answer.
20 A. I spoke -- we had -- we were
21 bringing Fred Karesa and Brad Sharp (phonetic)
22 up to speed on all of these items, contracts,
23 and investments and going through -- we had
24 hours and hours and hours of discussion. And
25 then not only do I have to repeat this not

Page 250

WATERHOUSE - 10-19-21

1 once, twice, three, four times with -- you
2 know, I mean, we -- I don't -- I don't remember
3 the sum culmination of all these discussions.
4 They all kind of blend together.
5 MR. MORRIS: Okay. I move to strike
6 and I will try one more time.
7 Q. Did you ever tell anybody at DSI
8 that you believed any of the notes receivable
9 on this list were doubtful or uncollectible?
10 MS. DANDENEAU: Object to form.
11 A. Potentially.
12 Q. Potentially you told them or
13 potentially they were doubtful or
14 uncollectible?
15 A. Potentially I told them that we
16 needed to look at the value of these -- of
17 these assets.
18 Q. Okay. Did you -- okay. It is
19 potential that you told them and it is
20 potentially that you didn't; right?
21 MS. DANDENEAU: Objection to form.
22 A. I've gone through that. I don't
23 recall specifically.
24 Q. So you should just -- I don't want
25

Page 251

WATERHOUSE - 10-19-21

1 to tell what you to do. Do you have --
2 MS. DANDENEAU: Good.
3 Q. Other than -- other than telling
4 them that they should look at the values, do
5 you have any recollection whatsoever of ever
6 having told anybody at DSI that any of the
7 notes receivable on this page were doubtful or
8 uncollectible?
9 MS. DEITSCH-PEREZ: Object to the
10 form.
11 MS. DANDENEAU: Objection.
12 A. I recall having general discussions
13 about everything on our balance sheet which
14 would have included these -- these notes
15 receivable.
16 Q. Okay.
17 A. I don't recall specifically where
18 those discussions delved into.
19 Q. Do you recall any discussion at all
20 on the topic of whether any of these notes on
21 this list were doubtful or uncollectible?
22 MR. AIGEN: Mr. Morris, how on earth
23 is that question different from the
24 question that you just asked for the last
25

Page 252

WATERHOUSE - 10-19-21

1 five times? I mean, really I thought you
2 were -- (overspeak.)
3 MR. MORRIS: Because he never
4 answered it.
5 MS. DEITSCH-PEREZ: Are you
6 listening to him?
7 MR. MORRIS: You know --
8 MS. DEITSCH-PEREZ: He basically
9 said that he had a conversation with DSI
10 that went over all of this stuff and that
11 conversation could have included the notes
12 but he doesn't recall specifically.
13 What more do you want him -- to ask
14 of him?
15 MR. MORRIS: I want him -- I would
16 love him to say -- I would like him to
17 testify to the truth, and that is he has no
18 recollection.
19 MS. DEITSCH-PEREZ: Well, the truth
20 as you would like to see it, but -- but he
21 is testifying truthfully. And I -- and, by
22 the way, I move to strike that comment --
23 MR. MORRIS: Okay.
24 MS. DEITSCH-PEREZ: -- because it
25

Page 253

WATERHOUSE - 10-19-21

1 suggests that he has not testified
2 truthfully.
3 MR. MORRIS: I will ask my question
4 again. And if at any time you want to
5 direct him not to answer, that is your
6 prerogative.
7 Q. Mr. Waterhouse, do you have any
8 recollection at all of ever telling anybody
9 from DSI that any of these notes were doubtful
10 or uncollectible?
11 MS. DANDENEAU: Object to form.
12 A. I don't remember specifically.
13 Q. Do you remember generally that
14 specific topic?
15 A. We generally talked about assets,
16 values. If -- we had discussions of that and
17 collectability in nature. I mean, of Highland,
18 the funds, the CLOs, the entire complex. We
19 had discussions like that, which is, you know,
20 as you look at a billion dollar consolidated
21 balance sheet.
22 So I generally remember -- this is
23 billions of dollars, including these assets --
24 having discussions of this -- of this type.
25

Page 254

1       WATERHOUSE - 10-19-21
2   Q.  Do you believe that an affiliate
3 loan on this list was doubtful or
4 uncollectible? Would you have told that to
5 DSI?
6     MS. DANDENEAU: Objection to form.
7     MS. DEITSCH-PEREZ: Object to form.
8   A.  If we had, like -- again, if we --
9 if -- if we weren't preparing financial
10 statements in accordance with GAAP, and -- you
11 know, if DSI at that point -- they were --
12 again, I was new to bankruptcy.
13     The CRO is -- we are delegating
14 everything to the CRO. All the decisionmaking.
15 Remember -- remember when you and I went into
16 Delaware Court and we were saying DSI basically
17 does everything, remember this, Mr. Morris?
18     You were my counsel at the time, and
19 basically we're running everything through DSI.
20 That was what this was like in the early part.
21     Everything was communicated through
22 DSI. So DSI says this. DSI says that. That
23 is what we're doing, and we're pointing out
24 things to them.
25     Now, they decide what direction this

Page 255

1       WATERHOUSE - 10-19-21
2 goes.
3   Q.  Did you point out that any of
4 these --
5   A.  I don't recall specifically.
6   Q.  Okay. At any time that you served
7 as Highland's CFO, did you ever point out to
8 DSI that any of these loans were doubtful or
9 uncollectible?
10     MS. DEITSCH-PEREZ: Object to the
11   form.
12     MS. DANDENEAU: Objection.
13   A.  If you're asking me if I had a
14 conversation with DSI, if any of these loans
15 were doubtful or uncollectible, I don't recall
16 specifically.
17   Q.  Do you recall that the debtor filed
18 on the docket monthly operating reports?
19   A.  Yes.
20   Q.  You prepared those personally,
21 didn't you?
22     MS. DEITSCH-PEREZ: Objection to
23   form.
24   A.  I didn't personally prepare them,
25 the team did with DSI.

Page 256

1       WATERHOUSE - 10-19-21
2   Q.  But you signed them; correct?
3   A.  My signature is on the MORs.
4   Q.  And you signed them as the preparer
5 of the document; correct?
6   A.  Yes, I did this pursuant to DSI's
7 instructions.
8   Q.  Okay. You wouldn't have signed the
9 document if you didn't believe it to be
10 accurate; correct?
11   A.  If I had reason to believe it
12 wasn't, presumably I wouldn't have signed it.
13   Q.  Okay. And do you have any reason to
14 believe right now that any monthly operating
15 report that has your signature on it was
16 inaccurate in any way?
17     MS. DEITSCH-PEREZ: Object to the
18   form.
19   A.  My understanding of the monthly
20 operating reports is we were filing them in
21 accordance with the standards set by the Court.
22 It wasn't -- you know, again, I don't -- you
23 know, it wasn't GAAP. It wasn't these other
24 standards, so I testified I didn't have
25 experience in this. The CRO was running the

Page 257

1       WATERHOUSE - 10-19-21
2 show. I followed their advice.
3   Q.  But you assured yourself that
4 everything in the report was accurate before
5 you signed them; correct?
6     MS. DANDENEAU: Objection to form.
7   A.  I trusted the guidance from the CRO
8 and their team and their experience and their
9 guidance for doing this for many, many, many
10 years to -- to -- to categorize and put things
11 in ways on the form.
12     You know, my team had -- had not
13 filled out these forms before and needed all of
14 this guidance. I'm not an expert in this. I
15 have oversight of it. I signed the form. DSI
16 told me to.
17   Q.  And you and your team are the source
18 of the information that DSI used to create the
19 reports; correct?
20     MS. DANDENEAU: Objection to form.
21   A.  The books and records reside with
22 the -- with -- with the corporate accounting
23 team.
24   Q.  Okay. And the corporate accounting
25 team was the corporate accounting team that was

Page 258

1        WATERHOUSE - 10-19-21
2 under your direction; correct?
3    A.  Yes.
4    Q.  So -- so your team was responsible
5 for maintaining Highland's books and records;
6 correct?
7    A.  I'm sorry, my team was responsible?
8    Q.  Correct.
9    A.  Yes.  They -- they -- they were
10 the -- the -- the general ledger of Highland,
11 that responsibility was with the corporate
12 accounting team.
13    Q.  The corporate accounting group
14 reported to you; correct?
15    A.  Yes.
16       MR. MORRIS:  Can we put up 41,
17 please.
18      (Exhibit 41 marked.)
19    Q.  All right.  You will see that this
20 is a report that is dated January 31st, 2020,
21 but it is for the month ending December 2019.
22      Do you see that?
23    A.  I do.
24    Q.  And you signed this report in your
25 capacity as the chief financial officer of

Page 259

1        WATERHOUSE - 10-19-21
2 Highland; correct?
3    A.  Yes.
4    Q.  And you're the preparer -- you're
5 identified as the preparer of the report;
6 correct?
7    A.  That is correct.
8    Q.  Do you recall participating in the
9 preparation of monthly operating reports?
10    A.  As I testified earlier, it was put
11 together, you know, with the team.  The team
12 worked with DSI to put these monthly operating
13 reports together.  We had no experience at this
14 time of the monthly operating reports or things
15 of this nature.
16       MR. MORRIS:  Can you turn to the
17 next page, please.
18    Q.  Do you see a line item under assets
19 due from affiliates?
20    A.  Yes, I do.
21    Q.  Okay.  And to the best of your
22 knowledge and understanding, as the person who
23 is identified as the preparer of this report,
24 does that line item include the affiliate loans
25 that we've been talking about?

Page 260

1        WATERHOUSE - 10-19-21
2    A.  Again, I would have to see, just
3 like we did with the financial statements of
4 Highland and NexPoint, I would have to see a
5 detailed build, but, you know, if you look at
6 the other line items, you know, the only other
7 place it could be would be in -- in other
8 assets.
9    Q.  Okay.  And as a matter of
10 arithmetic, is it fair to say that is the value
11 of the assets due from affiliates was more than
12 25 percent of the value of Highland's total
13 assets as of 12/31/2019?
14       MS. DANDENEAU:  Objection to form.
15    A.  I'm really not doing the mental math
16 right now, so I've been going at this depo for
17 hours, so I'm really not -- you know --
18    Q.  All right.  No problem.
19    A.  -- these are millions of dollars.
20    Q.  Let's look at the Footnote 1,
21 please.  Do you see there is a reference to the
22 Hunter Mountain note?
23    A.  Yes, I see that in Footnote 1.
24    Q.  Okay.  And that's the reserve that
25 was taken against that note?

Page 261

1        WATERHOUSE - 10-19-21
2    A.  Yes, that is what this indicates.
3    Q.  Okay.  And were you aware that the
4 reserve was being taken on that it was?
5    A.  I was -- I was aware, yeah, at some
6 point, yes.
7    Q.  Okay.  And are you aware of any
8 reserve being taken with respect to any other
9 note that was issued in favor of Highland?
10    A.  Again, as I testified, we didn't go
11 through an analysis on -- on -- on the other
12 notes.
13    Q.  Can we turn --
14    A.  I believe -- I believe it says that
15 in Footnote 1, fair value has not been
16 determined with respect to any of the notes.
17    So this footnote -- footnotes, look,
18 there has been no determination.
19    Q.  Okay.  The determination was made in
20 the audited financial statements just six
21 months earlier; right?  We saw that earlier?
22    A.  That was as of 12/31/18.  I mean,
23 things -- circumstances -- there's a bank --
24 circumstances change, things change -- things
25 change over time, you know, facts and

Page 262

WATERHOUSE - 10-19-21

1 circumstances change. Again, you have to do an
2 analysis.
3     Q.    Okay. And you do recall that in
4 Highland's 2018 financial statement, all of the
5 notes issued by affiliates and Mr. Dondero that
6 were due at year-end had a fair value equal to
7 the carrying value; correct? We looked at
8 that?
9     A.    Yes. That was in the -- in the
10 disclosure for the -- for the affiliate notes,
11 yes.
12    Q.    And -- and you were obligated to
13 share with PwC any subsequent events between
14 the end of 2018 and the date that you signed
15 your management representation letter on June
16 3rd, 2019; correct?
17        MS. DEITSCH-PEREZ: Object to the
18    form.
19    A.    Yes. I -- I -- I signed the
20 management, you know, my signature is in the
21 management representation letter -- I hope I'm
22 answering your question -- that is dated in
23 June with the representations made in that
24 management representation letter.

Page 263

WATERHOUSE - 10-19-21

1     Q.    Okay. And there was nothing that
2 caused PricewaterhouseCoopers to include in
3 subsequent events any adjustment to the
4 conclusion that the fair value of the affiliate
5 notes and the notes issued by Mr. Dondero
6 equaled the carrying value; correct?
7        MS. DANDENEAU: Objection to the
8    form.
9     A.    That is correct. That is what was
10 in the -- in the -- in the footnotes.
11    Q.    Okay. So are you aware of anything
12 that occurred between June 3rd, 2019 and
13 December 31st, 2019 that would have caused the
14 fair value of the notes to differ from the
15 carrying value?
16    A.    Yeah. Highland filed for
17 bankruptcy, things changed -- I mean, there was
18 a bankruptcy filed in October of -- of -- of
19 2019, right, the petition date that we've
20 described earlier.
21        I mean, I had a -- I guess looking
22 back naively, I thought we were going to get an
23 audit from PwC for year-ended 2019, and when we
24 had discussions with PwC, they were like, are

Page 264

WATERHOUSE - 10-19-21

1 you crazy, we're not auditing this. Values
2 change, all these things change, bankruptcy
3 changes the entire scenario. I mean -- and
4 they're like, we're not -- we're not touching
5 this.
6        And so, you know, I was like, okay,
7 sorry, I get it, okay, no an audit.
8        I mean, it is -- you know, and --
9 you know, and we weren't preparing GAAP
10 financial statements.
11       Again, I didn't know what we were
12 doing in relation to our financial statements,
13 but these were the discussions I was having at
14 the time. And yeah, I mean, filing bankruptcy
15 from what I got from outside auditors and
16 others involved changed things dramatically.
17    Q.    Okay. Highland wasn't the obligor
18 under any of the notes that we're talking
19 about; correct?
20    A.    No.
21    Q.    So --
22    A.    That's right.
23    Q.    So can you identify any fact that
24 would cause the fair value to deviate from the

Page 265

WATERHOUSE - 10-19-21

1 carrying value during the seven-month period
2 between June 3rd and the end of the year, 2019?
3        MS. DANDENEAU: Objection to form.
4     A.    No. I mean, I'm putting myself back
5 at that time, right. Hindsight is 2020, but we
6 didn't do an analysis, but we would have done a
7 fulsome analysis and looked at all of the facts
8 and circumstances at the time, but asset values
9 change. You know, there could have been a
10 market crash in hindsight in 2020, which --
11 which affected entities' abilities.
12       There could have been all of these
13 things, right, that -- that happen. It is --
14 it is easy to look back in hindsight, but when
15 you are looking at this in -- in realtime, the
16 analysis is different, and again, we didn't do
17 an analysis.
18    Q.    Okay. You didn't do an analysis.
19       Do I have that right?
20    A.    I don't -- I don't recall doing one
21 or maybe -- you know, I don't recall doing one.
22    MR. MORRIS: I'm going to
23    take a break. I may be done, so the time
24    now is -- is 4:30 your time. Let's just

Page 266

1    WATERHOUSE - 10-19-21
2 take a short break until 4:40 your time.
3    MS. DANDENEAU: Okay.
4    VIDEOGRAPHER: We're going off the
5 record, 4:31 p.m.
6 (Recess taken 4:31 p.m. to 4:43 p.m.)
7    VIDEOGRAPHER: We are back on the
8 record at 4:43 p.m.
9    MR. MORRIS: I have no further
10 questions.
11    MR. RUKAVINA: Okay.
12 Mr. Waterhouse, I will go next.
13    EXAMINATION
14 BY MR. RUKAVINA:
15    Q. Sir, my name is Davor Rukavina. I'm
16 the lawyer for --
17    MR. MORRIS: Hey, Davor, just before
18 you begin, I just want to put on the record
19 Highland's objection to documents that were
20 produced to me 10 minutes before the
21 deposition began.
22    MR. RUKAVINA: What the basis of
23 your objection?
24    MR. MORRIS: That they were due
25 quite some time ago, and the fact that you

Page 267

1    WATERHOUSE - 10-19-21
2 had -- I just think it's appropriate to --
3 to dump documents on somebody 10 minutes
4 before the deposition. I just think
5 that's --
6    MR. RUKAVINA: Well, these are
7 documents Highland produced. I'm not aware
8 of any rule I have to give you advance
9 documents when I know for the record that
10 other than the exhibits that you sent to us
11 last week, most of the exhibits you used
12 today you did not provide to me prior to
13 this deposition.
14    MR. MORRIS: No, but the documents
15 were produced by me in -- in litigation,
16 right?
17    MR. RUKAVINA: I'm going to use
18 primarily, John, the documents that you
19 produced to me today, but you may.
20    MR. MORRIS: Primarily. I've got --
21 I've got my objection. You have got your
22 response. Proceed.
23    Q. Mr. Waterhouse, again, I represent
24 the advisors, HCMFA and NexPoint Advisors.
25    Do you understand that?

Page 268

1    WATERHOUSE - 10-19-21
2    A. Yes.
3    Q. You and I have never met or talked
4 before today, have we?
5    A. No, I have -- I have heard your
6 voice on calls before.
7    Q. Okay.
8    MR. RUKAVINA: Madam Court Reporter,
9 I will use a few exhibits today. My
10 associate, Mr. Nguyen, will find some way
11 to get them to you. I don't know how to do
12 that, but it looks like you guys do.
13    I am going to use numbers as well.
14 But to differentiate them from Mr. Morris
15 we're going to mark mine with the prefix A
16 for advisors.
17    Do you understand?
18    COURT REPORTER: Yes.
19    MR. RUKAVINA: Okay. Perfect.
20    Q. Okay. So, Mr. Waterhouse, let's
21 start with those two HCMFA notes that you were
22 asked about, one for 5 million and one for
23 2.4 million.
24    Do you recall those notes?
25    A. Yes.

Page 269

1    WATERHOUSE - 10-19-21
2    Q. Were you ever the CFO of HCMFA?
3    A. I don't recall.
4    Q. So to the best of your recollection,
5 you were still an officer of HCMFA in 2019,
6 just that your title was treasurer?
7    MR. MORRIS: Object to the form of
8 the question. There is no leading here.
9 He works for your client.
10    MS. DANDENEAU: That is not -- that
11 is not true.
12    MR. MORRIS: He's the treasurer --
13 he is the treasurer of your client. I
14 don't -- I'm going to object every time you
15 try to lead, so...
16    MR. RUKAVINA: Totally fine to
17 object.
18    MR. MORRIS: Okay.
19    Q. Please answer my question,
20 Mr. Waterhouse.
21    A. I'm sorry, could you repeat? There
22 was...
23    Q. Yes. You were -- you testified
24 earlier that in 2019 you were an officer of
25 HCMFA; correct?

Page 270

WATERHOUSE - 10-19-21

1 A. Yes, I testified that I was the
2
3 treasurer and I didn't know if that incumbency
4 certificate, you know, was one that appointed
5 me as a treasurer, but yes.
6 Q. I'm just trying to confirm that
7 sitting here today, to the best of your
8 recollection, at that time you were -- your
9 title was treasurer. It was not chief
10 financial officer.
11 A. I don't recall that being my title.
12 Q. Okay. And in May of 2019, however,
13 I think you testified you were the chief
14 financial officer of the debtor; correct?
15 MR. MORRIS: Objection to the form
16 of the question.
17 A. Yes, I was -- yes.
18 Q. Okay. As such, in May of 2019, did
19 you have the authority, to your understanding,
20 to unilaterally loan $5 million or $2.4 million
21 to anyone on behalf of the debtor?
22 MR. MORRIS: Objection to the form
23 of the question.
24 A. Sorry, can you repeat that?
25 Q. Yes. So in your capacity as the

Page 271

WATERHOUSE - 10-19-21

1
2 chief financial officer of the debtor, Highland
3 Capital Management, L.P., in May of 2019, did
4 you believe that you unilaterally, just Frank
5 Waterhouse, had the authority to loan on behalf
6 of the debtor to anyone $5 million and
7 $2.4 million?
8 MR. MORRIS: Objection to the form
9 of the question.
10 A. No.
11 Q. Is it because loans of that amount
12 would have had to be approved by someone else?
13 A. Yes.
14 Q. Who in '20 -- in May of 2019, if
15 Highland wanted to loan 5 million or
16 $2.4 million to someone, what would have been
17 the internal approval procedure?
18 MR. MORRIS: Objection to the form
19 of the question.
20 A. If -- if we had loans of that nature
21 that needed to be made due to their size, we
22 would have gotten approval from the -- the
23 president of Highland.
24 Q. And who that was individual?
25 A. It was James Dondero.

Page 272

WATERHOUSE - 10-19-21

1
2 Q. Okay. Now, I'm going to ask you a
3 similar question but for a different entity.
4 In May of 2019, as the treasurer of
5 HCMFA, did you believe that you unilaterally
6 had the ability to cause HCMFA to become the
7 borrower of a $5 million loan and a
8 $2.4 million loan?
9 MR. MORRIS: Objection to the form
10 of the question.
11 A. No.
12 Q. What would -- what would the
13 approval have taken place -- strike that.
14 What would the approval process have
15 been like in May of 2019 at HCMFA for HCMFA to
16 take out a $7.4 million loan?
17 MR. MORRIS: Objection to the form
18 of the question.
19 A. The process would have been similar
20 to what we just discussed on -- for Highland to
21 make a loan to others. So, again, you know,
22 we -- we would have -- either myself or someone
23 on the team would have discussed this with
24 the -- the president and owner of -- of HCMFA.
25 Q. And who was that individual?

Page 273

WATERHOUSE - 10-19-21

1
2 A. That was James -- Jim Dondero.
3 Q. So do I understand that in May of
4 2019, on behalf of both the lender, Highland,
5 and the borrower, HCMFA, Mr. Dondero would have
6 had to approve $7.4 million in loans?
7 MR. MORRIS: Objection to the form
8 of the question.
9 A. Yes.
10 Q. You mentioned when Mr. Morris was
11 asking you the NAV error, N-A-V error, with
12 respect to TerreStar, without writing us a
13 novel, unless you feel like you have to, can
14 you summarize what that NAV error was? What
15 happened?
16 A. There was a -- in the Highland
17 Global Allocation Fund, it owned at the time an
18 equity interest in a company called TerreStar.
19 And TerreStar is -- at the time was a private
20 company, and it may still be today. Again, I'm
21 putting myself back then as a private company.
22 We had -- sorry, I don't mean we --
23 the fund and the advisor used Houlihan Lokey
24 to -- to value that investment. And during
25 that time there was some trades that were

Page 274

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2 executed at market levels that were much lower
3 than the Houlihan Lokey model.
4      And based on information and
5 discussions with the portfolio managers and,
6 you know, principals that were very familiar
7 with TerreStar, it was determined that those
8 trades were non-orderly and they were not
9 considered in the valuation as consulted with
10 Houlihan Lokey and PricewaterhouseCoopers at
11 the time.
12      Subsequent to a -- I can't remember
13 the exact circumstances of why the SEC got
14 involved. I think it was due to this -- this
15 investment became a material position in the
16 fund. It triggered an SEC, kind of, inquiry.
17 And as part of that inquiry, they questioned
18 the valuation methodology. "They" meaning the
19 SEC.
20      And at the culmination of that
21 process -- this is all summarized -- the value
22 that was -- that ultimately had to be used in
23 the fund's NAV was different than -- materially
24 different than what the original valuation at
25 Houlihan Lokey provided.

Page 275

1        WATERHOUSE - 10-19-21
2      And given that there was this fund
3 was, as we discussed -- I don't know if we
4 discussed it, but it was an open-ended fund
5 that was going -- that was converting to a
6 close-end fund.
7      Due to the fact that it was an
8 open-ended fund, you had to recalculate NAV and
9 see what the impact was on people -- on
10 investors coming in and out of the fund and if
11 there is a detrimental impact and to calculate
12 what that -- what that impact was and if there
13 was any amounts owed to the fund pursuant to
14 the error.
15    Q.  Were you personally involved
16 internally at either Highland or HCMFA with
17 these investigations and discussions with the
18 SEC?
19    A.  I was.
20    Q.  Which other key people or senior
21 people at Highland were involved, to your
22 recollection?
23    A.  Myself, Thomas Surgent, David Klos,
24 Lauren Thedford, Jason Post.
25    Q.  Mr. Dondero, was he --

Page 276

1        WATERHOUSE - 10-19-21
2    A.  I believe Cliff Stoops. I'm trying
3 to think. And maybe that is -- that is -- that
4 is -- that is all kind I can recall at the
5 moment.
6    Q.  Do you recall whether it was
7 determined that the fund suffered losses as a
8 result of this error?
9    A.  The -- the fund -- the -- the --
10 because the open-ended nature of the fund,
11 there were losses that were attributable to
12 investors. Meaning they -- they would have
13 redeemed and got a less money or -- or they
14 subscribed in and maybe because they didn't get
15 enough shares and then they later sold and then
16 they were harmed in that fashion.
17      And there is -- there is is -- there
18 were very -- there were very detailed
19 calculations and, you know, all these different
20 scenarios that we had to -- I'm sorry, I keep
21 saying "we" -- that the individuals involved
22 had to calculate and quantify.
23    Q.  Well, do you recall whether HCMFA
24 admitted certain fault and liability for this
25 error?

Page 277

1        WATERHOUSE - 10-19-21
2    A.  I don't recall specifically.
3    Q.  Do you recall whether HCMFA caused
4 any funds to be paid to the investors and the
5 fund the subject of the NAV error?
6    A.  Yes.
7    Q.  Do you recall the approximate amount
8 of funds, moneys paid to the investors and the
9 fund?
10    A.  It was -- it was approximately
11 $7 million.
12    Q.  If I was to suggest 7.8 million,
13 would that ring more true or are you sticking
14 with your original answer?
15    A.  It was -- it was approximately 7 --
16 7 to $8 million. Again, I don't remember the
17 exact number, but it was in that ballpark.
18    Q.  So regardless of whether HCMFA
19 accepted fault or liability, it caused some
20 $7 million or more to be paid out to affected
21 investors in the fund?
22    MR. MORRIS: Objection to the form
23 of the question.
24    A.  And I want to make sure I'm
25 understanding your question because there is a

Page 278

1 WATERHOUSE - 10-19-21
2 lot of different entities that are going on to
3 my head.
4 I think what you are saying is based
5 on this error, shareholders were harmed by this
6 approximately $7.8 million -- by approximately
7 $7.8 million. Is that what you are asking?
8 Q. Yes, sir.
9 A. Yes, that was -- again, I don't have
10 the exact numbers. If I take -- it was -- it
11 was in that ballpark, and there is a detail
12 calculation and write-up that could, that --
13 that exists someplace.
14 Q. Now, at that time, at the time that
15 the NAV error occurred, was there a contract in
16 place between HCMFA and the debtor pursuant to
17 which the debtor was providing services to
18 HCMFA?
19 MR. MORRIS: Objection to the form
20 of the question.
21 A. Yes.
22 Q. Was that contract generally called a
23 shared services agreement?
24 A. It was generally called that, but
25 there were -- there were -- I mean, it -- it --

Page 279

1 WATERHOUSE - 10-19-21
2 it depends on who you talk to, but yes,
3 generally, there were -- there are multiple
4 agreements.
5 Q. Pursuant to one or more of those
6 agreements, was the debtor providing certain
7 services to HCMFA?
8 MR. MORRIS: Objection to the form
9 of the question.
10 A. Yes.
11 Q. And can you at a very high level
12 summarize in 2018 and 2019 what those services
13 were?
14 A. Yes, there was a -- yes.
15 Q. Okay. Please -- please go -- go
16 through a short summary.
17 A. There was a -- a cost reimbursement
18 agreement between Highland Capital Management
19 Fund Advisors and Highland Capital Management,
20 L.P. That agreement was for what we referred
21 to as front office services, so investment
22 management, things of that nature.
23 There was I think what most people
24 refer to as the shared services agreement that
25 was -- that agreement was between Highland

Page 280

1 WATERHOUSE - 10-19-21
2 Capital Management Fund Advisors and Highland
3 Capital Management for back office services.
4 Q. And can you summarize what you mean
5 by back office services?
6 A. Those services were for accounting,
7 finance, tax, valuation, HR, IT, you know,
8 legal compliance, things of -- things of those
9 nature -- or things of that nature, excuse me.
10 Q. So in the spring of 2019, do you
11 recall whether HCMFA took the position that it
12 was actually Highland that caused the NAV error
13 to occur pursuant to the valuation services
14 that Highland was providing?
15 MR. MORRIS: Objection to the form
16 of the question.
17 A. I do not recall.
18 Q. Did you ever have any discussions
19 with anyone, Jim Dondero or anyone in the first
20 half of 2019 as to whether Highland, the
21 debtor, that is, had any liability to HCMFA
22 related to the NAV error?
23 MR. MORRIS: Objection to the form
24 of the question.
25 A. I do not recall.

Page 281

1 WATERHOUSE - 10-19-21
2 Q. And then you mentioned that the fund
3 was being closed and some compensation related
4 to that. Can you -- can you elaborate? What
5 were you referring to?
6 A. Right. So the advisor, pursuant to
7 board approval, put a proposal in front of the
8 shareholders of the Highland Global Allocation
9 Fund to convert it from an open-ended fund to a
10 closed-end fund.
11 So an open-ended fund, when
12 shareholders subscribe to the fund or redeem
13 into the fund, they do it at NAV.
14 When it is -- when you have a
15 closed-end fund, closed-end funds are -- are
16 publicly-traded, like on the New York Stock
17 Exchange, exchanges like that, and -- and
18 shareholders or investors, they're not --
19 they're -- they're not subscribing and
20 redeeming with the fund. They are like shares
21 of Apple.
22 Those shares of the Highland Global
23 Allocation Fund trade on an exchange, and that
24 is how you, you know, that is how, you know,
25 you become an equity owner in the fund or you

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2  sell your shares and you are no longer an
3  equity owner.
4         As part of that proposal, the
5  advisor told shareholders if you -- if you vote
6  for this proposal to -- to convert it from an
7  open-ended fund to a closed-end fund, we will
8  pay you some amounts of money.  I forgot -- a
9  certain number of points.  I think it was
10  like -- it was like two to three points or
11  something -- something like that.
12    Q.   Okay.  You mentioned when Mr. Morris
13  was asking you, going back to those two
14  promissory notes, you will recall the 5 million
15  and 2.4 million, you mentioned something to the
16  effect that Mr. Dondero told -- told you to pay
17  some moneys out of Highland.  Do you remember
18  that discussion with Mr. Morris?
19    A.   I do.
20    Q.   So, to the best of your
21  recollection, did you have a discussion with
22  Mr. Dondero about making some payments in May
23  of 2019 out of Highland?
24    A.   I recall, as I testified earlier,
25  that I had a conversation with Mr. Dondero

1    WATERHOUSE - 10-19-21
2  for -- for these amounts attributable to -- it
3  was either the error -- you know, the error,
4  and in that conversation he said, go get the
5  money from Highland.  I believe that is what I
6  testified earlier, and that -- that is my
7  recollection.
8    Q.   Do you recall if that was an
9  in-person meeting or some other mode for the
10  meeting?
11    A.   I -- I -- I recall that being
12  in-person.
13    Q.   Do you recall if anyone else was
14  present, or was it just you and Mr. Dondero?
15    A.   I recall just he and I.
16    Q.   And the moneys that he told you to
17  find from -- or get from Highland, was that in
18  the amount of $5 million and $2.4 million?
19        MR. MORRIS:  Objection to the form
20  of the question.
21    A.   I believe so, but I would have to go
22  back and look and see when those moneys were
23  actually paid into the -- into the fund and,
24  you know, when those transfers were done.  If
25  they were all done around that same time, then

1    WATERHOUSE - 10-19-21
2  yes, I would say it was -- it was all related
3  to that.
4    Q.   Did Mr. Dondero tell you that those
5  funds would be a loan from Highland to HCMFA?
6    A.   I don't recall.
7        MR. MORRIS:  Objection to the form
8  of the question.
9    Q.   Now, and forgive me, I'm probably
10  the only non-American born here, but I speak
11  reasonably well in English.  I don't recall,
12  does that mean you don't remember or does that
13  mean it didn't happen?
14        MR. MORRIS:  Objection to the form
15  of the question.
16    A.   It -- it means I don't -- I don't
17  remember.
18    Q.   Did Mr. Dondero tell you to have
19  those two promissory notes prepared?
20    A.   I don't recall.
21    Q.   When you -- again, when you say, I
22  don't recall today, that means that sitting
23  here today, you just don't remember one way or
24  the other.  Is that accurate?
25    A.   Yes.

1    WATERHOUSE - 10-19-21
2    Q.   Is it possible that you, having
3  heard what Mr. Dondero said and seeing funds
4  being transferred, assumed that that would be a
5  loan without him actually telling you that
6  would be a loan?
7        MR. MORRIS:  Objection to the form
8  of the question.
9    A.   Sorry, I want to make sure -- did I
10  ask the amounts that were transferred that I --
11  that -- that I assumed that that was a loan?
12    Q.   Well, let me -- let me take -- let
13  me try again.
14        So you have established already that
15  there were quite a number of promissory notes
16  back and forth -- I'm sorry, quite a number of
17  promissory notes with affiliated companies and
18  individuals owing Highland money; right?
19    A.   Yes.
20    Q.   And you have established that there
21  were many transactions and transfers going back
22  and forth over the years; right?
23        MS. DANDENEAU:  Objection to form.
24    A.   In -- yes, in my capacity as CFO and
25  my employment, yes, that is -- yes.

Page 286

1      WATERHOUSE - 10-19-21
2      Q.   And that's part of the reason why
3  you just can't remember some of the details
4  today because this -- this happened years ago,
5  and there were a number of transactions.  Is
6  that accurate?
7      MS. DANDENEAU:  Objection to the
8  form.
9      MR. MORRIS:  Objection to the form
10  of the question.
11      A.   I mean, I deal with thousands of --
12  of -- of -- of transactions, you know, whether
13  it has -- the processing of transactions, you
14  know, if it has got, you know, more -- more
15  zeros, you know, behind it than others.
16          When you look at thousands of
17  transactions over the years for funds and
18  advisors and -- and, you know, financial
19  statements, I mean, it is -- it is very hard
20  going back in -- in -- in my -- you know,
21  14-ish year career at -- at Highland to
22  remember a lot of those details, especially
23  when I don't have any records or books or
24  anything like that, and -- and going back many
25  years.

Page 287

1      WATERHOUSE - 10-19-21
2      Q.   And that is fine.  That -- that --
3  that is why I asked the question.
4          Is it possible in May of 2019 when
5  Mr. Dondero told you to transfer the funds from
6  Highland, you just assumed on your own that
7  those would be loans without him actually
8  telling you that those would be loans?
9      MR. MORRIS:  Objection to the form
10  of the question.
11      A.   I don't know.
12      Q.   I'm sorry, you --
13      A.   I said I don't know.
14      Q.   Okay.  Well, as the -- as the CFO
15  for Highland, if you saw $7.4 million going
16  out, you would feel some responsibility to
17  account for that, wouldn't you?
18      MR. MORRIS:  Objection to the form
19  of the question.
20      A.   Yes.
21      Q.   Is it fair to say that those would
22  be in the range large enough to rise up to your
23  level?
24      MR. MORRIS:  Objection to the form
25  of the question.

Page 288

1      WATERHOUSE - 10-19-21
2      A.   If -- I don't know if I understand
3  your question.  Those amounts would arise to my
4  level where I would be involved or...
5      Q.   You would want to know what a
6  transfer for that amount, $7.4 million, was all
7  about, as the CFO of Highland, wouldn't you?
8      MR. MORRIS:  Objection to the form
9  of the question.
10      A.   Yes, I make it -- I mean, I -- I
11  review all sorts of payments, I mean, even
12  smaller dollar payments on a periodic basis,
13  you know, to -- to -- to understand and to make
14  sure that we are paying things in a -- you
15  know, in -- in -- in an informed way.  And, you
16  know -- and we're -- and we're paying things
17  pursuant to vendor contracts and things like
18  that.
19      Q.   So as part of that, is it possible
20  that seeing $7.4 million go out you would have
21  promissory notes made in order to keep a paper
22  trail, assuming that those were loans, when
23  perhaps they were never intended to be loans by
24  Mr. Dondero?
25      MR. MORRIS:  Objection to the form

Page 289

1  of the question.
2      A.   I don't know.  As I testified
3  earlier, I had conversations with Mr. Dondero
4  about -- about the -- the -- the moneys that
5  were needed for the NAV error.  And I recall
6  him saying go get it from Highland -- or get it
7  from Highland.
8      Q.   Well, why did you sign those
9  promissory notes and why didn't you have him
10  sign them?
11      MR. MORRIS:  Objection to the form
12  of the question.
13      A.   I don't know.  I don't know.
14      Q.   You mentioned earlier that you
15  typically don't sign promissory notes.  Am I
16  remembering your testimony correctly?
17          I mean, promissory notes on behalf
18  of the entities.  Not yourself, obviously.
19      A.   Yes, that is what I said earlier.
20      Q.   Do you recall any other promissory
21  notes in the million-plus range that you had
22  ever signed before on behalf of any entity?
23      A.   There is -- there has been a lot of
24  transactions over the years.  I don't -- I

Page 290

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    don't -- I don't recall generally. I don't --
3    I don't recall.
4        Q.   So -- but to the best of your
5    recollection, it was on your initiative,
6    following your discussion with Mr. Dondero,
7    that you had someone draft those two promissory
8    notes; is that correct?
9            MR. MORRIS: Objection to the form
10    of the question.
11       A.   Yes, we would have -- the team, as I
12    stated earlier, we don't draft promissory
13    notes. "The team" meaning the accounting and
14    finance team.
15            So the team would have worked with
16    the legal group at Highland to draft any notes.
17       Q.   Do you believe or do you have any
18    recollection as to whether you would have done
19    that pursuant to an email or telephone call or
20    in-person meeting?
21            MR. MORRIS: Objection to the form
22    of the question.
23       A.   Are you asking if I would have -- if
24    those notes would have been drafted pursuant to
25    an email or phone call?

Page 291

1    WATERHOUSE - 10-19-21
2        Q.   Strike that.
3            Do you recall whether you sent an
4    email to anyone asking them to draft those two
5    promissory notes?
6        A.   I don't recall because, again,
7    once -- I would have instructed -- likely
8    instructed the team to -- to work with the
9    legal group to draft these documents.
10       I -- I -- I -- yeah, I didn't -- I
11    mean, that is more an operational-type
12    procedure. So, you know, a manager or a
13    controller or working with legal. You know,
14    they -- they can certainly handle that task to
15    get that -- you know, to request that from
16    legal.
17       Q.   And who on your team do you think
18    you would have asked to do that?
19            MR. MORRIS: Objection --
20       Q.   Who would have been the logical
21    person or people, if you don't remember their
22    name today?
23            MR. MORRIS: Objection to the form
24    of the question.
25       A.   It -- it -- there is only two

Page 292

1    WATERHOUSE - 10-19-21
2    managers of the group. That would have been
3    Dave Klos or Kristin Hendrix.
4            Dave was the -- one of his duties
5    was managing the valuation team, and so he was
6    intimately involved with this process. So, you
7    know...
8        Q.   Okay.
9        A.   I don't recall specifically but, I
10    mean, my general -- you know, I -- I -- I
11    likely would have talked to Dave first about it
12    versus someone like Kristin who hadn't been
13    intimately involved.
14       Q.   And -- and do you have a view as to
15    whether it is most likely that you would have
16    done that by email or in-person or how would
17    you believe you would have communicated that to
18    Mr. Klos?
19            MR. MORRIS: Objection to the form
20    of the question.
21       A.   I likely would have done that in
22    person. Again, if things of this nature
23    that -- again, you have to put ourselves back
24    to, we have been working on this very stressful
25    project for many, many months. And once the

Page 293

1    WATERHOUSE - 10-19-21
2    go-ahead was to -- you know, we see the light
3    at the end of the tunnel with wrapping this up
4    and making shareholders whole -- sorry to say
5    "we" -- you know, the -- so the folks that are
6    involved in it.
7            I like to talk to people
8    face-to-face and -- and -- and go to -- and go
9    to their desk, because that shows if I'm going
10    to their desk that -- that is something that I
11    want done, you know.
12       Q.   And do you remember, Mr. Waterhouse,
13    getting those two promissory notes in paper
14    format or by email before they were executed?
15            MR. MORRIS: Objection to the form
16    of the question.
17       A.   I don't recall.
18       Q.   For whatever was the ordinary course
19    back then in May 2019, would you expect to have
20    received them only on paper or would you have
21    expected to have received them in Word document
22    or PDF document by email?
23            MR. MORRIS: Objection to the form
24    of the question.
25       A.   I -- I didn't sign -- I signed very

Page 294

1    WATERHOUSE - 10-19-21
2  few documents via email. I can't say that it
3  never happened, but people either stopped by my
4  office and physically walked in documents for
5  signature that we discussed face-to-face.
6        Or documents were -- if -- if --
7  if -- if -- let's say I wasn't there or I
8  wasn't available, documents were dropped off.
9  I had -- I had some in- and outboxes in front
10  of my -- my office there at the Crescent.
11       Documents would be dropped off for
12  signature. There would be a cover sheet that
13  would be -- have been applied to those
14  documents detailing, you know, who dropped it
15  off, the purpose, why, what time.
16       And then, you know, as I stated, I
17  don't draft documents and I always go to the
18  legal group and the compliance group to make
19  sure that they're in the loop. And there is
20  a -- a box or section that says, Has legal
21  reviewed or approved, or something to that
22  nature.
23       Again, I don't -- I don't have
24  access to that cover sheet anymore, but it
25  was -- it was something to that effect.

Page 295

1    WATERHOUSE - 10-19-21
2        And my assistant, you know, if she
3  was there, she would review that -- you know,
4  whatever was being dropped off. And if that
5  has legal, you know, reviewed or -- reviewed or
6  approved it, if that wasn't -- if that stuff
7  hadn't been done, it was like she would just
8  tell them like, go -- go -- go to the legal
9  group, because --
10   Q.  Let me -- let me pause --
11       MS. DANDENEAU: Let him finish.
12       MR. MORRIS: Thank you. Go ahead.
13   A.  I take -- go to the legal group
14  because that -- that was my -- you know, I
15  didn't -- I didn't review anything that --
16  they weren't -- you know, or there wasn't some
17  representation made to me that they had
18  reviewed, approved in some capacity.
19       Again, my -- my -- my goal, as CFO,
20  is to provide transparency and make sure that
21  groups like compliance and other things -- and
22  the other group in legal are -- are in -- you
23  know, their -- they're made aware of
24  transactions of -- you know, that are crossing
25  my desk.

Page 296

1    WATERHOUSE - 10-19-21
2        Because I'm not in every
3  conversation. They're not in every
4  conversation -- meaning legal compliance -- and
5  I just want to make sure that -- that everyone
6  is in sync to, you know, to -- to the extent
7  possible.
8    Q.  So if we summarize, you don't
9  specifically remember signing these two notes,
10  but most likely it would have been that they
11  would have presented -- been presented to you
12  physically on paper?
13       MR. MORRIS: Objection to the form
14  of the question.
15   A.  They would -- they would have been
16  presented physically on paper most likely or
17  someone would have left it. But, I mean,
18  again, I don't -- I don't recall.
19   Q.  I understand. Understand.
20       When you signed -- when you signed
21  documents, when you personally signed
22  documents, did you typically use a ink pen or
23  did you use a stamp?
24   A.  No, I -- I -- I use a -- an -- an
25  ink pen.

Page 297

1    WATERHOUSE - 10-19-21
2    Q.  Do you know -- was there a file at
3  Highland kept anywhere with ink-signed
4  originals of a promissory notes in general or
5  these two promissory notes specifically?
6        MR. MORRIS: Objection to the form
7  of the question.
8    A.  Sorry, I just want to make sure I
9  understand your question. Are you saying is
10  there a file somewhere that has ink-signed
11  originals of these two promissory notes?
12   Q.  Yes.
13   A.  I would -- I would assume they're
14  some place. I mean --
15   Q.  Well, was there a -- was there a
16  place where Highland generally kept originals
17  of promissory notes owed to it?
18   A.  I wouldn't -- no.
19       MR. RUKAVINA: Mr. Nguyen, would you
20  please pull up my A7, alpha 7.
21   Q.  These are the two promissory notes,
22  Mr. Waterhouse.
23       (Exhibit A7 marked.)
24   Q.  And please -- Mr. Waterhouse, please
25  command my associate to scroll down as you need

Page 298

WATERHOUSE - 10-19-21

2  to, but I want you to take a very close look at
3  your two signatures here and tell me whether
4  you believe, in fact, that you ink signed them
5  or whether you --
6      MS. DANDENEAU:  Mr. Rukavina,
7  Mr. Waterhouse has the copies.
8      MR. RUKAVINA:  Perfect.  Then you
9  can take this down, Mr. Nguyen.
10     A.   These -- these -- these signatures
11 are identical, now that I stare at them, and I
12 mean, they are so close -- I mean, they're
13 identical that, I mean, even with my chicken
14 scratch signature, I don't know if I can -- you
15 know, I do this 100 times, could I do that
16 as -- as precisely as I see between the two
17 notes.
18     Q.   Well, that is why I ask.
19 Mr. Waterhouse, now that you have examined
20 them, does it seem like it is more likely that
21 you actually electronically signed these?
22     MR. MORRIS:  Objection to the form
23 of the question.
24     A.   Is -- I don't -- I don't recall
25 specifically.  As I said before, my assistant

Page 299

WATERHOUSE - 10-19-21

2  did have a -- an electronic signature, and that
3  was used from time to time.  It wasn't as
4  common practice back in 2019.  It definitely
5  was more common practice when we had to work
6  from home and remotely for COVID because it
7  that made it almost impossible to, right,
8  provide wet signatures since we're all working
9  from home remotely.
10     Q.   Well, going just for these two
11 promissory notes, Mr. Waterhouse, in light of
12 your inability to remember any details, are you
13 sure you actually signed either or both of
14 those notes?
15     MS. DANDENEAU:  Objection to form.
16     A.   I don't recall specifically
17 signing -- actually physically signing these
18 notes.  As I said before, I don't recall doing
19 that.  This -- this looks like my signature,
20 but yet these two signatures are identical.
21     Q.   So you don't recall physically
22 signing them, and I take it you don't recall
23 electronically signing them either?
24     A.   I don't recall.  You know, Highland
25 has all my emails.  If that occurred, you know,

Page 300

WATERHOUSE - 10-19-21

2  you know, I don't have any of these records is
3  what I'm saying.  I don't have any of those
4  records.
5      Q.   That is why I'm asking you these
6  questions in great detail because I don't have
7  those emails.  I'm trying to -- I'm hoping that
8  you will give me some names or some details so
9  I can go look for more emails, but again, you
10 don't remember any -- any individual, other
11 than Mr. Dondero that we've discussed, you
12 don't remember any individual with whom you
13 discussed these promissory notes prior to their
14 execution?
15     MR. MORRIS:  Objection to the form
16 of the question.
17     A.   I don't recall discussing it with
18 anybody else.
19     Q.   Okay.
20     A.   I mean, prior --
21     Q.   I understand.
22     A.   You know, there was no one else --
23 there was no one else in that meeting that I
24 recall with Mr. Dondero.
25     Q.   Now, when you established that by

Page 301

WATERHOUSE - 10-19-21

2  May of 2019 --
3      A.   And -- and from what I recall, and
4  the reason why I was by myself is -- is, you
5  know, I don't -- I don't want to speculate, I'm
6  sorry.
7      Q.   Okay.  We have established that by
8  May of 2019, in your view, the liabilities of
9  HCMFA exceeded its assets; correct?
10     A.   Yeah.  I mean, again, I don't have
11 financial statements in front of me, but I
12 think, if I recall, we'd have to go through the
13 testimony with Mr. Morris, I believe that was
14 the case.
15     Q.   In fact, you will recall that in
16 April of 2019, Mr. Dondero signed a document
17 that extended the demand feature of two prior
18 notes to May 31, 2019.  Do you recall that?
19     MS. DEITSCH-PEREZ:  I think you
20 might -- maybe have the court reporter read
21 that back.  You might have misspoke.
22     (Record read.)
23     MR. RUKAVINA:  And I did misspeak.
24     Q.   I meant to say to May 31, 2021.  Do
25 you recall that, sir?

Page 302

WATERHOUSE - 10-19-21

1
2   MR. MORRIS: Objection to the form
3   of the question.
4   A.  Yes.
5       MR. RUKAVINA: And, Mr. Nguyen, just
6   so that the record is clear, will you please
7   pull up my Exhibit Alpha 10, A10.
8       (Exhibit A10 marked.)
9   Q.   You don't have this one in front of
10  you, Mr. Waterhouse? This is the one that
11  Mr. Morris used earlier. Do you see that
12  document, sir?
13  A.  Yes, I do.
14  Q.   And this is what you were testifying
15  about before when Mr. Morris was asking you.
16  Do you remember that?
17  A.  Yes.
18  Q.   So here is my question for you,
19  Mr. Waterhouse: As the chief financial officer
20  of Highland, was it prudent for Highland less
21  than three weeks later to be lending
22  $7.2 million to an insolvent entity that
23  couldn't even then pay its debts back to
24  Highland?
25      MS. DANDENEAU: Objection to form.

Page 303

WATERHOUSE - 10-19-21

1
2   MR. MORRIS: Objection to the form
3   of the question.
4   A.  Sorry, I just want to make sure --
5   are you asking me, did you say, was it prudent
6   for Highland to loan $7.4 million to HCMFA a
7   few weeks after this document was executed?
8   Q.   Yes, and at a time when HCMFA's
9   liabilities exceeded its assets.
10      MR. MORRIS: Objection to the form
11  of the question.
12  A.  I don't -- it is odd. I don't know.
13      MR. RUKAVINA: You can take this
14  exhibit down, Mr. Nguyen.
15  Q.   Do you recall asking anyone,
16  Mr. Dondero or -- or anyone outside as to
17  whether Highland ought to be lending
18  $7.4 million to HCMF regarding HCMF's
19  creditworthiness?
20      MR. MORRIS: Objection to the form
21  of the question.
22  A.  I don't recall.
23  Q.   Did you receive personally any of
24  that $7.4 million?
25  A.  No.

Page 304

WATERHOUSE - 10-19-21

1
2   Q.   Did you even --
3       MR. MORRIS: I didn't hear that
4   question, sir.
5       MR. RUKAVINA: The one that he
6   answered, John, or my new one?
7       MR. MORRIS: No, no, your question,
8   Davor.
9       MR. RUKAVINA: I had asked him
10  whether he received any of the
11  $7.4 million. He said no.
12      MR. MORRIS: Yeah. I thought there
13  was a question after that. Maybe I was
14  mistaken. I apologize.
15      MR. RUKAVINA: I had started a new
16  question, so here, let me start the new
17  question again.
18  Q.   Did you personally receive any
19  direct benefit from those two notes for
20  $7.4 million?
21  A.  No.
22  Q.   Did you ever personally consider
23  yourself obligated to repay either or both of
24  those notes?
25  A.  No.

Page 305

WATERHOUSE - 10-19-21

1
2   MR. RUKAVINA: Pull up those notes
3   again, Mr. Nguyen.
4   Q.   You can have them in front of you,
5   Exhibit 7, Mr. Waterhouse, whatever is easier
6   for you. If you go to your signature page, my
7   question to you is, why did you not include
8   your title as treasurer by your name, Frank
9   Waterhouse?
10      MS. DANDENEAU: Objection to form.
11  A.  I didn't -- I didn't draft this
12  document.
13  Q.   So you relied on whoever drafted it
14  to draft it correctly?
15  A.  Yes.
16  Q.   Okay. But back then when you signed
17  this, did it ever cross your mind that you were
18  the maker on these notes?
19  A.  No.
20  Q.   Back then when you signed this
21  document, did it ever cross your mind that you
22  could be a co-obligor on these notes?
23  A.  No. I didn't receive $7.4 million,
24  I mean...
25  Q.   But can you say that HCMFA received

Page 306

1      WATERHOUSE - 10-19-21
2  $7.4 million?
3      A.   I would have to go back and look and
4  check in, you know, the -- the financial
5  records and the bank statements.
6      MR. RUKAVINA:  You can take this
7  exhibit down, Mr. Nguyen.
8      Q.   Mr. Waterhouse, I'm not trying to be
9  a smart-ass, but if the law says that because
10 of the way that you signed this promissory
11 note, if that is what the law says, that that
12 made you personally -- personally liable, then
13 you would agree with me that that was never
14 your intent?
15     MR. MORRIS:  Objection to the form
16     of the question.
17     A.   That was never -- I wouldn't sign a
18 note and not get consideration in return.
19     Q.   So putting all other issues aside,
20 if the law -- if the law says that you were
21 liable for those notes because of how you
22 signed them, then would you agree with me that
23 these notes are a mistake?
24     MR. MORRIS:  Objection to the form
25     of the question.

Page 307

1      WATERHOUSE - 10-19-21
2      MS. DANDENEAU:  Objection to the
3      form.
4      A.   Yes.
5      Q.   So do you agree with me that it's
6  odd -- I think that is the word you used --
7  that Highland would be loaning $7.4 million a
8  few weeks after that extension to an entity
9  whose liabilities exceeded its assets, and you
10 would agree with me that it was never your
11 intention to be in any way liable for these two
12 promissory notes; correct?
13     MR. MORRIS:  Objection to the form
14     of the question.
15     A.   Sorry, you -- you asked a lot there.
16     MR. RUKAVINA:  I will strike it and
17 I will move on.
18     Let's go to -- pull up Exhibit 9,
19 please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha
20 9, A9.
21     (Exhibit A9 marked.)
22     Q.   Sir, take a moment to look at this,
23 but this is an email, and you will see attached
24 July 31, 2020 affiliate notes.
25     Do you see that attachment?

Page 308

1      WATERHOUSE - 10-19-21
2      A.   Yes.
3      Q.   Okay.  And do you see an entry for
4  Highland Capital Management Fund Advisors?
5      MR. MORRIS:  I'm sorry, hold on.
6  Where are you looking?
7      MR. RUKAVINA:  Last page, John.
8      MR. MORRIS:  Is it the page on the
9  screen?
10     MR. RUKAVINA:  Oh, I'm sorry.
11 Mr. Nguyen just did it.  Yes, the last page
12 there.
13     MR. MORRIS:  Thank you.
14     Q.   Do you see an entry there for HCMFA?
15     A.   Yes.
16     Q.   About $10.5 million.
17     Do you see that?
18     A.   I do.
19     Q.   And, now, do you have any
20 explanation for why if HCMFA owed $7.4 million,
21 plus the 5.3 million that had been extended,
22 why that amount was only 10.5 million?
23     A.   I don't know.  Okay.
24     MR. RUKAVINA:  Close this one and
25 pull up, Mr. Nguyen, the schedules,

Page 309

1      WATERHOUSE - 10-19-21
2  schedule of assets.  What exhibit is this
3  of ours, Mr. Nguyen?
4      MR. NGUYEN:  This is A11.
5      MR. RUKAVINA:  Oh, this will be A11.
6      (Exhibit A11 marked.)
7      Q.   You don't have this in front of you,
8  Mr. Waterhouse?
9      A.   Okay.
10     Q.   This is what Mr. Morris used
11 earlier.  Do you remember looking at this with
12 Mr. Morris?
13     A.   Yes.
14     MR. RUKAVINA:  You might have to
15 zoom in a little.  Okay.
16     Q.   Now, I see Affiliate Note A, B, and
17 C.
18     Do you have any recollection as to
19 why the names of the affiliates are omitted?
20     A.   I don't.  I testified earlier that,
21 you know, the team worked with DSI in providing
22 these.  I -- I don't -- I don't know.
23     Q.   Can we deduce -- is it logical to
24 deduce that Affiliate Note A would be NexPoint
25 given its size of $24.5 million?

Page 310

WATERHOUSE - 10-19-21

1
2     MR. MORRIS: Objection to the form
3  of the question.
4     A.  I mean, it -- it is a -- it is -- it
5  is approximate.
6     Q.  Well, can we -- can we deduce -- or,
7  I'm sorry, strike that.
8         Can you, sitting here today,
9  logically conclude that Affiliate Note B or C
10 represents HCMFA?
11        MR. MORRIS: Objection to the form
12 of the question.
13    A.  I don't know.  I don't know.  I
14 can't.
15    Q.  Okay.  As of the petition date, we
16 have established that HCMFA, under promissory
17 notes, owed $7.4 million and $5.3 million to
18 the debtor; correct?
19        MR. MORRIS: Objection to the form
20 of the question.
21    A.  Yes.
22    Q.  Okay.  And by my reckoning, that
23 would be somewhere approaching $13 million.
24        MR. MORRIS: Objection to the form
25 of the question.

Page 311

WATERHOUSE - 10-19-21

1
2     Q.  It would be $12.7 million.  Is that
3  generally correct?
4     A.  Sorry, the amounts were 7.4, 5.3.
5     Q.  Yes.
6     A.  Okay.  Yeah, that -- that -- I can
7  do that math, yes.
8     Q.  Do you have any explanation or any
9  understanding of why there is no similar entry
10 listed here on the schedule of assets filed
11 with the bankruptcy court?
12        MR. MORRIS: Objection to the form
13 of the question.
14    A.  I don't know.  We have to look at
15 the supporting schedules, like I talked about
16 other -- presumably there is -- there is a
17 build to the schedule that would provide the
18 detail.
19    Q.  Well, that was going to be my next
20 question.  You anticipated it.
21        MR. RUKAVINA: You can -- you can
22 take this down, Mr. Nguyen.
23    Q.  Do you believe that whenever you and
24 your team provided the underlying data to the
25 financial advisor that the actual names of the

Page 312

WATERHOUSE - 10-19-21

1
2  affiliates for Affiliate Note A, B, and C would
3  have been listed there?
4     A.  Are you asking we provided the names
5  to the financial advisor?  I don't -- I don't
6  understand who the financial advisor is.
7     Q.  I'm sorry, DSI.
8         Let me ask the question this way,
9  Mr. Waterhouse.
10        Whenever you provided information
11 about the affiliate notes to DSI, do you
12 believe that you would have included the actual
13 names of the affiliates, you or your team, or
14 that you would have done the Affiliate Note A,
15 Note B, Note C?
16        MR. MORRIS: Objection to the form
17 of the question.
18        MS. DANDENEAU: Objection to the
19 form.
20    A.  We -- like I testified earlier, when
21 we were -- we gave everything to -- to DSI.  We
22 were giving all of our records, all of our
23 files, everything to DSI.  We weren't redacting
24 information or saying, hey, here is a note,
25 here is Affiliate Note A or B.

Page 313

WATERHOUSE - 10-19-21

1
2         I mean, it was -- our job and our
3  focus -- and I testified in court back in 2019;
4  right -- was -- was to be transparent and, you
5  know, get DSI up to speed on -- on the matters
6  at Highland.  So I can't see us redacting at
7  that point.
8         MR. RUKAVINA: Mr. Nguyen, will you
9  please pull up Mr. Morris' Exhibit 36.
10        Just the very first page, the very top
11 email.  You might zoom in a little bit.
12    Q.  Now, you recall being asked about
13 this by Mr. Morris?
14    A.  Yes, I do.
15    Q.  And you wrote: The HCMFA note is a
16 demand note.
17        You wrote that; right?
18    A.  Yes.
19    Q.  And, in fact, weren't there by that
20 point in time several notes?
21    A.  Yes, there were.  Again, I don't --
22 I don't remember everything specifically.  I
23 mean --
24    Q.  I understand.  I understand.
25        So this is an example where -- where

Page 314

```
1        WATERHOUSE - 10-19-21
2  you might have made a mistake by referring to a
3  singular instead of a plural; right?
4     A.  Yes.
5     Q.  Okay.  And you -- you wrote -- a
6  couple of sentences later, you wrote:  There
7  was an agreement between HCMLP and HCMFA the
8  earliest they could demand is May 2021.
9        You wrote that; right?
10    A.  Yes.
11    Q.  But I think you -- you agreed with
12 Mr. Morris that that can't possibly apply to
13 the May 2019 notes, can it?
14       MR. MORRIS:  Objection to the form
15 of the question.  That is not what he
16 testified to.
17    Q.  Let me ask -- let me ask a different
18 question.
19       Sitting here today -- or if you can
20 answer me from your memory on October 6,
21 2020 -- did the April acknowledgment that
22 extended the maturity date apply to the
23 May 2019 notes also?
24    A.  I don't recall specifically.
25    Q.  Well, you recall that the notes that
```

Page 315

```
1        WATERHOUSE - 10-19-21
2  you signed were demand notes; right?
3     A.  Yes.
4     Q.  Do you find it logical, based on
5  your experience, that had they intended to have
6  a different or a set maturity date, you would
7  have instructed that that set maturity date be
8  included instead of a demand feature?
9        MR. MORRIS:  Objection to the form
10 of the question.
11    A.  Sorry, just want to make sure I
12 understand.  You are saying that -- that the
13 $5 million note, the $2.4 million note, if
14 those were supposed to be a term note, that I
15 would have made sure that those were a term
16 note?
17    Q.  I'm saying -- I'm saying,
18 Mr. Waterhouse, that on May the 2nd and May the
19 3rd, 2019, if you intended that those two
20 promissory notes could not be called until May
21 2021, would you have included such language in
22 those two promissory notes?
23       MR. MORRIS:  Objection to the form
24 of the question.
25    A.  I guess -- I'm sorry, I don't recall
```

Page 316

```
1        WATERHOUSE - 10-19-21
2  putting language in those May notes.  I don't
3  remember what language you are referring to.
4     Q.  Well, let's read this again.
5        There was an agreement between HCMLP
6  and HCMFA the earliest they could demand is May
7  2021.
8        Do you recall that agreement?
9     A.  Yes, that was the agreement we
10 looked at earlier; correct?
11    Q.  Okay.  Yes.
12       Do you -- do you understand now that
13 that agreement that we looked at earlier also
14 applied to the May 2019 notes that you signed?
15    A.  I don't -- I don't know.
16    Q.  But as of October 6, 2020, you're
17 writing that there is one demand note and
18 you're categorizing that demand note as not
19 being demandable on May 2021; correct?
20    A.  Yes.
21    Q.  And you know now that you made at
22 least one mistake in this email; correct?
23       MR. MORRIS:  Objection to the form
24 of the question.
25    A.  Yes.
```

Page 317

```
1        WATERHOUSE - 10-19-21
2        MR. RUKAVINA:  You can pull this
3  down, Mr. Nguyen.
4     Q.  So, Mr. Waterhouse, you don't
5  remember Mr. Dondero telling you to make these
6  loans or not.  HCMLP was loaning $7.4 million
7  to someone that their assets were less than
8  their liabilities.
9        We don't see on the July list of
10 notes, where there is $12.7 million of notes,
11 we don't see that on the bankruptcy schedules,
12 and we have this Exhibit 36 where you are
13 confused.
14       Are you prepared to tell me, sir,
15 today that you might have made a mistake in
16 executing those two promissory notes?
17       MR. MORRIS:  Objection to the form
18 of the question.
19    A.  I -- I don't know.
20    Q.  And if it turns out that you're
21 personally liable for those promissory notes,
22 it would certainly be a mistake, wouldn't it?
23       MS. DANDENEAU:  Objection to the
24 form.
25       MR. MORRIS:  Join.
```

Page 318

WATERHOUSE - 10-19-21

1
2   A.   Yes.
3        Q.   If Mr. Dondero testifies that he
4   never told you to make these loans, would you
5   disagree with his testimony?
6        MR. MORRIS: Objection to the form
7   of the question.
8        A.   Like I testified earlier with my
9   conversation with Mr. Dondero, all I recall is
10  he said, get the money from Highland.
11       Q.   And if Mr. Dondero testifies that
12  he, in consultation with other senior personnel
13  at Highland, decided that Highland needed to
14  pay HCMFA $7.4 million as compensation for the
15  NAV error and not a loan, would you have any
16  reason to disagree with Mr. Dondero?
17       MR. MORRIS: Objection to the form
18  of the question.
19       A.   If that was -- if that was his
20  intent, yes, it would -- I would --
21       Q.   Do you have any reason to disagree
22  with him?
23       MR. MORRIS: Objection to the form
24  of the question.
25       A.   If that was his intent, I don't

Page 319

WATERHOUSE - 10-19-21

1   know. I don't know how I disagree with that.
2
3        Q.   And just to confirm, you don't
4   remember ever asking Mr. Dondero whether you
5   should have two promissory notes prepared?
6        A.   No.
7        Q.   And you don't remember discussing
8   with Mr. Dondero what the terms of those two
9   promissory notes should be?
10       A.   I don't recall -- I testified all I
11  recall is he said, get the money from Highland.
12  I don't -- the -- the terms of the note, I
13  don't recall ever having a discussion around
14  the terms of the note, but since I don't draft
15  the notes, that -- there could have been a
16  conversation with other people later.
17       Q.   Do you have any memory of whether
18  after the notes were drafted, but before you
19  signed them, that you communicated with
20  Mr. Dondero in any way to just confirm or -- or
21  get his blessing or ratification to signing
22  those notes?
23       MR. MORRIS: Objection to the form
24  of the question.
25       A.   I don't recall.

Page 320

WATERHOUSE - 10-19-21

1
2        Q.   Again, the only thing you remember,
3   sitting here today, was Mr. Dondero said, get
4   the money from Highland, and that is it, that
5   is all you remember?
6        MR. MORRIS: Objection to the form
7   of the question.
8        A.   I testified to that several times.
9   This was over two years ago. A lot has
10  happened. That is all I recall.
11       Q.   And help me here. I'm not very
12  technologically astute. When you -- and I -- I
13  recognize that you do it rarely, but when you
14  sign a document electronically, do you believe
15  that there is an electronic record of you
16  having authorized or signed a document
17  electronically?
18       MR. MORRIS: Objection to the form
19  of the question.
20       A.   I -- I don't know the tech answer to
21  that, but, you know, since I don't have -- I
22  don't ever attach my signature block
23  electronically, my assistant would have done
24  that, and if that is done over email like we
25  did several times -- you know, multiple,

Page 321

WATERHOUSE - 10-19-21

1
2   multiple times over COVID, she would attach my
3   signature block and then email it out to
4   whatever party.
5        Q.   What was your assistant's name in
6   May 2019?
7        A.   It was Naomi Chisum.
8        Q.   Is she the only one? I'm sorry, was
9   she your only assistant that would have maybe
10  facilitated logistically something like you
11  just described?
12       A.   You know, she was out on maternity
13  leave at some point. I don't -- I don't recall
14  those dates where she was out for maternity
15  leave. There was -- there were folks backing
16  her up. I don't recall specifically who
17  those -- who those, you know, administrative
18  assistants were, and I don't recall
19  specifically if she was out during this time on
20  maternity leave.
21       I do know that that she was out for
22  a period of time, or who knows, or she could
23  have been on vacation that day or, you know, I
24  don't know.
25       Q.   Switching gears now, the two

Page 322

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2  complaints that have been filed that is against
3  HCMFA and NexPoint, did you see any drafts of
4  those complaints before they were filed?
5      MR. MORRIS: Objection to the form
6    of the question, and to the extent that you
7    had any communications with counsel or you
8    were shown drafts of the complaints by
9    counsel while you were employed by
10   Highland, I direct you not to answer.
11   A.   I -- I reviewed documents yesterday
12  with counsel here.  I believe that is the first
13  time I have ever seen those.
14   Q.   Okay.  Did you ever discuss with
15  Mr. Seery these two lawsuits before or after
16  they were filed?
17   A.   I don't recall.
18   Q.   Were you ever interviewed by legal
19  counsel, to your knowledge, about these
20  promissory notes before the complaints were
21  filed?  Without going into what was said, were
22  you ever interviewed by legal counsel?
23      MR. MORRIS: Objection to the form
24    of the question.
25   A.   I don't recall.

Page 323

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2   Q.   Obviously with COVID, it changed,
3  but -- but before COVID, did you used to meet
4  with Mr. Seery from time to time in-person?
5   A.   Yeah, I mean, so before COVID -- so
6  we're talking kind of late March, early April,
7  right, there was about -- I don't remember the
8  specific date when the board for Highland was
9  appointed.  I believe it was around February of
10  2020, so maybe there was a month-and-a-half,
11  two-month window where we were meeting
12  in-person or, you know, like we were actually
13  in the office, excuse me, we were in the
14  office.
15      And, you know, when they were first
16  appointed, the board members and Mr. Seery
17  were -- were definitely down here more
18  in-person.
19   Q.   Did you ever see Mr. Seery taking
20  written notes of -- of his meetings with you or
21  others?
22   A.   I don't recall.
23   Q.   Do you recall on any Zoom or video
24  conference with Mr. Seery, seeing him take
25  notes, written notes?

Page 324

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2   A.   The Zoom calls we had, I don't
3  recall having seen video or, you know, or if it
4  was on Zoom, I just remember it being -- well,
5  no, you know what, there were some -- you know,
6  I take that back.
7      So there were -- there were some
8  times that I did remember seeing Mr. Seery
9  on -- on some of the Zoom calls.
10   Q.   Well, let me --
11   A.   I don't -- sorry, I'm thinking.  I'm
12  thinking -- I'm going back.  I'm trying to
13  process this.
14   Q.   I can make it much quicker,
15  Mr. Waterhouse.  I have heard -- I have heard
16  that Mr. Seery is a copious note taker.
17      Do you have any knowledge about
18  that?
19   A.   No.
20   Q.   Okay.  Switching gears yet again,
21  and this will be last theme.  Do you need a
22  restroom break, or are you good to go for
23  another half an hour?
24      MS. DEITSCH-PEREZ: I need a
25    restroom break.

Page 325

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2      MR. RUKAVINA: Can we make it five
3    minutes?
4      THE WITNESS: Five minutes would be
5    great.
6      VIDEOGRAPHER: We're going off the
7    record at 5:53 p.m.
8  (Recess taken 5:53 p.m. to 5:59 p.m.)
9      VIDEOGRAPHER: We are back on the
10    record at 5:59 p.m.
11   Q.   Mr. Waterhouse, I had asked you
12  earlier about contracts between HCMFA and the
13  debtor, and now I'm going to talk about
14  contracts between the debtor and NexPoint
15  Advisors.  Okay?
16   A.   Okay.
17   Q.   Now, were there contracts similar to
18  the ones with HCMFA that NexPoint had in the
19  nature of employee reimbursement and shared
20  services?
21   A.   Yes, they -- NexPoint Advisors and
22  Highland Capital Management Fund Advisors had
23  cost reimbursement and shared services
24  agreements with Highland Capital Management,
25  L.P.

Page 326

1      WATERHOUSE - 10-19-21
2   Q.   And was that shared services
3   agreement, to the best of your understanding,
4   in place as of December 31, 2020?
5   A.   It was -- it was terminated at some
6   point, and I remember the contracts had
7   different termination dates, but I think the --
8   the date of termination was January 31st of
9   2021, after the termination was put in.
10      So yeah, it would be in place at the
11  end of the year of December -- it would be in
12  place at December 31st, 2020.
13  Q.   And pursuant to that agreement as of
14  December 31st, 2020, was the debtor providing
15  what you would describe as back office services
16  to NexPoint?
17  A.   Yes.
18  Q.   Would those have included accounting
19  services?
20  A.   Yes.
21  Q.   And as part of those accounting
22  services, would the debtor have assisted
23  NexPoint with paying its bills?
24      MR. MORRIS:  Objection to the form
25  of the question.

Page 327

1      WATERHOUSE - 10-19-21
2   A.   Yes.
3   Q.   So let's break that up.  You were a
4   treasurer of NexPoint as well in December of
5   2020?
6      MR. MORRIS:  Objection to the form
7   of the question.
8   A.   Yes.
9   Q.   Okay.  And in December of 2020, did
10  NexPoint have its own bank accounts?
11  A.   Yes.
12  Q.   And did it use those bank accounts
13  to pay various of its obligations?
14  A.   Yes.
15  Q.   Did employees of the debtor have the
16  ability to cause transfers to be made from
17  those bank accounts on behalf of NexPoint?
18  A.   Yes.
19  Q.   And is that one of services that the
20  debtor provided NexPoint, basically ensuring
21  that accounts payable and other obligations
22  would be paid?
23  A.   Yes.
24      MR. MORRIS:  Objection to the form
25  of the question.

Page 328

1      WATERHOUSE - 10-19-21
2   Q.   You answered yes?
3   A.   Yes.
4   Q.   And the payments, though, whose
5   funds would they be made from?
6   A.   From the bank account of NexPoint
7   Advisors.  If they were NexPoint advisor
8   obligations, it would be made from NexPoint
9   Advisors' bank account.
10  Q.   So let's pull up Exhibit Alpha 1.
11  You should have that -- it is my Tab 1 or my
12  Exhibit 1.
13      (Exhibit A1 marked.)
14  Q.   So this is a -- this is a series of
15  emails, Mr. Waterhouse.  Let's look at the
16  first page here, November 25, 2020, between
17  Kristin Hendrix and yourself.
18      Do you see that, sir?
19  A.   I do.
20  Q.   And do you see where Ms. Hendrix
21  writes:  NPA.
22      Do you know what NPA stood for?
23  A.   Yes.
24  Q.   And what does it stand for?
25  A.   NexPoint Advisors.

Page 329

1      WATERHOUSE - 10-19-21
2   Q.   And was that how you-all internally
3   at Highland refer to NexPoint Advisors, L.P.?
4   A.   I mean, yes, amongst other things.
5   Q.   And she writes at the bottom of her
6   email: Okay to release?
7      Do you see that?
8   A.   Yes, I do.
9   Q.   So what --
10     MR. MORRIS:  Hold on one second.
11     Okay.  Go ahead.
12     MR. RUKAVINA:  Yeah.
13  Q.   So what is -- what is Ms. Hendrix
14  here on November 25 asking of you?
15  A.   She is asking me -- so she -- these
16  are -- these are payments -- typically we would
17  do an accounts payable run every week at the
18  end of every Friday.  But looking at this date,
19  it is Wednesday, November 25th, which means, to
20  me, it is likely Thanksgiving weekend.
21      So this is the day before
22  Thanksgiving, so this is the last kind of --
23  kind of day before the holidays and vacation
24  and things of that nature.  So it is
25  effectively the Friday of that week.

Page 330

1     WATERHOUSE - 10-19-21
2        So she is -- she is putting in all
3  the payments for the week because we batch
4  payments weekly. And these are the payments
5  that go out that week, and she is informing me
6  of the payments and -- you know, again, at the
7  bottom of the email, she is asking for my okay
8  to -- to release these payments in the wire
9  system.
10    Q.   So these would be accounts payable
11 of NexPoint?
12    A.   I mean, it would be accounts payable
13 for all of these entities listed on this email.
14    Q.   And who was Ms. Hendrix employed by
15 in November and December of 2020?
16    A.   Highland Capital Management.
17    Q.   Okay. So -- so part of the services
18 that NexPoint had contracted with was for
19 Highland to ensure that NexPoint timely paid
20 its accounts payable; is that accurate?
21       MR. MORRIS: Objection to the form
22 of the question. You have got to be
23 kidding me.
24    Q.   Is that accurate?
25    A.   Yes.

Page 331

1     WATERHOUSE - 10-19-21
2    Q.   And did NexPoint rely on employees
3  of the debtor to ensure that NexPoint's
4  accounts payable were timely paid?
5       MR. MORRIS: Objection to the form
6  of the question.
7    A.   Yes.
8       MR. RUKAVINA: Let's flip to the
9  next page, Mr. Nguyen, if you will please
10 scroll to the next page.
11    Q.   So this is an email similar to the
12 prior one, November 30th.
13       Do you see where it says, NPA HCMFA,
14 USD $325,000 one-day loan?
15       Do you see that, sir?
16    A.   I do.
17    Q.   Do you have any memory of what that
18 was?
19    A.   I don't recall what that -- what
20 that payment was for.
21    Q.   Did it sometimes occur that one
22 advisor would, on very short-terms, make loans
23 to another advisor?
24    A.   Yes. This -- this -- this occurred
25 from -- from -- from time to time. It actually

Page 332

1     WATERHOUSE - 10-19-21
2  looking at -- I'm -- I'm looking at the date of
3  this email. It is November 30th. It is the
4  last day of the month.
5       HCMFA has obligations it needs to
6  pay to its broker-dealer, which is HCFD. And
7  it likely was short funds to make those
8  obligations under that -- under its agreement,
9  and so it provided a one-day loan because on
10 the next business day on 12/1 -- or the next
11 business day in December, it would receive
12 management fees from the underlying funds that
13 it managed and it would be able to pay back
14 that loan to NexPoint Advisors.
15    Q.   So -- so here Ms. Hendrix was
16 seeking your approval to transfer $325,000 from
17 NexPoint to HCMFA for a one-day loan; is that
18 correct?
19    A.   That is correct.
20    Q.   Let's flip to the next page, sir.
21       MR. RUKAVINA: And, Mr. Nguyen, if
22 you will please scroll down.
23    Q.   Now we have as an entry for
24 $325,000, 11/30 loan payment.
25       Do you see that, sir?

Page 333

1     WATERHOUSE - 10-19-21
2    A.   Yes.
3    Q.   And that is probably the loan that
4  was approved on the prior page?
5    A.   Yes, most likely.
6    Q.   So is it also true, sir, that in
7  addition to accounts payable debtor employees
8  would be assisting NexPoint with respect to
9  paying back its debt?
10       MR. MORRIS: Objection to the form
11 of the question.
12    A.   I mean, yes, for loans of this
13 nature, yes.
14    Q.   Well, what about long term loans?
15 Was it reasonable for NexPoint to expect debtor
16 employees to ensure that NexPoint timely paid
17 its obligations under long-term notes?
18       MR. MORRIS: Objection to the form
19 of the question.
20       MS. DANDENEAU: Objection to form.
21    A.   I mean, that is one of the things
22 that the Highland personnel did provide to the
23 advisors. Yes, we would -- we would -- over
24 the years, yes, we -- we -- we -- we did do
25 that generally. Again, I don't remember

Page 334

1         WATERHOUSE - 10-19-21
2 specifically but, yes, generally we -- you
3 know, we did do that.
4     Q.   So do you recall -- and we can pull
5 it up, if need be -- that under the NexPoint
6 note that Mr. Morris asked you about earlier,
7 the one for more than $30 million, that
8 NexPoint was obligated to make an annual
9 payment of principal and interest?
10         MR. MORRIS:  Objection to the form
11     of the question.
12     A.   Yes, it was -- yes, it -- it was an
13 amortizing note.  It was -- you know, from what
14 we reviewed earlier, it was payable by
15 December 31st of each year.  So -- but are --
16 are you asking me --
17     Q.   I'm just asking you, sir, if you
18 recall the note.
19     A.   Yes, the $30 million note, yes, we
20 reviewed it earlier, yes.
21     Q.   And do you recall Mr. Morris had you
22 go through the fact that NexPoint had made
23 payments in years prior to 2020 on that note?
24     A.   I do.
25     Q.   And do you believe that employees of

Page 335

1         WATERHOUSE - 10-19-21
2 the debtor would have played any role in
3 NexPoint having made those prior payments?
4         MR. MORRIS:  Objection to the form
5     of the question.
6     A.   Yes.
7     Q.   And what role in years prior to 2020
8 would employees of the debtor have had with
9 respect to NexPoint making that annual payment?
10     A.   We -- we -- we would have -- I keep
11 saying "we."  The team would have calculated
12 any amounts due under that loan and other
13 loans, as -- as standard course.
14         We would -- since we provided
15 treasury services to the advisors, we would
16 inform the -- the -- the -- we informed
17 Mr. Dondero of any cash obligations that are
18 forthcoming, whether we do cash projections.
19         If, you know, any of these payments
20 would have -- or, you know, the sum total of
21 all of these payments, including any note
22 payments, if there were any cash shortfalls, we
23 would have informed Mr. Dondero of any cash
24 shortfalls.  We could adequately plan, you
25 know, in instances like that.

Page 336

1         WATERHOUSE - 10-19-21
2         Or, sorry, we -- I say "we" -- I
3 keep saying "we" -- I keep wearing my -- again,
4 my -- my treasurer hat.
5         But, yes, it is to -- it is to
6 inform Mr. Dondero of the obligations of the
7 advisors in terms of cash and obligations that
8 are -- are upcoming and that -- and that are --
9 are scheduled to be paid.
10     Q.   And would those obligations that are
11 upcoming and scheduled to be paid prior to 2020
12 have incurred the annual payment on that
13 NexPoint $30 million note?
14         MS. DANDENEAU:  Objection to form.
15         MS. DEITSCH-PEREZ:  Davor, I think
16     you misspoke.  You might want to just
17     repeat the question.
18     Q.   Okay.  Let me repeat the question,
19 sir.
20         Prior to 2020, those services that
21 you just described, would that -- on behalf of
22 the debtor, would that have included NexPoint's
23 payments on the $30 million note?
24     A.   Yes.
25     Q.   So someone at the debtor in treasury

Page 337

1         WATERHOUSE - 10-19-21
2 or accounting would have sent some schedule or
3 a reminder that a payment would be coming due
4 in the future.  Is that generally the practice?
5     A.   Yes, we would -- you know, again, I
6 didn't -- I didn't micromanage the teams, but
7 we had a -- a corporate accounting calendar
8 that we use as kind of a tickler file to keep
9 track of payments.
10         I actually, you know, don't know how
11 actively they're using that in -- in prior to
12 2020, but it was actively used at some point.
13         We did look at NexPoint cash
14 periodically and cash for the other advisors as
15 well and payments.  You know, we -- payments
16 like this would have appeared in our cash
17 projections, in the advisor's cash projections.
18         And, again, as like I said earlier,
19 they would have appeared there, so there would
20 be time to plan for making any of these
21 payments.
22     Q.   And based on your experience, would
23 it have been reasonable for NexPoint to rely on
24 the debtors' employees to inform NexPoint of an
25 upcoming payment due on the $30 million

Page 338

WATERHOUSE - 10-19-21

1
2 promissory note?
3    MR. MORRIS: Objection to form of
4 the question.
5    MS. DANDENEAU: Objection to form.
6    A. Yes. Yes, they did. I mean, but I
7 mean, but I don't think these -- these notes
8 were any secret to anybody.
9    Q. I understand, and I'm not suggesting
10 otherwise.
11    MR. RUKAVINA: Please pull up Alpha
12 2, Mr. Nguyen.
13    (Exhibit A2 marked.)
14    Q. Now, this document is similar to the
15 ones we've seen before as of December 31, 2020,
16 and I don't see under NTA anything there for
17 paying the promissory note to Highland.
18    Do you see anything like that?
19    A. I do not.
20    MR. RUKAVINA: You can pull that --
21 that exhibit down, Mr. Nguyen.
22    Q. You are aware, of course, by now
23 that, in fact, NexPoint failed to make the
24 payment due December 31, 2020, are you not?
25    A. I am aware, and yes, I do understand

Page 339

WATERHOUSE - 10-19-21

1
2 it.
3    Q. Were you aware that Highland
4 accelerated that $30 million promissory note?
5    A. I am aware.
6    Q. Were you aware of that acceleration
7 at the time that it occurred?
8    A. I don't remember specifically.
9    Q. Do you recall whether anyone asked
10 you -- prior to the acceleration, anyone asked
11 you at Highland, what Highland should do with
12 respect to the missed payment?
13    A. Did anyone ask me what Highland
14 should do about the missed payment?
15    Q. Yes, before acceleration.
16    MR. MORRIS: Objection to the form
17 of the question.
18    A. I mean, what -- what I recall is
19 there was the -- sorry, are you asking me --
20    MS. DANDENEAU: Why don't you just
21 repeat the question, Mr. Rukavina.
22    Q. Let me try again, Mr. Waterhouse,
23 let me try again.
24    I am saying you're the CFO of
25 someone, in this case, Highland, and the

Page 340

WATERHOUSE - 10-19-21

1
2 borrower failed to make the required payment.
3 Are you with me so far?
4    A. I am.
5    Q. Did anyone then ask you, what should
6 we do with respect to our rights against the
7 borrower that missed the payment?
8    A. Not that I recall.
9    Q. Did you play a role in the decision
10 to accelerate that $30 million promissory note?
11    A. I did not.
12    Q. Do you recall whether Mr. Seery ever
13 asked you before the acceleration as to whether
14 he should accelerate the note?
15    A. I don't recall.
16    Q. And you don't recall when you
17 learned of the acceleration itself?
18    MR. MORRIS: Objection to the form
19 of that question.
20    A. It was -- it was sometime in
21 early -- in early 2021. I don't remember
22 specifically.
23    Q. But do you recall whether it was
24 after the acceleration had already been
25 transmitted?

Page 341

WATERHOUSE - 10-19-21

1
2    MS. DANDENEAU: Objection to the
3 form of the question.
4    A. I don't recall.
5    Q. Do you recall in early to mid
6 January of 2021, after the default, discussing
7 the default with Mr. Dondero?
8    A. I do recall discussing with
9 Mr. Dondero after December 31, 2020?
10    Q. Yes, the fact of the default.
11    A. I don't recall.
12    MR. RUKAVINA: Let's pull up my
13 Exhibit 6, Alpha 6.
14    (Exhibit A6 marked.)
15    MR. RUKAVINA: And, Mr. Nguyen, if
16 you will please scroll down.
17    Q. This email chain begins with you
18 writing to Ms. Hendrix on January the 12th:
19 NexPoint note to HCMLP.
20    Do you see that, sir?
21    A. I do.
22    Q. Were you discussing this same
23 $30 million note we're talking about right now
24 with Ms. Hendrix?
25    A. Yes.

Page 342

1      WATERHOUSE - 10-19-21
2    Q.   Okay.  Do you recall what prompted
3  you to send that email to her?
4    A.   Yes, I had -- I had a conversation
5  with Jim.
6    Q.   Okay.  And what -- what did you
7  discuss with Jim that led to this email chain?
8    A.   He -- he called me and he said he
9  wanted to make payment on the NexPoint note,
10  and I didn't -- I didn't know the -- the amount
11  offhand, so I reached out to Kristin and got
12  the details and relayed that to him.
13    Q.   And you see you sent that email to
14  her at 11:15 a.m.  Does that help you remember
15  when you had this discussion with Mr. Dondero?
16  In other words, was it that morning or the day
17  before, or can you -- can you --
18    A.   No, it was -- it was that morning.
19    Q.   And do you recall how you had that
20  conversation with him?
21      MR. MORRIS:  Objection to the form
22  of the question.
23    Q.   By telephone, by email, in-person?
24    A.   Yeah, he -- he called me.  I was at
25  home.  We were working from home here in

Page 343

1      WATERHOUSE - 10-19-21
2  December of 2020.  He called me from home.  He
3  said he was in court.  He wanted to -- he asked
4  about, you know, making payment on the note and
5  the amount, and so I didn't have those numbers
6  in front of me, so I said I would get back to
7  him.  I wanted all the details, so here is
8  this -- so I reached out to Kristin.
9    Q.   And then she gave you that
10  $1,406,000 figure?
11      MR. RUKAVINA:  Mr. Nguyen, if you
12  will scroll up, please.
13    A.   Yes.  Yeah, she -- the $1,406,112.
14    Q.   And do you recall whether you
15  conveyed that amount to Mr. Dondero?
16    A.   Yes.  I -- I called him back and
17  gave him -- gave him this amount.
18    Q.   Are you aware of whether NexPoint
19  in, fact, then made that 1 million 406 and
20  change payment?
21    A.   Yes, they did.
22    Q.   Did you discuss with Mr. Dondero at
23  that time, either the first conference or the
24  second conference that day -- strike that.
25      When you conveyed the number to

Page 344

1      WATERHOUSE - 10-19-21
2  Mr. Dondero, was -- was it also on January
3  12th?
4    A.   Sorry, when I conveyed the
5  $1.4 million number?
6    Q.   Yes.
7    A.   Yes, yes, it was that -- it was --
8    Q.   So you had --
9    A.   It was that point.
10    Q.   Well, to the best of your
11  recollection, you had a conference with
12  Mr. Dondero by the telephone in the morning,
13  and then another conference with him by
14  telephone after 11:40 a.m. that morning?
15    A.   Yeah, I can't remember -- yeah, it
16  was either that morning or it could have been,
17  you know, early afternoon, but again, I
18  remember calling him back, relaying this
19  information to him, and he said, okay, pay --
20  you know, make -- make this payment.
21    Q.   And during either of those two
22  calls, did you tell Mr. Dondero anything to the
23  effect that making those -- I'm sorry, making
24  that payment would not de-accelerate the
25  promissory note?

Page 345

1      WATERHOUSE - 10-19-21
2    A.   No.
3    Q.   Did you tell him anything to the
4  effect that making that payment would not cure
5  the default?
6    A.   No.
7    Q.   Did you discuss that in any way with
8  him?
9    A.   No, I did not.
10    Q.   Did he say why he wanted to have
11  that $1.4 million payment made?
12      MR. MORRIS:  Objection to the form
13  of the question.
14    A.   He -- he -- he didn't go into
15  specifics.
16    Q.   Did he say anything to you to the
17  effect that if NexPoint makes that payment,
18  then the note will be de-accelerated?
19      MR. MORRIS:  Objection to the form
20  of the question.
21    A.   I don't recall.
22      MR. RUKAVINA:  You can put this one
23  down, Mr. Nguyen.
24    Q.   And, again, when you say you don't
25  recall, you mean you don't remember right now

Page 346

1         WATERHOUSE - 10-19-21
2 either way; correct?
3    A.  Yeah, I don't remember. I don't
4 remember us discussing that.
5    Q.  Now -- and we're almost done, I
6 promise. I'm just going to -- I don't know how
7 to ask this question, so I'm just going to try
8 to do my best.
9      Prior to the default on December 31,
10 2020, did Mr. Seery ever tell you any words to
11 the effect that you or someone at Highland
12 should ensure that NexPoint doesn't make its
13 payment?
14    A.  No.
15    Q.  Did you have any hint or any belief
16 that anyone at NexPoint -- I'm sorry, strike
17 that.
18      Did you have any reason to believe
19 that anyone with Highland was actively trying
20 to get NexPoint to make that default by not
21 paying on December 31?
22    MR. MORRIS: Objection to the form
23 of the question.
24    A.  Are you asking, did any Highland
25 employees actively work to make -- to

Page 347

1         WATERHOUSE - 10-19-21
2 somehow --
3    Q.  Yes. Let me take a step back. Let
4 me take a step back.
5      So you are aware now that as a
6 result of that default, what was still some
7 25-year note was accelerated and became
8 immediately due. You are aware of that now;
9 right?
10    A.  Yes.
11    Q.  And can you see how someone at
12 Highland might actually have been pleased with
13 that development?
14    MR. MORRIS: Objection to the form.
15    Q.  Not that they were --- not that they
16 were pleased, but you can see how someone at
17 Highland might have been pleased with that
18 development?
19    MR. MORRIS: Objection to the form
20 of the question.
21    MS. DANDENEAU: Object to form.
22    A.  I don't know how they would have
23 reacted to that.
24    Q.  Okay. But you're not -- you're not
25 aware of any instructions or any actions being

Page 348

1         WATERHOUSE - 10-19-21
2 given or taken at Highland by Mr. Seery, the
3 independent board, DSI, that -- that would have
4 basically led Highland to ensure that NexPoint
5 would fail to make that payment?
6    A.  I'm not aware.
7    Q.  In other words, there wasn't a trick
8 or a settlement; right?
9    MS. DEITSCH-PEREZ: Objection to
10 form.
11    MS. DANDENEAU: Object to form.
12    MR. MORRIS: Object to form.
13    A.  I'm not aware.
14      Look, I'm not aware. I'm not in
15 every conversation. I mean, and I'm just --
16 again, I'm sitting at home. It is the end of
17 the year. Again, I'm not aware.
18    Q.  That is a perfectly legitimate
19 answer. I don't know why -- why you think
20 otherwise.
21      Okay. Just give me one second to
22 compose my thoughts.
23    MS. DEITSCH-PEREZ: While you're
24 taking your one second, why don't we take
25 three minutes. I will be right back.

Page 349

1         WATERHOUSE - 10-19-21
2    VIDEOGRAPHER: Do we want to go off
3 the record?
4    MR. RUKAVINA: Yes.
5    VIDEOGRAPHER: All right. We're
6 going off the record at 6:27 p.m.
7    (Recess taken 6:27 p.m. to 6:30 p.m.)
8    VIDEOGRAPHER: We are back on the
9 record at 6:30 p.m.
10    MR. HORN: Is Deb back?
11    MS. DANDENEAU: Are you asking about
12 me? I'm here.
13    MR. HORN: Oh, okay. I don't see
14 you, sorry.
15    Q.  Actually, yeah, Mr. Waterhouse, so
16 when you had --
17    MS. DANDENEAU: Are you asking about
18 Deb Dandeneau or Deborah? I mean, there
19 are a lot -- as we talked about, a lot of
20 Debs. I'm here.
21    MS. DEITSCH-PEREZ: I'm here.
22    MR. HORN: Yes, I was asking about
23 DDP.
24    MS. DEITSCH-PEREZ: Oh, DDP is here.
25    MR. HORN: Okay. Here we go. I'm

Page 350

1    WATERHOUSE - 10-19-21
2    going back on mute.
3        MS. DANDENEAU: Get the right
4    nomenclature.
5    Q.    Mr. Waterhouse, on January 12th,
6    2021, when you had those talks with Mr. Dondero
7    about the $1.4 million payment, did you have a
8    communication or a conversation with Mr. Seery
9    about that payment after January 12th, 2021?
10   A.    I don't recall.
11   Q.    Well, in response to Mr. Dondero
12   reaching out to you, do you recall on that day,
13   January 12th, talking to Mr. Seery or anyone at
14   Highland other than the email chain we just saw
15   about Mr. Dondero's call with you?
16   A.    Did I talk to -- I spoke with
17   Kristin -- I don't know if I spoke to her. I
18   likely spoke to Kristin Hendrix because we had
19   to get the wire on NexPoint's behalf to make
20   the payment to Highland.
21   Q.    So it is true, then, that -- that
22   employees of the debtor did actually cause that
23   payment to be made when it was made after
24   January 12th?
25   A.    Yes, I mean, we -- we -- as I

Page 351

1    WATERHOUSE - 10-19-21
2    testified earlier, we provided that accounting
3    finance treasury function as -- under the
4    shared services agreement. And so once I
5    got the -- I talked to Jim, got the approval to
6    make this payment, we have to then make the
7    payment, or the team does, and so the payment
8    was made.
9    Q.    Okay. But -- okay. And -- and
10   sitting here right now, after Jim called you,
11   you don't remember talking to anyone other than
12   the -- the couple of people you mentioned,
13   talking to anyone about something to the effect
14   that, hey, Jim wants to make this payment now?
15       MR. MORRIS: Objection to the form
16   of the question.
17   A.    I don't -- I don't recall.
18   Q.    And does that include legal counsel?
19       Without going into any detail, on
20   January 12th or before that payment was made,
21   did you consult with legal counsel about
22   anything having to do with the $1.4 million
23   payment?
24   A.    I don't recall.
25   Q.    Okay. Thank you, sir, for your

Page 352

1    time.
2        MR. RUKAVINA: Pass the witness.
3        MR. MORRIS: I just have a few
4    questions, if I may.
5        MS. DEITSCH-PEREZ: Don't you go at
6    the end?
7        MR. MORRIS: Oh, I apologize. He is
8    your witness. I'm surprised you want to
9    ask him questions, but go right ahead.
10       MS. DEITSCH-PEREZ: Just have a
11   couple of things.
12       MR. RUKAVINA: And I will just
13   object to that, that he's our witness.
14   That's not --
15       MR. MORRIS: I'm not talking to you.
16   I'm not talking to you.
17       MS. DANDENEAU: Also, Mr. Morris, it
18   is -- it is --
19       MS. DEITSCH-PEREZ: He is not my
20   witness. He's been subpoenaed by you.
21   Okay?
22       That is no offense, Mr. Waterhouse,
23   I'm -- I'm not -- okay. Anyway.
24       EXAMINATION

Page 353

1    WATERHOUSE - 10-19-21
2    BY MS. DEITSCH-PEREZ:
3    Q.    Good evening. I'm very sorry to be
4    going last and I know you have had a long and
5    taxing day, so I thank you for indulging me.
6        The kinds of services that you
7    describe that the -- that Highland provided for
8    NexPoint, did Highland also provide similar
9    services to that to HCRE and HCMS?
10   A.    Yes.
11       MR. MORRIS: Objection to the form
12   of the question.
13   Q.    What kind of services did Highland
14   provide to HCRE and HCMS?
15       MR. MORRIS: Objection to the form
16   of the question.
17       MS. DEITSCH-PEREZ: What is your
18   objection, John?
19       MR. MORRIS: It is vague and
20   ambiguous. Unlike the advisors and
21   NexPoint, they actually had shared services
22   agreements.
23       MS. DEITSCH-PEREZ: I got -- I
24   understand your objection. That is fine.
25   Q.    Let's take them one at a time.

Page 354

1         WATERHOUSE - 10-19-21
2    What kinds of services did Highland
3 provide to HCRE?
4       MR. MORRIS: Objection to the form
5  of the question.
6    A. HCMS, Highland employees provided
7 accounting services, treasury management
8 services, potentially legal services. I
9 don't -- but I wouldn't have been directly
10 involved in that. But as far as the teams that
11 I manage, it was accounting, treasury, things
12 of that nature.
13    Q. Okay. And that was for HCM, LLP --
14    A. And -- and, sorry, it would also be
15 any asset valuation if needed as well.
16    Q. Okay. We went back and forth on
17 each other and I apologize, so just to clarify.
18    You were talking about the services
19 that Highland Capital Management provided to
20 HCMS; is that right?
21    A. HCMS. So, again, yes. And
22 accounting, treasury, valuation, and also tax
23 services too.
24    Q. Okay.
25    A. Tax services. Look, I'm expanding

Page 355

1         WATERHOUSE - 10-19-21
2 this, their HR services as well.
3    Q. Okay. And did that include bill
4 paying?
5       MR. MORRIS: Objection to the form
6  of the question.
7    Q. Did the services that HCM provided
8 to HCMS include bill paying?
9       MR. MORRIS: Objection to the form
10  of the question.
11    A. Yes.
12    Q. And did the services that HCMLP
13 provided to HCMS include scheduling upcoming
14 bills?
15       MR. MORRIS: Objection to the form
16  of the question.
17    A. Yes.
18    Q. And did HCMLP regularly pay -- cause
19 to be paid the payments on loans HCMS had from
20 HCMLP?
21       MR. MORRIS: Objection to the form
22  of the question.
23    A. Yes.
24    Q. Typically -- if there is a
25 typically, how far in advance of due dates did

Page 356

1         WATERHOUSE - 10-19-21
2 HCMLP cause HCMS to pay its bills?
3       MR. MORRIS: Objection to the form
4  of the question.
5    A. I mean, it -- it -- it depend -- it
6 depended on the nature of the payment and the
7 vendor, but, you know, if there were -- if
8 there were larger scheduled payments, you know,
9 I would like to give at least 30 days notice.
10    And that is -- that is kind of my
11 rule of thumb so no one is surprised.
12    Q. Okay. And was it generally HCMLP's
13 practice to timely pay HCMS' bills?
14       MR. MORRIS: Objection to the form
15  of the question.
16    A. It -- it -- it -- that depended on
17 the nature of the payment.
18    Q. Okay. And can you explain what you
19 mean by that?
20    A. Yeah, I mean if -- if it was -- I
21 mean -- if there was some professional fees
22 that weren't -- you know, they were due but
23 they weren't urgent, those fees may not be paid
24 as timely as others that have a due date or --
25 or things like that.

Page 357

1         WATERHOUSE - 10-19-21
2    Q. Okay. Are loan payments the kinds
3 of thing that HCMLP would pay on time because
4 of potential consequences of not paying on
5 time?
6       MR. MORRIS: Objection to the form
7  of the question.
8    A. Yes. As I testified earlier, we
9 would want to give, you know, notice on -- on
10 -- on larger payments and -- and things of that
11 nature so we didn't miss due dates.
12    Q. Okay. And over the course of time,
13 did HCMLP generally pay HCMS' loan payments in
14 a timely fashion?
15       MR. MORRIS: Objection to the form
16  of the question.
17    A. I can't remember specifically, but
18 generally, yes.
19    Q. Okay. Now, did HCMLP provide
20 similar services to HCRE that you have
21 described it provided to HCMS?
22       MR. MORRIS: Objection to the form
23  of the question.
24    A. Yes, but I don't think it -- it
25 provided -- I don't think it provided HR

Page 358

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2 services.
3   Q.   Can you describe the accounting and
4 treasury services that HCMLP provided for HCRE?
5   A.   Yeah, it -- it would provide
6 bookkeeping services on a -- on a periodic
7 basis. It would make payments, you know, as
8 needed.
9   Q.   Okay. So did it provide --
10   A.   And -- and I believe it -- it -- it
11 provided tax services as well.
12   Q.   Okay. And so did it provide the
13 same kind of bill -- did HCMLP provide the same
14 kind of bill-paying services for HCRE that it
15 provided for HCMS and NexPoint?
16   MR. MORRIS: Objection to the form
17   of the question.
18   A.   Yes.
19   Q.   And over the course of time, did
20 HCMLP generally cause to be made the loan
21 payments that HCRE owed to HCMLP?
22   MR. MORRIS: Objection to the form
23   of the question.
24   A.   Yes.
25   Q.   Did HCMLP make loan payment -- the

Page 359

1   WATERHOUSE - 10-19-21
2 loan payment that was due from HCMS to HCMLP in
3 December of 2020?
4   MR. MORRIS: Objection to the form
5   of the question.
6   A.   I don't believe that payment --
7 payment was made.
8   Q.   Okay. And when HCMLP caused HCMS in
9 the past to make loan payments, whose money did
10 it use to make those payments?
11   MR. MORRIS: Objection to the form
12   of the question.
13   A.   It was the -- the money in HCMS's
14 operating account would be made to that --
15 those moneys would be used to make payment to
16 Highland Capital Management.
17   Q.   Okay. And Highland -- is it correct
18 that Highland Capital Management personnel had
19 the access to HCMS's accounts to be able to
20 cause such payments to be made?
21   A.   Yes, Highland personnel had access
22 to those accounts.
23   Q.   Okay. And so now for HCRE, whose
24 money was used when HCMLP caused HCRE
25 payments -- loan payments to Highland to be

Page 360

1   WATERHOUSE - 10-19-21
2 made?
3   MR. MORRIS: Objection to the form
4   of the question.
5   A.   It was -- it was cash in HCRE's bank
6 account that would be used to make payments to
7 Highland Capital Management.
8   Q.   Okay. And so did Highland Capital
9 Management have access to HCRE's funds in order
10 to be able to make such payments?
11   MR. MORRIS: Objection to the form
12   of the question.
13   A.   Personnel at Highland Capital
14 Management had access to HCRE's bank account to
15 effectuate the payments.
16   Q.   Okay. And was the payment due from
17 HCRE to HCMLP due in December of 2020 made?
18   A.   It --
19   Q.   In December of 2020.
20   A.   It was not.
21   Q.   Okay. And was there money in HCRE's
22 account that would have enabled the payment to
23 be made had HCM personnel attempted to make the
24 payment?
25   MR. MORRIS: Objection to the form

Page 361

1   WATERHOUSE - 10-19-21
2   of the question.
3   A.   I -- I don't recall.
4   Q.   Do you have any reason to believe
5 that either HCRE or HCMS simply didn't have the
6 funds on hand to make the December 2020
7 payments?
8   A.   I don't know.
9   Q.   I guess I'm asking, do you have any
10 reason to believe that they didn't have the
11 funds?
12   A.   We managed cash for so many
13 different entities and funds, and I don't
14 recall, you know, where the cash position was
15 for HCRE and HCMS at 12/31/2020.
16   Q.   Okay.
17   A.   I just don't recall, and I don't --
18 and I don't remember what the loan payment
19 obligations were from HCRE to Highland, and
20 from HCMS to Highland. I don't recall. I
21 don't recall, I mean...
22   Q.   Let me come at it a different way.
23 Were the -- were the payments that would
24 otherwise have been due in December of 2020
25 made in January of 2021 for HCMS and HCRE?

Page 362

WATERHOUSE - 10-19-21

2    A.  I believe the HCRE payment was made
3  in January of 2021. I don't recall any
4  payments being made from HCMS to Highland.
5    Q.  If it -- how is it the HCRE payment
6  came to be made?  Why did you make it -- why
7  did HCM make the payment in January of 2021?
8    A.  Jim -- Jim called me and instructed
9  me to -- to make the payment on behalf of HCRE,
10  Jim Dondero -- Jim Dondero.
11    Q.  Did he seem upset that -- that the
12  payment had not been made?
13    A.  Yeah.  On the note that was, you
14  know, that was the term note, yes, he -- he was
15  displeased that the -- that the payment had not
16  been made by year-end.
17    Q.  Okay.  And did you make the -- cause
18  the payment to be made as -- as requested?
19    A.  Yes.
20    Q.  And did anyone else from HCM
21  participate with you in causing the payment to
22  be made to -- on the HCRE loan?
23    A.  Yes.  It would have been Kristin
24  Hendrix.  I -- again, I don't -- as I testified
25  earlier, I'm not an officer of HCRE.  I don't

Page 363

WATERHOUSE - 10-19-21

2  believe I'm an authorized signer.  So I
3  can't -- other personnel have to make payment
4  from HCRE to -- to -- to -- to Highland.
5    Q.  Okay.  And in the conversation
6  that -- that you had with Mr. Dondero when he
7  requested the payment to be made, did you say
8  to him words to the effect, Jim, this loan is
9  going to stay in default, what are you making
10  the payment for, anything like that?
11    A.  No.
12    Q.  In fact, did you have the impression
13  from him that he thought that the loan would
14  be -- the default would be cured by making the
15  payment?
16    MR. MORRIS:  Objection to the form
17    of the question.
18    A.  Did I get the impression from Jim
19  Dondero that the loan would be cured if the
20  payment from HCRE --
21    Q.  Yeah, if that is what he thought.
22    MR. MORRIS:  Objection to the form
23    of the question.
24    A.  I didn't get any impression from him
25  on that at the time.

Page 364

WATERHOUSE - 10-19-21

2    Q.  Do you know whether there was an
3  HCMS term loan that had a payment due in
4  December of 2020?
5    A.  I don't recall.
6    Q.  Okay.  And so the reason you don't
7  recall whether or not there was a payment in
8  January of 2021 is because you just don't
9  remember whether there was such a loan at all?
10    MR. MORRIS:  Objection to the form
11    of the question.
12    A.  I don't remember.  There is -- there
13  is so many notes, and I mean, demands, and I
14  don't -- I don't remember.  It's a lot to keep
15  track in your head.
16    Q.  I understand, and -- and I hear your
17  frustration when you have explained that the
18  debtor has your documents and you don't, and so
19  I fully appreciate it, and this is no knock on
20  you.  It's a knock on somebody else on this
21  call.
22    MR. MORRIS:  I move to strike.  That
23    was pretty obnoxious, but go ahead.
24    Q.  Okay.  But so, Mr. Waterhouse, if --
25  if a payment on the HCMS loan was made in

Page 365

WATERHOUSE - 10-19-21

2  January of 2021, do you think it was part of
3  the same conversation where Jim Dondero said,
4  hey, why didn't that get paid, please make
5  that -- get that payment done?
6    MR. MORRIS:  I object to the form of
7    the question.
8    A.  Yes.  Likely it would have been -- I
9  mean, again, I don't recall a payment being
10  made, but, you know, again, I don't remember
11  everything.
12    Q.  Okay.  Did -- at the time you were
13  communicating with Kristin Hendrix about the
14  payment being made, whichever payments were
15  made in January, did she say anything to you
16  about the payments not curing the loan
17  defaults?
18    A.  No.
19    Q.  Okay.  All right.  So I'm going to
20  take you back to very early in the deposition
21  when Mr. Morris was asking you about the --
22  the -- the -- the agreement with respect to
23  the -- the forgiveness element of the loans, so
24  that is just to orient you.
25    Do you remember that there was a

Page 366

1    WATERHOUSE - 10-19-21
2    time that you and Mr. Dondero were
3    communicating about potential means of
4    resolving the Highland bankruptcy by what was
5    colloquially referred to as a pot plan?
6        A.    Yes.
7        Q.    Okay.  And can you tell me generally
8    when that was?
9        A.    Like mid -- mid 2020, sometime in
10   2020, mid 2020.
11       Q.    Okay.  And did the process of trying
12   to figure out what the numbers should be
13   involve looking at what one should pay for the
14   Highland assets?
15       MR. MORRIS:  Objection to the form
16   of the question.
17       A.    Yes.
18       Q.    Okay.  And did there come a time
19   when you were proposing some potential numbers
20   and Mr. Dondero said something to you like,
21   well, why are you including payment for the
22   related party notes, those, you know, were
23   likely to be forgiven as part of my deferred
24   executive compensation?
25       MR. MORRIS:  Objection to the form

Page 367

1    WATERHOUSE - 10-19-21
2    of the question.
3        A.    Yes, we did have that conversation.
4        Q.    Okay.  Was that conversation in
5    connection with trying to figure out the right
6    numbers for a pot plan?
7        A.    Yeah.  I mean, it was -- it was -- I
8    mean, Jim -- Jim would ask for, you know,
9    most -- most recent asset values, you know, for
10   Highland, and -- and myself and the team
11   provided those to him, so it was in that
12   context.
13       Q.    Okay.  And does that refresh your
14   recollection that these communications were in
15   2020 rather than 2021?
16       MR. MORRIS:  Objection to the form
17   of the question.
18       A.    The -- the -- the executive
19   compensation discussions were definitely in
20   2020.
21       Q.    Okay.  Now, did you ever make
22   proposals that took into account Jim's comment
23   that the notes were likely to end up forgiven
24   as part of his compensation?
25       MR. MORRIS:  Objection to the form

Page 368

1    WATERHOUSE - 10-19-21
2    of the question.
3        A.    Yes, we -- the team and myself put
4    together, you know, asset summaries of Highland
5    at various times for all the assets of
6    Highland, and not including the notes.
7        Q.    Okay.  And were those presentations
8    communicated to -- to Mr. Seery?
9        A.    No.  Well, look, I didn't tell -- I
10   didn't tell Mr. Seery.  I don't know what
11   Mr. Dondero did with the information.
12       Q.    Okay.
13       A.    I did not have conversations with
14   Mr. Seery.
15       Q.    Okay.  Do you know who saw the
16   presentations that you put together that didn't
17   include the value of the related party notes?
18       A.    We're talking presentations -- these
19   are -- these are Excel spreadsheets?
20       Q.    Uh-huh.
21       A.    I don't know who -- these were given
22   to -- to Jim Dondero.  I don't know what was
23   done with them after that.
24       Q.    Okay.  You also mentioned earlier
25   that sometime during your tenure at Highland

Page 369

1    WATERHOUSE - 10-19-21
2    you knew of the practice of giving forgivable
3    loans to executives.
4        MR. MORRIS:  Objection to the form
5    of the question.
6        Q.    Can you -- can you tell me what you
7    recall about that practice?
8        MR. MORRIS:  Objection to the form
9    of the question.
10       A.    Yes, so there were -- there were --
11   during my tenure at Highland, there were loans
12   or -- given to employees that were later
13   forgiven at a future date and time.
14       Q.    Okay.  And when the loans were
15   given, did the notes, to your recollection, say
16   anything about the potential forgiveness term?
17       MR. MORRIS:  Objection to the form
18   of the question.
19       A.    When you say "did the notes," did
20   the promissory notes detail the forgiveness?
21       Q.    Yes.
22       A.    Not that I recall.
23       Q.    And until such time as whatever was
24   to trigger the forgiveness occurred, were the
25   notes bona fide notes as far as you were

Page 370

WATERHOUSE - 10-19-21

1     WATERHOUSE - 10-19-21
2  concerned?
3        MR. MORRIS: Objection to the form
4  of the question.
5     A.  Yes, similar to -- yes.
6     Q.  Okay. You were going to say similar
7  to what?
8     A.  Mr. Morris earlier today showed
9  notes of the financial statements about various
10  affiliate loans. I -- I -- I do recall these
11  notes because I -- at that time personally
12  worked on the -- the financial statements of
13  Highland. That was, you know, in my role as a
14  corporate accountant.
15        And there were -- those loans
16  were -- to the partners were detailed in the
17  notes to the financial statements, similar to
18  what we went through earlier today in the prior
19  testimony about what we saw with Highland
20  and -- and -- and the -- and HCMFA.
21     Q.  Is it fair to say that on Highland's
22  balance sheet there were any number of assets
23  that the value of which could be affected by
24  subsequent events?
25        MR. MORRIS: Objection to the form

Page 371

1  of the question.
2     A.  Yes. I mean, yes, that -- there
3  are. And that is -- yes.
4     Q.  Okay. And is it typical accounting
5  practice that until there is some certainty
6  about those potential future events, that asset
7  value listed on -- on the books doesn't take
8  into account those potential future events?
9        MR. MORRIS: Objection to the form
10  of the question.
11     A.  Yeah, if those -- yes. If -- if
12  those future events, you know, at the time of
13  issuance are not known or knowable, like I
14  discussed earlier with, like, market practice,
15  asset dislocation, or, you know, I mean, things
16  like that, you -- I mean, it -- it could affect
17  its fair value --
18     Q.  Okay.
19     A.  -- in the future.
20     Q.  And am I correct you wouldn't feel
21  compelled to footnote in every possible change
22  in -- in an asset when those possibilities are
23  still remote?
24        MR. MORRIS: Objection to the form

Page 372

1     WATERHOUSE - 10-19-21
2  of the question.
3     A.  The accounting standard is you have
4  to estimate to the best -- you know, to -- to
5  the best of your ability, the fair value of an
6  asset as of the balance sheet date under --
7  under GAAP.
8     Q.  Did -- strike that.
9        Okay. Give me a minute. I'm
10  close -- I'm close to done. Let me just go off
11  and look at my notes for a second. So take two
12  minutes.
13        VIDEOGRAPHER: We're going off the
14  record at 7:02 p.m.
15        (Recess taken 7:02 p.m. to 7:03 p.m.)
16        VIDEOGRAPHER: We are back on the
17  record at 7:03 p.m.
18     Q.  Mr. Waterhouse, is it generally your
19  understanding that people you work with now
20  have been asking the debtor for full and
21  unfettered access to their own former files?
22        MR. MORRIS: Objection to the form
23  of the question.
24     A.  Yes, I am -- I am generally aware.
25     Q.  Okay. And do you think you could

Page 373

1     WATERHOUSE - 10-19-21
2  have been better prepared for this deposition
3  if the debtor had complied with those requests?
4        MR. MORRIS: Objection to the form
5  of the question.
6     A.  I -- I -- I most certainly -- yes.
7  I mean, again, these are multiple years,
8  multiple years ago, lots and lots of
9  transactions.
10        You know, we asked about NAV errors
11  and, you know, things like that and these
12  are -- it would make this process a lot more --
13  a lot easier and if we had -- if we had access
14  to that.
15     Q.  Okay. And has the debtor -- is the
16  debtor suing you right now?
17     A.  Yes.
18     Q.  And is the debtor trying to renege
19  on deals that it had previously made with you?
20        MR. MORRIS: Objection to the form
21  of the question.
22     A.  Sorry, I need to -- it is my
23  understanding that the litigation trust is
24  suing me. And not being a lawyer, I don't
25  know -- is that the debtor?

Page 374

1    WATERHOUSE - 10-19-21
2        Is that -- I don't know the
3    relationship. So, again, I'm not the lawyers.
4    I've said many times. But my understanding is
5    the litigation trust is suing me. I could be
6    wrong there. I don't know.
7    Q.    Okay. I understand.
8        Someone with some connection to the
9    Highland debtor has brought a claim against
10   you; is that fair?
11       MR. MORRIS: Objection to the form
12   of the question.
13   A.    Yes.
14   Q.    Okay. And is there also some motion
15   practice in the bankruptcy where the debtor or
16   someone associated with the debtor is
17   attempting to undo something that was
18   previously resolved with you?
19   A.    Yes.
20   Q.    And so in one action somebody is
21   associated with the debtors trying to --
22   threatening you with trying to take money from
23   you, and then in the other -- and trying to --
24   and in the other they are threatening not to
25   pay you things that had previously been agreed;

Page 375

1    WATERHOUSE - 10-19-21
2    is that correct?
3        MR. MORRIS: Objection to the form
4    of the question.
5    A.    I want to be -- yes, I -- there
6    is -- I'm being sued, again, on -- on something
7    that was agreed to with Mr. Seery and myself.
8    I don't -- I don't -- I don't own that claim.
9    Q.    Okay.
10   A.    To be transparent, I don't own that
11   claim. So it is not my personal property.
12   Q.    Okay.
13   A.    And -- and being the nonlawyer, I
14   don't know how I can get sued for something
15   that I don't owe or, like, I don't own
16   anything. I'm not the lawyer. But, I mean, if
17   that is -- if I'm understanding the facts
18   correctly.
19   Q.    Okay. And the lawsuit that was
20   filed that names you, that was just filed
21   this -- this past week; is that right?
22       MS. DANDENEAU: Ms. Deitsch-Perez, I
23   do want to interrupt at this point because
24   just as I told Mr. Morris, that this is a
25   deposition about the noticed litigation.

Page 376

1    WATERHOUSE - 10-19-21
2        I really don't want to go -- go
3    afield --
4        MS. DEITSCH-PEREZ: Yeah.
5        MS. DANDENEAU: -- and open up a
6    whole new line of inquiry about the lawsuit
7    or the -- the motion and the bankruptcy
8    court. We will be here all night.
9        MS. DEITSCH-PEREZ: And I
10   understand.
11   Q.    My -- my point is: Do you feel
12   like -- like there is some effort by these
13   parties related to the debtor to intimidate
14   you -- not that you -- I'm not saying you are
15   or you aren't.
16       But do you feel like there is some
17   effort to intimidate you and maybe an effort to
18   deter you from being as prepared as you might
19   be in this deposition?
20       MR. MORRIS: Objection to the form
21   of the question.
22   A.    I was -- I was surprised by the
23   lawsuit, by me being named, because, again, I
24   don't own the asset and things like that.
25   Yeah, I just -- I want to move forward with my

Page 377

1    WATERHOUSE - 10-19-21
2    life at Skyview.
3        MS. DEITSCH-PEREZ: Thank you.
4        THE WITNESS: Thank you.
5        FURTHER EXAMINATION
6    BY MR. MORRIS:
7    Q.    If I may, I just have a few
8    questions.
9        Mr. Waterhouse, we saw a number of
10   documents that Mr. Rukavina put up on the
11   screen where Ms. Hendrix would send you a
12   schedule of payments that were due on behalf of
13   certain Highland affiliates.
14       Do you remember that?
15   A.    Yes.
16   Q.    And in each instance she asked for
17   your approval to make the payments; is that
18   right?
19   A.    Yes, she did.
20   Q.    And was that the -- was that the
21   practice in the second half of 2020 whereby
22   Ms. Hendrix would prepare a list of payments
23   that were due on behalf of Highland associates
24   and ask for approval?
25   A.    Yes.

Page 378

1    WATERHOUSE - 10-19-21
2    Q.   And I think you said that there was
3    a -- a --
4    A.   It was -- I think I testified to
5    this earlier when we talked about procedures
6    and policy, you know, again, I want to be
7    informed of -- of -- of -- of -- of any
8    payments that are going out.  I want to be made
9    aware of these payments, and that was just a
10   general policy, not just for 2020.
11   Q.   Okay.  So it went beyond 2020?
12   A.   Yes.
13   Q.   Is that right?
14   A.   Yes.
15   Q.   Okay.  And the corporate accounting
16   group would prepare a calendar that would set
17   forth all of the payments that were anticipated
18   in the -- in the three weeks ahead; is that
19   right?
20   A.   I -- like I testified earlier, we
21   had a corporate calendar that was set up, you
22   know, to -- to provide reminders or, you know,
23   of anything of any nature, whether it is
24   payments or -- or financial statements or, you
25   know, whatever it is, you know, to meet

Page 379

1    WATERHOUSE - 10-19-21
2    deadlines.
3    I don't know how, as I testified
4    earlier, how much they were using that
5    calendar.
6    Q.   Okay.  But -- but you did get notice
7    and a request to approve the payments that were
8    coming due on behalf of Highland's affiliates.
9    Do I have that right?
10   MS. DANDENEAU:  Objection to form.
11   A.   I mean, generally, yes.  I mean, you
12   know, as we saw with these emails, generally, I
13   mean, did that encompass everything, no.
14   Q.   Okay.  Do you know why the
15   payment -- do you know why there was no payment
16   made by NexPoint at the end of 2020?
17   A.   Yes.  There was -- there was -- we
18   talked about these agreements between the
19   advisors and Highland, the shared services and
20   the cost reimbursement agreement.
21   In late 2020, there were
22   overpayments, large overpayments that had been
23   made over the years on these agreements, and it
24   was my understanding that the advisors were --
25   were talking with -- like Jim Seery and others

Page 380

1    WATERHOUSE - 10-19-21
2    to offset any obligations that the advisors
3    owed to Highland as offset to the overpayments
4    on these agreements.
5    Q.   Okay.  Did you participate in any of
6    those conversations?
7    A.   I did not.
8    Q.   Okay.  Do you know -- do you recall
9    that the -- at the end of November, the debtor
10   did notice to the advisors of their intent to
11   terminate the shared services agreements?
12   A.   Like I testified earlier, there
13   was -- the agreements weren't identical, from
14   what I recall, and there is one that had a
15   longer notice period, which I think had a
16   60-day notice period.  I don't recall which one
17   that was, so not all of them were -- notice
18   hadn't been given as of November 30th, for all
19   of the agreements.
20   Q.   Upon the receipt of the -- the
21   termination notices that you recall, do you
22   know if the advisors decided at that point not
23   to make any further payments of any kind to
24   Highland?
25   MR. RUKAVINA:  Objection, form.

Page 381

1    WATERHOUSE - 10-19-21
2    A.   No.  The advisors -- the advisors
3    had stopped making payments prior to that
4    notice.
5    Q.   Okay.  And how do you know that the
6    advisors stopped making -- making payments
7    prior to the notice?
8    A.   I had -- I had a conversation
9    with -- with Jim Dondero.
10   Q.   And did Mr. Dondero tell you that
11   the advisors would no longer make payments to
12   Highland?
13   MS. DEITSCH-PEREZ:  Object to the
14   form.
15   A.   Yes, he -- he -- again, he said
16   they -- they -- the advisors have overpaid on
17   these agreements, to not make any future
18   payments, and that there needs to be offsets,
19   and they're working on getting offsets to these
20   overpayment.
21   Q.   Do you know if anybody ever
22   instructed Highland's employees to make the
23   payment that was due by NexPoint at the end of
24   the year?
25   A.   Did anyone instruct Highland's

Page 382

1      WATERHOUSE - 10-19-21
2  employees to make that payment?
3      Q.  Correct.
4      A.  Anyone -- not that I'm aware.
5      Q.  Were any of Highland's employees
6  authorized to make the payments on behalf of
7  its affiliates -- withdrawn.
8          Was any of Highland's employees
9  authorized to effectuate the payment on behalf
10 of NexPoint that was due at the end of the year
11 without getting approval from either you or
12 Mr. Dondero?
13     A.  They had the -- they had the ability
14 to make the payment, but they didn't -- you
15 know, that -- that payment needed to be
16 approved.
17     Q.  Okay.  And it needed to be approved
18 by you or Mr. Dondero; is that right?
19     A.  I mean, I'm not going to make the
20 unilateral decision.
21     Q.  Is that a decision that you
22 understood had to be made by Mr. Dondero?
23     A.  Yes.  Sitting back in December of
24 2020, the -- that -- there was this off --
25 offset negotiation that -- that was happening,

Page 383

1      WATERHOUSE - 10-19-21
2  so I mean, until those negotiations were
3  resolved, you know, there wasn't any
4  payments -- there weren't any payments.
5      Q.  And -- and there were no payments
6  until the negotiations were resolved because
7  that was the directive that you received from
8  Mr. Dondero; correct?
9      A.  I don't think he said -- I mean, I
10 think -- yeah, I mean -- I'm trying to recall
11 the conversation.  It was -- you know, there
12 is -- there is these negotiations.  There's --
13 there needs to be these offsets.  They're
14 talking with the debtor.  So, you know, until
15 this is resolved, right, I mean, depending on
16 how, whatever that resolution was, were we to
17 take any action.
18     Q.  Okay.  How about with respect to
19 HCMS, did HCMS have a term payment due at the
20 end of the year?
21     A.  Again, I don't -- I don't recall.
22     Q.  Okay.  You discussed briefly two
23 payments that were made in January of 2021, one
24 on behalf of NexPoint, and one on behalf of
25 HCMS.  Do I have that right?

Page 384

1      WATERHOUSE - 10-19-21
2      A.  No.  The two payments I recall were
3  NexPoint and HCRE.
4      Q.  Okay.  And those two payments --
5  thank you for the correction.  And those two
6  payments were made because Mr. Dondero
7  authorized those payments to be made; correct?
8      A.  Yes.
9      Q.  And they hadn't been made before
10 that because Mr. Dondero had not authorized
11 them to be made?
12         MS. DEITSCH-PEREZ:  Object to the
13 form.
14     A.  Yes, because of these negotiations.
15     Q.  Okay.  Just a couple of more
16 questions.
17         Did anybody, to the best of your
18 knowledge, on behalf of HCMFA, ever tell the
19 SEC that HCMLP was responsible for the mistakes
20 that were made on the TerreStar valuation?
21     A.  Did anyone from Highland on HCMFA's
22 behalf tell the SEC that Highland -- that
23 Highland was responsible for there -- I just
24 want to make sure --
25     Q.  It was a little bit different, so

Page 385

1      WATERHOUSE - 10-19-21
2  let me try again.
3      A.  These are very long questions, John.
4  I'm not trying to be --
5      Q.  That is good.  Do you know whether
6  anybody -- do you know whether anybody on
7  behalf of HCMS -- HCMFA ever told the SEC that
8  Highland was the responsible party for the
9  TerreStar valuation error?
10     A.  Not that I'm aware.
11     Q.  Okay.  Did anybody on behalf of
12 the -- on behalf of HCMFA ever tell the retail
13 board that Highland was responsible for the
14 TerreStar valuation error?
15     A.  Not that I'm aware.
16     Q.  Do you know if HCMFA made an
17 insurance claim with respect to the damages
18 that were incurred in relation to the TerreStar
19 valuation error?
20     A.  Yes.
21     Q.  And do you know why they made that
22 insurance claim?
23     A.  Because there was an error.  I
24 mean --
25     Q.  Was the insured's claim made -- was

1     WATERHOUSE - 10-19-21
2  the insurance claim made under HCMFA's policy?
3     A.   Yes.
4     Q.   Did HCMFA at any time prior to the
5  petition date -- withdrawn.
6     You were asked a couple of questions
7  where -- where you said that Mr. Dondero told
8  you that he was ascribing zero value to the
9  notes as part of a pot plan because he believed
10 that the notes were part of executive
11 compensation.
12    Do I have that right?
13    MS. DEITSCH-PEREZ:  Object to the
14 form.
15    A.   Yes.
16    Q.   Okay.  Have you ever heard that
17 before the time that Mr. Dondero told you that
18 in the conversation about the pot plan?
19    A.   Had I heard that prior to my
20 conversation with Mr. Dondero?
21    Q.   Yes.
22    A.   No, I had not heard that prior.
23    Q.   Okay.  And that was in the context
24 of his formulation of the settlement proposal;
25 is that right?

1     WATERHOUSE - 10-19-21
2     A.   I mean, generally, yes.  You know,
3  we were asked to provide asset values, right,
4  and he was having settlement discussions.
5  Again, I don't know who those went to
6  ultimately.  I don't recall.
7     MR. MORRIS:  I have no further
8  questions.  Thank you very much for your
9  patience.  I apologize for the late hour.
10    MS. DEITSCH-PEREZ:  John, you stay
11 on about your email when --
12    MR. RUKAVINA:  Hold on, I'm not
13 done.
14    MS. DEITSCH-PEREZ:  Oh, okay.  Davor
15 still has questions.  Sorry.  I was going
16 to say both John and Davor, could you stay
17 on afterwards just to talk about the
18 requests.
19    FURTHER EXAMINATION
20 BY MR. RUKAVINA:
21    Q.   Mr. Waterhouse, you were just now
22 testifying about a discussion you had with
23 Mr. Dondero where he said something like no
24 more payments.
25    Do you remember that testimony?

1     WATERHOUSE - 10-19-21
2     A.   Yes.
3     Q.   Okay.  And was that late November or
4  early December of 2020?
5     A.   It was, I would say, first or second
6  week of November.
7     Q.   Okay.  Do you recall whether --
8  whenever you had that discussion, whether
9  Mr. Dondero had already been fired by the
10 debtor?
11    A.   Yes, I -- I believe he was not an
12 employee of the debtor anymore at that time.
13    Q.   And when you were discussing this
14 with Mr. Dondero and he said no more payments,
15 you were discussing the two shared services
16 agreements and employee reimbursement
17 agreements we testified -- you testified about
18 before; is that correct?
19    MR. MORRIS:  Objection to the form
20 of the question.
21    A.   That is correct.
22    Q.   And had your office or you -- and we
23 will talk at a future deposition about the
24 administrative claim.
25    But had -- by that time that you

1     WATERHOUSE - 10-19-21
2  talked to Mr. Dondero, had your office or you
3  done any estimate of what the alleged
4  overpayments were?
5     MR. MORRIS:  Objection to the form
6  of the question.
7     A.   Yes, we had -- there was a -- there
8  was a detailed analysis that was put together
9  by David Klos at the time.
10    Q.   And do you recall just generally
11 what the total amount for both advisors of the
12 overpayments was?
13    A.   It was in excess of $10 million.
14    Q.   Was it in excess of $14 million?
15    MR. MORRIS:  Objection to the form
16 of the question.
17    A.   I -- I remember it was an
18 eight-figure number.  I don't remember
19 specifically.
20    Q.   Okay.  And did you convey that
21 number to Mr. Dondero when you had that
22 conversation?
23    A.   Yes.
24    Q.   What was his reaction?
25    A.   I mean, he wasn't happy.

Page 390

WATERHOUSE - 10-19-21

1
2 Q. Is it fair to say he was upset?
3 A. Yes.
4 Q. Did Mr. Dondero ever expressly tell
5 you to not have NexPoint make the required
6 December 31, 2020, payment?
7 A. Yes, I recall him saying don't make
8 the payment because it was being negotiated, as
9 I discussed with Mr. Morris, this offset
10 concept. So there were obligations due by the
11 advisors to Highland, they should be offset
12 that -- you know, those obligations should be
13 offset by this -- by this overpayment.
14 Q. And when did he tell you that?
15 A. I would say -- I would say around --
16 probably December -- December-ish.
17 Q. Early December, late December?
18 A. I don't recall with as much
19 specificity as -- as -- as -- as stopping the
20 shared services payments, because we had
21 actually made one shared services payment in
22 November. So that is why I need to remember
23 that one more clearly. I don't remember where
24 exactly in December that conversation occurred.
25 Q. Did Mr. Dondero expressly use the

Page 391

WATERHOUSE - 10-19-21

1
2 word "NexPoint" when he was saying don't make
3 these payments?
4 MR. MORRIS: Objection to the form
5 of the question, asked and answered.
6 A. Yeah, we were -- we were discussing
7 advisor obligations. So it was -- you know, it
8 was just obligations from the advisors.
9 And -- and he specifically talked
10 about the NexPoint payment as well.
11 Q. Okay. And it is your testimony that
12 he expressly told you not to make that NexPoint
13 December 31 payment?
14 MR. MORRIS: Objection, asked and
15 answered twice.
16 A. Yes, he -- he did, during that
17 conversation.
18 Q. And did you ever follow up with him
19 after that about whether NexPoint should or
20 shouldn't make that payment?
21 A. I did not.
22 Q. Did you ever, on or about
23 December 31, 2020, remind him and say, hey,
24 this payment is due, what shall I -- what
25 should I do?

Page 392

WATERHOUSE - 10-19-21

1
2 A. I did not.
3 Q. So sitting here today, you -- you
4 remember distinctly that Dondero in December of
5 2020 expressly told you not to have NexPoint
6 make that payment?
7 MR. MORRIS: Objection, asked and
8 answered three times.
9 A. Yes.
10 Q. Can you say categorically it wasn't
11 just some general discussion where he told you
12 not to make payments?
13 MR. MORRIS: Objection, asked and
14 answer four times.
15 MR. HORN: Four times now. Go for
16 five.
17 A. Yes.
18 Q. Did you tell Mr. Seery that?
19 A. I don't believe I did. I don't
20 recall.
21 Q. And was this an in-person discussion
22 or telephone or email? Do you remember?
23 A. This was a phone -- a phone
24 conversation.
25 Q. Okay. Would you have a record of --

Page 393

WATERHOUSE - 10-19-21

1
2 on your cell phone of when that conversation
3 might have taken place?
4 I'm sorry, strike that.
5 Was that by cell phone?
6 A. I believe -- yes, because we -- I
7 was at home. I mean, I don't have a landline.
8 All I have is my cell phone.
9 Q. Do you know whether your cell phone
10 still has records of conversations from
11 December 2020 on it?
12 A. My call log doesn't go back that
13 far.
14 Q. Okay. Thank you.
15 MR. RUKAVINA: I will pass the
16 witness.
17 MS. DEITSCH-PEREZ: Just a couple
18 quick questions.
19 FURTHER EXAMINATION
20 BY MS. DEITSCH-PEREZ:
21 Q. With respect to HCRE and HCMS, am I
22 correct there was -- there was no direction not
23 to pay those loan payments?
24 MR. MORRIS: Objection to the form
25 of the question.

Page 394

WATERHOUSE - 10-19-21

1
2   A.   Yes, I don't recall having
3   conversations about, you know, those -- those
4   entities.
5   Q.   And, in fact, what was the tone that
6   Mr. Dondero had when he talked to you about the
7   fact that HCRE and HCMS payments hadn't been
8   made when he found out that they hadn't been
9   paid?
10       MS. DANDENEAU:  Objection to form.
11       MR. MORRIS:  Objection to form.
12   Q.   What was the tone he took with you?
13   A.   Oh, it was -- it was -- it was -- it
14   was very negative.  I mean, I think he cursed
15   at me and he doesn't usually curse.
16   Q.   Okay.  And in your mind, is that
17   consistent with the fact that he was surprised
18   that those payments hadn't been made?
19       MR. MORRIS:  Objection to the form
20   of the question.
21   A.   Yes.
22   Q.   Okay.  Thank you.
23       MR. MORRIS:  I have nothing further.
24   Thank you so much, Mr. Waterhouse.
25       MR. HORN:  I have no questions.

Page 395

WATERHOUSE - 10-19-21

1
2   Thank you, Mr. Waterhouse.  We appreciate
3   your time.  I am logging off the discussion
4   and I will talk to y'all tomorrow.
5       MR. MORRIS:  Super.
6       VIDEOGRAPHER:  If there are no
7   further questions, this ends the
8   deposition -- excuse me.  This ends the
9   deposition, and we are going off the record
10   at 7:30 p.m.
11   (Deposition concluded at 7:30 p.m.)
12
13   _____
14       FRANK WATERHOUSE
15
16   Subscribed and sworn to before me
17   this   day of   2021.
18
19   ---------------------------------
20
21
22
23
24
25

Page 396

1       WATERHOUSE - 10-19-21
2       C E R T I F I C A T E
3
4       I, SUSAN S. KLINGER, a certified shorthand
5   reporter within and for the State of Texas, do
6   hereby certify:
7       That FRANK WATERHOUSE, the witness whose
8   deposition is hereinbefore set forth, was duly
9   sworn by me and that such deposition is a true
10  record of the testimony given by such witness.
11      I further certify that I am not related to
12  any of the parties to this action by blood or
13  marriage; and that I am in no way interested in
14  the outcome of this matter.
15      IN WITNESS WHEREOF, I have hereunto set my
16  hand this 19th of October, 2021.
17
18       _____
19       Susan S. Klinger, RMR-CRR, CSR
20       Texas CSR# 6531
21
22
23
24
25

Page 397

1       WATERHOUSE - 10-19-21
2   NAME OF CASE:  In re:  Highland Capital
3   DATE OF DEPOSITION:  October 19, 2021
4   NAME OF WITNESS:  Frank Waterhouse
5   Reason Codes:
6       1. To clarify the record.
7       2. To conform to the facts.
8       3. To correct transcription errors.
9   Page____Line____Reason_____
10  From_____to_____
11  Page____Line____Reason_____
12  From_____to_____
13  Page____Line____Reason_____
14  From_____to_____
15  Page____Line____Reason_____
16  From_____to_____
17  Page____Line____Reason_____
18  From_____to_____
19  Page____Line____Reason_____
20  From_____to_____
21  Page____Line____Reason_____
22  From_____to_____
23  Page____Line____Reason_____
24  From_____to_____
25

**$**

**$1,406,000** 343:10

**$1,406,112** 343:13

**$1.04** 109:15

**$1.4** 344:5 345:11 350:7 351:22

**$1.5** 223:17

**$1.7** 92:22

**$10** 389:13

**$10.5** 308:16

**$12.7** 311:2 317:10

**$13** 310:23

**$14** 389:14

**$150** 239:10

**$173,398,000** 107:7

**$2.4** 140:14 141:9,18 270:20 271:7,16 272:8 283:18 315:13

**$23** 220:24

**$24** 178:19

**$24.5** 309:25

**$30** 161:25 220:13,20 223:7 224:2 334:7,19 336:13,23 337:25 339:4 340:10 341:23

**$30.7** 216:17

**$325,000** 331:14 332:16,24

**$400** 239:24

**$410** 238:9 239:12

**$5** 142:19 270:20 271:6 272:7 283:18 315:13

**$5.3** 119:23 310:17

**$7** 217:16,19 221:7 277:11,20

**$7.2** 302:22

**$7.4** 131:13 132:8 138:12 143:12 144:6, 17,23 272:16 273:6

287:15 288:6,20 303:6,18,24 304:11, 20 305:23 306:2 307:7 308:20 310:17 317:6 318:14

**$7.8** 278:6,7

**$8** 277:16

**1**

**1** 8:9 35:17 139:22 140:12,13 215:25 216:3,7,12 238:8 260:20,23 261:15 328:10,11,12 343:19

**1/12** 6:9

**10** 5:6 197:4,7,9,15 198:2 266:20 267:3 302:7

**10-19-21** 3:1 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1

129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1

297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1 388:1 389:1 390:1 391:1 392:1 393:1 394:1 395:1

**10.5** 308:22

**100** 108:23 298:15

**10010** 4:21

**10017** 3:10

**10:08** 36:15,16

**10:11** 36:16,18

**11/25** 6:7

**11/30** 332:24

**11:02** 72:25 73:2,5,6

**11:15** 73:3 342:14

**11:20** 73:6,8

**11:40** 344:14

**11th** 152:18,25

**12/1** 332:10

**12/19** 5:25

**12/31** 6:8

**12/31/18** 117:12 122:12 135:21 261:22

**12/31/19** 219:16

**12/31/2018** 93:15

**12/31/2019** 260:13

**12/31/2020** 361:15

**12th** 341:18 344:3 350:5,9,13,24 351:20

**135** 6:2

**14-ish** 286:21

**142** 5:15

**15** 73:3 200:4 202:13, 23 203:3 210:6 213:18 221:23

**15(c)** 5:21 160:11 169:21,23 170:4,8,10 171:6 175:3,9 176:23 179:20 184:5 195:9 210:12,21

**150** 239:24

**150,331,222** 243:23

**151** 5:20

**15th** 203:15

**16** 224:5

**17** 89:16 109:19 110:8 137:24

**170** 5:21

**173** 110:14

**18** 89:16

**1900** 3:15

**19th** 8:19 21:7

**1:04** 150:24,25

**1:49** 150:25 151:3

**1c** 238:12

**1st** 14:8

**2**

**2** 5:15 35:18 140:18 142:15,16,22 171:10

172:8 174:13 179:4 195:11,14 215:22,23 216:3,4,5,8,25 338:12

**2.4** 268:23 282:15

**2/18** 5:22

**20** 15:25 271:14

**2006** 18:15

**2011** 19:2,4,22

**2012** 19:2,4 95:25

**2013** 52:7

**2014** 20:2

**2016** 23:19 25:13 87:8,20,24 89:15,16

**2017** 126:12 161:23 165:22 216:16 220:14 222:10 223:7 224:2,12

**2018** 105:19 109:14, 20 119:21 165:18 186:25 202:19 203:9 228:3,23 242:18,23 243:12 244:14,18 262:5,15 279:12

**2019** 6:4 21:7 98:17 99:25 103:2 125:18 126:2 131:10 132:6, 21 133:12 134:5,17, 23 137:6 138:12,20 139:18 140:14 141:5 142:18 152:18,25 165:15 180:24 181:4, 9,16,23 182:8,16 200:4,7 201:22 202:13,23 203:3,15 204:10 210:7 213:9, 19 218:21 219:7,12, 24 220:19,22 221:6 222:4,12 223:4,14 242:23 258:21 262:17 263:13,14,20, 24 265:3 269:5,24 270:12,18 271:3,14 272:4,15 273:4 279:12 280:10,20 282:23 287:4 293:19 299:4 301:2,8,16,18 313:3 314:13,23 315:19 316:14 321:6

**2020** 59:7,9 68:15 70:17 160:7,14,22 165:14 169:17,20 171:19 173:24 175:8 176:10 179:24 183:7, 14 186:12,14 189:13 195:20 196:3,17 200:24 204:20 207:16 221:11,16,21 258:20 265:6,11 307:24 314:21 316:16 323:10 326:4, 12,14 327:5,9 328:16 330:15 334:23 335:7 336:11,20 337:12 338:15,24 341:9 343:2 346:10 359:3 360:17,19 361:6,24 364:4 366:9,10 367:15,20 377:21 378:10,11 379:16,21 382:24 388:4 390:6 391:23 392:5 393:11

**2021** 8:19 14:8 19:5 37:2,10,19 38:2 70:21 71:3,5,12 121:13,22 122:19,24 163:2,7,8 165:5,9 166:2 173:18 176:24 187:3 198:21 199:7, 12,20 200:14 201:2 203:4,21 210:2,23 212:19 219:11,13,17 226:4 301:24 314:8 315:21 316:7,19 326:9 340:21 341:6 350:6,9 361:25 362:3,7 364:8 365:2 367:15 383:23 395:17

**20th** 160:5

**21** 78:3

**21-03000-SGI** 8:15

**21-3004** 197:18 215:4

**215** 106:2

**218** 6:4

**226** 5:22

**228** 8:22

**23** 178:19

**236** 5:23

**241** 110:23

**25** 260:12 328:16 329:14

**25-year** 347:7

**251** 129:16,22

**256** 5:7

**258** 5:25

**25th** 329:19

**297** 6:10

**2nd** 132:20 141:5 213:9 315:18

---

**3**

**3** 220:2

**30** 7:19 16:3 186:16 356:9

**302** 6:12

**307** 6:11

**309** 6:13

**30th** 176:10,24 331:12 332:3 380:18

**31** 122:19 197:20,24 198:7,9 199:7,12 200:24 201:2 203:4 301:18,24 307:24 326:4 338:15,24 341:9 346:9,21 390:6 391:13,23

**3102** 4:7

**31st** 105:18 109:14 119:21 121:13 122:23 199:20 200:14 202:19 203:9, 21 212:19 216:16 218:21 219:7 221:15, 21 242:18 258:20 263:14 326:8,12,14 334:15

**328** 6:7

**33** 5:16 91:20,21

**33416** 100:10

**338** 6:8

**34** 5:18 104:23,24

**341** 6:9

**35** 5:20 15:20,22 100:10 151:20,21

**352** 5:8

**35D** 101:10,19

**36** 5:21 102:18 170:18,19 177:18 313:9 317:12

**377** 5:9

**387** 5:10

**39** 5:22 226:23,24 236:17

**393** 5:11

**3:26** 224:20,23,24

**3:39** 224:24 225:2

**3:40** 224:21

**3rd** 92:2 98:17 99:25 103:2 132:20,25 135:2 137:6 142:18 200:7 213:9 242:23 262:17 263:13 265:3 315:19

---

**4**

**40** 5:23 236:22,23 237:19

**406** 343:19

**41** 5:25 258:16,18

**419** 103:11

**45** 6:2 135:12,14,15

**45th** 8:23

**46** 6:4 218:16,17

**4:30** 265:25

**4:31** 266:5,6

**4:40** 266:2

**4:43** 266:6,8

**4th** 135:2

**5**

**5** 268:22 271:15 282:14

**5.3** 121:3,6 124:17 308:21 311:4

**500** 3:23

**51** 4:20

**5:52** 172:4 174:6

**5:53** 325:7,8

**5:59** 325:8,10

**6**

**6** 183:7 186:14 217:16,19 314:20 316:16 341:13

**6/3/19** 5:16

**6/30** 176:8,16

**60-day** 380:16

**650** 4:13

**6:27** 349:6,7

**6:30** 349:7,9

**6th** 172:4 174:6 186:11 189:13

**7**

**7** 277:15,16 297:20 305:5

**7.4** 132:2 311:4

**7.8** 277:12

**70130** 4:14

**71** 238:20

**71A** 6:13

**75** 18:2

**75201** 3:16

**75201-6659** 3:24

**75219** 4:8

**780** 3:9

**7:02** 372:14,15

**7:03** 372:15,17

**7:30** 395:10,11

**8**

**8/31** 6:11

**850** 100:25 101:2,4,9

**9**

**9** 307:18,19,20

**90** 18:4

**91** 5:16

**94** 5:18

**99** 86:14

**9:32** 8:20

**9th** 70:16

**A**

**a.m.** 8:20 36:15,16,18
73:5,6,8 342:14
344:14

**A1** 6:7 328:13

**A10** 6:12 302:7,8

**A11** 6:13 309:4,5,6

**A2** 6:8 338:13

**A6** 6:9 341:14

**A7** 6:10 297:20,23

**A9** 6:11 307:20,21

**abilities** 265:12

**ability** 20:17 42:6
124:3 204:15 272:6
327:16 372:5 382:13

**absolute** 109:2

**accelerate** 340:10,
14

**accelerated** 339:4
347:7

**acceleration** 339:6,
10,15 340:13,17,24

**accept** 16:17 152:23
188:19

**accepted** 241:14
277:19

**accepting** 153:16

**accepts** 8:6

**access** 294:24
359:19,21 360:9,14
372:21 373:13

**accordance** 241:13,
25 242:4 254:10
256:21

**account** 287:17
328:6,9 359:14
360:6,14,22 367:22
371:9

**accountant** 21:17
25:20 116:12 370:14

**accountants** 147:22

**accounting** 26:2,4,
7,17 28:16 38:24
87:12,14,17 112:10,
11 148:23 149:2,14
150:14,19 188:11
200:17 230:16,18,21
240:19 241:14
257:22,24,25 258:12,
13 280:6 290:13
326:18,21 337:2,7
351:2 354:7,11,22
358:3 371:5 372:3
378:15

**accounts** 244:9
327:10,12,17,21
329:17 330:10,12,20
331:4 333:7 359:19,
22

**accuracy** 113:17
114:17 115:2

**accurate** 88:7,11,17
89:13,23 90:2,6
110:16 112:19 133:5
176:17 204:4 238:4
256:10 257:4 284:24
286:6 330:20,24

**accurately** 240:9,14

**accusations** 157:18

**acknowledgment**

6:12 201:13,25
213:6,17 314:21

**acting** 23:23 24:2,3,8
28:5,8,12,18,20 29:5,
9,11 30:14,16,24
31:2,3,5 155:6,9,14
156:4,12 158:3,9,11

**action** 374:20 383:17

**actions** 9:7 347:25

**actively** 337:11,12
346:19,25

**actual** 115:21 311:25
312:12

**add** 183:23

**added** 183:24

**addition** 333:7

**additional** 171:6

**adequately** 335:24

**adjustment** 242:7
263:4

**adjustments** 36:4
240:21 241:18 243:5
244:19 245:20

**administrative**
321:17 388:24

**admissible** 7:17

**admitted** 276:24

**advance** 57:21 60:21
61:5,10 62:21 63:5
267:8 355:25

**adversary** 197:18

**advice** 172:7 205:7
257:2

**advisor** 125:8,15
192:25 193:15
205:10 273:23 281:6
282:5 311:25 312:5,6
328:7 331:22,23
391:7

**advisor's** 337:17

**advisors** 3:17,18
9:21,22 22:22 27:10
29:10,12 32:18,20,25
33:24 39:2 42:21,22
44:6,7 58:8,14,15,18

125:3 126:10,13,16
127:10 152:14
160:10 167:13
168:19 171:14
172:18 175:7,13
178:11 179:18,21
183:7,18 184:15,19,
22 189:23 190:9,12,
19 191:2 192:25
193:8,19 194:3,21
195:10 196:8,22
205:7,12,23 206:14
208:4,7 210:5 213:22
215:14 235:9 267:24
268:16 279:19 280:2
286:18 308:4 325:15,
21,22 328:7,25 329:3
332:14 333:23
335:15 336:7 337:14
353:20 379:19,24
380:2,10,22 381:2,6,
11,16 389:11 390:11
391:8

**advisors'** 168:9
179:8,25 180:9 184:3
194:17 218:19 328:9

**advisory** 32:21
33:24

**affect** 371:17

**affected** 265:12
277:20 370:23

**affidavit** 164:10

**affiliate** 41:18 42:2,4
44:12,16 47:25 48:9,
22 49:5,6,10 51:17
54:17 57:19 58:3
60:14,21 61:4 62:9,
20 63:3,15,22 64:6,
10,16,24 65:18 78:18
93:21 94:6 100:25
105:8 107:2,13,21
108:3,7 109:10 131:2
171:14 220:6 225:6,
14,21 239:4 254:2
259:24 262:11 263:5
307:24 309:16,24
310:9 312:2,11,14,25
370:10

**affiliated** 134:6
285:17

**affiliates** 41:2,5,8,10,
13,14 44:4,11,15,25

45:13 46:3,9 47:18
48:7,13 54:2,11,13,
20,21,25 55:6,11,18
56:2,16,23 61:20
62:2 63:11 65:4 66:8
82:16,20 91:3 100:22
101:16 106:22 107:3
108:14,18 109:8,18
110:7 111:2,6,9,13,
23 112:18,24 113:19
115:4 117:24 118:7
119:4 120:20 121:4
176:9 233:9,23
234:10,16,21 235:4,
22 236:8 238:25
241:7 242:8 243:8
259:19 260:11 262:6
309:19 312:2,13
377:13 379:8 382:7

**affirmative** 96:15

**afield** 16:22 376:3

**afternoon** 344:17

**aggregate** 131:13
132:7 138:11 217:15,
19

**agree** 77:5 306:13,22
307:5,10

**agreed** 16:17 75:20
121:16,20 198:20
199:5,11,19 200:13
209:25 210:6 314:11
374:25 375:7

**agreement** 17:9
59:24 65:19,16,23
66:2,6 67:3,7,8,12,
16,22 68:4,9,12,17,
24 69:15,19,22 70:2,
7,11,16,20 71:18,24
72:4,7,10,13 75:4,5,
9,14,16,23,24 76:3,6,
7,10,14 77:6 78:15,
21,25 79:8,10,17,18,
24 80:5,6,11,16,20
81:6 82:9,17,22 83:7,
10,14,17,20,23
99:15,24 100:2,6
102:3,6 104:13,17,19
122:5 123:22 124:4
134:12 186:24 187:2,
16 189:2 200:13
210:22 212:17
278:23 279:18,20,24,

25 314:7 316:5,8,9,
13 326:3,13 332:8
351:4 365:22 379:20

**agreements** 58:16
77:24 83:4 168:9
186:10 279:4,6
325:24 353:22
379:18,23 380:4,11,
13,19 381:17 388:16,
17

**agrees** 243:25

**ahead** 68:22 82:6
156:20 164:10
212:25 248:12
295:12 329:11
352:10 364:23
378:18

**Aigen** 4:5 9:24 214:4
251:23

**Akard** 3:23

**allegations** 208:17

**alleged** 389:3

**Allocation** 35:19,21
125:2 273:17 281:8,
23

**allowed** 62:8 81:23,
25

**alpha** 297:20 302:7
307:19 328:10
338:11 341:13

**alter** 187:16

**ambiguous** 353:20

**amended** 5:15
214:18

**amortizing** 334:13

**amount** 49:10,11
50:23,24 57:6 119:7
131:13 132:8 138:11
142:18 144:5,16
161:19,25 195:16
196:16 216:17
217:15 220:23
222:11 239:5 240:9
244:3 271:11 277:7
283:18 288:6 308:22
342:10 343:5,15,17
389:11

**amounts** 106:21,25
108:14 109:7,18
110:6 111:2,5,8,12,
23 112:18,24 113:18
114:19 115:3 119:3
120:20 121:4,11
125:8 126:6 161:8
168:3 171:12 174:15,
22 175:11 176:9
181:15 199:12 202:7,
22 203:7,13,19
204:11,16,25 205:12
211:11 212:10,18
217:19,21 222:3,11
234:23 235:3 275:13
282:8 283:2 285:10
288:3 311:4 335:12

**analyses** 241:11

**analysis** 240:20,24
241:3,6 261:11 262:3
265:7,8,17,18,19
389:8

**and/or** 42:8,16 43:3,
14 59:14

**annual** 26:10 84:17,
23 85:2,24 96:7
168:10 170:5,9 184:5
217:2 228:16 334:8
335:9 336:12

**answering** 248:7,8
262:23

**answers** 12:2 16:25
26:15

**anticipated** 311:20
378:17

**anymore** 294:24
388:12

**apologize** 30:10
40:22 78:14 99:22
104:12 125:21,24
139:2 170:2 192:14
197:19 226:17
227:17 304:14 352:8
354:17 387:9

**appearances** 3:3

**appeared** 337:16,19

**appearing** 8:18

**appears** 224:8

**Apple** 281:21

**application** 165:10

**applied** 55:16,24
56:6 59:17 60:12
162:5 168:4 294:13
316:14

**apply** 213:7 314:12,
22

**appointed** 18:21,24
24:14,19,25 25:8
29:11,15 270:4
323:9,16

**appointment** 152:24
153:4,16

**appointments**
227:14

**appoints** 183:9

**appreciated** 74:16

**approaching** 310:23

**approval** 57:13 62:5,
10 63:12,17,23
144:24 170:14 206:5,
16 271:17,22 272:13,
14 281:7 332:16
351:5 377:17,24
382:11

**approve** 56:21 57:2,
3,20 61:5,9 231:21
273:6 379:7

**approved** 57:5 60:20
231:14 271:12
294:21 295:6,18
333:4 382:16,17

**approximate** 17:22
23:15 27:24 30:19
36:23 38:15 120:15
161:24 216:17 277:7
310:5

**approximately** 8:20
15:13,20 19:23
109:15,19 110:7
119:23 126:12 169:7
173:14,15 178:19
220:12,24 221:3,7
238:9 277:10,15
278:6

**approximates**
118:13 121:6

**April** 152:18,25 200:4
202:13,23 203:3,15
204:10 210:6 213:18
301:16 314:21 323:6

**areas** 26:5

**Argumentative**
156:10

**arise** 288:3

**arithmetic** 260:10

**armchair** 153:11

**ASC** 100:25 101:2,4,
9

**ascribing** 386:8

**Asia** 4:24 92:14
118:3 129:16 135:10
177:14 218:14

**asks** 97:12 171:10
172:6 174:21

**aspect** 26:18 116:20

**asset** 107:25 108:6,
24 109:14 118:23
225:16,23 265:9
354:15 367:9 368:4
371:7,16,23 372:6
376:24 387:3

**assets** 5:23 107:14
108:10,13 109:20
110:8 122:3,8 137:14
190:3 194:2 195:17,
20 196:3,9,17 204:19
211:3 225:8 235:11,
15 237:20,23 239:13,
19 240:15 241:4,18
242:13 250:18
253:16,24 259:18
260:8,11,13 301:9
303:9 307:9 309:2
311:10 317:7 366:14
368:5 370:22

**assistant** 295:2
298:25 320:23 321:9

**assistant's** 321:5

**assistants** 321:18

**assisted** 326:22

**assisting** 333:8

**associate** 268:10
297:25

**associates** 377:23

**association** 7:5 8:25

**assume** 22:15
133:24 297:13

**assumed** 285:4,11
287:6

**assuming** 288:22

**assure** 105:4

**assured** 257:3

**astute** 320:12

**attach** 320:22 321:2

**attached** 307:23

**attaching** 171:5

**attachment** 307:25

**attempted** 360:23

**attempting** 374:17

**attorney** 153:11
172:12

**attorneys** 3:4,11,17
4:2,10,16 147:21
187:6,11,15 188:3,7,
24,25

**attributable** 132:3
276:11 283:2

**audit** 26:11 48:5
52:23 85:24,25 86:9,
23 88:2,6,13,14,16
89:10,11,22 91:11,14
93:4,14 95:6 96:7,10
97:22 98:19 103:25
104:4 106:7,16,17
109:24 110:25
111:20 112:7,24
113:17 114:2,7
115:2,20 116:5
117:2,20 119:19
131:5 132:9,24 135:6
137:5,7,10,12,21
138:18 142:9,11
148:25 149:4 199:23,
25 200:6 218:7
219:4,5,12,15
221:11,14,20 243:12
244:18 263:24 264:8

**audited** 6:4 41:7
47:25 84:16,23 85:3,
19 90:2 93:24 95:14

98:6 102:7,10 104:21
107:22 113:7 114:18
133:22 138:3,4,9
143:8 186:25 196:21
200:9,12 201:7 211:6
217:24 218:4,12,24
241:24 242:2,3,15,16
261:20

**auditing** 264:2

**auditor** 84:21 97:12
113:11 136:6

**auditors** 46:8 47:17
48:7,10 52:11,20
53:4,11,13 84:10
86:10 88:9 91:12
113:8 136:16 137:3
149:13 211:16
212:15 264:16

**audits** 149:12 246:11

**authority** 63:9,21
270:19 271:5

**authorized** 57:8
139:4 143:13,22
144:7,18 150:4
152:11 158:4,13,18
159:4,15,23 160:15,
24 181:3 320:16
363:2 382:6,9 384:7,
10

**availability** 121:12

**Avenue** 3:9 4:7,20

**aware** 12:14 21:6
32:7 43:22 45:12
48:8,11 49:4,8 50:20,
25 51:5,8,13,18
53:24 57:6 61:7,19,
23 65:3,5 66:21 78:5,
15,22 83:15 85:10
93:8 102:5,14,16,22
103:5,16 107:20,23,
24 108:6 133:15,19
148:5 161:2,6,22,23
162:2,3,8 167:18,19,
24,25 168:7 181:6,7,
12,13,17,24,25
182:4,9,10,13,14,18
198:16 199:9,13,17
202:11,17,21 213:5,
13,15 220:17 223:3
226:3,6,7 261:3,5,7
263:12 267:7 295:23

338:22,25 339:3,5,6
343:18 347:5,8,25
348:6,13,14,17
372:24 378:9 382:4
385:10,15

---

**B**

**back** 20:14 36:17
40:22 50:2 61:24
71:11 73:2,7 75:17
89:17 91:10 92:9
93:11 95:18,20
125:19 140:14
141:12 151:2 160:6
174:20 183:8 185:19
192:23 202:3 205:19
207:2,5 209:6,13
215:20 224:20,25
226:18 243:22
263:23 265:5,15
266:7 273:21 280:3,5
282:13 283:22
285:16,21 286:20,24
292:23 293:19 299:4
301:21 302:23
305:16,20 306:3
313:3 324:6,12 325:9
326:15 332:13 333:9
343:6,16 344:18
347:3,4 348:25
349:8,10 350:2
354:16 365:20
372:16 382:23
393:12

**backed** 50:22 123:5

**background** 13:22
16:13

**backing** 189:9,15
190:10,12,19 191:3
193:20 194:20 205:8,
14,24 206:14,23
208:5 321:15

**bad** 134:9

**badly** 81:18

**Baker** 3:14 9:9

**balance** 106:19
107:14,22,25 108:11
109:6 110:4,5 111:11
112:4 120:23 175:2,
8,14 179:17 196:25
220:2 222:21 228:22

229:3,8,16 230:5
243:7 251:14 253:22
370:22 372:6

**ballpark** 196:15
277:17 278:11

**bank** 142:12 261:23
306:5 327:10,12,17
328:6,9 360:5,14

**bankruptcy** 8:13
21:7 45:24 187:15
188:25 219:23
236:24 237:2,14,24
240:8 244:6,21
245:17 247:9,17,23
248:14,24 254:12
263:18,19 264:3,15
311:11 317:11 366:4
374:15 376:7

**base** 109:14

**based** 71:16 78:25
101:13 108:21,23
111:15 146:8,23
204:22 274:4 278:4
315:4 337:22

**bases** 228:13

**basically** 122:19
145:15 152:10
199:14,23 200:23
252:9 254:16,19
327:20 348:4

**basis** 16:18 19:4
47:10 84:18 110:3,
10,17,18 137:16
151:14 154:6 170:15
190:13 226:11 227:5,
20,25 228:13,16
241:17 266:22
288:12 358:7

**batch** 330:3

**Bates** 129:16,21
137:25 177:16

**bear** 17:5

**began** 20:8,13,17,23
266:21

**begin** 11:22 12:2
266:18

**beginning** 202:5
249:9

**begins** 12:15 170:23
197:25 341:17

**behalf** 58:11 122:22
139:18 180:22 181:2,
7,13 182:17 201:13,
15 210:5 211:9 212:8
213:8 270:21 271:5
273:4 289:18,23
327:17 336:21
350:19 362:9 377:12,
23 379:8 382:6,9
383:24 384:18,22
385:7,11,12

**belief** 98:17 346:15

**believed** 143:22
161:7,17 175:22
246:22 250:9 386:9

**believing** 144:17

**benefit** 17:19 304:19

**bigger** 89:5

**bill** 117:9 355:3,8
358:13

**bill-paying** 358:14

**billion** 109:15 110:14
253:21

**billions** 253:24

**bills** 326:23 355:14
356:2,13

**binder** 91:23 216:10

**binders** 216:5

**bit** 16:22 96:4 117:22
152:17 171:2,25
201:12 222:25
313:11 384:25

**BK** 187:6

**blah** 248:18

**Blank** 170:24

**blend** 250:5

**blessing** 319:21

**block** 152:21 320:22
321:3

**board** 33:5,12 34:4
166:23 168:18,21,23
169:10,12,14,20
170:12,13 171:7

175:3,8,15 176:22
178:7,13,17,23
179:8,12,15,19,25
180:8,23 182:6,15
184:4,8 185:14
189:7,14,19 190:4,
14,18,21 191:2,8,13,
16,20 192:3,8 193:3,
18 194:12 204:18,23
205:6,22 206:12,13
209:16,19,21,24
210:6,20,22 233:7,
13,16 281:7 323:8,16
348:3 385:13

**board's** 174:13
175:23 176:18 179:3
194:17 195:10
210:11

**boards** 33:8 160:8
171:19 181:2,8,14,
19,21 182:2,11

**bona** 369:25

**book** 140:15

**bookkeeping** 358:6

**books** 225:8,15,23
235:16 237:15
240:11,14 257:21
258:5 286:23 371:8

**born** 284:10

**borrowed** 127:15,24
128:5,23 129:2,5

**borrower** 272:7
273:5 340:2,7

**borrowers** 44:15,19

**bottom** 92:16 106:5
129:25 143:3 170:21
221:24 224:4 329:5
330:7

**box** 294:20

**Boyce** 21:5

**Brad** 249:21

**break** 36:6 72:17,20
73:10 74:4,14 139:25
150:22 151:5 224:19
265:24 266:2 324:22,
25 327:3

**briefly** 383:22

Index: bring..company

**bring** 73:16 154:20

**bringing** 249:21

**broke** 221:12

**broker-dealer** 332:6

**brought** 73:17
248:13 374:9

**build** 107:7 108:22
260:5 311:17

**bulk** 89:9

**burdening** 81:12

**business** 226:10
229:22 332:10,11

**C**

**calculate** 275:11
276:22

**calculated** 335:11

**calculation** 278:12

**calculations** 276:19

**calculator** 110:12

**calendar** 337:7
378:16,21 379:5

**call** 46:14 55:2 68:6
70:3 154:8 167:4
191:14,15,24 192:2
290:19,25 350:15
364:21 393:12

**called** 16:10 22:21
27:10 29:25 31:8
32:4 81:9 115:3
130:3 227:2,19
228:21 273:18
278:22,24 315:20
342:8,24 343:2,16
351:10 362:8

**calling** 344:18

**calls** 45:17 46:10
55:21 107:5 126:4
268:6 324:2,9 344:22

**camera** 36:2

**Canty** 4:24 105:2,23
129:18,23 135:12,16
177:10,21,25 218:15

**capable** 86:12 88:20

**capacity** 11:3 19:25
21:3 24:17 26:22
65:10 97:15 143:25
174:3 232:4 258:25
270:25 285:24
295:18

**Capital** 3:4,18 8:11
9:6,22 10:22 11:7
15:16,23 18:7 22:21
30:2 41:18 42:10,18,
21 43:11,16 44:6
58:15,17,20 70:21
109:23 110:9 125:3
127:12 133:10
152:13 172:14
215:14,17 271:3
279:18,19 280:2,3
308:4 325:22,24
330:16 354:19
359:16,18 360:7,8,13

**capture** 107:10
130:15 203:11

**captured** 131:3

**career** 286:21

**careers** 89:6

**carefully** 40:14,18
47:9 114:14 144:14
223:12

**carried** 107:14,18,21
109:6,11 233:5 243:6

**carrying** 118:13,25
120:2,4,12,14 262:8
263:7,16 265:2

**case** 7:21 8:14
208:15 248:15
301:14 339:25

**cash** 57:3,4 121:12
335:17,18,22,23
336:7 337:13,14,16,
17 360:5 361:12,14

**categorically**
392:10

**categorize** 257:10

**categorizing** 316:18

**category** 107:24
109:6

**caused** 263:3,14
277:3,19 280:12
359:8,24

**causing** 362:21

**CCO** 192:25 193:8,14

**cease** 173:15

**ceased** 71:6 173:12

**cell** 393:2,5,8,9

**CEO** 14:16

**certainty** 371:6

**certificate** 5:20 22:3
152:2,5,10,13 159:19
183:11 270:4

**certificates** 21:21
154:20

**certification** 22:3

**certifications** 22:13

**certified** 7:5 21:17

**cetera** 164:10

**CF-** 25:2

**CFO** 14:14 18:10,17,
21,24 19:3,14,25
21:3 39:10,15,19,21,
23 40:3,4,9,12,25
42:5 43:10,23 44:25
46:7 47:16,24 49:17
50:10 51:10,15,20,25
53:9 55:16 60:23
61:21 62:4,8 84:20
85:12 86:3,19,24
88:10,15 90:15 94:4,
23 95:7,15 100:17
107:11 111:16 114:5
133:7,10,16 176:14
202:11 203:25
225:17,20 226:8
227:6 229:23 230:14,
18 240:7,14 243:4
247:7,23 248:24
255:7 269:2 285:24
287:14 288:7 295:19
339:24

**chain** 341:17 342:7
350:14

**challenges** 12:21

**change** 28:7,11,17
93:7 187:7,16 189:2

229:11 240:6 248:17
261:24,25 262:2
264:3 265:10 343:20
371:22

**changed** 20:6 28:11
189:10 194:13
206:24 207:6,7,9
208:2,3 263:18
264:17 323:2

**characterized**
247:12

**chat** 81:25 92:12
105:2,5 135:17
177:7,18

**check** 86:8 306:4

**chicken** 298:13

**chief** 14:12 26:24
27:5 120:8 184:22,24
258:25 270:9,13
271:2 302:19

**Chisum** 321:7

**chose** 113:25

**circumstances**
71:15 231:6 240:6
241:10 261:23,24
262:2 265:9 274:13

**Civil** 7:20

**claim** 167:9,13,25
374:9 375:8,11
385:17,22,25 386:2
388:24

**claims** 208:23

**clarify** 354:17

**clear** 40:15,16 54:22
55:5 75:16 81:2
156:2 188:21 214:17
238:17 302:6

**client** 74:5,10 75:19
269:9,13

**clients** 195:8 209:2

**Cliff** 276:2

**clock** 46:25

**CLOS** 253:19

**close** 229:10,19,21
230:2,23 232:8,20
233:3 298:2,12

308:24 372:10

**close-end** 275:6

**closed** 281:3

**closed-end** 281:10,
15 282:7

**co-invest** 127:13,16

**co-obligor** 305:22

**code** 101:21

**collect** 54:3

**collectability** 253:18

**collectively** 33:2
54:12

**colloquially** 366:5

**combined** 233:18

**comfort** 159:22
193:25

**comfortable** 90:9

**command** 297:25

**commenced** 53:25
54:11 181:22

**commencing**
203:20

**comment** 252:23
367:22

**common** 299:4,5

**communicate** 64:3

**communicated**
114:9 211:15,20
254:21 292:17
319:19 368:8

**communicating**
365:13 366:3

**communication**
87:6 207:23 350:8

**communications**
66:19 71:13,14
116:16 322:7 367:14

**comp** 78:10

**companies** 42:7
285:17

**company** 27:9 29:25
31:7 247:8 273:18,

20,21

**compared** 12:21

**comparing** 118:24

**compelled** 81:8
371:22

**compensation**
125:14 281:3 318:14
366:24 367:19,24
386:11

**competent** 88:20

**complaint** 5:15
140:4 208:17,22

**complaints** 322:2,4,
8,20

**complete** 112:19
208:16 221:10,13,18,
19,20

**completed** 132:24
178:8 200:7 219:7,
10,13,16

**completely** 13:4,7
205:5

**completeness**
97:22 98:5

**complex** 253:19

**compliance** 148:3,4
184:22,24 193:17
280:8 294:18 295:21
296:4

**complied** 373:3

**component** 119:17
120:22

**compose** 348:22

**conceived** 232:17

**concept** 52:24
201:20 390:10

**concern** 105:8
122:13

**concerned** 35:25
112:23 235:20,24
241:22 370:2

**concerns** 112:15
113:3 114:6,25
117:23 236:2

**conclude** 108:17
310:9

**concluded** 395:11

**conclusion** 42:20
43:9 44:18 45:5,9,17
46:11 47:21 48:4,17
49:2,14 55:21 107:5
126:4 142:7 143:16
153:13 154:9 157:8
212:25 263:5

**conduct** 85:24
169:10

**conducted** 86:14

**conference** 8:17
323:24 343:23,24
344:11,13

**conferred** 98:8

**confers** 143:20

**confirm** 96:14 98:16
108:23 141:13 143:4
214:3 270:6 319:3,20

**confirmation** 103:21

**confirming** 98:23

**confused** 78:11
317:13

**connection** 16:11,
16,19 48:15,23 50:15
93:13,14 95:5 96:9
125:25 149:3 160:11
175:9 179:19 184:5
199:22 367:5 374:8

**consequences**
357:4

**consideration**
306:18

**considered** 274:9

**consisted** 59:21

**consistent** 394:17

**consolidated** 5:18
6:2 105:17 110:2,5,9,
17 113:13 135:20
137:16 218:19
253:21

**constitute** 110:7

**constituted** 109:19

**consult** 94:12,17
351:21

**consultation** 318:12

**consulted** 274:9

**contend** 65:6 168:4

**contends** 168:3

**context** 41:21,22
58:13 124:18 136:21
168:20 170:4,9
189:18 367:12
386:23

**contexts** 41:15

**continue** 209:4

**continuing** 203:20

**continuous** 19:4

**contract** 278:15,22

**contracted** 330:18

**contracts** 15:9,11
249:22 288:17
325:12,14,17 326:6

**control** 90:3,5,9,14,
20,25 101:4,9,24
113:6 137:17,20
207:21

**controlled** 15:6 16:8
17:24 42:8,16,25
43:3,14 101:16

**controller** 291:13

**controls** 43:5,6
112:16

**conversation** 58:23
59:5 73:18 74:2 78:9
113:16 114:16 124:8
145:7,14,21 148:17,
20 164:23 166:2,9,
11,19,23 187:14
190:23 194:8 207:13
233:21 234:25
235:13,18 246:14,18
252:10,12 255:14
282:25 283:4 296:3,4
318:9 319:16 342:4,
20 348:15 350:8
363:5 365:3 367:3,4
381:8 383:11 386:18,
20 389:22 390:24
391:17 392:24 393:2

**conversations**
66:16 74:21 113:22
115:9 124:11 206:11
233:25 289:4 368:13
380:6 393:10 394:3

**conversion** 125:12,
14 131:23

**convert** 281:9 282:6

**converting** 275:5

**convey** 208:6 389:20

**conveyed** 343:15,25
344:4

**conveys** 193:15

**copied** 183:3

**copies** 13:11,16
142:12 149:8 298:7

**copious** 324:16

**copy** 92:13 148:24
197:23 200:18

**corner** 198:6

**corporate** 41:2,5
54:25 87:11,14,16
112:10,11 116:12
148:23 149:2,14
150:14,19 172:20
188:11 200:17
230:16,17,21 257:22,
24,25 258:11,13
337:7 370:14 378:15,
21

**correct** 11:16 18:10
19:8 22:16 24:7 29:3,
8 32:4,22 33:5 39:4,
12 41:3 43:24 45:2
50:24 55:19 59:18
69:24 74:12 79:24
84:11,18 91:23,24
93:15 95:7 100:4
109:17 110:19 112:8
115:4 117:17 120:21
132:8,24 133:7,11
137:3,8,22 142:5
143:9,14 149:4
150:9,16 155:7
156:13 160:17 161:9,
20,25 165:16,19,23
166:15 167:16
168:11 175:24 179:9
185:23 186:5,6

**conversations**
66:16 74:21 113:22

187:3,4 201:4,9
204:20 205:24 206:6
211:25 214:21,24
218:4 223:7 242:18,
23 243:2 256:2,5,10
257:5,19 258:2,6,8,
14 259:2,6,7 262:8,
17 263:7,10 264:20
269:25 270:14 290:8
301:9 307:12 310:18
311:3 316:10,19,22
332:18,19 346:2
359:17 371:21 375:2
382:3 383:8 384:7
388:18,21 393:22

**correction** 384:5

**correctly** 138:7
175:20 289:17
305:14 375:18

**cost** 279:17 325:23
379:20

**counsel** 9:2 66:17
73:13,14 74:15,21
140:10 150:2 164:7,
16,20 187:22,23
254:18 322:7,9,12,
19,22 351:18,21

**counsel's** 151:16

**Counselors** 7:4

**couple** 17:5 100:9
314:6 351:12 352:12
384:15 386:6 393:17

**court** 8:13,24 10:10
12:10 209:5 213:23
215:13 226:16 237:2,
24 244:6 245:22
254:16 256:21 268:8,
18 301:20 311:11
313:3 343:3 376:8

**courtroom** 7:18
156:19 157:23

**cover** 105:16 294:12,
24

**cover-to-cover**
208:22

**covered** 67:4 189:7
191:13

**COVID** 207:16,17
219:19 299:6 321:2

323:2,3,5

**COVID-19** 7:7 8:18

**CPA** 22:13

**crafted** 178:6

**crash** 265:11

**craziest** 157:5

**crazy** 264:2

**create** 257:18

**created** 199:10

**creditworthiness** 303:19

**Crescent** 294:10

**CRO** 254:13,14 256:25 257:7

**cross** 305:17,21

**crossing** 295:24

**culmination** 145:8 250:4 274:20

**cure** 345:4

**cured** 363:14,19

**curing** 365:16

**current** 86:13 158:9

**curse** 394:15

**cursed** 394:14

---

**D**

**D.C.** 162:20 164:6

**daily** 219:20

**Dallas** 3:16,24 4:8 8:14 9:20

**damages** 385:17

**Dandeneau** 3:12 7:23 9:8 13:10 14:25 16:9 17:7,18 20:4,20 22:14 25:15 31:16, 20,24 33:9 34:20 36:8,12 40:10 41:4, 12,24 42:11 43:17 46:18 47:3,7,12 50:7 52:8 53:18 54:8 55:10 56:11,25 58:25 59:19,25 60:7,15

61:12 62:11 63:13,24 64:19 65:12 66:14,24 67:17 69:5 72:15 73:12,21,24 74:8,12, 17 75:6,10,13 77:9, 14,21 79:4,14,20 80:12 82:5,11,24 83:25 85:15 86:2 91:4,8,22 92:11 94:3 96:11,20 99:17 104:25 107:15 108:5 110:11 111:24 112:20 113:20 114:20 115:5 117:6, 18 119:12 120:16 122:10,16 124:6,23 127:19 132:16 134:8 135:8,18 143:10 144:8 146:20 149:5 150:10,17 151:13 153:18 154:14 155:11,18,20,23 156:10,16 157:2,6, 11,15,24 158:15 159:17 160:3,12,18 163:24 167:5 168:8 177:15,20 178:20 180:3,11 181:5,11 183:15 184:6,20 185:2,18,24 193:21 194:5 195:21 196:13, 18 200:20 203:23 205:3,15,25 206:21 208:10 210:24 211:4, 13 212:22 213:11 216:2,9 220:10,15 222:13 225:10,24 228:9 229:24 231:18 234:6 235:23 236:10, 18 239:3,14,22 240:16 242:24 246:19,25 247:14 250:11,22 251:3,12 253:12 254:6 255:12 257:6,20 260:14 263:8 265:4 266:3 269:10 285:23 286:7 295:11 298:6 299:15 302:25 305:10 307:2 312:18 317:23 333:20 336:14 338:5 339:20 341:2 347:21 348:11 349:11,17,18 350:3 352:18 375:22 376:5 379:10 394:10

**data** 311:24

**date** 18:13,18,20 21:10 56:18 70:12 84:11 98:18 103:14 104:4 106:4 131:11 133:2,12 136:10 186:15 226:7 235:10, 14 239:17 241:20 262:15 263:20 310:15 314:22 315:6, 7 323:8 326:8 329:18 332:2 356:24 369:13 372:6 386:5

**dated** 92:2 106:10 132:20 142:18 152:17 200:3 203:2 213:18 216:16 220:14 228:3,23 258:20 262:23

**dates** 30:17 178:8 321:14 326:7 355:25 357:11

**Dave** 87:20 172:6 230:19 292:3,4,11

**David** 124:9 275:23 389:9

**Davor** 3:20 9:19 178:10 266:15,17 304:8 336:15 387:14, 16

**day** 106:10,13,16 134:20 187:8 226:4 321:23 329:21,23 332:4,10,11 342:16 343:24 350:12 353:5 395:17

**days** 71:12 356:9

**DDP** 349:23,24

**de-accelerate** 344:24

**de-accelerated** 345:18

**deadlines** 86:9 379:2

**deal** 74:25 219:18 224:14 286:11

**deals** 373:19

**Deb** 151:7 349:10,18

**Deborah** 4:4,18 9:8, 12 10:2,3 349:18

**Debra** 3:12

**Debs** 349:20

**debt** 333:9

**debtor** 240:8 245:15, 25 255:17 270:14,21 271:2,6 278:16,17 279:6 280:21 310:18 325:13,14 326:14,22 327:15,20 331:3 333:7,15 335:2,8 336:22,25 350:22 364:18 372:20 373:3, 15,16,18,25 374:9, 15,16 376:13 380:9 383:14 388:10,12

**debtor's** 233:7 239:12,19 240:15

**debtors** 374:21

**debtors'** 337:24

**debts** 302:23

**decade** 95:19 231:22

**decades** 95:21

**December** 59:9,12 105:18 109:14 119:21 202:19 203:8 218:21 219:7 221:15, 21 242:17 258:21 263:14 326:4,11,12, 14 327:4,9 330:15 332:11 334:15 338:15,24 341:9 343:2 346:9,21 359:3 360:17,19 361:6,24 364:4 382:23 388:4 390:6,16,17,24 391:13,23 392:4 393:11

**December-ish** 390:16

**decide** 254:25

**decided** 245:5 318:13 380:22

**deciding** 56:13,17

**decision** 121:24 122:2,21,22 245:2,8 340:9 382:20,21

**decisionmaking** 254:14

**declared** 182:7,12

**deduce** 309:23,24 310:6

**deemed** 53:2 94:19 109:9,10 113:11 131:6 244:16 245:24 246:6,16,24

**default** 182:7,12 341:6,7,10 345:5 346:9,20 347:6 363:9,14

**defaults** 365:17

**defendant's** 214:18

**defendants** 81:14

**defended** 11:14

**deferral** 200:23 201:4,7,21

**deferred** 203:3 366:23

**define** 32:9 33:21 101:6

**defined** 33:13 45:13 51:17 53:13 54:2 99:15 173:2

**defining** 44:16 69:8 109:21

**definition** 42:24 43:2 53:16 54:18 69:15 75:20 77:6 100:25 101:9,13 104:6

**degree** 245:20

**degrees** 22:7

**Deitsch-perez** 4:4 5:8,11 9:12,13 10:2 17:8,13 29:20 42:12 46:12 50:5 60:16,24 64:17 65:19 66:10 67:9,24 69:6,10,13 76:15,17,21,24 78:19 79:25 81:16,20,22,24 97:4 107:16 115:6 117:7 119:13 120:17 144:25 146:12 147:4, 11 148:12 149:21 153:19,25 154:7

159:25 160:19 177:6, 17 178:3 180:4,12 191:4,22 194:6,22 195:22 196:4,11 202:24 205:16 206:7 208:11 209:8 212:12, 20 214:9,13,16,22 215:5,11 216:11 220:25 227:21 231:8 232:9 238:10 239:20 242:25 247:15 248:2, 8 249:4,17 251:10 252:6,9,20,25 254:7 255:10,22 256:17 262:18 301:19 324:24 336:15 348:9, 23 349:21,24 352:6, 11,20 353:2,17,23 375:22 376:4,9 377:3 381:13 384:12 386:13 387:10,14 393:17,20

**Delaware** 254:16

**delegating** 254:13

**deliver** 50:14 230:22

**delivered** 178:7 235:20

**delved** 251:19

**demand** 121:11,17, 21 122:4,7,9,15,19, 23 123:23 124:4 134:13 140:17 142:21 182:15 186:18 187:3,17 198:21 199:6,11,19 200:14 202:18,22 205:19 209:25 210:7, 23 212:18 301:17 313:16 314:8 315:2,8 316:6,17,18

**demandable** 316:19

**demands** 122:14 364:13

**department** 146:10 147:3,10

**depend** 356:5

**depended** 356:6,16

**depending** 87:4 164:4 383:15

**depends** 41:20 57:15 279:2

**depo** 260:16

**deposed** 11:9,12

**deposition** 7:11 8:10,16 11:2,15,18 12:7,15,22 16:15,23 33:23 72:21,23 73:10,15,20 74:6 76:8 77:12 81:3 123:17 151:6,9 215:6 227:15 266:21 267:4, 13 365:20 373:2 375:25 376:19 388:23 395:8,9,11

**depositions** 11:19 12:19

**derived** 16:6 17:23

**describe** 56:4 84:3 111:21 326:15 353:7 358:3

**describing** 125:17 126:2

**description** 108:21, 24

**desk** 293:9,10 295:25

**detail** 107:7 120:25 153:8 159:20 222:22 229:14 278:11 300:6 311:18 351:19 369:20

**detailed** 122:20 132:12 179:23 224:9 230:7 260:5 276:18 370:16 389:8

**detailing** 294:14

**details** 77:24 78:7,12 80:8 84:7 104:16 131:25 286:3,22 299:12 300:8 342:12 343:7

**deter** 376:18

**determination** 41:25 42:4 261:18,19

**determine** 53:19 82:19 83:6

**determined** 261:16

274:7 276:7

**detrimental** 275:11

**development** 347:13,18

**deviate** 264:25

**dictate** 90:10

**differ** 263:15

**differentiate** 268:14

**differently** 96:5

**difficult** 145:12 205:19 207:18 222:25

**diligence** 85:5,8,13 169:11

**direct** 113:22 253:6 304:19 322:10

**directed** 57:17

**direction** 237:6 254:25 258:2 393:22

**directive** 383:7

**directly** 15:5 16:7 17:23 19:8 42:7,15 43:14 88:2 177:11 219:2 354:9

**director** 23:6 32:15 39:25

**directors** 15:22 72:7

**disagree** 318:5,16, 21 319:2

**disclosable** 131:7

**disclose** 46:7 47:17 52:11 53:10 88:13 91:12 94:6 99:14,20, 23 103:2 111:21 112:3 113:8 179:12 210:12,15 242:21

**disclosed** 48:7,9 52:19 53:4 93:24 94:18 102:3,7,13,18 103:8,10 113:12 117:13 130:10 133:21 134:3 138:8 190:25 212:4

**disclosure** 100:12 134:12,16 185:15

191:20 211:21,23 262:11

**disclosures** 91:2 94:16

**discovery** 81:4 196:21

**discuss** 99:3 124:2 148:18 201:18,20 322:14 342:7 343:22 345:7

**discussed** 26:18 73:23 74:11 80:14 107:9 114:25 192:12 193:23 227:12 234:4 272:20,23 275:3,4 294:5 300:11,13 371:15 383:22 390:9

**discussing** 117:25 148:22 180:8 191:6 217:18 234:9,15 300:17 319:7 341:6, 8,22 346:4 388:13,15 391:6

**discussion** 164:4,9, 12,17 180:19 191:9 217:21 246:4 249:24 251:20 282:18,21 290:6 319:13 342:15 387:22 388:8 392:11, 21 395:3

**discussions** 58:20 233:6,15 249:11 250:4 251:13,19 253:17,20,25 263:25 264:14 274:5 275:17 280:18 367:19 387:4

**dislocation** 371:16

**displeased** 362:15

**dispute** 61:7,10,13, 16

**disputes** 16:16

**distancing** 7:9

**distinction** 23:25 52:3 164:19

**distinctions** 33:17

**distinctly** 392:4

**District** 8:13

**diversion** 208:16

**divided** 110:14 239:24

**Division** 8:14

**docket** 215:4 255:18

**document** 13:3,6 91:19 92:5 96:3 103:18 104:23 105:5, 10,16 136:11 139:22 140:8,12 141:4,10,16 144:3 147:16 151:22 153:6,15,22,23,24 154:5,11,18,24 155:3 156:24 159:21 197:13,14,16,17,25 198:12,15,17,23 199:3,4,10,14,17,25 200:3,18,22 201:3,6, 15,18 202:4 203:2 209:14,16,22 210:12, 15 211:24 212:4 213:21 214:3,6,12, 15,17,20,24 215:7,13 216:7 226:10,25 227:8,19 228:6 236:16,19 237:18 239:17 244:5 256:5,9 293:21,22 301:16 302:12 303:7 305:12, 21 320:14,16 338:14

**documents** 12:24 13:12,14,16,19 25:5 123:15,17 126:19 140:10 143:24 147:20,25 149:12 153:8 159:15 197:2 227:13 235:19 236:25 266:19 267:3, 7,9,14,18 291:9 294:2,4,6,8,11,14,17 296:21,22 322:11 364:18 377:10

**dollar** 253:21 288:12

**dollars** 253:24 260:19

**Don-** 68:19

**Dondero** 4:2 9:14 15:6 16:8 17:24 19:8, 12,25 20:9,13,18,24 21:4 42:9,17 43:15, 24 44:3,5 50:11,14,

21,25 51:6,12 54:15,
17 55:2,7,11,19 56:2,
16,24 57:20,24 58:9
59:6 60:11,14,20
61:4,5,8,21 62:3,9,20
63:4,7,11 64:4,7,9,
10,13,16,21 65:3,5,9,
10,17,18 66:6,7,8
67:7,23 68:19,25
71:13 75:25 78:16,18
80:15 82:16,21,23
91:3 92:5 94:20 98:8
99:4,6,10,13,20,23
101:17 107:3,13,21
108:3,19 117:25
118:7 123:3 124:2
145:5,7,14 148:9,14
189:9,16 190:10,13,
17,25 191:3,9 193:20
194:19 201:14,21
205:9,14,24 206:6,
11,15,24 208:5,8
225:7,14,21 232:18
233:9,24 234:11,16,
22 235:5,7,9,22
236:9 239:2,5 241:8
242:8 243:8 262:6
263:6 271:25 273:2,5
275:25 280:19
282:16,22,25 283:14
284:4,18 285:3 287:5
288:24 289:4 290:6
300:11,24 301:16
303:16 317:5 318:3,
9,11,16 319:4,8,20
320:3 335:17,23
336:6 341:7,9 342:15
343:15,22 344:2,12,
22 350:6,11 362:10
363:6,19 365:3
366:2,20 368:11,22
381:9,10 382:12,18,
22 383:8 384:6,10
386:7,17,20 387:23
388:9,14 389:2,21
390:4,25 392:4 394:6

**Dondero's** 57:13
62:4,10 63:23 144:23
206:15 217:11
350:15

**doubtful** 244:9,17
245:25 246:7,17,23,
24 247:12,25 249:2
250:10,14 251:8,22
253:10 254:3 255:8,

15

**draft** 145:25 146:4
147:10,20 149:17
176:4 182:24 213:17
290:7,12,16 291:4,9
294:17 305:11,14
319:14

**drafted** 145:23
146:10 147:2,25
290:24 305:13
319:18

**drafting** 115:20
116:5 146:7 213:12,
13

**drafts** 230:22 322:3,8

**dramatically** 264:17

**Draper** 4:12 9:17

**driver's** 21:25

**dropped** 294:8,11,14
295:4

**DSI** 72:3 166:12
237:9,12 245:9,21
247:4 249:10 250:8
251:7 252:10 253:10
254:5,11,16,19,22
255:8,14,25 257:15,
18 259:12 309:21
312:7,11,21,23 313:5
348:3

**DSI's** 256:6

**Dubel** 233:21

**due** 7:7 8:18 50:3
55:17 56:18 58:2
59:15 63:10 106:21,
25 108:14 109:7,18
110:6 111:2,5,9,12,
23 112:18,24 113:19
114:19 115:3 119:3,
10,22 120:20 121:4
161:9 162:6 163:22
165:11 167:11 168:5
171:12 174:15
175:12 176:9 190:6
194:4 203:19 204:12,
16 205:2,13 208:8
211:12 212:10,11
220:23 223:6 234:23
240:10 259:19
260:11 262:7 266:24
271:21 274:14 275:7

335:12 337:3,25
338:24 347:8 355:25
356:22,24 357:11
359:2 360:16,17
361:24 364:3 377:12,
23 379:8 381:23
382:10 383:19
390:10 391:24

**Dugaboy** 4:10 9:18
42:23 43:6 65:11
100:18

**duly** 10:12

**dump** 267:3

**Dustin** 183:2,23
184:7

**Dustin's** 183:10

**duties** 25:17,19,22,
25 28:10 30:25 31:4
38:20 219:20 292:4

**E**

**e.g** 171:13

**earlier** 84:5 86:18
93:12 100:3,5 119:3
130:9 131:18 134:11
136:2 148:21 155:5
162:14 179:7,16
183:12 195:24
206:18 211:15
217:14 218:8 222:19
243:10 259:10
261:21 263:21
269:24 282:24 283:6
289:4,15,20 290:12
302:11 309:11,20
312:20 316:10,13
318:8 325:12 334:6,
14,20 337:18 351:2
357:8 362:25 368:24
370:8,18 371:15
378:5,20 379:4
380:12

**earliest** 314:8 316:6

**early** 19:5 173:17
231:22 254:20 323:6
340:21 341:5 344:17
365:20 388:4 390:17

**earth** 251:23

**easier** 305:5 373:13

**East** 8:23

**easy** 265:15

**educate** 204:9

**educated** 120:10

**education** 21:23
22:7

**effect** 282:16 294:25
344:23 345:4,17
346:11 351:13 363:8

**effective** 152:18,24

**effectively** 329:25

**effectuate** 57:8,12
63:22 360:15 382:9

**effort** 83:5 376:12,17

**efforts** 188:16

**eight-figure** 389:18

**elaborate** 26:12
281:4

**electronic** 299:2
320:15

**electronically**
298:21 299:23
320:14,17,23

**element** 365:23

**Ellington** 14:20,22

**email** 5:21 6:11 68:6
70:3 170:23 171:3,22
172:3 174:5 182:20
183:3,22 185:25
187:20 194:10
198:18 206:9,23
207:2,4,5,25 290:19,
25 291:4 292:16
293:14,22 294:2
307:23 313:11
316:22 320:24 321:3
329:6 330:7,13
331:11 332:3 341:17
342:3,7,13,23 350:14
387:11 392:22

**emails** 6:7,8,9
227:13 236:13
299:25 300:7,9
328:15 379:12

**Emanuel** 4:19 10:4

**employed** 14:2,6
23:3 27:15 30:7
32:10 34:7 89:21
240:25 322:9 330:14

**employee** 24:4
28:20,22 51:22 52:6,
17 70:24 71:7 72:12
115:22 172:17
184:21 325:19
388:12,16

**employees** 15:15,
19,23 39:12,19 40:6,
8,12 51:24 52:14,25
57:8,17 86:13 93:22
167:2 237:12 327:15
331:2 333:7,16
334:25 335:8 337:24
346:25 350:22 354:6
369:12 381:22 382:2,
5,8

**employment** 71:19
165:2,3 166:4 167:3
285:25

**enabled** 360:22

**encompass** 379:13

**encourage** 13:18
17:12

**end** 46:19,20 86:17
103:12,13 104:5
109:20 118:10 131:4
145:13 148:13 187:8
203:7 214:12 220:19,
22 221:6 222:12
223:4,14,17 224:13
242:23 262:15 265:3
293:3 326:11 329:18
348:16 352:7 367:23
379:16 380:9 381:23
382:10 383:20

**ending** 93:14 105:18
135:21 218:21 219:7,
16 221:15,21 242:17
258:21

**ends** 395:7,8

**enforced** 231:12

**English** 284:11

**ensure** 98:4 330:19
331:3 333:16 346:12

348:4

**ensuring** 327:20

**enter** 122:21

**entered** 67:7 68:25 104:14,19 122:6 124:5

**entire** 19:7 192:13 253:19 264:4

**entirety** 130:12,15

**entities** 16:7 17:23 43:13 44:3 54:21,25 55:4 101:8,15 189:8 278:2 289:19 330:13 361:13 394:4

**entities'** 265:12

**entitled** 41:8 82:7 110:25 157:16

**entity** 15:5 22:20,25 27:18 31:11,23 32:3, 6,11 42:14 109:24 137:13 272:3 289:23 302:22 307:8

**entries** 240:19

**entry** 131:10 308:3, 14 311:9 332:23

**environment** 90:3,5, 9,14,20 113:6 137:18,20

**environments** 207:21

**equal** 49:11 50:23 262:7

**equaled** 263:7

**equals** 119:6,9

**equity** 273:18 281:25 282:3

**erroneously** 197:22

**error** 125:6,9 131:17, 24 132:3 145:8 165:9 213:12,14 214:5 273:11,14 275:14 276:8,25 277:5 278:5,15 280:12,22 283:3 289:6 318:15 385:9,14,19,23

**errors** 163:21 167:14 373:10

**Esq** 3:6,7,12,13,20, 21 4:4,5,11,18

**established** 94:2 285:14,20 300:25 301:7 310:16

**estate** 31:12,17 235:11,15

**estimate** 20:12 372:4 389:3

**et al** 5:15

**evaluate** 170:12,14

**evaluated** 244:10

**evening** 353:3

**event** 131:2 134:22 138:9 143:9

**events** 103:13 125:16,25 130:4,10, 21 133:8 138:5 242:22 262:14 263:4 370:24 371:7,9,13

**exact** 15:24 17:25 18:13,18,19,22 20:5 30:17 131:20 156:21 274:13 277:17 278:10

**EXAMINATION** 5:6, 7,8,9,10,11 10:14 266:13 352:25 377:5 387:19 393:19

**examined** 298:19

**exceed** 121:12 190:2 195:19 196:3

**exceeded** 93:25 194:2 196:9,17 204:19 211:3 301:9 303:9 307:9

**Excel** 368:19

**exceptions** 231:2

**excerpts** 238:16

**excess** 94:6 121:12 389:13,14

**exchange** 45:15 212:17 281:17,23

**exchanged** 45:21

**exchanges** 281:17

**excuse** 14:25 35:23 201:2 249:18 280:9 323:13 395:8

**execute** 48:14,22

**executed** 49:21 142:10 161:12 221:6 274:2 293:14 303:7

**executing** 317:16

**execution** 181:9 300:14

**executive** 35:10,11, 16 36:20,24 37:5,18 38:3,4,9,14,16,21 39:3 78:10 366:24 367:18 386:10

**executives** 369:3

**exhibit** 5:15,16,18, 20,21,22,23,25 6:2,4, 7,8,9,10,11,12,13 13:13 91:20,21 104:23,24 135:8,14, 15 140:12,13 142:15, 16 151:20,21 170:18, 19 197:3,9,15 198:2 214:7 215:22,23,25 216:3,4,5,7,8,12 218:13,16,17 226:23, 24 236:16,23 237:19 258:18 297:23 302:7, 8 303:14 305:5 306:7 307:18,21 309:2,6 313:9 317:12 328:10, 12,13 338:13,21 341:13,14

**exhibits** 267:10,11 268:9

**exist** 15:12 16:17 114:22

**existence** 67:15 69:18 80:16 81:6 99:14,20,24 102:3

**exists** 278:13

**expanding** 354:25

**expect** 247:19 293:19 333:15

**expectation** 231:5

**expected** 200:17,21 293:21

**expects** 203:18 212:9

**experience** 101:14 111:16 116:14 169:10 256:25 257:8 259:13 315:5 337:22

**experienced** 47:13

**expert** 43:5 143:19 153:7 183:9 257:14

**explain** 356:18

**explained** 364:17

**explaining** 163:15

**explanation** 308:20 311:8

**expressly** 390:4,25 391:12 392:5

**extended** 301:17 308:21 314:22

**extension** 307:8

**extent** 45:17 55:21 66:15 107:5 126:4 208:6 244:15 296:6 322:6

**extra** 219:23

**F**

**face** 50:23 120:11 144:16 244:3

**face-to-face** 293:8 294:5

**facilitated** 321:10

**fact** 62:7 192:20 236:21 264:24 266:25 275:7 298:4 301:15 313:19 334:22 338:23 341:10 343:19 363:12 394:5,7,17

**facts** 111:22 240:6 261:25 265:8 375:17

**factual** 164:9

**fail** 12:3 348:5

**failed** 338:23 340:2

**fair** 11:23 19:24 44:14 49:7 52:4 93:17 99:13 110:21 118:11, 21,24 119:6,8,9 120:3,15 121:5 126:8,21 141:18 143:23 149:20 224:6 239:16 240:18,21 241:17 242:6 243:5 244:13,20 245:19 260:10 261:15 262:7 263:5,15 264:25 287:21 370:21 371:18 372:5 374:10 390:2

**faith** 189:8,15 190:9, 12,19 191:3 193:19 194:20 205:8,14,23 206:14,23 208:5

**familiar** 22:20 31:22 32:3 54:6,9 226:13 227:8,18 274:6

**fashion** 86:11 276:16 357:14

**fault** 229:17 276:24 277:19

**favor** 60:6 62:19 139:17 161:24 261:9

**feature** 301:17 315:8

**February** 70:21 226:3,4 228:3,23 323:9

**Federal** 7:19

**feel** 81:8,18 176:25 273:13 287:16 371:21 376:11,16

**fees** 332:12 356:21, 23

**fide** 369:25

**figure** 343:10 366:12 367:5

**file** 167:8,13 297:2,10 337:8

**filed** 21:6 197:17 208:18 213:23 215:13 219:23

226:16 237:2,24
238:4 244:5 255:17
263:17,19 311:10
322:2,4,16,21 375:20

**files** 312:23 372:21

**filing** 45:25 240:4,17
246:3 249:9 256:20
264:15

**filings** 237:14

**filled** 257:13

**finalized** 88:7 89:12
230:23

**finance** 25:21 26:2,4,
8,17 28:15 38:23
127:25 128:16 129:6
280:7 290:14 351:3

**financial** 5:18 6:2
14:12 26:24 27:5
41:7 48:2 84:17,23
85:3,13,19 88:11
90:2,7 93:24 95:14
96:7 100:12 102:7,
10,12 104:21 105:17
107:22 112:2 113:7,
14 114:18 120:8,18
122:11 130:23
133:22,25 135:20
138:3,4,9 143:8
176:21,24 179:16,23
180:15 196:22 201:8
211:7,21 217:24
218:3,19,24 219:6
221:14 222:24
224:10 235:17
241:24 242:3,15,16
254:9 258:25 260:3
261:20 262:5 264:11,
13 270:10,14 271:2
286:18 301:11
302:19 306:4 311:25
312:5,6 370:9,12,17
378:24

**financials** 6:5
137:16 168:19 176:8,
16 179:8 186:15,16
187:2 189:23,25
200:10,12 218:12
241:13,15,21 242:2
246:9 247:5

**find** 53:23 268:10
283:17 315:4

**fine** 36:8,9 45:10 84:8
154:12 269:16 287:2
353:24

**finish** 11:21 12:2
76:18,24 249:19
295:11

**fired** 388:9

**firm** 10:21

**fiscal** 103:14 104:6
131:4

**fit** 42:24

**flip** 331:8 332:20

**fluctuate** 93:10

**fluctuates** 94:10

**focus** 242:14 313:3

**folks** 46:15,24 87:25
152:10 197:23 293:5
321:15

**follow** 61:17 151:15
391:18

**follow-up** 171:7

**footnote** 244:8
260:20,23 261:15,17
371:22

**footnotes** 261:17
263:11

**forbearance** 134:5,
16

**forgave** 49:23 51:23
52:12 93:20

**forgivable** 369:2

**forgive** 51:10,15,20
52:5 284:9

**forgiven** 52:18 53:11
94:11 366:23 367:23
369:13

**forgiveness** 52:22
93:23 94:8 365:23
369:16,20,24

**forgot** 282:8

**form** 20:4,20 22:14
25:15 29:21 31:16
33:9 34:20 40:10
41:4,12,24 42:11,12

43:17 50:6,7 52:8
53:18 54:8 55:10
56:11,25 58:25
59:19,25 60:7,15,17,
25 61:12 62:11
63:13,24 64:18,19
65:12,20 66:11,24
67:10,17,25 69:7
75:6,10 78:20 79:4,
14,20 80:2,12 82:24
83:25 85:15 86:2
91:4 94:3 96:11,20
97:5 99:17 107:15,16
108:5 110:11 111:24
112:20 113:20
114:20 115:5,7
117:6,18 119:12,13
120:16,17 122:10,16
124:6,23 127:19
132:16 133:23 134:8
142:5,7 143:10 144:8
145:2 146:13 147:5,
12 149:5,22 150:10,
17 153:18,19 154:2,4
155:11 156:17
158:15 159:17 160:2,
3,12,18,20 167:5
168:8 178:21 180:3,
5,11,13 181:5,11
183:15 184:6,20
185:2,18,24 191:5,23
193:21 194:5,6,23
195:21,22 196:5,12,
13,18 200:20 201:25
202:25 203:23
204:14,23 205:3,9,
11,15,16,25 206:8,21
208:10,12 209:9
210:24 211:4,13
212:13,21,22 213:11,
25 220:10,15 221:2
222:13 225:10,24
227:22 228:9 229:24
231:9,18 232:10
234:6 235:23 236:10
238:11 239:3,14,21,
22 240:16,23 242:24,
25 246:19,25 247:14,
15,16 248:4 249:5
250:11,22 251:11
253:12 254:6,7
255:11,23 256:18
257:6,11,15,20
260:14 262:19 263:9
265:4 269:7 270:15,
22 271:8,18 272:9,17

273:7 277:22 278:19
279:8 280:15,23
283:19 284:7,14
285:7,23 286:8,9
287:9,18,24 288:8,25
289:12 290:9,21
291:23 292:19
293:15,23 296:13
297:6 298:22 299:15
300:15 302:2,25
303:2,10,20 305:10
306:15,24 307:3,13
310:2,11,19,24
311:12 312:16,19
314:14 315:9,23
316:23 317:17,24
318:6,17,23 319:23
320:6,18 322:5,23
326:24 327:6,24
330:21 331:5 333:10,
18,20 334:10 335:4
336:14 338:3,5
339:16 340:18 341:3
342:21 345:12,19
346:22 347:14,19,21
348:10,11,12 351:15
353:11,15 354:4
355:5,9,15,21 356:3,
14 357:6,15,22
358:16,22 359:4,11
360:3,11,25 363:16,
22 364:10 365:6
366:15,25 367:16,25
369:4,8,17 370:3,25
371:10,25 372:22
373:4,20 374:11
375:3 376:20 379:10
380:25 381:14
384:13 386:14
388:19 389:5,15
391:4 393:24 394:10,
11,19

**formal** 231:20

**format** 293:14

**forms** 257:13

**formulating** 184:3

**formulation** 386:24

**forthcoming** 335:18

**forward** 79:17
376:25

**found** 53:17 66:12
125:6 140:15 394:8

**Frank** 5:5 8:10 9:11
10:11,18 271:4 305:8
395:14

**frankly** 232:2

**Fred** 249:21

**Friday** 208:18
329:18,25

**front** 110:12 122:12
140:16 279:21 281:7
294:9 301:11 302:9
305:4 309:7 343:6

**frozen** 144:9

**frustration** 364:17

**full** 189:8,15 190:9,
12,19 191:2 193:19
194:19 205:8,14,23
206:14,23 208:5
241:15 372:20

**fully** 13:4,7 17:4
364:19

**fulsome** 265:8

**function** 26:8,20
28:16 87:3 89:4
351:3

**fund** 3:18 9:22 22:21
33:23 35:2,6,18,19,
21 39:7 42:22 44:7
58:15 125:2,3,6,7,10,
11 127:10,13 145:16
152:14 176:18
202:14 203:14
215:14 273:17,23
274:16 275:2,4,6,8,
10,13 276:7,9,10
277:5,9,21 279:19
280:2 281:2,9,10,11,
12,13,15,20,23,25
282:7 283:23 308:4
325:22

**fund's** 274:23

**funding** 202:8

**funds** 32:22,25 33:2,
4,8,12,15,16,18,22
34:5,8,13,18,23
35:12,15,17,18
36:21,25 37:4,9,17
38:2,5,10,17,22 39:4
145:15 160:8 168:10
171:15 173:2,6,10,

13,16,20,23 184:11
192:16,24 193:4,6,
11,16 253:19 277:4,8
281:15 284:5 285:3
286:17 287:5 328:5
332:7,12 360:9
361:6,11,13

**future** 171:12 174:16
175:13 185:17 337:4
369:13 371:7,9,13,20
381:17 388:23

**G**

**GAAP** 94:15 101:5,
16 109:10 130:21
131:23 241:13,15,20,
25 242:4,11 246:9
254:10 256:23
264:10 372:7

**gaming** 239:9

**garbling** 46:14

**gave** 45:14 57:11
149:2 197:23 205:6
215:10 312:21 343:9,
17

**gears** 321:25 324:20

**gen** 85:16

**general** 11:17 32:20
57:5 84:25 88:18
97:15,17 128:9,25
152:4,6,7,8 170:7
180:7 195:15 251:13
258:10 292:10 297:4
378:10 392:11

**generally** 54:9 61:2
62:14 64:2 80:23
84:24 87:6 89:7 95:8,
10,25 97:7 128:7,8,
19,24 129:8,13
162:2,3,8 170:6
180:14 187:19
189:20 192:11 194:8,
9,14 195:4 226:13
234:14 241:13
253:14,16,23 278:22,
24 279:3 290:2
297:16 311:3 333:25
334:2 337:4 356:12
357:13,18 358:20
366:7 372:18,24

379:11,12 387:2
389:10

**give** 12:25 20:11
35:5,9 38:15 45:4
49:6 51:7 86:15
96:15 97:17 116:14
117:4 123:12,13
150:8 159:22 163:17
193:25 235:25 236:6
267:8 300:8 348:21
356:9 357:9 372:9

**giving** 16:19 26:14
51:3 150:11 194:20
312:22 369:2

**Global** 35:18,20
124:25 273:17 281:8,
22

**go-ahead** 293:2

**goal** 295:19

**God** 156:19

**good** 7:3 10:19 72:16
118:5 156:19 248:11
251:3 324:22 353:3
385:5

**governed** 33:4

**great** 32:8 105:3
183:5 300:6 325:5

**ground** 11:17

**group** 14:5,7,24
15:4,14 16:14 29:23
146:5 148:24 149:2
150:15 154:19
172:13 258:13
290:16 291:9 292:2
294:18 295:9,13,22
378:16

**groups** 295:21

**grow** 88:23 89:4,9

**guess** 73:3 169:22
170:20 204:17
225:25 263:22
315:25 361:9

**guidance** 94:12,17
257:7,9,14

**guy** 25:21 81:19
88:25

**guys** 77:3 157:3

268:12

**H**

**half** 72:16 145:10
280:20 324:23
377:21

**halfway** 48:18

**hand** 361:6

**handle** 291:14

**handled** 147:18

**happen** 141:14
156:15 165:2,15,18,
22 168:25 248:21
265:14 284:13

**happened** 87:23
156:22 165:17
174:19 247:3,5
273:15 286:4 294:3
320:10

**happening** 165:21
231:6 242:10 382:25

**happy** 117:4 188:19
200:10 215:7 389:25

**hard** 13:11,16 104:11
123:16 197:23
286:19

**HARDD** 3:22

**Hardt** 3:22 9:20

**harmed** 276:16
278:5

**Harr** 9:20

**Hartmann** 3:13 9:10

**hat** 336:4

**Hatch** 7:4 8:21

**Hayley** 3:7

**HCFD** 332:6

**HCM** 42:22 45:5
156:12 354:13 355:7
360:23 362:7,20

**HCMA** 186:18

**HCMF** 30:10 43:12
180:22 303:18

**HCMF's** 303:18

**HCMFA** 5:20 6:2
22:25 23:3,6,11,16,
22,24 24:6,9,11,13,
15,21 25:2,8,14,18,
24 26:3,5,8,22,24
27:4,5 29:3,6 31:5
32:18 43:12 54:14
100:23 122:2,7,13
124:14,21 131:11
132:6 133:12,21
134:11,14 135:6,21,
23 137:22 138:8,14
139:18 140:4,21
141:9,16 142:2,24
143:18 144:22
152:24 153:17 155:7,
10 156:4,13 158:4,12
161:7,17 171:13
172:20 176:14
178:12 179:13
180:22,23 181:2,8,
14,15 182:8,17
184:25 186:9,18
187:3,17 189:14,24
195:19 198:21 199:6,
12,14,19 201:15
202:7,12,14 203:14,
18 204:2,11,24
205:7,19 210:2,7
211:10 212:9,18
213:8 218:8 221:20
241:23 242:6 267:24
268:21 269:2,5,25
272:5,6,15,24 273:5
275:16 276:23 277:3,
18 278:16,18 279:7
280:11,21 284:5
301:9 303:6 305:25
308:14,20 310:10,16
313:15 314:7 316:6
318:14 322:3 325:12,
18 331:13 332:5,17
370:20 384:18 385:7,
12,16 386:4

**HCMFA's** 26:10
121:12,21 122:11
124:3 137:3,10
138:3,19 143:8
196:16 202:14
204:15,19 211:2
303:8 384:21 386:2

**HCMLP** 5:18,22 6:12,
13 171:13 176:9

185:16 314:7 316:5
317:6 341:19 355:12,
18,20 356:2 357:3,
13,19 358:4,13,20,
21,25 359:2,8,24
360:17 384:19

**HCMLP's** 228:22
356:12

**HCMS** 4:3 9:15 30:4,
6,7,10,13,16,20,22,
24 31:3 43:12 44:8,9
54:14 65:6 100:24
128:23 129:2,4
353:9,14 354:6,20,21
355:8,13,19 356:2
357:21 358:15 359:2,
8 361:5,15,20,25
362:4 364:3,25
383:19,25 385:7
393:21 394:7

**HCMS'** 356:13
357:13

**HCMS's** 359:13,19

**HCRA** 4:2 9:15

**HCRE** 31:8,14,15
32:4,7,10,12,15
43:18 44:7 54:14
65:6 100:24 128:4,5,
11,14 353:9,14 354:3
357:20 358:4,14,21
359:23,24 360:17
361:5,15,19,25
362:2,5,9,22,25
363:4,20 384:3
393:21 394:7

**HCRE's** 360:5,9,14,
21

**head** 87:13,16 278:3
364:15

**headquartered** 8:22

**hear** 46:13,20 148:12
304:3 364:16

**heard** 27:9 29:25
31:7 74:22 77:25
78:21,23 79:6,7 80:4,
5,7,22 100:6 268:5
285:3 324:15 386:16,
19,22

**held** 8:16 27:20 30:9,
12 37:8 107:12

172:25 173:5 174:3
183:6 244:4

**Heller** 4:12 9:16

**Hendrix** 172:7
186:21 230:20 292:3
328:17,20 329:13
330:14 332:15
341:18,24 350:18
362:24 365:13
377:11,22

**hey** 45:3 188:6
266:17 312:24
351:14 365:4 391:23

**high** 126:25 238:2
279:11

**higher** 110:19

**Highland** 3:4,18 8:11
9:6,22 10:22 11:6
15:16,23 18:6,7,12,
25 20:3 21:6 22:21
30:2 35:17,18 39:10,
15,19,23,24,25 40:3,
4,7,25 41:18 42:6,10,
18,21 43:11,16,23
44:6 45:2,14,25 46:7
47:16 48:6,14,24
49:5,10,17,23 50:4,
10,14,16,21 51:6,10,
15,20,23 52:5,11,18
53:9,10,24 54:11
55:23 58:15,16,20
60:6 61:20 62:8,19
63:8,20 64:7 70:20,
24 71:7,10,18 72:13
78:18 84:22 85:2
86:13,22 87:8,18
93:20 94:5 95:13
96:7 103:2 105:17
107:12 109:22,23
110:8 112:8 115:21
116:4 118:23 120:8
121:16,20 122:23
123:21 124:13,20,25
125:3 126:11,23
127:2,16,25 128:5,
10,15,20,23 129:2,6
132:5 133:10,16,20
134:13 136:2 137:7,
11,21 138:8,11
140:21 141:9,18,23
142:25 143:7 144:23
145:17,19 146:5
149:19 152:13

160:10 161:8,24
165:7 167:3,9,14,15
172:14,17 175:13
176:15 178:19,23
179:13,22 180:2,9
181:21 182:2,6,11,15
186:9,11 198:20
199:5,11,18 200:13
201:15 202:7,12,13
203:13 204:12,16,25
205:13 209:25 210:6
211:9,11 212:8,11,16
215:14,17 216:22
218:8 219:21 220:19
222:2,17 223:5,24
225:9,21 226:2,3,9
227:5,20 228:8
229:2,6,9,21 230:3,
10 232:22 233:24
234:17 237:12,16
240:7 241:2,7 242:6,
9 243:4 244:4,22,25
245:5 247:7 248:23
253:18 258:10 259:2
260:4 261:9 263:17
264:18 267:7 271:2,
15,23 272:20 273:4,
16 275:16,21 279:18,
19,25 280:2,12,14,20
281:8,22 282:17,23
283:5,17 284:5
285:18 286:21 287:6,
15 288:7 289:7,8
290:16 297:3,16
299:24 302:20,24
303:6,17 307:7 308:4
313:6 318:10,13
319:11 320:4 322:10
323:8 325:22,24
329:3 330:16,19
333:22 338:17 339:3,
11,13,25 346:11,19,
24 347:12,17 348:2,4
350:14,20 353:7,8,13
354:2,6,19 359:16,
17,18,21,25 360:7,8,
13 361:19,20 362:4
363:4 366:4,14
367:10 368:4,6,25
369:11 370:13,19
374:9 377:13,23
379:19 380:3,24
381:12 384:21,22,23
385:8,13 390:11

**Highland's** 18:10,17
19:3 39:10,15 40:25

41:7 44:24 46:6
47:16,24,25 50:19
51:10,15,20 52:19
55:16 57:8,17 72:6
84:10,17 86:23 89:22
94:22 95:6 102:7,10
107:14,22,25 109:20
113:9 115:23 116:2,3
137:15 138:3 139:17
146:10 165:2,3 166:4
167:3 187:2 210:22
222:24 225:8,15,23
230:5 241:24 242:15
243:4 247:22 255:7
258:5 260:12 262:5
266:19 370:21 379:8
381:22,25 382:5,8

**hindsight** 265:6,11,
15

**hint** 346:15

**hit** 86:9

**hold** 21:12,16 23:5,8
25:13 27:17 34:15
37:3,15,16,21 39:6
163:12,25 167:12
184:9 192:15 193:9
199:13 212:24 308:5
329:10 387:12

**holding** 37:25

**holds** 184:14,18

**holidays** 329:23

**home** 191:17 207:15,
19 219:19 299:6,9
342:25 343:2 348:16
393:7

**honest** 144:3

**honestly** 78:4
198:22

**hope** 82:2 262:22

**hoping** 300:7

**Horn** 4:11,12 7:22
9:16,17 349:10,13,
22,25 392:15 394:25

**Houlihan** 273:23
274:3,10,25

**hour** 46:24 72:16
324:23 387:9

**hours** 249:24 260:17

**HR** 280:7 355:2
357:25

**Hunter** 244:23 245:2,
6 247:11 260:22

___

**I**

**idea** 150:2 154:21
156:23 201:24
232:14

**Ideally** 211:17

**identical** 298:11,13
299:20 380:13

**identified** 36:21
37:5,10 38:6,11,18
45:2 47:19 81:14
229:2,7 259:5,23

**identify** 35:14 42:14
52:17 57:23 58:6
60:10 61:3 62:25
188:24 191:18,25
264:24

**identity** 102:19 103:3

**imagine** 136:3

**immaterial** 53:3
94:19

**immediately** 347:8

**impact** 275:9,11,12

**impacted** 229:8
230:4

**impacting** 228:21
229:3

**impairment** 240:21,
24 241:3,5,11

**important** 11:21,25
12:25

**impossible** 299:7

**impression** 363:12,
18,24

**in-** 294:9

**in-house** 164:7

**in-person** 12:22
191:15 283:9,12
290:20 292:16 323:4,

12,18 342:23 392:21

**inability** 299:12

**inaccurate** 112:25
116:21 117:2,17
136:18 138:20,24
256:16

**inaudible** 48:14
148:10

**include** 26:9 106:25
189:7 230:3 259:24
263:3 305:7 351:18
355:3,8,13 368:17

**included** 54:17 81:4
108:4,7,19 175:13
176:23 183:21
194:18 200:12
213:22 217:23 222:2
232:14 239:11
243:12 251:15
252:12 312:12 315:8,
21 326:18 336:22

**includes** 172:3

**including** 132:11
178:15 253:24
335:21 366:21 368:6

**income** 35:18 179:17

**incomplete** 112:25
116:22 117:2

**incorporated** 153:9

**incumbency** 5:20
151:25 152:5,9,13
154:20 159:19
183:11 270:3

**incurred** 336:12
385:18

**independent** 72:7
166:22 233:7,12,15
348:3

**indirectly** 15:6 16:7
17:24 42:8,16 43:14
88:3

**individual** 11:3
271:24 272:25
300:10,12

**individually** 9:11
16:10

**individuals** 15:15

276:21 285:18

**indulging** 353:5

**inform** 190:18 210:19 211:2 335:16 336:6 337:24

**information** 16:14 80:19 86:10 88:13 91:12 112:5,17 117:14,15 169:11,13 171:20 176:8,15,22 179:16,17,18 188:8 206:3,5 218:20 230:3 236:7 237:13 257:18 274:4 312:10,24 344:19 368:11

**informed** 69:18 178:17 190:24 210:5 211:9 212:8 288:15 335:16,23 378:7

**informing** 64:13 181:25 182:11 330:5

**initially** 132:17 185:5 247:3

**initiated** 58:10

**initiating** 58:12

**initiative** 290:5

**ink** 296:22,25 298:4

**ink-signed** 297:3,10

**inquiries** 160:9

**inquiry** 210:12 274:16,17 376:6

**inside** 187:22

**insolvent** 302:22

**installment** 217:2

**instance** 52:12 57:16 60:10 377:16

**instances** 335:25

**instruct** 133:6 164:3 210:10,13,19 381:25

**instructed** 77:15 147:8,9,23 241:19 291:7,8 315:7 362:8 381:22

**instruction** 8:6 57:11 74:14,23

**instructions** 256:7 347:25

**insufficient** 122:8

**insurance** 385:17,22 386:2

**insured's** 385:25

**intend** 208:6

**intended** 111:21 214:19 288:23 315:5, 19

**intending** 16:25 146:16

**intent** 306:14 318:20, 25 380:10

**intention** 81:11 307:11

**interest** 50:3 55:25 56:22 57:18 58:2 59:14,17 60:13 62:18 63:2,10 64:5,15,22 119:10,16,21 120:22 162:6 163:22 164:25 165:11 167:11 168:5 217:17 223:18 273:18 334:9

**interests** 55:17

**internal** 271:17

**internally** 275:16 329:2

**interpret** 119:8

**interpreted** 74:20

**interrupt** 375:23

**interrupted** 76:25

**interrupting** 77:16, 18

**interviewed** 322:18, 22

**intimately** 292:6,13

**intimidate** 376:13,17

**introduce** 9:2

**invalid** 136:24 235:5

**investigations** 275:17

**investment** 4:10 9:18 32:21 65:11 127:17,24,25 128:12, 14,16 129:3 244:23 245:3,6 247:11 273:24 274:15 279:21

**investments** 128:17 129:5,6 249:23

**investors** 275:10 276:12 277:4,8,21 281:18

**invoices** 185:10

**involve** 366:13

**involved** 237:10 245:2 264:17 274:14 275:15,21 276:21 288:4 292:6,13 293:6 354:10

**issuance** 131:5 138:10,18 371:14

**issue** 54:7 178:14 191:13 201:25 204:10 208:24

**issued** 56:16 60:5 62:19 65:8,18 66:8 81:13 82:15,20 93:13 107:13,20 108:2 131:11 132:6 133:12 161:23 162:5 180:10 218:25 223:7,17 233:8 234:10,15 235:4,9,21 236:8 242:8 243:7 261:9 262:6 263:6

**issues** 113:5 248:14 306:19

**item** 108:19 111:11, 18 112:4 119:2,16 123:6 185:21 220:5 238:20 259:18,24

**items** 53:3 97:21 100:9 112:3 131:21 149:8 228:21 229:3,7 230:4,7 249:22 260:6

---

**J**

**James** 234:11 271:25 273:2

**investment** 4:10

**January** 70:16 163:7,8 219:11,13,17 258:20 326:8 341:6, 18 344:2 350:5,9,13, 24 351:20 361:25 362:3,7 364:8 365:2, 15 383:23

**Jason** 185:3 275:24

**Jim** 4:2 9:14 15:6 16:8 19:8 43:15,24 44:5 50:11,25 65:16 67:6,22 68:18 71:23 72:7 75:24 78:9,16 82:22 123:3,20 189:9,16 190:10,13, 15 205:9 206:23 232:18 273:2 280:19 342:5,7 351:5,10,14 362:8,10 363:8,18 365:3 367:8 368:22 379:25 381:9

**Jim's** 367:22

**job** 25:19,25 42:3 219:20 313:2

**John** 3:6 7:24 9:4 10:20 45:3 46:13,18 69:13 74:8 76:15,17 77:10 95:17 105:23 129:18 146:13 154:7 155:18 157:6 177:6 192:18 208:13 216:2 222:14 236:18 267:18 304:6 308:7 353:18 385:3 387:10, 16

**join** 18:12 317:25

**Jones** 3:8 9:5 10:21 72:10

**July** 307:24 317:9

**jumping** 234:18

**June** 92:2 98:17 99:25 103:2 132:25 135:2 137:6 176:10, 24 186:16 200:7 242:23 262:16,24 263:13 265:3

---

**K**

**Karesa** 249:21

**key** 275:20

**kidding** 330:23

**kind** 168:2 188:12 221:12 222:23 245:22 250:5 274:16 276:4 323:6 329:22, 23 337:8 353:13 356:10 358:13,14 380:23

**kinds** 353:6 354:2 357:2

**Kirschner** 4:16 10:5

**Klinger** 7:12 8:24

**Klos** 87:20 124:9 172:6 230:19 275:23 292:3,18 389:9

**knew** 68:18 103:9,10 369:2

**knock** 364:19,20

**knowable** 371:14

**knowledge** 43:10 46:5 47:23 48:12,21 49:9 50:13 52:5,10 53:10 62:5 63:12,16, 21,23 79:23 80:10 81:5 82:7,8 89:23 93:23 95:3 98:17 101:13,19 102:2,25 106:25 111:16 112:6 138:16 144:24 147:8 153:13 167:8,22 184:10 188:15 189:9 194:13 206:5 207:8 208:2 225:5,12 226:21 232:21,23,24 237:11 243:4 259:22 322:19 324:17 384:18

**Kopf** 3:22 9:20

**Kristin** 172:7 186:21 230:20 292:3,12 328:17 342:11 343:8 350:17,18 362:23 365:13

---

**L**

**L.P.** 3:19 8:12 9:6,23 10:22 11:7 15:16,23

18:7 41:19 42:10,18
43:16 58:17,21
109:23 110:9 152:14
172:15 271:3 279:20
325:25 329:3

**La** 4:24 104:25 118:3
129:16 135:10
177:14 218:14

**labeled** 8:9

**laborious** 145:12

**laid** 56:6

**landline** 393:7

**language** 101:4
315:21 316:2,3

**large** 287:22 379:22

**largely** 11:18

**larger** 356:8 357:10

**late** 323:6 379:21
387:9 388:3 390:17

**launching** 127:10

**Lauren** 171:4 183:24
192:5,12 275:24

**Lauren's** 185:9

**law** 12:11 306:9,11,
20

**Lawn** 4:7

**lawsuit** 55:8 164:13
181:22 375:19 376:6,
23

**lawsuits** 53:25 54:7,
10,12 322:15

**lawyer** 73:19 154:15
157:7 164:5 266:16
373:24 375:16

**lawyers** 147:20
374:3

**lead** 269:15

**leading** 269:8

**learn** 65:15 67:15
89:4,9 104:13

**learned** 66:16 68:3,8,
11 69:25 70:6,10,15,
19,23 71:17 76:2
80:19 90:19 340:17

**learning** 75:3 83:23

**leave** 157:23 321:13,
15,20

**led** 342:7 348:4

**ledger** 258:10

**leeway** 16:13 208:14

**left** 20:2 70:20 71:10,
18 87:8,18 164:25
165:3 166:4 167:3
226:2,3 232:22
296:17

**legal** 7:5 8:21 25:5
29:23 42:19 43:5,7,8
44:17,21 45:4,9,17
46:11 47:20 48:3,16,
25 49:13 55:21 107:5
126:4 127:11 142:6
143:15,19 146:5,10
147:3,9,24 148:2,4,5
149:7,11,15,24,25
150:20 153:2,7,8,12
154:8,19 155:12,13,
15,23 156:2,6 157:8
164:12 167:20
172:13 183:9 193:16
212:25 280:8 290:16
291:9,13,16 294:18,
20 295:5,8,13,22
296:4 322:18,22
351:18,21 354:8

**legitimate** 348:18

**lender** 273:4

**lending** 127:2 302:21
303:17

**lengthy** 105:15

**letter** 91:16 92:2
93:13 95:5,16 96:9
98:23 99:2,3,7,11,16,
21,25 103:7,14,18,23
104:8 106:11,15
130:8 135:25 136:7,
17 262:16,22,25

**letters** 94:21 95:11
96:19,22 97:3,8,13,
19,25 98:9 136:14

**level** 22:11 53:7
92:25 93:5,25 238:2
279:11 287:23 288:4

**levels** 274:2

**liabilities** 5:24
175:17,22 190:2,6
194:2 195:19 196:2,
8,17 204:19 211:3
220:4 237:20,23
242:12 301:8 303:9
307:9 317:8

**liability** 175:14
217:24 276:24
277:19 280:21

**liable** 306:12,21
307:11 317:21

**license** 21:22,25
22:2,8,9

**licenses** 21:13,16,21
22:12,16

**life** 377:2

**light** 293:2 299:11

**lighting** 35:25

**list** 83:12 100:9
243:17 245:16,24
246:6,23 247:10,25
249:2 250:10 251:22
254:3 317:9 377:22

**listed** 214:6 238:8
311:10 312:3 330:13
371:8

**listen** 40:14 47:8
114:13 144:14
223:12

**listening** 40:18
252:7

**lists** 152:10

**litigation** 4:17 10:5,6
16:12,20 17:3 267:15
373:23 374:5 375:25

**LLC** 31:8 32:4

**LLP** 9:13 354:13

**loan** 40:7 42:18 43:16
45:21 48:8,15,23
49:4,10,17,24 50:4,
15,20,24 51:2,5,16,
21 52:6,13,17,22
53:11 60:21 61:3,10,
19,22,23 62:9 63:10,
15,22 64:10 93:20

94:10 126:16,17
128:15 142:5 145:6
203:13 225:13,20
254:3 270:20 271:5,
15 272:7,8,16,21
284:5 285:5,6,11
303:6 318:15 331:14
332:9,14,17,24 333:3
335:12 357:2,13
358:20,25 359:2,9,25
361:18 362:22 363:8,
13,19 364:3,9,25
365:16 393:23

**loaned** 39:11,16,19
41:2 43:23 48:14
50:10 124:14,17,20
126:23 128:10 202:7

**loaning** 39:24 307:7
317:6

**loans** 40:4 41:8,23
42:9 44:10,12,16
45:15 46:8 47:18,25
48:6 51:11,23 52:22,
25 61:9,25 91:2 94:6,
8 105:8 125:24
126:10,11 128:15
129:10 131:2 202:14,
17 225:6,7 255:8,14
259:24 271:11,20
273:6 287:7,8
288:22,23 317:6
318:4 331:22 333:12,
14 335:13 355:19
365:23 369:3,11,14
370:10,15

**log** 393:12

**logging** 395:3

**logical** 291:20
309:23 315:4

**logically** 310:9

**logistically** 321:10

**Lokey** 273:23 274:3,
10,25

**long** 192:8 233:4
333:14 353:4 385:3

**long-term** 333:17

**longer** 282:2 380:15
381:11

**looked** 101:2 111:12,

18 134:6 136:2
158:5,14,19,24
159:5,10,16,24
160:17,25 198:19
201:8 220:9,13 222:5
224:2 262:8 265:8
316:10,13

**loop** 148:3 294:19

**Lord** 248:11

**losses** 276:7,11

**lot** 55:4 143:24
147:16 162:15 188:3
208:13 225:4 245:21
248:16 249:11 278:2
286:22 289:24
307:15 320:9 349:19
364:14 373:12,13

**lots** 169:12,13 373:8

**Louisiana** 4:14

**love** 252:17

**lower** 274:2

**LP** 3:17 9:21

**lunch** 139:25 150:22
158:6,14,20,25
159:6,11,16,24

**lured** 231:4

---

**M**

**Madam** 268:8

**made** 15:14 46:8
47:18 48:6,9 49:24
51:11,16,21 52:6,13
56:8,14,22 57:6,25
58:4,11 60:21 61:4,
11,19,22 62:2,4,18
63:2 64:5,9,14,22
78:5 98:19 121:24
122:2,9,15,21,22
124:4 125:25 127:21,
24 128:14 129:12
130:9 131:4 134:17
139:9,13,16 148:5
159:9 161:4 162:10,
11,18 163:6,10,21
165:10 168:2 182:15
190:14 195:10 202:6,
13 203:14 217:14
225:7 242:6 245:8,9

261:19 262:24
271:21 288:21
295:17,23 299:7
306:12 314:2 315:15
316:21 317:15
327:16 328:5,8
334:22 335:3 343:19
345:11 350:23 351:8,
20 358:20 359:7,14,
20 360:2,17,23
361:25 362:2,4,6,12,
16,18,22 363:7
364:25 365:10,14,15
373:19 378:8 379:16,
23 382:22 383:23
384:6,7,9,11,20
385:16,21,25 386:2
390:21 394:8,18

**Madison** 4:20

**maintain** 90:5

**maintaining** 258:5

**make** 36:4 41:25 42:3
57:17 63:9,14 74:3
83:2,5 86:8 88:16
89:21 96:14 112:16
117:10 123:23
127:16,18,21 129:5
136:16,23 145:6
157:17 164:19
176:19 177:7,12
187:3,17 198:20
199:19 200:14
209:25 210:7,16,23
243:5 272:21 277:24
285:9 288:10,13
294:18 295:20 296:5
297:8 303:4 315:11
317:5 318:4 324:14
325:2 331:22 332:7
334:8 338:23 340:2
342:9 344:20 346:12,
20,25 348:5 350:19
351:6,14 358:7,25
359:9,10,15 360:6,
10,23 361:6 362:6,7,
9,17 363:3 365:4
367:21 373:12
377:17 380:23
381:11,17,22 382:2,
6,14,19 384:24
390:5,7 391:2,12,20
392:6,12

**maker** 140:20 142:25

216:19 305:18

**makes** 123:16 153:3,
22 345:17

**making** 40:7 41:22
88:6 160:9 282:22
293:4 335:9 337:20
343:4 344:23 345:4
363:9,14 381:3,6

**manage** 26:7,17
28:15 38:23 116:11
354:11

**managed** 113:24
125:2 332:13 361:12

**management** 3:5,18
5:16 8:12 9:6,22
10:22 11:7 15:16,23
18:7 22:21 26:20
30:2 41:19 42:10,18,
22 43:11,16 44:6
58:15,17,20 70:21
90:21 91:16 94:21
95:4,16 96:8,18,21,
23 97:2,8,12,19,24
98:9,25 103:17,22
104:8 106:11,15
109:23 110:9 125:3
128:20 130:8 135:24
136:6,13 152:14
172:14 215:14,17
232:13,15 262:16,21,
22,25 271:3 279:18,
19,22 280:2,3 308:4
325:22,24 330:16
332:12 354:7,19
359:16,18 360:7,9,14

**manager** 116:9
230:16,22 291:12

**managers** 88:23,24
230:18 274:5 292:2

**managing** 88:21
292:5

**Marc** 4:16 10:5

**March** 14:8 323:6

**mark** 49:18,21
232:18 268:15

**marked** 91:21 104:24
135:13,15 142:16
151:21 170:19 197:9
215:23 216:7 218:17
226:24 236:23

237:18 258:18
297:23 302:8 307:21
309:6 328:13 338:13
341:14

**market** 119:6,9
120:15 240:21
241:17 242:7 243:5
265:11 274:2 371:15

**matching** 222:22

**material** 53:12 104:5
111:22 112:3 113:11
131:6 133:25 171:11
174:14 185:15,21
274:15

**materiality** 52:24
53:7,16,20 92:18,20
93:2,5,8 94:2,7,9
98:15 104:7 117:11,
13

**materially** 274:23

**materials** 175:4

**maternity** 321:12,14,
20

**math** 109:17 110:13
221:8 239:24 260:15
311:7

**matter** 236:21 260:9

**matters** 313:5

**maturity** 314:22
315:6,7

**Mckenzie** 3:14 9:9

**meaning** 231:3
274:18 276:12
290:13 296:4

**meanings** 41:14

**means** 33:23 41:11
118:17 284:16,22
329:19 366:3

**meant** 186:8 301:24

**measurement**
240:18

**mechanic** 155:13,16

**media** 8:9

**meet** 194:3 323:3
378:25

**meeting** 68:5 70:2
168:21,23 169:15
189:7 192:9 206:12
231:20 283:9,10
290:20 300:23
323:11

**meetings** 184:8
323:20

**members** 89:2
166:23 191:21 192:3
233:16 237:7,9
323:16

**memorialized** 75:9

**memory** 95:23
133:2,5 224:11,16
314:20 319:17
331:17

**mental** 260:15

**mentioned** 131:17,
20 273:10 281:2
282:12,15 289:15
351:12 368:24

**met** 268:3

**methodology**
274:18

**Michael** 4:5 9:24

**Michelle** 3:13 9:9
151:7

**micromanage** 337:6

**micromanaging**
89:3

**mid** 341:5 366:9,10

**middle** 119:19 121:8,
9 152:21

**milestones** 66:3,9,
12,22 69:2 76:3 79:2,
9 84:4

**million** 92:22 119:23
121:3,6 124:17
131:13 132:2,8
138:12 140:14 141:9,
18 142:19 143:12
144:6,17,23 161:25
178:19 216:17
217:16,19 220:13,20,
24 221:7 223:7,17
224:2 238:9 239:10,
12,24 268:22,23

270:20 271:6,7,15,16
272:7,8,16 273:6
277:11,12,16,20
278:6,7 282:14,15
283:18 287:15 288:6,
20 302:22 303:6,18,
24 304:11,20 305:23
306:2 307:7 308:16,
20,21,22 309:25
310:17,23 311:2
315:13 317:6,10
318:14 334:7,19
336:13,23 337:25
339:4 340:10 341:23
343:19 344:5 345:11
350:7 351:22 389:13,
14

**million-plus** 289:22

**millions** 260:19

**mind** 19:20 59:23
60:4 160:6 161:17
198:18 305:17,21
394:16

**mine** 268:15

**minimal** 86:4,5,17

**minute** 129:19 174:8
372:9

**minutes** 53:23
139:24 174:21 176:4
182:23 266:20 267:3
325:3,4 348:25
372:12

**misapplication**
163:15

**misremembering**
229:13

**missed** 339:12,14
340:7

**misspeak** 301:23

**misspoke** 301:21
336:16

**mistake** 61:17 139:9,
13,16 159:9 161:4
162:11,19 165:9
181:10 306:23 314:2
316:22 317:15,22

**mistaken** 304:14

**mistakenly** 167:10

168:4 214:11

**mistakes** 384:19

**mode** 283:9

**model** 274:3

**moment** 117:4 198:10 222:5 224:3 276:5 307:22

**money** 39:11,16,24 41:2 43:24 49:11,17 50:10 62:9 124:14,20 126:6,23 127:3,15,25 128:5,10,23 129:2,5 145:16,18 186:10 276:13 282:8 283:5 285:18 318:10 319:11 320:4 359:9, 13,24 360:21 374:22

**moneys** 39:19 162:5 167:9 277:8 282:17 283:16,22 289:5 359:15

**month** 59:11 132:23 226:16 229:15 258:21 332:4

**month-and-a-half** 323:10

**monthly** 5:25 226:11,14 227:5,20, 25 228:12 229:10,19, 21 230:2,11,22 231:14 232:6,8,13, 19,20 255:18 256:14, 19 259:9,12,14

**months** 261:21 292:25

**morning** 7:3 10:19 342:16,18 344:12,14, 16

**Morris** 3:6 5:6,9 7:24 9:4 10:7,15,20 13:10, 17 16:9,24 17:11,14, 19,20 22:16,18 31:18,19,21,25 35:24 36:5,11 45:6,10 46:15,23 47:4,6,11 55:4 69:8,11 72:15, 18,25 74:3,9,13,18, 24 75:11,15,19 76:19,23 77:2,11,19, 22 81:16,18,21,23

82:10,13 91:8,18,22, 24 92:9,11,14 95:9 105:4,25 110:22 114:11 118:2 129:15, 21,24 130:14,18 135:5,10,13 136:9 137:24 139:20 140:11,23 142:14 146:17 150:21 151:19 154:3,13,16 155:19,22,25 156:18, 25 157:3,10,13,21 170:17,20,25 171:24 174:18 177:9,14,16, 19,23 178:10 195:6 196:20 197:6,21 201:11 202:3 207:15 208:20 209:13 214:4, 8,10,14,21 215:3,10, 21,24 216:4,13 217:5,8 218:11 219:25 221:23 222:16 224:18 226:22 228:18 236:15,20 243:15 246:13 247:21 248:5, 11,22 249:18 250:6 251:23 252:4,8,16,24 253:4 254:17 258:16 259:16 265:23 266:9, 17,24 267:14,20 268:14 269:7,12,18 270:15,22 271:8,18 272:9,17 273:7,10 277:22 278:19 279:8 280:15,23 282:12,18 283:19 284:7,14 285:7 286:9 287:9, 18,24 288:8,25 289:12 290:9,21 291:19,23 292:19 293:15,23 295:12 296:13 297:6 298:22 300:15 301:13 302:2, 11,15 303:2,10,20 304:3,7,12 306:15,24 307:13 308:5,8,13 309:10,12 310:2,11, 19,24 311:12 312:16 313:13 314:12,14 315:9,23 316:23 317:17,25 318:6,17, 23 319:23 320:6,18 322:5,23 326:24 327:6,24 329:10 330:21 331:5 333:10,

18 334:6,10,21 335:4 338:3 339:16 340:18 342:21 345:12,19 346:22 347:14,19 348:12 351:15 352:4, 8,16,18 353:11,15,19 354:4 355:5,9,15,21 356:3,14 357:6,15,22 358:16,22 359:4,11 360:3,11,25 363:16, 22 364:10,22 365:6, 21 366:15,25 367:16, 25 369:4,8,17 370:3, 8,25 371:10,25 372:22 373:4,20 374:11 375:3,24 376:20 377:6 387:7 388:19 389:5,15 390:9 391:4,14 392:7,13 393:24 394:11,19,23 395:5

**Morris'** 313:9

**MORS** 256:3

**motion** 374:14 376:7

**Mountain** 244:23 245:3,6 247:11 260:22

**mouthpiece** 206:2

**move** 69:11,12 114:11 208:19 246:13 247:21 248:22 250:6 252:23 307:17 364:22 376:25

**moved** 126:6

**moving** 248:5

**muffled** 48:19

**multi-month** 145:11

**multiple** 279:3 320:25 321:2 373:7,8

**Munsch** 3:22 9:20

**mute** 36:10 350:2

**myriad** 248:14 249:11

---

**N**

**N-A-V** 273:11

**naively** 263:23

**named** 44:3 376:23

**names** 229:11 300:8 309:19 311:25 312:4, 13 375:20

**Nancy** 4:2 9:14 65:9, 17 66:7 67:6,22 68:19,25 75:25 78:16 82:22

**Naomi** 321:7

**narrative** 111:17

**nature** 84:4 85:6 144:2 147:17,18 180:20 230:8 240:22 253:18 259:15 271:20 276:10 279:22 280:9 292:22 294:22 325:19 329:24 333:13 354:12 356:6,17 357:11 378:23

**NAV** 125:6,9 131:17, 24 132:3 145:8 273:11,14 274:23 275:8 277:5 278:15 280:12,22 281:13 289:6 318:15 373:10

**needed** 155:2 250:17 257:13 271:21 289:6 318:13 354:15 358:8 382:15,17

**needle** 118:4

**negative** 7:25 394:14

**negotiated** 390:8

**negotiation** 382:25

**negotiations** 58:19 383:2,6,12 384:14

**Nelms** 233:21

**Newman** 4:18 10:3

**Nexpoint** 3:17 6:4 9:21 27:10,12,15,18, 21,25 28:4,6,16 29:7, 10,12,16,24 31:3,11, 17 32:17 42:21 43:12 44:6 54:14 58:7,11, 14 60:5 65:6 100:23 126:9,13,16,23 127:3,10,11,15,18,24

161:23 162:5,7,11,18 163:23 164:6 165:11 167:7,8,13,15 168:2, 6 171:13 172:21 176:14 178:12,17,18, 22 179:13 182:3,12 184:21,23 186:9,21 189:15 196:3,23,24 216:20 217:14,23 218:3,19 219:15,22 220:18 221:6,10,13, 25 223:5,24 241:23 242:6 260:4 267:24 309:24 322:3 325:14, 18,21 326:16,23 327:4,10,17,20 328:6,7,8,25 329:3 330:11,18,19 331:2 332:14,17 333:8,15, 16 334:5,8,22 335:3, 9 336:13 337:13,23, 24 338:23 341:19 342:9 343:18 345:17 346:12,16,20 348:4 353:8,21 358:15 379:16 381:23 382:10 383:24 384:3 390:5 391:2,10,12,19 392:5

**Nexpoint's** 59:18 218:6,12 219:6 331:3 336:22 350:19

**Nguyen** 3:21 268:10 297:19 298:9 302:5 303:14 305:3 306:7 307:19 308:11,25 309:3,4 311:22 313:8 317:3 331:9 332:21 338:12,21 341:15 343:11 345:23

**night** 376:8

**nomenclature** 350:4

**non-american** 284:10

**non-orderly** 274:8

**nonlawyer** 375:13

**nonsense** 156:6

**Norris** 183:3,6 184:2, 7,9 192:15,23 193:5

**North** 3:15,23

**Northern** 8:13

**note** 13:11 45:14,21 48:15,22 49:6,12 50:15,22 51:7 56:7 57:4,19 59:18 60:5, 13 62:19 63:3 64:6, 15,23 78:17 107:20 117:9,12 120:18 122:4 126:12 134:6 140:14,17,20 141:22, 24 142:2,4,18,22 147:15 149:17 150:4 161:24 162:4,7,18 163:23 165:12 167:11,15 168:6 182:3,12 186:18,22 187:17 213:16 214:4 216:16,20 217:2,13, 23 220:5,8,13,18,20, 23 221:5 222:4,10 223:4,7 224:2,9,12 233:22 234:10 243:17 244:23 245:3, 7,13,16,23 260:22,25 261:9 306:11,18 309:16,24 310:9 312:2,14,15,24,25 313:15,16 315:13,14, 16 316:17,18 319:12, 14 324:16 334:6,13, 18,19,23 335:21 336:13,23 338:2,17 339:4 340:10,14 341:19,23 342:9 343:4 344:25 345:18 347:7 362:13,14

**noted** 185:5 186:17

**notes** 6:10 44:20 45:2 46:2 49:21 50:18 54:3,6 55:7,18, 25 56:10,15,23 58:2 65:7,14,18 66:7 67:3 68:14,17 76:2 82:15, 20 83:6,10,13 106:21 107:2,12 108:2,14,18 109:5,7,17 110:6,25 111:5,8,12,22,25 112:18,23 113:9,10, 13,18 114:19 115:3 118:12,13,25 119:3, 6,9,11,22 120:19 121:3,21 122:8,15 123:6 124:3,15 130:23 131:12,16

132:7,10,14,20 133:13,21 134:5,14, 17,23 138:11,20 139:5,10,17,21 142:10 143:6,7,14, 21,23 144:5,12,16,22 145:4,23 146:2,4,7, 11,14,25 147:10 148:15,18,24 149:2 150:5,8,15 158:5,13, 19,24 159:5,10,23 160:16,25 161:5,9, 10,19 162:11 171:13 175:16 178:14,15 179:14,21 180:2,10, 24 181:4,9,16,22 182:8,16 205:19 209:2 210:8 213:7,8 222:2,17 223:13,16, 19,23 224:9 233:8 234:15,23 235:4,9, 14,21 236:3,7 238:20,25 239:4,5, 11,18 240:10,20 241:6 242:7 243:6, 11,18 244:4,15 246:6,15,22 247:10, 24 248:25 250:9 251:8,15,21 252:12 253:10 261:12,16 262:6,11 263:6,15 264:19 268:21,24 282:14 284:19 285:15,17 288:21 289:10,16,18,22 290:8,13,16,24 291:5 293:13 296:9 297:4, 5,11,17,21 298:17 299:11,14,18 300:13 301:18 304:19,24 305:2,18,22 306:21, 23 307:12,24 310:17 312:11 313:20 314:13,23,25 315:2, 20,22 316:2,14 317:10,16,21 319:5, 9,15,18,22 322:20 323:20,25 333:17 338:7 364:13 366:22 367:23 368:6,17 369:15,19,20,25 370:9,11,17 372:11 386:9,10

**notice** 7:25 356:9 357:9 379:6 380:10, 15,16,17 381:4,7

**noticed** 16:12,20 248:6 375:25

**notices** 380:21

**November** 59:12 328:16 329:14,19 330:15 331:12 332:3 380:9,18 388:3,6 390:22

**NPA** 5:15 189:24 328:21,22 331:13

**NTA** 338:16

**number** 8:9,14 13:13 15:24 17:25 93:7,10 100:10 108:9 111:7 126:10 135:10 137:25 139:22 170:24 177:15,16 179:4 197:4,7 218:13 222:21 236:21 239:25 240:9 277:17 282:9 285:15,16 286:5 343:25 344:5 370:22 377:9 389:18, 21

**numbers** 240:5,6,23 268:13 278:10 343:5 366:12,19 367:6

---

**O**

**Oak** 4:7

**object** 29:20 45:7,8,9 47:4 60:24 65:19 66:10,15 67:9,24 69:6 73:24 77:13 78:19 79:20,25 97:4 107:16 115:5 119:12 144:25 146:12 147:4, 11 149:21 151:13 156:7,16 159:25 164:2 180:4,11,12 191:4,22 194:6,22 202:24 206:7 208:10, 11 211:4 212:12,20, 22,24 213:25 220:25 225:10 227:21 231:8 232:9 239:20,22 248:3 249:4 250:11 251:10 253:12 254:7 255:10 256:17 262:18 269:7,14,17 347:21 348:11,12

352:14 365:6 381:13 384:12 386:13

**objecting** 154:3

**objection** 8:4 17:9, 10 20:4,20 22:14 25:15 31:16 33:9 34:20 40:10 41:4,12, 24 42:11,12,19 43:17 44:17 45:4,16 46:10 47:20 48:3,16,25 49:13 50:5,7 52:8 53:18 54:8 55:10,20 56:11,25 58:25 59:19,25 60:7,15,16 61:12 62:11 63:13,24 64:17,19 65:12 66:24 67:17 69:5,9,10 75:6, 10 79:4,14 80:12 82:24 83:25 85:15 86:2 91:4 94:3 96:11, 20 99:17 107:4,15 108:5 110:11 111:24 112:20 113:20 114:20 115:6 117:6, 18 119:13 120:16,17 122:10,16 124:6,23 126:3 127:19 132:16 133:23 134:8 142:6 143:10,15 144:8 149:5 150:10,17 151:16 153:18,19,25 154:6 155:11 157:2 158:15 159:17 160:3, 12,18,19 167:5 168:8 178:20 180:3 181:5, 11 183:15 184:6,20 185:2,18,24 193:21 194:5 195:21,22 196:4,11,18 200:20 203:23 205:3,15,25 206:21 210:24 211:13 213:11 220:10,15 222:13 225:24 228:9 229:24 231:18 234:6 235:23 236:10 238:10 239:3, 14 240:16 242:24 246:19,25 247:14 250:22 251:12 254:6 255:12,22 257:6,20 260:14 263:8 265:4 266:19,23 267:21 270:15,22 271:8,18 272:9,17 273:7 277:22 278:19 279:8

280:15,23 283:19 284:7,14 285:7,23 286:7,9 287:9,18,24 288:8,25 289:12 290:9,21 291:19,23 292:19 293:15,23 296:13 297:6 298:22 299:15 300:15 302:2, 25 303:2,10,20 305:10 306:15,24 307:2,13 310:2,11, 19,24 311:12 312:16, 18 314:14 315:9,23 316:23 317:17,23 318:6,17,23 319:23 320:6,18 322:5,23 326:24 327:6,24 330:21 331:5 333:10, 18,20 334:10 335:4 336:14 338:3,5 339:16 340:18 341:2 342:21 345:12,19 346:22 347:14,19 348:9 351:15 353:11, 15,18,24 354:4 355:5,9,15,21 356:3, 14 357:6,15,22 358:16,22 359:4,11 360:3,11,25 363:16, 22 364:10 366:15,25 367:16,25 369:4,8,17 370:3,25 371:10,25 372:22 373:4,20 374:11 375:3 376:20 379:10 380:25 388:19 389:5,15 391:4,14 392:7,13 393:24 394:10,11,19

**objections** 209:9

**obligated** 161:18 262:13 304:23 334:8

**obligating** 144:22

**obligation** 234:22 242:20

**obligations** 160:9 178:15 179:12 180:2, 9,23 185:15 194:4 208:8 327:13,21 328:8 332:5,8 333:17 335:17 336:6,7,10 361:19 380:2 390:10, 12 391:7,8

**obligor** 264:18

**obnoxious** 364:23

**obstacles** 90:23

**obtain** 57:12

**obtained** 48:23 49:5
50:4,16 51:6 126:10
128:15 176:16

**obtaining** 62:10

**occur** 169:6 280:13
331:21

**occurred** 103:13
104:5 125:17 126:2
263:13 278:15
299:25 331:24 339:7
369:24 390:24

**October** 8:19 21:7
160:5,7,14,21
169:17,24 171:19
172:4 173:24 174:6
183:7,14 186:11,13
189:13 207:16
219:24 263:19
314:20 316:16

**odd** 303:12 307:6

**offense** 352:23

**offhand** 342:11

**office** 279:21 280:3,5
294:4,10 323:13,14
326:15 388:22 389:2

**officer** 14:12 23:6
26:25 27:6 28:24
29:2,7 32:14 35:10,
12,16 36:20,24 37:6,
18 38:3,5,10,16,22
39:3,24 51:22 52:6,
17 120:8 143:18
173:7,9,13,16,20,23
174:3 184:23,24
258:25 269:5,24
270:10,14 271:2
302:19 362:25

**officers** 15:22 29:24
39:11 40:5,8,12
51:23 52:13 93:21
153:9

**offset** 380:2,3 382:25
390:9,11,13

**offsets** 58:21 381:18,
19 383:13

**Okada** 49:18,21,24
50:2 118:3 232:18

**omitted** 309:19

**one-day** 331:14
332:9,17

**one-third** 239:18

**one-word** 174:9

**ongoing** 125:11
202:8,14 203:14

**open** 36:13 376:5

**open-end-to-close-
end** 125:12

**open-ended** 125:7
275:4,8 276:10
281:9,11 282:7

**operating** 5:22,25
90:10 226:11,14
227:2,4,19 228:7
255:18 256:14,20
259:9,12,14 359:14

**operational** 143:25
147:17

**operational-type**
291:11

**operations** 202:8,15
203:14

**opinion** 120:6,7,10
204:8 205:9 247:17

**opinions** 204:15

**opportunity** 13:2

**oral** 65:8,16

**order** 13:3,7 105:11
128:16 129:6 288:21
360:9

**ordinary** 226:9
229:22 293:18

**organizational**
112:13

**orient** 365:24

**original** 223:25
232:11 274:24
277:14

**originally** 177:21
232:16

**originals** 297:4,11,
16

**Orleans** 4:14 9:17

**outboxes** 294:9

**output** 90:6

**outstanding** 118:12
119:22 142:10
171:11 174:15
175:12 185:10,23
186:8 202:6,18,23
203:7,8,13 220:18
222:3,12 223:4,14,
19,24 224:13,17
235:10,14 244:16

**overpaid** 58:16
381:16

**overpayment**
381:20 390:13

**overpayments**
58:22 379:22 380:3
389:4,12

**overruled** 17:15

**overseeing** 26:10
86:22 230:11

**oversight** 257:15

**overspeak** 115:16
252:3

**owe** 375:15

**owed** 125:8 160:10
161:8 178:18,23
185:6,16 186:9
199:12 204:12,25
205:13 212:18
275:13 297:17
308:20 310:17
358:21 380:3

**owing** 50:3 211:11
212:10 223:6 234:23
285:18

**owned** 15:6 16:7
17:24 42:8,16,24
43:3,13 273:17

**owner** 272:24 281:25
282:3

---

**P**

**p.m.** 150:24,25 151:3
174:6 224:23,24
225:2 266:5,6,8
325:7,8,10 349:6,7,9
372:14,15,17 395:10,
11

**Pachulski** 3:8 9:4
10:20 72:9 166:19

**package** 229:10,20,
22 230:2,12,23
232:6,8 233:3

**packages** 231:15
232:20

**pages** 214:11,17

**paid** 50:2 56:18
167:10 221:7 277:4,
8,20 283:23 327:22
330:19 331:4 333:16
336:9,11 355:19
356:23 365:4 394:9

**paper** 288:21 293:13,
20 296:12,16

**paragraph** 92:17
118:11 119:20 121:9
124:15 126:9 134:11
140:18 142:22 203:6
216:25 221:24 222:7,
9,10,14,16,18 223:9,
15

**paragraphs** 117:23
118:6

**part** 42:9,17 43:15
50:18 51:11,16,21
52:12,19,23 53:12
58:17 85:5 88:12,14,
22 90:21 91:14 93:22
103:22 105:9 116:13
117:20 125:12 142:9,
11 148:4 149:12
156:24 169:14,19
175:3 176:23 179:11
193:17 200:16
210:21 213:16
214:19 238:8 240:17
245:19 254:20
274:17 282:4 286:2
288:19 326:21
330:17 365:2 366:23

**participants** 8:17

**participate** 168:13
218:23 219:2 362:21
380:5

**participated** 87:25
137:20

**participating** 191:9
259:8

**participation** 86:23

**parties** 7:15 9:25
85:7,12 100:14,22
101:6,23 103:4
376:13

**partner** 9:9

**partners** 31:8,12,15,
18 32:4 370:16

**partnership** 121:11
122:6 131:12 132:7

**partnership's**
102:19 103:3 118:12

**party** 17:10 100:19
101:18 102:20 103:4
321:4 366:22 368:17
385:8

**pass** 352:3 393:15

**passing** 78:8

**past** 190:16 226:7
359:9 375:21

**patience** 387:9

**Patrick** 21:5

**pause** 295:10

**pay** 65:7 122:4
144:22 161:18
181:15 205:10,19
209:3 234:22 282:8,
16 302:23 318:14
327:13 332:6,13
344:19 355:18 356:2,
13 357:3,13 366:13
374:25 393:23

**payable** 171:12
174:15 190:6 202:18,
22 220:5 222:2,17
327:21 329:17
330:10,12,20 331:4

333:7 334:14

**payee** 140:21 142:25 216:22

**paying** 288:14,16 326:23 333:9 338:17 346:21 355:4,8 357:4

**payment** 56:5,21 57:4,6,12,18,25 58:6, 10,12 59:14,16,20,22 60:3,4,9,11 62:17,25 63:9,15 64:4,9,22 121:11,17,21 122:7, 19,23 162:13,16,17 163:4,6,10,14 164:24 182:16 199:6,11 212:18 331:20 332:24 334:9 335:9 336:12 337:3,25 338:24 339:12,14 340:2,7 342:9 343:4, 20 344:20,24 345:4, 11,17 346:13 348:5 350:7,9,20,23 351:6, 7,14,20,23 356:6,17 358:25 359:2,6,7,15 360:16,22,24 361:18 362:2,5,7,9,12,15,18, 21 363:3,7,10,15,20 364:3,7,25 365:5,9, 14 366:21 379:15 381:23 382:2,9,14,15 383:19 390:6,8,21 391:10,13,20,24 392:6

**payments** 55:16,24 56:8,14 57:2,9 64:14 162:10,24 163:16,21 165:10 167:14 217:15 282:22 288:11,12 328:4 329:16 330:3,4,6,8 334:23 335:3,19,21, 22 336:23 337:9,15, 21 355:19 356:8 357:2,10,13 358:7,21 359:9,10,20,25 360:6,10,15 361:7,23 362:4 365:14,16 377:12,17,22 378:8, 9,17,24 379:7 380:23 381:3,6,11,18 382:6 383:4,5,23 384:2,4,6, 7 387:24 388:14 390:20 391:3 392:12

393:23 394:7,18

**PDF** 293:22

**Pearl** 3:15

**pen** 296:22,25

**pending** 7:21 16:16

**people** 33:7,11 34:4 89:3 146:4 170:24 237:5 275:9,20,21 279:23 291:21 293:7 294:3 319:16 351:12 372:19

**percent** 18:2,4 86:15 108:23 109:19 110:8 260:12

**percentage** 110:19

**percentages** 86:16

**perfect** 90:17 118:5 130:19 189:4 197:19 268:19 298:8

**perfectly** 144:3 223:2 348:18

**performed** 48:5 246:11

**performing** 114:7 219:4

**period** 25:12 39:9,14 40:24 90:15 93:14 95:15 105:18 120:9 135:21 169:5 203:20 218:21 219:6,16 221:15 226:18 231:15 242:17 243:13 247:22 265:2 321:22 380:15,16

**periodic** 228:13 241:17 288:12 358:6

**periodically** 337:14

**persist** 157:9

**person** 26:2,4 43:7 44:21 57:7 79:9 86:21 87:6,7 114:2,4 116:14 155:16 167:20 191:18 259:22 291:21 292:22

**personal** 79:22 80:10 97:15 375:11

**personally** 62:20 64:3 85:23 89:11 95:4 97:9 101:22 237:4 255:20,24 275:15 296:21 303:23 304:18,22 306:12 317:21 370:11

**personnel** 237:16 318:12 333:22 359:18,21 360:13,23 363:3

**pertaining** 65:17

**petition** 21:9 70:11 84:11 235:10,14 241:20 263:20 310:15 386:5

**phone** 68:6 70:3 290:25 392:23 393:2, 5,8,9

**phonetic** 249:21

**phrase** 41:10 229:19

**physically** 191:16 294:4 296:12,16 299:17,21

**pick** 101:6

**picked** 101:10,12

**piece** 203:11

**pile** 139:23

**place** 58:24 59:6 112:16 122:18 166:2 260:7 272:13 278:16 297:14,16 326:4,10, 12 393:3

**plaintiff** 9:7

**plan** 335:24 337:20 366:5 367:6 386:9,18

**play** 85:23 153:11 168:16 184:2 340:9

**played** 86:3,6,17 335:2

**playing** 239:9

**pleading** 213:22

**pleased** 347:12,16, 17

**plural** 314:3

**point** 78:9 87:2,6,7 114:2,4 157:16 166:9 190:16 254:11 255:3, 7 261:6 313:7,20 321:13 326:6 337:12 344:9 375:23 376:11 380:22

**pointing** 254:23

**points** 282:9,10

**policy** 378:6,10 386:2

**poor** 207:22

**poorly** 104:10

**portfolio** 274:5

**portion** 13:2,6 16:5 17:22 19:13,16,19 112:23

**portions** 12:10

**position** 37:9 122:3 184:14 193:3,6,9 274:15 280:11 361:14

**positions** 38:24 172:25 173:5 183:6 184:10,18 192:16

**possession** 45:25 113:9 132:11

**possibilities** 29:19 371:23

**possibly** 213:7 314:12

**post** 92:12 184:13, 14,18 192:15,24 193:7,8 275:24

**pot** 366:5 367:6 386:9,18

**potential** 250:20 357:4 366:3,19 369:16 371:7,9

**potentially** 113:5 249:6 250:12,13,14, 16,21 354:8

**Poydras** 4:13

**practice** 7:8 64:13 89:20,24,25 90:4

91:11 97:7 98:7,12 106:14 146:9,24 150:13 230:25 231:2, 3,22,24 233:5 299:4, 5 337:4 356:13 369:2,7 371:6,15 374:15 377:21

**pre-petition** 226:18

**precisely** 205:21 298:16

**prefix** 268:15

**premarked** 91:19 104:23 197:15 216:5 236:16

**preparation** 137:21 230:11 259:9

**prepare** 123:17 204:23 226:9 229:6, 21 235:19 236:25 237:3,5,13 241:11 255:24 377:22 378:16

**prepared** 227:5,20, 24 228:15 229:2,4,9 230:3 232:20 237:8 239:17 241:25 242:3 255:20 284:19 317:14 319:5 373:2 376:18

**preparer** 256:4 259:4,5,23

**preparing** 137:10 164:9 232:5,7 241:12,15,16 254:9 264:10

**prerogative** 253:7

**present** 4:23 90:23 180:15 191:19 283:14

**presentations** 368:7,16,18

**presented** 86:10 113:14 117:10 161:11 296:11,16

**presents** 12:20

**president** 14:16 271:23 272:24

**presume** 207:13

**pretty** 105:15 364:23

**prevented** 231:6

**previously** 18:9 24:4 80:13 225:22 246:8 373:19 374:18,25

**Pricewaterhouseco opers** 84:9,13,16,20 106:7 113:23 132:5 137:2 141:24 142:3 149:3 150:9,12,16 211:10 212:9 242:21 263:3 274:10

**primarily** 267:18,20

**principal** 35:10,11, 15 36:20,24 37:5,18 38:3,4,9,13,16,21 39:3 49:11 50:3,23 55:17,25 56:22 57:18,25 59:14,17 60:12 62:18 63:2,9 64:5,14,22 119:7,10, 22 142:4 144:5 161:8,19 162:6 163:11,22 164:24 165:11 167:10 168:5 217:16,19 220:23 222:11 223:6,18,25 334:9

**principals** 274:6

**principles** 241:14

**prior** 20:14 26:12 37:10,18 54:21 56:18 57:13 62:4,10 63:23 74:14 84:10 87:17 99:16,24 121:13 131:5 138:17 144:24 163:15 164:25 165:9 189:13 193:23 199:6 206:15 212:19 217:20 227:15 243:23,24 267:12 300:13,20 301:17 331:12 333:4 334:23 335:3,7 336:11,20 337:11 339:10 346:9 370:18 381:3,7 386:4,19,22

**private** 273:19,21

**privilege** 151:14

**privileged** 66:18 74:2

**probe** 82:7

**problem** 8:3 214:14 260:18

**procedure** 271:17 291:12

**procedures** 7:20 114:8 207:21 378:5

**Proceed** 267:22

**proceeding** 197:18

**process** 52:23 55:23 56:4,5 58:18 90:21, 25 91:14 116:13 131:24 137:9,11 145:10,11 148:25 156:21,24 168:14,17, 25 169:6,9,15,17,19 170:5,9,14 176:23 179:11,20 189:2 200:16 210:21 218:6, 7,23 237:10 245:19 272:14,19 274:21 292:6 324:13 366:11 373:12

**processes** 207:21

**processing** 286:13

**produce** 178:12 195:8 210:14 235:24

**produced** 132:10 183:11 228:12,13 266:20 267:7,15,19

**producing** 241:20

**professional** 21:12, 15,20,22 22:15 356:21

**proficiency** 22:11

**project** 292:25

**projections** 335:18 337:17

**promise** 346:6

**promissory** 6:10 45:14,21 46:2 48:15, 22 49:6,12,20 50:15, 18,22 51:7 54:3 55:7 56:6,9 60:5,13 67:3 75:25 78:17 82:15,20

83:6,10,13 107:20 108:2 109:5 119:22 131:12 132:6,10,14 133:13 138:10 139:5, 10,17,21 140:14 142:9,17 144:5,12, 16,22 146:7 158:5, 13,19,24 159:5,10,23 160:16 161:10 178:14 179:14 209:2 210:8 216:16 217:13, 23 233:8,22 234:10, 15 235:8,21 240:20 241:6 243:6 244:4 282:14 284:19 285:15,17 288:21 289:10,16,18,21 290:7,12 291:5 293:13 297:4,5,11, 17,21 299:11 300:13 306:10 307:12 310:16 315:20,22 317:16,21 319:5,9 322:20 338:2,17 339:4 340:10 344:25 369:20

**prompted** 81:7 342:2

**proof** 167:8,13

**proper** 100:11 229:18

**properties** 146:15 238:8

**property** 375:11

**proposal** 125:13 281:7 282:4,6 386:24

**proposals** 367:22

**proposed** 136:18 178:5

**proposing** 366:19

**prosecution** 208:23

**provide** 15:4 28:24 174:22 175:7 267:12 295:20 299:8 311:17 333:22 353:8,14 354:3 357:19 358:5, 9,12,13 378:22 387:3

**provided** 32:20 112:8,9,17 114:18 127:12 142:8 146:15

175:3 176:22 179:19 182:23 194:25 200:18 274:25 311:24 312:4,10 327:20 332:9 335:14 351:2 353:7 354:6,19 355:7,13 357:21,25 358:4,11,15 367:11

**providing** 88:11 219:21 278:17 279:6 280:14 309:21 326:14

**provision** 103:17 132:15

**provisions** 105:7

**prudent** 302:20 303:5

**public** 21:17

**publicly-traded** 281:16

**pull** 200:10 215:6 297:20 302:7 305:2 307:18 308:25 313:9 317:2 328:10 334:4 338:11,20 341:12

**purely** 240:22

**purporting** 228:7

**purpose** 16:23 17:2 36:6 53:17 112:2 126:7 232:5,7,11 294:15

**purposes** 16:11 33:22 85:8 92:21 93:4 101:18 128:13 129:3 197:12

**pursuant** 15:8 122:6 148:25 199:10,18 200:13 256:6 275:13 278:16 279:5 280:13 281:6 288:17 290:19, 24 326:13

**put** 12:23 36:9 61:24 71:11 81:10 89:25 91:18 104:22 105:2,5 122:2 124:18 135:5, 16 139:22 151:19 170:17 177:8,10,13 197:7 207:2,5,14 215:21 218:11,18

226:22 235:15 236:15 240:4 257:10 258:16 259:10,12 266:18 281:7 292:23 326:9 345:22 368:3, 16 377:10 389:8

**putting** 144:19 197:11 240:23 265:5 273:21 306:19 316:2 330:2

**Pwc** 84:14 92:25 93:5 94:2 96:17,25 97:10 102:4 103:2,21 104:3 114:6 142:8 200:19 211:2 262:14 263:24, 25

**Pwc's** 85:24 86:23 97:6 105:22

---

## Q

**qualified** 194:11 206:19

**qualify** 101:18 136:14

**quantify** 276:22

**question** 11:22 12:3 13:4,8 17:17 22:17 26:13 35:4 38:8 40:15 45:11,22 46:19,20 48:19 51:4 68:20,21 93:12 96:4 99:19 104:11 114:14 132:4 139:14 144:15 146:18 148:13 150:7 154:4,17 155:24 156:9 157:20 158:8 164:22 171:10 174:13 175:19,23 176:18,20 178:18,24 179:3 185:9 188:18 192:21 194:18 195:11,14,24 209:6, 10 210:20 212:23 213:2 223:13 224:6 226:2 229:5 236:5 243:9 248:7,9 251:24,25 253:4 262:23 269:8,19 270:16,23 271:9,19 272:3,10,18 273:8 277:23,25 278:20

279:9 280:16,24
283:20 284:8,15
285:8 286:10 287:3,
10,19,25 288:3,9
289:2,13 290:10,22
291:24 292:20
293:16,24 296:14
297:7,9 298:23
300:16 302:3,18
303:3,11,21 304:4,7,
13,16,17 305:7
306:16,25 307:14
310:3,12,20,25
311:13,20 312:8,17
314:15,18 315:10,24
316:24 317:18 318:7,
18,24 319:24 320:7,
19 322:6,24 326:25
327:7,25 330:22
331:6 333:11,19
334:11 335:5 336:17,
18 338:4 339:17,21
340:19 341:3 342:22
345:13,20 346:7,23
347:20 351:16
353:12,16 354:5
355:6,10,16,22
356:4,15 357:7,16,23
358:17,23 359:5,12
360:4,12 361:2
363:17,23 364:11
365:7 366:16 367:2,
17 368:2 369:5,9,18
370:4 371:2,11
372:2,23 373:5,21
374:12 375:4 376:21
388:20 389:6,16
391:5 393:25 394:20

**questioned** 274:17

**questions** 11:20
17:2,4 26:15 40:19,
21,23 47:9 77:13
79:13 81:17 82:6,12
99:7,10 105:7,13
156:2 157:12 169:21,
24 171:7 177:2
180:16,17 184:4
209:5 266:10 300:6
352:5,10 377:8
384:16 385:3 386:6
387:8,15 393:18
394:25 395:7

**quick** 393:18

**quicker** 324:14

**quickly** 139:21

**Quinn** 4:19 10:4

**quo** 248:18

**quote** 118:11 189:6

_____

**R**

**ran** 88:2

**range** 287:22 289:22

**rarely** 320:13

**ratification** 319:21

**reached** 66:4,9 69:3
76:3 79:2,9 342:11
343:8

**reaching** 350:12

**reacted** 347:23

**reaction** 389:24

**read** 101:21,25
102:12 172:8 198:10
208:21 209:6,7
301:20,22 316:4

**reading** 120:11
138:7

**Real** 31:11,17

**realtime** 265:16

**reason** 81:13 85:2
96:6 101:11 109:4
114:23 116:25
117:16 127:2 141:21
150:3 159:14 160:15,
23 161:3 205:21
235:3,5 238:5 247:9,
24 248:25 256:11,13
286:2 301:4 318:16,
21 346:18 361:4,10
364:6

**reasonable** 108:17
333:15 337:23

**reasons** 161:13

**recalculate** 275:8

**recall** 15:3 18:13,18,
20,22 19:17,20 20:8,
10,21,22 23:4,12,20
24:23 25:16 27:16

29:13,17 30:17,18
32:16 36:22,23 37:7,
12,22,23,25 38:19
39:8,20 40:2 49:19,
22,25 50:2,8,9 52:9,
21 53:8,15,16 57:22
59:2,3,11,20 60:18
61:25 62:6,17,23
63:6 65:2 67:19 68:2,
3,7,8,11 69:17,20,21,
25 70:5 71:6,21,22,
23 78:5 79:15 80:17,
18,21 89:14,19 90:13
91:5,6,9,13 95:2,9,
13,17,21 96:13 99:5,
6,8,9,12 100:20
102:6 112:21,22
113:15 114:3,15,21
115:8,14,17,18
116:15,18,19,23
119:15 122:17 123:5
124:7,10,12 126:5,9,
16,20,25 127:2,5,8,
21 131:25 132:13,17,
19 134:10,18 135:3
136:4,5 138:21,25
139:7,19 141:6,8,11
144:12 145:3,4,16,
20,22 148:16,17,20,
22 150:11 155:4
158:16,21 159:2,7,12
160:7,13 165:4,5,13,
17,20,24 166:13,16,
18,20,21,25 167:6
168:24 169:16
171:18,21 173:7,8,21
178:5 179:6,24
180:6,14,18,19,20
183:16,20 188:19
189:3,21 190:22,24
191:6,10,12,19,24
192:10,19 194:16
196:19 200:9,11
201:23 202:2 209:17,
20,23 210:3,9,18,25
211:19 212:3,14
217:18,20 219:5,9
220:21 223:10
225:13,18,20 228:25
233:10,20,25 234:8,
9,12,14,20,24 235:6,
12,18 236:11 237:22,
25 241:9 242:5,10
243:10 244:22
245:14,18 246:20,21
247:2,6 248:15,19

249:13 250:24
251:13,18,20 252:13
255:5,15,17 259:8
262:4 265:21,22
268:24 269:3 270:11
276:4,6,23 277:2,3,7
280:11,17,25 282:14,
24 283:8,11,13,15
284:6,11,20,22
289:6,21 290:2,3
291:3,6 292:9 293:17
296:18 298:24
299:16,18,21,22,24
300:17,24 301:3,12,
15,18,25 303:15,22
313:12 314:24,25
315:25 316:8 318:9
319:10,11,13,25
320:10 321:13,16,18
322:17,25 323:22,23
324:3 331:19 334:4,
18,21 339:9,18
340:8,12,15,16,23
341:4,5,8,11 342:2,
19 343:14 345:21,25
350:10,12 351:17,24
361:3,14,17,20,21
362:3 364:5,7 365:9
369:7,22 370:10
380:8,14,16,21
383:10,21 384:2
387:6 388:7 389:10
390:7,18 392:20
394:2

**receipt** 380:20

**receivable** 118:12,
14 238:21,25 239:11,
18 240:10 243:18
245:24 246:6,15,22
247:10 249:2 250:9
251:8,16

**receive** 11:6 22:10
141:17 303:23
304:18 305:23
332:11

**received** 42:9,17
43:15 85:12 123:21
125:14 141:17 142:3
212:16 293:20,21
304:10 305:25 383:7

**receives** 179:16

**recent** 367:9

**recess** 36:16 73:6
150:25 224:24 266:6
325:8 349:7 372:15

**reckoning** 310:22

**recognize** 217:10
320:13

**recollection** 24:25
29:14 39:22 40:6
67:21 71:5 105:12
115:12 124:19
126:22 127:23
128:10,22,25 131:16
166:15 173:22 180:7
183:19 187:24
192:20 221:5 223:23
225:6 227:10 228:14
229:7 246:3 251:6
252:19 253:9 269:4
270:8 275:22 282:21
283:7 290:5,18
309:18 344:11
367:14 369:15

**record** 7:10 10:17
36:3,15,18 73:5,8
150:24 151:3 209:7
224:23 225:2 266:5,
8,18 267:9 301:22
302:6 320:15 325:7,
10 349:3,6,9 372:14,
17 392:25 395:9

**recorded** 8:10 225:7,
15,22

**recording** 7:16
100:11

**records** 50:19 225:8,
15 227:13 235:17
237:15 240:12,14
257:21 258:5 286:23
300:2,4 306:5 312:22
393:10

**recover** 167:9 168:3
181:22 182:3

**redacting** 312:23
313:6

**redeem** 281:12

**redeemed** 276:13

**redeeming** 281:20

**refer** 13:13 18:6 21:9
22:24 27:12 30:4

31:14 32:7,17,24 33:19 44:2,10 54:10, 24 68:24 79:17 84:13 95:11 175:2 186:24 203:6 279:24 329:3

**reference** 92:17 103:12 200:12 202:6 222:3,10 223:9 238:20,24 260:21

**referenced** 132:14 186:25

**referred** 84:4 91:15 123:24 143:7 169:21 186:7,20 223:15 279:20 366:5

**referring** 33:16 50:17 75:24 76:6 118:8 163:5 187:11 199:25 223:11 226:15 281:5 314:2 316:3

**refers** 170:4

**reflected** 13:14 75:5 175:16 181:15 235:4 240:9

**refresh** 24:24 105:12 131:15 192:20 221:4 223:22 227:10 367:13

**refuse** 74:9,10 209:2

**regard** 133:5

**regret** 81:10

**regularly** 355:18

**reimburse** 145:15

**reimbursement** 279:17 325:19,23 379:20 388:16

**relate** 130:6

**related** 59:23 60:4 90:25 100:13,19,22 101:6,18,23 102:19, 20 103:3,4 105:7 131:17 138:5,10 145:9 167:14 208:25 280:22 281:3 284:2 366:22 368:17 376:13

**relates** 76:14 113:6, 18 130:11 211:24

**relating** 131:2 138:19

**relation** 27:21 30:10, 13 35:6 41:18 58:21 112:3 125:9 163:21 172:25 176:17 184:11,18 191:16 264:13 385:18

**relationship** 374:3

**relationships** 100:13 102:20,21 103:4

**relative** 192:16

**relayed** 188:8 206:4 342:12

**relaying** 206:3 207:24 344:18

**release** 329:6 330:8

**relevant** 88:13 208:15

**reliable** 113:2

**relied** 305:13

**rely** 85:14,18 96:3 237:12 331:2 337:23

**relying** 85:20

**remained** 202:18,23 203:8

**remaining** 119:10 223:25

**remember** 59:8 70:9 71:2,3 80:22,23,24 87:23 95:19 102:9 122:25 123:2,19 124:16,24 127:6,14 128:6,7 129:11 131:19 147:15 162:22,24 163:4 165:6 166:3,7 172:17 174:4 187:13,19,21 188:15 189:18 194:7, 15,24 195:4 200:6,15 234:4 236:12 250:3 253:13,14,23 254:15, 17 274:12 277:16 282:17 284:12,17,23 286:3,22 291:21

293:12 296:9 299:12 300:10,12 302:16 309:11 313:22 316:3 317:5 319:4,7 320:2, 5 323:7 324:4,8 326:6 333:25 339:8 340:21 342:14 344:15,18 345:25 346:3,4 351:11 357:17 361:18 364:9, 12,14 365:10,25 377:14 387:25 389:17,18 390:22,23 392:4,22

**remembering** 289:17

**remind** 72:19 77:17 391:23

**reminded** 132:18

**reminder** 337:3

**reminders** 378:22

**remote** 7:16 371:24

**remotely** 7:11,14 8:18 12:20 299:6,9

**rendered** 204:5 233:23

**renege** 373:18

**renew** 196:25

**renewal** 168:10,14, 16,25 169:6 170:5,9

**reorganized** 3:4 9:5

**rep** 95:11 136:17

**repaid** 57:4

**repay** 203:19 204:11, 15,25 205:12 211:11 212:10 304:23

**repeat** 17:19 38:7 45:11 46:21 48:20 146:21,22 249:25 269:21 270:24 336:17,18 339:21

**report** 5:25 14:13,21 19:12 26:21 88:2,6, 16 89:12 98:18 105:8 106:4,8,16 110:25 111:21 112:7,12,25 115:20 116:5,17,21

117:2 119:19 131:5, 11 133:12 134:7 135:6 137:5,7,10,12, 25 138:3,4,9,13,19 166:8,11 178:13 219:13,15 226:19 227:4 228:7 229:2,4 232:12 256:15 257:4 258:20,24 259:5,23

**reported** 19:7,10,17, 21,25 20:23 21:2 119:17 120:23 226:10 240:15 258:14

**reporter** 7:12 8:24 10:10 209:6 268:8,18 301:20

**reporting** 7:6 8:22, 25 20:9,13,17,23 21:4 87:22 91:2 114:17 230:12 231:14 232:6,19

**reports** 89:22 113:18 115:2 143:8 171:5 196:22 226:14,16 229:6 255:18 256:20 257:19 259:9,13,14

**represent** 9:25 10:4, 22 133:4 267:23

**representation** 5:17 91:16 94:21 95:5,16 96:9,18,22 97:2,8,13, 19,25 98:9 99:2 103:7,17,23 104:8 106:11,15 130:8,9 135:25 136:6,14 214:23 215:9 262:16, 22,25 295:17

**representations** 92:21 98:19,24 136:16,23,24 262:24

**representing** 9:11, 14,17,21

**represents** 310:10

**reproducing** 171:6

**request** 87:4 103:25 172:8 196:25 291:15 379:7

**requested** 196:21 362:18 363:7

**requests** 85:18 373:3 387:18

**require** 63:16

**required** 56:9 94:5 96:17 97:19,20,21,25 98:3 127:18,20 340:2 390:5

**requires** 96:25

**reserve** 245:2,6 260:24 261:4,8

**reserved** 244:22 245:13,16

**reserving** 46:17

**reside** 257:21

**resolution** 383:16

**resolved** 374:18 383:3,6,15

**resolving** 366:4

**respect** 27:18 34:13, 18,23 35:2 37:4 39:7 56:15 112:17 134:17 182:7 212:5 261:8,16 273:12 333:8 335:9 339:12 340:6 365:22 383:18 385:17 393:21

**respond** 174:25

**responded** 174:8 182:22

**responding** 210:11

**responds** 176:3

**response** 8:5 83:24 174:8,13 176:4 178:6,18 182:20,24 185:5 189:6 190:8 194:17,18 195:9,13 205:6 210:20 267:22 350:11

**responses** 81:4 184:3

**responsibilities** 25:18,23 28:10 31:2, 4 38:21 219:20

**responsibility** 26:6, 10 88:5,9 115:23 116:2,3 258:11

287:16

**responsible** 56:13, 17 86:22 89:8,9 115:19,22 116:4 146:6 230:10 258:4,7 384:19,23 385:8,13

**responsive** 175:23 176:17,25 185:8

**rest** 214:23

**restate** 75:17

**restrictions** 8:19

**restroom** 324:22,25

**result** 276:8 347:6

**results** 5:22 226:11 227:2,5,19 228:7

**retail** 32:21,24 33:2, 4,8,12,14,15,18,22, 23 34:5,8,13,18,23 35:2,6,12,14 36:21 37:17 38:2,5,10,17, 22 39:4,7 160:8 168:10,18 169:20 170:12 171:19 172:25 173:5,10,13, 16,20,23 174:13 175:15,23 176:18,22 178:7,13,17,23 179:3,8,12,15,19,25 180:8,22 181:2,8,14, 19,21 182:2,6,11,15 184:4,11 185:14 189:14,19 190:4,14, 18,20 191:2 192:16, 24 193:3,4,6,11,15, 18 194:11,17 204:18, 23 205:6,22,23 206:13 209:16,19,21, 24 210:5,11,20,22 385:12

**retain** 149:8,9

**retract** 39:17

**return** 49:7 51:7 123:22 306:18

**reveal** 66:17,18

**revenue** 16:6 17:22

**review** 11:5,6 13:2 89:11 160:11 175:9 184:5 288:11 295:3,

15

**reviewed** 231:13 232:13 233:3 294:21 295:5,18 322:11 334:14,20

**reviewing** 198:12 233:2 237:22,25

**right-hand** 198:6

**rights** 340:6

**ring** 277:13

**rise** 287:22

**role** 14:14 31:5 85:23 86:4,5,17 168:16 184:2,8 335:2,7 340:9 370:13

**roll-up** 126:17

**rolled** 126:11

**Rome** 170:24

**room** 7:9,13 9:10 105:3,5

**rope** 88:24

**roughly** 120:14

**Rukavina** 3:20 5:7, 10 9:19 42:19 44:17 45:3,8,16 46:10 47:20 48:3,16,25 49:13 55:20 107:4 126:3 133:23 142:6 143:15 163:25 195:7 212:24 213:24 266:11,14,15,22 267:6,17 268:8,19 269:16 297:19 298:6, 8 301:23 302:5 303:13 304:5,9,15 305:2 306:6 307:16 308:7,10,24 309:5,14 311:21 313:8 317:2 325:2 329:12 331:8 332:21 338:11,20 339:21 341:12,15 343:11 345:22 349:4 352:3,13 377:10 380:25 387:12,20 393:15

**rule** 7:19 267:8 356:11

**rules** 7:19,20 11:17

**run** 46:24 188:6 329:17

**running** 45:4 254:19 256:25

---

## S

**satisfied** 89:21

**satisfy** 89:12 122:8, 14 124:3 208:7

**Sauter** 162:20,21 163:20 164:7,8,24 166:20,24 167:4 168:4

**scenario** 264:4

**scenarios** 276:20

**schedule** 6:13 117:10 222:23 244:3 309:2 311:10,17 337:2 377:12

**scheduled** 336:9,11 356:8

**schedules** 129:10 308:25 311:15 317:11

**scheduling** 355:13

**school** 22:5

**scope** 136:18

**Scott** 7:4 8:21 14:20

**scratch** 298:14

**screen** 12:24 91:19 104:22 135:6 140:6 151:20 170:18 197:7, 12 215:22 216:14 226:23 230:7 237:17 308:9 377:11

**scroll** 106:18 117:22 130:14 136:9 140:23 152:16 170:25 171:24 174:7,18 176:2 182:21 201:11 202:3 217:3,5,8 238:17 297:25 331:10 332:22 341:16 343:12

**SEC** 274:13,16,19 275:18 384:19,22 385:7

**secret** 338:8

**secretary** 172:20

**section** 41:8 101:5, 19,22,25 110:24 111:17,20 112:7 113:12,17 115:2 116:5,17,21,25 117:17 130:3,15 131:3 134:7,22 138:4 170:10 175:14 192:6 215:16 220:5 294:20

**sections** 143:9 192:7

**seek** 12:9 199:6

**seeking** 332:16

**Seery** 71:23 72:2 166:9 233:20 234:11, 17,21 235:2,8,20,25 236:6 322:15 323:4, 16,19,24 324:8,16 340:12 346:10 348:2 350:8,13 368:8,10,14 375:7 379:25 392:18

**sell** 118:23 282:2

**send** 13:20 342:3 377:11

**sends** 174:5

**senior** 232:13,15 275:20 318:12

**sense** 57:5 88:19

**sentence** 98:14,15, 20 118:20 120:13 121:7,10,18 130:7 133:17 138:19,23 139:6,11 187:9 189:6 199:5 203:18 211:24 212:5

**sentences** 314:6

**separate** 54:24

**September** 169:7

**series** 11:20 328:14

**serve** 19:3 24:15,21 29:2 32:14 33:7,12 34:4 35:11,15 37:17 38:25 39:2

**served** 11:7 18:10 19:13 32:25 39:9,14 40:9,24 46:4 47:16 49:16 51:9,14,19 84:9 90:15 94:22 95:6 137:2 155:6 172:19 227:6 229:23 248:24 255:6

**serves** 133:2

**service** 185:10

**services** 15:5 28:25 30:2 32:21 33:25 42:22 59:2 128:21 129:9 171:15 185:6, 23 186:8,10 219:22 278:17,23 279:7,12, 21,24 280:3,5,6,13 325:20,23 326:2,15, 19,22 327:19 330:17 335:15 336:20 351:4 353:6,9,13,21 354:2, 7,8,18,23,25 355:2,7, 12 357:20 358:2,4,6, 11,14 379:19 380:11 388:15 390:20,21

**serving** 247:23

**set** 89:24 92:25 93:5 112:6 256:21 315:6,7 378:16,21

**settlement** 348:8 386:24 387:4

**seven-month** 265:2

**severity** 7:7

**shades** 36:13

**share** 209:18 262:14

**shared** 59:23 185:6, 10,22 186:7,10 209:16 278:23 279:24 325:19,23 326:2 351:4 353:21 379:19 380:11 388:15 390:20,21

**shareholders** 125:13 278:5 281:8, 12,18 282:5 293:4

**shares** 276:15 281:20,22 282:2

**Sharp** 249:21

**sheet** 106:19 107:25 108:11 109:6 110:4,5 111:11 112:4 120:23 175:2,14 179:17 220:2 222:21 228:22 229:3,8,16 230:5 243:7 251:14 253:22 294:12,24 370:22 372:6

**sheets** 107:14,22 175:8

**short** 266:2 279:16 332:7

**short-terms** 331:22

**shortfalls** 335:22,24

**show** 126:20 189:25 226:20 257:2

**showed** 119:2 370:8

**shown** 322:8

**shows** 293:9

**sign** 50:14 91:15 94:20 95:16,22 96:8, 18 97:2 106:14 135:24 136:6,22,25 139:4 141:4,21 143:14,23 144:11 150:4 153:24 154:5, 10,18,22 155:3 158:4,13,18 159:4, 15,23 160:16,25 181:3 213:16 289:9, 11,16 293:25 306:17 320:14

**signature** 92:3,7 105:22 106:9 130:7 136:20 140:25 141:2, 7 143:4,21 144:20 152:20,21 217:9,11 256:3,15 262:21 294:5,12 298:14 299:2,19 305:6 320:22 321:3

**signatures** 298:3,10 299:8,20

**signed** 46:2 55:7,12 92:5 94:25 95:2,4,11 96:22 98:10,23,25 99:4,7,10,16,25 103:18 106:7,16 107:2 123:4 132:13

137:6 139:10,16 141:10,15 143:24 144:4,13,15,21 148:15 153:14 158:23 159:9 161:5, 20 180:24 181:16,23 182:8,16 201:12,14 213:7,9 256:2,4,8,12 257:5,15 258:24 262:15,20 289:23 293:25 296:20,21 298:4,21 299:13 301:16 305:16,20 306:10,22 315:2 316:14 319:19 320:16

**signer** 103:7 363:2

**signers** 152:11 159:20

**significant** 228:21 229:3,7 230:4

**signing** 141:6 152:23 156:23 296:9 299:17, 22,23 319:21

**similar** 135:25 218:7, 9 272:3,19 311:9 325:17 331:11 338:14 353:8 357:20 370:5,6,17

**simple** 156:8

**simply** 188:23 361:5

**single** 62:13,24 89:15 93:9 95:9 129:11

**singular** 314:3

**sir** 13:23 21:13 22:17 43:9 68:17 69:14 80:11 115:12 130:17 140:3 141:2 144:4 146:18 151:23 154:18 156:8,20 158:2 167:23 209:12 218:18 266:15 278:8 301:25 302:12 304:4 307:22 317:14 328:18 331:15 332:20,25 333:6 334:17 336:19 341:20 351:25

**sit** 102:13 114:24

116:24 138:22 141:12 159:13 231:20

**sitting** 149:24 270:7 284:22 310:8 314:19 320:3 348:16 351:10 382:23 392:3

**size** 271:21 309:25

**skip** 55:13

**Skyview** 14:5,7,9,17, 24 15:4,14,19 16:6, 14 24:4 28:20,22 377:2

**Skyview's** 16:6 17:22

**smaller** 288:12

**smart-ass** 306:9

**social** 7:8

**sold** 276:15

**solely** 132:3 208:25

**someplace** 278:13

**sort** 142:13 208:15, 16

**sorts** 288:11

**source** 80:18 257:17

**speak** 62:13 63:25 72:20 73:9,14 74:15, 19 94:24 103:6 151:4 233:12 284:10

**speaking** 95:8 179:24

**specialist** 8:21

**specialized** 94:16

**specific** 25:22 40:19, 23 97:7 120:19 124:8 198:15 199:3 224:16 235:12,18 253:15 323:8

**specifically** 29:13 40:21 57:22 59:2,11 68:10 70:9 71:21 85:17 87:10 117:24 121:19 124:16 126:5 128:6 131:25 141:6, 11 145:5 146:3 162:23 180:6 187:19

192:10 194:8,25 196:20 233:11 234:2, 5,13 247:6 248:20 249:13 250:24 251:18 252:13 253:13 255:5,16 277:2 292:9 296:9 297:5 298:25 299:16 313:22 314:24 321:16,19 334:2 339:8 340:22 357:17 389:19 391:9

**specificity** 163:18 239:9 390:19

**specifics** 345:15

**speculate** 20:5 188:21 301:5

**speculation** 142:7

**speed** 247:4 249:10, 22 313:5

**spilled** 169:17

**spoke** 62:14 74:5 151:7 188:9 249:20 350:16,17,18

**spreadsheets** 368:19

**spring** 125:17 201:21 280:10

**stable** 90:5

**stack** 197:4

**staff** 116:9

**stamp** 296:23

**stand** 328:24

**stand-behind-you** 88:25

**standard** 231:22 233:4 335:13 372:3

**standards** 256:21,24

**Stang** 3:8 9:5 10:20 72:10 166:19

**stapled** 197:22 214:12

**stare** 298:11

**start** 8:9 41:9 170:21 214:18 248:14

268:21 304:16

**started** 21:3 36:7 125:19 207:15 231:10 304:15

**state** 8:4 10:16 47:2 161:16

**state's** 7:20

**stated** 8:3 24:5 179:15 206:9 246:8 249:8 290:12 294:16

**statement** 114:18 118:24 120:19 121:5, 10 133:7,13 134:4 179:17 190:14 194:18 204:3 205:18 224:10 228:20 262:5

**statements** 5:19 6:3 41:7 48:2 84:17,23 85:3,13,19 88:11 90:3,7 93:25 95:14 100:12 102:8,11,12 104:22 105:18 112:2 113:7,14 122:12 130:23 133:22 134:2 135:20 142:12 176:24 179:23 180:15 201:8 211:7, 22 217:25 218:4,20, 24 219:6 221:15 222:24 235:17 241:24 242:3,15,17 254:10 260:3 261:20 264:11,13 286:19 301:11 306:5 370:9, 12,17 378:24

**states** 8:12 98:16 118:11 119:20 200:23 201:3,6

**status** 248:18

**stay** 248:19 363:9 387:10,16

**step** 347:3,4

**steps** 88:16

**stick** 20:7

**sticking** 203:5 277:13

**Stinson** 4:6 9:13,25

**stipulate** 7:15

**stipulation** 8:6

**Stock** 281:16

**stonewall** 157:18

**stood** 328:22

**Stoops** 276:2

**stop** 76:19,20,21,23 77:11,22 81:21,22 106:2 155:19,22 157:14 215:6 220:2

**stopped** 231:16 294:3 381:3,6

**stopping** 390:19

**strategy** 164:12

**Street** 3:15,23 4:13 8:23

**stressful** 292:24

**strike** 114:12 246:13 247:21 248:5,22 250:6 252:23 272:13 291:2 307:16 310:7 343:24 346:16 364:22 372:8 393:4

**string** 5:21 172:3 183:22

**structure** 87:22 112:13

**stuff** 156:6 157:5 252:11 295:6

**subevent** 130:24

**subject** 55:8 65:8 82:16,21 83:6,10,14 109:24,25 124:14 139:5,11 168:10 277:5

**subpoena** 11:6 16:18 81:13

**subpoenaed** 352:21

**subscribe** 281:12

**subscribed** 276:14 395:16

**subscribing** 281:19

**subsequent** 130:3, 10,21 131:2 133:8 134:19,22 138:5,9

143:9 242:22 262:14 263:4 274:12 370:24

**subsequently** 244:22

**substance** 72:22 73:15,19 74:6 151:5, 8 185:7 209:22

**substantively** 12:15

**substitute** 16:15

**succeeded** 31:22 32:11

**successor** 32:8,15

**sued** 182:2 375:6,14

**suffered** 276:7

**sufficient** 122:3

**suggest** 277:12

**suggesting** 338:9

**suggests** 253:2

**suing** 373:16,24 374:5

**SULLIVAN** 4:19

**sum** 250:4 335:20

**summaries** 368:4

**summarize** 273:14 279:12 280:4 296:8

**summarized** 274:21

**summarizing** 188:13

**summary** 5:23 237:19,23 279:16

**Suntrust** 4:17 10:6

**Super** 395:5

**supplemental** 218:20

**supporting** 311:15

**supposed** 315:14

**Surgent** 171:4 275:23

**surprised** 352:9 356:11 376:22 394:17

**Susan** 7:12 8:24

**sustained** 17:14

**swear** 7:13 10:10

**swearing** 7:17

**Switching** 321:25 324:20

**sworn** 10:12 395:16

**sync** 296:6

**system** 330:9

---

**T**

**Tab** 328:11

**taker** 324:16

**taking** 81:12 110:14 120:12 176:7 208:16 226:17 239:23 240:23 323:19 348:24

**talk** 89:2 157:16 164:15,20 233:19 279:2 293:7 325:13 350:16 387:17 388:23 395:4

**talked** 100:3 113:4 130:8 151:11 162:14, 15 187:21,23 188:4,7 190:15 217:14 222:23 249:14 253:16 268:3 292:11 311:15 349:19 351:5 378:5 379:18 389:2 391:9 394:6

**talking** 40:5 59:13,16 75:14 76:20,23 77:12,22 89:15 101:23 157:14 162:16 208:24 222:6, 8 231:19 259:25 264:19 323:6 341:23 350:13 351:11,13 352:16,17 354:18 368:18 379:25 383:14

**talks** 58:19 100:11 350:6

**task** 291:14

**tax** 280:7 354:22,25 358:11

**taxing** 353:5

**team** 53:4 86:8,12 87:12,14,22 88:21,23 89:2,8 112:10,12 113:8,24 116:7 137:18,20 147:14,18, 19,24 148:2,4,5 149:7,11,14,15,24 150:19,20 188:4,6 200:17 219:3 237:7 255:25 257:8,12,17, 23,25 258:4,7,12 259:11 272:23 290:11,13,14,15 291:8,17 292:5 309:21 311:24 312:13 335:11 351:7 367:10 368:3

**teams** 116:10 337:6 354:10

**tech** 320:20

**technologically** 320:12

**telephone** 191:15 290:19 342:23 344:12,14 392:22

**telling** 71:23 79:10 125:4 166:18 181:8, 14 182:14 207:24 246:21 251:4 253:9 285:5 287:8 317:5

**tendered** 45:2 55:18 57:19 58:3 60:13 63:3 64:6,15,23

**tenure** 39:20 40:2 86:3 94:4 102:11 114:5 230:14,18 368:25 369:11

**term** 28:19 33:13 41:17 44:16 45:14 51:17 53:13 54:2 58:14 69:8 71:20 75:23 79:8 99:16 170:8 173:2 186:21 315:14,15 333:14 362:14 364:3 369:16 383:19

**terminate** 380:11

**terminated** 326:5

**termination** 326:7,8, 9 380:21

**terms** 33:21 65:23 66:2,6 69:22 75:8 76:2 78:25 79:23 80:11 83:16,20 319:8,12,14 336:7

**Terrestar** 145:9 273:12,18,19 274:7 384:20 385:9,14,18

**testified** 10:12 68:18 80:7 155:5 156:11 179:7 201:23 206:10, 18 211:14 253:2 256:24 259:10 261:10 269:23 270:2, 13 282:24 283:6 289:3 309:20 312:20 313:3 314:16 318:8 319:10 320:8 351:2 357:8 362:24 378:4, 20 379:3 380:12 388:17

**testifies** 318:3,11

**testify** 252:18

**testifying** 252:22 302:14 387:22

**testimony** 16:11,19 20:7,15 29:5 72:22 289:17 301:13 318:5 370:19 387:25 391:11

**Texas** 3:16,24 4:8 8:14

**Thanksgiving** 329:20,22

**Thedford** 171:4 172:3,11,24 173:5 174:20 176:3,16 178:6 182:23 186:20 192:5 198:19 210:10, 13 275:24

**Thedford's** 182:20

**theme** 324:21

**thing** 129:4 187:5 199:23 215:17 320:2 357:3

Index: things..unable

**things** 61:14 85:6
89:5 136:19 142:13
147:17 153:10
162:15 248:16
249:12 254:24
257:10 259:14
261:23,24 263:18
264:3,17 265:14
279:22 280:8,9
288:14,16,17 292:22
295:21 329:4,24
333:21 352:12
354:11 356:25
357:10 371:16
373:11 374:25
376:24

**thinking** 22:18
324:11,12

**Thomas** 171:4
275:23

**thought** 37:14 40:11
54:20 127:9 188:25
235:8 252:2 263:23
304:12 363:13,21

**thoughts** 348:22

**thousands** 224:14
286:11,16

**thread** 118:4

**threatening** 374:22,
24

**thumb** 356:11

**tickler** 337:8

**tie** 222:25

**ties** 111:18 243:20

**till** 200:24

**time** 12:23 17:15
19:7,13,16,19 20:2
24:16,18,20,21 25:3,
12 37:18 38:25
39:10,15,18,23 40:8,
25 42:2 43:22,23
45:9,24 46:6 47:15
49:16 50:10 51:9,14,
19,25 55:15 56:8
58:19 60:22 61:10,
21,25 62:3 64:4
72:17 73:2,3 75:21
76:7 77:8 81:12
84:19 85:4,9 86:19,

24 87:3,8,17 93:7
99:16,24 100:6 101:3
113:16 114:16
116:16,20 120:9
122:5 124:4 127:16
135:24 136:15,16
137:12,22 138:15,18
139:4,9,16 141:10
148:19,21 154:21
158:11,18,23 159:4,9
160:8,24 162:4
163:10 164:25
166:12 168:24 169:2,
4,5 186:4 191:7
192:13 204:4,14
205:20 206:12
207:20 212:13,21
221:5 225:17,19
227:6 229:12,23
230:14,15 231:7,15,
16,23 232:21 233:4,
13,14,15 238:4
240:3,25 241:19
244:5,16 246:5 247:8
248:3,23 250:7 253:5
254:18 255:6 259:14
261:25 264:15 265:6,
9,24,25 266:2,25
269:14 270:8 273:17,
19,25 274:11 278:14
283:25 294:15 299:3
303:8 313:20 321:19,
22 322:13 323:4
331:25 337:20 339:7
343:23 352:2 353:25
357:3,5,12 358:19
363:25 365:12 366:2,
18 369:13,23 370:11
371:13 386:4,17
388:12,25 389:9
395:3

**timeframe** 169:8

**timeline** 40:20

**timely** 86:11 330:19
331:4 333:16 356:13,
24 357:14

**times** 11:11,13 25:7
62:12 90:17,18,19
207:17 249:8 250:2
252:2 298:15 320:8,
25 321:2 324:8 368:5
374:4 392:8,14,15

**title** 14:9,11,12 23:6,8

25:13 27:17 28:7,11,
17 34:12,22,25 35:5,
8 37:3,9,16 39:6
51:25 111:10 173:8
174:2 183:13,17
192:23 227:3,11
269:6 270:9,11 305:8

**titled** 237:19

**titles** 27:20 30:9,12
34:15,17 37:15,21,
22,23,25

**today** 11:2 13:20
23:22,23 24:7,13
28:4 30:23 31:11
51:17 73:15 81:11
93:12 102:14 116:24
118:8 141:12 162:14,
16 173:10 203:20
267:12,19 268:4,9
270:7 273:20 284:22,
23 286:4 291:22
310:8 314:19 317:15
320:3 370:8,18 392:3

**told** 47:8 58:18 60:11
67:19,21 69:21 78:3
81:6 116:19 132:5
138:23 139:3 145:18
154:10 162:17
163:20 165:8 174:4
180:22 181:2,19,21
182:6 189:14,19
190:20,25 191:8
203:9 204:18 205:22
211:5 234:20 246:9
248:17 250:13,16,20
251:7 254:4 257:16
282:5,16 283:16
287:5 318:4 375:24
385:7 386:7,17
391:12 392:5,11

**tomorrow** 395:4

**tone** 394:5,12

**top** 92:10 111:4,8
198:5 219:19 313:10

**topic** 114:19 234:3,
15 251:21 253:15

**total** 109:13 110:8
119:21 238:7 239:12
240:9 260:12 335:20
389:11

**totaled** 143:11

**totaling** 223:17

**Totally** 269:16

**touching** 264:5

**track** 337:9 364:15

**trade** 281:23

**trades** 273:25 274:8

**trail** 288:22

**transactions** 85:6,8,
14 100:13 102:21
103:5 148:6 224:15
285:21 286:5,12,13,
17 289:25 295:24
373:9

**transfer** 141:20
287:5 288:6 332:16

**transferred** 141:9
285:4,10

**transfers** 283:24
285:21 327:16

**transmitted** 340:25

**transparency**
295:20

**transparent** 313:4
375:10

**treasurer** 23:9,10,
16,22,23 24:2,3,6,8,
10,13,15,21 25:2,8,
14,18,23 26:19,22
27:4,22,23,25 28:3,5,
8,12,18,20 29:5,9,12,
15 30:14,15,16,20,
22,24 31:2,3,5 39:2
135:23 138:14
152:24 153:3,16,22
155:7,10,14,21
156:4,12 158:3,9,12
176:14 202:12 204:2
269:6,12,13 270:3,5,
9 272:4 305:8 327:4
336:4

**treasury** 335:15
336:25 351:3 354:7,
11,22 358:4

**treatment** 242:12

**trick** 348:7

**trigger** 369:24

**triggered** 274:16

**true** 74:18 89:22
186:4 204:4 269:11
277:13 333:6 350:21

**trust** 4:10 9:18 65:11
244:23 245:3,7
247:11 373:23 374:5

**trusted** 257:7

**trustee** 4:16 10:5
65:10

**truth** 252:18,20

**truthfully** 252:22
253:3

**TSG** 7:6 8:22,25

**Tuesday** 8:19 172:4

**tunnel** 293:3

**turn** 100:8 105:25
110:22 149:12
259:16 261:13

**turning** 197:12,16

**turns** 317:20

**two-month** 323:11

**type** 88:25 94:21
130:23,25 227:9
253:25

**types** 148:6

**typical** 103:25
106:17 371:5

**typically** 144:11
168:22 169:10
192:12 230:16
289:16 296:22
329:16 355:24,25

U

**Uh-huh** 69:4 210:17
237:21 368:20

**ultimately** 125:6
178:17 274:22 387:6

**unable** 122:14
203:18 204:24 208:7
211:10 212:10

**unaware** 64:24

**uncollectible** 244:9, 17 245:25 246:7,17, 24 247:13,25 249:3 250:10,15 251:9,22 253:11 254:4 255:9, 15

**uncomfortable** 90:14,20,24 91:9

**unconsolidated** 110:2,18

**undergoing** 207:20 241:16

**underlying** 246:11 311:24 332:12

**understand** 10:21, 25 12:6,9 13:24 17:3 31:10 41:13 45:22 53:22 55:9 68:20 74:4 75:22 76:5 78:24 79:16 98:22 99:18 104:2 127:7 133:9 153:15 158:7 176:20 203:12 222:9 225:25 267:25 268:17 273:3 288:2, 13 296:19 297:9 300:21 312:6 313:24 315:12 316:12 338:9, 25 353:24 364:16 374:7 376:10

**understanding** 41:10,17 53:6 65:22, 25 66:5 84:25 85:11 96:25 97:11,16,18,24 100:18 103:20 104:3 111:15 118:16,19 146:25 152:4,6,7,9 153:14,21 156:3 170:3,8 173:4 175:19 184:17 195:15 242:19 256:19 259:22 270:19 277:25 311:9 326:3 372:19 373:23 374:4 375:17 379:24

**understood** 69:2 155:6 203:10 382:22

**undo** 374:17

**unfettered** 372:21

**unilateral** 382:20

**unilaterally** 270:20 271:4 272:5

**unique** 12:21

**United** 8:12

**unlike** 12:18 353:20

**unpaid** 119:10 161:8, 18

**untested** 207:22

**upcoming** 336:8,11 337:25 355:13

**updated** 154:22

**upset** 362:11 390:2

**urgent** 356:23

**URQUHART** 4:19

**USD** 331:14

**V**

**vacation** 321:23 329:23

**vague** 353:19

**valid** 159:18 161:12, 16

**validity** 7:16

**valuation** 274:9,18, 24 280:7,13 292:5 354:15,22 384:20 385:9,14,19

**values** 251:5 253:17 264:2 265:9 367:9 387:3

**varied** 230:15

**varies** 87:2,3 230:14

**vendor** 288:17 356:7

**verify** 97:22

**verifying** 215:2

**versions** 136:13 146:14

**versus** 292:12

**video** 7:16 8:10,17, 21 323:23 324:3

**videotape** 12:10

**view** 204:24 205:11 292:14 301:8

**voice** 268:6

**vote** 282:5

**voted** 125:13

**W**

**wait** 156:18 157:4,5, 22 249:17

**waiting** 196:24

**walk** 180:17

**walk-through** 168:19

**walked** 179:7 294:4

**walking** 189:22

**wanted** 89:8 104:3 129:4 271:15 342:9 343:3,7 345:10

**Warren** 4:11 9:16

**Waterhouse** 3:1 4:1 5:1,5 6:1 7:1 8:1,11 9:1,11 10:1,11,18,19 11:1 12:1,24 13:1,15 14:1 15:1 16:1,10 17:1,16 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1,19 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1,7,15 48:1 49:1 50:1 51:1,4 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,19 73:1,9 74:1 75:1,3,22 76:1 77:1 78:1,14 79:1 80:1,25 81:1 82:1,4,14 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1,25 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1

100:1 101:1 102:1 103:1 104:1 105:1,9 106:1,6 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1,2 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1,23 147:1 148:1 149:1 150:1 151:1,4 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1,5 165:1 166:1 167:1 168:1 169:1 170:1,21 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1,25 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1,17 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1,5 198:1, 3 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1,15 210:1 211:1 212:1 213:1 214:1 215:1 216:1,15 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1,3 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1,25 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1,12 249:1 250:1 251:1 252:1 253:1,8 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1,12

267:1,23 268:1,20 269:1,20 270:1 271:1,5 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1,12 294:1 295:1 296:1 297:1, 22,24 298:1,7,19 299:1,11 300:1 301:1 302:1,10,19 303:1 304:1 305:1,5,9 306:1,8 307:1 308:1 309:1,8 310:1 311:1 312:1,9 313:1 314:1 315:1,18 316:1 317:1,4 318:1 319:1 320:1 321:1 322:1 323:1 324:1,15 325:1,11 326:1 327:1 328:1,15 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1,22 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1,15 350:1,5 351:1 352:1,23 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1,24 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,18 373:1 374:1 375:1 376:1 377:1,9 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1,21 388:1 389:1 390:1 391:1 392:1 393:1 394:1,24 395:1,2,14

**Waterhouse's** 140:24

**ways** 257:11

**wearing** 336:3

**Webex** 191:14

**Wednesday** 329:19

**week** 267:11 329:17, 25 330:3,5 375:21 388:6

**weekend** 329:20

**weekly** 330:4

**weeks** 302:21 303:7 307:8 378:18

**wet** 299:8

**whatsoever** 251:6

**whichever** 365:14

**wholly** 233:17

**window** 323:11

**Winograd** 3:7

**wire** 330:8 350:19

**withdraw** 35:4 134:9

**withdrawn** 19:11 34:16,21 38:14 57:23 59:15 62:16 63:7 65:4 93:18 98:13 119:7 133:20 141:25 148:8 157:3 160:5 163:18,19 180:24 181:19 191:11 195:16,18 201:19 203:25 220:11 232:6, 19 382:7 386:5

**witness'** 36:2 156:3

**word** 68:23 76:7 146:13 293:21 307:6 391:2

**worded** 104:10

**words** 79:5 342:16 346:10 348:7 363:8

**work** 113:8 204:22 219:23 233:18 291:8 299:5 346:25 372:19

**worked** 116:7,12 237:8 259:12 290:15 309:21 370:12

**working** 90:22 147:13 207:19 219:18 291:13 292:24 299:8 342:25 381:19

**works** 269:9

**worried** 241:22 246:12

**worry** 215:18

**wrapping** 293:3

**write** 187:6

**write-up** 278:12

**writes** 174:20 328:21 329:5

**writing** 67:13 75:5 79:11 273:12 316:17 341:18

**written** 15:9 83:17,20 186:3 195:9 323:20, 25

**wrong** 77:3,4 133:18 138:20,24 215:16 374:6

**wrote** 313:15,17 314:5,6,9

**Y**

**y'all** 139:23 395:4

**year** 18:14,16,20,22 19:23 20:6,12 23:13, 14,15 27:24 30:19 36:23 38:15 59:3,5 68:11 80:9 84:23 85:3 87:3 90:12 93:5, 9 94:10,22 95:6,10, 14 100:7 103:14 104:6 131:4 145:10 160:7 161:4,7,17 162:25 166:6 168:14 169:2,4,6 170:12 220:19 221:21 223:16,18 224:13,15 244:14 265:3 286:21 326:11 334:15 348:17 381:24 382:10 383:20

**year-end** 222:4 244:10,14 262:7 362:16

**year-ended** 263:24

**yearly** 170:15

**years** 18:23 62:13,22 86:18 87:17 89:16

91:10 115:10 123:23 231:11 257:10 285:22 286:4,17,25 289:25 320:9 333:24 334:23 335:7 373:7,8 379:23

**years-plus** 89:18

**yellow** 178:8

**yesterday** 8:2 66:13 140:10 322:11

**York** 3:10 4:21 8:23 281:16

**you-all** 329:2

**Z**

**zeros** 286:15

**Ziehl** 3:8 9:5 10:21 72:10

**zoom** 3:3 191:14 309:15 313:11 323:23 324:2,4,9