Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

*Attorneys for Highland Capital Management Services, Inc. and HCRE Partners, LLC*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** § | | **Case No. 19-34054-SGJ-11** |
| § | | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** § | | **Chapter 11** |
| § | | |
| Debtor. § | | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** § | | |
| § | | |
| Plaintiff. § | | |
| § | | |
| v. § | | |
| § | | **Adversary No.: 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** § | | |
| § | | |
| Defendants. § | | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** § | | |
| § | | |
| Plaintiff. § | | |
| § | | |
| v. § | | |
| § | | **Adversary No.: 21-03007-sgj** |
| **HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND DUGABOY INVESTMENT TRUST** § | | |
| § | | |
| Defendants. § | | |

### DECLARATION OF MICHAEL P. AIGEN IN SUPPORT OF
### MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES

I, Michael P. Aigen, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declare as follows:

1.  I am a member of the law firm of Stinson LLP, counsel to Highland Capital Management Services, Inc. ("HCMS") and HCRE Partners, LLC ("HCRE"), and I submit this Declaration in support of the *Motion to Extend Expert Disclosure and Discovery Deadlines*, filed on October 29, 2021. I submit this Declaration based on my personal knowledge and review of the documents listed below.

2.  Attached as **Exhibit 1** is a true and correct copy of excerpts of the Transcript of the October 29, 2021 Remote Videotaped Deposition of James Dondero, Volume 2, at 335:19-336:13, 338:11-339:18, 371:5-9, and 381:10-23.

Dated: December 8, 2021.  /s/ Michael P. Aigen  
                           Michael P. Aigen

# Exhibit 1

```
 1                  DONDERO - 10/29/21

 2       IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
 3                 DALLAS DIVISION
     -------------------------------
 4   IN RE:

 5                                  Chapter 11
     HIGHLAND CAPITAL
 6   MANAGEMENT, L.P.,              CASE NO.
                                    19-34054-SGI11
 7
                 Debtor.
 8   -------------------------------
     HIGHLAND CAPITAL MANAGEMENT, L.P.,
 9
                 Plaintiff,
10   vs.                            Adversary
                                    Proceeding No.
11   JAMES D. DONDERO,              21-03003-sgi

12               Defendant.
     -------------------------------
13

14          REMOTE VIDEOTAPED DEPOSITION OF

15             JAMES DONDERO - VOLUME 2

16                October 29, 2021

17

18

19

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No. 201874
```

1                    DONDERO - 10/29/21

2

3

4                    October 29, 2021

5                    10:21 a.m.

6

7

8

9     Remote Deposition of JAMES DONDERO, held

10  before Susan S. Klinger, a Registered Merit

11  Reporter and Certified Realtime Reporter of the

12  State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 DONDERO - 10/29/21
 2   A P P E A R A N C E S:
 3   (All appearances via Zoom.)
 4   Attorneys for the Reorganized Highland Capital
 5   Management:
 6        John Morris, Esq.
 7        Hayley Winograd, Esq.
 8        Gregory Demo, Esq.
 9        PACHULSKI STANG ZIEHL & JONES
10        780 Third Avenue
11        New York, New York 10017
12
13   Attorneys for NexPoint Advisors, LP and
14   Highland Capital Management Fund Advisors,
15   L.P.:
16        Davor Rukavina, Esq.
17        Thomas Berghman, Esq.
18        MUNSCH HARDT KOPF & HARR
19        500 North Akard Street
20        Dallas, Texas 75201
21
22
23
24
25
```

```
 1                     DONDERO - 10/29/21
 2   complete answer regarding a myriad of ways
 3   you've asked me kind of the same structural
 4   questions.
 5        Q.    I am, and just to be clear, I'm
 6   asking kind of the same structural questions
 7   with respect to each of the entities at issue.
 8   I think you picked up on that.  I hope you
 9   don't think I'm being repetitive.
10             You mentioned Frank and his group in
11   the context of HCMS.  Did I hear that
12   correctly?
13        A.    Yes.
14        Q.    Okay.  HCMS did not have a shared
15   services agreement with Highland; correct?
16             MS. DEITSCH-PEREZ:  You mean a
17        written shared services agreement, John?
18        Q.    Do you understand the question, sir?
19        A.    Yeah.  My answer would be the
20   advisors like NexPoint and HFAM that had to
21   have by law and regulatory statute have to have
22   formal sub advisors and shared services
23   agreements had formal shared services
24   agreement.
25             Entities that didn't need to have
```

```
 1                    DONDERO - 10/29/21
 2    formal written shared services agreements were
 3    often serviced similarly or -- or exactly the
 4    same as those entities, but without a written
 5    agreement, but with a verbal shared services
 6    agreement providing, again, all the same
 7    similar services.
 8                 And the entities that didn't have a
 9    written shared services agreement weren't
10    getting shared services or support from any
11    other entities other than Highland doing the
12    same thing for them that it did for the mutual
13    funds.
14         Q.   Okay.  Can you tell me who entered
15    into an oral shared services agreement between
16    Highland and HCMS?
17         A.   Boy, I can imagine way back in the
18    day it would have been myself and Frank, but he
19    and his group understood and knew that they
20    were doing it for all the new entities that
21    came along, and I can't imagine it was even
22    talked about much over the years.
23         Q.   Did -- did HCMFA and NexPoint pay
24    money to Highland under the shared services
25    agreement until let's just say late 2020?
```

```
 1                    DONDERO - 10/29/21
 2   the Highland entity.
 3               And then -- and they prepared
 4   statements or did work for services, Frank and
 5   his group would have passed through those costs
 6   and expected services and/or Dugaboy or any of
 7   the other entities to pay for direct
 8   out-of-pocket costs.  But it wouldn't have paid
 9   a supplemental fee or profit or anything to
10   Highland.
11        Q.   Okay.  To the best of your
12   recollection, during the time that you were
13   president of Highland, did Highland ever
14   receive anything of value from HCMS on account
15   of services other than the reimbursement of
16   out-of-pocket expenses?
17        A.   Yeah, I'm going to go back to my
18   comment in terms of building track record.  And
19   I would use -- yeah, we had done it several
20   times in the past and it had worked
21   effectively.  And that is -- you know, yeah, I
22   mean, the -- the track record in CLO paper was
23   what was used to track -- (inaudible) -- as an
24   investor.
25               And so, you know, to the extent that
```

```
                                              Page 339
 1                 DONDERO - 10/29/21
 2    the DAF wasn't paying a fee, along the way, to
 3    Highland for shared services, Highland got the
 4    benefit of the track record that was being
 5    built at the DAF to then market to third
 6    parties, which then created a revenue stream
 7    for Highland down the road.
 8              And I would say that was the same
 9    intent on Services.
10         Q.   Is there anything -- anything else
11    of value that you believe HCMS provided to
12    Highland in exchange for the services that
13    Highland rendered?
14         A.   That would be primarily it.  I would
15    say there is probably times where Services
16    provided liquidity for Highland or helped on
17    investments that Highland was involved in, but
18    I would have to refresh myself on exactly what.
19         Q.   Is it fair to say that HCMF -- HCMS
20    never provided a revenue stream to Highland
21    similar to the revenue stream that was provided
22    by HCMFA and NexPoint under the shared services
23    agreements?
24         A.   That is correct.
25         Q.   Okay.  Did anybody at HCMF --
```

```
 1                    DONDERO - 10/29/21
 2   to the extent that there was a screw-up, on the
 3   term loans.
 4          Q.    What screw-up are you referring to?
 5          A.    Well, we didn't have accountants or
 6   employees at Services, you know, and Services
 7   was relying on Highland and shared services to
 8   stay in compliance or to -- on the various
 9   loans.
10          Q.    Did you ever personally instruct
11   anybody in December of 2020 to make a payment
12   on behalf of HCMS under the term note?
13          A.    To make -- I'm sorry, is this --
14   what was the timeframe again?
15          Q.    December 2020 -- let's just say
16   anytime in 2020.  Did you, in your capacity as
17   the person in control of HCMS, ever direct or
18   authorize any person in the world to make a
19   payment from HCMS to Highland in satisfaction
20   of the obligation that was due under the term
21   note at the end of the year?
22          A.    Not that -- not that I recall.
23          Q.    Okay.  Do you know whether anybody
24   acting on behalf of HCMS ever instructed or
25   authorized Highland to make a payment on
```

Case 21-03006-sgj Doc 120-1 Filed 12/08/21    Entered 12/08/21 12:13:16    Page 12 of 13

Page 381

```
 1                    DONDERO - 10/29/21
 2       the screen on if you want so that we can
 3       get back fast.
 4              MR. MORRIS:  My pleasure, Deborah.
 5       No problem.
 6              MS. DEITSCH-PEREZ:  Thank you.
 7              VIDEOGRAPHER:  Off the record,
 8       12:40.
 9       (Recess taken 12:40 p.m. to 12:51 p.m.)
10       Q.    Before we go on to this document,
11  sir, did HCRE have a shared services agreement
12  with Highland?
13              VIDEOGRAPHER:  We're back on the
14       record.
15              MR. MORRIS:  Oh, do I need to read
16       the question again?
17              COURT REPORTER:  No, I've got it.
18       A.    I -- I don't believe it is a formal
19  written one.  I think it is just a verbal one.
20       Q.    And who is the verbal agreement
21  between?
22       A.    It was between Highland and HCRE.
23  Now it is between NexPoint and HCRE.
24       Q.    And who entered into the agreement
25  between Highland and HCRE?
```

```
                                                          Page 484
 1                    DONDERO - 10/29/21

 2             C E R T I F I C A T E

 3

 4         I, SUSAN S. KLINGER, a certified shorthand

 5   reporter within and for the State of Texas, do

 6   hereby certify:

 7         That JAMES DONDERO, the witness whose

 8   deposition is hereinbefore set forth, was duly

 9   sworn by me and that such deposition is a true

10   record of the testimony given by such witness.

11         I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage; and that I am in no way interested in

14   the outcome of this matter.

15         IN WITNESS WHEREOF, I have hereunto set my

16   hand this 29th of October, 2021.

17                      [signature: Susan S. Klinger]

18                      _____

19                      Susan S. Klinger, RMR-CRR, CSR

20                      Texas CSR# 6531

21

22

23

24

25
```