Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**Attorneys for James Dondero, Nancy Dondero, Highland Capital Management Services, Inc. and HCRE Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND** | § | |
| **THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | |
| **vs.** | § § | **Adv. Proc. No. 21-03005-sgj** |
| **NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03006-sgj** |
| **vs.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § | **Adv. Proc. No. 21-03007-sgj** |
| **Plaintiff,** | § § | |
| **vs.** | § § | |
| **HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § | |
| **Defendants.** | § § | |

## APPENDIX IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants James Dondero, NexPoint Advisors, L.P., Highland Capital Management Services, Inc., and HCRE Partners, LLC file this Appendix in Support of their Opposition to Plaintiff Highland Capital Management, L.P.'s Motion for Partial Summary Judgment, and request the Court take judicial notice of the documents contained herein.

1

| Exhibit | Document | Appendix Page(s) |
|---|---|---|
| **1** | **Declaration of James Dondero, dated January 20, 2022** | App. 1-23 |
| A | HCMS Payment Ledger | App. 24-25 |
| B | Nancy Dondero's Acceptance of Appointment of Family Trustee for the Dugaboy Family Trust effective October 14, 2015 | App. 26-31 |
| C | Documents showing J. Dondero proof of service as Family Trustee for the Dugaboy Family Trust and subsequent resignation | App. 32-72 |
| D | Letter to J. Pomerantz from D. Lynn, dated February 1, 2021 | App. 73-74 |
| E | Termination of Amended and Restated Shared Services Agreement, among Highland Capital Management, L.P. and NexPoint Advisors, L.P., dated November 30, 2020 | App. 75-76 |
| **2** | **Declaration of Nancy M. Dondero, dated January 20, 2022** | App. 77-85 |
| A | Nancy Dondero's Acceptance of Appointment of Family Trustee for the Dugaboy Family Trust effective October 14, 2015 | App. 86-91 |
| **3** | **Declaration of Michael Aigen, dated January 20, 2022** | App. 92-95 |
| A | Transcript of the Video Deposition of James P. Seery, Jr. on October 21, 2021, Adv. Proc. No. 21-03005 | App. 96-185 |
| B | Transcript of the Remote Deposition of Bruce McGovern on November 9, 2021, Adv. Proc. No 21-03003 | App. 186-200 |
| C | List of Promissory Notes | App. 201-202 |
| D | Email from F. Waterhouse to K. Hendrix, dated November 25, 2020 | App. 203-208 |
| E | Email from F. Waterhouse to K. Hendrix, dated December 31, 2020 | App. 209-210 |
| F | Expert Report of Steven J. Pully | App. 211-235 |
| G | Expert Report of Alan M. Johnson | App. 236-262 |
| H | Highland Capital Management, L.P.'s Responses and Objections to Defendants' Joint Discovery Requests, dated September 27, 2021 | App. 263-300 |

CORE/3522697.0002/172203842.1

Dated: January 20, 2022

Respectfully submitted,

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**ATTORNEYS FOR JAMES DONDERO, NANCY DONDERO, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. AND NEXPOINT REAL ESTATE PARTNERS, LLC**

*/s/Clay M. Taylor*
Clay M. Taylor
State Bar No. 24033261
Bryan C. Assink
State Bar No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**ATTORNEYS FOR JAMES DONDERO**

*/s/Davor Rukavina*
Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P. AND HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

CORE/3522697.0002/172203842.1

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that, on January 20, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for Plaintiff Highland Capital Management, L.P. and on all other parties requesting or consenting to such service in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

4

# Exhibit 1

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**Attorneys for James Dondero**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors, L.P.**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**Attorneys for James Dondero, Nancy Dondero,
Highland Capital Management Services, Inc. and
NexPoint Real Estate Partners, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff,** | § | **Adv. Proc. No. 21-03004-sgj** |
| | § | |
| **vs.** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,** | § | |
| | § | |
| **Defendant.** | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff,** | § | **Adv. Proc. No. 21-03005-sgj** |
| | § | |
| **vs.** | § | |
| | § | |
| **NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| **Defendants.** | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff,** | § | **Adv. Proc. No. 21-03006-sgj** |
| | § | |
| **vs.** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| **Defendants.** | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Adv. Proc. No. 21-03007-sgj** |
| | § | |
| **Plaintiff,** | § | |
| **vs.** | § | |
| | § | |
| **HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| **Defendants.** | § | |

## <u>DECLARATION OF JAMES DONDERO</u>

I, James Dondero, hereby swear under oath and penalty of perjury pursuant to the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1.      My name is James Dondero.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration.  I have personal knowledge of the facts stated in this Declaration.

### A.      Background.

2.      I am currently a named Defendant in Adversary Proceedings No. 21-03003-sgj, 21-03005-sgj, 21-03006-sgj, and 21-03007-sgj.  I have personal knowledge of the facts contained in this declaration, and if called as a witness to testify, I could and would do so competently.

3.      I co-founded Highland Capital Management, L.P. ("HCM") in the year 2000, and have been working in the financial services industry for over thirty (30) years.  I served as HCM's President and Chief Executive Officer until my resignation on January 9, 2020.

4.      Along with having served as CEO for HCM, I have also served as a high-level executive and controlling portfolio manager for NexPoint Advisors, L.P. ("NexPoint"), HCRE Partners, LLC ("HCRE"), Highland Capital Management Services, Inc. ("HCMS"), and Highland Capital Management Fund Advisors, L.P. ("HCMFA").  I have spent years of service to these companies as a chief executive, and am familiar with each company's internal management and operational structures and procedures.

### B.      The Promissory Notes.

#### 1.      HCM Issued Three (3) Notes to Me.

1

5. On February 2, 2018, I borrowed money from HCM and entered into a promissory note with HCM in the amount of $3,825,000.00 (the "February 2018 Note").[1] The February 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.66%, to be calculated at a daily rate equal to 1/365[th] per annum. On its original terms, the February 2018 Note was a payable on demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note, and was made, as indicated in the promissory note, to help satisfy personal tax obligations.

6. On August 1, 2018, I borrowed money from HCM and entered into a promissory note with HCM in the amount of $2,500,000 (the "August 1, 2018 Note").[2] The August 1, 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.95%, to be calculated at a daily rate equal to 1/365[th] per annum. On its original terms, the August 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note, which was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.

7. On August 13, 2018, I borrowed money from HCM and entered into a promissory note with HCM in the amount of $2,500,000 (the "August 13, 2018 Note").[3] The August 13, 2018

---

[1] Pl. Appx. 00678-679.
[2] *Id.* at 00681-682.
[3] *Id.* at 00684-685.

Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.95%, to be calculated at a daily rate equal to 1/365[th] per annum. On its original terms, the August 2018 Note was payable upon demand by HCM and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.

**2.      HCM Issued one (1) Term Note to NexPoint.**

8.      On May 31, 2017, NexPoint borrowed money from HCM and entered into a promissory note with HCM in the amount of $30,746,812.33 (the "NexPoint Term Note").[4] The NexPoint Term Note bore an interest rate of 6%, to be calculated at a daily rate equal to 1/365[th] per annum. The NexPoint Term Note was due in thirty (30) equal annual payments, due by the 31st day of December of each calendar year, with the final payment being due on December 31, 2047. This Term Note is paid current. The NexPoint Term Note allowed for prepayment, and was also subject to an acceleration clause upon failure to pay any installment as it became due. The purpose of the NexPoint Term Note was in-part to consolidate several prior notes made between NexPoint Advisors, L.P. and HCM. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note. This promissory note was also ambiguous with respect to the prepayment of future interest and the application of any

---

[4] *Id.* at 00042-43.

prepayment between accrued interest, future interest, and principal, and it did not contain any provision concerning what the impact of prepayments would be on future scheduled payments.

**3.     HCM Issued Five (5) Notes to HCRE.**

9.      On November 27, 2013, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $100,000 (the "November 27, 2013 Note").[5]  The November 27, 2013 Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365th per annum.  On its original terms, the November 27, 2013 Note was payable on demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

10.     On May 31, 2017, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $6,059,831.51 (the "HCRE Term Note").[6]  The HCRE Term Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365th per annum.  The HCRE Term Note was due in thirty (30) equal annual payments, due the 31st day of December of each calendar year, with the final payment being due on December 31, 2047.  The HCRE Term Note allowed for prepayment, and was also subject to an acceleration clause upon failure to pay any installment as it became due.  The purpose of the HCRE Term Note was made in-part to consolidate several prior notes made between HCRE Partners, LLC, and HCM.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was

---

[5] *Id.* at 00202-203.
[6] *Id.* at 00218-219.

CORE/3522697.0002/171867762.5                                                    **App. 7**

ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

11. On October 12, 2017, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $2,500,000 (the "October 12, 2017 Note").[7] The October 12, 2017 Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365[th] per annum. On its original terms, the October 12, 2017 Note was payable on demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

12. On October 15, 2018, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $750,000 (the "October 15, 2018 Note").[8] The October 15, 2018 Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365[th] per annum. On its original terms, the October 15, 2018 Note was payable on demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

---

[7] *Id.* at 00205-206.
[8] *Id.* at 00208-209.

13. On September 25, 2019, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $900,000 (the "September 25, 2019 Note").[9] The September 25, 2019 Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365[th] per annum. On its original terms, the September 25, 2019 Note was payable on demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

**4.      HCM Issued five (5) Notes to HCMS.**

14. On March 28, 2018, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $150,000.00 (the "March 28, 2018 Note").[10] The March 28, 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.88%, to be calculated at a daily rate equal to 1/365[th] per annum. On its original terms, the March 28, 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

---

[9] *Id.* at 00211-212.
[10] *Id.* at 00118-119.

**App. 9**

15.     On June 25, 2018, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $200,000.00 (the "June 25, 2018 Note").[11]  The June 25, 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 3.05%, to be calculated at a daily rate equal to $1/365^{th}$ per annum.  On its original terms, the June 25, 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

16.     On May 29, 2019, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $400,000.00 (the "May 29, 2019 Note").[12]  The May 29, 2019 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.39%, to be calculated at a daily rate equal to $1/365^{th}$ per annum.  On its original terms, the June 25, 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

---

[11] *Id.* at 00121-122.
[12] *Id.* at 00124-125.

**App. 10**

17. On June 26, 2019, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $150,000.00 (the "June 26, 2019 Note").[13] The June 26, 2019 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.37%, to be calculated at a daily rate equal to 1/365th per annum. On its original terms, the June 26, 2019 Note was payable upon demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

18. On May 31, 2017, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $20,247,628.02 (the "HCMS Term Note").[14] The HCMS Term Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365th per annum. The HCMS Term Note was due in thirty (30) equal annual payments, due the 31st day of December of each calendar year, with the final payment being due on December 31, 2047. This Term Note has been paid current. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note. This promissory note was also ambiguous with respect to the prepayment of future interest and the application of any prepayment between accrued interest, future interest, and principal, and it did not contain any

---

[13] *Id.* at 00127-128.
[14] *Id.* at 00134-135.

provision concerning what the impact of prepayments would be on future scheduled payments. Attached to this Declaration as "Exhibit A" is an amortization table showing payments made on the HCMS Term Note, which was kept in the normal and ordinary course of business and made by someone with knowledge of the payments at the time it was created.

**C.      Dugaboy, as the "Majority Interest" Approved Compensation.**

19.      HCM was formed as a limited partnership under the laws of the State of Delaware, and was governed by a Limited Partnership Agreement ("LPA").[15]  The LPA was entered into on December 24, 2015, between Strand Advisors, Inc. (the General Partner), and the following Limited Partners:

> (1)      The Dugaboy Investment Trust ("Dugaboy"),
>
> (2)      The Mark and Pamela Okada Family Trust – Exempt Trust #1,
>
> (3)      The Mark and Pamela Okada Family Trust – Exempt Trust #2, and
>
> (4)      Mark Okada.[16]

20.      Pursuant to the LPA – specifically in Section 3.10(a) –HCM's "Majority Interest[-holder]" was entitled to approve the compensation of HCM's General Partner and any "Affiliate" of the General Partner.[17]  The LPA defines the Majority Interest as "the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners."[18]  The Dugaboy Family Trust ("Dugaboy") represented the Majority Interest of the Limited Partners, owning a 74.4426% interest of the Limited Partners Class A Interest.[19]

---

[15] *Id.* at 00606-641.
[16] *Id.* at 00636-638.
[17] *Id.* at 00622.
[18] *Id.* at 00612.
[19] *Id.* at 00639.

9

**App. 12**

21.     My sister Nancy Dondero has served as the Dugaboy Family Trustee since her appointment in 2015.  Attached as "Exhibit B" is a copy of Nancy Dondero's Acceptance of Appointment of Family Trustee for the Dugaboy Family Trust effective October 14, 2015, a record which was kept in the ordinary course of business and made by someone with knowledge of the appointment.  Prior to Nancy Dondero's service, Grant Scott served as Dugaboy Family Trustee until October 12, 2015.  Grant Scott's resignation letter is contained within Exhibit B.  Prior to Grant Scott's service as Dugaboy Family Trustee, I personally served as Dugaboy Family Trustee until my resignation on August 26, 2015.  Attached as "Exhibit C" is  proof of my service as Family Trustee for the Dugaboy Family Trust and my subsequent resignation prior to Grant Scott's appointment, a record which was kept in the ordinary course of business and made by someone with knowledge of the document..  .

**D.     Dugaboy Agreed That HCM Would Not Collect on the Notes Upon Fulfillment of Conditions Subsequent, Making the Notes Potentially Deferred Compensation.**

22.     Based on my years of experience in working in Private Equity, I am familiar with the compensation structure of similarly situated Private Equity firms.  Based on this experience, I am also very familiar with the compensation structure of other similarly situated executives like myself.

23.     At HCM, as at other comparable capital investment firms, it was common practice to compensate executives with forgivable loans.  My compensation was no exception to this practice.   In fact, I was undercompensated in my position compared to similarly-situated contemporaries in my field.   I know that several other individuals may have received loans by HCM that were forgiven.  These individuals include Mike Hurley, Tim Lawler, Pat Daugherty, Jack Yang, Paul Adkins, Gibran Mahmud, Jean-Luc Eberlin, and Appu Mundassery and this was also a common practice and another company in which I have an interest, NexBank Capital, Inc.

10

**App. 13**

24.    At either the end of 2017 or the beginning of 2018, Dugaboy – through Nancy Dondero – entered into a verbal agreement (the "2017 Agreement") with myself that HCM would not collect on any of the aforementioned Notes issued in 2017 if certain events occurred. Specifically, if one of specific portfolio companies – either MGM, Cornerstone, or Trussway – were sold for above cost, or sold in a circumstance outside of my control, HCM agreed that the Notes would be forgiven.  In late 2013 or early 2014, the Dugaboy Family Trustee had made an identical agreement that applied to the November 27, 2013 Note.  The Agreement assured HCM that the monetization of these portfolio companies would have my utmost focus and attention, and served as an incentive for me to work particularly hard to make sure these assets were successful. Further, this agreement provided the additional benefit to HCM of not increasing my base salary, which I normally would have requested and obtained.  However, reaching this agreement made my compensation conditional on performance, and ensured that HCM would not immediately realize a change in its financial position through an increase in my salary, something I had the right to increase.

25.    At either the end of 2018 or the beginning of 2019, Dugaboy and I entered into another agreement that was identical to the Agreement made in the preceding year (the "2018 Agreement").  This 2018 Agreement covered all the Notes at issue in this litigation that were issued in 2018.  The 2018 Agreement provided the same benefits to the HCM as the 2017 Agreement.

26.    At either the end of 2019 or the beginning of 2020 (prior to January 9, 2020), Dugaboy and I entered into another agreement that was identical to the 2018 Agreement (the "2019 Agreement").  Again, the 2019 Agreement applied to all the Notes at issue in this litigation that were issued in 2019.  The 2019 Agreement provided the same benefits to HCM as the 2018 and 2017 Agreements.  Collectively, the 2017, 2018, and 2019 Agreements are referred to herein as

11

the "Agreements." I understand that Plaintiff claims in its Motion that Nancy Dondero and I do not agree about whether I identified the Notes subject to the Agreements. Despite unclear questioning at my deposition, I testified that I identified the Notes that were subject to the Agreements when entering into the Agreements (which is how Nancy Dondero was aware that they involved the different companies) and I specifically remember discussing and identifying the Notes to Nancy Dondero.

27.     In my years of experience in this industry, and experience working with financial auditors, although the Agreements were not disclosed to the financial auditors at HCM, such a disclosure was not necessary since it would not be considered material. When compared to the considerable size of HCM's assets, the Agreement on such small comparative Notes was *de minimus* when viewed in light of such large assets. Therefore, the Agreement was non-material and did not require disclosure.

28.     Prior to the commencement of any Adversary Proceedings concerning the Notes, I mentioned to Frank Waterhouse that there were mechanisms in place for forgiving the Notes, or for having them considered as compensation and not being an asset to the Debtor's estate. This came up in the context of discussing what we called the "Pot Plan" discussion for resolving the bankruptcy. I did not discuss every detail of the Agreements, because the important point was that he was made aware that the Notes should be considered as part of my compensation in connection with a resolution of the bankruptcy. By that time there was a great likelihood that some or all of the portfolio companies would be able to be sold for far more that their acquisition price.

29.     Further, opposing counsel was alerted on February 1, 2021 that one of the defenses in this litigation was that the Notes were subject to forgiveness as potential compensation. In a letter from my one of my attorneys– to opposing counsel at Pachulski Stang Ziehl & Jones, LLP,

the late retired Bankruptcy Judge Lynn, my lead counsel, made that disclosure. A true and correct copy of this letter is attached to this Declaration as "Exhibit D."

**E.     The Agreements Were Made in Good Faith.**

30.     The Agreements made between myself and Dugaboy were all entered into in good faith. At no point in time were any of these Agreements made with the intent to hinder or defraud HCM as payee. Dugaboy had the right to approve my compensation under the LPA, and it was exercising that right when it agreed to make the Notes forgivable as compensation, provided that I performed successfully as a HCM executive and made sure that the aforementioned illiquid assets were sold for at-or-above cost.

**F.     HCM Waived Any Rights to Collect on the Notes When Dugaboy Made the Agreements.**

31.     When the Agreements were made, HCM waived any rights it had to demand repayment of the demand Notes until it became impossible for the condition subsequent to be met. However, I still intended to make periodic interest payments because I understood that until forgiveness actually occurred, the notes were still bona fide notes. Also, making periodic payments kept the Notes from becoming unreasonably large in the event the conditions for forgiveness did not come to pass. The term loans had requirements for interest payments to be made until the conditions for forgiveness were met, which, as discussed below, were met.

**G.     Under its Shared Services Agreement with NexPoint, HCM was Responsible for the NexPoint Term Note Payments Being Made.**

32.     NexPoint and HCM entered into a written Shared Services Agreement (the "NexPoint SSA") on January 1, 2018, in which HCM provided a broad array of services to NexPoint, and essentially covered all functional areas of NexPoint's business other than executive

13

**App. 16**

and investment functions.[20] In my experience, these types of shared services agreements are common in my industry, and exist to help consolidate function and manpower between a large entity (like HCM) and smaller entities (like NexPoint) that share overlapping ownership structures.

33.    The NexPoint SSA outlined multiple areas in which HCM would provide services for NexPoint, which resulted in HCM providing virtually the entire workforce for NexPoint's business. Among the areas of services provided under the NexPoint SSA, HCM provided services for NexPoint's back- and middle-office divisions, legal compliance and risk divisions, tax division, administrative services division, management of NexPoint's clients and accounts, and many other divisions.[21] Again, this type of shared services agreement covering these types of services is common in the private equity market where ownership overlaps.

34.    The result of this shared services agreement was that HCM was responsible for making debt payments on behalf of NexPoint – considered a "back and middle office" task – which included making payments on the NexPoint Term Note. In fact, HCM made the NexPoint Term Note payments – consistent with the SSA, which specifically provided that HCM would make payments to creditors – on December 31 of 2017, 2018, and 2019, without any specific authorization or permission from any of the makers.

35.    Although HCM sought to provide notice of termination of the NexPoint SSA in November of 2020, that termination date was subsequently extended and the SSA was still active and in full effect as of December 31, 2020, the date on which the 2020 annual installment payment was due. The letters providing for the subsequent extension of the NexPoint SSA is attached to this Declaration as "Exhibit E"[22] Because HCM was still responsible for making these types of

---

[20] *Id.* at 04163-04181.
[21] *Id.* at 04165-04167, NexPoint SSA, Section 2.02 "Provision of Services" (a-l).
[22] See attached Exhibit B, (Letters confirming Jim Dondero's resignation as Dugaboy Family Trustee, and the appointment of Nancy Dondero as Dugaboy Family Trustee)

payments for NexPoint at that time under the active SSA, HCM was responsible for missing that payment. The fact that HCM did not make that payment – as it had done in previous years – was surprising to me, since I never at any point directed Frank Waterhouse to cease making term payments on any Note. In fact, I fully expected HCM's accounting staff to continue making scheduled payments on the NexPoint Note, since the SSA was still in place. The only thing I instructed Frank Waterhouse to do was to pause payment to HCM regarding the NexPoint SSA because it came to light that NexPoint was being substantially overcharged and had already substantially overpaid. I would not have instructed Frank Waterhouse to not make a $1.4 million installment payment on the NexPoint Term Note – which could result in a default – as the $1.4 million payment would be trivial compared to a note acceleration.

**H.    Under its Oral Shared Services Agreement with HCRE, HCM was also Responsible for the HCRE Term Note Payments Being Made.**

36.    HCRE had a similar shared services agreement (the "HCRE SSA") with HCM that was established by oral agreement. In my experience, shared services agreements are not always in written form, but established by oral agreement and patterns of conduct. HCM provided the same type of services to HCRE as it did to NexPoint, and orally agreed to do so. Similar to NexPoint, HCRE simply did not have the infrastructure or manpower to run its business without the HCRE SSA. As such, HCM provided a comprehensive array of services to HCRE that included back- and middle-office tasks like making sure HCRE's bills and loans were timely paid. This HCRE SSA was long-standing, as HCM had provided these comprehensive services to HCRE for years, and HCRE relied heavily on HCM to provide these services.

37.    HCM – despite having routinely paid on bills and notes for HCRE – did not make the December 31, 2020 payment on the HCRE Term Note. At no point prior to that missed payment did I ever direct any person to terminate the HCRE SSA. Further, at no point prior to

15

that missed payment did I ever direct anyone at HCM to miss or skip any payment on the HCRE Term Note. I fully expected HCM's accounting staff to continue providing these services and making the scheduled payments on the HCRE Term Note.

**I.** **Under its Oral Shared Services Agreement with HCMS, HCM was also Responsible for the HCMS Term Note Payments Being Made.**

38.    HCMS also had a similar shared services agreement (the "HCMS SSA") with HCM that was established by oral agreement. In my experience, shared services agreements are not always in written form, but established by oral agreement and patterns of conduct. HCM provided the same type of services to HCMS as it did to NexPoint and HCRE, and orally agreed to do so. Similar to NexPoint and HCRE, HCMS simply did not have the infrastructure or manpower to run its business without the HCMS SSA. As such, HCM provided a comprehensive array of services to HCMS that included back- and middle-office tasks like making sure HCMS's bills and loans were timely paid. This HCMS SSA was long-standing, as HCM had provided these comprehensive services to HCMS for years, and HCMS relied heavily on HCM to provide these services.

39.    HCM – despite having routinely paid on bills and notes for HCMS – did not make the December 31, 2020 payment on the HCMS Term Note. At no point prior to that missed payment did I ever direct any person to terminate the HCMS SSA. Further, at no point prior to that missed payment did I ever direct anyone at HCM to miss or skip any payment on the HCMS Term Note. I fully expected HCM's accounting staff to continue providing these services and making the scheduled payments on the HCMS Term Note.

**J.** **Payments Were Made on the NexPoint, HCRE, and HCMS Term Notes to Cure Any Defaults.**

40.    I did not know that the NexPoint, HCRE, and HCMS Term Notes were in default until I called Frank Waterhouse from an in-person hearing in January 2021. I was surprised,

angered, and annoyed to learn that such *de minimis* amounts had not been paid on the Term Notes to keep them current. After asking Frank Waterhouse what it would take to cure them and make them current, he informed me of the amounts required, and I instructed him to make sure the payments got made and that the Term Notes were cured. Much later I learned, discussed further below, that the NexPoint and HCMS loans had been substantially prepaid so that no payment was actually due in December 2021. HCM, which was responsible for keeping track of the status of the loan, did not remind me of the prepayments in December of 2020 or January of 2021. So I pressed Frank Waterhouse, who was HCM's CFO and had the ability and authority to speak on behalf of and bind HCM, to make the payments HCM should have made if it believed that end of year payments on the Term Notes were due in 2020, and he told me the amounts needed and proceeded to make the payments. I would not have caused these payments to be made if Frank Waterhouse disagreed and told me that the payments would not cure and reinstate the loans.

41. As a result of my conversation with Frank Waterhouse, I therefore believed that the Term Notes would be cured by the payments I directed Frank Waterhouse to make. Surely if the payments would not have cured the loans, he -- the lender's CFO -- would have told me that before making the payments. I could not have been clearer that I was flabbergasted that the payments had not been made and wanted the payment to be made as soon as possible to bring the loans current. I specifically discussed with Frank Waterhouse – HCM's CFO at the time – that I wanted these payments to act as cure payments for all three Term Notes. Waterhouse did not disagree with me that the payments would cure the missed payments, and he agreed to make the cure payments. However, HCM refused to accept the payments as cure for the defaults.

K. **Prepayments by NexPoint and HCMS.**

42.     The HCMS and NexPoint Term Notes called for annual payments to be made by December 31 of every calendar year.  Not only did HCM make the required term payments, but I also instructed several prepayments to be made on these Notes throughout the years whenever HCM needed liquidity.  I understood that the prepayments I caused to be made on the Term Notes, when cash flow required, would be applied to the next scheduled annual payments if payments were not otherwise able to be made, and any reconciliations would be conducted by the HCM so that the borrowers would not be in default as a result of their voluntary prepayments for HCM's benefit.  I know that both NexPoint and HCMS made substantial prepayments on their term loans.

43.     Between March and August of 2019, the following prepayments were made on the NexPoint Term Note: (i) $750,000.00 on March 29, 2019; (ii) $1,300,000.00 on April 16, 2019; (iii) $300,000.00 on June 4, 2019; (iv) $2,100,000.00 on June 19, 2019; (v) $630,000.00 on July 9, 2019; and (vi) $1,300,000.00 on August 13, 2019.  These payments totaled $6,380,000.00 in 2019.  Setting aside all issues of prepayment, the normal December, 2019 payment of principal and interest on the NexPoint Term Note would have been $2,273,970.54, leaving $4,106,029.46 remaining to apply as prepayments on the Note.

44.     I know that none of the payments listed above were scheduled payments, but rather, they were payments made upon request from HCM because it needed the liquid funds.  Both NexPoint and HCM intended for these payments to count as prepayments on the NexPoint Note to be applied to the December 31, 2020 annual installment payment.

45.     Similar to NexPoint, HCMS made substantial prepayments towards the HCMS Term Note between May of 2017 and December of 2020.  In fact, the prepayments were so large that the HCMS Term Note's principal was paid down by almost $14,000,000.  In that timeframe, the following prepayments were made on the HCMS Term Note: (i) $985,216.44 on June 23, 2017;

18

(ii) $907,296.25 on July 6, 2017; (iii) $1,031,463.70 on July 18, 2017; (iv) $1,971,260.13 on August 25, 2017; (v) $1,500,000.00 on December 21, 2017; (vi) $160,665.94 on May 31, 2018; (vii) $1,000,000.00 on October 8, 2018; (viii) $1,015,000.00 on May 5, 2019; (ix) $550,000.00 on August 9, 2019; (x) $5,600,000.00 on August 21, 2019; and (xi) $65,360.49 on December 30, 2019.

46.     Similar to the NexPoint Term Note prepayments, none of these payments were made on December 31 of any given year, nor were any of these payments made on arrears. Instead, these payments were intended by HCMS to be applied to the annual installment payments, and were believed to be accepted as such, since HCM never declared the HCMS Term Note to be in default in either 2017, 2018, or 2019.

**L.      Sale of Shares of MGM.**

47.     I understand that Plaintiff raises the issue of a sale of Plaintiff's interest in MGM in its Motion. This sale of a small portion of Plaintiff's interest in MGM would not have implicated the Agreements because it was for a *de minimis* amount of MGM stock and was only necessitated as a result of the UCC not being willing to cooperate in a transaction as part of the bankruptcy process that was agreed to by all of the other participants.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is

true and correct.

Dated:  January 20, 2022

_____
JAMES DONDERO

# Exhibit A

**HCM Services**
**Exhibit A**

| Closing Date | 5/31/2017 |
|---|---|
| Total Commitment | $ 20,247,628 |
| Rate | 2.750% |

| Date | Interest Accrual | Interest Paid | Accrued Interest | Beg Prin Bal | Principal Paid | Ending Prin Bal |
|---|---|---|---|---|---|---|
| 5/31/2017 | | | | | | 20,247,628.02 |
| 5/31/2017 | - | | - | 20,247,628.02 | | 20,247,628.02 |
| 6/23/2017 | 35,086.64 | (35,086.64) | - | 20,247,628.02 | (950,129.80) | 19,297,498.22 |
| 6/30/2017 | 10,177.45 | | 10,177.45 | 19,297,498.22 | | 19,297,498.22 |
| 7/6/2017 | 8,723.53 | (18,900.97) | - | 19,297,498.22 | (888,395.28) | 18,409,102.95 |
| 7/18/2017 | 16,643.85 | (16,643.85) | 0.00 | 18,409,102.95 | (1,014,819.85) | 17,394,283.10 |
| 7/31/2017 | 17,036.87 | | 17,036.87 | 17,394,283.10 | | 17,394,283.10 |
| 8/25/2017 | 32,763.20 | (199,329.33) | (149,529.26) | 17,394,283.10 | (1,771,930.80) | 15,622,352.30 |
| 8/31/2017 | 7,062.16 | | (142,467.10) | 15,622,352.30 | | 15,622,352.30 |
| 9/30/2017 | 35,310.80 | | (107,156.30) | 15,622,352.30 | | 15,622,352.30 |
| 10/31/2017 | 36,487.82 | | (70,668.48) | 15,622,352.30 | | 15,622,352.30 |
| 11/30/2017 | 35,310.80 | | (35,357.68) | 15,622,352.30 | | 15,622,352.30 |
| 12/21/2017 | 24,717.56 | (10,640.13) | (10,640.13) | 15,622,352.30 | (1,500,000.00) | 14,122,352.30 |
| 12/31/2017 | 10,640.13 | | 0.00 | 14,122,352.30 | | 14,122,352.30 |
| 1/31/2018 | 32,984.40 | | 32,984.40 | 14,122,352.30 | | 14,122,352.30 |
| 2/28/2018 | 29,792.36 | | 62,776.76 | 14,122,352.30 | | 14,122,352.30 |
| 3/31/2018 | 32,984.40 | | 95,761.16 | 14,122,352.30 | | 14,122,352.30 |
| 4/30/2018 | 31,920.39 | | 127,681.54 | 14,122,352.30 | | 14,122,352.30 |
| 5/31/2018 | 32,984.40 | (160,665.94) | 0.00 | 14,122,352.30 | 160,665.94 | 14,283,018.24 |
| 6/30/2018 | 32,283.53 | | 32,283.54 | 14,283,018.24 | | 14,283,018.24 |
| 7/31/2018 | 33,359.65 | | 65,643.19 | 14,283,018.24 | | 14,283,018.24 |
| 8/31/2018 | 33,359.65 | | 99,002.84 | 14,283,018.24 | | 14,283,018.24 |
| 9/30/2018 | 32,283.53 | | 131,286.37 | 14,283,018.24 | | 14,283,018.24 |
| 10/8/2018 | 8,608.94 | (412,000.00) | (272,104.68) | 14,283,018.24 | (588,000.00) | 13,695,018.24 |
| 10/31/2018 | 23,731.78 | | (248,372.91) | 13,695,018.24 | | 13,695,018.24 |
| 11/30/2018 | 30,954.49 | | (217,418.41) | 13,695,018.24 | | 13,695,018.24 |
| 12/31/2018 | 31,986.31 | | (185,432.10) | 13,695,018.24 | | 13,695,018.24 |
| 1/31/2019 | 31,986.31 | | (153,445.79) | 13,695,018.24 | | 13,695,018.24 |
| 2/28/2019 | 28,890.86 | | (124,554.93) | 13,695,018.24 | | 13,695,018.24 |
| 3/5/2019 | 5,159.08 | (37,904.91) | (157,300.76) | 13,695,018.24 | (977,095.09) | 12,717,923.15 |
| 3/31/2019 | 24,913.19 | | (132,387.57) | 12,717,923.15 | | 12,717,923.15 |
| 4/30/2019 | 28,745.99 | | (103,641.58) | 12,717,923.15 | | 12,717,923.15 |
| 5/31/2019 | 29,704.19 | | (73,937.39) | 12,717,923.15 | | 12,717,923.15 |
| 6/30/2019 | 28,745.99 | | (45,191.40) | 12,717,923.15 | | 12,717,923.15 |
| 7/31/2019 | 29,704.19 | | (15,487.21) | 12,717,923.15 | | 12,717,923.15 |
| 8/9/2019 | 8,623.80 | | (6,863.41) | 12,717,923.15 | (550,000.00) | 12,167,923.15 |
| 8/21/2019 | 11,001.14 | (4,137.73) | (0.00) | 12,167,923.15 | (5,595,862.27) | 6,572,060.88 |
| 8/31/2019 | 4,951.55 | | 4,951.55 | 6,572,060.88 | | 6,572,060.88 |
| 9/30/2019 | 14,854.66 | | 19,806.21 | 6,572,060.88 | | 6,572,060.88 |
| 10/15/2019 | 7,427.33 | | 27,233.54 | 6,572,060.88 | | 6,572,060.88 |
| 10/31/2019 | 7,922.48 | | 35,156.02 | 6,572,060.88 | | 6,572,060.88 |
| 11/30/2019 | 14,854.66 | | 50,010.68 | 6,572,060.88 | | 6,572,060.88 |
| 12/30/2019 | 14,854.66 | (65,360.49) | (495.15) | 6,572,060.88 | | 6,572,060.88 |
| 12/31/2019 | 495.16 | | 0.00 | 6,572,060.88 | | 6,572,060.88 |
| 1/31/2020 | 15,349.81 | | 15,349.82 | 6,572,060.88 | | 6,572,060.88 |
| 2/29/2020 | 14,359.50 | | 29,709.32 | 6,572,060.88 | | 6,572,060.88 |
| 3/31/2020 | 15,349.81 | | 45,059.13 | 6,572,060.88 | | 6,572,060.88 |
| 4/30/2020 | 14,854.66 | | 59,913.79 | 6,572,060.88 | | 6,572,060.88 |
| 5/31/2020 | 15,349.81 | | 75,263.60 | 6,572,060.88 | - | 6,572,060.88 |
| 6/30/2020 | 14,854.66 | | 90,118.26 | 6,572,060.88 | | 6,572,060.88 |
| 7/31/2020 | 15,349.81 | | 105,468.08 | 6,572,060.88 | | 6,572,060.88 |
| 8/31/2020 | 15,349.81 | | 120,817.89 | 6,572,060.88 | | 6,572,060.88 |
| 9/30/2020 | 14,854.66 | | 135,672.55 | 6,572,060.88 | | 6,572,060.88 |
| 10/31/2020 | 15,349.81 | | 151,022.36 | 6,572,060.88 | | 6,572,060.88 |
| 11/30/2020 | 14,854.66 | | 165,877.02 | 6,572,060.88 | | 6,572,060.88 |
| 12/31/2020 | 15,349.81 | | 181,226.83 | 6,572,060.88 | | 6,572,060.88 |
| 1/21/2021 | 10,398.26 | (181,226.83) | 10,398.26 | 6,572,060.88 | | 6,572,060.88 |

**App. 25**

# Exhibit B

THE DUGABOY INVESTMENT TRUST
James D. Dondero, Primary Beneficiary

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

       Re:    The Dugaboy Investment Trust

Dear Ms. Breault,

       I, James D. Dondero, am writing to inform you that on October 12, 2015, I received notice from Grant James Scott that he will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

       Pursuant to the attached Resignation of Family Trustee from Grant James Scott, I appoint Nancy Marie Dondero as the successor Family Trustee of the Trust.

       This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.2 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with notice of my appointment of a successor Family Trustee.

Very truly yours,

James D. Dondero

DEFENDANT 000037

## THE DUGABOY INVESTMENT TRUST
### Grant James Scott, Family Trustee

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

        Re:    The Dugaboy Investment Trust

Dear Ms. Breault,

        I, Grant James Scott, am writing to inform you that as of October 12, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust pursuant to the attached Resignation of Family Trustee.

        This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

        Very truly yours,

Grant James Scott

App. 28

**DEFENDANT 000038**

## RESIGNATION OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein NANCY MARIE DONDERO accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF**, I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

_____         10/12/2015
Family Trustee                   Date

STATE OF TEXAS          §
COUNTY OF DALLAS        §

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14ᵗʰ day of October, 2015.

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

Notary Public's Signature

[SEAL]

Expiration: January 15, 2019

App. 29
DEFENDANT 000039

## ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE

I, **NANCY MARIE DONDERO**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this 13th day of October, 2015.

**NANCY MARIE DONDERO**
**Family Trustee**

STATE OF TEXAS          §
COUNTY OF DALLAS     §

Before me, a notary public, on this day personally appeared **NANCY MARIE DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14th day of October, 2015.

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

Notary Public's Signature

[SEAL]

Expiration: January 15, 2019

**DEFENDANT 000040**

<center>ACKNOWLEDGEMENT OF DELIVERY</center>

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family Trustee by NANCY MARIE DONDERO was delivered to and received by me on October __, 2015.

<div align="right">
James D. Dondero
</div>

DEFENDANT 000041

# Exhibit C

TRUST AGREEMENT

Between

DANA SCOTT BREAULT,
Settlor

and

JAMES D. DONDERO and
COMMONWEALTH TRUST COMPANY,
Trustees

THE DUGABOY INVESTMENT TRUST

WINSTEAD PC
DALLAS, TEXAS

DEFENDANT 000001

# THE DUGABOY INVESTMENT TRUST

## TABLE OF CONTENTS

PAGE

ARTICLE I  DEFINITIONS ...........................................................................................1
    1.1    Settlor.................................................................................................1
    1.2    Jim.....................................................................................................1
    1.3    Trustees .............................................................................................1
    1.4    Children.............................................................................................1
    1.5    Descendants ......................................................................................1
    1.6    Code ..................................................................................................1
    1.7    Per Stirpes ........................................................................................1

ARTICLE II  FUNDING ................................................................................................2

ARTICLE III  DISTRIBUTION OF PRINCIPAL AND INCOME ................................2
    3.1    Trust for Jim.......................................................................................2
    3.2    Trust for Child....................................................................................5
    3.3    Trusts for Descendants.......................................................................6
    3.4    Contingent Distribution .....................................................................9
    3.5    General Power of Appointment for Certain Beneficiaries....................9
    3.6    Postponement of Distribution ..........................................................10

ARTICLE IV  PROVISIONS AFFECTING DISTRIBUTION ....................................10
    4.1    Withdrawal Right..............................................................................10
    4.2    Restriction Upon Alienation ............................................................12
    4.3    Distributions Constitute Separate Property.......................................12
    4.4    Method of Payment...........................................................................12
    4.5    Evidence of Need .............................................................................12
    4.6    Termination of Small Trust...............................................................12
    4.7    Generation-Skipping Transfer Taxes and Payment ...........................13

ARTICLE V  THE TRUSTEE .......................................................................................13
    5.1    Resignation of Trustee .....................................................................13
    5.2    Appointment and Succession of Trustees..........................................14
    5.3    Removal of Trustee...........................................................................16
    5.4    Succession of Corporate Trustee ......................................................16
    5.5    Trustee's Fees...................................................................................16
    5.6    Bond.................................................................................................16
    5.7    Liability of Trustee. ..........................................................................16
    5.8    Predecessor Fiduciary ......................................................................18
    5.9    Periodic Accounting.........................................................................18
    5.10  Beneficiary under Disability ............................................................19
    5.11  Incapacity of Individual Trustee ......................................................19

ARTICLE VI  TRUST ADMINISTRATION ...............................................................19

App. 34

DEFENDANT 000002

TABLE OF CONTENTS
(Continued)

PAGE

6.1   General Powers ......................................................................................................19
6.2   Division of Powers................................................................................................24
6.3   Merger of Trusts ...................................................................................................25
6.4   Certain Powers and Rights Limited .....................................................................25
6.5   GST Inclusion Ratio .............................................................................................25
6.6   Out-of-State Properties .........................................................................................25
6.7   Management of Real Property ..............................................................................26
6.8   No Court Supervision ...........................................................................................26
6.9   Division of Trusts .................................................................................................26
6.10  Limitation of Powers.............................................................................................26
6.11  Dealing with Fiduciaries.......................................................................................27

ARTICLE VII  IRREVOCABILITY..............................................................................27

ARTICLE VIII  MISCELLANEOUS PROVISIONS......................................................28
8.1   Applicable Law .....................................................................................................28
8.2   Perpetuities Provision ...........................................................................................28
8.3   Gestation ...............................................................................................................28
8.4   Survivorship..........................................................................................................29
8.5   Release of Powers and Interests...........................................................................29
8.6   Powers of Appointment. .......................................................................................29
8.7   Liability of Third Party .........................................................................................30
8.8   Use of Words ........................................................................................................30
8.9   Unenforceable Provision.......................................................................................30
8.10  Titles, Headings, and Captions ............................................................................30
8.11  Counterpart Signatures..........................................................................................30
8.12  Trust Name............................................................................................................30

App. 35
DEFENDANT 000003

## THE DUGABOY INVESTMENT TRUST

AGREEMENT OF TRUST made and entered into at Dallas, Texas, this ____ day of October, 2010, by and between DANA SCOTT BREAULT, as Settlor, and JAMES D. DONDERO, and COMMONWEALTH TRUST COMPANY, as Trustees.

### ARTICLE I

### DEFINITIONS

The following terms, as used in this Trust Agreement, have the meanings set forth below, unless another meaning is clearly indicated by context or circumstances:

1.1    Settlor.  "Settlor" means DANA SCOTT BREAULT.

1.2    Jim.  "Jim" means JAMES D. DONDERO.

1.3    Trustees.  The initial Trustee of each trust created hereunder is JAMES D. DONDERO.  "Trustee" means any person or entity serving as Trustee, whether original or successor and whether one or more in number.  "Administrative Trustee" means COMMONWEALTH TRUST COMPANY in its capacity as Administrative Trustee, and any successor Administrative Trustee appointed in accordance with Section 5.2(c).  "Independent Trustee" means GRANT JAMES SCOTT, III, (upon his acceptance as set forth in Section 5.2(b)) in his capacity as Trustee, and any successor Independent Trustee appointed in accordance with Section 5.2(b).  "Family Trustee" means JAMES D. DONDERO in his capacity as Trustee, and any successor Family Trustee appointed in accordance with Section 5.2(a).  The rights, powers, duties, and obligations, of the Family Trustee, Independent Trustee and Administrative Trustee are to be exercised and allocated pursuant to Section 6.2 of this Trust Agreement.

1.4    Children.  "Children" means REESE AVRY DONDERO, JAMESON DRUE DONDERO, and any other child born to or adopted by Jim after the date of this Trust Agreement.  "Child" means one of the Children.

1.5    Descendants.  "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children, and includes any person adopted before attaining age fifteen (15) and the adopted person's legitimate lineal descendants. A posthumous child shall be considered as living at the death of his parent.

1.6    Code.  "Code" means the Internal Revenue Code of 1986, as amended, and corresponding provisions of future federal tax law.

1.7    Per Stirpes.  "Per Stirpes," when used with respect to a distribution of property among a class of beneficiaries, shall mean by representation; that is, the Descendants of a deceased ancestor take the share such ancestor would have received had he or she been living, and the issue of a living ascendant would not take in competition with such ascendant.  The per

App. 36

DEFENDANT 000004

stirpital allocation shall commence with the most senior generation that has a living representative.

<div align="center">ARTICLE II</div>

<div align="center">FUNDING</div>

Settlor has transferred to the Trustee, without consideration, One Thousand and No/100 Dollars ($1,000.00) which shall be administered and distributed in accordance with the terms of this Trust Agreement. Settlor and others may transfer to the Trustee properties acceptable to them, to be added to the trust estate. The Trustee shall administer the initial trust estate pursuant to the terms of Section 3.1.

<div align="center">ARTICLE III</div>

<div align="center">DISTRIBUTION OF PRINCIPAL AND INCOME</div>

3.1     Trust for Jim.   The trust for the benefit of Jim shall be administered and distributed upon the following terms:

(a)     Distributions to Jim.  The Family Trustee may distribute to Jim so much of the net income and principal of the trust as the Family Trustee deems necessary to provide for Jim's maintenance, support and health.   Undistributed income shall be accumulated and added to principal.  In exercising its discretion, the Family Trustee shall take into account the following factors:

(i)     Jim is the primary beneficiary of the trust.

(ii)     The Family Trustee shall take into consideration in determining Jim's needs any other income or resources known upon reasonable inquiry by the Family Trustee to be available to Jim for these purposes.

(iii)     Settlor's intention to assist or enable Jim to obtain and furnish a home commensurate with his standard of living.

(iv)     Settlor's intention to assist or enable Jim to obtain capital to enter a business or profession.

(v)     Any federal, state or local income taxes imposed on Jim as a result of the income and/or gains from the trust

(b)     Distributions by Independent Trustee.  The Independent Trustee may, in its sole and absolute discretion, distribute to Jim so much of the income and principal of the trust as the Independent Trustee shall deem appropriate or advisable.  It is Settlor's intention to give the Independent Trustee the broadest discretion possible in determining the amount and timing of distributions of income and principal hereunder and Settlor recognizes that the Independent Trustee may, in the exercise of its discretion, determine

<div align="center">-2-</div>

DEFENDANT 000005

to distribute the entire trust estate to Jim or to make no distributions to Jim during Jim's disability or for so long as Jim shall have a judgment outstanding, or for so long as any distribution might be lost to Jim's creditors. It is also Settlor's intention and desire for the Independent Trustee to consider any federal, state or local income taxes imposed on Jim as a result of the income and/or gains from the trust in determining the amount of distributions to be made to Jim under this subsection (b).

(c)    Inter Vivos Special Power of Appointment. During Jim's lifetime, he shall have a special power to appoint any part or all of the trust estate to any individual or entity, except that no appointment shall be made to Jim, his creditors, his estate, or the creditors of his estate. Valid appointments may be in such amounts and proportions and upon such terms and conditions as Jim shall determine and evidence by written instrument delivered to the Trustee which specifically refers to this power of appointment and expresses the intention to exercise it; provided that such power of appointment shall not extend to any life insurance policies insuring Jim's life that constitute a part of the trust estate; and provided further that Jim shall not have a power to appoint by deed to or for the benefit of Jim or any individual or entity if such appointment has the effect of satisfying Jim's contractual or legal obligations. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.1(c).

(d)    Independent Trustee's Power to Grant Testamentary General Power of Appointment. Except as otherwise provided herein, the Independent Trustee, by signed acknowledged instrument delivered to Jim, may grant Jim a testamentary general power of appointment (as defined in Sections 2041 of the Code) over part or all of the trust estate, provided, however, that such power of appointment shall only be effective in an amount up to but not in excess of the amount, if any, above which any further addition to the amount subject to the power of appointment would increase the Net Death Taxes (as hereinafter defined) by an amount equal to or greater than the decrease in the generation-skipping transfer tax that would result from such further addition. Unless Jim's will provides otherwise by express reference to this Trust Agreement and the above power of appointment, the increase in the Net Death Taxes resulting from such power shall be paid from that amount of the principal of the trust estate over which the power is exercisable. As used in this section, the term "Net Death Taxes" shall mean the aggregate death taxes (including, without limitation, Federal, state, local and other estate taxes and inheritance taxes but exclusive of interest and penalties), after taking into account all applicable credits, payable with respect to Jim's estate.

(i)    If Jim has one or more other general powers of appointment exercisable and measured substantially as provided in subsection (d) above, the amount that Jim may appoint under subsection (d) shall be reduced proportionally, based on the net fair market values of the principal of the trusts with respect to which such powers are exercisable as of the date of Jim's death, so that the aggregate of the amount so appointable under this Trust Agreement and the amount or amounts so appointable pursuant to such other power or powers

App. 38
DEFENDANT 000006

together shall be no greater than the amount otherwise appointable under subsection (d) above.

(ii) The scope and terms of the power shall be defined in the instrument. Before such a power is exercised by Jim and the exercise becomes effective, the Independent Trustee may, in a similar manner, revoke or alter the power which was granted. This power shall not apply if the trust has an inclusion ratio of zero for generation-skipping transfer tax purposes. Jim shall not have a general power of appointment over any part of the trust estate unless such power is specifically granted to Jim by the Independent Trustee pursuant to this subsection.

(e) <u>Termination</u>. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate upon Jim's death. Upon termination of the trust, the Trustee shall distribute the balance of the trust estate as follows:

(i) <u>Pursuant to General Testamentary Power of Appointment</u>. This paragraph (i) shall apply if, but only if, the Independent Trustee grants Jim a general testamentary power of appointment pursuant to subsection (d) above and the Independent Trustee has not revoked the grant of that general power prior to the date of Jim's death. In that event, if Jim validly exercises such general testamentary power of appointment, the Trustee shall distribute so much of the trust estate then remaining as is validly appointed by Jim pursuant to such power in accordance with the terms of such appointment.

(ii) <u>Special Testamentary Power of Appointment</u>. This paragraph (ii) shall apply to so much of the trust estate then remaining as is not distributed pursuant to paragraph (i) above. The Trustee shall distribute the trust estate to such one or more individuals and entities, in such amounts and proportions and upon such terms and conditions, as Jim appoints by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, Jim may not appoint to Jim, Jim's estate, Jim's creditors, or creditors of Jim's estate.

(iii) <u>Alternative Disposition</u>. The remaining and unappointed trust estate shall be held in trust or distributed as follows:

(1) If one or more of Jim's Descendants are then living, the Trustee shall divide the trust estate into separate equal shares, one for each then living Child and one for the then living Descendants, collectively, of each deceased Child with one or more Descendants then living. The Trustee shall administer a share for each Child in a separate trust for the primary benefit of the Child and for the Child's Descendants pursuant to Section 3.2 hereof. The Trustee shall administer a share for the Descendants of each deceased Child pursuant to Section 3.3 hereof.

-4-

App. 39

DEFENDANT 000007

(2)     If none of Jim's Descendants is then living, the trust estate shall be administered or distributed in accordance with Section 3.4 hereof.

3.2     Trust for Child. All property directed to be administered in a separate trust for a Child under this Section 3.2 shall be administered and distributed for the Child's benefit upon the following terms:

(a)     Distributions to Child. The Trustee may distribute to the Child so much of the net income and principal of the trust as the Trustee deems necessary to provide for the Child's reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

(i)     The Child's standard of living at the creation of the trust.

(ii)     The Child is the primary beneficiary of the trust.

(iii)     The Trustee shall take into consideration, in determining the Child's needs, any other income or resources known upon reasonable inquiry by it to be available to the Child for these purposes.

(iv)     Settlor's intention to enable or assist each Child to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Child's advantage and to receive an excellent earlier education.

(v)     Settlor's intention that the trust distributions not serve as a disincentive to the Child's motivation to provide for her own needs in life.

(b)     Distributions to Child's Descendants. The Trustee may distribute to the Child's Descendants so much of the net income and principal of the trust as the Trustee, in its discretion, deems necessary to provide for their reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

(i)     The primary purpose of the trust.

(ii)     The respective needs of each Descendant.

(iii)     The Trustee shall take into consideration, in determining a Descendant's needs, any other income or resources known upon reasonable inquiry by it to be available to the Descendant for these purposes.

(iv)     Settlor's intention to enable or assist each Descendant to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Descendant's advantage and to receive an excellent earlier education.

**App. 40**

**DEFENDANT 000008**

(v)     Settlor's intention that the trust distributions not serve as a disincentive to a Descendant's motivation to provide for his or her own needs in life, and Settlor's instruction to the Trustee to terminate or lessen distributions to a Descendant if that objective, in the judgment of the Trustee, would thereby be served.

Distributions hereunder need not be equal among the Descendants, and the Trustee may make distributions to one or more Descendants to the exclusion of others. Distributions shall be charged against the trust estate as a whole, and not against the distributive share of any Descendant upon termination of the trust.

(c)     <u>Inter Vivos Special Power of Appointment</u>. The Child, acting in the Child's individual capacity, shall have a special power to appoint the income and principal of the trust to or for the benefit of one or more members of the limited class consisting of the Descendants of the Children, in such amounts and proportions and upon such terms and conditions, as the Child shall direct; provided that the Child shall not have a power to appoint by deed to or for the benefit of any individual if such appointment has the effect of satisfying a contractual obligation or legal support obligation of the Child. This power of appointment may be exercised subject to such terms and conditions as the Child shall direct, including an appointment in further trust, but no trust created by the exercise of such power may extend beyond the maximum term allowable with respect to any trust created under this Trust Agreement. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.2(c).

(d)     <u>Termination</u>. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate upon the death of the Child. Upon termination, the Trustee shall distribute the trust estate then remaining, or any part thereof, to such one or more members of the limited class consisting of Jim's Descendants, in such amounts and proportions and upon such terms and conditions, as the Child shall appoint by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, the Child may not appoint to the Child, the Child's creditors, estate, or creditors of the Child's estate. The trust property not appointed by the Child in accordance with this special power of appointment shall be administered by the Trustees for the Child's then living Descendants pursuant to Section 3.3 hereof. If there are no Descendants of the Child then living, the Trustee shall distribute the remaining trust estate to Jim's then living Descendants, <u>Per Stirpes</u>. If any property is distributable to a person for whose benefit a trust which was established under this Trust Agreement is then being administered, the property shall be added to that trust and administered according to its terms. If no Descendant of Jim is then living, the Trustee shall administer or distribute the remaining trust estate pursuant to Section 3.4 hereof.

3.3     <u>Trusts for Descendants</u>. The Trustee shall divide property which is to be administered under this Section 3.3 for the Descendants of a deceased Child, among such

-6-

DEFENDANT 000009

Descendants, Per Stirpes. The Trustee shall administer each share created for a Descendant of a deceased Child (the "Beneficiary") in a separate trust for the Beneficiary's benefit upon the following terms:

      (a)    <u>Distributions</u>. The Trustee shall distribute to the Beneficiary so much of the net income and principal of the trust as the Trustee deems necessary for the Beneficiary's reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

          (i)    The Beneficiary's standard of living at the creation of the trust.

          (ii)    The Beneficiary is the primary beneficiary of the trust.

          (iii)    The Trustee shall take into consideration, in determining the Beneficiary's needs, any other income or resources known upon reasonable inquiry by it to be available to the Beneficiary for these purposes.

          (iv)    Settlor's intention to enable or assist each Beneficiary to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Beneficiary's advantage and to receive an excellent earlier education.

          (v)    Settlor's intention that the trust distributions not serve as a disincentive to the Beneficiary's motivation to provide for his or her own needs in life.

      (b)    <u>Distributions to Beneficiary's Descendants</u>. The Trustee may distribute to the Beneficiary's Descendants so much of the net income and principal of the trust as the Trustee, in its discretion, deems necessary to provide for their reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

          (i)    The primary purpose of the trust.

          (ii)    The respective needs of each Descendant.

          (iii)    The Trustee shall take into consideration, in determining a Descendant's needs, any other income or resources known upon reasonable inquiry by it to be available to the Descendant for these purposes.

          (iv)    Settlor's intention to enable or assist each Descendant to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Descendant's advantage and to receive an excellent earlier education.

          (v)    Settlor's intention that the trust distributions not serve as a disincentive to a Descendant's motivation to provide for his or her own needs in

App. 42

DEFENDANT 000010

life, and Settlor's instruction to the Trustee to terminate or lessen distributions to a Descendant if that objective, in the judgment of the Trustee, would thereby be served.

Distributions hereunder need not be equal among the Descendants, and the Trustee may make distributions to one or more Descendants to the exclusion of others. Distributions shall be charged against the trust estate as a whole, and not against the distributive share of any Descendant upon termination of the trust.

(c)     Inter Vivos Special Power of Appointment. The Beneficiary, acting in the Beneficiary's individual capacity, shall have a special power to appoint the income and principal of the trust to or for the benefit of one or more members of the limited class consisting of Jim's Descendants in such amounts and proportions and upon such terms and conditions, as the Beneficiary shall direct; provided that the Beneficiary shall not have a power to appoint by deed to or for the benefit of any individual if such appointment has the effect of satisfying a contractual obligation or legal support obligation of the Beneficiary. Furthermore, the Beneficiary may not appoint to the Beneficiary, the Beneficiary's creditors, estate or creditors of the Beneficiary's estate. This power of appointment may be exercised subject to such terms and conditions as the Beneficiary shall direct, including an appointment in further trust, but no trust created by the exercise of such power may extend beyond the maximum term allowable with respect to any trust created under this Trust Agreement. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.3(c).

(d)     Termination. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate at the death of the Beneficiary. Upon termination, and except as otherwise provided pursuant to Section 3.5 hereof, the Trustee shall distribute the trust estate then remaining, or any part thereof to such one or more members of the limited class consisting of Jim's Descendants, in such amounts and proportions and upon such terms and conditions, as the Beneficiary shall appoint by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, the Beneficiary may not appoint to the Beneficiary, the Beneficiary's creditors, estate or creditors of the Beneficiary's estate. The trust property not effectively appointed by the Beneficiary in accordance with this special power of appointment or pursuant to Section 3.5 hereof shall be distributed, Per Stirpes, to: the Beneficiary's Descendants living at the termination of the trust; or if there are no such Descendants then living, to the then living Descendants of the Child who was the parent of the Beneficiary; or if there are no such Descendants then living, to Jim's then living Descendants. If any property is distributable under this subsection to a Child, such property shall be added to the Child's Trust and administered pursuant to the terms of Section 3.2. If any property is distributable under this subsection to a Descendant of Jim (other than a Child), such property shall be administered in trust for such Descendant's benefit pursuant to the terms of this Section 3.3. If no Descendant of Jim is then living,

-8-

DEFENDANT 000011

the Trustee shall administer or distribute the remaining trust estate pursuant to Section 3.4 hereof.

3.4 <u>Contingent Distribution</u>. If Jim and Jim's Descendants are all are deceased and no other disposition of the trust estate is called for in this Trust Agreement, the trust estate then remaining shall be distributed to those persons other than creditors and Settlor who, under the laws of Texas in force at that time, would have taken the personal property of Jim had he died intestate, a single person without Descendants, domiciled in the State of Texas, the moment after the event causing the distribution hereunder, the shares and proportions of taking to be determined by Texas laws.

3.5 <u>General Power of Appointment for Certain Beneficiaries</u>.

(a) Except as provided in subsection (c) below, any provision of this Trust Agreement to the contrary notwithstanding, at the death of any individual ("such beneficiary") at whose death the generation-skipping transfer tax would, but for the provisions of this section, be applicable with respect to any trust created under this Trust Agreement, the Trustees shall pay out of the principal of such trust such amount as such beneficiary, by express provision referring to this Trust Agreement and this power of appointment in his or her will, appoints, to or among such beneficiary's creditors, up to but not in excess of the amount, if any, above which any further addition to the amount subject to the power of appointment would increase the Net Death Taxes (as hereinafter defined) by an amount equal to or greater than the decrease in the generation-skipping transfer tax that would result from such further addition. Unless such beneficiary's will otherwise provides by express reference to this Trust Agreement and the above power of appointment, the increase in the Net Death Taxes resulting from such power shall be paid from that amount of the principal of such trust over which such power is exercisable. The foregoing provisions of this section shall be effective only if the Trustees shall make a determination that the generation-skipping transfer tax would not be applicable with respect to the amount of such trust over which such power is exercisable. As used in this section, the term "Net Death Taxes" shall mean "the aggregate death taxes (including, without limitation, federal, state, local and other estate taxes and inheritance taxes but exclusive of interest and penalties), after taking into account all applicable credits, payable with respect to the estate of such beneficiary."

(b) If under the will of any individual or individuals and/or any other trust instrument or instruments, such beneficiary has one or more other general powers of appointment exercisable and measured substantially as provided in subsection (a) above, the amount such beneficiary may appoint under subsection (a) shall be reduced proportionally, based on the net fair market values of the principal of the trusts with respect to which such powers are exercisable as of the date of death of such beneficiary, so that the aggregate of the amount so appointable under this Trust Agreement and the amount or amounts so appointable pursuant to such other power or powers together shall be no greater than the amount otherwise appointable under subsection (a) above.

App. 44
DEFENDANT 000012

(c)     The provisions of this section shall not apply to the trust administered for Jim under Section 3.1.

3.6     Postponement of Distribution.     Upon termination of any trust established hereunder, if any property is distributable to a beneficiary who is then under age twenty-five (25), or who, because of age, physical or mental weakness, or for any other reason is, in the sole discretion of the Trustee, unable to manage the property, the Trustee shall retain such property in a separate trust for the benefit of that beneficiary, until he or she attains age twenty-five (25) and in the sole discretion of the Trustee becomes able to manage the property.  At that time, the remaining trust property shall be distributed to the beneficiary and the separate trust shall terminate.  During the term of the trust, the Trustee shall distribute to the beneficiary so much of the net income and principal as the Trustee deems necessary to provide for the beneficiary's health, support, maintenance and education.  If the beneficiary dies before the termination of the trust, the then remaining trust estate shall be distributed to the beneficiary's estate.

ARTICLE IV

PROVISIONS AFFECTING DISTRIBUTION

4.1     Withdrawal Right.  Jim shall have the right, following a contribution to Jim's trust, to make a withdrawal in accordance with the provisions of this section unless the transferor indicates otherwise when making the transfer.  A separate withdrawal right shall attach to each separate contribution of properties to Jim's trust.  If a transferor is married at the time of contribution to the Trustee, then solely for purposes of the withdrawal rights granted in this Section 4.1, unless the transferor notifies the Trustee in writing to the contrary, such contribution shall be treated as two separate contributions having been made one-half (1/2) by the transferor and one-half (1/2) by the transferor's spouse, regardless of whether the property contributed is community property and regardless of whether they elect to treat such contribution as having been made one-half by each of them for Federal gift tax purposes.  Any person making a contribution to Jim's trust may give the Trustee written instructions that no withdrawal right is to be granted, or that alternative withdrawal rights are to be granted with respect to the contribution being made.

(a)     Amount That May Be Withdrawn.  When a contribution is made, Jim may withdraw the lesser of the following amounts:

(i)     the maximum present interest exclusion amount permitted, under Section 2503(b) of the Code, or any similar succeeding statute (such amount being $12,000 at the date of execution of this Trust Agreement), less the cumulative value of all previous known gifts to or for the benefit of Jim by the same transferor during the same calendar year which would qualify for the present interest exclusion; or

(ii)     the remainder determined by subtracting Jim's cumulative rights of withdrawal with respect to any other gifts from any transferor that are either

App. 45

DEFENDANT 000013

currently outstanding or that have previously lapsed (but not including the present right of withdrawal) during the same calendar year from the greater of (1) Five Thousand Dollars ($5,000), or (2) Five Percent (5%) of the total value of Jim's trust determined as of the date the current withdrawal power is to lapse (such value may be estimated by the Trustee), or (3) any greater withdrawal power, the lapse of which would not constitute a release of such power under Sections 2041(b)(2) and 2514(e) of the Code or any similar subsequent statute; or

      (iii)    the value of the contribution that is subject to the withdrawal right.

      (b)    <u>Withdrawal Period and Notice</u>.  Unless directed to the contrary by the transferor, the Trustee shall promptly provide Jim with written notice of the date of the contribution, the name of the transferor, the value of the properties contributed, and the value of Jim's withdrawal right.  Withdrawals may be made at any time for a period of thirty (30) days following Jim's receipt of the notice of the existence of the withdrawal right.  During any period that Jim lacks legal capacity, Jim's guardian or other legal representative, other than Settlor, may exercise Jim's withdrawal right on Jim's behalf.  If Jim does not exercise the withdrawal right before the expiration of that period, the unexercised right shall lapse.  For purposes of this section, the term "contribution" means any cash or other property which is transferred to the Trustee as part of the trust estate.  The value of any contribution to the trust estate shall be its value for federal gift tax purposes.

      (c)    <u>Payment of Withdrawal Amount</u>.  If Jim exercises his withdrawal right, payment of the amount due shall be made in cash immediately upon receipt by the Trustee of a demand in writing from Jim or his guardian or other legal representative, other than Settlor.  Upon the exercise of a withdrawal right, payment shall be made, first, from any gifts made to Jim's trust prior to the exercise of such withdrawal right, but during the same calendar year in which the withdrawal right is exercised, and shall be charged against the trust.  Should such gift or gifts not consist of sufficient cash to satisfy the exercised withdrawal right, the Trustee shall use other liquid assets of Jim's trust for such purpose.  Should Jim's trust not contain sufficient liquid assets to satisfy an exercised withdrawal right when made, the Trustee shall borrow funds in order to satisfy the demand and shall, if necessary, pledge trust property to secure the loan.

      (d)    <u>Distributions During Withdrawal Period</u>.  If any contribution is made subject to a withdrawal right, the Trustee shall not make any distributions under any other provision of the Trust Agreement which would prevent the Trustee from being able to satisfy fully any unexpired right of withdrawal.

      (e)    <u>Lapse of Withdrawal Right</u>.  In the event Jim allows a withdrawal right granted under this Section 4.1 to lapse with respect to a contribution, or any portion thereof, the Trustee is authorized to characterize such lapse as a "release" for purposes of Section 678(a) of the Code.

DEFENDANT 000014

4.2 <u>Restriction Upon Alienation</u>. No beneficiary may anticipate, by assignment or otherwise, his beneficial interest in the principal or income of the trust estate; nor may any beneficiary sell, transfer, encumber, or in any way charge his interest in trust income or principal prior to actually receiving it. Neither the income nor the principal of any trust established hereunder shall be subject to any execution, garnishment, attachment, bankruptcy, claims for alimony or support, other legal proceeding of any character, legal sequestration, levy or sale, or in any other event or manner be applicable or subject, voluntarily or involuntarily, to the payment of a beneficiary's debts. The Trustee shall make distributions to or for each beneficiary according to the terms hereof, notwithstanding any purported sale, assignment, hypothecation, transfer, attachment, or judicial process. The provisions of this section shall not limit or detract from any power of appointment or withdrawal right granted to any beneficiary herein.

4.3 <u>Distributions Constitute Separate Property</u>. Settlor intends to make a gift to each beneficiary hereunder of only that portion of the income and principal of each trust that is in fact distributed to such beneficiary. Inasmuch as the amounts actually distributed to a beneficiary hereunder constitute the gift Settlor contemplated making, such distributions, whether they be income or principal, shall constitute the separate property of such beneficiary and not the community property of such beneficiary. Furthermore, it is Settlor's intention that no beneficiary shall have any interest in any undistributed income or principal until the distribution of such income or principal and, accordingly, such undistributed income and principal shall not be deemed the community property of any such beneficiary and that beneficiary's spouse.

4.4 <u>Method of Payment</u>. The Trustee, in its discretion, may make distributions to any beneficiary, including a beneficiary who is under a physical, mental, or legal disability (minority or other), in any one or more of the following ways: directly to the beneficiary without the intervention of any legal guardian or other legal representative; as expenditures in the beneficiary's behalf; to the guardian, committee, conservator, or other similar official acting for the beneficiary; to a custodian for the beneficiary under a Uniform Transfers to Minors Act or Uniform Gifts to Minors Act; to a relative of the beneficiary or to any suitable person with whom the beneficiary resides or who has care or custody of the beneficiary; and in all ways provided by law for gifts or other transfers to or for minors or other persons under disability. In each case, receipt by the beneficiary or other person to whom payment is made or a distribution entrusted shall be a complete discharge of the Trustee with respect thereto. The Trustee may act upon such evidence as it deems appropriate and reliable in determining a beneficiary's ability to manage property and identifying a proper recipient of trust funds hereunder.

4.5 <u>Evidence of Need</u>. In exercising its discretion under this Trust Agreement, the Trustee shall be entitled to rely upon the written certification of a beneficiary or of another as to the nature and extent of a beneficiary's needs, and the adequacy of the beneficiary's resources apart from the trust to meet those needs. The Trustee may, but shall not be required to, make inquiry into the accuracy of the information it receives

4.6 <u>Termination of Small Trust</u>. Notwithstanding any provision of this Trust Agreement to the contrary, the Trustee may at any time terminate any trust when in its judgment the trust is so small that it would be inadvisable or uneconomical to continue the trust administration. In the event of termination, the Trustee shall distribute the trust to the income

App. 47

DEFENDANT 000015

beneficiaries of the trust determined at the time of distribution in the proportions to which they are entitled to receive income. If at that time rights to income are not fixed by the terms of the trust, distribution shall be made to the persons to whom the Trustee may then distribute income, in proportions determined in the Trustee's discretion, exercised consistently with the trust's purposes. Distribution of trust funds in the manner herein provided shall relieve the Trustee of any further responsibility with respect to such funds. This section shall not apply to a Trustee with respect to any trust of which such Trustee is a beneficiary, or if Trustee has duty to support the beneficiary or to any Trustee who may be removed and replaced by a beneficiary of the trust unless the successor trustee must be a corporate fiduciary or someone who is not related or subordinate to the beneficiary within the meaning of Section 672(c) of the Code. The provisions of this section shall not limit or detract from any withdrawal right granted to any beneficiary herein.

4.7 <u>Generation-Skipping Transfer Taxes and Payment</u>. It is Settlor's intent that the trusts created hereunder be exempt from Generation-Skipping Transfer Taxes. If, however, the Trustee considers any distribution or termination of an interest or power in a trust to be a taxable distribution (a "Distribution") or a taxable termination (a "Termination"), or a direct skip (a "Direct Skip") for generation-skipping transfer tax purposes, the Trustee may exercise the following authorities with respect to any such Distribution, Termination or Direct Skip. In the case of a Distribution, the Trustee may increase the amount to be distributed by an amount estimated to be sufficient to permit the beneficiary receiving such Distribution to pay the estimated generation-skipping tax attributable to such Distribution. Generally, the Trustee would not be expected to augment any partial terminating distribution in order to pay generation-skipping transfer taxes attributable to such partial terminating distribution from a trust. In the case of a Termination or Direct Skip, the Trustee shall pay the generation-skipping transfer tax attributable to such Termination or Direct Skip, and may postpone final termination of any trust or the complete funding of any Direct Skip, and may withhold all or any portion of the trust property, until the Trustee is satisfied it no longer has any liability to pay any generation-skipping transfer tax with reference to the Termination or Direct Skip. If a generation-skipping transfer tax is imposed in part by reason of property held in trust under a Settlor's will or codicil, and in part by reason of other property, the Trustee shall pay only the portion of such tax that is fairly attributable to the Distribution, Termination, or Direct Skip hereunder, taking into consideration deductions, exemptions, credits and other factors which the Trustee deems appropriate. The Trustee may, but need not make any equitable adjustments among beneficiaries of a trust as a consequence of additional distributions or generation-skipping transfer tax payments made with respect to Distributions or Terminations or Direct Skips.

ARTICLE V

THE TRUSTEE

5.1 <u>Resignation of Trustee</u>. The Trustee may resign as to any one or more of the trusts created hereunder by giving written notice to Settlor, if living; otherwise to the current income beneficiary of the trust.

App. 48

DEFENDANT 000016

5.2     Appointment and Succession of Trustees.

    (a)     Generally.

        (i)     Family Trustee.    Jim is the initial Family Trustee of all trusts created hereunder.  If Jim ceases to act as Family Trustee, or if any successor Family Trustee fails or ceases to act, Jim may appoint a successor Family Trustee within thirty (30) days of a vacancy arising.  If Jim is deceased or if Jim otherwise fails to appoint a successor, GRANT JAMES SCOTT, III is appointed as successor Family Trustee.  If GRANT JAMES SCOTT, III fails or ceases to act as Family Trustee, or if any other Family Trustee fails or ceases to act, and a successor is not appointed by Jim as provided above, JOHN WILLIAM HONIS is appointed as successor Family Trustee.  If JOHN WILLIAM HONIS fails or ceases to act as Family Trustee, and a successor is not appointed by Jim as provided above, the Family Trustee last serving shall appoint a successor Family Trustee.  If a successor Family Trustee is not appointed within sixty (60) days of a vacancy arising, the successor Family Trustee shall be appointed pursuant to the provisions of subsection (b) hereof.

        (ii)     Independent Trustee. GRANT JAMES SCOTT, III is appointed as the initial Independent Trustee and shall begin serving as such upon delivery of a written acknowledged instrument to the Family Trustee wherein GRANT JAMES SCOTT, III accepts the trust and the position of Independent Trustee.  If GRANT JAMES SCOTT, III, fails or ceases to act, or if any other Independent Trustee fails or ceases to act, Jim may appoint a successor within thirty days (30) of the vacancy arising; provided that Jim shall not serve as Independent Trustee and a successor Independent Trustee appointed by Jim may not be related or subordinate to Jim within the meaning of Section 672(c) of the Code.  If a successor is not so appointed, JOHN WILLIAM HONIS is appointed Independent Trustee.  If JOHN WILLIAM HONIS fails or ceases to act as Independent Trustee, and a successor is not appointed by Jim as provided above, the Independent Trustee last serving may appoint the successor Independent Trustee.  If a successor Independent Trustee is not so appointed within sixty (60) days of a vacancy arising, a successor Independent Trustee shall be appointed pursuant to the provisions of subsection (b) hereof.

        (iii)     Administrative     Trustee.        COMMONWEALTH     TRUST COMPANY is the initial Administrative Trustee.   If COMMONWEALTH TRUST COMPANY fails or ceases to serve, Jim may appoint a successor Administrative Trustee within thirty days (30) of the vacancy arising.   If a successor is not so appointed, the Family Trustee may appoint a successor Administrative Trustee within sixty (60) days of the vacancy arising.   If a successor is not so appointed, a successor shall be appointed in the same manner as provided for the Family Trustee under subsection (a) above.  The selection of the Administrative Trustee can have a substantial impact on the situs of the trust, which should be considered in appointing a successor Administrative Trustee.

App. 49

DEFENDANT 000017

Notwithstanding any other provision in the Trust Agreement to the contrary, no Administrative Trustee may be appointed under this paragraph if the appointment of such Administrative Trustee would change the situs of the trust to a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust

The Administrative Trustee shall act in a fiduciary capacity but shall not be a Trustee or co-Trustee except to the extent and for the limited purposes described in Section 6.2. Accordingly, no reference in this Trust Agreement to the "Trustee" or "co-Trustee" shall include, or be deemed to refer to, the Administrative Trustee. Notwithstanding the foregoing, the same individual or bank or trust company may serve simultaneously as both a Trustee or co-Trustee and as Administrative Trustee for any trust created hereunder. The initial Administrative Trustee and each successor may resign at any time and may be removed at any time by the Family Trustee.

For services rendered as Administrative Trustee under this Agreement, any Administrative Trustee shall be entitled to reasonable compensation for his, her or its services, as well as be entitled to reimbursement for all expenses reasonably incurred in performing his, her or its duties hereunder. Any Administrative Trustee may receive (or retain) payment in accordance with its schedule or rates as published from time to time and as in effect at the time such compensation becomes payable, unless otherwise agreed in writing with the Family Trustee.

No termination fee shall be charged upon removal or resignation of an Administrative Trustee. However, such Administrative Trustee shall be entitled to reasonable compensation for time and materials for additional services over and above Administrative Trustee's normal duties in transferring trust assets and administration of the trust to the new Administrative Trustee.

(b) <u>Successor Trustee</u>. If a named or appointed successor Trustee fails or ceases to serve and no other successor is named or appointed pursuant to subsection (a) hereof, a majority in number of the beneficiaries to whom the Trustee is to or may distribute income at that time may appoint the successor Trustee, and each shall have a reasonable time in which to act. If a successor Trustee is not so appointed, any beneficiary of a trust may secure the appointment of a successor Trustee by a court of competent jurisdiction at the expense of the trust estate.

(c) <u>Manner of Appointment; Permissible Trustees</u>. Appointment, other than by a court, shall be by a signed, acknowledged instrument delivered to the appointed Trustee. An appointment may be made before a vacancy arises, to become effective in the event of the vacancy with the last such instrument to control. The successor Trustee appointed by Jim or a Trustee may be one or more persons and/or entities; provided that neither Settlor nor Jim shall serve as Independent Trustee and a successor Independent Trustee appointed by Jim may not be related or subordinate to Jim within the meaning of

-15-

DEFENDANT 000018

Section 672(c) of the Code. Any other successor Trustee shall be a trust company or a bank in the United States having trust powers with not less than Fifty Million Dollars unimpaired capital and surplus. A successor Trustee shall have a reasonable time after a vacancy occurs in which to accept the office by signed, acknowledged instrument delivered to those making the appointment, if living, or to the then current beneficiaries to whom the Trustees are to or may make distributions.

5.3　Removal of Trustee. Jim shall have the power to remove the Trustee of any trust created hereunder, without cause. If Jim is deceased or if Jim is incapacitated within the meaning of Section 5.11 hereof, the primary beneficiary (or, if more than one, a majority of the primary beneficiaries) of a trust may remove any Trustee without cause. Removal shall be effected by delivering to the Trustee a signed acknowledged instrument which is effective thirty (30) days from its receipt (unless a shorter period is agreed to by the Trustee).

5.4　Succession of Corporate Trustee. If any corporate Trustee before or after qualification changes its name, becomes consolidated or merged with another corporation, or otherwise reorganizes, any resulting corporation which succeeds to the fiduciary business of such corporate Trustee shall become a Trustee hereunder in lieu of such corporate Trustee.

5.5　Trustee's Fees. Jim and Jim's Descendants shall not receive a fee for serving as Trustee. Any other Trustee shall be entitled to reasonable fees commensurate with its duties and responsibilities, taking into account the value and nature of the trust estate and the time and work involved. The Trustee shall be reimbursed for reasonable costs and expenses incurred in connection with its fiduciary duties hereunder.

5.6　Bond. The Trustee shall not be required to furnish bond or other security.

5.7　Liability of Trustee.

(a)　Generally. A Trustee other than a corporate trustee shall only be liable for willful misconduct or gross negligence, and shall not be liable for breach of fiduciary duty by virtue of mistake or error in judgment.

(b)　Administrative Trustee. Every act done, power exercised or obligation assumed by the Administrative Trustee pursuant to the provisions of this Agreement shall be held to be done, exercised or assumed, as the case may be, by the Administrative Trustee acting in a fiduciary capacity and not otherwise, and every person, firm, corporation or other entity contracting or otherwise dealing with the Administrative Trustee shall look only to the funds and property of the trust fund for payment under such contract or payment of any money that may become due or payable under any obligation arising under this Agreement, in whole or in part, and the Administrative Trustee shall not be individually liable therefor even though the Administrative Trustee did not exempt himself, herself or itself from individual liability when entering into any contract, obligation or transaction in connection with or growing out of the trust fund.

The decision of the Administrative Trustee hereunder with respect to the exercise or nonexercise by such Administrative Trustee of any power hereunder, or the time or

-16-

App. 51
DEFENDANT 000019

manner of the exercise thereof, made in good faith, shall fully protect such Administrative Trustee and shall be final, conclusive and binding upon all persons interested in the Trust or the income therefrom. To the extent permitted under applicable law, the Administrative Trustee acting hereunder shall not be responsible for any error of judgment or mistake of fact or law, absent bad faith or willful misconduct.

The Administrative Trustee shall be liable hereunder only for the Administrative Trustee's bad faith or willful misconduct proved by clear and convincing evidence in the court then having primary jurisdiction over the trust. The Administrative Trustee shall not be personally liable for making any delegation that is authorized under this Agreement, nor for any action taken without the Administrative Trustee's express agreement, nor for any failure to act absent willful misconduct. The Administrative Trustee shall not be liable for relying absolutely on (i) any apparently valid documents and certifications including, but not limited to, tax reports and other tax information provided to the Administrative Trustee by any entity in which the trust fund holds an ownership interest; and (ii) the opinions of counsel or any accountant to any trust.

Prior to the death of Settlor, the Administrative Trustee shall be under no duty to inform any person having a beneficial interest in any trust created hereunder of the existence of any such trust or the nature and extent of that person's beneficial interest in, or rights with respect to, any such trust. Following the death of Settlor, the Administrative Trustee shall be under no duty to inform any person, other than the primary beneficiary of each trust hereunder, having a beneficial interest in any trust created hereunder of the existence of such trust or the nature and extent of that person's beneficial interest in, or rights with respect to, any such trust.

While not required, the same procedure used to settle the Administrative Trustee's accounts may also be employed to obtain the conclusive consent by the beneficiaries to the Administrative Trustee's specific conduct of any other particular matter. The Administrative Trustee and each former Administrative Trustee shall be indemnified and held harmless by each trust created hereunder against any threatened, pending or completed action, claim, demand, suit or proceeding, whether civil, criminal, administrative or investigative, falling within the exculpatory provisions of this Section or to which the Administrative Trustee is made a party, or threatened to be made a party, by reason of serving as Administrative Trustee if the Administrative Trustee acted in good faith, subject to the limitations set forth above. Such indemnification shall include expenses, including attorneys' fees, judgments, fines and amounts paid in settlement actually incurred by the Administrative Trustee in connection with such action, claim, demand, suit or proceeding. The cost of indemnification shall be apportioned against the various trusts created hereunder as the Administrative Trustee reasonably considers appropriate, taking into account the nature of the claims involved.

The Administrative Trustee shall not have any fiduciary responsibility to observe, monitor or evaluate the actions of any Trustee or other fiduciary and shall not be liable to any party for the failure to seek to attempt to prevent a breach of trust, or failure to remedy a breach of trust, or in a recurring situation to request instructions from a court

-17-

App. 52

DEFENDANT 000020

having jurisdiction over the trust. In no event shall any Administrative Trustee hereunder be liable for any matter with respect to which he, she or it is not authorized to participate hereunder (including the duty to review or monitor trust investments).

Any Successor Administrative Trustee shall be deemed vested with all the duties, rights, titles and powers, whether discretionary or otherwise, as if originally named as Administrative Trustee. No Successor Administrative Trustee shall be personally liable for any act or failure to act of any predecessor Administrative Trustee or any other Trustee. The Successor Administrative Trustee may accept the account rendered and the property delivered by the predecessor Administrative Trustee as a full and complete discharge to the predecessor Administrative Trustee, without incurring any liability for so doing.

5.8     Predecessor Fiduciary.  No successor Trustee shall be obligated or required to inquire into the acts, omissions, or accounts of any prior trustee or to bring any action against any prior trustee to compel redress of any breach of trust or for any other reason. In no event shall a successor Trustee be liable for any act or omission of any prior Trustee. A successor Trustee may accept the account rendered and the property received from a prior Trustee as a full and complete discharge to the prior Trustee without incurring any liability for doing so. A successor Trustee shall have all of the powers and discretions conferred in the governing instrument upon the original trustee.

5.9     Periodic Accounting.  The Trustee may from time to time render an informal account, statement or report of its administration of each separate trust hereunder to each beneficiary who during the period covered by the account was entitled absolutely to a current payment of income or principal from the trust, or, if there is no such beneficiary, to such beneficiaries who are entitled absolutely or in the discretion of the Trustee to a payment of income or principal from the trust. If any beneficiary or legal representative or parent of a beneficiary who is not of full age or legal capacity to whom any such account is rendered shall not, within ninety (90) days after the mailing of such statement, have notified the Trustee in writing of its disapproval of the same, such statement shall be deemed to be approved

No Administrative Trustee shall be required to file or render periodic accounts in or to any court other than for good cause shown. No Administrative Trustee shall be required to give any bond.

Within 90 days following the close of each calendar year, if information is available, and if not within 30 days after it is delivered to the Administrative Trustee, and within 90 days after the removal or resignation of the Administrative Trustee, the Administrative Trustee may deliver an accounting to each primary beneficiary. The accounting shall be a written accounting of the trusts hereunder during such year or during the period from the close of the last preceding year to the date of such removal or resignation and shall set forth all investments, receipts, distributions, expenses and other transactions of each such trust and show all cash, securities, and other property held as a part of each such trust at the end of such year or as of the date of such removal or resignation, as the case may be. The accountings referred to in this Section shall be deemed to be an account stated, accepted and approved by all of the beneficiaries of each trust for which an

App. 53
DEFENDANT 000021

accounting is rendered, and the Administrative Trustee shall be relieved and discharged, as if such accounting had been settled and allowed by a final judgment or decree of a court of competent jurisdiction, unless protested by written notice to the Administrative Trustee, within 60 days of mailing thereof, by the person designated to receive such accounting. The Administrative Trustee shall have the right, at the expense of the trust, to apply at any time to a court of competent jurisdiction for judicial settlement of any account of the Administrative Trustee whether or not previously settled as herein provided or for the determination of any question of construction or for instructions. In any such action or proceeding it shall be necessary to join as parties solely the Administrative Trustee and the Settlor (although the Administrative Trustee may also join such other parties as it may deem appropriate), and any judgment or decree entered therein shall be conclusive and binding on all persons at any time interested in the trust.

5.10    Beneficiary under Disability. A parent, custodian, or guardian of any beneficiary who is under the disability of minority or, in the Trustee's opinion, any other legal, physical, or mental disability, may, in carrying out the provisions of this Trust Agreement, act and receive notice in the beneficiary's stead, and sign any instrument for the beneficiary.

5.11    Incapacity of Individual Trustee. In the event a Trustee other than a corporate Trustee becomes unable to discharge his duties as Trustee hereunder by reason of accident, physical or mental illness or deterioration, or other cause, and does not resign, then upon certification by two medical doctors affirming that each has examined the Trustee and that each has concluded, based on such examination, that he is unable to discharge his duties hereunder, the Trustee shall cease to serve, as if he had resigned, effective the date of the certification.

## ARTICLE VI

## TRUST ADMINISTRATION

6.1    General Powers.    Subject to any limitation stated elsewhere in this Trust Agreement, and the division of powers contained in Section 6.2, the Trustee shall have, in addition to all powers granted to trustees by the common law and by Delaware statutes, as amended from time to time, the following powers with respect to each trust established hereunder:

(a)    Retain Property. To retain any property received from any source, including any corporate Trustee's securities, regardless of lack of diversification, risk, or nonproductivity.

(b)    Invest. To invest the trust estate in any kind of property, including common trust funds administered by a corporate Trustee or by others, without being limited by any statute or any rule of law dealing with the character, risk, productivity, diversification of, or otherwise concerning, investments by trustees.

(c)    Sell. By public offering or private negotiation, to sell, exchange, assign, transfer, or otherwise dispose of all or any real or personal trust property and give options

App. 54

DEFENDANT 000022

for these purposes, for such price and on such terms, with such covenants of warranty and such security for deferred payment as the Trustee deems proper. To partition between the trust and any other owner, as the Trustee deems proper, any property in which the trust owns an undivided interest.

(d)     Lease. To lease trust property for terms within or extending beyond the term of the trust, for any purpose.

(e)     Real Estate. To operate, maintain, repair, rehabilitate, alter, erect, improve, or remove any improvements on real estate; to subdivide real estate; to grant easements, give consents, and enter into contracts relating to real estate or its use; and to release or dedicate any interest in real estate.

(f)     Borrow. To borrow money for any purpose either from the banking department of any corporate Trustee or from others; to encumber or hypothecate trust property by mortgage, deed of trust, or otherwise; and to maintain, renew, or extend any indebtedness upon such terms as the Trustee deems appropriate.

(g)     Loans. To lend money to any person or entity, including, but not limited to, a beneficiary hereunder, but not including a Settlor or a Trustee (other than a beneficiary serving as Trustee) hereunder, or a spouse of theirs, upon such terms and with such security as the Trustee deems advisable.

(h)     Conserve Estate. To take any action to conserve the trust estate.

(i)     Litigation. To commence or defend at the expense of the trust such litigation with respect to the trust estate as the Trustee deems advisable.

(j)     Claims. To collect, pay, contest, compromise, settle, renew, or abandon any claims or demands of or against the trust estate without court authority on whatever terms the Trustee deems advisable.

(k)     Abandon Property. To abandon any property or interest in property belonging to the trust when, in the Trustee's discretion, such abandonment is in the best interest of the trust and its beneficiaries.

(l)     Documents. To execute contracts, notes, conveyances, and other instruments containing covenants, representations, or warranties binding upon and creating a charge against the trust estate or containing provisions excluding personal liability, or any other written instrument of any character appropriate to any of the powers or duties conferred upon the Trustee.

(m)     Agents. To employ attorneys, auditors, investment advisors, depositaries, and agents with or without discretionary powers, to employ a bank with trust powers as agent for the purpose of performing any ministerial duties incident to the administration, and to pay all expenses and fees so incurred.

App. 55

DEFENDANT 000023

(n)   Securities.   To engage in all actions necessary to the effective administration of securities including, but not limited to, the authority to: vote securities in person or by proxy; engage in a voting trust or voting agreement; and consent to or participate in mergers, consolidations, sales of assets, recapitalizations, reorganizations, dissolutions, or other alterations of corporate structure affecting securities held in the trust.

(o)   Nominee.   To hold securities and other property in bearer form or in the name of a trustee or nominee with or without disclosure of any fiduciary relationship.

(p)   Additional Property.   To receive additional property from any source and add it to the trust estate.

(q)   Insurance.   To carry insurance of such kinds and in such amounts as the Trustee deems advisable, except for insurance on the life of a Settlor, the Trustee, or a spouse of theirs.  The Trustee shall not apply trust property to the payment of premiums on an insurance policy on the life of Settlor, the Trustee, or a spouse of theirs.

(r)   Business Powers.

(i)   In General.   To engage in any lawful business including, but not limited to, the power to continue at the risk of the trust estate the operation of any business which may become a part of the trust estate, and to sell, liquidate, or otherwise terminate any business interest, including, but not limited to, the fulfillment of any agreement for the disposition of any such business interest.

(ii)   Closely Held Businesses.   This trust may be funded with, or subsequently purchase or otherwise acquire, securities or other financial interests in one or more closely held businesses (each of which is hereinafter referred to as the "business").

(1)   Exoneration from Liability.   It is realized that the business may not be the type of investment in which fiduciaries would normally invest estate or trust funds.  Nonetheless, the Trustees shall incur no liability for any loss which may be sustained by reason of the retention, operation or sale of the business or the exercise of any power conferred upon the Trustees with respect to the business.

(2)   Management Powers.   The Family Trustee shall have the exclusive duty to deal with and manage the business.  In addition to any power granted by law or elsewhere in this document, the Family Trustee shall have the following powers:

(A)   To retain and continue the business or any interest therein for such time as the Family Trustee considers advisable;

-21-

App. 56

DEFENDANT 000024

(B)     To operate or participate in the operation of the business in the form of a corporation, limited liability company, partnership or proprietorship;

(C)     To direct, control, supervise, manage, operate or participate in the operation of the business; to serve as an officer and director of the business; and to receive from the business compensation for his services in addition to his compensation as a Family Trustee;

(D)     To delegate all or any part of his power to supervise, manage or operate the business to such persons as he may select, including any director, officer or employee of the business;

(E)     To engage, compensate and discharge such managers, employees, agents, attorneys, accountants, consultants or other representatives as he considers advisable, including anyone who may be a beneficiary or fiduciary of this Trust;

(F)     To invest or employ in the business, or to use as collateral for loans to the business, such other estate or trust funds as he considers advisable;

(G)     To sell, liquidate or otherwise dispose of all or any part of the business at such time or times, for such prices and upon such terms and conditions as he considers advisable, and to sell the business to anyone who is a beneficiary or a fiduciary of this Trust; and

(3)     Exclusion from Powers.   Neither Commonwealth Trust Company nor any successor Administrative Trustee shall have any power, duty and/or responsibility in connection with the operation, control, supervision, management and participation of the business.

(s)     Income and Principal.  To determine, in accordance with the provisions of Delaware law, what constitutes income and principal of the trust estate, the manner in which expenses and other charges shall be allocated between these accounts, and whether or not to establish reserves for depreciation or depletion, and to add undistributed income to principal.

(t)     Tax Elections.  To exercise any tax option or election permitted by law as the Trustee determines, in its sole discretion, even though the effect is to treat beneficiaries hereunder differently, or to favor some at the expense of others.  The Trustee may, but need not, make such compensating adjustments among beneficiaries with respect thereof as it deems appropriate considering the nature of the tax election and the amounts involved.

App. 57

DEFENDANT 000025

(u)  Reliance.  To rely upon any notice, certificate, affidavit, or other document or evidence believed by the Trustee to be genuine and accurate, in making any payment or distribution.  The Trustee shall incur no liability for a disbursement or distribution made in good faith and without actual notice or knowledge of a changed condition or status affecting any person's interest in the trust or any other matter.

(v)  Commingling.  To commingle and invest as one fund, or make joint investments with, the principal of two or more separate trusts established hereunder, with each trust having an undivided interest therein.

(w)  Division and Distribution.  To make all allocations, distributions, or divisions contemplated by this Trust Agreement; to allocate, distribute and divide different kinds or disproportionate shares of property or undivided interests in property among the beneficiaries or trusts, in cash or in kind, or both, without regard to the income tax basis of specific property allocated to any beneficiary or trust, even though shares may as a result be composed differently, and to determine the value of any property so allocated, divided or distributed.

(x)  Withholding of Distribution.  To withhold from distribution all or any part of the trust property as long as the Trustee, in its discretion, determines that such property may be subject to conflicting claims, to tax deficiencies, or to liabilities, contingent or otherwise, properly incurred in the administration of the trust.

(y)  Mineral Powers.  To retain or acquire interests in oil, gas, or other mineral resources; to execute as to those interests any agreements, assignments, contracts, deeds, grants or leases for any term (even though the term may extend beyond the termination of the trust); to manage, control, operate, explore, mine, develop, or take any action for the production, recovery, sale, treatment, storage, or transportation of any such interest; to drill, rework, or recomplete wells of any type; to conduct or participate in secondary recovery operations; to enter into agreements for pooling or unitization; and to install, operate, or participate in the operation of any plant, mine, or other facility.

(z)  Environmental Hazards.  To use and expend the trust income and principal to (i) take all appropriate action to prevent, identify, or respond to actual or threatened violations of any environmental law or regulation for which the Trustee may have responsibility, including the authority to conduct environmental assessments, audits, and site monitoring to determine compliance with any environmental law or regulation; (ii) take all appropriate remedial action to contain, cleanup, or remove any environmental hazard including a spill, release, discharge, or contamination, either on its own accord or in response to an actual or threatened violation of any environmental law or regulation; (iii) institute legal proceedings concerning environmental hazards or contest or settle legal proceedings brought by any local, state, or federal agency concerned with environmental compliance, or by a private litigant; and (iv) comply with any local, state, or federal agency order or court order directing an assessment, abatement, or cleanup of any environmental hazards.

-23-

(aa)  Miscellaneous Powers.  Generally to do and perform any and all acts, things, or deeds which, in the discretion of the Trustee, may be necessary or proper for the protection, preservation, and promotion of the trust properties and estate.

6.2  Division of Powers.  The powers and duties granted under this Trust Agreement shall be divided among the Trustees as follows:

(a)  Administrative Trustee.  The Administrative Trustee shall have the following exclusive duties, which shall all be carried out in the State of Delaware or such other jurisdiction as the Trustee shall, from time to time, select as the situs of the trust:

(i)  To maintain bank accounts, brokerage accounts and other custody accounts which receive trust income and contributions and from which trust expenditures and distributions are disbursed.

(ii)  To maintain storage of tangible personalty and evidence of intangible trust property.

(iii)  To maintain trust records.

(iv)  To maintain an office for Trustee meetings and other trust business.

(v)  To originate, facilitate and review trust accountings, reports and other communications with the Settlor, any co-Trustees, beneficiaries and unrelated third parties.

(vi)  To respond to inquiries concerning the trust from the Settlor, any co-Trustees, beneficiaries and unrelated third parties.

(vii)  To execute documents with respect to trust account transactions.

(viii)  To retain accountants, attorneys, investment counsel, agents and other advisers in connection with the performance of its duties under this Section 6.2.

(b)  Independent Trustee.  The Independent Trustee shall have all of the powers and duties specifically assigned to the Independent Trustee under this Trust Agreement.  These powers may only be exercised by the Independent Trustee.

(c)  Family Trustee.  The Family Trustee shall possess and exercise all of the powers and duties of the Trustee not specifically granted to the Administrative Trustee or the Independent Trustee under this Trust Agreement, including those specifically assigned to the Family Trustee.  Without limiting the generality of the foregoing, the Family Trustee shall exercise all Trustee authority and have all Trustee responsibility with respect to the investment of the trust estate.  If there is no Family Trustee serving,

-24-

App. 59

DEFENDANT 000027

however, all of the powers and duties of the Trustee, including those assigned to the Family Trustee, shall be exercised and discharged by the Independent Trustee.

6.3    Merger of Trusts. If at any time a Trustee of any trust created pursuant to this Trust Agreement shall also be acting as Trustee of any other trust created by trust instrument or by will for the benefit of the same beneficiary or beneficiaries and upon substantially the same terms and conditions, the Trustee is authorized and empowered, if in the Trustee's discretion such action is in the best interest of the beneficiary or beneficiaries of the trust created hereunder, to transfer and merge all of the assets then held under such trust created pursuant to this Trust Agreement to and with such other trust and thereupon and thereby to terminate the trust created pursuant to this Trust Agreement. The Trustee is further authorized to accept the assets of the other trust which may be transferred to the Trustee of the trust created hereunder and to administer and distribute such assets and properties so transferred in accordance with the provisions of this Trust Agreement. If the component trusts differ as to contingent beneficiaries and the contingency occurs, the funds may be distributed in such shares as the Trustee, in the Trustee's sole discretion, shall deem necessary to create a fair ratio between the various sets of remaindermen. If any trust created in this Trust Agreement is merged with any trust created under any other instrument, such merged trust shall not continue beyond the date on which the earliest maximum term of the trusts so merged would, without regard to such merger, have been required to expire. Settlor further directs that, as to any property at any time a part of any trust estate (including a merged trust) as to which under the laws of any state applicable to said property that trust is required to be terminated at any time prior to its normal termination date, the trust as to that particular property shall terminate at the time required by the laws of said state.

6.4    Certain Powers and Rights Limited. Settlor intends that the trust created under Section 3.1 hereof shall not be included in Jim's gross estate for estate tax purposes unless the Independent Trustee grants Jim a general power of appointment pursuant to paragraph 3.1(d). All issues applicable to the trust shall be resolved accordingly.

6.5    GST Inclusion Ratio. If property not having an inclusion ratio for purposes of the generation-skipping transfer tax equal to zero is directed to be added to a trust which has an inclusion ratio equal to zero, the Trustee may decline to make the addition and may, instead, administer the property as a separate trust with provisions identical to the trust having an inclusion ratio equal to zero. If property having an inclusion ratio for purposes of the generation-skipping transfer tax equal to zero is directed to be added to a trust which has an inclusion ratio not equal to zero, the Trustee may decline to make the addition and may, instead, administer the property as a separate trust with provisions identical to the trust having an inclusion ratio not equal to zero.

6.6    Out-of-State Properties. If any trust property is situated in a jurisdiction in which the Trustee is unable or unwilling to act, the Trustee may appoint an ancillary trustee for such jurisdiction and may confer upon the ancillary trustee such powers and discretions, exercisable without court order, to act with respect to such property as the Trustee deems proper. The ancillary trustee shall be responsible to the Trustee for all property it administers. The Trustee

App. 60
DEFENDANT 000028

may pay the ancillary trustee reasonable compensation for its services and may absolve it from any requirement to furnish bond or other security.

6.7     Management of Real Property. The Family Trustee (or the Independent Trustee pursuant to Section 6.2(c) hereof), acting alone, shall make any and all decisions regarding: (i) the acquisition, retention and disposal of real estate; (ii) the operation, maintenance, repair, rehabilitation, alteration, construction, erection, improvement, or removal of any improvements on real estate; (iii) the subdivision of real estate; (iv) the granting of easements, giving of consents, and entering into contracts relating to real estate or its use; (v) the release or dedication of any interest in real estate; and (vi) the payment of taxes, utilities, and maintenance expenses attributable to real estate owned by any trust created hereunder. The Family Trustee (or the Independent Trustee pursuant to Section 6.2(c) hereof) may, in its discretion, either exercise such powers or appoint an ancillary trustee to exercise such powers. The Trustee may pay the ancillary trustee reasonable compensation for its services and may absolve it from any requirement to furnish bond or other security.

6.8     No Court Supervision. The Trustee shall not be required to qualify before or be appointed by any court; nor shall the Trustee be required to obtain the order or approval of any court in the exercise of any power or discretion.

6.9     Division of Trusts. The Trustee may divide any trust established by this Trust Agreement into two or more separate trusts as provided in this section. Settlor exonerates the Trustee from any liability arising from the exercise or failure to exercise any powers granted herein, provided the Trustee acts in good faith.

       (a)     Division and Funding of Separate Trusts. The Trustee may divide any trust established by this Trust Agreement, at any time, into two or more separate trusts so that the generation-skipping transfer tax inclusion ratio as defined in Section 2642(a) of the Code for each trust shall be either zero or one. Any such division shall be accomplished in accordance with applicable regulations under Chapter 13 of the Code.

       (b)     Administration of Separate Trusts. Such separate trusts shall have the identical provisions as the original trust. However, with respect to each separate trust, the Trustee may: (1) make different tax elections, (2) expend principal and exercise any other discretionary powers with respect to such separate trusts differently, (3) invest such separate trusts differently, and (4) take all other actions consistent with such trusts being separate trusts.

       (c)     Powers of Appointment. The donee of any power of appointment with respect to a trust so divided may exercise such power of appointment differently with respect to the separate trusts created by the division.

6.10     Limitation of Powers. The following limitations, affecting the administration of the trusts created hereunder, apply notwithstanding any other provision of this Trust Agreement. For purposes of this Section 6.10, the term "Settlor" shall include any individual who contributes property to the Trustee to be added to the trust estate.

App. 61
DEFENDANT 000029

(a) <u>Support Duty</u>. Distributions from the trust estate shall not be made which discharge, in whole or in part, the personal legal obligations of a Settlor or a Trustee from time to time existing, to support or educate any of the trust beneficiaries. When determining these legal obligations, the existence of this trust and funds made available by it shall not be taken into consideration.

(b) <u>Adequacy of Consideration</u>. No party may, through purchase, exchange, or otherwise, deal with or dispose of the corpus or the income of the trust estate for less than adequate consideration in money or money's worth.

(c) <u>Insurance</u>. The Trustee shall not apply trust property to the payment of premiums on an insurance policy on the life of a Settlor, the Trustee or a spouse of either of them.

(d) <u>Borrow</u>. The Trustee shall not allow a Settlor to borrow trust principal or income, directly or indirectly, without adequate interest or security.

(e) <u>Substitute Property</u>. The Trustee shall not allow a Settlor to reacquire or exchange any property of the trust estate by substituting other property with an equivalent value.

(f) <u>Vote</u>. A Settlor, acting as a Trustee, shall not be entitled to vote, directly or indirectly, shares of stock of a controlled corporation, as defined under Section 2036 of the Code, which is held as part of the trust estate.

6.11 <u>Dealing with Fiduciaries</u>. The Trustee may enter into any transaction with the Trustee or beneficiaries of the trusts created hereunder, acting in their individual or in another fiduciary capacity, or with any person or entity related to the Trustee or a beneficiary in any manner, if such transaction is otherwise authorized under this Trust Agreement. Without limiting the generality of the foregoing authorization, the Trustee may enter into any transaction otherwise authorized hereunder on behalf of any trust created hereunder even though the other party to the transaction is: a trust of which a beneficiary or Trustee under this Trust Agreement is a beneficiary or trustee, including, but not limited to, any trust established by this Trust Agreement; an estate of which a beneficiary or Trustee under this Trust Agreement is a representative or beneficiary; or a business or charitable corporation of which a beneficiary or Trustee under this Trust Agreement is a director, officer, employee, or owner.

<div align="center">ARTICLE VII</div>

<div align="center"><u>IRREVOCABILITY</u></div>

This Trust Agreement and each of its provisions may not be revoked, amended, or modified.

App. 62

DEFENDANT 000030

ARTICLE VIII

MISCELLANEOUS PROVISIONS

8.1 <u>Applicable Law</u>. The trust created under this Trust Agreement shall be deemed a Delaware trust and all matters pertaining to the validity, construction, and application of this Trust Agreement or to the administration of the trust created hereunder shall, in all respects, be governed by the laws of the State of Delaware. However, if the Trustee, in its sole discretion, determines that a change of situs would be beneficial to the purposes of the trust established by this Trust Agreement, the Trustee shall have the discretion and authority to change the situs of any such trust to another state. No change of situs shall be authorized herein, however, which would result in a termination of the trust for federal tax purposes. Furthermore, the Trustee shall not be entitled to change the situs of the trust to a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust. Any proceeding involving the Trust must be brought in the State of Delaware for so long as the situs of the Trust shall be the State of Delaware.

8.2 <u>Perpetuities Provision</u>. The trust created hereunder shall be perpetual to the fullest extent permitted by Delaware law. If the trust created hereunder is deemed to be subject to the law of a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust, then such trust shall terminate in all events upon the expiration of the longest period the property may be held in trust under this Agreement under the law of such jurisdiction (including any application periods in gross, such as 110 years, 360 years, or 1,000 years); provided, however, that if the jurisdiction has a rule against perpetuities or similar rule which applies only to certain types of property, such as real property, the provisions of this Section shall apply only to such property. If under the law of such jurisdiction the longest period that property may be held in trust is determined with reference to the death of the last survivor of a group of individuals in being upon the date of this Trust Agreement, those individuals shall consist of Jim and Jim's Descendants who are in being on the date of this Trust Agreement. Upon termination of a trust pursuant to the provisions of this Section 8.2, the Trustee shall distribute such trust to its income beneficiaries determined at the time of distribution. If at that time rights to income are not fixed by the terms of the trust, distribution shall be made to the persons to whom the Trustee may then distribute income, in proportions determined in the Trustee's discretion, exercised consistently with the trust's purposes.

In the event any trust created hereunder owns real property, and if such real property is subject to a rule against perpetuities or similar rule which limits the period during which property can be held in trust, then the Trustee shall take such action as is necessary to avoid termination of the trust with respect to that real property interest including, without limitation, selling the real property or contributing the real property to a business entity in exchange for ownership interests in such entity to be owned by the trust.

8.3 <u>Gestation</u>. A child in gestation who is born alive shall be considered a child in being throughout the period of gestation.

-28-

DEFENDANT 000031

8.4     Survivorship.  Any person must survive by thirty (30) days for a gift made in this Trust Agreement which directly or indirectly requires such person's survival of another to be effective.

8.5     Release of Powers and Interests.  Any person, including a beneficiary and a Trustee, shall have the power to disclaim, release, or restrict, irrevocably, in whole or in part, any interest, right, power, or discretion granted to such person with respect to any trust by signed instrument delivered to the Trustee, or in any other manner permitted by law.  Any person designated or appointed as a Trustee may, prior to accepting the trust, by written instrument decline to accept any right, power, or discretion with respect to the trust and may accept the trust without such right, power, or discretion.

8.6     Powers of Appointment.

(a)     Capacity in Which Exercisable.  Every power of appointment granted to a beneficiary under this Trust Agreement is exercisable by that beneficiary in the beneficiary's individual capacity, notwithstanding the fact that the beneficiary may also be serving as a Trustee of the trust.

(b)     Manner of Appointment.  Every power of appointment granted herein: (i) shall be personal to the donee of such power and may not be exercised on behalf of the donee by any other person, including an attorney-in-fact, a guardian, or any other court appointed representative, and (ii) may be exercised in whole or in part and in favor of one or more potential beneficiaries to the exclusion of others.  Appointment may be outright or in further trust, with all provisions determined by the donee of the power, and may confer a power of appointment upon the beneficiary or others, if within the constraints imposed by any applicable rule against perpetuities and any other law which is applicable to the appointment.

(c)     Exercise of Inter Vivos Power.  An inter vivos power of appointment granted in this Trust Agreement may be exercised only by a written instrument, executed and acknowledged by the donee and delivered to the Trustee during the donee's lifetime, which specifically refers to the power of appointment and expresses the intention to exercise it.  If no such instrument is delivered to the Trustee during the donee's lifetime, upon the donee's death the Trustee may distribute the property subject to the power in the manner provided in this Trust Agreement for distribution in default of exercise.

(d)     Determination of the Exercise of a Testamentary Power.  The Trustee may rely upon any instrument admitted to probate as a will or codicil in determining whether a testamentary power of appointment granted herein has been exercised.  If no will or codicil is brought to the Trustee's attention within ninety (90) days of a death to indicate the exercise of a testamentary power, the Trustee may distribute the property subject to the power according to the terms herein provided for distribution in default of exercise. The Trustee will be protected from liability for its actions as authorized in this subsection (d), but this subsection does not affect a beneficiary's rights in the property subject to the power of appointment.

App. 64

DEFENDANT 000032

(e)     Tax Consequences.  The exercise of a power of appointment may have important tax consequences.  The donee of any power of appointment should consult with counsel before exercising such power of appointment.

8.7     Liability of Third Party.  No person paying money or delivering property to the Trustee need see to the application of such money or property.  No person dealing with the Trustee need inquire into the propriety of any transaction or the Trustee's authority to enter into and consummate the same.

8.8     Use of Words.  As used in this Trust Agreement, the masculine, feminine, and neuter gender, and the singular or plural of any word each includes the others unless the context indicates otherwise.

8.9     Unenforceable Provision.   If any provision of this Trust Agreement is unenforceable, the remaining provisions shall be given effect, unless to do so would produce an unreasonable result.

8.10    Titles, Headings, and Captions.  All titles, headings, and captions used in this Trust Agreement have been included for administrative convenience only and should not be construed in interpreting this Trust Agreement.

8.11    Counterpart Signatures.  This document may be executed in counterparts, and all counterparts so executed shall constitute a single document, notwithstanding that the interested parties are not or may not be signatories to the original or to the same counterpart.

8.12    Trust Name.  The trusts established under Article II of this Trust Agreement, collectively, shall be known as the "The Dugaboy Investment Trust".

IN WITNESS WHEREOF, the Settlor, the Family Trustee and the Administrative Trustee have hereunto set their hands on the day and year first above written in multiple originals.  The Trustees agree to administer the trust estate in accordance with the terms of this Trust Agreement.  The Independent Trustee shall begin serving as such upon delivery of a written acknowledged instrument to the Family Trustee in accordance with Section 5.2 hereof.

App. 65

DEFENDANT 000033

DANA SCOTT BREAULT, Settlor

STATE OF TEXAS        §
                      §
COUNTY OF DALLAS      §

BEFORE ME, the undersigned authority, on this day personally appeared DANA SCOTT BREAULT, as Settlor, known to me to be the person whose name is subscribed to the foregoing Trust Agreement and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 23rd day of October, 2010.

Notary Public

RAVI IYER
Notary Public, State of Texas
My Commission Expires
June 12, 2013

-31-

App. 66
DEFENDANT 000034

_____

JAMES D. DONDERO, Family Trustee

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

BEFORE ME, the undersigned authority, on this day personally appeared JAMES D. DONDERO, as Family Trustee, known to me to be the person whose name is subscribed to the foregoing Trust Agreement and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 28th day of October, 2010.



_____

Notary Public

MELINDA SLOANE
Notary Public, State of Texas
My Commission Expires
October 19, 2011

-32-

DEFENDANT 000035

COMMONWEALTH TRUST COMPANY,
Administrative Trustee


By: _Cynthia D M Brown_
    Name:   Cynthia D. M. Brown
    Title:     President


STATE OF DELAWARE       §
                              §
COUNTY OF NEW CASTLE   §

    BEFORE ME, the undersigned authority on this day personally appeared
Cynthia D. M. Brown_____, President_____, known to me to be the person and officer
whose name is subscribed to the foregoing instrument and acknowledged to me that he/she
executed the same for the purposes and consideration therein expressed as the act of
COMMONWEALTH TRUST COMPANY and in the capacity therein expressed.
                                            November _LMB_
    GIVEN UNDER MY HAND AND SEAL OF OFFICE this _15th_ day of ~~October~~, 2010.


                        _Laura M Owens_
                        Notary Public

LAURA M. OWENS
MY COMMISSION
EXPIRES
MAY 30, 2014
NOTARY PUBLIC
STATE OF DELAWARE

5480300v.6 47609/1

App. 68
DEFENDANT 000036

THE DUGABOY INVESTMENT TRUST
James D. Dondero, Family Trustee

August 26, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

      Re:   The Dugaboy Investment Trust

Dear Ms. Breault,

    I, James D. Dondero, am writing to inform you that on August 26, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "Trust") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

    Pursuant to the attached Resignation of Family Trustee, I appoint Grant James Scott as the successor Family Trustee of the Trust.

    This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

Very truly yours,

James D. Dondero

DEFENDANT 000042

## RESIGNATION OF FAMILY TRUSTEE

I, **JAMES D. DONDERO**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

I appoint **GRANT JAMES SCOTT** as the successor Family Trustee. This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein Grant James Scott accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF**, I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

_____          8.26.15
Family Trustee                      Date

STATE OF TEXAS          §
COUNTY OF DALLAS        §

Before me, a notary public, on this day personally appeared **JAMES D. DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _26th_ day of August, 2015.

_____
Notary Public's Signature

[SEAL]   MICAELA SUE ALLEN
         Notary Public, State of Texas
         My Commission Expires
         January 15, 2019

Expiration: _1-15-2019_

## ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this _26th_ day of August, 2015.

                                         _____
                                         GRANT JAMES SCOTT
                                         **Family Trustee**

STATE OF TEXAS NC      §
COUNTY OF DALLAS       §
         WAKE

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _26th_ day of August, 2015.



                                         _Dianna Dees_____
                                         Notary Public's Signature

                                         MY COMMISSION EXPIRES MAY 17, 2018

[SEAL]                                   Expiration:_____

DEFENDANT 000044

## ACKNOWLEDGEMENT OF DELIVERY

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family Trustee was delivered to and received by me on August 26 2015.

James D. Dondero

**DEFENDANT 000045**

# Exhibit D

# BONDS ELLIS EPPICH SCHAFER JONES LLP
## ATTORNEYS & COUNSELORS

D. MICHAEL LYNN | D: 817.405.6915 | MICHAEL.LYNN@BONDSELLIS.COM

February 1, 2021

***Via Email and First Class Mail:***
Jeffrey Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com

**Re:     Highland Capital Management, L.P.: notes receivable from Dondero et al.**

Dear Jeff:

The Debtor recently commenced suit to collect on certain notes payable to it executed by Mr. Dondero and certain of his affiliates. As you are aware, in addition to other defenses, Mr. Dondero views the notes in question as having been given in exchange for loans by Highland made in lieu of compensation to Mr. Dondero.

Please ensure that any transferee of any of the notes is made aware of Mr. Dondero's position and that the Independent Board receives copies of this letter. I thank you in advance for your cooperation in this matter.

Sincerely,

D. Michael Lynn

Cc:     Jim Dondero
John Bonds
Douglas Draper
Davor Rukavina
Lee Hogewood
John Kane
Jason Rudd
Lauren Drawhorn

**App. 74**

Confidential

DEFENDANTS-0000435

# Exhibit E

November 30, 2020

NexPoint Advisors, L.P.
200 Crescent Court, Suite 700
Dallas, Texas 75201

> **RE:** **Termination of Amended and Restated Shared Services Agreement, dated January 1, 2018, and among Highland Capital Management, L.P. ("<u>HCMLP</u>"), and NexPoint Advisors, L.P. (the "<u>Agreement</u>").**

To Whom It May Concern:

As set forth in Section 7.01 of the Agreement, the Agreement is terminable at will upon at least 30 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement. Such termination will be effective January 31, 2021. HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.


/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

ACL-001587

# Exhibit 2

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**Attorneys for James Dondero, Nancy Dondero,
Highland Capital Management Services, Inc. and
NexPoint Real Estate Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors, L.P.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| Debtor. | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| **Plaintiff,** | § | **Adv. Proc. No. 21-03003-sgj** |
| vs. | § | |
| **JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| **Defendants.** | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03004-sgj** |
| **vs.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,** | § § § § | |
| **Defendant.** | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03005-sgj** |
| **vs.** | § § | |
| **NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § | |
| **Defendants.** | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03006-sgj** |
| **vs.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § | **Adv. Proc. No. 21-03007-sgj** |
| **Plaintiff,** | § § | |
| **vs.** | § | |
| **HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § | |

## DECLARATION OF NANCY M. DONDERO

I, Nancy Marie Dondero, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I reside in Vero Beach, Florida and am over the age of 21. The following facts are based on my personal knowledge and are all true and correct. I am willing and able to testify about these matters if and when called upon to do so.

2.      I have successfully owned and operated my own private investigation services business for over 30 years. I also have an undergraduate college degree from Pennsylvania State University, which included the study of basic business operations and management.

3.      I am also the Family Trustee of The Dugaboy Investment Trust ("Dugaboy"), and I have held that position since October 2015. A true and correct copy of the document appointing me as Family Trustee is attached to this Declaration as Exhibit A. At the times that the notes discussed below were entered into, Dugaboy owned and represented a majority of the Class A shareholders in Highland Capital Management, L.P. ("Highland Capital"). Jim Dondero is my brother and was, at that time, the President and CEO of Highland Capital. I understood that he was one of the founders of Highland Capital and, through The Dugaboy Investment Trust, a majority interest holder.

4.      Jim Dondero told me about his current and previous annual salaries at Highland Capital and explained that he was substantially underpaid as compared to other senior executives in the financial services industry. He told me that his annual salary from Highland Capital had been around $500,000 to $700,000 during the preceding several years. I had no reason to doubt the accuracy of what he told me about his compensation from Highland Capital or how that compared unfavorably to the compensation of others in similar positions with other companies in

the industry.

5.        Jim Dondero also advised me that he and certain of his affiliated companies had, on several occasions between 2013 and 2019, borrowed money from Highland Capital and had issued demand and term promissory notes in favor of Highland Capital regarding those loans.  He proposed that Highland Capital enter into an agreement with him and the other borrowers to forgive the Notes upon the occurrence of certain conditions subsequent, as a form of additional contingent compensation to him.

6.        In either December of 2017 or January of 2018, I caused Dugaboy (solely in my capacity as Dugaboy's Family Trustee) to cause Highland Capital to enter into the first of a series of verbal agreements with Jim Dondero that provided that the repayment obligation on the notes made in 2017 involved in this litigation would be forgiven if Highland Capital sold any of Trussway, Cornerstone, or MGM for a price greater than its cost, or if any of those portfolio companies were sold in a circumstance that was outside of Jim Dondero's control.  I fully understood the implications and terms of this Agreement.

7.        At either the end of 2018 or the beginning of 2019, Jim Dondero and I later entered into the same Agreement to apply to subsequent notes that were issued by him or one of his affiliated companies to Highland Capital in 2018.  I also fully understood the implications and terms of this Agreement.

8.        At either the end of 2019 or the beginning of 2020, Jim Dondero and I again entered into the same agreement to cover and apply to the notes at issue in this litigation that were issued in 2019.  All the Notes referenced herein are collectively referred to as the "Notes," and the agreements between Highland Capital and Jim regarding all of the Notes are collectively referred to herein as the "Agreements**.**"  I also fully understood the implications and terms of these

Agreements.  The Notes are as follows:

    i.    A demand note executed on February 2, 2018, between Highland Capital and Jim Dondero in the amount of $3,825,000.[1]

    ii.    A demand note executed on August 1, 2018, between Highland Capital and Jim Dondero in the amount of $2,500,000.[2]

    iii.    A demand note executed on August 13, 2018, between Highland Capital and Jim Dondero in the amount of $2,500,000.[3]

    iv.    A demand note executed on March 28, 2018, between Highland Capital and Highland Capital Management Services, Inc. ("HCMS") in the amount of $150,000.[4]

    v.    A demand note executed on June 25, 2018, between Highland Capital and HCMS in the amount of $200,000.[5]

    vi.    A demand note executed on May 29, 2019, between Highland Capital and HCMS in the amount of $400,000.[6]

    vii.    A demand note executed on June 26, 2019, between Highland Capital and HCMS in the amount of $150,000.[7]

    viii.    A demand note executed on October 12, 2017, between Highland Capital and HCRE Partners, LLC ("HCRE") in the amount of $2,500,000.[8]

    ix.    A demand note executed on October 15, 2018, between Highland Capital and

---

[1] Pl. Appx. 00678-679.
[2] Pl. Appx. 00681-682.
[3] Pl. Appx. 00684-685.
[4] Pl. Appx. 00118-119.
[5] Pl. Appx. 00121-122.
[6] Pl. Appx. 00124-125.
[7] Pl. Appx. 00127-128.
[8] Pl. Appx. 00205-206.

HCRE in the amount of $750,000.[9]

    x.    A demand note executed on September 25, 2019, between Highland Capital and HCRE in the amount of $900,000.[10]

    xi.    A term note executed on May 31, 2017, between Highland Capital and NexPoint Advisors, L.P. ("NexPoint"), in the amount of $30,746,812.33.[11]

    xii.    A term note executed on May 31, 2017, between Highland Capital and HCMS in the amount of $20,247,628.02.[12]

    xiii.    A term note executed on May 31, 2017, between Highland Capital and HCRE in the amount of $6,059,831.51.[13]

9.    At the time I caused Highland Capital to enter into each of the Agreements, I knew that Highland Capital was a hedge fund and that its general partner was Strand Advisors, Inc. I also knew that Highland Capital owned an interest in each of Cornerstone, MGM, and Trussway, the portfolio companies that were involved in the Agreements. I also knew that Highland Capital's business included buying and selling portfolio companies at a profit. I also knew and believed that Jim would be the person most involved in, and responsible for, the marketing and eventual sale of Cornerstone, MGM, and Trussway by Highland Capital. I also knew and believed that executives in the financial services industry tend to be paid more when the companies they work for perform better.

10.    The Agreements had two primary purposes, both of which would benefit Highland Capital's performance and reputation. First, the Agreements would provide additional incentive

---

[9] Pl. Appx. 00208-209.
[10] Pl. Appx. 00211-212.
[11] Pl. Appx. 00042-43.
[12] Pl. Appx. 00134-135.
[13] Pl. Appx. 00218-219.

*ACTIVE 48197723v1*

and motivation to Jim Dondero to attempt to maximize the value and return to Highland Capital on Trussway, Cornerstone, and MGM, and to remain in Plaintiff's employment. Second, the Agreements would allow Highland Capital to contingently increase Jim Dondero's compensation without requiring additional cash or salary to be paid to him and the consequential effect of such an increase on Highland Capital's financial position.

11.     At the time I caused Highland Capital to enter into each of the Agreements, I did not know every detail about every aspect of Highland Capital's business or the Notes. However, I did have all of the facts and information I considered necessary, appropriate, and reasonable for my decision (solely in my capacity as Dugaboy's Family Trustee) to cause Highland Capital to enter into each of the Agreements. I do not believe that Highland Capital, Dugaboy, or I were deceived or mislead in any manner by Jim Dondero or anyone else regarding the Notes or any of the Agreements.

12.     At the time I caused Highland to enter into each of the Agreements, I appreciated the effect of what I was doing and I understood the nature and consequences of those acts. I was not mentally incompetent, under a legal guardianship, intoxicated, or under any other mental impairment.

13.     At the time I caused Highland Capital to enter into each of the Agreements, I believed I had the authority, as the Dugaboy Family Trustee, to cause Dugaboy to cause Highland Capital to enter into the Agreements. I also intended, believed, and expected that each of the Agreements would be a binding and enforceable agreement between Highland Capital and Jim Dondero.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 20 , 2022.

_Nancy M. Dondero_
Nancy M. Dondero

# Exhibit A

### THE DUGABOY INVESTMENT TRUST
**James D. Dondero, Primary Beneficiary**

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

      Re:    The Dugaboy Investment Trust

Dear Ms. Breault,

      I, James D. Dondero, am writing to inform you that on October 12, 2015, I received notice from Grant James Scott that he will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

      Pursuant to the attached Resignation of Family Trustee from Grant James Scott, I appoint Nancy Marie Dondero as the successor Family Trustee of the Trust.

      This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.2 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with notice of my appointment of a successor Family Trustee.

Very truly yours,

James D. Dondero

**DEFENDANT 000037**

**THE DUGABOY INVESTMENT TRUST**
**Grant James Scott, Family Trustee**

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

        Re:    The Dugaboy Investment Trust

Dear Ms. Breault,

        I, Grant James Scott, am writing to inform you that as of October 12, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust pursuant to the attached Resignation of Family Trustee.

        This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

Very truly yours,

Grant James Scott

App. 88
DEFENDANT 000038

## RESIGNATION OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein NANCY MARIE DONDERO accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF**, I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

_____          10/12/2015
Family Trustee                                     Date

STATE OF TEXAS              §
COUNTY OF DALLAS          §

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14ᵗʰ day of October, 2015.

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

_____
Notary Public's Signature

[SEAL]

Expiration: January 15, 2019

DEFENDANT 000039

## ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE

I, **NANCY MARIE DONDERO**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this 13th day of October, 2015.

Nancy Marie Dondero
**NANCY MARIE DONDERO**
**Family Trustee**

STATE OF TEXAS    §
COUNTY OF DALLAS    §

Before me, a notary public, on this day personally appeared **NANCY MARIE DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14th day of October, 2015.

Notary Public's Signature

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

[SEAL]

Expiration: January 15, 2019

**DEFENDANT 000040**

### ACKNOWLEDGEMENT OF DELIVERY

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family Trustee by NANCY MARIE DONDERO was delivered to and received by me on October __, 2015.

_____
James D. Dondero

DEFENDANT 000041

# Exhibit 3

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**Attorneys for James Dondero, Nancy Dondero,
Highland Capital Management Services, Inc. and
HCRE Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com
**Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors, L.P.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03005-sgj** |
| **vs.** | § § | |
| **NEXPOINT ADVISORS, L.P., JAMES DONDERO, AND NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03006-sgj** |
| **vs.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § | **Adv. Proc. No. 21-03007-sgj** |
| **Plaintiff,** | § § | |
| **vs.** | § § | |
| **HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |

## DECLARATION OF MICHAEL P. AIGEN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Michael P. Aigen, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declares as follows:

1.     I am a member of the law firm of Stinson LLP, counsel to Defendant James Dondero, Highland Capital Management Services, Inc. and HCRE Partners, LLC n/k/a NexPoint Real Estate Partners, LLC, and I submit this Declaration in support of the *Defendants' Opposition to Plaintiff Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, which

is being filed concurrently with this Declaration. I submit this Declaration based on my personal knowledge and the documents listed below.

2. Attached as **Exhibit A** is a true and correct copy of the Transcript of the Video Deposition of James P. Seery, Jr. taken on October 21, 2021 in Adv. Proc. No. 21-03005.

3. Attached as **Exhibit** B is a true and correct copy of the Transcript of the Remote Deposition of Bruce McGovern taken on November 9, 2021 in Adv. Proc. No 21-03003.

4. Attached as **Exhibit C** is a true and correct copy of a List of Promissory Notes, bates labeled DEFENDANTS-0000434, that was used by Mr. Dondero at his deposition and produced to Plaintiff.

5. Attached as **Exhibit D** is a true and correct copy of an email from F. Waterhouse to K. Hendrix, dated November 25, 2020.

6. Attached as **Exhibit E** is a true and correct copy of an email from F. Waterhouse to K. Hendrix, dated December 31, 2020.

7. Attached as **Exhibit F** is a true and correct copy of the Expert Report of Steven J. Pully, dated December 10, 2021.

8. Attached as **Exhibit G** is a true and correct copy of the Expert Report of Alan M. Johnson, dated May 28, 2021.

9. Attached as **Exhibit H** is a true and correct copy of Highland Capital Management, L.P.'s Responses and Objections to Defendants' Joint Discovery Requests, dated September 27, 2021.

Dated: January 20, 2022          */s/Michael P. Aigen*
                                 Michael P. Aigen

# Exhibit A

1

2          IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
3                    DALLAS DIVISION

4    In re:                         )
                                    ) Chapter 11
5    HIGHLAND CAPITAL MANAGEMENT, L.P.) Case No.
                                    ) 19-34054-sqj11
6                 Debtor.           )
     -------------------------------- )
7                                   )
     HIGHLAND CAPITAL MANAGEMENT, L.P.)
8                                   )
                  Plaintiff,        )
9                                   )
          -vs-                      ) Adversary
10                                  ) Proceeding No.
     NEXPOINT ADVISORS, L.P., JAMES  ) 21-03005-sgj
11   DONDERO, NANCY DONDERO, AND THE )
     DUGABOY INVESTMENT TRUST,       )
12                                  )
                  Defendants.       )
13   -------------------------------

14

15

16      VIDEO DEPOSITION OF JAMES P. SEERY, JR.

17              New York, New York

18           Thursday, October 21, 2021

19

20

21

22

23

24   Reported by:
     MARIANNE WITKOWSKI-SMITH
25   JOB NO. 201192

Page 2

```
1
2
3
4                    October 21, 2021
5                    2:02 p.m.
6
7
8        Video Deposition of JAMES P. SEERY, JR.,
9  individually and on behalf of HIGHLAND CAPITAL
10 MANAGEMENT LP, held at the offices of Pachulski
11 Stang Ziehl & Jones LLP, 780 Third Avenue, New
12 York, New York, before Marianne Witkowski-Smith,
13 a Shorthand Reporter and Notary Public of the
14 State of New York.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2  A P P E A R A N C E S:
3
4
5      PACHULSKI STANG ZIEHL & JONES
6      Attorneys for Highland Capital Management LP
       and the Witness
7
          780 Third Avenue
8
          New York, New York 10017
9
10     BY:  JOHN MORRIS, ESQ.
11         GREGORY DEMO, ESQ.
12         HAYLEY WINOGRAD, ESQ.
13
14     MUNSCH HARDT KOPF & HARR
15     Attorneys for NexPoint Advisors LP
16
          500 North Akard Street
17
          Dallas, Texas 75201
18
19     BY:  DAVOR RUKAVINA, ESQ.
20         THOMAS BERGHMAN, ESQ.
21
22
23
24
25        (Continued on Next Page)
```

Page 4

```
1
2  A P P E A R A N C E S (Cont'd):
3
4
5      STINSON
6      Attorneys for James Dondero, Nancy Dondero,
       HCRE, HCMS
7
          3102 Oak Lawn Avenue
8
          Dallas, Texas 75219
9
10     BY:  DEBORAH DEITSCH-PEREZ, ESQ.
           MICHAEL AIGEN, ESQ.
11
12
13
       HELLER, DRAPER, HAYDEN, PATRICK, & HORN
14
       Attorneys for The Dugaboy Investment Trust
15
          650 Poydras Street
16
          New Orleans, Louisiana 70130
17
       BY:  WARREN HORN, ESQ.
18
19
20
21 ALSO PRESENT:
22    MANUEL GARCIA, Legal Video Specialist
23    THANHAN NGUYEN, ESQ. (Via Zoom)
24    AARON LAWRENCE, ESQ. (Via Zoom)
25    LA ASIA CANTY (Via Zoom)
```

Page 5

```
1              J. Seery
2        VIDEO TECHNICIAN:  This is the
3  start of Media Label No. 1 in the
4  video-recorded deposition of James P.
5  Seery Jr., in the matter of Highland
6  Capital Management LP vs. NexPoint
7  Advisors LP, et al., on October the
8  21st, 2021, at approximately 2:02 p.m.
9        My name is Manuel Garcia.  I'm the
10 certified legal videographer from TSG
11 Reporting Inc.  The court reporter is
12 Marianne Smith, in association with TSG
13 Reporting.
14        Counsel, please introduce
15 yourselves.
16        MR. RUKAVINA:  My name is Davor
17 Rukavina.  I represent NexPoint
18 Advisors LP.
19        MR. MORRIS:  My name is John
20 Morris from Pachulski Stang Ziehl &
21 Jones, on behalf of Capital -- Highland
22 Capital Management LP, and I'm
23 representing the witness, James P.
24 Seery, Jr., today.
25        MS. DEITSCH-PEREZ:  Hi.  This is
```

App. 98

Page 6

J. Seery

1
2     Deborah Deitsch-Perez from Stinson LLP.
3     I'm on with my partner, Michael Aigen,
4     also from Stinson.  We're representing
5     James Dondero, Nancy Dondero, HCRE and
6     HCMS.
7           MR. HORN:  Warren Horn
8     [inaudible].
9           (Reporter clarification.)
10          MR. HORN:  Warren Horn, H-O-R-N,
11    with Heller, Draper & Horn,
12    representing The Dugaboy Investment
13    Trust.
14          VIDEO TECHNICIAN:  Will the court
15    reporter please swear in the witness.
16  J A M E S   P.   S E E R Y ,   J R.,
17    the witness herein, was thereupon duly
18    sworn by the Notary Public and was
19    examined and testified as follows:
20  EXAMINATION
21  BY MR. RUKAVINA:
22    Q.    Sir, good afternoon.
23          State your name, please.
24    A.    James P. Seery, Jr.
25    Q.    And just so we're clear, you have a

Page 7

J. Seery

1
2     laptop in front of you because this is being
3     done remotely as well, but you're not
4     reviewing any material or taking any
5     information or texts or emails like that, are
6     you?
7     A.    No.
8     Q.    Okay.  It's fair to say you've
9     been --
10    A.    I -- I have a phone in front of me,
11    but I don't intend to use it.
12    Q.    Okay.  Fair to say that you've been
13    deposed before?
14    A.    I have.
15    Q.    Approximately how many times?
16    A.    More -- more than twenty-five.
17    Q.    Okay.  And quite a number in this
18    case as well, correct?
19    A.    More than -- probably more than
20    fifteen.
21    Q.    Okay.  The only thing I'd ask -
22    you're -- you're a veteran - is I have an
23    accent and sometimes I talk fast, so don't --
24    don't hesitate to tell me that you didn't
25    understand or ask me to rephrase, please.

Page 8

J. Seery

1
2     Please don't hesitate to do that.
3     A.    Thank you.
4     Q.    Sir, just for the record, where do
5     you live?
6     A.    I live in New York City, Upper West
7     Side.
8     Q.    Do you have any real estate or
9     property that -- where you live periodically
10    in the State of Texas?
11    A.    No.
12    Q.    Okay.  Other than your work for
13    Highland here, do you have any business
14    calling that takes you to the State of Texas
15    on a regular basis?
16    A.    No.
17          MR. RUKAVINA:  Okay.  We'll mark
18    as Exhibit 1 the Notice of 30(b)(6).
19          (Brief off-record discussion.)
20          (Exhibit 1, Notice of
21    Deposition/Seery, marked for
22    identification, as of this date.)
23    Q.    Mr. Seery, you've been handed
24    Exhibit 1.
25          Have you seen this document?

Page 9

J. Seery

1
2     A.    I believe I have, yes.
3     Q.    Okay.  And are you familiar with
4     the topics I've designated in here?
5           MR. MORRIS:  I think this is
6     missing a page.
7           THE WITNESS:  Going to 1 to 2
8     to --
9           MR. MORRIS:  The topics aren't in
10    this version.
11          MR. RUKAVINA:  Oh, I gave you the
12    wrong one; I apologize --
13          (Simultaneous speaking.)
14          MR. RUKAVINA:  I apologize, I
15    apologize.  Sir, that -- that's the one
16    that, that -- that Notices you
17    personally here today.  Let me try
18    again, and -- and Exhibit 2 will be the
19    30(b)(6).
20          (Exhibit 2, Notice of
21    Deposition/30(b)(6), marked for
22    identification, as of this date.)
23    Q.    Sir, have you seen Exhibit 2
24    before?
25    A.    I believe I have, yes.

Page 10

J. Seery

2  Q.  Okay.  And subject to your
3  counsel's objections, which he sent to me by
4  email, are you prepared to testify on the
5  topics that are designated in here today?
6  A.  Yes.
7  Q.  Okay.  And have you reasonably
8  informed yourself on those topics prior to
9  sitting here today?
10  A.  Yes.
11  Q.  Okay.  Now, some background, and we
12  don't need to go into excruciating detail.
13       What is your educational
14  background?
15  A.  I have a BA in history.  I have a
16  law degree, JD.  And I've taken lots and lots
17  of courses.
18  Q.  And what university or college is
19  your history BA from?
20  A.  Colgate University.
21  Q.  Okay.  And what university is your
22  JD from?
23  A.  New York Law School.
24  Q.  And when did you graduate New York
25  Law School and get your JD?

Page 11

J. Seery

2  A.  1990.
3  Q.  Okay.  And what states have you
4  been licensed in as a lawyer?
5  A.  New York and Connecticut.
6  Q.  Are you currently licensed as a
7  lawyer?
8  A.  I believe I am.
9  Q.  Okay.  Have you ever faced any
10  disciplinary proceedings as a lawyer?
11  A.  No.
12  Q.  With respect to bankruptcy cases,
13  can you give us a brief recitation of -- of
14  your relevant experience in administering
15  Chapter 11 or other bankruptcy estates?
16  A.  Administering, I -- I've been
17  involved or been an active player - either as
18  a lawyer, senior lawyer, investor, and in
19  this case an independent director and CRO -
20  in really my entire career, so I would say
21  hundreds.
22  Q.  Okay.  Do you consider yourself an
23  expert on bankruptcy law?
24  A.  I'm pretty good.
25  Q.  Okay.  And with respect to the

Page 12

J. Seery

2  Highland Capital Management LP bankruptcy
3  case, obviously the plan has been confirmed
4  and it's gone effective.
5       Before the plan went effective,
6  what was your role with the debtor?
7  A.  I was an independent director, and
8  subsequently I was appointed as the CRO and
9  CEO of Highland.
10  Q.  And approximately when did you
11  become an independent director?
12  A.  January 9, 2020.
13  Q.  And just to be clear, what entity
14  were you an independent director of?
15  A.  I was an independent director of
16  Strand Advisors, which was the GP of Highland
17  Capital Management LP and had control of
18  Highland Capital Management LP, which became
19  the debtor - or was the debtor.
20  Q.  And there were two other
21  independent directors, correct?
22  A.  There were, yes.
23  Q.  What were their names, sir?
24  A.  Russell Nelms and John Dubel.
25  Q.  Okay.  And did the three of you --

Page 13

J. Seery

2  were the three of you independent directors
3  since January 9, 2020, until the plan became
4  effective?
5  A.  That's correct.
6  Q.  Were there any other people who,
7  during that time frame, were ever independent
8  directors?
9  A.  No.
10  Q.  Okay.  And, sir, when did you
11  become the CEO and/or CRO?
12  A.  In July of 2020.
13  Q.  Okay.  Prior to July of 2020, was
14  your role with Highland and Strand solely
15  that of an independent director?
16  A.  It -- it was.  I effectively was, I
17  guess, probably the lead independent
18  director, just spent the most time -- I
19  shouldn't say the most time.
20       I spent a significant amount of
21  time on it, as did my fellow directors, but I
22  spent a significant amount of time.
23  Q.  And -- and Mr. Nelms, he was a
24  former bankruptcy judge?
25  A.  Yes.

Page 14

J. Seery

1     J. Seery
2        Q.    Okay.  And Mr. Duval [ph], what
3    was, just briefly, his background to your
4    understanding?
5        A.    Dubel --
6        Q.    I'm sorry, Dubel.
7        A.    -- and he was a -- he's a very
8    experienced practitioner in distressed
9    corporate management and bankruptcy corporate
10   management.
11       Q.    Okay.  After the bankruptcy plan
12   became effective, what happened to the
13   debtor?
14             In other words, as a corporate
15   entity, what happened to the debtor?
16       A.    The debtor was reconstituted with a
17   new GP and new limited partnership units.
18       Q.    Okay.  And do you have any role
19   with respect to authority at the debtor
20   today?
21       A.    I do.
22       Q.    What is your role, sir?
23       A.    I'm the CEO.
24       Q.    The -- I'm sorry, the CEO?
25       A.    Yes.

Page 15

J. Seery

1     J. Seery
2        Q.    Okay.  And you're also a
3    post-confirmation trustee, are you not?
4        A.    I am, yes.
5        Q.    And what are you the trustee of?
6        A.    The Claimant trustee.
7        Q.    Okay.  And what role does the
8    Claimant trustee, if any, have with the
9    reorganized debtor?
10       A.    The Claimant trustee is the
11   claimant -- is the trustee for the Claimant
12   Trust, which holds the limited partnership
13   units for the reorganized debtor.
14       Q.    Okay.  And does it also hold any
15   general partnership units for the reorganized
16   debtor?
17       A.    It holds the ownership interest in
18   the GP.
19       Q.    Okay.  Is it fair to say that --
20   that all economic value in the reorganized
21   debtor one way or the other inures to the
22   benefit of the Claimant Trust under the plan?
23       A.    It does effectively run up to the
24   Claimant Trust, yes.
25       Q.    And is it fair to say that you are

Page 16

J. Seery

1     J. Seery
2    in charge of the reorganized debtor?
3        A.    I'm in charge of the reorganized
4    debtor and I'm in charge of the Claimant
5    Trust, but not all of the value runs through
6    me directly.
7        Q.    Because there's also a Litigation
8    Sub-Trust?
9        A.    That's correct, and that doesn't
10   report to me.
11       Q.    As far, sir -- let's just limit it
12   now to the debtor's post effective date
13   operations.
14             Are you the person in charge of
15   those operations?
16       A.    Yes.
17       Q.    Okay.  Are you -- and you said that
18   you're the CEO of the debtor.
19             Are there any other officers,
20   either at the debtor or its new GP, in
21   addition to you?
22       A.    Yes.
23       Q.    Who -- who, sir?
24       A.    Thomas Surgent is the general
25   counsel and David Klos is the CFO.

Page 17

J. Seery

1     J. Seery
2        Q.    Okay.  And both Mr. Surgeon -- I'm
3    sorry, Surgent and Mr. Klos were previously
4    employed with the debtor prior to the
5    effective date?
6        A.    They were.
7        Q.    Okay.  So in July 2020, you
8    mentioned you became the CEO and CRO of the
9    debtor, correct?
10       A.    That's correct.
11       Q.    Okay.  And prior to that -- well,
12   obviously, you know who Mr. James Dondero is,
13   correct?
14       A.    I do.
15       Q.    Okay.  And part of what happened on
16   January 9, 2020, in summary, was that
17   Mr. Dondero, pursuant to his agreement and
18   Court order, was removed from controlling the
19   debtor.
20             Is that a fair summary?
21       A.    Certain --
22             MR. MORRIS:  Objection to the
23   form of the question.
24       A.    Certain -- certainly with respect
25   to the -- the corporate delegation of

Page 18

1           J. Seery
2    authority, yes.
3        Q.    Okay.  He stayed on as an employee,
4    but whatever he did - is it fair to say -
5    after January 9, 2020 would be subject to the
6    new independent board?
7        A.    I don't think that would be fair to
8    say.  I think from a corporate rule
9    perspective it would be.  I think he -- he,
10   subsequently, we learned, did quite a few
11   things without --
12           (Reporter clarification.)
13           THE WITNESS:  Subsequently we
14       learned he did quite a few things
15       without oversight by the independent
16       board.
17   BY MR. RUKAVINA:
18       Q.    Okay.  Can you give me an example
19   of what he did without oversight by the
20   independent board?
21       A.    He traded -- traded assets; he
22   managed the Select account on his own; he
23   didn't meet margins calls at direction that
24   the -- that the board, independent board, had
25   said to -- to meet; he tried to overrule me

Page 19

1           J. Seery
2    subsequently and later in the year on asset
3    sales that were being conducted out of
4    certain of the CLOs --
5           (Reporter clarification.)
6           THE WITNESS:  Asset sales -- I'm
7       sorry, asset sales out of certain of
8       the CLOs.
9           So there, there -- if we take time,
10      we can go through dozens.
11   BY MR. RUKAVINA:
12       Q.    Well, I get the general gist.  And
13   is it fair to say that those things that he
14   was doing, amongst others, is why the
15   independent board made you the CEO and CRO?
16           MR. MORRIS:  Objection to the
17       form of the question.
18       Q.    Let me rephrase the question.
19           Why, in July -- first of all, who
20   made you CEO and CRO in July of 2020?
21       A.    The independent board approved it
22   and then the Court approved it.
23       Q.    And you were on that independent
24   board, so you were one of the people that
25   approved it?

Page 20

1           J. Seery
2           MR. MORRIS:  Objection to the
3       form of the question.
4        A.    No, I would have abstained.
5        Q.    I apologize.
6           So the other two board members
7    approved it?
8        A.    Correct.
9        Q.    Okay.  Do you have an understanding
10   as to why they approved you becoming CEO and
11   CRO?
12       A.    We felt like the organization
13   needed a specific leader and a specific
14   direction.  Mr. Dondero's activities were
15   pulling many of the people in the business
16   multiple ways, and we felt that it was both
17   dangerous for the organization and dangerous
18   for the individuals.
19       Q.    Okay.  Between January 9, 2020 and
20   July 2020, when you became the CEO and CRO, what
21   should have, pursuant to the settlement and
22   Court agreement, Mr. Dondero's role at the
23   debtor have been?
24           MR. MORRIS:  Objection to the
25       form of the question --

Page 21

1           J. Seery
2        A.    He was --
3           MR. MORRIS:  -- and I just -- I
4       just want to note that I, I -- I don't
5       see how this is connected in any way to
6       the issues in the lawsuits.
7           I'll allow you to ask a few more
8       questions for background purposes, but
9       I -- I just want to note my concern that
10      we're running a little far afield.
11          But you can answer the question.
12       A.    Can you read back the question --
13          (Simultaneous speaking and
14      reporter interjection.)
15       Q.    Between January 9, 2020 and July
16   2020, whenever you became the CEO and CRO,
17   pursuant to the court approved settlement,
18   what should Mr. Dondero's role at the debtor
19   have been?
20          MR. MORRIS:  Objection to the
21      form of the question.
22       A.    I think you have to understand
23   the -- the settlement.  Mr. Dondero initially
24   agreed to be removed from all roles at the
25   debtor.  At the very last second he changed

Page 22

J. Seery

2 that and wanted to be put back in.  I think
3 it probably had to do with -- with press
4 reports that he didn't like reading.  So he
5 maintained an unpaid role as the portfolio
6 manager.  The portfolio that he really
7 managed was the Select account.
8        What he should have done is he
9 should have taken direction.  He should have
10 honored the margin calls that -- that
11 Jefferies had made, he should have sold
12 assets, he should have reported to the board.
13 He did none of those things.
14        He independently, then, ran
15 roughshod over certain parts of the
16 organization.  He should not have done that.
17 And it was very difficult, with the existing
18 employees, to manage them with Mr. Dondero
19 there because they'd worked for him for a
20 number of years.
21    Q.    That was going to be my next
22 question.
23        Did you feel, prior to July 2020,
24 that some employees, some key employees, were
25 basically doing his bidding instead of what

Page 23

J. Seery

2 the independent board expected them to be
3 doing?
4    A.    I think we had -- we certainly had
5 concerns about that, yes.
6    Q.    And we'll round this off pretty
7 quickly.
8        Did there come a time when you
9 asked Mr. Dondero for his resignation?
10    A.    There did, yes.
11    Q.    And -- and did he give it?
12    A.    He did, yes.
13    Q.    And do you recall the date?
14    A.    It was in October of 2020.
15        MR. RUKAVINA:  I have it in here
16    somewhere.  I'm not sure that it's --
17    well, let's just put it in the record,
18    see if this will refresh your memory.
19        This is going to be 3, right?
20        (Exhibit 3, Email Chain Re:
21    HCMLP Roles, marked for identification,
22    as of this date.)
23        (Brief off-record discussion.)
24 BY MR. RUKAVINA:
25    Q.    Do you recall this email chain,

Page 24

J. Seery

2 sir?
3    A.    Vague -- vaguely.  I'm -- I'm
4 familiar with it, yes.
5    Q.    And does this refresh your memory
6 that Mr. Dondero resigned on October the 9th,
7 2020?
8    A.    I -- I would say it confirms my
9 memory since I said it was in October.
10    Q.    Okay.  But can you now confirm that
11 it was October 9, 2020?
12    A.    Yes.
13    Q.    Okay.  Thank you.  Now, just to put
14 it in the record here because of Mr. Morris'
15 objection, it is -- and I apologize, we're
16 going to talk about the debtor's contentions
17 today in this lawsuit against NexPoint.
18        Is it okay if I say debtor or you
19 want me to say reorganized debtor or --
20    A.    Whatever you're more comfortable,
21 I'm okay.
22    Q.    It is -- well, the -- the debtor
23 the reorganized debtor under the plan,
24 retained interest in this lawsuit; is that
25 accurate?

Page 25

J. Seery

2    A.    That's correct.
3    Q.    Okay.  So it -- it's -- is it the
4 debtor's contention that NexPoint failed to
5 make a payment due, let's say on or before
6 December 31, 2020, on this $30.7 million
7 promissory note?
8    A.    That's correct.
9    Q.    Okay.  And we'll go further in
10 detail, but ultimately, on or about January
11 7, the debtor sent notice that the note was
12 immediately due and payable, correct?
13    A.    That's correct.
14    Q.    And did you make that decision to
15 say that the note is immediately due and
16 payable?
17    A.    I did, yes.
18    Q.    Okay.  Thank you.  Now -- and you
19 were aware, when you made that decision,
20 that -- that NexPoint was affiliated to some
21 degree with Mr. Dondero?
22        MR. MORRIS:  Objection to the
23    form of the question.
24    A.    Yes, I was.
25    Q.    What was your understanding then or

Page 26

J. Seery

1
2 what is your understanding now - you answer
3 it how ever you can - as to what
4 Mr. Dondero's role with NexPoint Advisors LP
5 was in December 2020?
6    A.    I believe it was and continues to
7 be complete ownership control and domination
8 of NexPoint Advisors.
9    Q.    Between January 9, 2020, when you
10 became an independent director, and October
11 9, 2020, when Mr. Dondero resigned, did you
12 form an opinion as to Mr. Dondero's honesty?
13    A.    Between which dates?
14    Q.    January 9 and October 9, 2020.
15    A.    January 9 and October -- yes.
16    Q.    Yes.
17          And did you form an opinion as to
18 his business acumen?
19    A.    To some degree, yes.
20    Q.    Okay.  Did you form an opinion as
21 to his management skills?
22    A.    Yes.
23    Q.    Okay.  What was your opinion
24 with -- pardon me, strike that.
25          What opinion did you form during

Page 27

J. Seery

1
2 that time as to Mr. Dondero's honesty?
3    A.    I think he's dishonest.
4    Q.    Okay.  What opinion did you form as
5 to his business acumen?
6    A.    I think it's challenged.
7    Q.    Can you elaborate?
8    A.    I -- the Select account we've
9 talked about is a -- is a great example.
10          Shorting Zoom in the pandemic and
11 holding it, shorting Netflix for long periods
12 of time, moving money all around without any
13 thought of the corporate form, moving money
14 in and out of different entities.
15          The litigations that he was
16 involved in; Acis alone he could have settled
17 for $2 million and probably burned nearly
18 $200 million of value.
19          So those are just beginning
20 examples.
21    Q.    Given the opinions that you formed
22 as to Mr. Dondero, did you believe that
23 that's also how he was running NexPoint at
24 that time in late 2020?
25    A.    I didn't make any judgments about

Page 28

J. Seery

1
2 NexPoint.
3    Q.    Okay.  Now, are you familiar with
4 the concepts, in bankruptcy, of solvency or
5 insolvency?
6    A.    Yes.
7    Q.    Okay.  Are you familiar with one or
8 more metrics or definitions --
9    A.    Yes.
10    Q.    -- for solvency -- okay.
11    A.    Yes.
12    Q.    Can you tell me how you understand
13 solvency to be.
14    A.    In which context?
15    Q.    Well, under the Bankruptcy Code.
16    A.    There's no --
17          MR. MORRIS:  Objection to the
18     form of the question.
19    A.    There's no definition of solvency
20 in the bankruptcy code.
21    Q.    Sir, there is.
22          MR. MORRIS:  Well --
23    A.    Failure to pay debts as they come
24 due, balance sheet insolvency --
25    Q.    That's what I'm --

Page 29

J. Seery

1
2          (Simultaneous speaking.)
3    A.    -- depends on the context.
4          (Reporter interjection.)
5    Q.    I'm sorry.
6          So you agree with me -- you agree
7 with me, again, depending on the context,
8 that one definition of insolvency is balance
9 sheet, meaning that your liabilities exceed
10 your assets?
11    A.    That is one definition of
12 insolvency.
13    Q.    And you agree with me that another
14 definition is when you're basically unable to
15 pay your debts as they become due?
16    A.    That's another definition.
17    Q.    Okay.  And I'm going to ask you,
18 when you became -- or after you became an
19 independent director on January 9, 2020, did
20 you form an opinion as to the debtor's
21 solvency?
22    A.    On January 9?
23    Q.    Well, or after that -- after,
24 after --
25          (Simultaneous speaking.)

Page 30

J. Seery

1
2    Q.    -- January 9, 2020.
3    A.    It's a -- it's a long period.  So
4 if you want to break it down --
5    Q.    Yeah.
6    A.    -- in the early part of the case I
7 did not form an opinion as to solvency.
8         I had to determine what the asset
9 values were and what the -- what the claims
10 were.
11   Q.    Did you ever form an opinion -- and
12 the reason why I'm -- I want to separate the
13 debtor from the reorganized debtor.  That's
14 why I'm trying to be sensitive on the dates.
15        So I'm going to say debtor.  Did
16 you ever form an opinion as to the debtor's
17 solvency?
18        MR. MORRIS:  Objection to the
19    form of the question.
20   A.    That's -- that's what I answered.
21   Q.    So you did?
22        MR. MORRIS:  Objection to the
23    form of the question.
24   A.    The -- the debtor's solvency
25 depends on when.

Page 31

J. Seery

1
2    Q.    Okay.
3    A.    I think early in the case, as I
4 said, I didn't form any opinion as to
5 solvency.
6    Q.    But at some point did you form an
7 opinion as to solvency?
8    A.    Yeah, I don't know exactly when it
9 was, but at -- at some point it became clear
10 to me that the claims exceeded the asset
11 value.
12   Q.    So is it fair to say that at some
13 point you concluded that the debtor was
14 insolvent based on the balance sheet test?
15        MR. MORRIS:  Objection to the
16    form of the question.
17   A.    Certainly on -- on the balance
18 sheet test, yeah.
19   Q.    What about on the inability to pay
20 debts as they become due; did you ever form
21 an opinion on that test?
22   A.    Well, it was in bankruptcy, so that
23 had already been met.
24   Q.    Okay.  Did you ever form an opinion
25 or have one provided by non-lawyers to you as

Page 32

J. Seery

1
2 to whether the debtor was insolvent prior to
3 the petition date?
4    A.    Did I, I -- I do now.
5    Q.    Okay.  What is your opinion?
6    A.    I think the debtor was insolvent
7 and very much insolvent well before the
8 filing.
9    Q.    Into 2018?
10   A.    Certainly.
11   Q.    2017?
12   A.    Certainly.
13   Q.    2016?
14   A.    Yes.
15   Q.    Okay.  And when you say that the
16 debtor was well insolvent before filing, are
17 you applying one or both of the definitions
18 we discussed for insolvency?
19        MR. MORRIS:  Davor, I'm just
20    going to express the same concern I did
21    earlier.  For the life of me, I don't
22    know -- I mean, I know why you're doing
23    this, but it's certainly not related to
24    any of the claims that are at issue in
25    this lawsuit.  So I'm just -- I just --

Page 33

J. Seery

1
2        MR. RUKAVINA:  With due respect,
3    John, you've sued my client for
4    fraudulent transfer.  That requires
5    insolvency as an element.  I'm entitled
6    to explore insolvency.
7        MR. MORRIS:  Sure, for -- for
8    2019, go right ahead.  That's when the
9    transfer was made, right?
10        MR. RUKAVINA:  The note --
11        MR. MORRIS:  The note is 2000 --
12    the, the note is -- is May 2, 2019,
13    so --
14        MR. RUKAVINA:  No, sir, you're --
15    I'm sorry, you're confusing this with
16    the HCMA case.  Let's put the note into
17    evidence.
18        MR. MORRIS:  Okay.
19        MR. RUKAVINA:  It's -- I'm not
20    trying to be --
21        (Simultaneous speaking.)
22        MR. MORRIS:  No, no, no, no, no.
23    Let me, let me -- let me restate this.
24        MR. RUKAVINA:  Yeah.
25        MR. MORRIS:  It's for actual

Page 34

```
1                    J. Seery
2     fraudulent transfer.
3           MR. RUKAVINA:  Yes.
4           MR. MORRIS:  Solvency is not an
5        issue.  Solvency is not an issue.  We
6        have no burden of proving solvency.
7        It's only -- that's exactly why we
8        didn't put constructive fraudulent
9        transfer in the complaint, so we
10       wouldn't do this.
11          MR. RUKAVINA:  We can -- we can
12       debate the law on that, but I think --
13       I think you have answered it.
14    BY MR. RUKAVINA:
15       Q.   To your view, the debtor was
16    insolvent certainly as of 2016?
17       A.   Yeah.
18       Q.   Okay.  And I asked you, and before
19    counsel objected, what definition or, or --
20    or both definitions were you using when you
21    told me that the debtor was insolvent in
22    2019, 2018, 2017 and 2016?
23       A.   I think --
24          MR. MORRIS:  Object to the form
25       of the question.
```

Page 35

```
1                    J. Seery
2       A.   I -- I think both.  I think you'd
3     have to go through each, but when you
4     properly look at the balance sheet and you
5     add the contingent liabilities, it was pretty
6     clear that the debtor didn't have the -- the
7     wherewithal from the balance sheet
8     perspective to satisfy those ultimate
9     liabilities.
10          In addition, the debtor continually
11    borrowed money when it needed it.  The debtor
12    was -- was always on a very tight leash with
13    respect to liquidity, as money kept getting
14    sucked out at different times.
15       Q.   Okay.  After October 9, 2020, when
16    Mr. Dondero resigned, should Mr. Dondero have
17    had any ability to instruct the debtor's
18    employees as to what to do, if that question
19    makes sense?
20          MR. MORRIS:  Yeah, objection to
21       the form of the question.
22       A.   The -- the answer is with
23    respect -- he was permitted, I believe, after
24    the -- the dates will get a little bit
25    confusing, but with respect to the shared
```

Page 36

```
1                    J. Seery
2     services, he could make certain direction to
3     the employees and even after the contempt
4     finding could make certain directions with
5     respect to shared services.
6           With respect to operations of
7     HCMLP, no.
8       Q.   Okay.  And that was my question.
9           So if it was an HCMLP operational
10    issue, Mr. Dondero had no ability to instruct
11    anyone else?
12       A.   Or, or -- or any issue --
13       Q.   Any issue --
14       A.   -- but with respect to shared
15    services, he certainly could communicate with
16    them, and if there were shared services that
17    needed to be performed, he could request
18    those.
19       Q.   Now, as of October 9, 2020, is it
20    true that Frank Waterhouse was the chief
21    financial officer of the debtor?
22       A.   That's correct.
23       Q.   And that he was the chief financial
24    officer of the debtor through January 2021?
25       A.   I don't remember the exact date,
```

Page 37

```
1                    J. Seery
2     but yes, right around there.
3       Q.   Okay.  Was he the chief financial
4     officer of the debtor on January 12, 2021?
5       A.   I -- I believe he was.  I don't
6     recall the exact dates that we did the -- the
7     cutover.
8       Q.   Okay.  Well, let's -- let's try to
9     pin that down.
10          You recall that there was a shared
11    services agreement in place between the
12    debtor and NexPoint?
13       A.   Yes.
14       Q.   Okay.  And you recall that the
15    debtor exercised its opt -- or right to
16    terminate that agreement?
17       A.   That's correct.
18       Q.   Okay.  And do you recall the date,
19    after several extensions, on which that
20    agreement was actually terminated?
21       A.   I don't recall the initial -- I
22    think the notice was in -- in November, late
23    November or December, and it was a -- I
24    believe it was a sixty-day notice for --
25          (Reporter clarification.)
```

Page 38

J. Seery
2      THE WITNESS:  Sixty-day for NPA,
3  I'm sorry, NPA.
4      And -- there was some sixty days
5  and some thirty days, so I don't recall
6  the exact date that there -- that it was
7  effectively terminated.
8  BY MR. RUKAVINA:
9      Q.   Well, by NPA, you mean NexPoint
10  Advisors?
11      A.   Correct.
12      Q.   Okay.
13      A.   Isn't that who you asked me about?
14      Q.   I know.  I'm just -- for the
15  record, the jury might not know who NPA is.
16      A.   Okay.
17      Q.   Do you recall that we -- you and I
18  had a trial in -- sometime in mid February
19  2021 about the shared services agreements?
20      A.   I know we had a hearing.  I don't
21  recall if you'd call it a trial.  It was a
22  hearing on termination.
23      Q.   Okay.  And -- and do you recall
24  that the debtor had agreed to extend
25  termination until February the 28th, 2021 of

Page 39

J. Seery
2  the shared services agreement?
3      A.   There -- there were extensions; I
4  don't recall the specific dates.
5      Q.   Okay.  Was -- to your recollection,
6  was -- was Mr. Waterhouse the chief financial
7  officer until the termination of that shared
8  services agreement or did he cease being the
9  chief financial officer at some period prior
10  to that?
11      A.   I -- I believe it was to the end,
12  but I'm not -- I'm not absolutely certain
13  about that.
14      Q.   So in December of 2021 -- I'm
15  sorry, strike that.
16      In December of 2020, you were the
17  chief restructuring officer, you were the
18  chief executive officer of the debtor,
19  correct?
20      A.   Yes.
21      Q.   Mr. Waterhouse was the chief
22  financial officer, correct?
23      A.   Yes.
24      Q.   Who else would have been an officer
25  of the debtor in December of 2020?

Page 40

J. Seery
2      A.   In December of 2020?
3      Scott Ellington was still the
4  general counsel.
5      Q.   Okay.
6      A.   And I don't believe that we had any
7  other corporate officers.
8      Q.   Mr. Surgent wasn't an officer, to
9  your recollection?
10      A.   He was the CCO --
11      Q.   Okay.
12      A.   -- so I don't believe that's
13  actually a corporate officer.
14      Q.   Was there a COO, do you know?
15      A.   I don't believe so at the time.
16      Q.   Okay.  Now, in the latter half of
17  2020, Mr. Dondero was trying to float some --
18  what we've all called pot plan.
19      Do you recall that?
20      MR. MORRIS:  Objection to the
21  form of the question.
22      A.   The latter half, I -- I guess
23  starting in probably around August --
24      Q.   Okay.
25      A.   -- in -- in connection with the

Page 41

J. Seery
2  mediation.
3      Q.   You've heard the term "pot plan"
4  that Mr. Dondero has talked about before,
5  correct?
6      A.   I have, yes.
7      Q.   Okay.  And what did you understand
8  a pot plan, as he was proposing it starting
9  in August of 2020, to be?
10      A.   Yeah, it's not a novel term.
11  Certainly he didn't invent it or -- or
12  probably didn't get it in this case.  He
13  probably got it from his lawyer.
14      But the idea of a pot plan is to
15  put a bunch of money into the middle and
16  create a pot that then the creditors can
17  determine how to divide, and the reorganized
18  debtor moves on with its existence away from
19  the creditor claims.
20      Q.   There was a creditors' committee in
21  the Highland bankruptcy case, correct?
22      A.   Yes.
23      Q.   And how many committee members were
24  there?
25      A.   Four.

Page 42

J. Seery

2    Q.    Okay.  And is it fair to say that
3  as part of this pot plan, Mr. Dondero was
4  trying to propose something that might be
5  palatable to that creditor's committee?
6    A.    I think it's fair to say it would
7  have to be palatable to that creditor's
8  committee.
9    Q.    And is it fair to say that -- that
10 starting in August of 2020, you were trying
11 to see if you might facilitate or bridge that
12 gap?
13   A.    I wouldn't say bridge but certainly
14 facilitate --
15   Q.    Okay.  What --
16   A.    -- or if you want to say I did as a
17 bridge between Mr. Dondero and his counsel
18 and -- and the committee and their counsel,
19 that -- that would be fair.
20   Q.    Okay.  Well, let me -- let me look
21 at your prior -- we're saying the same thing,
22 we're just having --
23         (Simultaneous speaking.)
24   A.    I don't think we're having a
25 definitional problem.  I just don't want it

Page 43

J. Seery

2  to sound like I was going to bridge it with
3  any sort of finances.
4    Q.    Yeah, that's true, the word
5  "bridge" could be construed to mean that.
6  You're correct.
7         MR. RUKAVINA:  Are we on 4?
8         THE WITNESS:  Yes.
9         (Exhibit 4, Seery Declaration in
10    Support of Motion for TRO, marked for
11    identification, as of this date.)
12        (Brief off-record discussion.)
13   Q.    Do you recall this declaration,
14 sir?
15   A.    Not -- not specifically.
16   Q.    Okay.  But if I represent to you
17 that I pulled this from the docket as your
18 counsel filed it, and assuming that I'm
19 telling the truth, would it -- would this
20 have been a declaration that you caused to be
21 filed?
22   A.    Yeah, I have no -- no reason to
23 challenge it, yes.
24   Q.    Okay.  And we might come back to
25 this a little bit later.  I don't want to

Page 44

J. Seery

2  waste your time right now.  But I've lost my
3  place, so we'll come back to it later, after
4  a break.
5         Going back --
6         (Simultaneous speaking.)
7    A.    -- see if there was a bridge quote
8  in here?
9    Q.    No, no, you were -- you were
10 describing that you had been trying to
11 facilitate a settlement, and I was just going
12 to try to use your words so that I wouldn't
13 misstate it.
14        But, but going back, so -- so in
15 August -- starting in August of 2020,
16 Mr. Dondero was trying to propose some pot
17 plan, and it had to have been acceptable to
18 the committee for there to be any settlement.
19        So far I'm correct, right?
20   A.    Yes.
21   Q.    And you as the COO was trying to do
22 what you could to see if you could facilitate
23 the two of them coming to an under --
24 understanding.
25        Is that generally accurate?

Page 45

J. Seery

2    A.    That's correct.
3    Q.    Okay.  And did you continue doing
4  so for a period of months after that?
5    A.    Certainly into early November.
6    Q.    Okay.  Would you say that there was
7  a point in time at which you stopped
8  personally - you, Mr. Seery - personally
9  stopped trying to facilitate some settlement
10 between Mr. Dondero and the committee
11 vis-a-vis a pot plan?
12   A.    I think at some point it became
13 very clear to me that it was futile, that --
14 that Mr. Dondero was never going to come up
15 with any real value that would be anywhere
16 close to what the committee would accept.
17        And his structure of his -- his pot
18 plan was always more notes, and the basic
19 assumption was, well, if you're not paying on
20 these notes how -- how do we trust new notes?
21   Q.    And when -- when did that view
22 crystalize in your mind?
23   A.    Probably some -- it probably
24 developed - so crystallized is a fair word -
25 over a period of time.  I think in the -- the

Page 46

```
 1                J. Seery
 2  mediation, through the negotiations in
 3  September and October or the -- the multiple
 4  re-trades on -- on very specific prior
 5  agreements, by November it was clear to me
 6  that -- that there was little hope.
 7       Q.   Okay.  So we can say by December 1,
 8  certainly by December 1, there was very
 9  little hope?
10       A.   Yeah, I think that that's
11  probably -- at least in my mind.  I don't
12  know if others felt the same, and there was
13  certainly opportunities for settlement beyond
14  that, but it seemed pretty clear to me that
15  we were moving towards a monetization plan
16  and we started negotiating the separation,
17  not with Mr. Dondero but with the team, of --
18  of the various business and the termination
19  of the --
20           (Reporter clarification.)
21           THE WITNESS:  Businesses and the
22       termination of the shared services,
23       sorry.
24  BY MR. RUKAVINA:
25       Q.   Did you convey that to
```

Page 47

```
 1                J. Seery
 2  Mr. Waterhouse at any point in time,
 3  basically that you believed that
 4  Mr. Dondero's pot plan was -- was not going
 5  to happen?
 6       A.   I -- I don't recall if I did or
 7  not.
 8       Q.   Did you -- strike that.
 9           In -- in the course of these
10  discussions between the committee and
11  Mr. Dondero and -- and maybe your trying to
12  facilitate something, was Mr. Waterhouse even
13  involved directly, to your knowledge?
14       A.   He was certainly involved,
15  assisting Mr. Dondero --
16       Q.   Okay.
17       A.   -- and he certainly provided or his
18  team provided data to me, which ultimately
19  went to the committee.
20           So I would -- I would think he's
21  involved to some degree.  I don't recall that
22  he would ever have been involved in -- in
23  specific discussions --
24       Q.   Okay.
25       A.   -- at least not with me.
```

Page 48

```
 1                J. Seery
 2           I think it was pretty clear he was
 3  involved with discussions with Mr. Dondero.
 4       Q.   You -- not you, pardon me.
 5           The debtor had an outside financial
 6  advisor, correct?
 7       A.   That's correct.
 8       Q.   And what was that entity's name?
 9       A.   DSI.
10       Q.   Is it fair to say that you relied
11  on DSI to some degree in the course of these
12  discussions and negotiations?
13       A.   To some degree, but I don't think
14  it's a fair characterization that they were
15  sort of a hands-on financial advisor around
16  the -- these negotiations.
17       Q.   I just want to -- I just want to
18  understand that, that -- it sounds like, to
19  me, at least on the debtor's side,
20  Mr. Waterhouse was not one of the key
21  individuals trying to facilitate an agreement
22  between the debtor and the committee?
23       A.   I, I --
24           MR. MORRIS:  Objection to the
25       form of the question.
```

Page 49

```
 1                J. Seery
 2       A.   I don't think that's fair.  I think
 3  that I -- I and my professionals, lawyers
 4  and -- and DSI, were in the middle between
 5  Mr. Dondero and his counsel and the
 6  committee.  The committee had their own
 7  financial advisors.
 8           I drew on Mr. Waterhouse and his
 9  team for financial information regarding the
10  debtor's assets throughout the case,
11  certainly since I took the position as CEO.
12       Q.   Okay.
13       A.   Mr. Dondero also drew on that
14  information quite a bit.
15       Q.   At that point in time, let's say in
16  December of 2020, did you understand that
17  Mr. Waterhouse had a role with my client,
18  NexPoint Advisors?
19       A.   Did you say December of 2020?
20       Q.   Yes, sir.
21       A.   Did he have a --
22           (Simultaneous speaking.)
23       A.   -- he was -- I think he was
24  treasurer and he was an executive officer of
25  some -- one of the funds.
```

Page 50

J. Seery

2  Q.   Now, you mentioned the debtor's
3  monetization plan that the debtor filed.
4       I think that's the word you used,
5  right, monetization plan?
6  A.   Correct.
7  Q.   Okay.  And in, in -- in a nutshell
8  amongst other things, that plan -- well, you,
9  you tell the -- the Court.
10      What was the monetization plan
11 intended to do?
12 A.   It was aptly named.  It was
13 intended to monetize the assets of the debtor
14 over a period of time that we thought was
15 legitimate to run the businesses in a way
16 that would maximize value for the estate.
17 Q.   And some of the assets of the
18 debtor, at least in the latter half of 2020,
19 included promissory notes from Mr. Dondero
20 and other entities affiliated with
21 Mr. Dondero; is that correct?
22 A.   That's correct.
23 Q.   And some of those promissory notes
24 were demand notes; is that correct?
25 A.   That's correct.

Page 51

J. Seery

2  Q.   And some of those promissory notes
3  were term notes, at least as of that time; is
4  that correct?
5  A.   That's correct.
6  Q.   Okay.  And I think, actually, it's
7  in this declaration which we marked 4, did
8  we?
9  A.   Yes.
10 Q.   Yes.  So you filed -- or, I'm
11 sorry, sir, you -- this was filed on December
12 7, 2020.
13      And I think if you go to paragraph
14 26 and 27, you'll see that you're discussing
15 demand notes.
16 A.   That's correct.
17 Q.   And in paragraph 29 it says that on
18 December 30 -- I'm sorry, strike that.
19      In paragraph 29 it says (as read):
20      On December 3, 2020, at my
21      instruction, the debtor's counsel
22      sent letters to representatives of
23      Mr. Dondero and each of the
24      corporate obligors, demanding
25      payment of all unpaid principal

Page 52

J. Seery

2  and accrued interest due under the
3  demand notes by December 11, 2020.
4       Was that a true statement?
5  A.   Yes.
6  Q.   Why did you decide to make demand
7  of the demand notes at that time?
8  A.   Well, it was pretty -- this will be
9  a long answer, but it's pretty clear that I
10 made a mistake, that I should have demanded
11 payment from Mr. Dondero earlier in the case.
12      The demand notes were due and
13 owing, they could be called at any time, and
14 I thought that leaving them outstanding would
15 provide a way to facilitate a grand bargain,
16 or a pot plan.
17      And by the time -- the beginning of
18 December, when we knew we were moving forward
19 with the monetization plan, it was time to
20 start to collect the assets of the debtor, so
21 I made a decision that we should demand
22 payment on each of the notes.
23 Q.   At that time, on December the 3rd,
24 2020, were you aware of the $30.7 million
25 NexPoint note?

Page 53

J. Seery

2  A.   Yes.
3  Q.   Okay.  And did you understand that
4  at that point in time that was a term note?
5  A.   Yes.
6  Q.   Okay.  And, and did you have a -- a
7  plan at that point in time as to -- and did
8  you -- pardon me.  Strike all that.
9       Did you understand that -- that
10 that had a thirty-year term originally when
11 it was executed?
12 A.   Yeah, you should understand that --
13 and maybe you do, and that's -- so we'll make
14 sure the record is clear.
15      Each of the -- the term notes were
16 not term notes.  They were -- they became
17 term notes because they were roll-up of
18 demand notes, and they were roll-up of demand
19 notes in 27 -- 2017, when things at the
20 debtor and for Mr. Dondero became very
21 precarious.
22      Certain lawsuits had been filed,
23 the asset stripping in the Cayman Islands had
24 begun.  It was a difficult time.  So without
25 any consideration whatsoever, Mr. Dondero, on

J. Seery

1  both sides, extended the terms -- rolled up
2  those notes and extended the terms of those
3  notes for thirty years and generally -
4  although not all - very low interest rate and
5  very easy terms, no -- no security, no
6  covenants.
7
8        So those became the term notes, but
9  they were always potentially subject to other
10 litigation demands.
11 Q.   You weren't around with the debtor
12 or NexPoint in 2017, were you?
13 A.   No.
14 Q.   Okay.  So you have no personal
15 knowledge about the execution of any notes at
16 that time?
17 A.   I, I would differ and say I do -- I
18 wasn't in the room, but I have the evidence
19 by the virtue of the fact that I've seen the
20 backup to the notes, and they actually
21 contain the schedule with the roll -- the
22 notes that are being rolled up.
23 Q.   So you're -- you're making an
24 educated deduction, based on your
25 professional experience, but you aren't

J. Seery

1  either the maker or the lender in 2017, when
2  these notes -- when this note was executed,
3  were you?
4        MR. MORRIS:  Objection to the
5        form of the question.
6  A.   I haven't been the maker or the, or
7  the -- or the lender on any of these notes.
8        MR. RUKAVINA:  Well, this is
9        going to be Exhibit 5.  This is the
10       note that we're here on today.
11       (Exhibit 5, Promissory Note
12       Dated May 31, 2017, marked for
13       identification, as of this date.)
14       (Brief off-record discussion.)
15 BY MR. RUKAVINA:
16 Q.   So if we go to the last page of
17 this exhibit, this references prior notes,
18 and the body of this basically says that each
19 of the prior notes are superseded by the new
20 note, correct?
21       MR. MORRIS:  Objection to the
22       form of the question.  Can you just
23       point that to Mr. Seery so --
24 Q.   Sure.  So, Mr. Seery, if you see

J. Seery

1  Section 9, (as read):
2        The original of each of the
3        prior notes superseded hereby
4        shall be marked void.
5  A.   Yes, so --
6  Q.   And then you see the prior notes in
7  the preamble?
8  A.   Uh-huh.
9  Q.   So is this what you were just
10 talking about, that this promissory note was
11 a roll-up of these five prior demand notes?
12 A.   That's correct.
13 Q.   Okay.  Now, if -- if we look at
14 this -- I'm looking at the last page here,
15 sir.
16 A.   Uh-huh.
17 Q.   The initial note amount of the
18 original five was 27,675,000; is that
19 correct?
20 A.   That's correct.
21 Q.   And -- and as of May 31, 2017, this
22 says that principal and interest outstanding
23 was 30,746,812.33; is that correct?
24 A.   That's what it says, yes.

J. Seery

1  Q.   Okay.  Is -- is the logical
2  conclusion that -- that on those five
3  promissory notes, not even all the interest
4  had been kept current?
5  A.   I, I --
6        MR. MORRIS:  Objection to the
7        form of the question.
8  A.   Yeah, I'd have to do the math on
9  each of them.  You're talking about three
10 years, 240 -- yeah, it looks roughly but not
11 all of the -- it looks like some payments
12 were made, but -- but certainly on -- it
13 doesn't look like it completely kept current,
14 at least on some of these.
15 Q.   Well, can you think of a reason --
16 other than the failure to pay interest, can
17 you think of reason as to why the initial
18 note amount increased by at least $3 million
19 in that time frame?
20       MR. MORRIS:  Objection to the
21       form of the question.
22 A.   No, I -- I would think it would be
23 an accrual.  And it's just unclear to me on
24 each of them whether there were pay-downs,

Page 58

1              J. Seery
2   whether there were times where it didn't pay
3   down, but certainly in the -- in the
4   aggregate, they didn't pay down.  And so I
5   just don't know if it was -- if there was
6   some payments or not; I don't recall.
7       Q.   Okay.  And -- and we're not here on
8   the HCMFA note, but are you general --
9   generally familiar that in April of 2019,
10  Mr. Dondero executed a document that took two
11  promissory notes that HCMFA had issued that
12  were demand notes and extended them until May
13  31, 2021?
14      A.   That's not what it did, no.
15      Q.   What do you understand happened?
16      A.   It, it -- they were -- they were
17  demand notes without maturity, and the -- the
18  obligor was given the statement from the
19  holder, HCMLP, that it wouldn't collect on
20  those notes until May 31, 2021.
21           And that was done because HCMFA did
22  not have the money to pay, and because it was
23  an advisor, it had to make representations
24  that it could support itself.
25      Q.   So is it fair to say that, at least

Page 59

1              J. Seery
2   prior to the time that you became CEO/CRO,
3   the debtor was lax in its enforcement of its
4   rights as the payee under promissory notes
5   from the advisors?
6       A.   That's --
7            MR. MORRIS:  Objection to form of
8       the question.
9       A.   That's completely unfair.
10           (Simultaneous speaking.)
11      A.   -- virtually no basis for you to
12  say something like that.
13           It's a demand note that hadn't been
14  demanded, and then -- then it was to a third
15  party, so they could rely on the fact that
16  HCMFA would have -- wouldn't have to have
17  outflows to payoff demands that could happen
18  at any time; that gave an agreement to extend
19  the term, which is not really a term, it's
20  just we won't demand it.
21           So how -- how you call that lax,
22  I -- that doesn't have -- has nothing to do
23  with being lax.
24      Q.   Well, I thought you testified a few
25  minutes ago that, at least in 2017, the

Page 60

1              J. Seery
2   debtor was facing serious problems and that
3   Mr. Dondero was rolling up these notes for --
4   for some ulterior purpose?
5       A.   Not ulterior purpose.  The purpose
6   is really, really obvious.  He wanted to
7   extend out the term so that they wouldn't
8   become due, couldn't be demanded at any time.
9       Q.   Okay.  So that -- that goes back to
10  my question, which you said was not a fair
11  question --
12      A.   No, I said your characterization
13  was unfair.  You can't call that being lax.
14  It's a demand note.  You can either demand it
15  or not demand it, but if you don't demand it,
16  it doesn't mean you're being lax.
17      Q.   Okay.  Fair enough.  But if, if --
18  so we're still on Exhibit 5.
19           If the debtor had allowed for these
20  five notes' accrued interest to go unpaid for
21  a period of one or more years, wouldn't that
22  suggest to you that the debtor was, as -- as
23  a payee, not strictly enforcing its rights?
24      A.   I believe the underlying terms
25  allowed it to accrue.

Page 61

1              J. Seery
2       Q.   Okay.  Okay.  So is it your
3   testimony, sir, that prior to you becoming
4   CEO/CRO, the debtor did or did not enforce
5   its rights as the payee under various
6   promissory notes according to industry
7   standards, as you would understand them to
8   be?
9            MR. MORRIS:  Objection to the
10      form of the question.
11      A.   I think industry standards are --
12  are a bit nebulous, particularly when you're
13  talking about the payee and the payor being
14  controlled by the same person.  But I think
15  there's nothing uncommon about letting a note
16  accrue when it's permitted to accrue.
17      Q.   Do you believe that there -- strike
18  that.
19           Do you believe that the debtor,
20  prior to you becoming CEO/CRO, had acted
21  inappropriately with permitting the roll-up
22  of these five notes into Exhibit 5 or -- or
23  changing the -- the HCMFA notes from demand
24  to May 31, 2021?
25           MR. MORRIS:  Objection to the

Page 62

```
1                    J. Seery
2         form of the question.
3         A.    Yeah, with -- with respect to the
4    HCMFA, I don't know -- I don't think that's
5    inappropriate, based on the shared services
6    and a tangential relationship between the
7    affiliates, although clearly it was
8    aggrandizing to Mr. Dondero and his
9    interests, which it syphoned off tons of
10   value from the debtor as opposed to HCMLP.
11        With respect to the roll-up of
12   these notes for thirty years, without --
13   without real consideration, I think that that
14   was --
15        (Reporter clarification.)
16        THE WITNESS:  Inappropriate, yes.
17   BY MR. RUKAVINA:
18        Q.    So if we go back now to December of
19   2020, early December of 2020, you've made
20   demand - as we've just read in your
21   declaration - on demand notes, and you've
22   testified that you were aware of the
23   existence of this note.
24        Did you, at that point in time,
25   have any plans as to how to monetize this
```

Page 63

```
1                    J. Seery
2    note, number -- Exhibit 5 --
3         A.    Yes.
4         Q.    -- on December 3, 2020?
5         A.    Yes.
6         Q.    Okay.  What was the plan back then?
7         A.    It depended on what happened to the
8    note, but ultimately we would seek to sell
9    the note because of its long tenor, but
10   likely we would end up suing Mr. -- or NPA,
11   the -- the maker of the note, for fraudulent
12   conveyance in 2017.
13        Q.    On account of the roll-up?
14        A.    Correct.
15        Q.    Okay.  Did the debtor ever actually
16   solicit any offers of -- whereby someone
17   might buy this note, No. 5, Exhibit 5?
18        A.    No.
19        Q.    Okay.  Did you form an opinion or
20   were -- were you given an opinion from a
21   non-lawyer as to what the monetization value
22   of this note, Exhibit 5, might have been in
23   early December of 2020?
24        A.    I -- we did form an opinion, and --
25   and we discounted it substantially.
```

Page 64

```
1                    J. Seery
2         Q.    Can you tell the Court
3    approximately what amount?
4         A.    Off the top of my head, I don't
5    recall.
6         Q.    Okay.  But -- but substantially?
7         A.    Substantially.  The reason is
8    pretty obvious.  This is a -- if you don't
9    win the fraudulent conveyance suit, you've
10   got a long-dated note with Mr. Dondero on the
11   other side.
12        He's not generally viewed as a
13   creditworthy counter-party and he controls
14   the inflows that go into NPA.  So the chances
15   you are ever going to be paid early are
16   extremely low, and the chances that it's
17   going to default are probably pretty high.
18        Q.    And this was an unsecured note,
19   correct?
20        A.    That's correct.
21        Q.    Okay.  So you -- going into
22   December 31, 2020, were you hoping that
23   NexPoint would default on this note?
24        MR. MORRIS:  Objection to the
25        form of the question.
```

Page 65

```
1                    J. Seery
2         A.    I -- I think hoping is -- is not
3    the right term.  I think I -- I assumed that
4    they wouldn't, because you'd have to not
5    understand, you know, what happens when you
6    default on a term note and it gets
7    accelerated.
8         But if it happened, if I had
9    that -- if that fortune befell the estate, I
10   thought that would be a good thing.
11        Q.    Let's look at the -- some of the
12   terms of this note, sir.  So we're on Exhibit
13   5.  And in particular, Section 2.1, sir, the
14   second sentence says (as read):
15        Borrower shall pay the
16        annual installment on the 31st day
17        of December of each calendar year.
18        Do you see that sentence, sir?
19        A.    I do.
20        Q.    Do you believe that that means that
21   the payment must be on the 31st of December
22   or is it -- should it be read as on or before
23   the 31st day of December?
24        A.    It's -- it says on, but typically
25   there's no issue about prepayment and that
```

Page 66

J. Seery

1  paragraph 3 says you can prepay.
2  Q.    Well, so you see how -- how this
3  Section 2.1 uses the word "borrower," right?
4  A.    Yes.
5  Q.    And borrower isn't defined here,
6  but logically it's maker, right?
7  A.    Correct.
8  Q.    Okay.  So that's just probably
9  sloppiness, right?
10      MR. MORRIS:  Objection to the
11      form of the question.
12  A.    Appears to be.
13  Q.    Okay.  And then you, you
14  actually -- you saw Section 3, that talks
15  about the -- the prepayment (as read):
16      Maker may prepay in whole or
17      in part the unpaid principal or
18      accrued interest of this note.
19      Do you see that, sir?
20  A.    Yes.
21  Q.    Okay.  (As read):
22      Any payments on this note
23      shall be applied first to unpaid
24      accrued interest hereon and then

Page 67

J. Seery

1  to unpaid principal hereof -
2  correct?
3  A.    Correct.
4  Q.    Okay.  So that, that goes -- that
5  ties back to your prior answer, that even
6  though Section 2.1 says on the 31st day of
7  December, it's logical to read it on or
8  before the 31st day of December?
9      MR. MORRIS:  Objection to the
10      form of the question.
11  A.    It, it -- it would be.  Your --
12  your interest amounts would be different but
13  yes.
14  Q.    Okay.  Well, can -- so going back
15  to Section 3, it says prepay accrued
16  interest.
17      How does one prepay accrued
18  interest?
19  A.    Interest accrues on this note.  How
20  you prepay it is you send the money before
21  the accrual date.
22  Q.    Okay.  Fair enough.  And going back
23  to Section 3, the -- the style of that
24  section - whatever the word is - it says

Page 68

J. Seery

1  prepayment allowed, renegotiation
2  discretionary.
3      You see where it says renegotiation
4  discretionary?
5  A.    Yes.
6  Q.    Can you -- can you see anything
7  actually in that paragraph that talks about a
8  renegotiation?
9  A.    Nope.
10  Q.    Okay.  And just to -- to be clear,
11  do you see anything in here that talks about
12  that headings are for stylistic purposes only
13  and have no meaning?
14  A.    I -- I don't see anything --
15  Q.    Okay.
16  A.    -- that says that.
17      I just think that, one, the
18  headings are probably appropriate; two,
19  renegotiation is always discretionary.
20  Q.    Okay.  Well, but nothing in here
21  suggests to you, does it, sir, that -- that
22  the debtor was prohibited from renegotiating
23  anything about this note?
24  A.    No, the -- the holder of the note,

Page 69

J. Seery

1  the payee, could negotiate/renegotiate or
2  not.
3      In fact, it says that.  Because it
4  says it as a waiver, that the maker hereby
5  waives any grace, demand, presentment -- it's
6  got a very clear, broad waiver of any kind of
7  implication that there might be some courtesy
8  that the payee would have to give to the
9  maker.
10      MR. RUKAVINA:  Are we on 6?
11      Okay.  Sir, I'm going to hand you
12      what's -- what's going to be marked as
13      Exhibit 6, which is your January 7, 2021
14      letter.
15      (Exhibit 6, Correspondence
16      Dated January 7, 2021, marked for
17      identification, as of this date.)
18      (Brief off-record discussion.)
19      THE WITNESS:  By the way,
20      who's -- who's Aaron Lawrence?  I
21      didn't see that person earlier.
22      MR. MORRIS:  That is, I think, a
23      paralegal with Quinn.
24      THE WITNESS:  Oh, okay.

Page 70

```
1                   J. Seery
2           MR. MORRIS:  Or an assistant,
3    maybe an associate.
4           I apologize if you're an attorney.
5    I apologize.  In any event, but -- but,
6    Mr. Lawrence you're with Quinn, right?
7           MR. LAWRENCE:  Yes, I am.
8           MR. MORRIS:  Yeah, thank you.
9           MR. LAWRENCE:  I -- I've -- I've
10   taken the bar.
11          MR. MORRIS:  Yeah.  Oh, okay.
12   Thank you.
13          MS. DEITSCH-PEREZ:  Does that
14   imply you've just taken the bar?
15          MR. LAWRENCE:  Yes.
16          MS. DEITSCH-PEREZ:  Okay.  Thank
17   you.
18          (Simultaneous speaking.)
19   BY MR. RUKAVINA:
20       Q.    Mr. Seery, you have Exhibit 6.
21   Do you recognize this document?
22       A.    I do, yes.
23       Q.    Okay.  And -- and that's your
24   electronic signature there?
25       A.    That is.
```

Page 71

```
1                   J. Seery
2        Q.    And you authorized this document to
3    be issued to NexPoint Advisors?
4        A.    I did, yes.
5        Q.    Okay.  Did you discuss this
6    document, prior to you sending it, with the
7    independent board?
8        A.    Yes.
9        Q.    Okay.  And what do you recall about
10   that discussion?  Who was there; how did it
11   happen?
12       A.    I don't recall it specifically.
13   That would be at regular meetings and we
14   talked about the case.  This came shortly
15   after -- as we were moving towards -- I don't
16   remember the exact confirmation date, but it
17   was, you know, in and around that time.  And
18   this was a material asset of the estate, so
19   talking to them about that would have been
20   normal course of action.
21       Q.    Part of what you discussed with
22   them, was it how the debtor should respond to
23   the missed December 31 payment?
24       A.    I don't -- I don't think that's a
25   fair characterization.  I would have said
```

Page 72

```
1                   J. Seery
2    that they missed the payment, we're going to
3    accelerate it unless you have some objection.
4    They didn't object.  This would have been
5    standard for anyone I know who's a holder of
6    a note.
7        Q.    So there was no discussion with the
8    board about maybe giving NexPoint a chance to
9    fix that default before sending this note?
10       A.    No.
11       Q.    Okay.  Same question:  Did you
12   discuss the substance of this letter, before
13   you sent it, with the committee?
14       A.    I doubt it and I don't recall.  I
15   don't think so.  It wouldn't -- it wouldn't
16   have been -- if there had been a committee
17   call, we would have told them about it, but I
18   wouldn't have been seeking permission.
19       Q.    Okay.  Did you keep notes of your
20   meetings or discussions with the other board
21   members generally?
22       A.    Sometimes.  Not -- not always.  It
23   depends.
24       Q.    I've heard tell that you're a
25   copious note -- note-taker; is that
```

Page 73

```
1                   J. Seery
2    incorrect?
3        A.    I don't -- I don't think that's
4    fair.
5        Q.    Okay.
6        A.    I take -- I take notes but not
7    always.
8        Q.    Do you have any memory, not that
9    you should, as to whether you took any notes
10   of the -- the meeting with the other board
11   members we just discussed, about where the
12   substance of this letter was discussed?
13       A.    I don't recall.  It would have been
14   unusual for me to put the substance of that
15   kind of board meeting - if it was a board
16   meeting or if it was just a call - into
17   notes, because I would have -- if it's a
18   board meeting, we would have had minutes, and
19   if it was just a call for something like
20   this, it wouldn't have risen to the level of
21   we're taking notes and writing it down.
22       Q.    Okay.
23       A.    I didn't have any reason to record
24   every single thing I said with them because
25   our collective memories are good and
```

Page 74

J. Seery

1      they're -- they're pretty honest folks.
2      Q.     Okay.  Did -- did either you or
3  anyone video-record or audio-record any of
4  the discussions that you had with the other
5  board members ever?
6      A.     No.
7      Q.     Okay.  Were any of those meetings
8  with the other board members by Zoom or
9  Webex?
10     A.     Very few, I mean, typically not.
11     Q.     Okay.  The very few that might have
12 taken place, do you recall if -- if anyone
13 pressed a record button on Zoom or Webex?
14     A.     Nobody would have.
15     Q.     Okay.
16     A.     I can't imagine anyone would have
17 recorded it without requesting permission
18 from the other participants.
19            We didn't do much in that group by
20 Zoom or Webex, we just -- it wasn't standard
21 operating procedure for the group.
22     Q.     Do you recall any of the other
23 board members, or anyone else on any board,
24 discussing -- seeking permission to record

Page 75

J. Seery

1  any of those meetings?
2      A.     No, never.
3      Q.     Did you keep any calendar or
4  logbook where you might be able to find the
5  dates on which you had any call or meeting
6  with the other board members?
7      A.     If it was an official board
8  meeting, certainly it would have been in
9  Outlook.
10     Q.     Okay.  And if it was an official
11 board meeting, would there have been an
12 agenda circulated prior to the meeting?
13     A.     Not always, because these were
14 always done - particularly at this time,
15 where we were in litigation - with counsel.
16     Q.     And I take it that they would have
17 been done more or less sometimes on an ad-hoc
18 basis because of developments that might
19 happen?
20     A.     They -- they could, yes.
21     Q.     Okay.  Did you -- in responding to
22 my discovery requests in this NexPoint
23 lawsuit, did you consult any of your
24 handwritten notes, as to whether there was

Page 76

J. Seery

1   anything in there responsive?
2      A.     I believe I looked -- I want to
3  make sure I don't -- I don't know if I can
4  distinguish between your requests and the
5  other requests around these notes, but I
6  certainly looked through some of my notes to
7  see if I had any specific items that might
8  have been requested.  I don't recall if there
9  was something about whether I had a
10 conversation with John --
11            (Reporter clarification.)
12            THE WITNESS:  John Dubel and Russ
13     Nelms, the other directors.
14 BY MR. RUKAVINA:
15     Q.     But you do recall, in response to
16 discovery requests, looking at your
17 handwritten notes to see if there was
18 something responsive?
19     A.     Yes, and I just don't recall the
20 specific topics, because there were some that
21 were specific topics particularly around the,
22 the -- the made-up story about a subsequent
23 event and things like that kind of nonsense.
24     Q.     Do you recall whether you provided

Page 77

J. Seery

1  to the debtor's or the reorganized debtor's
2  counsel any handwritten notes for potential
3  review and production?
4      A.     I don't believe I did, because if
5  I -- if I found something, I would have but
6  I -- but I didn't find something
7  specifically, I didn't -- wouldn't have given
8  notes that were nonresponsive.
9      Q.     Similar question:  Did you -- you
10 have a Gmail account by email, right?
11     A.     I do, yes.
12     Q.     Okay.  And -- and I'm not an
13 expert, but that wouldn't be on the debtor's
14 or reorganized debtor's server, would it?
15     A.     It would not.
16     Q.     Okay.  Did you review your personal
17 emails with respect to whether there was
18 anything responsive there to the discovery
19 requests in this NexPoint lawsuit?
20     A.     Yes.
21     Q.     Okay.  And if you found something,
22 did you send it to counsel for potential
23 review for privilege and potential production
24 to me?

Page 78

J. Seery

2  A.  Yes.
3  Q.  Okay.  Did you, on your own,
4  withhold anything believing -- well, strike
5  that.
6      Is it fair to say that anything you
7  thought might be responsive you provided to
8  counsel?
9  A.  I did, and I provided them complete
10 access to my email.
11 Q.  And you didn't intentionally
12 withhold anything that might be -- strike
13 that.
14     Other than privileged material, did
15 you intentionally withhold anything that you
16 believed was responsive to my discovery
17 requests?
18 A.  I -- I didn't withhold anything.
19 If there was -- determined to be privileged,
20 then it would have been determined by
21 counsel.
22 Q.  Understood.
23     MR. MORRIS:  And if it was --
24     just to be clear, Davor, if it was
25     determined to be duplicative of other

Page 79

J. Seery

2  emails that we produced --
3      (Simultaneous speaking.)
4      MR. RUKAVINA:  I'm totally fine
5  with that.
6  Q.  I just want to make sure that you,
7  Mr. Seery, did not --
8  A.  No, I didn't --
9  Q.  -- intentionally -- intentionally
10 withhold anything just because you didn't
11 want it produced?
12 A.  No, certainly not, nor -- neither
13 intentionally nor accidentally, because I
14 turned everything over.
15 Q.  Understood.  Going back to
16 Exhibit 6, I've asked you about the board,
17 I've asked you about the committee.
18     And you -- you said, I believe,
19 that you don't remember having a discussion
20 about the substance of Exhibit 6 with the
21 committee, right?
22 A.  I don't think I -- certainly not in
23 advance of it, I would not -- it wouldn't
24 have been standard to -- to do that, unless
25 there had been a meeting right around then,

Page 80

J. Seery

2  and I would have mentioned that I had done
3  this.
4  Q.  Did -- similar to the -- the prior
5  answer, would you have recorded in Outlook or
6  some other means any meetings that you had
7  with the committee in the January 2021 time
8  frame?
9  A.  Yeah, it would have -- any meetings
10 with the committee would have been official.
11 Q.  Okay.  You could -- you could find
12 out what days those would have been had on?
13 A.  I believe so, yes.
14 Q.  And prior to these meetings, and
15 I'm talking about January 2021 now, were
16 there -- was there an agenda shared in
17 advance either by the debtor or by the
18 committee?
19 A.  I believe oftentimes there was with
20 the committee.
21 Q.  Do you recall - and I think I know
22 your answer - whether there was any such
23 agenda related to whether the debtor should
24 declare the NexPoint note, Exhibit 5,
25 immediately due and payable?

Page 81

J. Seery

2  A.  Well, I don't recall a meeting
3  around this, so I -- I certainly wouldn't
4  recall an agenda.
5  Q.  Now I'm going to ask about
6  Mr. Waterhouse.
7      Before you authorized this letter,
8  Exhibit 6, to go out, did you discuss the
9  substance of this letter with Mr. Waterhouse?
10 A.  I don't believe so.
11 Q.  How did you find out that the
12 December 31, 2020 payment had not been made
13 by NexPoint?
14 A.  I believe I was told during the
15 cash-flow meetings that we had weekly.
16 Q.  Okay.  What -- was that like a
17 certain set day of the week or --
18 A.  Yeah.
19 Q.  What day of the week was --
20 A.  -- was either Tuesday or Wednesday.
21 Q.  Okay.  Do you recall who told you
22 that this payment had not been made?
23 A.  I don't recall specifically, no.
24 Q.  Okay.  Would you have received a
25 report from which that would have been

Page 82

J. Seery

1 evident?
2
3     A.    I would get a cash flow,
4 thirteen-week --
5          (Reporter clarification.)
6          THE WITNESS:  Thirteen-week cash
7     flow.  I'm sorry.
8     Q.    So -- so to the best of your
9 recollection, do you recall, on the one hand,
10 whether someone told you, Mr. Seery, NexPoint
11 didn't pay or, on the other hand, whether you
12 said where is NexPoint's payment?
13         MR. MORRIS:  Objection to the
14     form of the question.
15    A.    I -- I don't recall.  It could
16 have -- it could have easily been either,
17 because it certainly would have been
18 something I would have asked about.  NexPoint
19 and others had already failed to pay their
20 shared service payments, so it was a question
21 as to whether any other payments would be
22 coming.
23    Q.    Okay.  And who would have logically
24 been, pursuant to your course of practice, on
25 these weekly cash flow meetings?

Page 83

J. Seery

1
2     A.    Typically it would be sometimes
3 Frank Waterhouse, Kristin Hendrix, Dave
4 Klos - not always but most of the time - and
5 Jack Donohue from DSI --
6     Q.    Okay.
7     A.    Fred Caruso as well, I believe --
8     Q.    So in --
9     A.    -- DSI.
10    Q.    -- in early January 2021, do you
11 have any reason to believe that any of those
12 meetings would have been recorded visually or
13 audio-recorded?
14    A.    No, I would think they would not
15 have been.
16    Q.    Would any meetings -- I'm sorry,
17 strike that -- any minutes of those
18 discussions have been kept?
19    A.    No, no minutes would have been
20 kept.
21    Q.    So you would get the, the -- the
22 thirteen-week report you mentioned.
23         Would you get any other documents
24 in the nature of an agenda or an update to
25 you as the chief executive?

Page 84

J. Seery

1
2     A.    I don't --
3          MR. MORRIS:  Objection to the
4     form of the question.
5     A.    I -- I don't believe so with
6 respect to the thirteen-week cash flow
7 discussion.
8     Q.    So what -- what do you remember
9 saying or doing right then, when you learned
10 that NexPoint did not make a December 31
11 payment?
12    A.    I don't recall the specific date,
13 but as soon as I knew that the payment was
14 late, I would have accelerated the note and
15 told counsel to draft the acceleration and
16 demand.
17    Q.    And you don't recall discussing
18 that with Mr. Waterhouse?
19    A.    I don't recall it.
20    Q.    What about with Mr. Klos?
21    A.    I don't recall it.
22    Q.    And obviously I don't want to hear
23 about your discussion with counsel.
24         Other than counsel and DS -- or
25 DSI, do you -- do you recall discussing with

Page 85

J. Seery

1
2 anyone at the debtor the fact that NexPoint
3 hadn't made the payment and that you were
4 going to do something about that payment?
5     A.    I would have only discussed it -- I
6 think I would only have discussed it with
7 counsel and with DSI, had DSI get the
8 outstanding full amount up to whatever date
9 we were going to set in the demand notice,
10 and then send out the demand notice.
11         I wasn't going to advertise to
12 anybody exactly what I was doing, because
13 HCMLP had the right to do what it could do.
14    Q.    Okay.  And I'm going to struggle to
15 ask the next question, so it's going to take
16 me several questions and counsel will object.
17         Prior to the December 31 missed
18 payment, did you issue any instructions to
19 employees of the debtor to do anything
20 differently with respect to facilitating
21 NexPoint making that payment than they had
22 done in the past?
23         MR. MORRIS:  Objection to --
24         (Simultaneous speaking.)
25    A.    -- payment or any other payment?

**App. 118**

Page 86

J. Seery

1
2   Q.    This payment.
3   A.    No.
4         (Reporter clarification.)
5   MR. MORRIS:  I'm sorry, objection
6   to form.
7         THE WITNESS:  And I said -- I
8   think my answer was no.
9   BY MR. RUKAVINA:
10  Q.    So we've -- we've learned that in
11  early December of 2020, the debtor was going
12  to be able to -- strike that.
13        You agree with me that in December
14  of 2020, it would have been to the debtor's
15  economic advantage for NexPoint to miss the
16  annual payment?
17        MR. MORRIS:  Objection to the
18  form of the question.
19  A.    I -- I don't know if that's fair,
20  because right now we're having to deal with
21  what I would say are completely nonsensical
22  defenses and spend millions of dollars to
23  collect what are obviously true and owing
24  amounts that are due to the debtor.  So I
25  don't know that it was necessarily in our

Page 87

J. Seery

1
2   best interest to have this happen.
3         Overall, I think we will collect
4   it, and it will be in our interest rather
5   than having a thirty-year note to -- owed by
6   NPA, to have a collected amount, which I
7   expect to collect in full.
8   Q.    As opposed to selling the note at a
9   substantial discount, correct?
10  A.    That would have been one of the
11  options, yes, or suing on a fraudulent
12  conveyance.
13        (Reporter clarification.)
14        THE WITNESS:  On a fraudulent
15  conveyance.
16  BY MR. RUKAVINA:
17  Q.    So again, without ascribing any
18  mal-intent here, it turned out for the debtor
19  to be better, in December of 2020, that
20  NexPoint missed its payment, correct?
21        MR. MORRIS:  Objection to the
22  form of the question.
23  A.    Again, we'll -- we'll find out
24  after we collect.
25  Q.    Okay.  So I just want to again

Page 88

J. Seery

1
2   round off --
3   A.    Quite -- quite clearly, though,
4   just so -- so it's -- there's no ambiguity,
5   it's far better to collect the full amount of
6   the note than wait to be paid on an unsecured
7   basis over the next twenty-plus years.
8   Q.    And again, just to round off this
9   topic, you did not instruct anyone at the
10  debtor to do anything or fail to do anything
11  to try to ensure that NexPoint misses that
12  payment, did you?
13  A.    No.
14  Q.    Okay.  Did you, to the best of your
15  recollection, issue any instructions to
16  employees of the debtor having anything to do
17  with NexPoint making the December 31, 2020
18  payment?
19  A.    None at all.
20  Q.    Okay.  So we go back to Exhibit 6,
21  and you'll see in the middle there it talks
22  about the amount due and payable is
23  $24,471,000 and change.
24        Do you see that, sir?
25  A.    Yes.

Page 89

J. Seery

1
2   Q.    Do you recall who calculated that
3   amount?
4   A.    I believe I got that from DSI.
5   Q.    Okay.  Did you ever ask yourself or
6   ask anyone why the amount was more than
7   $6 million less than the principal amount of
8   the note?
9   A.    I knew the answer.
10  Q.    What's the answer?
11  A.    That there were payments made on
12  the note.
13        MR. RUKAVINA:  Okay.  In fact --
14  Mr. Nguyen, pull up the exhibit that I
15  don't have here.
16        You're going to have to bear with
17  me; I forgot to bring one exhibit, and I
18  apologize to everyone involved.
19        MR. MORRIS:  No apology needed.
20  BY MR. RUKAVINA:
21  Q.    Okay.  So -- so this was -- so,
22  Mr. Seery, this is a document produced by the
23  debtor.  Please scroll up and down.
24        I want to ask you first, do you
25  have any idea who created this document or

Page 90

```
1                   J. Seery
2    when or why?  Because I'll represent to you
3    that it was just produced to us like this,
4    without any kind of context.
5         A.   I -- I don't know specifically, no.
6         Q.   You don't know specifically, but
7    could it be DSI?
8              Is this the kind of -- does it look
9    like the kind of report that DSI would have
10   made?
11             MR. MORRIS:  Objection to the
12        form of the question.
13        A.   I don't think so.  I would think
14   this would have been produced by NPA or -- or
15   HCMLP's accounting group.
16        Q.   Well, scroll down to the next page
17   Mr. Nguyen.
18             So you see, sir, on 5/31/2020, a --
19             (Reporter clarification.)
20             MR. RUKAVINA:  I'm sorry.
21        Q.   A $575,550.56 payment made?
22        A.   Yes.
23        Q.   Okay.  And prior to that, there had
24   been advanced payments, or -- or payments on
25   more than just the principal and interest,
```

Page 91

```
1                   J. Seery
2    right?
3         A.   There --
4              MR. MORRIS:  Objection to the
5         form of the question.
6         A.   -- there were but there's a very
7    odd entry above that, on 12/30/19 with a --
8    instead of having parentheses, having a
9    negative sign.
10             I'm not sure if that's a payment or
11   what that is.
12        Q.   Well, let's scroll back to the
13   first page and see what these headings are.
14             So if we look in the far right
15   column, total paid, do you see that, sir?
16        A.   Yes, I do.
17        Q.   And principal paid.
18             So scroll back to the next page,
19   Mr. Nguyen.
20             Do you see those now, the payments?
21        A.   I do.  I just -- I'm just pointing
22   out that that's --
23        Q.   Okay.
24        A.   -- not a correct way to do it, but
25   it could have just -- maybe they did it as a
```

Page 92

```
1                   J. Seery
2    negative number as opposed to having it
3    negative in the -- in the Excel file --
4         Q.   Well, sir --
5         A.   -- automatically.
6         Q.   -- how do you know that the note
7    hadn't be been prepaid, that the December 31,
8    2020 payment hadn't been prepaid?
9         A.   Well, I know there was a payment
10   due.
11        Q.   Okay.  But you didn't ask
12   Mr. Waterhouse or anyone else whether the
13   note had been prepaid or that payment had
14   been prepaid, did you?
15        A.   In the cash-flow discussions, the
16   fact that NPA owed the money on 12/31 was a
17   common discussion.  So if it had been
18   prepaid, it wouldn't have been owed.
19        Q.   And who prepared those cash-flow
20   discussion reports?
21        A.   Waterhouse's team.
22        Q.   Okay.  When you learned that the
23   December 31, 2020 payment had not been --
24   been made, did you ask anyone as to whether
25   that payment had hypothetically been prepaid
```

Page 93

```
1                   J. Seery
2    at some point in the -- previous to that?
3              MR. MORRIS:  Objection to the
4         form of the question.
5         A.   I don't believe that I did.
6         Q.   Okay.
7         A.   We certainly had discussions on
8    other notes, whether there had been
9    prepayments.  And it would have come up
10   around this note, but I don't have a specific
11   recollection of, around December 20, asking
12   whether something had been prepaid.  There
13   was an amount due - it was listed as due and
14   owing - and I expected to get it paid.
15        Q.   And I apologize, the $24 million
16   figure in Exhibit 6, DSI supplied that?
17        A.   I believe so.
18        Q.   And do you know whether DSI
19   consulted employees of the debtor to
20   calculate that amount?
21        A.   I assume they did.  I don't -- I
22   don't know the answer.
23        Q.   Why didn't you -- strike that.
24             Before you sent this letter on --
25   that's Exhibit 6 -- well, first of all, did
```

Page 94

J. Seery

1  you understand at that point in time, on or
2  before January 7, 2021, why NexPoint didn't
3  make the December 31 payment?
4  A.    I don't recall if I knew before
5  that --
6  Q.    Okay.
7  A.    -- or right around that time --
8  Q.    Okay.
9  A.    -- but I -- I came to know --
10      (Simultaneous speaking.)
11 Q.    You came to know it?
12 A.    Uh-huh.
13 Q.    Do you recall if you asked anyone,
14 prior to sending this letter, why that
15 payment hadn't been made or did someone
16 volunteer that information to you?
17      (Simultaneous speaking and
18      reporter interjection.)
19      MR. MORRIS:  Objection to the
20      form of the question.
21 A.    I -- I think you asked me that
22 already.  I'm not sure if I asked about it
23 being made or someone pointed it out to me.
24      It was certainly a -- a topic I was

Page 95

J. Seery

1  anticipating, as to -- because they had not
2  made the payment in -- on the shared
3  services, as with all the other related
4  entities, because Dondero had directed that
5  those payments not be made.  So I was curious
6  as to whether they were going to make the
7  payments that were due on the term notes.
8  Q.    So let's, let's -- let's break that
9  down.
10      I had asked you before, I believe,
11 as to how you learned of the lack of payment.
12 Now I'm asking you, once you learned about
13 the lack of payment, did you ask why didn't
14 the payment get made?
15      MR. MORRIS:  Objection to the
16      form of the question.
17 A.    No, I -- I don't think I would have
18 asked why the payment didn't get made.
19 Either -- as I said, either right before
20 this, at this time or shortly thereafter, I
21 learned -- I knew that the other payments
22 hadn't been made.  I believe that I knew that
23 Dondero had directed that.  I just don't know
24 exactly, around these notes, about all of the

Page 96

J. Seery

1  payments; if it was before or right around
2  thereafter.
3  Q.    And when you say before or right
4  around thereafter, are you referring to
5  January 7, 2021?
6  A.    Correct.
7  Q.    Okay.  And -- and so you can't tell
8  me right now the exact date, but whenever you
9  learned about why the payment -- the NexPoint
10 payment hadn't been made, what did you learn?
11 A.    I learned that the NexPoint payment
12 hadn't been made.
13 Q.    Okay.  I'm sorry.  What did you
14 learn about why it hadn't been made?
15      MR. MORRIS:  Objection to the
16      form of --
17 A.    I was told that Mr. Dondero
18 directed that no payments be made to the
19 debtor.
20 Q.    Who told you that?
21 A.    I believe it was Kristin Hendrix
22 who had heard it from Frank Waterhouse, was
23 directed by Frank Waterhouse.
24 Q.    So to the best of your

Page 97

J. Seery

1  recollection, Dondero told Waterhouse, who
2  told Hendrix, who told you?
3  A.    Correct.
4  Q.    Okay.  So do you agree with me that
5  before you sent this Exhibit 6, this letter,
6  the debtor could have undertaken some action
7  in the nature of trying to get NexPoint to
8  cure its default?
9      MR. MORRIS:  Objection to the --
10 A.    The debtor could have, yes.
11 Q.    And you made the decision
12 ultimately to -- let's just say call the note
13 immediately due and payable?
14 A.    That's correct.
15 Q.    Why did you make that decision as
16 opposed to seeing, with NexPoint, if
17 something could be worked out?
18 A.    Number one, I'm a fiduciary.  I'm a
19 fiduciary to HCMLP.  It's my job to maximize
20 the value of the estate and to collect the
21 assets of the estate, including this note.
22      Number two, in furtherance of that
23 duty, the note specifically provides that
24 it's due on a specific date and that there is

Page 98

J. Seery

1    J. Seery
2    waived any notice of presentment, any demand.
3    Once the payment is missed, the entire amount
4    is due and owing.
5        Q.    And I believe you've called my
6    defenses nonsensical, right?
7        A.    There -- there's so many different
8    ones, but most of them, yeah.
9        Q.    Okay.  And did you take any steps,
10   prior to sending Exhibit 6, to see if
11   NexPoint had any defenses as to why that
12   payment hadn't been made?
13       A.    No.
14       Q.    Okay.  And again, you didn't ask
15   anyone whether that note had been prepaid?
16       A.    We had discussed the note and what
17   was due and owing, so it had never been
18   volunteered to me that it otherwise had been
19   prepaid in a way that would have obviated the
20   need to make this payment, so it's pretty
21   clear that this payment had to be made.
22           MR. RUKAVINA:  Okay.  I need a
23       restroom break.  Five or ten minutes?
24           (Simultaneous speaking.)
25           VIDEO TECHNICIAN:  The time is

Page 99

J. Seery

1    J. Seery
2    3:18.  We're going off the record.
3            (Recess taken.)
4            VIDEO TECHNICIAN:  The time is
5    3:29.  We're back on the record.
6            MR. RUKAVINA:  So, just for the
7        record, the document that my associate
8        showed to Mr. Seery during questioning
9        a few moments ago is going to be
10       emailed to Mr. Morris and the court
11       reporter, and it will be marked as
12       Exhibit 7.
13           (Exhibit 7, Loan Document
14       D-NNL-029141, marked for
15       identification, as of this date.)
16   BY MR. RUKAVINA:
17       Q.    Mr. Seery, before the break you
18   mentioned that Ms. Hendrix told you that
19   Mr. Waterhouse told her that Mr. Dondero said
20   that there'll be no payments -- whatever
21   words you used; that's not my question.
22           My question is, do you have that in
23   any email or any writing or any recording?
24       A.    I don't believe so.
25           One thing that I just wanted to add

Page 100

J. Seery

1    J. Seery
2    is that I was admonished by the court
3    reporter during the break that I was speaking
4    a little too quickly, and so I will try to
5    slow down quite a bit.  And I'll try to be a
6    little bit more clear.  I've been bouncing
7    between the camera and the court reporter.
8        Q.    I think you should look at this
9    one.
10       A.    Okay.
11       Q.    So, again, you said you don't think
12   that there is any email or recording of what
13   Mr. Dondero said, correct?
14       A.    Not to my recollection, no.  He
15   didn't -- he didn't say it to me.
16       Q.    Okay.  And -- and during the break,
17   did you have any more of a recollection as to
18   the time, whether it's prior to or before
19   Exhibit 6, that you learned that?
20       A.    I, I, I -- I do not have any
21   additional recollection, no.
22       Q.    Okay.  Are you aware that
23   Mr. Waterhouse was deposed a couple days ago,
24   a couple/three days ago?
25       A.    I am, yes.

Page 101

J. Seery

1    J. Seery
2        Q.    Okay.  Did you read all or part of
3    his deposition?
4        A.    Yes.
5        Q.    Okay.  All of it?
6        A.    It was rather lengthy so no, not
7    all of it.
8        Q.    Okay.  Did you see any of the video
9    of it?
10       A.    No.
11       Q.    Okay.  Did you read any of my
12   examination of him?
13       A.    Yes.
14       Q.    Okay.  Do you recall if you read
15   the whole of my examination of him?
16       A.    I certainly read the last part of
17   your examination of him.
18       Q.    Including where Mr. Waterhouse
19   testified about what Mr. Dondero told him
20   with respect to these payments?
21       A.    Yes.
22       Q.    Okay.  But it's your testimony that
23   you had heard that well before you read that
24   deposition transcript?
25       A.    Oh, absolutely.

Page 102

J. Seery

2  Q.  Okay.  And when you read
3 Mr. Waterhouse's -- parts of his transcript,
4 did it include Ms. Deborah Deitsch-Perez's
5 questions?
6  A.  There was a section at the end that
7 it was unclear to me who was asking the
8 question, because I think there was also a --
9 another attorney --
10  Q.  Okay.
11  A.  -- Debra Dandeneau.
12  (Simultaneous speaking.)
13  A.  -- so I wasn't sure who was -- who
14 was asking -- I didn't know who represented
15 whom and who was asking the questions.
16  Q.  Did you ever discuss with
17 Mr. Waterhouse the substance of what
18 Mr. Dondero told him vis-a-vis not making any
19 more payments?
20  A.  I don't believe so, no.
21  Q.  Did you ever -- other than legal
22 counsel, did you ever discuss that with
23 anyone at Highland, to your recollection?
24  A.  Yes.
25  Q.  Okay.  With whom?

Page 103

J. Seery

2  A.  Ms. Hendrix and Mr. Klos.
3  Q.  Why Mr. Klos?
4  A.  He's my CFO.
5  Q.  To your knowledge, did he overhear
6 Mr. Waterhouse or Mr. Dondero say something
7 to that same effect?
8  A.  I don't believe he did, no.
9  Q.  Is it fair to say that other than
10 Mr. Waterhouse's deposition from a few days
11 ago, the universe of what you heard about
12 what Mr. Dondero instructed came from
13 Ms. Hendrix?
14  A.  I don't think that's fair.  I might
15 have heard it from Mr. Klos, who heard it
16 from Mr. Hendrix -- from Ms. Hendrix, I'm
17 sorry.
18  Q.  Okay.
19  A.  So around this time it was clear
20 that the payment wasn't made, the shared
21 services payments had -- had not been made,
22 none of the payments from related entities
23 had been made, and it was clear Mr. Dondero
24 had directed that no payments be made.  And
25 even around the negotiations for any kind of

Page 104

transition, it was very difficult to agree on
2 any payments because Mr. Dondero had this
3 edict of no payments.
4  And I just don't recall if it was
5 before January 7, at January 7 or immediately
6 thereafter.  I just -- it -- I don't recall.
7 It may have even been as far back as
8 December.  I don't know the exact answer.
9  Q.  Did Highland, prior to the plan
10 becoming effective, have any written policies
11 or procedures in place with respect to how it
12 would operate any aspect of its business
13 practices?
14  A.  Certainly.
15  Q.  Okay.  Do you recall whether any of
16 those policies or -- or procedures related to
17 enforcing debt obligations due and payable to
18 Highland?
19  A.  I -- I don't recall seeing anything
20 like that.
21  Q.  Do you recall whether you ever
22 tried to consult any policies and procedures
23 before your letter of January the 6th?
24  A.  I, I did not nor -- nor would I

Page 105

J. Seery

have.
3  Q.  Because, again, you made the
4 determination that the payment hadn't been
5 made, the note says what it says, and it was
6 the fiduciary obligation that you felt to the
7 estate to call the note?
8  A.  That's correct.
9  MR. MORRIS:  Objection to the
10 form of the question.
11  Q.  Did any part of your motivation
12 involve trying to stick it to Mr. Dondero?
13  A.  Not at all.
14  Q.  Okay.  Did you consider any
15 alternatives to the January 6 letter before
16 you sent it?
17  MR. MORRIS:  Objection to the
18 form of the question.
19  Q.  And I think -- let's exclude
20 discussions you might have had with counsel.
21  MR. MORRIS:  Same objection.
22  A.  No, I -- I think I just considered
23 that the note was due and we would accelerate
24 it.  It wasn't paid, we'd accelerate it and
25 try to collect the whole.

Page 106

J. Seery

1
2    Q.    After you sent your letter of
3  January 7, did you issue any instructions to
4  Mr. Waterhouse or anyone else at the debtor
5  with respect to anything having to do with
6  the NexPoint note or missed payment?
7    A.    I don't believe so, no.
8    Q.    Are you aware that on or about
9  January 12, 2021, Mr. Waterhouse and
10 Mr. Dondero had a telephone conversation, at
11 least one, regarding the missed payment?
12   A.    I am aware of that from your --
13 Mr. Waterhouse's deposition.  I had no
14 knowledge of that before the --
15   Q.    Mr. Waterhouse never talked to you
16 about that prior to you seeing it in his
17 deposition?
18   A.    No.
19   Q.    Okay.  You're aware that on or
20 about January the 14th, 2021, NexPoint did
21 make a $1.4 million and change payment?
22   A.    Yes, I am.
23        MR. RUKAVINA:  Okay.
24        (Brief off-record discussion.)
25        MR. RUKAVINA:  Sir, this is going

Page 107

J. Seery

1
2  to be marked Exhibit 8.  This is your
3  letter of January 15, 2021.
4        (Exhibit 8, Correspondence
5  Dated January 15, 2021, marked for
6  identification, as of this date.)
7        (Brief off-record discussion.).
8        THE WITNESS:  Oh, 7 is to come?
9        MR. RUKAVINA:  Yes, sir.
10   Q.    Do you recognize Exhibit 8?
11   A.    I do, yes.
12   Q.    Okay.  Do you recall authorizing
13 this to be sent under your electronic
14 signature?
15   A.    Yes.
16   Q.    Okay.  Do you recall what prompted
17 you to send Exhibit 8?
18   A.    Yes.
19   Q.    What was it?
20   A.    I believe the -- I think it's the
21 day before I was on the stand in a court
22 hearing, and I testified that I'd accelerated
23 this note.  Mr. Dondero was there.
24        It appears to me that he
25 immediately learned or realized, oh, my gosh,

Page 108

J. Seery

1
2  my edict caused the acceleration of note.  I
3  don't know if he paid attention to the prior
4  demand -- acceleration and demand note.
5        So a payment was received on the
6  14th for $1.4 million.  And under the terms
7  of the note, my understanding of the law, we
8  applied the payment to the balance and
9  reiterated our demand.
10   Q.    When you were just now putting
11 words in Mr. Dondero's mouth, were you
12 speculating as to his mental process or did
13 he say anything like that to you?
14   A.    He wasn't allowed to talk to me and
15 I didn't -- so I was speculating, but part of
16 it is that -- I believe the colloquy you had
17 yesterday with Frank had -- or two days ago,
18 had a reference to Mr. Dondero being in
19 court.  I don't remember if that was on an
20 email or if it was in the -- the colloquy
21 that you had.
22   Q.    But at least as of January the
23 15th, 2021, your then mental impression was
24 that it was an event that occurred on January
25 the 14th, 2021 that prompted that

Page 109

J. Seery

1
2  $1.4 million payment?
3    A.    I -- I think so, either the 14th or
4  the 13th.  I know -- I recall testifying to
5  the acceleration and that the note -- the
6  payment had been missed and we had
7  accelerated it.
8    Q.    Do you recall what -- was that like
9  the Dondero PI -- do you recall what
10 proceeding that was?
11   A.    I don't -- I don't recall --
12        (Simultaneous speaking.)
13   A.    -- at least two that week, I
14 believe.
15   Q.    Sitting here today, you think it
16 was January 13 or January 14?
17   A.    Yes.
18   Q.    Okay.  Did you ask Mr. Waterhouse
19 anything about that $1.4 million payment
20 before you sent Exhibit 8?
21   A.    No.
22   Q.    Okay.  Did you ask anyone else at
23 the debtor -- again, we're excluding legal
24 counsel.
25        Did you ask anyone else at the

Page 110

J. Seery

1    debtor as to anything having to do with why
2    that $1.4 million payment had come in?
3
4    A.    I did not.  I don't -- well, I
5    don't recall doing that.
6    Q.    Why didn't you return -- I'm sorry,
7    strike that.
8          Why didn't the debtor return the
9    payment?
10   A.    Because I would apply it on account
11   and reduce the total amount owed and make the
12   demand again.
13   Q.    Why wouldn't you have applied it to
14   the amounts owing under the shared services
15   agreement and payroll reimbursement
16   agreement?
17   A.    I believe because it was on account
18   of the note, and the note had already been
19   accelerated, so any payments are on account
20   of the note.
21   Q.    What led you to believe that the
22   payment was on account of the note?
23   A.    I don't recall.
24   Q.    So until you read Mr. Waterhouse's
25   transcript, you had no knowledge of his -

Page 111

J. Seery

1    let's just say January 12, whatever day it
2    was - conference with Mr. Dondero, correct?
3    A.    None.
4    Q.    And no knowledge of what they may
5    have discussed?
6    A.    No.
7    Q.    Okay.  Can you think of a reason
8    why Dondero would have caused that
9    $1.4 million payment to have been made?
10         MR. MORRIS:  Objection to the
11         form of the question.
12   A.    Can I speculate?
13   Q.    If you're speculating, tell me
14   you're speculating, sure.
15   A.    I -- I can speculate, yeah.
16   Q.    Speculate.
17   A.    He realized that the note had been
18   accelerated and that he was going to try to
19   decelerate it.
20         You know, one thing sort of
21   interesting that -- well, maybe there's a
22   question on it.
23         MR. RUKAVINA:  Let's go off the
24         record for a second.

Page 112

J. Seery

1    (Brief off-record discussion.)
2    VIDEO TECHNICIAN:  The time is
3    3:40.  We're going off the record.
4    (Recess taken.)
5    VIDEO TECHNICIAN:  The time is
6    3:42.  We're back on the record.
7    (Brief off-record discussion.)
8    MR. RUKAVINA:  So during --
9    during the break, Mr. Morris was kind
10   enough to print out exhibit -- the --
11   the prior report that we had seen that
12   is now marked as Exhibit 7.
13         And I will represent to you,
14   Mr. Seery, and to the Court that Exhibit
15   7 is a true and correct copy of what was
16   previously on the Zoom, care of my
17   associate.
18         Okay.  Sir, we're going to now go
19   to 9, Exhibit 9, which is going to be the
20   shared services agreement.
21         (Exhibit 9, Amended and Restated
22   Shared Services Agreement, marked for
23   identification, as of this date.)
24   Q.    Now, sir, I've handed you

Page 113

J. Seery

1    Exhibit 9, and you're certainly free to read
2    it.  This purports to be the amended and
3    restated shared services agreement between
4    NexPoint and the debtor.
5          I'll represent to you that it is a
6    true and correct copy, as filed by your
7    attorneys.  And if I'm wrong about that, then
8    certainly you're not going to be held to your
9    answers.
10         But just sitting here today, do you
11   have any reason to suspect the authenticity
12   of Exhibit 9?
13   A.    No.
14   Q.    Okay.  All right.  So this is
15   called the "Amended and Restated Shared
16   Services Agreement" as of January 1, 2018.
17         To the best of your knowledge, was
18   this the latest iteration prior to its
19   termination or were there any subsequent
20   amendments?
21         MR. MORRIS:  Objection to the
22         form of the question.
23   A.    I don't recall.
24   Q.    And obviously the document speaks

Page 114

```
1              J. Seery
2  for itself, but as the CRO/CEO, what was your
3  understanding of what this contract
4  effectuated as between the debtor and
5  NexPoint?
6      A.    Part of the way the debtor was set
7  up and the way it was run was that the debtor
8  would provide certain services to certain of
9  the affiliated entities.  And those would be,
10 to some degree, embodied in this agreement.
11          Oftentimes the debtor provided
12 services to affiliates without any agreement,
13 oftentimes they provided additional services
14 that may not have been in the agreement, and
15 that was because they were such closely
16 related parties.
17     Q.    As of December 2020, do you agree
18 with me -- as of December 31, 2020, do you
19 agree with me that this agreement had not yet
20 been terminated?
21     A.    As of December 20?
22     Q.    I'm sorry.
23          As of December 31, 2020, do you
24 agree with me that this agreement had not yet
25 been terminated?
```

Page 115

```
1              J. Seery
2      A.    Yeah, I think the termination
3  notice had gone out but it had not yet become
4  effective.
5      Q.    Okay.  And we see here what -- some
6  of the services that the debtor was
7  providing.  We see it on the top of page 4,
8  if you want to flip there.
9          It says, amongst other things,
10 finance and accounting, payments,
11 bookkeeping, cash management.
12          Do you see all that, sir?
13     A.    Yes.
14     Q.    Okay.  Do you have an understanding
15 of what those terms under this agreement
16 meant?
17          MR. MORRIS:  Objection to the
18     form of the question.
19     A.    Yes, I do.
20     Q.    Okay.  Give me your understanding,
21 please, sir.
22     A.    The debtor provided back office
23 support for -- under those terms, for the
24 affiliated entity and received some form of
25 remuneration in exchange for that and other
```

Page 116

```
1              J. Seery
2  services.
3      Q.    And when you said affiliated
4  entity, in this instance, are you referring
5  to NexPoint?
6      A.    Uh-huh.  Yes, I am.
7      Q.    Okay.  When you say back office
8  services, would that have included, as of
9  December 2020, helping NexPoint ensure that
10 NexPoint pays from its own funds its
11 obligations coming due?
12     A.    I -- I think as part of back office
13 services -- that's the heading of the
14 section, and so part of it is to assist in
15 preparing payments and calculating what those
16 should be.
17     Q.    So obviously the debtor wasn't
18 responsible for paying NexPoint's
19 obligations, right?
20     A.    That's correct.
21     Q.    But the debtor had some level of
22 responsibility to help NexPoint pay its
23 accounts payable on a timely basis, correct?
24     A.    Yes.
25     Q.    And that would have been from
```

Page 117

```
1              J. Seery
2  NexPoint's funds?
3      A.    Correct.
4      Q.    And is the same true for NexPoint's
5  loan obligations?
6      A.    I believe so, yes.
7      Q.    So if Mr. Waterhouse testified that
8  it was reasonable for NexPoint, in December
9  2020, to rely on the debtor to facilitate the
10 December 31 note payment, would you have
11 reason to disagree with that?
12          MR. MORRIS:  Objection to the
13     form of the question.
14     A.    I would, yes.
15     Q.    Okay.  And what's your disagreement
16 and your reason for the disagreement?
17     A.    Because the debtor does work to
18 figure out how much payments are, whether
19 they be on notes or whether they be for some
20 other service that the affiliated entity has
21 gotten.
22          The debtor's accounting team puts
23 together that schedule, and then the debtor
24 needs direction from an officer at NexPoint
25 to make the payment.  If the debtor has
```

Page 118

J. Seery

1 already been told don't make the payment, it
2 wouldn't be scheduled.
3
4    Q.   So, to summarize, it's ultimately
5 up to NexPoint to specifically approve or
6 disapprove any potentially scheduled
7 payments?
8    A.   Correct.
9    Q.   Okay.  And in this instance, what
10 you've learned is that Mr. Waterhouse was
11 told by Dondero, don't make the payment?
12    A.   Correct.
13    Q.   Okay.  And that -- that is the sum
14 of your understanding as to why the
15 December 31 payment wasn't made?
16    A.   I don't think that's the sum of it.
17 There's -- there's emails that show that
18 Ms. Hendrix prepared and requested from
19 Mr. Waterhouse payment of these amounts
20 okayed and he approves them.  So they -- they
21 are the amounts that are permitted to be
22 approved, and they're all to third parties.
23 None of them are to HCMLP.
24    Q.   Are you aware of any email where
25 Ms. Hendrix prepared the December 31 note

Page 119

J. Seery

1 payment by NexPoint for Mr. Waterhouse's
2 approval?
3
4    A.   No, I'm not.
5    Q.   If there is no such email, do you
6 have any explanation or understanding for why
7 there wouldn't be such an email?
8    A.   Sure.
9    Q.   Okay.  What is it?
10    A.   She was told not to make the
11 payment.
12    Q.   So, consequently, she did not
13 include it in any upcoming payment list?
14    A.   Correct.
15    Q.   And that goes back to what you
16 tell -- told me before, that Waterhouse told
17 her what Dondero told him, right?
18    A.   That's correct.
19    Q.   Okay.  And are you aware that
20 Mr. Waterhouse said -- testified that that
21 instruction had come sometime in early
22 December of 2020?
23    A.   I don't recall.
24         This was in the testimony
25 yesterday?

Page 120

J. Seery

1
2    Q.   From a couple days ago.
3    A.   Yeah, two days ago, I'm sorry.
4         I don't recall the specific dates
5 that he said that.
6    Q.   Well, whatever the -- whatever the
7 dates that he testified about were with
8 respect to the Dondero discussion, would you
9 have any reason to dispute those dates?
10    A.   No.
11    Q.   Okay.  So, sir, is it your
12 understanding that having been given that
13 instruction by Mr. Dondero, that employees of
14 the debtor, including Mr. Waterhouse, had no
15 further obligation with respect to that
16 December 31 payment?
17         MR. MORRIS:  Objection to the
18    form of the question.
19    A.   I think they -- I think they took
20 the direction of Mr. Dondero to heart and
21 followed his direction.
22    Q.   Is it your belief that they had no
23 obligation to subsequently ask Mr. Dondero
24 whether he meant it?
25         MR. MORRIS:  Objection to the

Page 121

J. Seery

1
2    form of the question.
3    A.   Absolutely.
4    Q.   Did they have no such obligation?
5    A.   No.
6    Q.   Is it your understanding that they
7 had no obligation to communicate with
8 Mr. Dondero and inform him of the
9 consequences that would happen if that
10 payment wasn't made?
11         MR. MORRIS:  Objection to the
12    form.
13         (Simultaneous speaking and
14    reporter interjection.)
15    A.   I -- I don't think it would be
16 appropriate for the employees of the debtor
17 to go to the founder of the organization, who
18 owns and controls all of the entities, after
19 he's given them a direction, to go challenge
20 his direction.  And that's just not the way
21 Highland ever worked, from what I could see.
22    Q.   Did you believe, in December of
23 2020, that employees of Highland had a
24 conflict of interest with respect to their
25 dual role as employees of NexPoint with

Page 122

1                    J. Seery
2  respect to that promissory note?
3      A.    Not specifically with respect to
4  the promissory note, but generally it was a
5  concern of mine throughout the case.
6      Q.    Well, we can -- can we agree on
7  this; that when Mr. Dondero gave
8  Mr. Waterhouse that instruction,
9  Mr. Waterhouse should have known that that
10 instruction was not on behalf of Highland
11 because Mr. Dondero no longer had any
12 management role with Highland?
13         MR. MORRIS:  Objection to the
14      form of the question.
15     A.    I think he should have known that,
16 yes.
17     Q.    And can we therefore agree that
18 Mr. Waterhouse should have known that that
19 instruction from Dondero was coming from
20 NexPoint --
21         MR. MORRIS:  Objection --
22         (Simultaneous speaking.)
23     Q.    -- Dondero wearing his NexPoint
24 hat?
25     A.    I -- I think you're trying to parse

Page 123

1                    J. Seery
2  something that doesn't exist.  There's no
3  hats.  There's one hat for Mr. Dondero.  He
4  controls all of the entities other than
5  HCMLP.
6         And his edicts, whether they be
7  from prior to our taking over HCMLP as
8  independent directors or with respect to any
9  of the other entities, are final.
10     Q.    Mr. Dondero might not have had two
11 hats, but in December of 2020, would you
12 agree that Mr. Waterhouse wore two hats?
13     A.    Yes, he did.
14     Q.    The CFO of the debtor and the
15 treasurer of NexPoint?
16     A.    That's correct.
17     Q.    And both being executive officer
18 positions, correct?
19     A.    Correct.
20     Q.    Pardon me.  With, to your
21 understanding, under Delaware law, fiduciary
22 duties to his respective principals, correct?
23     A.    I believe these are both Delaware
24 but I'm not positive.
25     Q.    Certainly you would have expected

Page 124

1                    J. Seery
2  Mr. Waterhouse to have fiduciary duties, in
3  December of 2020, to the debtor?
4      A.    Yes.
5      Q.    Okay.  That's the role that I'm
6  asking about, sir.
7         Mr. Waterhouse simultaneously being
8  the CFO of the debtor, the payee on a large
9  promissory note, and the treasurer of
10 NexPoint, the maker on that same promissory
11 note, did you not perceive there to be any
12 conflict of interest?
13         MR. MORRIS:  Objection to the
14      form of the question.
15     A.    No, no more than -- I -- I
16 perceived a concern throughout the case, but
17 no more than there had been at any other time
18 with any of these related entities.
19     Q.    Except, sir, that at this time,
20 Mr. Waterhouse had a fiduciary duty to the
21 bankruptcy estate.
22         Would you agree with that?
23     A.    Yes.
24     Q.    Okay.  And do you agree that his
25 fiduciary duty to the bankruptcy estate, in

Page 125

1                    J. Seery
2  December of 2020 with respect to this
3  promissory note, might have conflicted with
4  his duties - whatever they were - to
5  NexPoint?
6         (Simultaneously speaking.)
7         (Reporter interjection.)
8      A.    I'm sorry.
9         MR. MORRIS:  Objection to the
10      form of the question.
11     A.    Potentially but not necessarily.
12 Mr. Waterhouse took direction from the man in
13 control of NexPoint.  That man directs his
14 inferiors, which would include the treasurer.
15 So following that direction doesn't cause any
16 conflict with respect to NexPoint.
17     Q.    On the debtor's side, you mentioned
18 before, for example, that -- that you
19 believed after the payment was made, that
20 your fiduciary duties necessitated the
21 calling of the note, right?
22     A.    I don't know if they necessitated
23 it.  They certainly informed it.
24     Q.    Informed it.
25         But -- so they certainly informed

Page 126

J. Seery

1 it, correct?
2     A.    Yes.
3     Q.    Okay.  And would you expect
4 Mr. Waterhouse to have had similar duties to
5 the bankruptcy estate?
6         MR. MORRIS:  Objection to the
7     form of the question.
8     A.    No, I believe that would be my
9 direction, if I had -- I would be his
10 superior at HCMLP.  If I directed that we
11 collect it, we collect it.  If I direct that
12 we don't, then we don't.
13     Q.    Is it fair to say, from your prior
14 testimony, that at no time prior to January
15 1, 2021 did Mr. Waterhouse, Mr. Klos or
16 Ms. Hendrix tell you about the Dondero
17 instruction not to make any more payments?
18         MR. MORRIS:  Objection to the
19     form of the question.
20     A.    Prior to when?
21     Q.    January 1, 2021.
22     A.    I -- I don't -- as I said, I don't
23 recall if it was right around the time of
24 the -- the payment had been failed to be made

Page 127

J. Seery

1 on the 31st, and we sent it, or if it was in
2 December.  I believe I testified to that
3 before.  And the shared service payments
4 hadn't been made, so there may have been some
5 discussion that Dondero's cut it off.
6     Q.    Well, I -- I think I asked you
7 before about the timing in reference to the
8 January 7 letter, when --
9     A.    Correct.
10     Q.    -- you said it might have been
11 right around there.
12         Am, am I understanding -- or strike
13 all that.
14         Is it your testimony that maybe you
15 learned about the Dondero instruction on or
16 before December 31, 2020?
17         MR. MORRIS:  Objection, asked and
18     answered.
19     A.    That -- that's correct.  I don't
20 recall when I learned but, factually, I know
21 that the payments on shared services hadn't
22 been made.  I could not have known that the
23 December 31 payment wouldn't have been made
24 on December 31 until after December 31.

Page 128

J. Seery

1     Q.    Well, but you could have learned
2 that Mr. Dondero had instructed that the
3 December 31 payment not be made ahead of
4 time, could you not have?
5     A.    I -- I could have, but I did not
6 learn that.
7     Q.    Okay.  That's -- that's what I'm
8 trying -- that's what I'm trying to
9 ascertain.  I'm trying to refresh your
10 memory.
11         So you can now testify that prior
12 to the payment not being made, you did not
13 know about the Dondero instruction not to
14 make the payment?
15     A.    With respect to the -- the note
16 payment, that's correct.
17     Q.    Okay.  So what -- that's what I
18 mean.
19         It would have had to have been
20 January 1 or after -- January 1, 2021 or
21 after that you learned about that?
22     A.    I would have to have learned of the
23 effect of it.  If the -- if the actual
24 statement was don't make any payments

Page 129

J. Seery

1 irrespective of when they're due, that could
2 have been made in early December.  I wouldn't
3 have known the effect of it.
4         I knew the effect with respect to
5 the shared service because it wouldn't be
6 paid.  He might have changed his mind and I
7 didn't know that.
8     Q.    Okay.  I'm going to -- I'm going to
9 try again.
10         On or about January 31, 2020 --
11     A.    December 31.
12     Q.    Thank you.
13         On or before December 31, 2020,
14 sitting here today, do you remember being
15 informed of the Dondero instruction not to
16 make payments?
17         MR. MORRIS:  Objection, asked and
18     answered.
19     A.    Again, I don't recall the exact
20 date I learned.  I believe I certainly knew
21 that the shared service payments had not been
22 made.  I believe I knew that that related to
23 a Dondero edict.
24     Q.    So you're saying shared services in

Page 130

J. Seery

1     response to my answer.
2
3           Why, why does -- why is that
4     relevant?  Because from that you deduced that
5     all payments were to cease?
6     A.    No, they were due before.
7     Q.    That's -- okay, I apologize.
8           So this shared services contract
9     required periodic payments, right?
10    A.    Correct.
11    Q.    And, and -- and are you saying that
12    before December 31, 2020, NexPoint had
13    already failed to make at least one of those
14    periodic payments?
15    A.    I believe so, yes.
16    Q.    Okay.  Did you, at that point in
17    time, inquire as to why that payment hadn't
18    been made?
19    A.    I don't recall, but I loosely
20    recall - but I don't know exactly when I
21    learned it - that there had been this edict.
22    Q.    Okay.  I'll use that word "edict."
23    That's the one -- we're both saying the same
24    thing, right --
25    A.    Correct.

Page 131

J. Seery

1
2     Q.    -- where Dondero tells Waterhouse
3     no more payments, right?
4     A.    Fair enough.
5     Q.    So sitting here today, it is
6     possible that before December 31, 2020, you
7     had heard vis-a-vis Ms. Hendrix that NexPoint
8     would not be making its scheduled payment
9     because of the Dondero edict?
10    A.    Scheduled payment on the note?
11    Q.    On the note.
12    A.    No, I don't think that's fair.
13    Q.    That's all I'm -- okay.  So I'm --
14    I'm asking just about the note.
15          As of December 31, 2020, sitting
16    here today, do you remember having heard that
17    NexPoint would not be making its December 31
18    payment because of the Dondero edict?
19    A.    I pretty clearly recall that the
20    payments had not been made, and I had heard
21    that there had been an edict.
22          The full implication of that edict
23    and whether it extended to the note I did not
24    know until the payment was missed.
25    Q.    Understood.  I think that -- I

Page 132

J. Seery

1
2     think -- thank you.  I understand now.
3           So you knew that there had been an
4     edict not to make payments, you just didn't
5     realize definitively that that edict also
6     applied to the promissory note payment?
7     A.    Correct.
8     Q.    Okay.  By December 31, 2020, had
9     the debtor laid off certain people, certain
10    employees, let's just say for cost-cutting
11    purposes as opposed to regular terminations,
12    you know -- you know what I'm trying to say?
13    Had there been just --
14    A.    Had there been a RIF?
15    Q.    A reduction --
16          (Simultaneous speaking.)
17    Q.    Yes, yes.
18    A.    No, there had not been.
19    Q.    So to your understanding, the
20    debtor personnel that would have had any
21    involvement with these treasury and payment
22    services, helping affiliated companies make
23    their payments, all those personnel were
24    still there?
25    A.    Largely the same.

Page 133

J. Seery

1
2     Q.    Okay.  When you say largely, can
3     you think of anyone right now that was no
4     longer there or changed?
5     A.    Not specifically.  There were --
6     there was some attrition during 2020 and we
7     didn't specifically replace some of those,
8     but some -- some people we did replace.  We
9     actually hired people in 2020.
10    Q.    But as with respect -- pardon me.
11    As it respects -- strike that.
12          With respect only to the payment
13    we're talking about, i.e. scheduling future
14    permission to pay them, all those personnel
15    that would have had a role in -- on that for
16    the debtor were still there in December 2020?
17    A.    I -- I believe that group was
18    largely the same.
19    Q.    Waterhouse, Klos and Hendrix?
20    A.    Ellison Rober -- I can't remember
21    her last name.  So there -- there were a
22    couple others in that group as well, and then
23    there were some other junior people that
24    would have assisted them.
25    Q.    I'm going to ask you a hypothetical

1                    J. Seery
2    question.  Let's say that on December the
3    10th, 2020, Hendrix tells you that Dondero
4    has instructed that the note payment by
5    NexPoint will not be made.
6            Would you have issued any
7    instructions to employees of the debtor
8    following up on that, what you just learned?
9            MR. MORRIS:  Objection to the
10           form of the question.
11   A.    I, I don't know -- know if --
12   knowing what I know now and that they hadn't
13   made the shared service payments at that time
14   and that it seemed to be going towards
15   litigation, I would not have done anything, I
16   don't think.
17   Q.    Okay.  So, again, to round off this
18   topic, you do not believe that employees of
19   the debtor had any obligation, after
20   Dondero's edict, to follow up with NexPoint
21   about its upcoming note payment?
22   A.    No.
23   Q.    Okay.  Did you consult this shared
24   services agreement, to your recollection,
25   before your January 7, 2021 letter?

1                    J. Seery
2    A.    I certainly --
3            MR. MORRIS:  Objection to the --
4            (Simultaneous speaking and
5    reporter interjection.)
6    A.    I certainly was familiar with the
7    agreement and had consulted it numerous
8    times.
9            If your question is did I consult
10   this agreement with respect to that demand
11   letter, the answer's no.
12   Q.    Okay.  If you'll turn to Section
13   2.06 of this agreement for me, sir.
14           And certainly you can look at the
15   definitions, but the staff and services
16   provider, that's the debtor, right?
17   A.    Yes.
18   Q.    And management company, that's
19   NexPoint, right?
20   A.    Yes.
21   Q.    Okay.  So Section 2.06, the last
22   sentence, sir, that basically says that the
23   debtor will not have any duties or
24   obligations to NexPoint unless those duties
25   and obligations are specifically provided for

1                    J. Seery
2    in this agreement.
3            Did I paraphrase that correctly?
4    A.    Roughly, yes.
5    Q.    Okay.  And if we flip to Section
6    6.01, sir, and -- and take a second, please,
7    to read that section.
8    A.    (Document review.)
9            Okay.
10   Q.    And -- and you might want to look
11   at the definition of covered person real
12   quick.  I believe you'll find it includes the
13   debtor.
14   A.    Okay.
15   Q.    So I read this and, and -- and it
16   says (as read):
17           Except as otherwise
18       expressly provided herein, each
19       covered person shall discharge its
20       duties under this agreement with
21       the care, skill, prudence and
22       diligence under the circumstances
23       then prevailing that a prudent
24       person acting in a like capacity
25       and familiar with such matters

1                    J. Seery
2        would use in the conduct of an
3        enterprise of a like character and
4        with like aims.
5            Did I read that correctly?
6    A.    Roughly.
7    Q.    Okay.  Do you have any
8    understanding of that section, sitting here
9    today?
10   A.    I know what every one of those
11   words mean.
12   Q.    Okay.  Reading that, do you still
13   believe that Mr. Waterhouse and Mr. Klos and
14   Ms. Hendrix had no duty to go back to
15   Mr. Dondero and advise him of the
16   ramifications of his edict and try to
17   persuade him otherwise?
18           MR. MORRIS:  Objection to the
19           form of the question.
20   A.    Yes, I do.
21   Q.    Okay.
22   A.    I believe that they didn't have any
23   further duty.
24   Q.    If you had issued an edict in the
25   heat of the moment or based on bad advice,

Page 138

J. Seery

1              J. Seery
2  would you expect your officers to come to you
3  and say, Mr. Seery, just so you know, there's
4  going to be consequences, please reconsider?
5          MR. MORRIS:  Objection to the --
6    A.   Me personally?
7    Q.   Yes.
8          MR. MORRIS:  -- form of the
9  question.
10        (Simultaneous speaking and
11  reporter interjection.)
12    A.   My relationship with people who
13  work with or for me is very different than I
14  understand Mr. Dondero's.  But as a
15  professional and someone who's been doing
16  this for thirty years, if I give my
17  direction, I expect it to be followed.  And I
18  know, from what I have heard and seen,
19  Mr. Dondero is that to the nth degree.
20    Q.   So, again, I understand that you
21  expect your instructions, Mr. Seery's
22  instructions, to be followed.
23    A.   Yes.
24    Q.   But from your officers, do you
25  believe that they have an obligation to come

Page 139

J. Seery

1  to you, after you issue an instruction and if
2  they believe it's bad for the company, to
3  dissuade you of that instruction?
4    A.   I, I --
5          MR. MORRIS:  Objection to the
6  form of the question.
7    A.   I would prefer that they did, yes.
8    Q.   Okay.  NexPoint was paying the
9  debtor's employees in this -- including
10  Mr. Waterhouse, Mr. Klos and Ms. Hendrix, for
11  services under this contract, correct?
12    A.   Correct.
13    Q.   And other than amounts in
14  controversy that are not insignificant,
15  NexPoint paid millions of dollars to the
16  debtor under this contract, did it not?
17    A.   I don't believe it paid millions --
18    Q.   Okay.
19    A.   -- of dollars.
20          MR. MORRIS:  Yeah, objection.
21    Q.   Okay.  But it paid -- it paid some
22  amount under this contract?
23    A.   I would say for the services, one
24  would easily say a paltry amount.  And the

Page 140

J. Seery

1  vehicle, NPA, was used largely to strip
2  assets and value out of Highland.
3    Q.   But the same Mr. Waterhouse that
4  has a duty to you, as the chief executive
5  officer, to tell you that one of your courses
6  of action is going to be detrimental has no
7  such duty to Mr. Dondero, because
8  Mr. Dondero's a tyrant?
9          MR. MORRIS:  Objection to the
10  form of the question.
11    A.   I said I would prefer that a
12  Mr. Waterhouse or anyone else who works for
13  or with me advise me if they think the course
14  of action I'm taking is incorrect.  If I
15  listen to their advice and make my decision,
16  then we live with my decision.  I don't want
17  to revisit it ten times.
18        So I don't know whether
19  Mr. Waterhouse told Mr. Dondero that that
20  course might have ramifications.  One would
21  think that a man who's run these businesses
22  for this long and had put this company into
23  bankruptcy and had left hundreds of millions
24  of dollars strewn across the street of

Page 141

J. Seery

1  losses, that one would have some
2  understanding of what those ramifications
3  might be, and maybe Mr. Waterhouse didn't.  I
4  don't know; I wasn't there.
5    Q.   Do you agree, sir, that Section 601
6  also applied to you with respect to -- as a
7  covered person, with respect to how you
8  conducted business under this contract?
9        Do you --
10    A.   Could I -- no, I think it -- well,
11  I can --
12    Q.   Take a second -- take a second to
13  read the definition of covered person.
14    A.   Uh-huh.
15    Q.   And, look, we can agree that you're
16  not making any legal conclusions here.  I'm
17  just...
18    A.   (Document review.)
19        I believe it does, yes.
20    Q.   Yet before you sent your January 7
21  letter, you did not check to see whether
22  NexPoint had made any prepayments on the
23  note, correct?
24    A.   I think I testified that I didn't

Page 142

```
1                    J. Seery
2    check, but our -- my understanding, based
3    upon the work of the accounting group, was
4    that the payment was due and scheduled.  It
5    had to be paid.
6            If it had not been due, it had been
7    prepaid, it would not have been scheduled.
8    So there was no need for me to go doublecheck
9    that.
10       Q.    And you did not separately inquire
11   of anyone at the debtor as to whether
12   NexPoint had a defense to your January 7
13   letter, correct?
14           MR. MORRIS:  Objection to the
15       form of the question.
16       A.    No, I did not.
17       Q.    Is that not, sir, something that
18   would have been prudent to do pursuant to
19   Section 601, check as to whether NexPoint had
20   made a prepayment or had a defense?
21           MR. MORRIS:  Objection --
22       A.    I --
23           (Simultaneous speaking.)
24       A.    -- I don't believe that's something
25   that would have been required by this or any
```

Page 143

```
1                    J. Seery
2    other provision.
3        Q.    Do you believe that Section 601
4    played any role at all, now that you're
5    reading it, with respect to your decision to
6    call the note as opposed to call NexPoint and
7    say, hey, what happened?
8        A.    I don't -- I don't believe it
9    governs it at all.
10       Q.    Do you believe it governed in any
11   respect whatever Mr. Waterhouse and
12   Mr. Dondero discussed on or about January --
13   January 12, 2021?
14       A.    I don't know the substance of their
15   discussion, other than that the -- what we've
16   referred to as the edict, at least that's as
17   it's been reported.  So I don't know what
18   colloquy they had with respect to
19   ramifications of making a payment or not.
20           Clearly, there should have been
21   more ramifications for not making the shared
22   services payments, but Mr. Dondero issued a
23   similar edict or --
24           (Simultaneous speaking.)
25       Q.    Mr. Dondero didn't issue a similar
```

Page 144

```
1                    J. Seery
2    edict?
3        A.    I said he did.
4        Q.    He did.
5            So why didn't you terminate the
6    services agreement immediately upon
7    NexPoint's failure to pay?
8        A.    Well, we would have, I think, if we
9    thought we could.  We also had an issue that
10   both NexPoint and HCMFA were providing
11   services to retail funds and had no ability
12   to provide any of those services without
13   Highland.  They literally had left themselves
14   completely exposed, while just stripping out
15   fees.
16       Q.    Do you believe with respect to
17   Section 601, standard of care, that the
18   parties prior course of dealing, i.e. rolling
19   up prior notes, had any role on January 7,
20   2021?
21           MR. MORRIS:  Objection to the
22       form of the question.
23       A.    No, I don't.
24       Q.    Okay.  Did you take any prior
25   course of action between the parties into
```

Page 145

```
1                    J. Seery
2    account when you executed and issued your
3    January 27, 2021 letter?
4        A.    Certainly.  The payments are
5    typically made on time, and if they're not
6    paid, then it's prudent and required to
7    accelerate the note.
8        Q.    But five times before, you -- you
9    knew by then that five times before, demand
10   notes were rolled up into a term note, which
11   you said before, I believe, was for an
12   improper purpose?
13           MR. MORRIS:  Objection to the
14       form --
15       A.    At least three of them that are
16   sub -- subject to the current litigation.  I
17   don't recall if it was five, but this one
18   contained five notes, if -- three term notes
19   that were rolled notes.  But those were done
20   prior to bankruptcy and they were done with
21   Mr. Dondero on both sides of the transaction.
22       Q.    So your borrower, who owes you
23   24 million and change that you're under a
24   contract with that the borrower is paying
25   you, where you provide employees to the
```

Page 146

J. Seery

1   J. Seery
2   borrower, and your affiliate entity misses a
3   scheduled payment, you believe that you have
4   no obligation to do anything before you
5   called the note immediately due?
6       A.   That -- that's absolutely correct.
7            MR. RUKAVINA:  Okay.  Do you mind
8       if we take another restroom break?
9            MR. MORRIS:  Sure.
10           MR. RUKAVINA:  I'm getting
11      near -- near the end.  Five minutes,
12      please.
13           (Brief off-record discussion.)
14           VIDEO TECHNICIAN:  The time is
15      4:16.  We're off the record.
16           (Recess taken.)
17           VIDEO TECHNICIAN:  The time is
18      4:21.  We're back on the record.
19   BY MR. RUKAVINA:
20      Q.   Did you have a view, as of December
21   2020 or January 2021, as to whether the
22   debtor owed any fiduciary duties to NexPoint?
23           MR. MORRIS:  Objection to the
24      form of the question.
25      A.   I -- I believe I did.

Page 147

1   J. Seery
2       Q.   And what was your view?
3       A.   I don't think -- certainly by that
4   time, if there ever had been, I don't think
5   by that time there were any fiduciary duties
6   owed.
7       Q.   Okay.  Real quick, we're still on
8   this shared services agreement, sir, page 4.
9   This is a list of services to be provided.
10  I'm just -- you can read it in detail, but I
11  just have a very simple question.  4B talks
12  about legal compliance risk analysis.
13           In December of 2020, was the debtor
14  providing legal services to NexPoint?
15      A.   I don't believe so, or at least not
16  any -- there might have been some assistance.
17  I'm trying to think what would have been done
18  at that time in terms of support, but there
19  certainly -- compliance was probably
20  transferred pretty fully by then.
21           I don't think NexPoint was involved
22  in any litigation at that point, certainly
23  not that the debtor was supporting, so I -- I
24  don't think very much, if anything.
25      Q.   Okay.  Do you know whether NexPoint

Page 148

1   J. Seery
2   had written policies and procedures in place
3   with respect to how it conducted its
4   business?
5       A.   I'm not sure.
6            MR. RUKAVINA:  Okay.  You can put
7       that down, sir.
8            (Brief off-record discussion.)
9            MR. RUKAVINA:  So this is going
10      to be Exhibit 10.
11           (Exhibit 10, Email Chain
12      D-NNL-007578 - D-NNL-007579, marked
13      for identification, as of this date.)
14   BY MR. RUKAVINA:
15      Q.   Sir, you are not on this email
16   chain, so I don't expect you to authenticate it.
17           But have you seen this email chain
18   before, between Mr. Waterhouse and
19   Ms. Hendrix on January 12, 2021?
20      A.   I believe I have, yes.
21      Q.   Okay.  Was it in preparation for
22   this deposition or had you seen it before?
23      A.   Only in preparation for the
24   deposition.
25      Q.   Were you aware that Mr. Waterhouse

Page 149

1   J. Seery
2   was asking Ms. -- asking Ms. Hendrix for the
3   total principal on this note on January 12,
4   2021?
5            I'm sorry, were you aware of it at
6   about that point in time?
7       A.   No, not until I saw this email.
8       Q.   Okay.  Did you ever discuss -- so I
9   think -- I think you've -- you've said it
10  earlier, that you did not know until
11  Mr. Waterhouse's deposition that
12  Mr. Waterhouse and James Dondero had a
13  communication on January 12, 2021, right?
14      A.   I did not know.
15      Q.   Did, did -- did you know from
16  Ms. Hendrix that she had had any
17  communications with Mr. Waterhouse on or
18  about January 12, 2021, about how much the
19  missed payment was?
20      A.   No, I did not.
21      Q.   Okay.  Have you asked her about
22  what this email was in reference to since
23  you've seen this email?
24      A.   No, I have not.
25           MR. RUKAVINA:  Okay.  This is

Page 150

```
1                    J. Seery
2        going to be Exhibit 11, sir.
3             (Exhibit 11, Email Chain
4        D-NNL-028514 - D-NNL-028515, marked
5        for identification, as of this date.)
6        Q.    So, Mr. Seery, this -- you're not
7    on this email chain, but this email begins on
8    December 10, 2020, from Ms. Hendrix to
9    Mr. Romey -- I'm sorry, from Mr. Romey to
10   Ms. Hendrix, where he writes (as read):
11            Can you tell me the original
12        maturity date for the NPA loan
13        before it was restructured?  Sorry
14        for the hustle.  Seery is asking
15        for this ASAP for today's court
16        hearing.
17            Do you see that, sir?
18   A.    I do see it.
19   Q.    Do you recall asking Mr. Romey
20   anything about that loan or anything about
21   this on or about January -- December 10,
22   2020?
23            MR. MORRIS:  Objection to the --
24   A.    Not specifically.
25   Q.    Okay.  It says that you were --
```

Page 151

```
1                    J. Seery
2    there was a court hearing.
3            Do you remember what that court
4    hearing might have been?
5    A.    I -- I don't.
6    Q.    Okay.  Do you have any recollection
7    as to why you would have been asking about
8    the original maturity date of the NPA loan
9    before it was restructured?
10   A.    I think it's a mistake, that there
11   were -- there were five notes --
12   Q.    Okay.
13   A.    -- that were rolled into this one.
14            I may have just been checking
15   whether they were all demand or if any of
16   them have had a maturity.  I don't -- I don't
17   know why I would have been asking for it.  I
18   don't recall what the hearing was about.
19   Q.    Fair enough.  You testified before
20   that -- and I'm not trying to put words in
21   your mouth, sir.
22            You testified before that there was
23   something maybe inappropriate or shady about
24   the roll-up of the five notes into the one
25   NexPoint note.
```

Page 152

```
1                    J. Seery
2            Whatever -- whatever words you
3    used, was that your speculation as to why it
4    happened, was that your logical deduction, or
5    did someone tell you that that's why the
6    notes were rolled up?
7            MR. MORRIS:  Objection --
8            (Simultaneous speaking.)
9    A.    -- logical deduction.
10           (Reporter clarification.)
11   BY MR. RUKAVINA:
12   Q.    Excluding lawyers, sir, and
13   excluding now in litigation, that back
14   when -- when the debtor existed and you were
15   the CEO/CRO, did you ask anyone at the debtor
16   or did you ask Mr. Dondero why those notes
17   had been rolled up into the $30.7 million
18   note?
19   A.    I don't believe I asked
20   Mr. Dondero.
21           I know I inquired as to whether the
22   debtor got anything for the extension of the
23   maturity.
24   Q.    Who did you inquire of?
25   A.    I don't recall specifically.
```

Page 153

```
1                    J. Seery
2    Q.    Mr. Surgent?
3    A.    I don't recall specifically.  He
4    wouldn't, he wouldn't have -- it would either
5    have been Frank Waterhouse or someone else in
6    accounting; was anything paid?  And --
7    because there were a number of notes that
8    were rolled up in a similar fashion, and it
9    all happened around the same thing; a number
10   of things were happening to the debtor at
11   that time.
12   Q.    Why did the debtor or the
13   reorganized debtor not retain Mr. Waterhouse
14   after the termination of the shared services
15   agreements?
16   A.    I didn't need him.
17   Q.    Okay.  Mr. Klos was promoted to
18   CFO?
19   A.    Correct.
20   Q.    Okay.  Did you have any personal
21   dislike of Mr. Waterhouse ever?
22   A.    No.
23   Q.    Did you have any personal views
24   that his services as CFO were not up to
25   par --
```

**App. 135**

Page 154

J. Seery

1
2     MR. MORRIS:  Objection --
3     Q.    -- not up to what you expected them
4  to be?
5     A.    No, I just preferred, for what we
6  were doing, Mr. Klos.
7     Q.    Did you ever form the opinion that
8  Mr. Waterhouse was -- I don't know what word
9  to use -- Mr. Dondero's stooge or tentacle?
10    A.    No.
11    Q.    Okay.  Did you have any opinion as
12 to whether he was -- again, I don't know what
13 word to use -- whether he was a responsible,
14 proper CFO when he was the CFO of Highland
15 and you were the CRO?
16    A.    While he was CFO, I -- I think he
17 was adequate, but I think the challenge that
18 the employees had at Highland was the pull
19 that Dondero had, the go-betweens that he
20 had.
21          And it's hard to say at a specific
22 time, because I know a lot more now,
23 including to do with payments, including tens
24 of millions of dollars offshore, with respect
25 to Ellington.

Page 155

J. Seery

1
2     So I -- I know way more now, so
3  it's hard to separate those things.  But with
4  respect to Mr. Waterhouse, I think he was --
5  he was adequate.  I think the team was very
6  good.  And I think that the -- I was always
7  concerned about loyalties.
8     Q.    Did you ever, when you were the
9  CRO, discipline, censure, caution
10 Mr. Waterhouse about anything?
11          MR. MORRIS:  Objection to the
12    form of the question.
13    A.    I actually gave him a raise on his
14 base salary because he couldn't get bonuses
15 because of the Court order structure.  I did
16 caution him and many employees about
17 loyalties and their duties to the debtor.
18    Q.    And you remember cautioning him
19 specifically about that or as part of larger
20 group?
21    A.    As part -- I -- I believe it was
22 part of the larger group.  I certainly did it
23 with both legal and accounting, particularly
24 after Judge Jernigan's expressed --
25 expression of concern in -- in and around

Page 156

J. Seery

1
2  July of 2020.
3     Q.    After you learned about the
4  NexPoint missed December 31, 2020 payment,
5  did you give any instructions to
6  Mr. Waterhouse or anyone else to the effect
7  of don't negotiate any settlement or cure or
8  anything on that default without talking to
9  me first?
10    A.    I don't believe that I had any
11 discussion like that with anybody, but it
12 would have been clear, I think, that once the
13 demand letter went out and I had been
14 responsible for initiating it, that the full
15 amount was due, and if anybody wanted to
16 negotiate anything, they would have to do it
17 through me.
18          And certainly no one had the
19 ability to negotiate any monetary settlements
20 with respect to the debtor's assets without
21 talking to me and the board.
22    Q.    Okay.  Why is that?
23    A.    Because we were in bankruptcy and I
24 was the CEO, and I told everybody on the team
25 that they had to come through me.  Any

Page 157

J. Seery

1
2  material decisions had to go through me.
3     Q.    And you told that to
4  Mr. Waterhouse?
5     A.    The whole accounting team as well
6  as the legal team.
7     Q.    Do you recall if that's in writing
8  anywhere?
9     A.    I don't think so.
10    Q.    Did you define materiality to them;
11 do you recall?
12    A.    I don't think so.
13    Q.    Okay.  So you never expressly
14 prohibited Mr. Waterhouse from hypothetically
15 accepting any cure to reinstate that note,
16 but you would have expected him to know that
17 he had no authority to do so on behalf of the
18 debtor?
19    A.    Oh, I --
20          MR. MORRIS:  Object -- objection
21    to the form of the question.
22    A.    -- I -- I think it would have been
23 beyond obvious that he had no authority to do
24 that for the debtor.
25    Q.    Do you think that would have been

Page 158

J. Seery

1    J. Seery
2 beyond obvious to Mr. Dondero?
3    A.   Yes, I do, well --
4    Q.   Why --
5    A.   -- beyond -- well beyond obvious.
6    Q.   Why is that?
7    A.   Because the shared services had
8 already been terminated.  We were heading
9 towards a confirmation of a monetization
10 plan.  He had already failed to pay shared
11 service amounts.  He had already been found
12 in contempt of court.
13        The idea that he could cut a deal
14 with a former employee over material asset of
15 the debtor is nonsensical.
16    Q.   Okay.  Mr. Waterhouse wasn't a
17 former employee on January 12, 2021, was he?
18    A.   No, he was not, correct.
19    Q.   And although the notice of
20 termination had gone out for the shared
21 services agreement, it had not been
22 terminated as of January 12, 2021, correct?
23    A.   That's correct.
24        Are you -- are you implying that --
25 that there was such a deal and you're going

Page 159

J. Seery

1 to make up a new story?
2    Q.   Well, sir, I object to you saying
3 I'm going to make anything up.  I'll let
4 Mr. Waterhouse and Mr. Dondero testify as
5 they did.
6        But certainly you would -- you
7 would not be aware of any deal that Frank or
8 James Dondero might have made, right?
9    A.   I -- I would not be aware of any
10 such deal.
11    Q.   Certainly you would have never,
12 ahead of time or after the fact, authorized
13 any such deal?
14    A.   No, I would not.
15    Q.   Okay.  Why not?  Why not accept a
16 cure and reinstate the note?
17    A.   Because the full amount of the note
18 was due.  We're in a monetization plan.  This
19 is an opportunity to monetize an asset.
20        MR. RUKAVINA:  Just a moment,
21    please.
22        THE WITNESS:  Sure.
23        MR. RUKAVINA:  It's 4:30 local,
24    right?

Page 160

J. Seery

1    J. Seery
2        Mr. Seery, allow me just five
3    minutes to consult with my co-counsel.  I
4    believe that I'm done, but before I make
5    that decision, I just want to have a few
6    minutes.
7        THE WITNESS:  Certainly.
8        VIDEO TECHNICIAN:  The time is
9    4:34.  We're going off the record.
10        (Recess taken.)
11        VIDEO TECHNICIAN:  The time is
12    4:40.  We're back on the record.
13        (Brief off-record discussion.)
14        MR. MORRIS:  Pass the witness.
15        Mr. Seery, thank you for doing this
16    in person in your beautiful city.
17        THE WITNESS:  Thank you.  It's
18    coming back, slowly.
19        MS. DEITSCH-PEREZ:  Okay.  Good
20    afternoon, Mr. Seery.
21        THE WITNESS:  Good afternoon.
22 EXAMINATION
23 BY MS. DEITSCH-PEREZ:
24    Q.   When Mr. Rukavina started
25    questioning you, and you were describing your

Page 161

J. Seery

1 background, you mentioned that you had been
2 involved in hundreds of bankruptcies.
3        Could you tell us, just by listing
4 them, the -- the most substantial companies
5 that you were involved with bankruptcies for?
6    A.   United Airlines, TWA, Columbia Gas,
7 Lehman Brothers.  It, it -- it's a
8 thirty-year career, so...
9    Q.   I'm just asking for the highlights.
10    A.   Those aren't bad.
11    Q.   Okay.  Were there any other
12 financial services companies that you were
13 involved in the bankruptcy or restructuring
14 of?
15    A.   Lehman Brothers would be considered
16 a financial services company.
17    Q.   Okay.  And what kind of company
18 would you consider Highland?
19    A.   Highland is a financial advisor.
20    Q.   Okay.  Were there any other
21 financial advisors that you were involved in
22 the restructuring or bankruptcy of?
23    A.   I guess technically MF Global, in
24 some of its places, would fall into that

J. Seery

1               J. Seery
2  category. Madoff would fall into that
3  category.
4     Q.   Any others?
5     A.   There may be. Off the top of my
6  head, I don't recall.
7     Q.   Okay. And in the course of those
8  engagements, were you generally aware of the
9  top-level executive compensation for the
10  top-level executives prior to the -- the
11  bankruptcies?
12     A.   Not specifically. It just depends
13  on each -- each company.
14     Q.   Generally, were you -- were you
15  aware? Is that the kind of thing you took
16  note of?
17     A.   Not -- it -- I was more concerned
18  with the particular issue that I was dealing
19  with as opposed to whether somebody -- what
20  somebody made.
21     Q.   In the bankruptcies that you were
22  involved with, with the -- with the larger
23  companies and all of the financial services
24  or financial advisory companies, can you --
25  can you tell me generally the range of

1               J. Seery
2  compensation for the CEOs --
3     A.   I, I --
4       (Simultaneous speaking.)
5     A.   -- no, I wouldn't be able to tell
6  you that.
7     Q.   Even a ballpark you couldn't --
8  couldn't say?
9     A.   They're all different kinds of
10  companies.
11     Q.   I understand, but can you -- for
12  any of those companies, can you give me a
13  ballpark of what the compensation was?
14     A.   It could be anywhere in any
15  particular year from zero to $25 million.
16     Q.   Okay. And is there a general
17  pattern that founder CEOs have higher
18  compensation than hired-off-the-street CEOs?
19       MR. MORRIS: Objection to the
20     form of the question.
21     A.   No, there's not. In fact, it could
22  sometimes go the other way.
23     Q.   But -- but is it sometimes the
24  case, in your experience, that founder CEO
25  compensation is on the high end?

1               J. Seery
2       MR. MORRIS: Objection to the
3     form of the question.
4     A.   I, I -- I don't have any basis to
5  say that. It really depends upon the company
6  and it depends on the performance of the
7  company. Just because you founded something
8  and you sit on a log doesn't mean you get
9  paid a lot of money.
10     Q.   Do you know what the CEO
11  compensation was for the CEO of Lehman prior
12  to the bankruptcy?
13     A.   In which year?
14     Q.   The, the year prior -- the years
15  prior to the bankruptcy.
16     A.   I -- I don't know.
17     Q.   Does it -- does it refresh your
18  recollection that it was in the range of
19  $70 million?
20     A.   There's no chance it was in the
21  range of $70 million. He would have gotten
22  stock awards and it would depend on what
23  those were worth.
24       (Simultaneous speaking.)
25     A.   Obviously -- obviously, they ended

1               J. Seery
2  up being worth -- I think the number is -- I
3  think it's zero.
4       You're aware of that, correct?
5     Q.   Prior to the bankruptcy.
6     A.   Oh, prior to it being worth zero,
7  it -- it was worth a lot more.
8     Q.   But as you sit here today, you
9  don't know what any of the CEOs of the
10  companies you advised made --
11       MR. MORRIS: Objection --
12     Q.   -- that's what you're telling us?
13       MR. MORRIS: Objection to the
14     form of the question.
15     A.   I didn't say I advised those
16  companies.
17       MR. MORRIS: Thank you.
18     Q.   But you were involved in the -- in
19  the bankruptcy or reorganization --
20     A.   No --
21       (Simultaneous speaking.)
22     A.   -- I -- I don't have at my
23  fingertips the amount that the CEOs of
24  various companies made in various industries
25  over the last thirty years.

Page 166

J. Seery

1
2    Q.    And -- and not even in a general
3  way, other than zero to 25 million?
4    A.    That's a pretty good range.
5    Q.    Okay.  Do you have an understanding
6  of what the typical compensation is -- for a
7  financial advisory CEO is for a company that
8  has a billion or more under management?
9    A.    It depends on the type of assets
10  that are under management, it tends -- it
11  depends on the performance of the assets and
12  it depends on the cost structure of the
13  business.
14    Q.    And taking those things into
15  account, can you describe for us what the
16  compensation for a CEO of a financial advisor
17  firm is, where there are assets under
18  management of a billion or more?
19    A.    When you [mean] a financial
20  advisor, do you mean an FA type firm or do
21  you -- financial advisor, or do you mean
22  somebody who advises investors?
23    Q.    I -- I'm talking about a company
24  similar to Highland.
25    A.    So high -- Highland is a -- is a

Page 167

J. Seery

1
2  combination of types of businesses.  It's
3  basically, in the last five years, at best a
4  melting ice cube.  It receives certain
5  management fees and then it gives away
6  services at below cost.
7        So Highland was run at a loss.
8  Typically people who run businesses that
9  operate at an operating loss don't get paid a
10  lot of money.
11    Q.    Let me -- let me ask you, you're
12  now -- you've been the CEO of Highland for a
13  while, right?
14    A.    That's correct.
15    Q.    And you're going to remain the CEO
16  for a while longer?
17    A.    Perhaps.
18    Q.    And do you have an expectation of
19  how many years in total you'll likely be the
20  CEO of Highland?
21    A.    The less the better.
22    Q.    But aside from that, do you have an
23  expectation of how many years you will likely
24  be the CEO of Highland?
25    A.    I don't.  I hope we complete the

Page 168

J. Seery

1
2  monetization by 2022.  Whether I'm the CEO or
3  not that will depend on the oversight board
4  and whether I want to continue to do it.
5    Q.    Okay.  And if you are as -- as
6  successful as you hope to be, whatever that
7  is, how much do you expect to make as the CEO
8  of Highland on average for each year that you
9  will have been the CEO of Highland?
10        MR. MORRIS:  Objection to the
11     form of the question.
12    A.    I -- I don't have a particular
13  expectation right now.  I have to negotiate
14  that, but I would expect to make a few
15  million dollars a year.
16    Q.    Have you not negotiated your
17  potential contingent compensation yet?
18    A.    I have not.
19    Q.    What -- what do you intend to ask
20  for?
21        MR. MORRIS:  Objection to the
22     form of the question.
23    A.    I'd like to get a significant
24  amount of money, as much as I can get and
25  treat my team fairly, but it has to be fair

Page 169

J. Seery

1
2  based on the returns that we get for the
3  investors.
4    Q.    So based on, if you were as -- as
5  successful as you hope to be, what do you
6  think that number would be on an annual
7  basis?
8        (Simultaneous speaking and
9     reporter interjection.)
10        MR. MORRIS:  Objection to the
11     form of the question.
12    A.    I would expect it to be at least a
13  few million dollars a year.  If I was as
14  successful as I think we will be, it should
15  be significantly more than that.
16    Q.    Okay.  And so what does -- what
17  is -- because I don't know you very well,
18  Mr. Seery.
19        To you, what is significantly more
20  than a few million a year?
21    A.    Just to be clear, you don't know me
22  at all.  We've never met, so we'll -- we'll
23  make sure that that's clear so we don't --
24  there's no implication that there's some
25  prior relationship or that we've ever worked

Page 170

J. Seery

1      J. Seery
2  in any matter, in any connection whatsoever
3  other than this one.
4      Now, your question was?
5      MS. DEITSCH-PEREZ:  Can you read
6    it back?
7      (As read by the reporter):
8      "QUESTION:  And so what does --
9    what is -- because I don't know you
10   very well, Mr. Seery.  To you, what is
11   significantly more than a few million a
12   year?"
13   A.    It will depend on -- on the cost.
14 It depends on the overall performance, and --
15 and that will dictate whether there's upside
16 to a performance bonus.
17   Q.    Is significantly -- let -- let's
18 break this down to little pieces.
19     A few million, is that two, three,
20 four, five?  What is a few million?
21   A.    Typically I think of two as a
22 couple, three as a few.
23   Q.    Okay.  Is four also a few?
24   A.    Four is a little more than a few,
25 but it could be in that neighborhood.

Page 171

J. Seery

1      J. Seery
2    Q.    Okay.  So what is significantly
3  more than 3 to 4 million?
4      Is that twenty?
5    A.    That would be --
6      MR. MORRIS:  Objection --
7      (Simultaneous speaking and
8    reporter interjection.)
9    A.    Twenty is significantly more than a
10 few, but it's -- it's not any -- there's no
11 prospect of $20 million of a bonus in this
12 type of arrangement.  There's simply not
13 enough assets here.
14   Q.    Okay.  So when you say
15 significantly more than a few, do you mean
16 something like ten, 10 million a year?
17     MR. MORRIS:  Objection to the
18   form of the question.
19   A.    Again, I -- I don't have a specific
20 number in mind.  I think that's -- that
21 there's no chance of that either.
22   Q.    So can you tell me what you mean by
23 significantly more than a few million?
24   A.    Five is significantly more than
25 three.

Page 172

J. Seery

1      J. Seery
2    Q.    Okay.  Does that mean you're hoping
3  for compensation of 8 million a year or
4  5 million a year, just so I understand you?
5      MR. MORRIS:  Objection to the
6    form of the question.  Come on.
7    A.    There's no chance of $8 million a
8  year here.  There's not enough assets.
9  There's not enough value in the estate to pay
10 anybody that amount, which is why Highland
11 would never pay anybody that amount anyway,
12 because when you have a melting ice cube and
13 you don't get any performance fees because
14 your performance is terrible, you don't pay
15 somebody that much money.
16 MO*    MS. DEITSCH-PEREZ:  Move to
17   strike.
18   Q.    In your experience with the various
19 companies you've mentioned, have you seen
20 executives given loans as part of their
21 executive compensation?
22   A.    You know, I don't --
23     MR. MORRIS:  Objection to the
24   form of the question.
25   A.    I don't know.  I don't -- I don't

Page 173

J. Seery

1      J. Seery
2  recall.  I've certainly seen loans be given
3  as part of compensation.
4      Typically senior executives, in my
5  experience, don't get loans because loans
6  either have to be paid back or structured in
7  an odd way.
8      If they're structured just to avoid
9  taxes, most legitimate companies don't want
10 to do that, so most companies will either pay
11 somebody a -- base salary and deferred
12 amounts or will pay them with stock.
13   Q.    But you have seen loans given as
14 part of compensation?
15   A.    I -- I don't think I've seen it.  I
16 know that it exists.  I -- I don't recall any
17 senior executives in any companies that I've
18 worked around where a loan to a senior
19 executive was a -- was a material issue in a
20 case.
21   Q.    Have you also seen circumstances
22 where executives or just high-level employees
23 are given loans that are eventually forgiven
24 as part of their compensation?
25   A.    I -- I know it exists.  Again, I

Page 174

J. Seery

1  don't think it's been something or -- or
2  characteristic in any case either that I've
3  been involved with, invested in, worked on.
4      Q.    Given the nature of your work in
5  bankruptcies, does that simply mean that the
6  issue of loans and the forgiveness of the
7  loans has not been materially challenged in
8  the various engagements that you've
9  undertaken?
10     A.    No, I don't think -- I think it's
11 because it's not a material issue, and so you
12 don't -- you don't see very many companies
13 that I have been around where significant
14 amounts of the assets are company --
15 intercompany related loans or -- or loans to
16 the senior executives, where it's all
17 controlled by the same executive.  It's a --
18     Q.    Have you --
19     A.    -- it's a rare item.
20     Q.    Have you made any investigation, as
21 part of your role in this case, into whether
22 there are other companies that -- that have
23 similar loan programs, where executives or
24 senior officers receive loans that have the

Page 175

J. Seery

1  potential to be forgiven?
2          MR. MORRIS:  Objection to the
3      form of the question.
4      A.    Yeah, again, I don't -- I don't --
5  I don't think there's a program involved in
6  this situation, and I don't think there's any
7  potential for loans to be forgiven, so I --
8  it's not something that I've seen elsewhere,
9  although forgivable loans can be used for
10 certain types of compensation to employees to
11 retain them, certainly would be -- be
12 humorous to do that with respect to a
13 founder, but I don't -- in my experience, I
14 haven't seen this as a -- as a material issue
15 like it is in this case.
16     Q.    And I was asking whether you had
17 investigated, so that you could -- currently,
18 whether or not there are other companies in
19 which there was a practice like the one you
20 just described.
21         MR. MORRIS:  Objection, asked and
22     answered.
23     A.    I haven't done any other
24 investigation, other than -- than my

Page 176

J. Seery

1  experience.
2      Q.    Okay.  Did you investigate whether
3  or not any of the following people - mike
4  Hurley, Tim Lawlor, Pat Daugherty, Jack Yang,
5  Paul Adkins, Labraya Mamoud [ph], Jean Luc
6  Everland [ph] or Appou Landoseri [ph]
7  received loans that were potentially
8  forgivable and then that were, in whole or in
9  part, forgiven?
10         MR. MORRIS:  Objection to the
11     form of the question.
12     A.    I have looked at that, yes.
13     Q.    Okay.  And what did you determine?
14     A.    I determined that Highland, I don't
15 believe, has made a loan to any employee
16 other than Okada and Dondero in about twelve
17 years; that no loans were forgiven, notes --
18 so they were -- actually, I don't believe
19 they got any before 2014, maybe '13.
20         No senior executive got it except
21 with respect to Yang, but he was employed by
22 New York, not by HCMLP.  That was part --
23 effectively, was part of a severance when he
24 left.  And I don't think there's been any

Page 177

J. Seery

1  that have been north of $500,000, so nothing
2  like this.
3          And I did determine that Okada's --
4  I believe he only had one loan.  I could be
5  wrong on that, but that's the only one I
6  recollect, and he paid it back.
7      Q.    And did he pay it back in
8  connection with this bankruptcy, a demand of
9  the bankruptcy?
10     A.    He did, yes.
11     Q.    Under threat of lawsuit?
12     A.    No.  I spoke to Mark and I said you
13 should go talk to your counsel, you have a
14 very good counsel, Sullivan & Cromwell.
15         He went and talked to them and he
16 said you're right, they said I have to pay it
17 back.  And he did, and we structured it.
18     Q.    So did you determine that the --
19 you mentioned Yang.
20         But the others that I listed, did
21 you determine whether they had or had not
22 received loans that had been forgiven in
23 whole or in part?
24     A.    It looks like they had, and that

Page 178

J. Seery

1    was about more than ten or twelve years ago
2    and it had not been done since. None of
3    those were obviously a founder, none of them
4    were more than $500,000.
5        Q.   Okay. And did you learn that all
6    of the notes that existed in relation to
7    those loans for the people that I listed --
8    none of the notes actually contained the
9    forgiveness term?
10          MR. MORRIS: Objection to the
11       form of the question.
12       A.   I -- I do not know that, no.
13       Q.   Well, did you search for the notes
14   at issue?
15       A.   I did not look at the notes, I just
16   looked at the dollar amounts.
17       Q.   Did you talk to anyone who had been
18   involved in the -- the issuance of the notes
19   to the people that I listed that were
20   eventually forgiven?
21       A.   No.
22       Q.   Okay. Are -- are you aware that
23   it's generally the case, when companies use
24   potentially forgivable loans as a part of

Page 179

J. Seery

1    compensation, that the notes are bona fide
2    notes from the start that don't have a
3    forgiveness term and that the forgiveness
4    term, for tax purposes, is subsequent and
5    that taxes then are only paid when the note
6    is actually forgiven?
7           MR. MORRIS: Objection to the
8        form of the question.
9        A.   My experience and understanding of
10   that is actually different. When an employee
11   receives a forgivable loan as part of either
12   their retention, and often it happens as a --
13   a way to either retain somebody or to employ
14   someone, that it's very clear that it's
15   forgivable up front. Otherwise, it would be
16   a trust-me loan.
17          Now, certainly the founder who
18   controls everything can make his own trust-me
19   loan because he can trust himself, but -- but
20   to structure it to avoid taxes, my experience
21   is that that's actually illegal.
22       Q.   If you make payments on the loan
23   and it's only forgivable if certain
24   conditions occur in the future that are not

Page 180

J. Seery

1    certain --
2           MR. MORRIS: Objection to the
3        form.
4        Q.   -- doesn't that -- does -- in your
5    understanding, isn't that a -- a loan that,
6    until it's forgiven, is a bona fide loan of
7    which no taxes are owed?
8           MR. MORRIS: Objection to the
9        form of the question.
10       A.   I think you've described -- I
11   apologize.
12          I think you've described what I'd
13   call a scam.
14       Q.   Let's step -- step back a second,
15   Mr. Seery.
16          If I use the term "tax efficient
17   transaction," what do you understand that to
18   mean?
19          MR. MORRIS: Objection to the --
20          (Simultaneous speaking.)
21       Q.   -- something is tax efficient, what
22   does that mean to you, so I just make sure
23   we're -- we're talking the same language?
24          MR. MORRIS: Objection to the

Page 181

J. Seery

1    form of the question.
2        A.   It -- it means a transaction
3    that's -- that's structured in a way to
4    minimize the -- the tax cost.
5        Q.   Okay. And is your impression of
6    Mr. Dondero that, if he has a choice between
7    doing a transaction in a tax efficient way
8    and a non-tax efficient way, that he would
9    pick the tax efficient way?
10       A.   I believe he would, yes.
11       Q.   Okay. And are you condemning of
12   that --
13       A.   No.
14       Q.   -- is it a bad thing?
15       A.   Tax -- tax avoidance is a --
16       Q.   Taxi efficiency.
17       A.   I said tax avoidance is a duty,
18   taxi evasion is a crime.
19       Q.   Okay. So when you say "duty," what
20   do you mean?
21          Remember, a jury is listening to
22   this so I want it to be clear.
23       A.   I believe --
24          MR. MORRIS: That's not entirely

**App. 142**

Page 182

J. Seery

1                J. Seery
2    clear, just to be -- just to be
3    certain.  You may never get to a jury,
4    but go ahead.
5    A.   I don't recall if that was a -- a
6  quote from Learned Hand or one of the other
7  well known --
8    Q.   It had that sound to you?
9    A.   -- judges, but I -- I think that
10  structuring a transaction that has legitimate
11  purposes in a tax efficient way is not
12  necessarily problematic.
13          Structuring a transaction to avoid
14  taxes, and -- and mainly or solely to avoid
15  taxes, is actually a -- a violation of the
16  Internal Revenue Code.
17    Q.   And looking at the various loans to
18  Mr. Dondero and the related company loans
19  that are the subject of the notes litigation
20  that you are here today to testify about, was
21  it the case that annual payments both on the
22  term loans and interest payments on the
23  demand loans were made?
24    A.   Oftentimes, yes.
25    Q.   Okay.  And is that a characteristic

Page 183

1  of a bona fide loan, that --
2          MR. MORRIS:  Objection to the
3    form of the question.
4          (Technical disruption.)
5    Q.   -- later, but as long as that
6  hasn't happened, interest payments should be
7  made, and if it's a --
8          MR. RUKAVINA:  We lost you,
9    Deborah.  Deborah, we lost you.
10         MS. DEITSCH-PEREZ:  Can you --
11    did you hear me?
12         MR. RUKAVINA:  No.
13         MS. DEITSCH-PEREZ:  Okay.  I'll,
14    I'll -- I'll start over then.
15    Q.   In your experience, is it a
16  characteristic of a bona fide loan, whether
17  demand or a term loan, that until it is
18  actually forgiven -- until and unless it is
19  forgiven, that annual interest payments
20  should be made on a demand loan, and whatever
21  is due pursuant to the terms of the note on
22  the term loan should also be made annually?
23         MR. MORRIS:  Objection to the
24    form of the question.


Page 184

1                J. Seery
2    A.   I -- I think that's a
3  characteristic of a bona fide loan, but I
4  think that you can have an accruing loan that
5  doesn't have those payments that is also a
6  bona fide loan.  And so I -- I do think these
7  are bona fide loans.  The money was given, a
8  note was signed, the amounts are owed.
9    Q.   And do you have a reason to believe
10  that if it was in Mr. Dondero's power to
11  attempt to have these loans subject to a
12  condition under which there would be
13  forgiveness of the loan, is that something
14  that is -- that surprises you?
15         MR. MORRIS:  Objection to the
16    form of the question.
17    A.   It -- it shocks me.
18    Q.   So you don't think that if
19  Mr. Dondero had the opportunity to -- to have
20  contingent compensation rather than
21  compensation in 2017, 2018 or '19, but move
22  it out into the future, it surprises you
23  that -- that he would want to do that?
24         MR. MORRIS:  Objection to the
25    form of the question.

Page 185

1                J. Seery
2    A.   Can -- can you read that question
3  back --
4         (Simultaneous speaking.)
5    A.   -- I didn't understand it.
6         MS. DEITSCH-PEREZ:  The court
7    reporter can read it back.
8         (As read by the reporter):
9       "QUESTION:  So you don't think
10    that if Mr. Dondero had the opportunity
11    to have contingent compensation rather
12    than compensation in 2017, 2018 or '19,
13    but move it out into the future, it
14    surprises you that -- that he would
15    want to do that?"
16         MR. MORRIS:  Objection to the
17    form of the question.
18    A.   I -- I don't see any evidence
19  whatsoever that that's what he did.  And in
20  fact, the way the business was run and the
21  monies he took out from various different
22  places connected to the business shows that
23  that wasn't the case.
24 MO*     MS. DEITSCH-PEREZ:  Move to strike
25    because you didn't answer --

Page 186

J. Seery

1      J. Seery
2    MR. MORRIS:  And, and -- and I --
3  and I object, you asked him if -- I
4  just -- I, I --
5    MS. DEITSCH-PEREZ:  Well, John --
6    MR. MORRIS:  -- it's not -- the
7  judge will rule.
8    Go ahead.
9 BY MS. DEITSCH-PEREZ:
10  Q. You've heard of -- Highland has
11 interests in Cornerstone, Trussway and MGM,
12 that's correct?
13    MR. MORRIS:  Objection to the
14  form of the question.
15  A. You should be precise.  Highland
16 owns certain equity interests in Cornerstone,
17 approximately 4 percent.  Highland owns,
18 indirectly, all of the interests -- almost
19 all of the interests in Trussway.  Highland
20 owns a small piece of MGM.
21  Q. Okay.  And have you made any
22 inquiry into whether employees at Highland
23 referred to these colloquially as portfolio
24 companies?
25  A. I --

Page 187

J. Seery

1      J. Seery
2    MR. MORRIS:  Object --
3  A. I -- I know that cornerstone is
4 sometimes referred to as a portfolio company.
5 I know that Trussway is referred to as a
6 portfolio company.
7    It would be -- I've never heard
8 anyone refer to as -- MGM as a portfolio
9 company.
10  Q. Have you ever made an inquiry as to
11 whether sometimes it was colloquially called
12 a portfolio company?
13  A. I -- I haven't made an inquiry as
14 to it, no.  I've been around the business for
15 a year-and-a-half, nineteen months.
16  Q. Have you ever heard Mr. Dondero
17 refer to MGM as one of the portfolio
18 companies?
19  A. No, I haven't.  It would be very
20 odd if he would.
21  Q. When you -- in the early days, when
22 you communicated with Mr. Dondero about the
23 prospects for the assets at Highland, did he
24 appear to have high hopes for the
25 monetization and increase in value of

Page 188

J. Seery

1      J. Seery
2 Cornerstone, Trussway and MGM?
3    MR. MORRIS:  Objection to the
4  form of the question.
5  A. I don't recall him ever talking to
6 me very much about Cornerstone and potential
7 upside or Trussway.
8    He did have high hopes, or
9 expressed high hopes, of upside value in MGM.
10 But at the same time, he sold 1.7 million
11 shares after the filing for 7250.  So that
12 sort of belied that optimism, but he
13 expressed some optimism that MGM would have
14 upside.  And of course he sat on the board,
15 so he'd have some insight into it.
16  Q. And it looks like, hopefully, he
17 was right to -- in that optimism?
18    MR. MORRIS:  Objection to the
19  form of the question.
20  Q. Is that right?
21  A. We'll find out.
22  Q. So far it appears that his optimism
23 may be justified; is that right?
24  A. There's -- there's a transaction.
25 It's subject to approval and closure.

Page 189

J. Seery

1      J. Seery
2  Q. Okay.
3  A. Certainly hope so.
4  Q. If in fact all three of those
5 companies, MGM -- or Highland's interest in
6 those three companies are successfully
7 monetized, will the assets of Highland exceed
8 its liabilities?
9    MR. MORRIS:  Objection to the
10  form of the question.
11  A. Extremely unlikely.
12  Q. Possible though?
13    MR. MORRIS:  Objection to the
14  form of the question.
15  Q. In your educated opinion --
16  (Simultaneous speaking.)
17  A. Can I -- can I answer your
18 question --
19  Q. Yes.
20  A. -- unless "possible though" is just
21 a quip, because then I won't answer it.
22  Q. No --
23  A. Is that a question?
24  Q. -- it's not a quip --
25  A. Oh, okay.

Page 190

J. Seery

2  Q.  -- it is a question.
3  A.  It's -- we know what the -- at
4  least now what the potential upside is to
5  MGM.  We don't know what the upside is for
6  Cornerstone or Trussway, but we understand
7  the performance of the companies and the
8  framework with which somebody would value
9  them.
10  So it would be extremely unlikely,
11  not impossible but extremely unlikely, for
12  those two companies - with MGM capped - to
13  have a performance that exceeded the total
14  amount of claims.
15  Q.  How close a matter is it?
16  MR. MORRIS:  Objection --
17  (Simultaneous speaking and
18  reporter interjection.)
19  Q.  How -- how close -- how close --
20  let me -- let me strike that and start again.
21  What would MGM, Trussway and
22  Cornerstone need to be monetized for in order
23  for the overall assets of Highland to exceed
24  its liabilities?
25  MR. MORRIS:  Objection to the

Page 191

J. Seery

2  form of the question.
3  A.  I'm not in a position to answer
4  that, but all of the assets minus the
5  expenses to get there would need to exceed
6  $400 million.
7  Q.  And right now, what do you think
8  the assets are worth?
9  MR. MORRIS:  Objection to the
10  form of the question.
11  A.  Again, I don't -- I know what MGM
12  is potentially worth, but it's hard to -- I
13  can't count that until it's done.
14  Q.  I know but --
15  (Simultaneous speaking.)
16  MR. MORRIS:  Let him finish,
17  please let him finish.
18  A.  You don't -- can't count that until
19  it's done.  And then the other -- the other
20  businesses we have to put through a process,
21  to see what they're worth.  And they're,
22  they're, they're -- they've got potential
23  upside but they have challenges as well.
24  Q.  Okay.  Assuming you are as
25  successful as you hope to be, and crediting

Page 192

J. Seery

2  for the moment the potential value of the MGM
3  transaction, what do you think the assets of
4  Highland are likely to be worth?
5  MR. MORRIS:  Objection to the
6  form of the question.
7  A.  I -- I don't know.  Part of it
8  depends on -- again, it's the costs.  It's
9  collection of $63 million notes in these
10  litigations, and then it's the ultimate value
11  of those assets.
12  But I would hope that we would be
13  very successful in the asset monetization,
14  where we would be able to get at lease
15  $300 million with those -- those assets and
16  others.
17  Q.  Do you think that if you're as
18  successful as you hope to be, that the assets
19  will be worth more than 400 million net of
20  the collection costs?
21  A.  I --
22  MR. MORRIS:  Objection to the
23  form of the question.
24  A.  I believe I already said I believe
25  that's unlikely, but I'm an optimistic

Page 193

J. Seery

2  fellow.
3  Q.  So then you hope it is likely?
4  A.  I certainly hope so.
5  And, again, that -- that hope
6  counts on $63 million of note collections
7  that I do expect to collect.
8  MR. MORRIS:  Deborah?
9  MS. DEITSCH-PEREZ:  Yes.
10  MR. MORRIS:  I apologize for
11  interrupting, but sometime between now
12  and 6:00 I'm going to have to take
13  about a ten or a twelve-minute break.
14  I have no idea how much you have.
15  If you're going to finish in twenty
16  minutes, then let's do that.  If you're
17  going to take more than an hour, I
18  just -- just please stop at some point
19  by, you know, 5:30, 5:35, so I can take
20  that break.
21  I just have to attend to something
22  that -- it won't take too long, but I
23  just wanted to let you know that so you
24  weren't surprised.
25  MS. DEITSCH-PEREZ:  Okay.  If

Page 194

```
 1                    J. Seery
 2     you're okay, let me do one more segment
 3     and then I'll let you -- I'll excuse
 4     you to -- to do your errands and we'll
 5     come back?
 6             MR. MORRIS:  Sure.
 7             (Brief off-record discussion.)
 8             MS. DEITSCH-PEREZ:  He needs --
 9     he needs his ten or twelve minutes
10     before 6:00 --
11             THE WITNESS:  Got it, got it.
12             MS. DEITSCH-PEREZ:  -- is that
13     right?
14             MR. MORRIS:  Yep.
15     BY MS. DEITSCH-PEREZ:
16        Q.    Okay.  When Mr. Rukavina was
17     questioning you, he was questioning you about
18     the nonpayment of the NexPoint Advisors loan.
19     Remember that?
20             And you -- were you only talking
21     about NexPoint, that -- that loan not the
22     HCMS term loan and not the HCRE term loan?
23        A.    He was only asking me about the
24     NexPoint, as I understood it.
25        Q.    Okay.  So let me ask you, are you
```

Page 195

```
 1                    J. Seery
 2     aware that there were what -- at issue in
 3     these litigations, a term loan between
 4     Highland and HCMS?
 5        A.    Yes.
 6        Q.    And a term loan between Highland
 7     and HCRE?
 8        A.    Yes.
 9        Q.    Okay.  And when was the last
10     payment due on the HCMS term loan and the
11     HCRE term loan?
12             MR. MORRIS:  Objection to the
13     form of the question.
14        A.    I -- I don't recall exactly.  I
15     thought they were -- they were all in and
16     around the same time.  If they weren't the
17     31st, they were right there.
18        Q.    All right.  And were the annual
19     payments for the HCMS and HCRE term loans
20     made by December 31, 2020?
21        A.    They were not.
22        Q.    And were the annual -- and was a
23     payment made on each of those loans in
24     January of 2021?
25        A.    I believe a payment was made after
```

Page 196

```
 1                    J. Seery
 2     they were accelerated for each of those
 3     loans, similar to the situation with the NPA
 4     loan.
 5        Q.    Let me show you - hang on, let me
 6     pull it up - what I have marked as -- I
 7     marked it as exhibit -- premarked it as
 8     Exhibit 111, just to make sure I cleared
 9     Mr. Rukavina's exhibits.  But it's an
10     arbitrary number, we're not missing 100-odd
11     exhibits.
12             Okay.  Can you see the exhibit?
13             And I did email it to Mr. Morris
14     prior to the deposition.  Do you have it
15     there?
16             MR. MORRIS:  No, I didn't see
17     your email.
18        A.    I see it on the screen.
19        Q.    Okay.  You have them in your email.
20     If there are any of them that you need to
21     break for a moment and have the exhibits
22     printed so that you can look at the whole
23     thing, please let me know and we can stop,
24     okay?
25             So have you seen what I've marked
```

Page 197

```
 1                    J. Seery
 2     as Exhibit 111 before?
 3        A.    I believe I have.
 4        Q.    Okay.  And did you cause the letter
 5     to be sent out?
 6        A.    I did, yes.
 7        Q.    And did you write the letter?
 8        A.    I don't believe I wrote it.  I
 9     would have marked it up to some degree.
10        Q.    Who wrote Exhibit 111, which is the
11     letter to Mr. Dondero from you, dated
12     January 7, entitled "Demand on Promissory
13     Note"?
14             MR. MORRIS:  Objection to the
15     form of the question.
16        A.    My counsel.
17        Q.    Okay.  Do you know in particular
18     who wrote it?
19  DI*          MR. MORRIS:  I'm going to direct
20     the witness not to answer.
21             MS. DEITSCH-PEREZ:  Just he can
22     answer that, whether he knows who wrote
23     it?
24             MR. MORRIS:  Sure, he can answer
25     that question.
```

Page 198

J. Seery

1
2     A.     Yes, I know.
3     Q.     Okay.  And can you tell me who
4 wrote it?
5            MR. MORRIS:  No.
6     Q.     And that's because your counsel has
7 directed you not to answer --
8            MR. MORRIS:  That's right.
9     Q.     -- or because you don't know?
10           MR. MORRIS:  It's because I'm
11    directing him not to answer.  We're not
12    going to even find out whether he knows
13    or not because it's privileged.
14    Q.     Okay.  Is this the only letter that
15 you caused to be sent to Highland Capital
16 Management Services with regard to the term
17 loan in the original principal amount of
18 20,247,628?
19    A.     I don't recall.  I would expect
20 there to have been a follow-up letter as
21 well, but I don't recall specifically.
22           Perhaps you have it.
23    Q.     I do not.  That's why I'm asking, I
24 don't see a letter like the one that we saw
25 earlier that was to NexPoint.

Page 199

J. Seery

1
2     A.     I don't recall specifically; I
3 would have to look.  If we had it, we would
4 have produced it.
5     Q.     Okay.  And if you had it, would you
6 also have attached it to the complaint --
7            MR. MORRIS:  Objection to the
8     form --
9     Q.     -- the way the NexPoint letter was
10 attached to the complaint?
11           MR. MORRIS:  Objection to the
12    form of the question.
13    A.     I -- I don't know if we would have
14 or not.  I think the demand is sufficient on
15 its own.
16    Q.     Other than the possibility that
17 there was a -- let me back up.
18           Was there a payment made in January
19 on the HCMS term loan?
20    A.     I thought there was, but I don't
21 recall specifically.  I'd have to look at
22 the -- it would be in the complaint, I would
23 think.
24    Q.     Okay.  And if the complaint says
25 there was, then there -- then that would be

Page 200

J. Seery

1
2 the case?
3     A.     If there was, it would have --
4 similar to the NPA, it would have been
5 applied on account.
6     Q.     Other than the letter that's been
7 marked as Exhibit 111, did you have any
8 communications with anyone at Highland
9 Capital Management Services about the note or
10 the payment or the nonpayment other than this
11 possible post-payment letter and the -- that
12 was similar to the NexPoint one that we
13 looked at earlier?
14           MR. MORRIS:  Objection to the
15    form of the question.
16    A.     I would only have communicated
17 through the demands.
18    Q.     Okay.  So just to make it very
19 clear, did you talk with Mr. Dondero about
20 the HCMS note payment, nonpayment or status
21 of the -- of the demand?
22    A.     No.
23    Q.     And did you talk with
24 Mr. Waterhouse about the note, the payment,
25 the nonpayment or the status of the demand?

Page 201

J. Seery

1
2     A.     Not that I recall.
3     Q.     Okay.  What about Ms. Hendrix and
4 Mr. Klos; did you talk with either of them
5 about the note, the nonpayment, the payment
6 or the status of the -- of -- of the loan?
7     A.     Do you mean at the time this demand
8 note was sent?
9     Q.     Yes, in -- in December of 2020 or
10 January/February of 2021, that time frame.
11    A.     Not that I recall specifically, no.
12    Q.     And was it your understanding that
13 Highland provided shared services to Highland
14 Capital Management Services?
15           MR. MORRIS:  Objection to the
16    form of the question.
17    A.     It did not have a shared service
18 arrangement --
19    Q.     That wasn't -- wasn't my question.
20    A.     I'm answering your question .
21           But lots of free services were
22 given to lots of Dondero entities by lots of
23 Highland employees, who were never paid, over
24 the years.
25    Q.     Was it your understanding that

J. Seery

1  J. Seery
2  Highland provided shared services to Highland
3  Capital Management Services?
4      A.   No.
5          MR. MORRIS:  Objection to the
6      form --
7      A.   Sorry.
8          MR. MORRIS:  -- of the question.
9      A.   No, shared -- shared services refer
10  to a specific agreement.  There was no --
11  there was no agreement or other arrangement.
12          Highland employees did things
13  wherever Dondero asked them to do.
14      Q.   I, I -- I assume, when you say
15  there was no agreement, you're talking about
16  no formal written agreement like the one
17  we've looked at for NexPoint earlier today --
18          MR. MORRIS:  Objection to --
19      Q.   -- is that what you're referring
20  to?
21          MR. MORRIS:  Objection to the
22      form of the question.
23      A.   No, I'm referring to any type of
24  agreement.
25          You, you -- you refer to these

1  J. Seery
2  companies as if they're standalone operating
3  entities that actually do things.  These are
4  entries on paper that move money around.
5          So when Dondero asks an employee to
6  do work on behalf of himself, whether that's
7  closing his own house loans, whether that's
8  coming over and doing work at his house or
9  whether it's working for Highland Capital
10  Management Services, they -- they did it and
11  Highland was not compensated.
12      Q.   Have you -- have you investigated
13  whether there was effective compensation for
14  the services that Highland provided to
15  Highland Capital Management Services?
16          MR. MORRIS:  Objection to the
17      form of the question.
18      A.   I -- I don't know what effective
19  compensation means, but I have investigated
20  whether Highland Capital Management received
21  anything from HCM Services.
22      Q.   And who did you ask?
23      A.   It's been part of the ongoing
24  review of the business throughout the second
25  half of this case and into the spring of this

1  J. Seery
2  year.
3      Q.   And did you determine, in the
4  course of that investigation, that there was
5  a pattern and practice of Highland providing
6  services like the ones in the NexPoint shared
7  services agreement to Highland Capital
8  Management Services?
9      A.   I think you asked me if we got some
10  sort of -- I think you said either indirect
11  or some other form of compensation.
12          The answer was no.  There were
13  things that Highland employees did at
14  different times at Mr. Dondero's directions
15  for these various entities, none of which
16  were paid for.
17      Q.   Was it generally the case that
18  Highland provided the back office services
19  for Highland Capital Management Services,
20  such as bill paying?
21      A.   Sometimes.  I don't know that it
22  was generally the case.  It depended.  And
23  Highland Capital --
24          (Simultaneous speaking.)
25      A.   -- and Highland Capital Management

1  J. Seery
2  Services really just owned certain things and
3  took money out of Highland.
4          The fact of the matter is, Highland
5  Capital Services' main business is that it
6  gives money to Jim Dondero.  I think he owes
7  around a hundred million to services.
8  MO*     MS. DEITSCH-PEREZ:  Move to
9      strike.  That wasn't my question.
10      Q.   I asked you whether or not you
11  noticed, in the course of your various
12  investigations, that Highland Capital
13  Management provided back office services like
14  bill paying for cap -- for Highland Capital
15  Management Services?
16      A.   I --
17          MR. MORRIS:  Objection to the
18      form of the question.
19      A.   And I -- and I answered that I
20  don't think you can think of this company --
21  this entity - or company, Highland Capital
22  Services Inc. - in that manner.
23          It didn't -- it didn't have, for
24  example, advisory services that anybody there
25  was performing for third parties like NPA.

Page 206

```
 1                J. Seery
 2  So there wasn't doing work for a fund, et
 3  cetera, so I don't -- there were certain
 4  things that were done.  Whether they were ad
 5  hoc or specific, I didn't see any true
 6  pattern that this was similar to an agreement
 7  where third -- true third-party services were
 8  being continually performed.
 9      Q.    Did Highland Capital Management
10  Services have employees that you knew of?
11      A.    No.
12      Q.    Okay.  So if it wanted to pay a
13  bill, it was using employees at Highland
14  Capital Management to do that, correct?
15      A.    If it had a bill, yeah.
16      Q.    Okay.  And in fact, did -- did
17  Highland Capital Management charge Highland
18  Capital Management Services for shared
19  services?
20      A.    I don't believe so.
21      MS. DEITSCH-PEREZ:  Let me show
22  you another document that I'll -- has
23  been premarked as Exhibit 110.
24      MR. MORRIS:  Are we going to be
25  able to take that break shortly?
```

Page 207

```
 1                J. Seery
 2      MS. DEITSCH-PEREZ:  If you want
 3  to take it now, that's fine.
 4      MR. MORRIS:  Yeah, I would
 5  appreciate it.
 6      MS. DEITSCH-PEREZ:  Well,
 7  actually, why don't -- if you don't
 8  mind, let me just finish 110.
 9      MR. MORRIS:  Okay.
10      MS. DEITSCH-PEREZ:  I think that
11  will be pretty quick and then --
12      MR. MORRIS:  Okay.
13      MS. DEITSCH-PEREZ:  -- then we
14  can break.
15      Is that all right?
16      MR. MORRIS:  Sure.
17  BY MS. DEITSCH-PEREZ:
18      Q.    Okay.  Okay.  Can you see Exhibit
19  110?
20      A.    I can, yes.
21      Q.    Okay.  And I'm going to scroll down
22  because what I'm going to ask you about is
23  the email from Fred Caruso to Brian Collins,
24  JP Sevilla, Frank Waterhouse, Dave Klos, with
25  a copy to you.
```

Page 208

```
 1                J. Seery
 2      Do you recall Exhibit 110?
 3      A.    Not specifically, no.
 4      Q.    Do you generally -- well, first,
 5  who's Fred Caruso?
 6      A.    He is a partner at DSI.
 7      Q.    Okay.  And were Brian -- and who
 8  are Brian Collins, JP Sevilla -- the other --
 9  the others we've spoken about.
10      So who are Collins and Sevilla?
11      A.    Brian Collins -- at this time
12  Collins, I believe, was still head of HR at
13  HCMLP and Sevilla was a counsel at HCMLP, but
14  they were really working for the transition,
15  which I don't know if it had a name at that
16  point, whether it was Highgate or Skyview.
17      But that's what they were working
18  on, and this had to do with transition of the
19  business, the service part of the business,
20  from Highland to other entities.
21      Q.    But am I correct that this is a
22  demand from HCMLP to the companies listed in
23  Exhibit 110 for money?
24      A.    It looks to be that, yes.
25      Q.    Okay.  And the email says there are
```

Page 209

```
 1                J. Seery
 2  outstanding fees and cost reimbursements.
 3      What kind of fees were these?
 4      A.    I believe some of these were fees
 5  related to shared services and others were
 6  reimbursements for costs.
 7      Q.    Okay.  And do you see that there is
 8  a line item for HCM Services and a -- the
 9  amount 116,531 is listed?
10      A.    Yes.
11      Q.    And so was that HCMLP demanding
12  money from HCM Services for services that
13  HCMLP had provided to HCM Services?
14      A.    I don't --
15      MR. MORRIS:  Objection to the
16  form of the question.
17      A.    I don't think so.
18      Q.    Why not?
19      A.    I think it's for cost
20  reimbursement.
21      Q.    What, what cost was -- was it
22  seeking to be reimbursed for?
23      A.    I -- I don't recall.  This is not
24  a -- something I recall specifically.
25      Q.    But in any event, this Exhibit 110
```

Page 210

J. Seery

2 confirms that HCMLP was either providing
3 services or advancing costs for HCM Services
4 and then billing HCM Services?
5      THE WITNESS:  Objection to the
6   form of the question.
7   A.   I -- I believe it was the latter.
8   Q.   Can you exclude the possibility
9 that this was an instance of HCMLP billing
10 HCM Services for services performed by HCMLP?
11   A.   Well, there was no agreement, so I
12 don't know the basis of it, but we could look
13 for it.  I don't -- I don't think that's the
14 case.
15   Q.   Do you know whether or not there
16 was an oral agreement with respect to HCM
17 providing services to HCM Services?
18   A.   Not that I ever heard of.
19   Q.   Did you ever specifically make an
20 inquiry --
21   A.   I, I have made --
22      (Simultaneous speaking.)
23   A.   You're not finished?  I'm sorry.
24   Q.   You can -- you can answer.
25   A.   I, I have --

Page 211

J. Seery

2   Q.   I take it you got the gist.
3   A.   I have made inquiry regarding
4 whether there was any arrangement for -- to
5 provide services and pay back for those
6 services, and I was told there wasn't.
7   Q.   Who did you make --
8   A.   That's my recollection.
9   Q.   Who did you -- who did you make an
10 inquiry to?
11   A.   Our -- our accounting team.
12   Q.   And any -- which people?
13   A.   That would be Waterhouse and Klos
14 and Hendrix.
15      It's not a specific inquiry that I
16 made.  There was -- this was over the time
17 during the case.
18   Q.   You actually have a specific
19 recollection of speaking to any of the people
20 that you just listed, like to Surgent, Klos
21 and --
22   A.   I didn't mention Surgent.
23   Q.   Okay.  Klos, Hendrix and
24 Waterhouse?
25   A.   Yes.

Page 212

J. Seery

2   Q.   Okay.  Do you have a specific
3 recollection of asking any or -- any of them
4 whether there was an unwritten agreement
5 between HCM and HCM Services for HCM to
6 provide shared services, back office
7 services, to HCM Services?
8   A.   No, I never would have asked that
9 question.
10   Q.   Did -- do you have a specific
11 recollection of what question you did ask?
12   A.   Yes.
13   Q.   What was it?
14   A.   Do we have a shared services
15 agreement.
16   Q.   Did you make it clear that you were
17 asking for a written or unwritten agreement?
18   A.   No.  As I said, if I asked if there
19 was an agreement, I would have assumed it was
20 a formal written agreement because that's the
21 way the business was run.
22      And I didn't ask if there was some
23 unwritten, secret, hidden or not so secret
24 but not shared with anybody agreement.  I
25 don't -- it's not something I inquired about.

Page 213

J. Seery

2   Q.   Did you ask whether there was an
3 agreement caused by a pattern and practice of
4 conduct?
5   A.   No.
6      MR. MORRIS:  Hey, Deborah, I'd
7   really like to take that break now.
8   That's why I started giving a --
9      MS. DEITSCH-PEREZ:  Okay.
10      MR. MORRIS:  -- a warning quite
11   some time ago.
12      Thank you.
13      MS. DEITSCH-PEREZ:  Okay, okay.
14      MR. MORRIS:  Yep, let -- let's
15   come back --
16      VIDEO TECHNICIAN:  The time is
17   5:37.  We're going off the record.
18      (Recess taken.)
19      VIDEO TECHNICIAN:  The time is
20   5:58.  We're back on the record.
21 BY MS. DEITSCH-PEREZ:
22   Q.   Mr. Seery, I'm showing you what's
23 been premarked as Exhibit 112.  I don't know
24 if you have it there, but if not, let me
25 scroll through it.

J. Seery

2 Have you seen it before?

3 A. It -- it looks familiar, yes.

4 Q. Okay. This is a letter dated

5 January 7, from you to Mr. Dondero at HCR --

6 HCRE Partners.

7 Did you cause this letter to be

8 sent?

9 A. Yes.

10 Q. And like Exhibit 1 -- I think 111,

11 was this written by your counsel?

12 A. It -- it certainly had my counsel's

13 input and my input, so how --

14 Q. Okay.

15 A. -- I probably got a base and marked

16 it up, and they finished it.

17 Q. Okay. And --

18 A. Same as the other.

19 Q. Okay. And was there any

20 communication, other than Exhibit 112,

21 between you and HCRE Partners about the HCRE

22 term loan?

23 A. No.

24 Q. Do you know whether -- was there a

25 payment due on the HCRE term loan, in your

J. Seery

2 view, by December 31, 2020?

3 A. I believe there was, yes.

4 Q. And was it made?

5 A. No.

6 Q. And was the payment made in January

7 of 2021?

8 A. A payment was made in January of

9 2021 on account that -- the full amount that

10 was demanded.

11 Q. Well, when high -- when HCM

12 received the payment from HCRE Partners, who

13 facilitated the -- the making of the payment,

14 as far as you know?

15 A. I don't know.

16 Q. Do you know if anyone from Highland

17 Capital Management was involved in the making

18 of HCRE's payment to HCM?

19 A. I don't know.

20 Q. Do you know whether HCRE had

21 employees?

22 A. I don't believe it did.

23 Q. And so was it your understanding,

24 generally, that HCM employees provided

25 services like paying bills for HCRE Partners?

J. Seery

2 MR. MORRIS: Objection to the

3 form of the question.

4 A. It was similar to HCM Services, but

5 that doesn't mean they were the only people

6 to do anything for HCRE; I just don't know.

7 Q. Well, when HCM received the

8 payments in January of 2021 from HCRE and HCM

9 Services, was there any communication that

10 these payments were being made to pay down

11 the term loan generally as opposed to -- to

12 making the payment otherwise to be made on

13 December 31, 2020?

14 MR. MORRIS: Objection to the

15 form of the question.

16 A. I -- I'm not sure I understand your

17 question, but I -- I don't recall any

18 specific communication. Certainly if there

19 was a payment made, we would have applied it

20 on the total balance due, as you described.

21 Q. But did anyone on behalf of the

22 HCRE or HCMS communicate that the payments

23 were to be applied to the total balance due

24 as opposed to fulfilling the payment that

25 otherwise was typically made at the end of

J. Seery

2 the -- of the year?

3 MR. MORRIS: Objection to the

4 form of the question.

5 A. Again, I -- I don't think I

6 understand your question, but I don't know if

7 there was any communication at all. I just

8 don't recall.

9 Q. You don't recall one?

10 A. No.

11 Q. Did you look, in the course of

12 responding to the discovery, at the -- what

13 the -- the means by which HCM received the

14 payments from HCRE and HCMS?

15 MR. MORRIS: Objection to the

16 form of the question.

17 A. I -- I believe I did. I certainly

18 looked at the total payments that came in

19 from various entities and how we applied

20 them, but I don't recall any specifics around

21 communication.

22 Q. Well, did you look for the wire

23 transfer information?

24 MR. MORRIS: Objection to the

25 form of the question.

Page 218

J. Seery

1   A.   I, I --
2   Q.   Was there -- let me rephrase.
3        Was -- did the payments come in by
4   wire?
5   A.   I don't recall.
6   Q.   Did you look for any communication
7   that would accompany the payment?
8        For example, a check can have a
9   note on the note line, a wire can have a note
10  on the re line, an ACH payment can have a
11  note on a re line.  Did you attempt, in
12  responding to the discovery in these notes
13  cases, to find any such communications?
14       MR. MORRIS:  Objection to the
15  form of the question.
16  A.   I'm relatively certain it didn't
17  come in as a check, because I would have
18  known that.  I just don't recall if it came
19  in by wire or ACH, and I didn't look for any
20  specific communication that accompanied the
21  wire or the ACH payment.
22  Q.   Okay.  And with respect to HCRE,
23  did you send a letter like the one we looked
24  at earlier for NexPoint, contending that the

Page 219

J. Seery

1   payment had been applied to the principal
2   balance as opposed to satisfying and curing
3   any default on the note?
4        MR. MORRIS:  Objection to the
5   form of the question.
6   A.   If -- if we did send it, it would
7   have been in the -- the production.  It
8   certainly would have -- there was no cure
9   provision in the notes, so we would have
10  applied it in the same way as we did the NPA
11  payment and the services payment.
12  Q.   If there are in fact no
13  post-payment letters for the HCRE term loan
14  and the HCMS term loan, was there a reason
15  for that?
16  A.   No, no reason if there are none.
17  They're not required.  The notes are very
18  clear with respect to the waiver of demand,
19  presentment.
20       So there's no requirement of it.  I
21  thought there would be, that I would have
22  sent it, but I don't -- don't recall
23  specifically.
24  Q.   Did anyone on behalf of HCRE ever

Page 220

J. Seery

1   communicate an acknowledgment or acceptance
2   that the loan was in default and that the
3   payment would be applied to the principal --
4   to the balance?
5   A.   Other than the terms of the note,
6   no.
7   Q.   And do you have an understanding of
8   why -- strike that.
9        Do you have an understanding, based
10  on personal knowledge, of why the HCRE and
11  HCMS payments were not made in December of
12  2020?
13       MR. MORRIS:  Objection to the
14  form of the question.
15  A.   I -- I believe I do.
16  Q.   And what is that knowledge based
17  on?
18  A.   The same edict that we discussed
19  with Mr. Rukavina earlier in the day.
20  Q.   So tell me the actual words that
21  you contend Ms. Hendrix said to you that
22  caused you to believe whatever it is you
23  believe about what Mr. Dondero said.
24       MR. MORRIS:  Objection to the

Page 221

J. Seery

1   form of the question, and -- asked and
2   answered.
3   A.   I -- I don't recall the specific
4   words.
5   Q.   Now, at -- in -- and -- and you
6   don't recall when the words were sent to you
7   either; you can't say whether it was December
8   or January or some other time?
9        MR. MORRIS:  Objection to the
10  form of the question --
11  A.   No, I --
12       MR. MORRIS:  -- mischaracterizes
13  the testimony.
14  A.   -- I'm pretty clear that it -- I
15  learned of the action in December.
16       I may have learned of the words in
17  December.  It could have been in January, on
18  or about the time I sent the demand note.
19  But it wouldn't have been, as you phrased it,
20  some other time.
21  Q.   Now, in -- in or around December of
22  2020, you understood there was a dispute
23  between Mr. Dondero and -- and affiliated
24  companies and the debtor about whether the

Page 222

```
1                    J. Seery
2    affiliated companies had overpaid shared
3    service fees to Highland, correct?
4        A.     Absolutely not.
5        Q.     Are you not aware that Mr. Dondero
6    contended that NexPoint, for example, had
7    overpaid Highland by many millions of dollars
8    for shared service fees?
9        A.     I'm quite aware that Mr. Dondero
10   has fabricated a story as part of the
11   negotiations for a pot plan.  In fact, he
12   included it in one of the term sheets, to
13   fabricate a claim about additional services.
14       I'm also quite aware of other
15   evidence that shows that's not the case.
16       Q.     Let's take this in pieces.
17       How much did Mr. Dondero contend
18   shared services had been overpaid --
19       A.     I don't recall --
20       Q.     -- what amount?
21       A.     I don't recall the exact amount.
22       Q.     More than 10 million?
23       A.     I think he claimed 14, some number
24   like that, but it doesn't have any connection
25   to reality.
```

Page 223

```
1                    J. Seery
2        Q.     Mr. Seery, what did you do to
3    investigate whether or not there had been
4    overpayments of shared service fees by
5    NexPoint to Highland?
6        MR. MORRIS:  I'm just going to
7    caution the -- the questioner not to go
8    too far down this path.  These are
9    topics that are related to a completely
10   separate contested matter, actually --
11       (Simultaneous speaking.)
12       MR. MORRIS:  Okay.  So I just --
13   okay, that's fine.
14       MR. RUKAVINA:  Yeah, I'm not
15   trying to litigate that, it's --
16       MR. MORRIS:  Yep.
17       MS. DEITSCH-PEREZ:  -- it's
18   relevant to this whole incident that
19   Mr. Seery is --
20       MR. MORRIS:  I don't think so,
21   but --
22       MS. DEITSCH-PEREZ:  -- is --
23       MR. MORRIS:  -- but go ahead, I'm
24   not directing him not to answer.
25       MS. DEITSCH-PEREZ:  I -- I'm not
```

Page 224

```
1                    J. Seery
2        going to call him a liar like he's been
3        calling everybody else, so I'll be
4        polite about it, but it is relevant --
5        THE WITNESS:  Well, the reason
6        for that is because I don't lie, and I
7        just -- I just don't do it.  I don't
8        fabricate testimony.  So you can call
9        me whatever you like.  It doesn't
10       matter.  I -- I tell the truth.
11       I have a very good memory.  To the
12       extent I can't remember the specific
13       words of something from months ago, I --
14       I'm unable to remember those specific
15       words, but I have a pretty darn good
16       memory.
17   BY MS. DEITSCH-PEREZ:
18       Q.     Okay.  But -- but it would be in
19   your interest -- interest to -- to take
20   something that was said about a clear dispute
21   about the shared services payments and try to
22   apply it to some other payments, wouldn't it,
23   Mr. Seery?
24       A.     Not -- not in any way whatsoever.
25       Q.     Well, that's why I'm asking,
```

Page 225

```
1                    J. Seery
2    Mr. Seery.  You were aware of the dispute,
3    whether -- regardless of your belief as to
4    the bona fides of it, you were aware of an
5    actual dispute about whether NexPoint had
6    overpaid shared services fees, correct?
7        A.     I --
8        MR. MORRIS:  Objection to the
9        form of the question.
10       A.     I -- I would not concede that
11   there's a dispute, because there is no
12   legitimate disagreement among what was
13   performed and what was paid.
14       I will -- I will agree that
15   Mr. Dondero came up with a story, or we can
16   say a -- an idea, that NexPoint had somehow
17   overpaid for the services that it received.
18       Q.     Ms. -- Mr. Seery, I -- I understand
19   that you're -- you are anxious to be an
20   advocate for your side.  I'm asking you for
21   strictly factual testimony.
22       Was there a dispute, meaning one
23   side said one thing and the other side said
24   the other, about whether shared services fees
25   had been overpaid?
```

**App. 153**

Page 226

J. Seery

1           J. Seery
2       MR. MORRIS: Objection, asked and
3  answered.
4      A.  I -- I will concede that
5  Mr. Dondero claimed that shared services by
6  NexPoint were overpaid for.
7      Q.  Okay.  And will you also concede
8  that you disagreed with that?
9      A.  I don't need to concede that.  I do
10 disagree with that.
11     Q.  Okay.  Hence, we have a dispute,
12 okay.
13      MR. MORRIS: Objection to the
14   form of the question.
15     Q.  Mr. Seery, if you don't recall the
16 words that Ms. Hendrix said to you, how do
17 you know that whatever this edict was that
18 you have mentioned did not relate simply to
19 don't pay any more shared services because
20 they have been overpaid?
21      MR. MORRIS: Objection to the
22   form of the question, "ans" and
23   answered -- asked and answered.
24     A.  Again, I believe that it was
25 Ms. Hendrix.  It could have been Mr. Klos.

Page 227

J. Seery

1  Over time it could be both.  We've certainly
2  had discussions about it.  I believe that it
3  related to the shared services.  I believe it
4  also related to the notes, because the notes
5  weren't paid.
6      Q.  Okay.  And am I correct that the
7  only reason you believe it also applied to
8  the notes was because the notes weren't
9  paid --
10      MR. MORRIS: Objection --
11     Q.  -- not because of the words used?
12     A.  The -- the words were not limiting
13 to -- that I recall in any way.
14     Q.  Were the words -- did the words
15 specifically include don't pay the notes?
16     A.  I believe I testified that I don't
17 recall the specific words, so I can't --
18     Q.  Okay.
19     A.  -- say what the specific words
20 were.
21     Q.  And -- and, Mr. Seery, I recognize
22 that you're a smart guy and a cagey witness,
23 so you have said several times that the
24 reason you believe the edict applied to the

Page 228

J. Seery

1  notes was because they weren't paid.
2      And I'm just asking you to answer,
3  honestly, whether your belief that the edict
4  concerned the notes was simp -- happenstance
5  of what happened, not because of what was
6  said to you?
7       MR. MORRIS: Objection to the
8    form of the question, asked and
9    answered.
10     A.  The idea that you're calling me
11 cagey is -- is insulting and rude, so you
12 should please withdraw that.  No one's ever
13 called me cagey, and I always am honest.
14     I said very specifically to
15 Mr. Rukavina how I heard what I heard, how I
16 came to understand it.  I don't recall the
17 specific words or the exact time.  It is
18 clear what the facts are and what happened,
19 so that supports my interpretation of what I
20 heard and my recollection of it.
21     Q.  You -- you can't admit, as you sit
22 here today, you're not sure whether or not
23 the edict concerned the notes?
24     A.  I didn't hear the edict.  All I

Page 229

J. Seery

1  know is that we didn't get the shared service
2  payments and we didn't get the -- we didn't
3  get the -- the note payments, and I read
4  Mr. Waterhouse's testimony from two days ago,
5  which seemed to confirm everything I just
6  said.
7      So it -- I think it makes sense,
8  but I don't have a specific recollection of
9  what was told to me and I do recollect that
10 the shared service payments were not made,
11 but that was before the amounts on the notes
12 were due, so there wouldn't have been a
13 discussion about the notes.
14     Q.  Now, did you look at the payment
15 history on all of the term loan notes that --
16 that payments had been made prior to December
17 31, 2020 in excess of the amounts due, if
18 you -- if -- if the obligor was paying the
19 minimums for the number of years the notes
20 had been outstanding?
21     A.  Which -- which notes?
22     Q.  All of the note -- did you do that
23 exercise for all of the notes, all of the
24 term loan notes?

Page 230

J. Seery

2    MR. MORRIS: Objection to the
3    form of the question.
4    A.    We -- we looked at the payments on
5    each of the notes, yes.
6    Q.    And did you determine whether or
7    not the amounts paid in total prior to
8    December 31, 2020 exceeded the total amount
9    due of principal and interest on the minimum
10   principal and interest payments due on those
11   notes --
12        (Simultaneous speaking.)
13   A.    I --
14   Q.    -- outstanding?
15   A.    We certainly looked at that. I
16   don't believe that's the case for each of
17   them, but I don't have a specific
18   recollection of how they each balance out.
19   Q.    Did any of the loans have payments
20   that were made that, in total, exceeded the
21   total amount of minimum principal and
22   interest payments due on the loans for the
23   number of years they had been outstanding?
24   A.    One of them may have; I don't
25   recall. I don't recall specifically which

Page 231

J. Seery

1    one.
2    Q.    And were there documents that you
3    looked at in connection with that inquiry?
4    A.    There would be a payment ledger.
5    Q.    And have you produced that payment
6    ledger?
7    A.    Yes.
8        MR. MORRIS: Yes, we have.
9    Q.    Is there anyone from HCRE that you
10   contend -- and I apologize if I asked that,
11   because I'm -- I'm maybe mixing up HC -- HCMS
12   and HCRE.
13        But is there anyone from HCRE
14   that -- that acknowledged to you or said
15   something to you, admitting that the payment
16   that was made in January of 2021 was a
17   payment towards the overall principal and not
18   the payment that was due at the end of 2020?
19   A.    No, I don't believe I had
20   discussion with anybody who claimed to
21   represent HCRE; which, as you said, had no
22   employees.
23   Q.    Have you -- strike that.
24        Earlier I couldn't tell if it was

Page 232

J. Seery

1    Mr. Morris talking or you, and I apologize
2    for that, but somebody said something like
3    constructive fraud is not an issue in any of
4    the note cases and therefore, you know, we
5    shouldn't be looking at -- at solvency.
6        MR. MORRIS: That would have --
7        MS. DEITSCH-PEREZ: Was that you?
8        MR. MORRIS: -- that would --
9    that would have been me.
10        There is no claim for constructive
11   fraudulent transfer.
12   BY MS. DEITSCH-PEREZ:
13   Q.    And so let me ask Mr. Seery, as the
14   30(b)(6) witness for HCM, is it your position
15   that constructive fraud and therefore
16   solvency has no bearing on any of the note
17   cases?
18        MR. MORRIS: Objection to the
19   form of the question.
20   A.    With respect to these claims, I
21   think that the -- the allegations are pretty
22   clear that there is no agreement, there's no
23   subsequent agreement. That's nonsense. If
24   there is one --

Page 233

J. Seery

1    Q.    Mr. -- Mr. Seery --
2    A.    Well, I'm answering your question.
3        (Simultaneous speaking.)
4        MR. MORRIS: Please let him
5    finish.
6    A.    So when -- if, in some world, that
7    story is bought, then we think it's clearly
8    an actual fraud.
9  MO*      MS. DEITSCH-PEREZ: Move to
10   strike.
11   Q.    I'm asking a simple question,
12   Mr. Seery. As HCM's 30(b)(6) witness, do you
13   agree with the assertion of your counsel that
14   constructive fraud is not an issue, is not
15   something HCM is asserting in the note cases?
16   A.    That's correct.
17   Q.    Okay. And therefore, is it also
18   your position, as the 30(b)(6) witness for
19   HCM, that whether Highland was or was not
20   solvent at the time the notes were made or at
21   the time the forgiveness condition was agreed
22   upon, that the solvency of Highland is
23   irrelevant to those issues?
24        MR. MORRIS: Objection, it's not

Page 234

J. Seery

1
2 a 30(b)(6) topic, and I object to the
3 extent it calls for a legal conclusion.
4      MS. DEITSCH-PEREZ: I'm -- I'm
5 just -- can you read it back and have
6 the witness answer.
7      MR. MORRIS: Okay.
8      (As read by the reporter):
9      "QUESTION: And therefore, is it
10 also your position, as the 30(b)(6)
11 witness for HCM, that whether Highland
12 was or was not solvent at the time the
13 notes were made or at the time the
14 forgiveness condition was agreed upon,
15 that the solvency of Highland is
16 irrelevant to those issues?"
17      A.   I -- I don't think it's irrelevant.
18 It's not a precondition to a case for an
19 actual fraud.  But when these things are done
20 in the face of solve -- insolvency, when
21 they're -- when -- when the supposed
22 agreements are done on the eve or after
23 bankruptcy, that sure adds to the badges of
24 fraud.
25      MS. DEITSCH-PEREZ: Then, John,

Page 235

J. Seery

1
2 we -- we may have an issue about
3 picking up this deposition.  Let me --
4 let me ask another question.
5      Q.   Do you have a solvency analysis
6 done for these note cases?
7      A.   Not for these note cases, no.
8      Q.   And are you prepared to explain
9 right now, in this deposition, how -- what
10 Highland's solvency was at any of the time
11 periods, either when the notes were made or
12 when the alleged agreement regarding
13 forgiveness -- potential forgiveness of the
14 notes was entered into?
15      Are you prepared today to tell us
16 what you think about Highland's solvency and
17 why?
18      MR. MORRIS: Objection to the
19 form of the question.
20      A.   I -- I believe I already did, but I
21 can do it again, if you'd like.  Mr. Rukavina
22 asked me very specific questions about where
23 I thought solvency was, and I gave my very
24 specific answers.
25      Q.   For each -- for the dates of each

Page 236

J. Seery

1
2 of -- each of the notes and when the
3 forgiveness condition arose, what is your
4 answer as to whether Highland was solvent and
5 why?
6      MR. MORRIS: Objection to the
7 form of the question.
8      A.   There's -- there's about twelve
9 different dates in there, but why don't I
10 make it easy.
11      In '17, I think Highland was
12 insolvent.  Highland had significant exposure
13 to litigation claims that it had not properly
14 put on its balance sheet, and I think the
15 actions of the principals show that they
16 understood the risks with respect to those
17 claims.  And that's why you have a number of
18 actions, including taking money offshore,
19 including rolling out these notes thirty
20 years.  That's 2017.
21      '18 is similar, because the --
22 because the actions get more and more
23 developed and the claims against Highland get
24 bigger and bigger.
25      In '19 it comes crumbling down and

Page 237

J. Seery

1
2 Redeemer gets a very large arbitration award
3 that it's about to win and Highland files for
4 bankruptcy.
5      I don't -- the -- the idea that
6 there are these subsequent agreements, we
7 don't even agree that that exists.  We think
8 it's completely fabricated and false.  But to
9 the extent it incurred -- occurred during '17
10 '18, December/January.  '18, '19,
11 December/January.  '19, '20 after the
12 bankruptcy, yeah, I think that -- that pretty
13 much shows that they fall into insolvency.
14      Again, with an actual fraud, we
15 don't need it.  But it certainly helps with
16 the badges of fraud.
17      Q.   Is that your complete answer?
18      A.   To -- to your question, yes.
19      Q.   And do you have -- Highland has
20 made breach of fiduciary duty claims against
21 Dugaboy and then aiding and abetting claims
22 against Nancy Dondero and Jim Dondero?
23      A.   That's correct.
24      Q.   Can you tell me from whence those
25 fiduciary duties come?

Page 238

J. Seery

1
2    A.    Yes.
3    Q.    Where are -- where can we find
4    them?
5          MR. MORRIS:  Objection to the
6    form of the question.
7    A.    They're -- they're in the amended
8    complaint.
9    Q.    No, no, no, where -- where do the
10   duties come from?  What are the duties based
11   on?
12   A.    With respect to both Dugaboy and
13   Nancy Dondero, Nancy Dondero is the trustee
14   of Dugaboy.  Dugaboy was a limited partner.
15   Limited partners are not permitted to run the
16   affairs of the partnership.
17         She has testified that she made
18   agreements on behalf of Highland.  So she
19   stepped into the role of a general partner,
20   as did Dugaboy.  Her testimony was very clear
21   on these points, that she cut the agreements
22   on behalf of Highland.
23   Q.    Okay.  So it is -- are you saying
24   that it is the HCMLP partnership agreement
25   that gives rise to the fiduciary duties?

Page 239

J. Seery

1
2          MR. MORRIS:  Objection to the
3    form of the question, asked and
4    answered, mischaracterizes the
5    testimony.  It calls for a legal
6    conclusion.
7    A.    It -- it's -- in my opinion, it's
8    the law, and our position is it's the law,
9    that when a limited partner takes over the
10   operation and running of the partnership and
11   takes on those duties, they step into the
12   role of a general partner.
13         And that is the -- we don't believe
14   this agreement exists, but if it were to
15   somehow metastasize into something of an
16   agreement, then clearly we believe that it
17   breached the fiduciary duties that those
18   persons and entities who took on those duties
19   would have to the partnership.
20   Q.    Okay.  And I'm -- I'm just -- I'm
21   just trying to understand your testimony.
22         You're talking about duties under
23   the -- the HCM fourth amended limited
24   partnership agreement?
25         MR. MORRIS:  Objection to the

Page 240

J. Seery

1
2    form of the question, mischaracterizes
3    the testimony.
4    A.    The duties are under Delaware law
5    related to partnerships.
6    Q.    Yes.  And the partnership duties
7    that you're talking about are the HCMLP --
8    the fourth amended partnership agreement; is
9    that right?
10         MR. MORRIS:  Objection to the
11   form of the question, calls for a legal
12   conclusion.
13   A.    That's the partnership agreement,
14   yes.
15   Q.    Okay.  And you're not saying these
16   duties just arise out of the air?
17         MR. MORRIS:  Objection to the
18   form of the question, mischaracterizes
19   the testimony.
20   A.    I didn't say they arise out of the
21   air, no.
22   Q.    Okay.  I mean, you are the witness
23   designated to talk about these -- these
24   breach of fiduciary duty claims, correct?
25   A.    That is correct.

Page 241

J. Seery

1
2    Q.    Is there anything other than law,
3    generally, and the fourth amended limited
4    partnership agreement of Highland Capital
5    Management that gives rise to the duties that
6    you are contending Dugaboy breached and Nancy
7    Dondero and Jim Dondero allegedly aided in
8    the breaching of?
9          MR. MORRIS:  Objection, asked and
10   answered.
11   A.    There's also facts.
12   Q.    Okay.  And the, the facts -- the
13   fact that you said underlaid the claim was
14   their -- the supposed stepping into the shoes
15   of the general partner, is -- 
16         MR. MORRIS:  Objection to -- 
17   Q.    -- anything else?
18         MR. MORRIS:  Objection to the
19   form of the question, mischaracterizes
20   the testimony, asked and answered.
21   A.    Stepping into -- 
22   Q.    Mr. Seery, correct me if I'm wrong.
23   If there's some other fact that you are
24   pointing to, let me know.
25         MR. MORRIS:  Objection to the

Page 242

J. Seery

1  form of the question, asked and
2  answered.
3  A.   I -- I believe I gave a pretty
4  good, concise summary, but is there more that
5  you want to know?
6
7         When it -- our position is that
8  when a limited partner takes over the
9  management or any of the management roles of
10  the partnership and enters into an agreement
11  on behalf of the partnership, they stepped
12  into the general partner role.
13        When they're in the general partner
14  role they have fiduciary duties to the
15  partnership and all of the partners.  When
16  they breach those duties, which we argue is
17  the case if this supposed agreement were
18  actually something, then they should be
19  liable for the damages caused by those
20  breaches.
21  Q.   You've said, a couple times now, if
22  a limited partner steps in and manages the
23  partnership.
24        Can you tell me every way in which
25  you contend Dugaboy or Nancy Dondero as the

Page 243

J. Seery

1  trustee of Dugaboy took a management step?
2  A.   Nancy Dondero and Jim Dondero claim
3  that Nancy Dondero and Dugaboy entered into
4  an agreement on behalf of the partnership and
5  gave away 63 million -- or maybe that's the
6  total amount of the notes, but some 50
7  million-ish amount of notes for virtually
8  nothing - and in most instances could
9  actually be nothing - with no investigation,
10  no discussion, no analysis and really no
11  authority.
12        But they -- they assert that that
13  was the agreement.  And without any
14  consideration received by this entity,
15  nothing, they claim that they did this.
16        Now we don't -- we don't believe
17  this agreement exists, again, to be clear.
18  We think it's fabricated.  We think that
19  that's really beyond any kind of dispute.  We
20  think you all know that too, but we'll play
21  along.
22  Q.   Is there any other action that you
23  contend is management that you contend
24  Dugaboy or Nancy undertook with respect to

Page 244

J. Seery

1  Highland?
2  A.   No.  Taking control of the payment
3  to an affiliate of the general partner for no
4  consideration and claiming that you are able
5  to do that, we think that is sufficient.
6  MO*   MR. DEITSCH-PEREZ:  Move to
7        strike everything after "No."
8  Q.   Let me just get it clear.  There is
9  no other action, other than entering into
10  this agreement, that you contend is
11  management by Dugaboy or Nancy Dondero; is
12  that correct?
13  A.   No, that's not correct.  It's
14  everything around the supposed agreement.
15  So, so it -- it can't be cabined to just what
16  the supposed agreement is, it's all of the
17  other -- lack of -- of -- if it were a real
18  agreement, the lack of any sort of care, the
19  lack of any sort of loyalty, it all permeates
20  from this supposed agreement --
21        (Simultaneous speaking.)
22  A.   -- these folks haven't thought
23  through --
24        MR. MORRIS:  Just let him finish.

Page 245

J. Seery

1  A.   -- the full implications of what
2  they are arguing.
3  Q.   Okay.  Other than the things that
4  you have testified to in the last ten or
5  fifteen minutes, there are no other acts of
6  supposed management that you contend Dugaboy
7  or Nancy undertook that form the basis for
8  the breach of fiduciary duty claims, correct?
9        MR. MORRIS:  Objection to the
10        form of the question.
11  A.   I -- I think I've touched on all of
12  them.
13  Q.   Okay.  Thank you.  Okay.  I'm going
14  to show you what has been marked as --
15  premarked as Exhibit 109.
16        Is this a document that you have
17  seen before?
18  A.   I -- I believe I have, but you're
19  literally just showing me a slice of the
20  heading.
21  Q.   I know.  It's the -- it's the
22  Notice of Filing of Debtor's Amended
23  Schedules, and then annexed to it - let me
24  get to that - are the Global Notes and

Page 246

J. Seery

1
2    Statement of Limitations, Methods and
3    Disclaimers Regarding Debtor's Amended
4    Schedules of Assets and Liabilities.
5          Is that a document that you have
6    seen before?
7      A.    I -- I don't recall it
8    specifically.
9      Q.    Well, let me ask a different way.
10   In -- this was filed in September of 2020.
11         What was your role with respect to
12   filings of the debtor in September of 2020?
13     A.    Depending on the filing, I executed
14   many of them.  So if I executed this one,
15   please let me know.
16         I certainly was around and
17   consulted with respect to all the filings.  I
18   was the CEO of the company.
19         That's my signature, so I've seen
20   this.
21     Q.    Okay, okay.
22         (Simultaneous speaking.)
23     A.    I may not have seen the -- I don't
24   know if I -- I just don't recall the, the --
25   the piece at the top.

Page 247

J. Seery

1
2      Q.    Okay.  But, generally, if you
3    signed a declaration under penalty of perjury
4    for non-individual debtors that was then
5    annexed to a filing, you would have looked
6    through the filing and assured yourself that
7    it was correct, to the best of your knowledge
8    and belief?
9      A.    I would have either looked through
10   the filing or I would have reviewed it with
11   my team, whomever prepared it.
12     Q.    And so as you sit here today, do
13   you have any reason to believe that there are
14   inaccuracies in docket 1082?
15         MR. MORRIS:  Do you want to
16       give -- do you need to read the
17       document?
18     A.    I have no --
19     Q.    Yeah.  And I -- and I emailed it to
20   John, so if you want to sit down and take a
21   look at it, please --
22         (Simultaneous speaking.)
23     A.    No, I -- I don't need to review it.
24         No one's brought anything to my
25   attention.  I don't -- I have no reason to

Page 248

J. Seery

1
2    believe it wasn't accurate at the time.
3          MS. DEITSCH-PEREZ:  Okay.  Thank
4        you.
5          Okay.  Why don't we take a few
6        minutes and I'm going to have a look at
7        my notes and -- and I'll have a better
8        idea of how much longer I have then.
9          VIDEO TECHNICIAN:  The time is
10       6:36.  We're going off the record.
11         (Recess taken.)
12         VIDEO TECHNICIAN:  The time is
13       6:41.  We're back on the record.
14         MS. DEITSCH-PEREZ:  Okay.  Thank
15       you.
16         Thank you very much, Mr. Seery.
17       I'm going to pass back to whomever might
18       want to ask you anything more.
19         MR. RUKAVINA:  Well, I think
20       Mr. Horn is busy.  I have one more
21       question for you, Mr. Seery.
22         MR. HORN:  I -- I have no
23       questions, so I'll defer to Davor if he
24       has --
25         MR. RUKAVINA:  Thank you, thank

Page 249

J. Seery

1
2        you.
3    EXAMINATION
4    BY MR. RUKAVINA:
5      Q.    My only question was as follows:
6    When you were answering counsel's questions,
7    you mentioned something about a payment
8    ledger on the notes.
9          Do you recall that?
10     A.    Not a specific -- I would have
11   looked at a payment ledger.  I don't have
12   a -- I'm not thinking of one particular
13   payment ledger.
14         The one that -- that was one of the
15   exhibits --
16     Q.    That's where I'm going --
17     A.    -- is a type of payment ledger.
18         That one, it looks like it was --
19   that's actually the actual schedule of
20   payment, because it shows as if the payments
21   had made -- it doesn't show what's been made,
22   but it actually shows you the schedule of --
23   all the way to maturity, I believe, and so --
24     Q.    Well, here's -- here's where I'm
25   going with this.

Page 250

J. Seery

1
2    A.    Okay.
3    Q.    For the $30.7 million note, to the
4    best of your knowledge, did the debtor
5    maintain a payment ledger showing any
6    historical payments on that $30.7 million
7    note?
8    A.    Yes, we would have -- we would
9    have.
10    Q.    And to the best of your knowledge,
11    would that have been produced in this
12    litigation?
13    A.    Yes.
14    Q.    Okay.  To the best of your
15    knowledge, is Exhibit 7 that or is Exhibit 7
16    something else?
17    A.    I think Exhibit 7 is something
18    else.  It's just because I hadn't seen this
19    one.  It may be that this was -- I think
20    it's -- I think it's something else.
21 RQ*    MR. RUKAVINA:  Okay.  Mr. Morris,
22    I'll just ask the debtor, I've -- I've
23    asked and we only got this in PDF,
24    there's no metadata.
25    I would just ask if the debtor

Page 251

J. Seery

1
2    would be willing to please check to see
3    what the native of this Exhibit 7 is and
4    please send it to me, along with any
5    metadata.
6    MR. MORRIS:  Email that exhibit
7    to me --
8    MR. RUKAVINA:  I will.
9    MR. MORRIS:  -- and I'll be able
10    to do that, but I do know that if you
11    look -- I'm certain it was in one of
12    the supplemental productions.
13    MR. RUKAVINA:  Yes, we received
14    it recently.
15    MR. MORRIS:  Right.  So in one of
16    the supplemental productions I know
17    that we produced schedules showing all
18    payments made against all notes at
19    issue, and I think we even gave you the
20    backup with the bank statements, you
21    know, fully redacted -- yeah.
22    MR. MORRIS:  -- to show only the
23    payments --
24    MR. RUKAVINA:  Let's talk
25    offline --

Page 252

J. Seery

1
2    (Simultaneous speaking.)
3    MR. MORRIS:  -- you've got all of
4    that.
5    MR. RUKAVINA:  Let's talk
6    offline, because I'm not sure that I
7    agree we have that --
8    MR. MORRIS:  Yeah.
9    MR. RUKAVINA:  -- but if the
10    debtors produced it, then we'll --
11    MR. MORRIS:  I know I instructed
12    my team to produce it, so I -- I'm --
13    MR. RUKAVINA:  Okay.
14    MR. MORRIS:  -- I'm pretty
15    confident they did what I asked.
16    MR. RUKAVINA:  That was all I
17    had.  Thank you, sir.
18    THE WITNESS:  Thank you.
19    MS. DEITSCH-PEREZ:  Okay.  Let me
20    follow up with that -- with the
21    witness.  And then if it's really a
22    conversation with counsel, we could
23    move it on to that.
24 EXAMINATION
25 BY MS. DEITSCH-PEREZ:

Page 253

J. Seery

1
2    Q.    But to your knowledge, were the
3    native files such as spreadsheets and emails
4    provided to counsel to produce them, such
5    that we should be able to see the Word
6    versions of the notes, any emails about the
7    notes and the payments, so --
8    MR. MORRIS:  You -- you've got
9    that.  That's not for this witness.  We
10    can talk about that offline.  He
11    doesn't know anything about like the
12    actual --
13    Q.    Well, let -- let me just ask him.
14    Did he provide the native files to
15    counsel?
16    A.    I'm not quite sure what you mean by
17    native files, but counsel had access to -- we
18    did full -- had access to the systems, and we
19    did full data review of the systems and
20    produced everything responsive.
21    So I'm not sure exactly what you
22    mean by that, but -- but certainly counsel
23    had access to -- to those --
24    (Simultaneous speaking.)
25    Q.    -- understand that -- that native

**App. 160**

Page 254

```
1                J. Seery
2  files means a document, if it's in Excel,
3  providing it in Excel; or if it's in email,
4  providing it as a -- in a -- in email format,
5  a PST format or something that will show the
6  metadata; or if it's a Word document, in --
7  in Word, with its properties showing.
8          That's -- that's what I mean.  Do
9  you know if that was done?
10     A.   Counsel certainly had access to all
11 of that.  We didn't just PDF things and send
12 them to counsel.  It was done electronically.
13 So anything on the system responsive was --
14 was accessible.
15     Q.   Okay.  And just who is the person
16 who conducted the searches to respond to
17 discovery requests?
18     A.   It would have been through the
19 Pachulski firm, you know, working in -- with
20 outside -- either DSI or one of the outside
21 providers, to go through and -- and find
22 certain -- whatever the terms they came up
23 with to find the data.
24     Q.   And do you know who the actual
25 people were that -- that did the -- the
```

Page 255

```
1                J. Seery
2  searching?
3      A.   At Pachulski?  I don't -- I should
4  know, but I worked mostly through John.
5      Q.   Okay.  And then what about the
6  non-lawyers; who were the non-lawyers who
7  worked on collecting materials responsive to
8  the discovery requests?
9      A.   I believe -- at third parties or
10 at --
11         (Simultaneous speaking.)
12     Q.   -- you just mentioned DSI or I
13 mean --
14     A.   DSI --
15     Q.   -- anyone other than the lawyer --
16 outside lawyers.
17     A.   Yeah, DSI.  The outside firm, ISI.
18 I don't know if Robert Half was involved in
19 some of this production as well.  He's been
20 on --
21         MR. MORRIS:  Robert Half does
22     document review.
23     A.   -- the payroll for a long time now
24 during this case.
25         MR. MORRIS:  They do -- they do
```

Page 256

```
1                J. Seery
2      the document review.
3          I mean, I could just -- I could
4      just represent to you that -- that we
5      came up with search terms, my firm ran
6      the searches.  There may have been
7      certain financial data that we had to get
8      from DSI, but we produced whatever came
9      up with the search terms to -- to Robert
10     Half.
11         They -- they did their review, they
12     sent the documents to us.  We did a
13     little quality control and we produced
14     it.
15     Q.   Okay.  And are -- are you
16 confident, Mr. Seery, that you have looked
17 for and produced whatever documents there
18 are that concern the -- the loan payments due
19 and made at the end of 2020, beginning of
20 2021?
21     A.   I -- I am.  It was done in the
22 same -- same manner that -- that Mr. Morris
23 just described.
24         MR. MORRIS:  Yeah.  And I would
25     again encourage you guys -- I've asked
```

Page 257

```
1                J. Seery
2  probably five different ways in
3  interrogatories, in emails, if you
4  actually think there's something out
5  there, instead of just fishing, you
6  should let me know if you think that
7  there's --
8          MR. RUKAVINA:  Oh, oh, no, and I
9      do think --
10         MR. MORRIS:  Yeah, I mean --
11         (Simultaneous speaking.)
12         MR. MORRIS:  I've asked so many
13     times and -- and I --
14         MR. RUKAVINA:  There's no --
15     there's no need to have this on the
16     record --
17         MS. DEITSCH-PEREZ:  Yeah, and
18     Mr. Seery mentioned in -- in the course
19     of the examination that they had not
20     looked at the actual transfer
21     documents, the -- I think the -- if
22     there was a wire or an ACH, to see if
23     there were notations on them and
24     that --
25         MR. MORRIS:  He said he didn't.
```

Page 258

J. Seery

1
2     THE WITNESS:  I said I didn't.
3     MR. MORRIS:  He said he didn't.
4     THE WITNESS:  I said I didn't.
5  BY MS. DEITSCH-PEREZ:
6     Q.    Well, do you know if anybody did?
7     A.    I don't know, but certainly that's
8  something that accounting would see rather
9  easily.
10 RQ*     MS. DEITSCH-PEREZ:  Okay.  So I
11       would like confirmation that that was
12       looked for, and -- and the same as I
13       requested previously, the Word versions
14       of -- of the notes.
15       MR. MORRIS:  Okay.
16       THE WITNESS:  I, I -- I think
17       that the materials that Mr. Morris
18       described has all that with bank
19       statements.
20       MR. MORRIS:  It's okay, thank
21       you.
22       Are we done?
23       MS. DEITSCH-PEREZ:  Thank you.
24       MR. MORRIS:  Yep.
25       MS. DEITSCH-PEREZ:  Yes.

Page 259

J. Seery

1
2     VIDEO TECHNICIAN:  The time is
3     6:49.  This concludes today's
4     deposition, Thursday, October 21, 2021.
5
6
7
8
9
10  I,          , do hereby certify under
11  penalty of perjury that I have read the foregoing
12  transcript of my deposition taken on          ;
13  that I have made such corrections as appear noted
14  herein in ink, initialed by me; that my testimony as
15  contained herein, as corrected, is true and correct.
16
17  DATED this ____ day of _____, 20  ,
18  at _____,        .
19
20
21
22
                    _____
23                  JAMES P. SEERY, JR.
24
25

Page 260

1
2         C E R T I F I C A T E
3
4  STATE OF NEW YORK      )
5                         )ss.:
6  COUNTY OF NEW YORK     )
7
8         I, MARIANNE WITKOWSKI-SMITH, a Notary
9    Public within and for the State of New York,
10   do hereby certify:
11        That JAMES P. SEERY, JR., the witness
12   whose deposition is hereinbefore set forth,
13   was duly sworn by me and that such deposition
14   is a true record of the testimony given by
15   the witness.
16        I further certify that I am not
17   related to any of the parties to this action
18   by blood or marriage, and that I am in no
19   way interested in the outcome of this
20   matter.
21        IN WITNESS WHEREOF, I have hereunto
22   set my hand this 22nd day of October, 2021.
23                  _____
24
25                  MARIANNE WITKOWSKI-SMITH

Page 261

1
2  -----------------I N D E X------------------
3  WITNESS         EXAMINATION BY         PAGE
4  JAMES P.        MR. RUKAVINA          6, 249
   SEERY, JR.
5                  MS. DEITSCH-PEREZ   160, 252
6
7  Directions:  197
8  Motions:  172, 185, 205, 233, 244
9
10 ------------ PRODUCTION REQUESTS -------------
11 PAGE:  250  Native Exhibit 7 and metadata.
12       258  Transfer documents notations and
                 Word versions of notes.
13
14
15 -------------------EXHIBITS-------------------
16 EXHIBIT                          PAGE LINE
17 Exhibit 1
   Notice of Deposition
18 Seery                            8   20
19 Exhibit 2
   Notice of Deposition
20 30(b)(6)                         9   20
21 Exhibit 3
   Email Chain
22 Re: HCMLP Roles                  23  20
23 Exhibit 4
   Seery Declaration in Support of
24 Motion for TRO                   43  9
25       (Continued on Next Page)

Page 262

```
 1
 2   ---------------EXHIBITS(Cont'd)---------------
 3   EXHIBIT                          PAGE LINE
 4   Exhibit 5
     Promissory Note
 5   Dated May 31, 2017                55   12
 6   Exhibit 6
     Correspondence
 7   Dated January 7, 2021            69   16
 8   Exhibit 7
     Loan Document
 9   D-NNL-029141                      99   12
10   Exhibit 8
     Correspondence
11   Dated January 15, 2021           107   4
12   Exhibit 9
     Amended and Restated
13   Shared Services Agreement        112  22
14   Exhibit 10
     Email Chain
15   D-NNL-007578 - D-NNL-007579      148  11
16   Exhibit 11
     Email Chain
17   D-NNL-028514 - D-NNL-028515      150   3
18                  * * *
19   PREMARKED
     EXHIBITS                         PAGE LINE
20   (Not Provided to Reporter)
21   Exhibit 109                      245  16
22   Exhibit 110                      206  23
23   Exhibit 111                      196   8
24   Exhibit 112                      213  23
25
```

Page 263

```
 1               ERRATA SHEET
 2   Case Name:
 3   Deposition Date:
 4   Deponent:
 5   Pg.  No. Now Reads     Should Read  Reason
 6   ___  ___ _____    _____   _____
 7   ___  ___ _____    _____   _____
 8   ___  ___ _____    _____   _____
 9   ___  ___ _____    _____   _____
10   ___  ___ _____    _____   _____
11   ___  ___ _____    _____   _____
12   ___  ___ _____    _____   _____
13   ___  ___ _____    _____   _____
14   ___  ___ _____    _____   _____
15   ___  ___ _____    _____   _____
16   ___  ___ _____    _____   _____
17   ___  ___ _____    _____   _____
18   ___  ___ _____    _____   _____
19   ___  ___ _____    _____   _____
20
                      _____
21                    Signature of Deponent
22   SUBSCRIBED AND SWORN BEFORE ME
23   THIS _____ DAY OF _____, 2021.
24   _____
25   (Notary Public)   MY COMMISSION EXPIRES:_____
```

Index: $1.4..7250

**$**

**$1.4** 106:21 108:6
109:2,19 110:3
111:10

**$2** 27:17

**$20** 171:11

**$200** 27:18

**$24** 93:15

**$24,471,000** 88:23

**$25** 163:15

**$3** 57:19

**$30.7** 25:6 52:24
152:17 250:3,6

**$300** 192:15

**$400** 191:6

**$500,000** 177:2
178:5

**$575,550.56** 90:21

**$6** 89:7

**$63** 192:9 193:6

**$70** 164:19,21

**$8** 172:7

**1**

**1** 5:3 8:18,20,24 9:7
46:7,8 113:17
126:16,22 128:21
214:10

**1.7** 188:10

**10** 148:10,11 150:8,
21 171:16 222:22

**100-odd** 196:10

**1082** 247:14

**109** 245:16

**10th** 134:3

**11** 11:15 52:3 150:2,3

**110** 206:23 207:8,19
208:2,23 209:25

**111** 196:8 197:2,10
200:7 214:10

**112** 213:23 214:20

**116,531** 209:9

**12** 37:4 106:9 111:2
143:13 148:19 149:3,
13,18 158:17,22

**12/30/19** 91:7

**12/31** 92:16

**13** 109:16 176:20

**13th** 109:4

**14** 109:16 222:23

**14th** 106:20 108:6,25
109:3

**15** 107:3,5

**15th** 108:23

**17** 236:11 237:9

**18** 236:21 237:10

**19** 184:21 185:12
236:25 237:10,11

**1990** 11:2

**2**

**2** 9:7,18,20,23 33:12

**2.06** 135:13,21

**2.1** 65:13 66:4 67:7

**20** 93:11 114:21
237:11 259:17

**20,247,628** 198:18

**2000** 33:11

**2014** 176:20

**2016** 32:13 34:16,22

**2017** 32:11 34:22
53:19 54:12 55:2,13
56:22 59:25 63:12
184:21 185:12
236:20

**2018** 32:9 34:22
113:17 184:21
185:12

**2019** 33:8,12 34:22

58:9

**2020** 12:12 13:3,12,
13 17:7,16 18:5
19:20 20:19,20
21:15,16 22:23 23:14
24:7,11 25:6 26:5,9,
11,14 27:24 29:19
30:2 35:15 36:19
39:16,25 40:2,17
41:9 42:10 44:15
49:16,19 50:18
51:12,20 52:3,24
62:19 63:4,23 64:22
81:12 86:11,14 87:19
88:17 92:8,23
114:17,18,23 116:9
117:9 119:22 121:23
123:11 124:3 125:2
127:17 129:11,14
130:12 131:6,15
132:8 133:6,9,16
134:3 146:21 147:13
150:8,22 156:2,4
195:20 201:9 215:2
216:13 220:13
221:23 229:18 230:8
231:19 246:10,12
256:19

**2021** 5:8 36:24 37:4
38:19,25 39:14
58:13,20 61:24
69:14,17 80:7,15
83:10 94:3 96:6
106:9,20 107:3,5
108:23,25 126:16,22
128:21 134:25
143:13 144:20 145:3
146:21 148:19 149:4,
13,18 158:17,22
195:24 201:10 215:7,
9 216:8 231:17
256:20 259:4

**2022** 168:2

**21** 259:4

**21st** 5:8

**24** 145:23

**240** 57:11

**25** 166:3

**26** 51:14

**27** 51:14 53:19 145:3

**27,675,000** 56:19

**28th** 38:25

**29** 51:17,19

**2:02** 5:8

**3**

**3** 23:19,20 51:20 63:4
66:2,15 67:16,24
171:3

**30** 51:18

**30(b)(6)** 8:18 9:19
232:15 233:13,19
234:2,10

**30,746,812.33** 56:24

**31** 25:6 55:13 56:22
58:13,20 61:24 64:22
71:23 81:12 84:10
85:17 88:17 92:7,23
94:4 114:18,23
117:10 118:15,25
120:16 127:17,24,25
128:4 129:11,12,14
130:12 131:6,15,17
132:8 156:4 195:20
215:2 216:13 229:18
230:8

**31st** 65:16,21,23
67:7,9 127:2 195:17

**3:18** 99:2

**3:29** 99:5

**3:40** 112:4

**3:42** 112:7

**3rd** 52:23

**4**

**4** 43:7,9 51:7 115:7
147:8 171:3 186:17

**400** 192:19

**4:16** 146:15

**4:21** 146:18

**4:30** 159:24

**4:34** 160:9

**4:40** 160:12

**4B** 147:11

**5**

**5** 55:10,12 60:18
61:22 63:2,17,22
65:13 80:24 172:4

**5/31/2020** 90:18

**50** 243:7

**5:30** 193:19

**5:35** 193:19

**5:37** 213:17

**5:58** 213:20

**6**

**6** 69:11,14,16 70:20
79:16,20 81:8 88:20
93:16,25 97:6 98:10
100:19 105:15

**6.01** 136:6

**601** 141:6 142:19
143:3 144:17

**63** 243:6

**6:00** 193:12 194:10

**6:36** 248:10

**6:41** 248:13

**6:49** 259:3

**6th** 104:24

**7**

**7** 25:11 51:12 69:14,
17 94:3 96:6 99:12,
13 104:6 106:3 107:8
112:13,16 127:9
134:25 141:21
142:12 144:19
197:12 214:5 250:15,
17 251:3

**7250** 188:11

**8**

**8** 107:2,4,10,17 109:20 172:3

**9**

**9** 12:12 13:3 17:16 18:5 20:19 21:15 24:11 26:9,11,14,15 29:19,22 30:2 35:15 36:19 56:2 112:20,22 113:2,13

**9th** 24:6

**A**

**Aaron** 69:21

**abetting** 237:21

**ability** 35:17 36:10 144:11 156:19

**absolutely** 39:12 101:25 121:3 146:6 222:4

**abstained** 20:4

**accelerate** 72:3 105:23,24 145:7

**accelerated** 65:7 84:14 107:22 109:7 110:19 111:19 196:2

**acceleration** 84:15 108:2,4 109:5

**accent** 7:23

**accept** 45:16 159:16

**acceptable** 44:17

**acceptance** 220:2

**accepting** 157:15

**access** 78:10 253:17,18,23 254:10

**accessible** 254:14

**accidentally** 79:13

**accompanied** 218:21

**accompany** 218:8

**account** 18:22 22:7 27:8 63:13 77:11 110:10,17,19,22 145:2 166:15 200:5 215:9

**accounting** 90:15 115:10 117:22 142:3 153:6 155:23 157:5 211:11 258:8

**accounts** 116:23

**accrual** 57:24 67:22

**accrue** 60:25 61:16

**accrued** 52:2 60:20 66:19,25 67:16,18

**accrues** 67:20

**accruing** 184:4

**accurate** 24:25 44:25 248:2

**ACH** 218:11,20,22 257:22

**Acis** 27:16

**acknowledged** 231:15

**acknowledgment** 220:2

**acted** 61:20

**acting** 136:24

**action** 71:20 97:7 140:7,15 144:25 221:16 243:23 244:10

**actions** 236:15,18,22

**active** 11:17

**activities** 20:14

**acts** 245:6

**actual** 33:25 128:24 220:21 225:5 233:9 234:19 237:14 249:19 253:12 254:24 257:20

**acumen** 26:18 27:5

**ad** 206:4

**ad-hoc** 75:18

**add** 35:5 99:25

**addition** 16:21 35:10

**additional** 100:21 114:13 222:13

**adds** 234:23

**adequate** 154:17 155:5

**Adkins** 176:6

**administering** 11:14,16

**admit** 228:22

**admitting** 231:16

**admonished** 100:2

**advance** 79:23 80:17

**advanced** 90:24

**advancing** 210:3

**advantage** 86:15

**advertise** 85:11

**advice** 137:25 140:16

**advise** 137:15 140:14

**advised** 165:10,15

**advises** 166:22

**advisor** 48:6,15 58:23 161:20 166:16, 20,21

**advisors** 5:7,18 12:16 26:4,8 38:10 49:7,18 59:5 71:3 161:22 194:18

**advisory** 162:24 166:7 205:24

**advocate** 225:20

**affairs** 238:16

**affiliate** 146:2 244:4

**affiliated** 25:20 50:20 114:9 115:24 116:3 117:20 132:22 221:24 222:2

**affiliates** 62:7 114:12

**afield** 21:10

**afternoon** 6:22 160:20,21

**agenda** 75:13 80:16, 23 81:4 83:24

**aggrandizing** 62:8

**aggregate** 58:4

**agree** 29:6,13 86:13 97:5 104:2 114:17, 19,24 122:6,17 123:12 124:22,24 141:6,16 225:14 233:14 237:7 252:7

**agreed** 21:24 38:24 233:22 234:14

**agreement** 17:17 20:22 37:11,16,20 39:2,8 48:21 59:18 110:15,16 112:21,23 113:4,17 114:10,12, 14,19,24 115:15 134:24 135:7,10,13 136:2,20 144:6 147:8 158:21 202:10,11,15, 16,24 204:7 206:6 210:11,16 212:4,15, 17,19,20,24 213:3 232:23,24 235:12 238:24 239:14,16,24 240:8,13 241:4 242:10,17 243:5,14, 18 244:11,15,17,19, 21

**agreements** 38:19 46:5 153:15 234:22 237:6 238:18,21

**ahead** 33:8 128:4 159:13 182:4 186:8 223:23

**aided** 241:7

**aiding** 237:21

**Aigen** 6:3

**aims** 137:4

**air** 240:16,21

**Airlines** 161:7

**allegations** 232:22

**alleged** 235:12

**allegedly** 241:7

**allowed** 60:19,25 68:2 108:14

**alternatives** 105:15

**ambiguity** 88:4

**amended** 112:22 113:3,16 238:7 239:23 240:8 241:3 245:23 246:3

**amendments** 113:21

**amount** 13:20,22 56:18 57:19 64:3 85:8 87:6 88:5,22 89:3,6,7 93:13,20 98:3 110:11 139:23, 25 156:15 159:18 165:23 168:24 172:10,11 190:14 198:17 209:9 215:9 222:20,21 230:8,21 243:7,8

**amounts** 67:13 86:24 110:14 118:19, 21 139:14 158:11 173:12 174:15 178:17 184:8 229:12, 18 230:7

**analysis** 147:12 235:5 243:11

**and/or** 13:11

**annexed** 245:24 247:5

**annual** 65:16 86:16 169:6 182:21 183:20 195:18,22

**annually** 183:23

**ans** 226:22

**answer's** 135:11

**answering** 201:20 233:3 249:6

**answers** 113:10 235:24

**anticipating** 95:2

**anxious** 225:19

**apologize** 9:12,14, 15 20:5 24:15 70:4,5 89:18 93:15 130:7 180:12 193:10 231:11 232:2

**apology** 89:19

**appears** 66:13 107:24 188:22

**applied** 66:24 108:8 110:13 132:6 141:7 200:5 216:19,23 217:19 219:2,11 220:4 227:8,25

**apply** 110:10 224:22

**applying** 32:17

**appointed** 12:8

**Appou** 176:7

**approval** 119:3 188:25

**approve** 118:5

**approved** 19:21,22, 25 20:7,10 21:17 118:22

**approves** 118:20

**approximately** 5:8 7:15 12:10 64:3 186:17

**April** 58:9

**aptly** 50:12

**arbitrary** 196:10

**arbitration** 237:2

**argue** 242:16

**arguing** 245:3

**arise** 240:16,20

**arose** 236:3

**arrangement** 171:12 201:18 202:11 211:4

**ASAP** 150:15

**ascertain** 128:10

**ascribing** 87:17

**asks** 203:5

**aspect** 104:13

**assert** 243:13

**asserting** 233:16

**assertion** 233:14

**asset** 19:2,6,7 30:8 31:10 53:23 71:18 158:14 159:20 192:13

**assets** 18:21 22:12 29:10 49:10 50:13,17 52:20 97:22 140:3 156:20 166:9,11,17 171:13 172:8 174:15 187:23 189:7 190:23 191:4,8 192:3,11,15, 18 246:4

**assist** 116:14

**assistance** 147:16

**assistant** 70:2

**assisted** 133:24

**assisting** 47:15

**associate** 70:3 99:7 112:18

**association** 5:12

**assume** 93:21 202:14

**assumed** 65:3 212:19

**assuming** 43:18 191:24

**assumption** 45:19

**assured** 247:6

**attached** 199:6,10

**attempt** 184:11 218:12

**attend** 193:21

**attention** 108:3 247:25

**attorney** 70:4 102:9

**attorneys** 113:8

**attrition** 133:6

**audio-record** 74:4

**audio-recorded** 83:13

**August** 40:23 41:9 42:10 44:15

**authenticate** 148:16

**authenticity** 113:12

**authority** 14:19 18:2 157:17,23 243:12

**authorized** 71:2 81:7 159:13

**authorizing** 107:12

**automatically** 92:5

**average** 168:8

**avoid** 173:8 179:21 182:13,14

**avoidance** 181:16, 18

**award** 237:2

**awards** 164:22

**aware** 25:19 52:24 62:22 100:22 106:8, 12,19 118:24 119:19 148:25 149:5 159:8, 10 162:8,15 165:4 178:23 195:2 222:5, 9,14 225:2,4

---

**B**

**BA** 10:15,19

**back** 21:12 22:2 43:24 44:3,5,14 60:9 62:18 63:6 67:6,15, 23 79:15 88:20 91:12,18 99:5 104:8 112:7 115:22 116:7, 12 119:15 137:14 146:18 152:13 160:12,18 170:6 173:6 177:7,8,18 180:15 185:3,7 194:5 199:17 204:18 205:13 211:5 212:6 213:15,20 234:5 248:13,17

**background** 10:11, 14 14:3 21:8 161:2

**backup** 54:20 251:20

**bad** 137:25 139:3 161:11 181:15

**badges** 234:23 237:16

**balance** 28:24 29:8 31:14,17 35:4,7 108:8 216:20,23 219:3 220:5 230:18 236:14

**ballpark** 163:7,13

**bank** 251:20 258:18

**bankruptcies** 161:3, 6 162:11,21 174:6

**bankruptcy** 11:12, 15,23 12:2 13:24 14:9,11 28:4,15,20 31:22 41:21 124:21, 25 126:6 140:24 145:20 156:23 161:14,23 164:12,15 165:5,19 177:9,10 234:23 237:4,12

**bar** 70:10,14

**bargain** 52:15

**base** 155:14 173:11 214:15

**based** 31:14 54:24 62:5 137:25 142:2 169:2,4 220:10,17 238:10

**basic** 45:18

**basically** 22:25 29:14 47:3 55:19 135:22 167:3

**basis** 8:15 59:11 75:19 88:7 116:23 164:4 169:7 210:12 245:8

**bear** 89:16

**bearing** 232:17

**beautiful** 160:16

**befell** 65:9

**beginning** 27:19 52:17 256:19

**begins** 150:7

**begun** 53:24

**behalf** 5:21 122:10 157:17 203:6 216:21 219:25 238:18,22 242:11 243:5

**belied** 188:12

**belief** 120:22 225:3 228:4 247:8

**believed** 47:3 78:16 125:19

**believing** 78:4

**benefit** 15:22

**bidding** 22:25

**bigger** 236:24

**bill** 204:20 205:14 206:13,15

**billing** 210:4,9

**billion** 166:8,18

**bills** 215:25

**bit** 35:24 43:25 49:14 61:12 100:5,6

**board** 18:6,16,20,24 19:15,21,24 20:6 22:12 23:2 71:7 72:8, 20 73:10,15,18 74:6, 9,24 75:7,8,12 79:16 156:21 168:3 188:14

**body** 55:19

**bona** 179:2 180:7 183:2,17 184:3,6,7 225:4

**bonus** 170:16 171:11

**bonuses** 155:14

**bookkeeping** 115:11

**borrowed** 35:11

**borrower** 65:15 66:4,6 145:22,24 146:2

**bought** 233:8

**bouncing** 100:6

**breach** 237:20 240:24 242:16 245:9

breached 239:17 241:6

breaches 242:20

breaching 241:8

break 30:4 44:4 95:9 98:23 99:17 100:3,16 112:10 146:8 170:18 193:13,20 196:21 206:25 207:14 213:7

Brian 207:23 208:7,8, 11

bridge 42:11,13,17 43:2,5 44:7

briefly 14:3

bring 89:17

broad 69:7

Brothers 161:8,16

brought 247:24

bunch 41:15

burden 34:6

burned 27:17

business 8:13 20:15 26:18 27:5 46:18 104:13 141:9 148:4 166:13 185:20,22 187:14 203:24 205:5 208:19 212:21

businesses 46:21 50:15 140:22 167:2,8 191:20

busy 248:20

button 74:14

buy 63:17

**C**

cabined 244:16

cagey 227:23 228:12,14

calculate 93:20

calculated 89:2

calculating 116:15

calendar 65:17 75:4

call 38:21 59:21 60:13 72:17 73:16,19 75:6 97:13 105:7 143:6 180:14 224:2,8

called 40:18 52:13 98:5 113:16 146:5 187:11 228:14

calling 8:14 125:21 224:3 228:11

calls 18:23 22:10 234:3 239:5 240:11

camera 100:7

cap 205:14

capacity 136:24

Capital 5:6,21,22 12:2,17,18 198:15 200:9 201:14 202:3 203:9,15,20 204:7, 19,23,25 205:5,12, 14,21 206:9,14,17,18 215:17 241:4

capped 190:12

care 112:17 136:21 144:17 244:19

career 11:20 161:9

Caruso 83:7 207:23 208:5

case 7:18 11:19 12:3 30:6 31:3 33:16 41:12,21 49:10 52:11 71:14 122:5 124:16 163:24 173:20 174:3, 22 175:16 178:24 182:21 185:23 200:2 203:25 204:17,22 210:14 211:17 222:15 230:16 234:18 242:17 255:24

cases 11:12 218:14 232:5,18 233:16 235:6,7

cash 82:3,6,25 84:6 115:11

cash-flow 81:15 92:15,19

category 162:2,3

caused 43:20 108:2 111:9 198:15 213:3 220:23 242:19

caution 155:9,16 223:7

cautioning 155:18

Cayman 53:23

CCO 40:10

cease 39:8 130:5

censure 155:9

CEO 12:9 13:11 14:23,24 16:18 17:8 19:15,20 20:10,20 21:16 49:11 156:24 163:24 164:10,11 166:7,16 167:12,15, 20,24 168:2,7,9 246:18

CEO/CRO 59:2 61:4, 20 152:15

CEOS 163:2,17,18 165:9,23

certified 5:10

certify 259:10

cetera 206:3

CFO 16:25 103:4 123:14 124:8 153:18, 24 154:14,16

chain 23:20,25 148:11,16,17 150:3,7

challenge 43:23 121:19 154:17

challenged 27:6 174:8

challenges 191:23

chance 72:8 164:20 171:21 172:7

chances 64:14,16

change 88:23 106:21 145:23

changed 21:25 129:7 133:4

changing 61:23

Chapter 11:15

character 137:3

characteristic 174:3 182:25 183:17 184:3

characterization 48:14 60:12 71:25

charge 16:2,3,4,14 206:17

check 141:22 142:2, 19 218:9,18 251:2

checking 151:14

chief 36:20,23 37:3 39:6,9,17,18,21 83:25 140:5

choice 181:7

circulated 75:13

circumstances 136:22 173:21

city 8:6 160:16

claim 222:13 232:11 241:13 243:3,16

claimant 15:6,8,10, 11,22,24 16:4

claimed 222:23 226:5 231:21

claiming 244:5

claims 30:9 31:10 32:24 41:19 190:14 232:21 236:13,17,23 237:20,21 240:24 245:9

clarification 6:9 18:12 19:5 37:25 46:20 62:15 76:12 82:5 86:4 87:13 90:19 152:10

clear 6:25 12:13 31:9 35:6 45:13 46:5,14 48:2 52:9 53:14 68:11 69:7 78:24 98:21 100:6 103:19, 23 156:12 169:21,23 179:15 181:23 182:2 200:19 212:16 219:19 221:15 224:20 228:19 232:23 238:20

243:18 244:9

cleared 196:8

client 33:3 49:17

CLOS 19:4,8

close 45:16 190:15, 19

closely 114:15

closing 203:7

closure 188:25

co-counsel 160:3

code 28:15,20 182:16

Colgate 10:20

collect 52:20 58:19 86:23 87:3,7,24 88:5 97:21 105:25 126:12 193:7

collected 87:6

collecting 255:7

collection 192:9,20

collections 193:6

collective 73:25

college 10:18

Collins 207:23 208:8,10,11,12

colloquially 186:23 187:11

colloquy 108:16,20 143:18

Columbia 161:7

column 91:15

combination 167:2

comfortable 24:20

committee 41:20,23 42:5,8,18 44:18 45:10,16 47:10,19 48:22 49:6 72:13,16 79:17,21 80:7,10,18, 20

common 92:17

communicate 36:15 121:7 216:22 220:2

communicated 187:22 200:16

communication 149:13 214:20 216:9, 18 217:7,21 218:7,21

communications 149:17 200:8 218:14

companies 132:22 161:5,13 162:23,24 163:10,12 165:10,16, 24 172:19 173:9,10, 17 174:13,23 175:19 178:24 186:24 187:18 189:5,6 190:7,12 203:2 208:22 221:25 222:2

company 135:18 139:3 140:23 161:17, 18 162:13 164:5,7 166:7,23 174:15 182:18 187:4,6,9,12 205:20,21 246:18

compensated 203:11

compensation 162:9 163:2,13,18,25 164:11 166:6,16 168:17 172:3,21 173:3,14,24 175:11 179:2 184:20,21 185:11,12 203:13,19 204:11

complaint 34:9 199:6,10,22,24 238:8

complete 26:7 78:9 167:25 237:17

completely 57:14 59:9 86:21 144:14 223:9 237:8

compliance 147:12, 19

concede 225:10 226:4,7,9

concepts 28:4

concern 21:9 32:20 122:5 124:16 155:25 256:18

concerned 155:7 162:17 228:5,24

concerns 23:5

concise 242:5

concluded 31:13

concludes 259:3

conclusion 57:3 234:3 239:6 240:12

conclusions 141:17

condemning 181:12

condition 184:12 233:22 234:14 236:3

conditions 179:25

conduct 137:2 213:4

conducted 19:3 141:9 148:3 254:16

conference 111:3

confident 252:15 256:16

confirm 24:10 229:6

confirmation 71:16 158:9 258:11

confirmed 12:3

confirms 24:8 210:2

conflict 121:24 124:12 125:16

conflicted 125:3

confusing 33:15 35:25

connected 21:5 185:22

Connecticut 11:5

connection 40:25 170:2 177:9 222:24 231:4

consequences 121:9 138:4

consideration 53:25 62:13 243:15 244:5

considered 105:22 161:16

constructive 34:8 232:4,11,16 233:15

construed 43:5

consult 75:24 104:23 134:23 135:9 160:3

consulted 93:19 135:7 246:17

contained 145:18 178:9 259:15

contempt 36:3 158:12

contend 220:22 222:17 231:11 242:25 243:24 244:11 245:7

contended 222:6

contending 218:25 241:6

contention 25:4

contentions 24:16

contested 223:10

context 28:14 29:3,7 90:4

contingent 35:5 168:17 184:20 185:11

continually 35:10 206:8

continue 45:3 168:4

continues 26:6

contract 114:3 130:8 139:12,17,23 141:9 145:24

control 12:17 26:7 125:13 244:3 256:13

controlled 61:14 174:18

controlling 17:18

controls 64:13 121:18 123:4 179:19

controversy 139:15

conversation 76:11 106:10 252:22

convey 46:25

conveyance 63:12

64:9 87:12,15

COO 40:14 44:21

copious 72:25

copy 112:16 113:7 207:25

cornerstone 186:11, 16 187:3 188:2,6 190:6,22

corporate 14:9,14 17:25 18:8 27:13 40:7,13 51:24

correct 7:18 12:21 13:5 16:9 17:9,10,13 20:8 25:2,8,12,13 36:22 37:17 38:11 39:19,22 41:5,21 43:6 44:19 45:2 48:6, 7 50:6,21,22,24,25 51:4,5,16 55:21 56:13,20,21,24 63:14 64:19,20 66:8 67:3,4 87:9,20 91:24 96:7 97:4,15 100:13 105:8 111:3 112:16 113:7 116:20,23 117:3 118:8,12 119:14,18 123:16,18,19,22 126:2 127:10,20 128:17 130:10,25 132:7 139:12,13 141:24 142:13 146:6 153:19 158:18,22,23 165:4 167:14 186:12 206:14 208:21 222:3 225:6 227:7 233:17 237:23 240:24,25 241:22 244:13,14 245:9 247:7 259:15

corrected 259:15

corrections 259:13

correctly 136:3 137:5

Correspondence 69:16 107:4

cost 166:12 167:6 170:13 181:5 209:2, 19,21

cost-cutting 132:10

costs 192:8,20 209:6

210:3

counsel 5:14 16:25 34:19 40:4 42:17,18 43:18 49:5 51:21 75:16 77:3,23 78:8, 21 84:15,23,24 85:7, 16 102:22 105:20 109:24 177:14,15 197:16 198:6 208:13 214:11 233:14 252:22 253:4,15,17, 22 254:10,12

counsel's 10:3 214:12 249:6

count 191:13,18

counter-party 64:13

counts 193:6

couple 100:23 120:2 133:22 170:22 242:21

couple/three 100:24

courses 10:17 140:6

court 5:11 6:14 17:18 19:22 20:22 21:17 50:9 64:2 99:10 100:2,7 107:21 108:19 112:15 150:15 151:2,3 155:15 158:12 185:6

courtesy 69:8

covenants 54:7

covered 136:11,19 141:8,14

create 41:16

created 89:25

crediting 191:25

creditor 41:19

creditor's 42:5,7

creditors 41:20

creditors' 41:20

creditworthy 64:13

crime 181:19

CRO 11:19 12:8 13:11 17:8 19:15,20

20:11,20 21:16
154:15 155:9

**CRO/CEO** 114:2

**Cromwell** 177:15

**crumbling** 236:25

**crystalize** 45:22

**crystallized** 45:24

**cube** 167:4 172:12

**cure** 97:9 156:7
157:15 159:17 219:9

**curing** 219:3

**curious** 95:6

**current** 57:5,14
145:16

**cut** 127:6 158:13
238:21

**cutover** 37:7

**D**

**D-NNL-007578**
148:12

**D-NNL-007579**
148:12

**D-NNL-028514**
150:4

**D-NNL-028515**
150:4

**D-NNL-029141**
99:14

**damages** 242:19

**Dandeneau** 102:11

**dangerous** 20:17

**darn** 224:15

**data** 47:18 253:19
254:23 256:7

**date** 8:22 9:22 16:12
17:5 23:13,22 32:3
36:25 37:18 38:6
43:11 55:14 67:22
69:18 71:16 84:12
85:8 96:9 97:25
99:15 107:6 112:24
129:21 148:13 150:5,

12 151:8

**dated** 55:13 69:17
107:5 197:11 214:4
259:17

**dates** 26:13 30:14
35:24 37:6 39:4 75:6
120:4,7,9 235:25
236:9

**Daugherty** 176:5

**Dave** 83:3 207:24

**David** 16:25

**Davor** 5:16 32:19
78:24 248:23

**day** 65:16,23 67:7,9
81:17,19 107:21
111:2 220:20 259:17

**days** 38:4,5 80:12
100:23,24 103:10
108:17 120:2,3
187:21 229:5

**deal** 86:20 158:13,25
159:8,11,14

**dealing** 144:18
162:18

**debate** 34:12

**Deborah** 6:2 102:4
183:10 193:8 213:6

**Debra** 102:11

**debt** 104:18

**debtor** 12:6,19
14:13,15,16,19 15:9,
13,16,21 16:2,4,18,
20 17:4,9,19 20:23
21:18,25 24:18,19,
22,23 25:11 30:13,15
31:13 32:2,6,16
34:15,21 35:6,10,11
36:21,24 37:4,12,15
38:24 39:18,25 41:18
48:5,22 50:3,13,18
52:20 53:20 54:11
59:3 60:2,19,22 61:4,
19 62:10 63:15 68:23
71:22 80:17,23 85:2,
19 86:11,24 87:18
88:10,16 89:23 93:19
96:20 97:7,11 106:4
109:23 110:2,8 113:5

114:4,6,7,11 115:6,
22 116:17,21 117:9,
17,23,25 120:14
121:16 123:14 124:3,
8 132:9,20 133:16
134:7,19 135:16,23
136:13 139:17
142:11 146:22
147:13,23 152:14,15,
22 153:10,12,13
155:17 157:18,24
158:15 221:25
246:12 250:4,22,25

**debtor's** 16:12 24:16
25:4 29:20 30:16,24
35:17 48:19 49:10
50:2 51:21 77:2,14,
15 86:14 117:22
125:17 139:10
156:20 245:23 246:3

**debtors** 247:4
252:10

**debts** 28:23 29:15
31:20

**decelerate** 111:20

**December** 25:6 26:5
37:23 39:14,16,25
40:2 46:7,8 49:16,19
51:11,18,20 52:3,18,
23 62:18,19 63:4,23
64:22 65:17,21,23
67:8,9 71:23 81:12
84:10 85:17 86:11,13
87:19 88:17 92:7,23
93:11 94:4 104:9
114:17,18,21,23
116:9 117:8,10
118:15,25 119:22
120:16 121:22
123:11 124:3 125:2
127:3,17,24,25 128:4
129:3,12,14 130:12
131:6,15,17 132:8
133:16 134:2 146:20
147:13 150:8,21
156:4 195:20 201:9
215:2 216:13 220:12
221:8,16,18,22
229:17 230:8

**December/january**
237:10,11

**decide** 52:6

**decision** 25:14,19
52:21 97:12,16
140:16,17 143:5
160:5

**decisions** 157:2

**declaration** 43:9,13,
20 51:7 62:21 247:3

**declare** 80:24

**deduced** 130:4

**deduction** 54:24
152:4,9

**default** 64:17,23 65:6
72:9 97:9 156:8
219:4 220:3

**defense** 142:12,20

**defenses** 86:22
98:6,11

**defer** 248:23

**deferred** 173:11

**define** 157:10

**defined** 66:6

**definition** 28:19
29:8,11,14,16 34:19
136:11 141:14

**definitional** 42:25

**definitions** 28:8
32:17 34:20 135:15

**definitively** 132:5

**degree** 10:16 25:21
26:19 47:21 48:11,13
114:10 138:19 197:9

**Deitsch-perez** 5:25
6:2 70:13,16 160:19,
23 170:5 172:16
183:11,14 185:6,24
186:5,9 193:9,25
194:8,12,15 197:21
205:8 206:21 207:2,
6,10,13,17 213:9,13,
21 223:17,22,25
224:17 232:8,13
233:10 234:4,25
244:7 248:3,14
252:19,25 257:17
258:5,10,23,25

**Deitsch-perez's**

102:4

**Delaware** 123:21,23
240:4

**delegation** 17:25

**demand** 50:24 51:15
52:3,6,7,12,21 53:18
56:12 58:12,17
59:13,20 60:14,15
61:23 62:20,21 69:6
84:16 85:9,10 98:2
108:4,9 110:12
135:10 145:9 151:15
156:13 177:9 182:23
183:18,21 197:12
199:14 200:21,25
201:7 208:22 219:19
221:19

**demanded** 52:10
59:14 60:8 215:10

**demanding** 51:24
209:11

**demands** 54:10
59:17 200:17

**depend** 164:22 168:3
170:13

**depended** 63:7
204:22

**depending** 29:7
246:13

**depends** 29:3 30:25
72:23 162:12 164:5,6
166:9,11,12 170:14
192:8

**deposed** 7:13
100:23

**deposition** 5:4
101:3,24 103:10
106:13,17 148:22,24
149:11 196:14 235:3,
9 259:4,12

**Deposition/30(b)(6)**
9:21

**Deposition/seery**
8:21

**describe** 166:15

**describing** 44:10
160:25

**designated** 9:4 10:5 240:23

**detail** 10:12 25:10 147:10

**determination** 105:4

**determine** 30:8 41:17 176:14 177:4, 19,22 204:3 230:6

**determined** 78:19, 20,25 176:15

**detrimental** 140:7

**developed** 45:24 236:23

**developments** 75:19

**DI** 197:19

**dictate** 170:15

**differ** 54:17

**differently** 85:20

**difficult** 22:17 53:24 104:2

**diligence** 136:22

**direct** 126:12 197:19

**directed** 95:5,24 96:19,24 103:24 126:11 198:7

**directing** 198:11 223:24

**direction** 18:23 20:14 22:9 36:2 117:24 120:20,21 121:19,20 125:12,15 126:10 138:17

**directions** 36:4 204:14

**directly** 16:6 47:13

**director** 11:19 12:7, 11,14,15 13:15,18 26:10 29:19

**directors** 12:21 13:2, 8,21 76:14 123:8

**directs** 125:13

**disagree** 117:11 226:10

**disagreed** 226:8

**disagreement** 117:15,16 225:12

**disapprove** 118:6

**discharge** 136:19

**disciplinary** 11:10

**discipline** 155:9

**Disclaimers** 246:3

**discount** 87:9

**discounted** 63:25

**discovery** 75:23 76:17 77:19 78:16 217:12 218:13 254:17 255:8

**discretionary** 68:3, 5,20

**discuss** 71:5 72:12 81:8 102:16,22 149:8

**discussed** 32:18 71:21 73:11,12 85:5, 6 98:16 111:6 143:12 220:19

**discussing** 51:14 74:25 84:17,25

**discussion** 8:19 23:23 43:12 55:15 69:19 71:10 72:7 79:19 84:7,23 92:17, 20 106:24 107:7 112:2,8 120:8 127:6 143:15 146:13 148:8 156:11 160:13 194:7 229:14 231:21 243:11

**discussions** 47:10, 23 48:3,12 72:20 74:5 83:18 92:15 93:7 105:20 227:3

**dishonest** 27:3

**dislike** 153:21

**dispute** 120:9 221:23 224:20 225:2,5,11,22 226:11 243:20

**disruption** 183:5

**dissuade** 139:4

**distinguish** 76:5

**distressed** 14:8

**divide** 41:17

**docket** 43:17 247:14

**document** 8:25 58:10 70:21 71:2,6 89:22,25 99:7,13 113:25 136:8 141:19 206:22 245:17 246:5 247:17 254:2,6 255:22 256:2

**documents** 83:23 231:3 256:12,17 257:21

**dollar** 178:17

**dollars** 86:22 139:16, 20 140:25 154:24 168:15 169:13 222:7

**domination** 26:7

**Dondero** 6:5 17:12, 17 21:23 22:18 23:9 24:6 25:21 26:11 27:22 35:16 36:10 40:17 41:4 42:3,17 44:16 45:10,14 46:17 47:11,15 48:3 49:5, 13 50:19,21 51:23 52:11 53:20,25 58:10 60:3 62:8 64:10 95:5, 24 96:18 97:2 99:19 100:13 101:19 102:18 103:6,12,23 104:3 105:12 106:10 107:23 108:18 109:9 111:3,9 118:11 119:17 120:8,13,20, 23 121:8 122:7,11, 19,23 123:3,10 126:17 127:16 128:3, 14 129:16,24 131:2, 9,18 134:3 137:15 138:19 140:8,20 143:12,22,25 145:21 149:12 152:16,20 154:19 158:2 159:5,9 176:17 181:7 182:18 184:19 185:10 187:16,22 197:11

200:19 201:22 202:13 203:5 205:6 214:5 220:24 221:24 222:5,9,17 225:15 226:5 237:22 238:13 241:7 242:25 243:3,4 244:12

**Dondero's** 20:14,22 21:18 26:4,12 27:2 47:4 108:11 127:6 134:20 138:14 140:9 154:9 184:10 204:14

**Donohue** 83:5

**doublecheck** 142:8

**doubt** 72:14

**dozens** 19:10

**draft** 84:15

**Draper** 6:11

**drew** 49:8,13

**DS** 84:24

**DSI** 48:9,11 49:4 83:5,9 84:25 85:7 89:4 90:7,9 93:16,18 208:6 254:20 255:12, 14,17 256:8

**dual** 121:25

**Dubel** 12:24 14:5,6 76:13

**due** 25:5,12,15 28:24 29:15 31:20 33:2 52:2,12 60:8 80:25 86:24 88:22 92:10 93:13 95:8 97:14,25 98:4,17 104:18 105:23 116:11 129:2 130:6 142:4,6 146:5 156:15 159:19 183:22 195:10 214:25 216:20,23 229:13,18 230:9,10, 22 231:19 256:18

**Dugaboy** 6:12 237:21 238:12,14,20 241:6 242:25 243:2, 4,25 244:12 245:7

**duly** 6:17

**duplicative** 78:25

**duties** 123:22 124:2 125:4,20 126:5 135:23,24 136:20 146:22 147:5 155:17 239:11,17,18,22 240:4,6,16 241:5 242:14,16

**duty** 97:24 124:20,25 137:14,23 140:5,8 181:18,20 237:20 240:24 245:9

**Duval** 14:2

**E**

**earlier** 32:21 52:11 69:22 149:10 198:25 200:13 202:17 218:25 220:20 231:25

**early** 30:6 31:3 45:5 62:19 63:23 64:15 83:10 86:11 119:21 129:3 187:21

**easily** 82:16 139:25 258:9

**easy** 54:6 236:10

**economic** 15:20 86:15

**edict** 104:4 108:2 129:24 130:21,22 131:9,18,21,22 132:4,5 134:20 137:16,24 143:16,23 144:2 220:19 226:17 227:25 228:4,24,25

**edicts** 123:6

**educated** 54:24 189:15

**educational** 10:13

**effect** 103:7 128:24 129:4,5 156:6

**effective** 12:4,5 13:4 14:12 16:12 17:5 104:11 115:4 203:13, 18

**effectively** 13:16

15:23 38:7 176:24

**effectuated** 114:4

**efficiency** 181:17

**efficient** 180:17,22
181:8,9,10 182:11

**elaborate** 27:7

**electronic** 70:24
107:13

**electronically**
254:12

**element** 33:5

**Ellington** 40:3
154:25

**Ellison** 133:20

**email** 10:4 23:20,25
77:11 78:10 99:23
100:12 108:20
118:24 119:5,7
148:11,15,17 149:7,
22,23 150:3,7
196:13,17,19 207:23
208:25 251:6 254:3,4

**emailed** 99:10
247:19

**emails** 7:5 77:18
79:2 118:17 253:3,6
257:3

**embodied** 114:10

**employ** 179:14

**employed** 17:4
176:22

**employee** 18:3
158:14,17 176:16
179:11 203:5

**employees** 22:18,24
35:18 36:3 85:19
88:16 93:19 120:13
121:16,23,25 132:10
134:7,18 139:10
145:25 154:18
155:16 173:22
175:11 186:22
201:23 202:12
204:13 206:10,13
215:21,24 231:23

**encourage** 256:25

**end** 39:11 63:10
102:6 146:11 163:25
216:25 231:19
256:19

**ended** 164:25

**enforce** 61:4

**enforcement** 59:3

**enforcing** 60:23
104:18

**engagements** 162:8
174:9

**ensure** 88:11 116:9

**entered** 235:14
243:4

**entering** 244:10

**enterprise** 137:3

**enters** 242:10

**entire** 11:20 98:3

**entities** 27:14 50:20
95:5 103:22 114:9
121:18 123:4,9
124:18 201:22 203:3
204:15 208:20
217:19 239:18

**entitled** 33:5 197:12

**entity** 12:13 14:15
115:24 116:4 117:20
146:2 205:21 243:15

**entity's** 48:8

**entries** 203:4

**entry** 91:7

**equity** 186:16

**errands** 194:4

**estate** 8:8 50:16 65:9
71:18 97:21,22 105:7
124:21,25 126:6
172:9

**estates** 11:15

**et al** 5:7

**evasion** 181:19

**eve** 234:22

**event** 70:5 76:24
108:24 209:25

**eventually** 173:23
178:21

**Everland** 176:7

**evidence** 33:17
54:18 185:18 222:15

**evident** 82:2

**exact** 36:25 37:6 38:6
71:16 96:9 104:9
129:20 222:21
228:18

**examination** 6:20
101:12,15,17 160:22
249:3 252:24 257:19

**examined** 6:19

**examples** 27:20

**exceed** 29:9 189:7
190:23 191:5

**exceeded** 31:10
190:13 230:8,20

**Excel** 92:3 254:2,3

**excess** 229:18

**exchange** 115:25

**exclude** 105:19
210:8

**excluding** 109:23
152:12,13

**excruciating** 10:12

**excuse** 194:3

**executed** 53:11 55:3
58:10 145:2 246:13,
14

**execution** 54:15

**executive** 39:18
49:24 83:25 123:17
140:5 162:9 172:21
173:19 174:18
176:21

**executives** 162:10
172:20 173:4,17,22
174:17,24

**exercise** 229:24

**exercised** 37:15

**exhibit** 8:18,20,24
9:18,20,23 23:20

43:9 55:10,12,18
60:18 61:22 63:2,17,
22 65:12 69:14,16
70:20 79:16,20 80:24
81:8 88:20 89:14,17
93:16,25 97:6 98:10
99:12,13 100:19
107:2,4,10,17 109:20
112:11,13,15,20,22
113:2,13 148:10,11
150:2,3 196:7,8,12
197:2,10 200:7
206:23 207:18 208:2,
23 209:25 213:23
214:10,20 245:16
250:15,17 251:3,6

**exhibits** 196:9,11,21
249:15

**exist** 123:2

**existed** 152:14 178:7

**existence** 41:18
62:23

**existing** 22:17

**exists** 173:16,25
237:7 239:14 243:18

**expect** 87:7 126:4
138:2,17,21 148:16
168:7,14 169:12
193:7 198:19

**expectation** 167:18,
23 168:13

**expected** 23:2 93:14
123:25 154:3 157:16

**expenses** 191:5

**experience** 11:14
54:25 163:24 172:18
173:5 175:14 176:2
179:10,21 183:16

**experienced** 14:8

**expert** 11:23 77:14

**explain** 235:8

**explanation** 119:6

**explore** 33:6

**exposed** 144:14

**exposure** 236:12

**express** 32:20

**expressed** 155:24
188:9,13

**expression** 155:25

**expressly** 136:18
157:13

**extend** 38:24 59:18
60:7

**extended** 54:2,3
58:12 131:23

**extension** 152:22

**extensions** 37:19
39:3

**extent** 224:12 234:3
237:9

**extremely** 64:16
189:11 190:10,11

**F**

**FA** 166:20

**fabricate** 222:13
224:8

**fabricated** 222:10
237:8 243:19

**face** 234:20

**faced** 11:9

**facilitate** 42:11,14
44:11,22 45:9 47:12
48:21 52:15 117:9

**facilitated** 215:13

**facilitating** 85:20

**facing** 60:2

**fact** 54:19 59:15 69:4
85:2 89:13 92:16
159:13 163:21
185:20 189:4 205:4
206:16 219:13
222:11 241:13,23

**facts** 228:19 241:11,
12

**factual** 225:21

**factually** 127:21

**fail** 88:10

**failed** 25:4 82:19 126:25 130:13 158:10

**failure** 28:23 57:17 144:7

**fair** 7:8,12 15:19,25 17:20 18:4,7 19:13 31:12 42:2,6,9,19 45:24 48:10,14 49:2 58:25 60:10,17 67:23 71:25 73:4 78:6 86:19 103:9,14 126:14 131:4,12 151:19 168:25

**fairly** 168:25

**fall** 161:25 162:2 237:13

**false** 237:8

**familiar** 9:3 24:4 28:3,7 58:9 135:6 136:25 214:3

**fashion** 153:8

**fast** 7:23

**February** 38:18,25

**feel** 22:23

**fees** 144:15 167:5 172:13 209:2,3,4 222:3,8 223:4 225:6, 24

**fellow** 13:21 193:2

**felt** 20:12,16 46:12 105:6

**fide** 179:2 180:7 183:2,17 184:3,6,7

**fides** 225:4

**fiduciary** 97:19,20 105:6 123:21 124:2, 20,25 125:20 146:22 147:5 237:20,25 238:25 239:17 240:24 242:14 245:9

**fifteen** 7:20 245:6

**figure** 93:16 117:18

**file** 92:3

**filed** 43:18,21 50:3 51:10,11 53:22 113:7

246:10

**files** 237:3 253:3,14, 17 254:2

**filing** 32:8,16 188:11 245:23 246:13 247:5, 6,10

**filings** 246:12,17

**final** 123:9

**finance** 115:10

**finances** 43:3

**financial** 36:21,23 37:3 39:6,9,22 48:5, 15 49:7,9 161:13,17, 20,22 162:23,24 166:7,16,19,21 256:7

**find** 75:5 77:7 80:11 81:11 87:23 136:12 188:21 198:12 218:14 238:3 254:21, 23

**finding** 36:4

**fine** 79:4 207:3 223:13

**fingertips** 165:23

**finish** 191:16,17 193:15 207:8 233:6 244:25

**finished** 210:23 214:16

**firm** 166:17,20 254:19 255:17 256:5

**fishing** 257:5

**fix** 72:9

**flip** 115:8 136:5

**float** 40:17

**flow** 82:3,7,25 84:6

**folks** 74:2 244:23

**follow** 134:20 252:20

**follow-up** 198:20

**foregoing** 259:11

**forgivable** 175:10 176:9 178:25 179:12, 16,24

**forgiven** 173:23 175:2,8 176:10,18 177:23 178:21 179:7 180:7 183:19,20

**forgiveness** 174:7 178:10 179:4 184:13 233:22 234:14 235:13 236:3

**forgot** 89:17

**form** 17:23 19:17 20:3,25 21:21 25:23 26:12,17,20,25 27:4, 13 28:18 29:20 30:7, 11,16,19,23 31:4,6, 16,20,24 34:24 35:21 40:21 48:25 55:6,23 57:8,22 59:7 61:10 62:2 63:19,24 64:25 66:12 67:11 82:14 84:4 86:6,18 87:22 90:12 91:5 93:4 94:21 95:17 96:17 105:10,18 111:12 113:23 115:18,24 117:13 120:18 121:2, 12 122:14 124:14 125:10 126:8,20 134:10 137:19 138:8 139:7 140:11 142:15 144:22 145:14 146:24 154:7 155:12 157:21 163:20 164:3 165:14 168:11,22 169:11 171:18 172:6, 24 175:4 176:12 178:12 179:9 180:4, 10 181:2 183:4,25 184:16,25 185:17 186:14 188:4,19 189:10,14 191:2,10 192:6,23 195:13 197:15 199:8,12 200:15 201:16 202:6, 22 203:17 204:11 205:18 209:16 210:6 216:3,15 217:4,16,25 218:16 219:6 220:15 221:2,11 225:9 226:14,22 228:9 230:3 232:20 235:19 236:7 238:6 239:3 240:2,11,18 241:19 242:2 245:8,11

**formal** 202:16 212:20

**format** 254:4,5

**formed** 27:21

**fortune** 65:9

**forward** 52:18

**found** 77:6,22 158:11

**founded** 164:7

**founder** 121:17 163:17,24 175:14 178:4 179:18

**fourth** 239:23 240:8 241:3

**frame** 13:7 57:20 80:8 201:10

**framework** 190:8

**Frank** 36:20 83:3 96:23,24 108:17 153:5 159:8 207:24

**fraud** 232:4,16 233:9, 15 234:19,24 237:14, 16

**fraudulent** 33:4 34:2,8 63:11 64:9 87:11,14 232:12

**Fred** 83:7 207:23 208:5

**free** 113:2 201:21

**front** 7:2,10 179:16

**fulfilling** 216:24

**full** 85:8 87:7 88:5 131:22 156:14 159:18 215:9 245:2 253:18,19

**fully** 147:20 251:21

**fund** 206:2

**funds** 49:25 116:10 117:2 144:11

**furtherance** 97:23

**futile** 45:13

**future** 133:13 179:25 184:22 185:13

---

# G

**gap** 42:12

**Garcia** 5:9

**Gas** 161:7

**gave** 9:11 59:18 122:7 155:13 235:23 242:4 243:6 251:19

**general** 15:15 16:24 19:12 40:4 58:8 163:16 166:2 238:19 239:12 241:15 242:12,13 244:4

**generally** 44:25 54:4 58:9 64:12 72:21 122:4 162:8,14,25 178:24 204:17,22 208:4 215:24 216:11 241:3 247:2

**gist** 19:12 211:2

**give** 11:13 18:18 23:11 69:9 115:20 138:16 156:5 163:12 247:16

**giving** 72:8 213:8

**Global** 161:24 245:25

**Gmail** 77:11

**go-betweens** 154:19

**good** 6:22 11:24 65:10 73:25 155:6 160:19,21 166:4 177:15 224:11,15 242:5

**gosh** 107:25

**governed** 143:10

**governs** 143:9

**GP** 12:16 14:17 15:18 16:20

**grace** 69:6

**graduate** 10:24

**grand** 52:15

**great** 27:9

**group** 74:20,22
90:15 133:17,22
142:3 155:20,22

**guess** 13:17 40:22
161:24

**guy** 227:23

**guys** 256:25

---

**H**

**H-O-R-N** 6:10

**half** 40:16,22 50:18
203:25 255:18,21
256:10

**hand** 69:12 82:9,11
182:6

**handed** 8:23 112:25

**hands-on** 48:15

**handwritten** 75:25
76:18 77:3

**hang** 196:5

**happen** 47:5 59:17
71:11 75:20 87:2
121:9

**happened** 14:12,15
17:15 58:15 63:7
65:8 143:7 152:4
153:9 183:7 228:6,19

**happening** 153:10

**happenstance**
228:5

**hard** 154:21 155:3
191:12

**hat** 122:24 123:3

**hats** 123:3,11,12

**HC** 231:12

**HCM** 203:21 209:8,
12,13 210:3,4,10,16,
17 212:5,7 215:11,
18,24 216:4,7,8
217:13 232:15
233:16,20 234:11
239:23

**HCM's** 233:13

**HCMA** 33:16

**HCMFA** 58:8,11,21
59:16 61:23 62:4
144:10

**HCMLP** 23:21 36:7,9
58:19 62:10 85:13
97:20 118:23 123:5,7
126:11 176:23
208:13,22 209:11,13
210:2,9,10 238:24
240:7

**HCMLP's** 90:15

**HCMS** 6:6 194:22
195:4,10,19 199:19
200:20 216:22
217:14 219:15
220:12 231:12

**HCR** 214:5

**HCRE** 6:5 194:22
195:7,11,19 214:6,
21,25 215:12,20,25
216:6,8,22 217:14
218:23 219:14,25
220:11 231:10,13,14,
22

**HCRE's** 215:18

**head** 64:4 162:6
208:12

**heading** 116:13
158:8 245:21

**headings** 68:13,19
91:13

**hear** 84:22 183:12
228:25

**heard** 41:3 72:24
96:23 101:23 103:11,
15 131:7,16,20
138:18 186:10 187:7,
16 210:18 228:16,21

**hearing** 38:20,22
107:22 150:16 151:2,
4,18

**heart** 120:20

**heat** 137:25

**held** 113:9

**Heller** 6:11

**helping** 116:9 132:22

**helps** 237:15

**Hendrix** 83:3 96:22
97:3 99:18 103:2,13,
16 118:18,25 126:17
131:7 133:19 134:3
137:14 139:11
148:19 149:2,16
150:8,10 201:3
211:14,23 220:22
226:16,25

**hereof** 67:2

**hereon** 66:25

**hesitate** 7:24 8:2

**hey** 143:7 213:6

**hidden** 212:23

**high** 64:17 163:25
166:25 187:24 188:8,
9 215:11

**high-level** 173:22

**higher** 163:17

**Highgate** 208:16

**Highland** 5:5,21 8:13
12:2,9,16,18 13:14
41:21 102:23 104:10,
19 121:21,23 122:10,
12 140:3 144:13
154:14,18 161:19,20
166:24,25 167:7,12,
20,24 168:8,9 172:10
176:15 186:10,15,17,
19,22 187:23 189:7
190:23 192:4 195:4,6
198:15 200:8 201:13,
23 202:2,12 203:9,
11,14,15,20 204:5,7,
13,18,19,23,25
205:3,4,12,14,21
206:9,13,17 208:20
215:16 222:3,7 223:5
233:20,23 234:11,15
236:4,11,12,23
237:3,19 238:18,22
241:4 244:2

**Highland's** 189:5
235:10,16

**highlights** 161:10

**hired** 133:9

**hired-off-the-street**
163:18

**historical** 250:6

**history** 10:15,19
229:16

**hoc** 206:5

**hold** 15:14

**holder** 58:19 68:25
72:5

**holding** 27:11

**holds** 15:12,17

**honest** 74:2 228:14

**honestly** 228:4

**honesty** 26:12 27:2

**honored** 22:10

**hope** 46:6,9 167:25
168:6 169:5 189:3
191:25 192:12,18
193:3,4,5

**hopes** 187:24 188:8,
9

**hoping** 64:22 65:2
172:2

**Horn** 6:7,10,11
248:20,22

**hour** 193:17

**house** 203:7,8

**HR** 208:12

**humorous** 175:13

**hundred** 205:7

**hundreds** 11:21
140:24 161:3

**Hurley** 176:5

**hustle** 150:14

**hypothetical** 133:25

**hypothetically**
92:25 157:14

---

**I**

**i.e.** 133:13 144:18

**ice** 167:4 172:12

**idea** 41:14 89:25
158:13 193:14
225:16 228:11 237:5
248:8

**identification** 8:22
9:22 23:21 43:11
55:14 69:18 99:15
107:6 112:24 148:13
150:5

**illegal** 179:22

**imagine** 74:17

**immediately** 25:12,
15 80:25 97:14 104:6
107:25 144:6 146:5

**implication** 69:8
131:22 169:24

**implications** 245:2

**imply** 70:14

**implying** 158:24

**impossible** 190:11

**impression** 108:23
181:6

**improper** 145:12

**inability** 31:19

**inaccuracies** 247:14

**inappropriate** 62:5,
16 151:23

**inappropriately**
61:21

**inaudible** 6:8

**incident** 223:18

**include** 102:4 119:13
125:14 227:16

**included** 50:19
116:8 222:12

**includes** 136:12

**including** 97:22
101:18 120:14
139:10 154:23
236:18,19

**incorrect** 73:2
140:15

**increase** 187:25

**increased** 57:19

**incurred** 237:9

**independent** 11:19 12:7,11,14,15,21 13:2,7,15,17 18:6,15, 20,24 19:15,21,23 23:2 26:10 29:19 71:7 123:8

**independently** 22:14

**indirect** 204:10

**indirectly** 186:18

**individuals** 20:18 48:21

**industries** 165:24

**industry** 61:6,11

**inferiors** 125:14

**inflows** 64:14

**inform** 121:8

**information** 7:5 49:9,14 94:17 217:23

**informed** 10:8 125:23,24,25 129:16

**initial** 37:21 56:18 57:18

**initialed** 259:14

**initially** 21:23

**initiating** 156:14

**ink** 259:14

**input** 214:13

**inquire** 130:17 142:10 152:24

**inquired** 152:21 212:25

**inquiry** 186:22 187:10,13 210:20 211:3,10,15 231:4

**insight** 188:15

**insignificant** 139:15

**insolvency** 28:5,24 29:8,12 32:18 33:5,6

234:20 237:13

**insolvent** 31:14 32:2,6,7,16 34:16,21 236:12

**installment** 65:16

**instance** 116:4 118:9 210:9

**instances** 243:9

**instruct** 35:17 36:10 88:9

**instructed** 103:12 128:3 134:4 252:11

**instruction** 51:21 119:21 120:13 122:8, 10,19 126:18 127:16 128:14 129:16 139:2, 4

**instructions** 85:18 88:15 106:3 134:7 138:21,22 156:5

**insulting** 228:12

**intend** 7:11 168:19

**intended** 50:11,13

**intentionally** 78:11, 15 79:9,13

**intercompany** 174:16

**interest** 15:17 24:24 52:2 54:5 56:23 57:4, 17 60:20 66:19,25 67:13,17,19,20 87:2, 4 90:25 121:24 124:12 182:22 183:7, 20 189:5 224:19 230:9,10,22

**interesting** 111:22

**interests** 62:9 186:11,16,18,19

**interjection** 21:14 29:4 94:19 121:14 125:7 135:5 138:11 169:9 171:8 190:18

**Internal** 182:16

**interpretation** 228:20

**interrogatories** 257:3

**interrupting** 193:11

**introduce** 5:14

**inures** 15:21

**invent** 41:11

**invested** 174:4

**investigate** 176:3 223:3

**investigated** 175:18 203:12,19

**investigation** 174:21 175:25 204:4 243:10

**investigations** 205:12

**Investment** 6:12

**investor** 11:18

**investors** 166:22 169:3

**involve** 105:12

**involved** 11:17 27:16 47:13,14,21,22 48:3 89:18 147:21 161:3, 6,14,22 162:22 165:18 174:4 175:6 178:19 215:17 255:18

**involvement** 132:21

**irrelevant** 233:24 234:16,17

**irrespective** 129:2

**ISI** 255:17

**Islands** 53:23

**issuance** 178:19

**issue** 32:24 34:5 36:10,12,13 65:25 85:18 88:15 106:3 139:2 143:25 144:9 162:18 173:19 174:7, 12 175:15 178:15 195:2 232:4 233:15 235:2 251:19

**issued** 58:11 71:3

134:6 137:24 143:22 145:2

**issues** 21:6 233:24 234:16

**item** 174:20 209:8

**items** 76:8

**iteration** 113:19

---

**J**

**Jack** 83:5 176:5

**James** 5:4,23 6:5,24 17:12 149:12 159:9 259:23

**January** 12:12 13:3 17:16 18:5 20:19 21:15 25:10 26:9,14, 15 29:19,22 30:2 36:24 37:4 69:14,17 80:7,15 83:10 94:3 96:6 104:6,24 105:15 106:3,9,20 107:3,5 108:22,24 109:16 111:2 113:17 126:15, 22 127:9 128:21 129:11 134:25 141:21 142:12 143:12,13 144:19 145:3 146:21 148:19 149:3,13,18 150:21 158:17,22 195:24 197:12 199:18 214:5 215:6,8 216:8 221:9, 18 231:17

**January/february** 201:10

**JD** 10:16,22,25

**Jean** 176:6

**Jefferies** 22:11

**Jernigan's** 155:24

**Jim** 205:6 237:22 241:7 243:3

**job** 97:20

**John** 5:19 12:24 33:3 76:11,13 186:5 234:25 247:20 255:4

**Jones** 5:21

**JP** 207:24 208:8

**Jr** 5:5,24 6:24 259:23

**judge** 13:24 155:24 186:7

**judges** 182:9

**judgments** 27:25

**July** 13:12,13 17:7 19:19,20 20:20 21:15 22:23 156:2

**junior** 133:23

**jury** 38:15 181:22 182:3

**justified** 188:23

---

**K**

**key** 22:24 48:20

**kind** 69:7 73:15 76:24 90:4,8,9 103:25 112:10 161:18 162:15 209:3 243:20

**kinds** 163:9

**Klos** 16:25 17:3 83:4 84:20 103:2,3,15 126:16 133:19 137:13 139:11 153:17 154:6 201:4 207:24 211:13,20,23 226:25

**knew** 52:18 84:13 89:9 94:5 95:22,23 129:5,21,23 132:3 145:9 206:10

**knowing** 134:12

**knowledge** 47:13 54:15 103:5 106:14 110:25 111:5 113:18 220:11,17 247:7 250:4,10,15 253:2

**Kristin** 83:3 96:22

---

**L**

**Label** 5:3

**Labraya** 176:6

**lack** 95:12,14 244:18, 19,20

**laid** 132:9

**Landoseri** 176:7

**language** 180:24

**laptop** 7:2

**large** 124:8 237:2

**largely** 132:25 133:2, 18 140:2

**larger** 155:19,22 162:22

**late** 27:24 37:22 84:14

**latest** 113:19

**law** 10:16,23,25 11:23 34:12 108:7 123:21 239:8 240:4 241:2

**Lawlor** 176:5

**Lawrence** 69:21 70:6,7,9,15

**lawsuit** 24:17,24 32:25 75:24 77:20 177:12

**lawsuits** 21:6 53:22

**lawyer** 11:4,7,10,18 41:13 255:15

**lawyers** 49:3 152:12 255:16

**lax** 59:3,21,23 60:13, 16

**lead** 13:17

**leader** 20:13

**learn** 96:11,15 128:7 178:6

**learned** 18:10,14 84:9 86:10 92:22 95:12,13,22 96:10,12 100:19 107:25 118:10 127:16,21 128:2,22,23 129:21 130:21 134:8 156:3 182:6 221:16,17

**lease** 192:14

**leash** 35:12

**leaving** 52:14

**led** 110:21

**ledger** 231:5,7 249:8, 11,13,17 250:5

**left** 140:24 144:13 176:25

**legal** 5:10 102:21 109:23 141:17 147:12,14 155:23 157:6 234:3 239:5 240:11

**legitimate** 50:15 173:9 182:10 225:12

**Lehman** 161:8,16 164:11

**lender** 55:2,8

**lengthy** 101:6

**letter** 69:15 72:12 73:12 81:7,9 93:24 94:15 97:6 104:24 105:15 106:2 107:3 127:9 134:25 135:11 141:22 142:13 145:3 156:13 197:4,7,11 198:14,20,24 199:9 200:6,11 214:4,7 218:24

**letters** 51:22 219:14

**letting** 61:15

**level** 73:20 116:21

**liabilities** 29:9 35:5,9 189:8 190:24 246:4

**liable** 242:19

**liar** 224:2

**licensed** 11:4,6

**lie** 224:6

**life** 32:21

**limit** 16:11

**Limitations** 246:2

**limited** 14:17 15:12 238:14,15 239:9,23 241:3 242:8,22

**limiting** 227:13

**liquidity** 35:13

**list** 119:13 147:9

**listed** 93:13 177:21 178:8,20 208:22 209:9 211:20

**listen** 140:16

**listening** 181:22

**listing** 161:4

**literally** 144:13 245:20

**litigate** 223:15

**litigation** 16:7 54:10 75:16 134:15 145:16 147:22 152:13 182:19 236:13 250:12

**litigations** 27:15 192:10 195:3

**live** 8:5,6,9 140:17

**LLP** 6:2

**loan** 99:13 117:5 150:12,20 151:8 173:18 174:24 176:16 177:5 179:12, 17,20,23 180:6,7 183:2,17,18,21,23 184:3,4,6,13 194:18, 21,22 195:3,6,10,11 196:4 198:17 199:19 201:6 214:22,25 216:11 219:14,15 220:3 229:16,25 256:18

**loans** 172:20 173:2, 5,13,23 174:7,8,16, 25 175:8,10 176:8,18 177:23 178:8,25 182:17,18,22,23 184:7,11 195:19,23 196:3 203:7 230:19, 22

**local** 159:24

**log** 164:8

**logbook** 75:5

**logical** 57:2 67:8 152:4,9

**logically** 66:7 82:23

**long** 27:11 30:3 52:9 63:9 140:23 183:6 193:22 255:23

**long-dated** 64:10

**longer** 122:11 133:4 167:16 248:8

**looked** 76:3,7 176:13 178:17 200:13 202:17 217:18 218:24 230:4,15 231:4 247:5,9 249:11 256:16 257:20 258:12

**loosely** 130:19

**loss** 167:7,9

**losses** 141:2

**lost** 44:2 183:9,10

**lot** 154:22 164:9 165:7 167:10

**lots** 10:16 201:21,22

**low** 54:5 64:16

**loyalties** 155:7,17

**loyalty** 244:20

**LP** 5:6,7,18,22 12:2, 17,18 26:4

**Luc** 176:6

**M**

**made** 19:15,20 22:11 25:19 33:9 52:10,21 57:13 62:19 81:12,22 85:3 89:11 90:10,21 92:24 94:16,24 95:3, 6,15,19,23 96:11,13, 15,19 97:12 98:12,21 103:20,21,23,24 105:3,5 111:10 118:15 121:10 125:19 126:25 127:5, 23,24 128:4,13 129:3,23 130:18 131:20 134:5,13 141:23 142:20 145:5 159:9 162:20 165:10, 24 174:21 176:16

182:23 183:8,21,23 186:21 187:10,13 195:20,23,25 199:18 210:21 211:3,16 215:4,6,8 216:10,12, 19,25 220:12 229:11, 17 230:20 231:17 233:21 234:13 235:11 237:20 238:17 249:21 251:18 256:19 259:13

**made-up** 76:23

**Madoff** 162:2

**main** 205:5

**maintain** 250:5

**maintained** 22:5

**make** 25:5,14 27:25 36:2,4 52:6 53:13 58:23 76:4 79:6 84:10 94:4 95:7 97:16 98:20 106:21 110:11 117:25 118:2, 11 119:10 126:18 128:15,25 129:17 130:13 132:4,22 140:16 159:2,4 160:4 168:7,14 169:23 179:19,23 180:23 196:8 200:18 210:19 211:7,9 212:16 236:10

**maker** 55:2,7 63:11 66:7,17 69:5,10 124:10

**makes** 35:19 229:8

**making** 54:23 85:21 88:17 102:18 131:8, 17 141:17 143:19,21 215:13,17 216:12

**mal-intent** 87:18

**Mamoud** 176:6

**man** 125:12,13 140:22

**manage** 22:18

**managed** 18:22 22:7

**management** 5:6,22 12:2,17,18 14:9,10

26:21 115:11 122:12 135:18 166:8,10,18 167:5 198:16 200:9 201:14 202:3 203:10, 15,20 204:8,19,25 205:13,15 206:9,14, 17,18 215:17 241:5 242:9 243:2,24 244:12 245:7

**manager** 22:6

**manages** 242:22

**manner** 205:22 256:22

**Manuel** 5:9

**margin** 22:10

**margins** 18:23

**Marianne** 5:12

**mark** 8:17 177:13

**marked** 8:21 9:21 23:21 43:10 51:7 55:13 56:5 69:13,17 99:11,14 107:2,5 112:13,23 148:12 150:4 196:6,7,25 197:9 200:7 214:15 245:15

**material** 7:4 71:18 78:14 157:2 158:14 173:19 174:12 175:15

**materiality** 157:10

**materially** 174:8

**materials** 255:7 258:17

**math** 57:9

**matter** 5:5 170:2 190:15 205:4 223:10 224:10

**matters** 136:25

**maturity** 58:17 150:12 151:8,16 152:23 249:23

**maximize** 50:16 97:20

**meaning** 29:9 68:14 225:22

**means** 65:20 80:6 181:3 203:19 217:13 254:2

**meant** 115:16 120:24

**Media** 5:3

**mediation** 41:2 46:2

**meet** 18:23,25

**meeting** 73:10,15, 16,18 75:6,9,12,13 79:25 81:2

**meetings** 71:13 72:20 74:8 75:2 80:6, 9,14 81:15 82:25 83:12,16

**melting** 167:4 172:12

**members** 20:6 41:23 72:21 73:11 74:6,9, 24 75:7

**memories** 73:25

**memory** 23:18 24:5, 9 73:8 128:11 224:11,16

**mental** 108:12,13

**mention** 211:22

**mentioned** 17:8 50:2 80:2 83:22 99:18 125:17 161:2 172:19 177:20 226:18 249:7 255:12 257:18

**met** 31:23 169:22

**metadata** 250:24 251:5 254:6

**metastasize** 239:15

**Methods** 246:2

**metrics** 28:8

**MF** 161:24

**MGM** 186:11,20 187:8,17 188:2,9,13 189:5 190:5,12,21 191:11 192:2

**Michael** 6:3

**mid** 38:18

**middle** 41:15 49:4 88:21

**mike** 176:4

**million** 25:6 27:17,18 52:24 57:19 89:7 93:15 106:21 108:6 109:2,19 110:3 111:10 145:23 152:17 163:15 164:19,21 166:3 168:15 169:13,20 170:11,19,20 171:3, 11,16,23 172:3,4,7 188:10 191:6 192:9, 15,19 193:6 205:7 222:22 243:6 250:3,6

**million-ish** 243:8

**millions** 86:22 139:16,18 140:24 154:24 222:7

**mind** 45:22 46:11 129:7 146:7 171:20 207:8

**mine** 122:5

**minimize** 181:5

**minimum** 230:9,21

**minimums** 229:20

**minus** 191:4

**minutes** 59:25 73:18 83:17,19 98:23 146:11 160:3,6 193:16 194:9 245:6 248:6

**mischaracterizes** 221:13 239:4 240:2, 18 241:19

**missed** 71:23 72:2 85:17 87:20 98:3 106:6,11 109:6 131:24 149:19 156:4

**misses** 88:11 146:2

**missing** 9:6 196:10

**misstate** 44:13

**mistake** 52:10 151:10

**mixing** 231:12

**MO** 172:16 185:24 205:8 233:10 244:7

**moment** 137:25 159:21 192:2 196:21

**moments** 99:9

**monetary** 156:19

**monetization** 46:15 50:3,5,10 52:19 63:21 158:9 159:19 168:2 187:25 192:13

**monetize** 50:13 62:25 159:20

**monetized** 189:7 190:22

**money** 27:12,13 35:11,13 41:15 58:22 67:21 92:16 164:9 167:10 168:24 172:15 184:7 203:4 205:3,6 208:23 209:12 236:18

**monies** 185:21

**months** 45:4 187:15 224:13

**Morris** 5:19,20 9:5,9 17:22 19:16 20:2,24 21:3,20 25:22 28:17, 22 30:18,22 31:15 32:19 33:7,11,18,22, 25 34:4,24 35:20 40:20 48:24 55:5,22 57:7,21 59:7 61:9,25 64:24 66:11 67:10 69:23 70:2,8,11 78:23 82:13 84:3 85:23 86:5,17 87:21 89:19 90:11 91:4 93:3 94:20 95:16 96:16 97:10 99:10 105:9,17,21 111:11 112:10 113:22 115:17 117:12 120:17,25 121:11 122:13,21 124:13 125:9 126:7,19 127:18 129:18 134:9 135:3 137:18 138:5,8 139:6,21 140:10 142:14,21 144:21 145:13 146:9,23 150:23 152:7 154:2 155:11 157:20 160:14 163:19 164:2

165:11,13,17 168:10, 21 169:10 171:6,17 172:5,23 175:3,22 176:11 178:11 179:8 180:3,9,20,25 181:25 183:3,24 184:15,24 185:16 186:2,6,13 187:2 188:3,18 189:9,13 190:16,25 191:9,16 192:5,22 193:8,10 194:6,14 195:12 196:13,16 197:14,19,24 198:5, 8,10 199:7,11 200:14 201:15 202:5,8,18,21 203:16 205:17 206:24 207:4,9,12,16 209:15 213:6,10,14 216:2,14 217:3,15,24 218:15 219:5 220:14, 25 221:10,13 223:6, 12,16,20,23 226:2 226:2,13,21 227:11 228:8 230:2 231:9 232:2,7,9,19 233:5, 25 234:7 235:18 236:6 238:5 239:2,25 240:10,17 241:9,16, 18,25 244:25 245:10 247:15 250:21 251:6, 9,15,22 252:3,8,11, 14 253:8 255:21,25 256:22,24 257:10,12, 25 258:3,15,17,20,24

**Morris'** 24:14

**Motion** 43:10

**motivation** 105:11

**mouth** 108:11 151:21

**move** 172:16 184:21 185:13,24 203:4 205:8 233:10 244:7 252:23

**moves** 41:18

**moving** 27:12,13 46:15 52:18 71:15

**multiple** 20:16 46:3

**N**

**named** 50:12

**names** 12:23

**Nancy** 6:5 237:22 238:13 241:6 242:25 243:3,4,25 244:12 245:8

**native** 251:3 253:3, 14,17,25

**nature** 83:24 97:8 174:5

**nebulous** 61:12

**necessarily** 86:25 125:11 182:12

**necessitated** 125:20,22

**needed** 20:13 35:11 36:17 89:19

**negative** 91:9 92:2,3

**negotiate** 156:7,16, 19 168:13

**negotiate/ renegotiate** 69:2

**negotiated** 168:16

**negotiating** 46:16

**negotiations** 46:2 48:12,16 103:25 222:11

**neighborhood** 170:25

**Nelms** 12:24 13:23 76:14

**net** 192:19

**Netflix** 27:11

**Nexpoint** 5:6,17 24:17 25:4,20 26:4,8 27:23 28:2 37:12 38:9 49:18 52:25 54:12 64:23 71:3 72:8 75:23 77:20 80:24 81:13 82:10,18 84:10 85:2,21 86:15 87:20 88:11,17 94:3 96:10,12 97:8,17 98:11 106:6,20 113:5 114:5 116:5,9,10,22 117:8,24 118:5 119:2 121:25 122:20,23

123:15 124:10 125:5, 13,16 130:12 131:7, 17 134:5,20 135:19, 24 139:9,16 141:23 142:12,19 143:6 144:10 146:22 147:14,21,25 151:25 156:4 194:18,21,24 198:25 199:9 200:12 202:17 204:6 218:25 222:6 223:5 225:5,16 226:6

**Nexpoint's** 82:12 116:18 117:2,4 144:7

**Nguyen** 89:14 90:17 91:19

**nineteen** 187:15

**non-individual** 247:4

**non-lawyer** 63:21

**non-lawyers** 31:25 255:6

**non-tax** 181:9

**nonpayment** 194:18 200:10,20,25 201:5

**nonresponsive** 77:9

**nonsense** 76:24 232:24

**nonsensical** 86:21 98:6 158:15

**normal** 71:20

**north** 177:2

**Notary** 6:18

**notations** 257:23

**note** 21:4,9 25:7,11, 15 33:10,11,12,16 52:25 53:4 55:3,11, 12,21 56:11,18 57:19 58:8 59:13 60:14 61:15 62:23 63:2,8,9, 11,17,22 64:10,18,23 65:6,12 66:19,23 67:20 68:24,25 72:6, 9,25 80:24 84:14 87:5,8 88:6 89:8,12 92:6,13 93:10 97:13, 22,24 98:15,16

105:5,7,23 106:6 107:23 108:2,4,7 109:5 110:18,20,22 111:18 117:10 118:25 122:2,4 124:9,11 125:3,21 128:16 131:10,11,14, 23 132:6 134:4,21 141:24 143:6 145:7, 10 146:5 149:3 151:25 152:18 157:15 159:17,18 162:16 179:6 183:22 184:8 193:6 197:13 200:9,20,24 201:5,8 218:10,12 219:4 220:6 221:19 229:4, 23 232:5,17 233:16 235:6,7 250:3,7

**note-taker** 72:25

**noted** 259:13

**notes** 45:18,20 50:19,23,24 51:2,3, 15 52:3,7,12,22 53:15,16,17,18,19 54:3,4,8,15,20,22 55:3,8,18,20 56:4,7, 12 57:4 58:11,12,17, 20 59:4 60:3 61:6,22, 23 62:12,21 72:19 73:6,9,17,21 75:25 76:6,7,18 77:3,9 93:8 95:8,25 117:19 144:19 145:10,18,19 151:11,24 152:6,16 153:7 176:18 178:7, 9,14,16,19 179:2,3 182:19 192:9 218:13 219:10,18 227:5,9,16 228:2,5,24 229:12, 14,16,20,22,24,25 230:5,11 233:21 234:13 235:11,14 236:2,19 243:7,8 245:25 248:7 249:8 251:18 253:6,7 258:14

**notes'** 60:20

**notice** 8:18,20 9:20 25:11 37:22,24 85:9, 10 98:2 115:3 158:19 245:23

**noticed** 205:11

**Notices** 9:16

**November** 37:22,23 45:5 46:5

**NPA** 38:2,3,9,15 63:10 64:14 87:6 90:14 92:16 140:2 150:12 151:8 196:3 200:4 205:25 219:11

**nth** 138:19

**number** 7:17 22:20 63:2 92:2 97:19,23 153:7,9 165:2 169:6 171:20 196:10 222:23 229:20 230:23 236:17

**numerous** 135:7

**nutshell** 50:7

---

## O

**object** 34:24 72:4 85:16 157:20 159:3 186:3 187:2 234:2

**objected** 34:19

**objection** 17:22 19:16 20:2,24 21:20 24:15 25:22 28:17 30:18,22 31:15 35:20 40:20 48:24 55:5,22 57:7,21 59:7 61:9,25 64:24 66:11 67:10 72:3 82:13 84:3 85:23 86:5,17 87:21 90:11 91:4 93:3 94:20 95:16 96:16 97:10 105:9,17,21 111:11 113:22 115:17 117:12 120:17,25 121:11 122:13,21 124:13 125:9 126:7,19 127:18 129:18 134:9 135:3 137:18 138:5 139:6,21 140:10 142:14,21 144:21 145:13 146:23 150:23 152:7 154:2 155:11 157:20 163:19 164:2 165:11, 13 168:10,21 169:10

171:6,17 172:5,23 175:3,22 176:11 178:11 179:8 180:3, 9,20,25 183:3,24 184:15,24 185:16 186:13 188:3,18 189:9,13 190:16,25 191:9 192:5,22 195:12 197:14 199:7, 11 200:14 201:15 202:5,18,21 203:16 205:17 209:15 210:5 216:2,14 217:3,15,24 218:15 219:5 220:14, 25 221:10 225:8 226:2,13,21 227:11 228:8 230:2 232:19 233:25 235:18 236:6 238:5 239:2,25 240:10,17 241:9,16, 18,25 245:10

**objections** 10:3

**obligation** 105:6 120:15,23 121:4,7 134:19 138:25 146:4

**obligations** 104:18 116:11,19 117:5 135:24,25

**obligor** 58:18 229:19

**obligors** 51:24

**obviated** 98:19

**obvious** 60:6 64:8 157:23 158:2,5

**occur** 179:25

**occurred** 108:24 237:9

**October** 5:7 23:14 24:6,9,11 26:10,14, 15 35:15 36:19 46:3 259:4

**odd** 91:7 173:7 187:20

**off-record** 8:19 23:23 43:12 55:15 69:19 106:24 107:7 112:2,8 146:13 148:8 160:13 194:7

**offers** 63:16

**office** 115:22 116:7, 12 204:18 205:13 212:6

**officer** 36:21,24 37:4 39:7,9,17,18,22,24 40:8,13 49:24 117:24 123:17 140:6

**officers** 16:19 40:7 138:2,24 174:25

**official** 75:8,11 80:10

**offline** 251:25 252:6 253:10

**offshore** 154:24 236:18

**oftentimes** 80:19 114:11,13 182:24

**Okada** 176:17

**Okada's** 177:4

**okayed** 118:20

**one's** 228:13 247:24

**ongoing** 203:23

**operate** 104:13 167:9

**operating** 74:22 167:9 203:2

**operation** 239:10

**operational** 36:9

**operations** 16:13,15 36:6

**opinion** 26:12,17,20, 23,25 27:4 29:20 30:7,11,16 31:4,7,21, 24 32:5 63:19,20,24 154:7,11 189:15 239:7

**opinions** 27:21

**opportunities** 46:13

**opportunity** 159:20 184:19 185:10

**opposed** 62:10 87:8 92:2 97:17 132:11 143:6 162:19 216:11, 24 219:3

**opt** 37:15

**optimism** 188:12,13, 17,22

**optimistic** 192:25

**options** 87:11

**oral** 210:16

**order** 17:18 155:15 190:22

**organization** 20:12, 17 22:16 121:17

**original** 56:3,19 150:11 151:8 198:17

**originally** 53:10

**outflows** 59:17

**Outlook** 75:10 80:5

**outstanding** 52:14 56:23 85:8 209:2 229:21 230:14,23

**overhear** 103:5

**overpaid** 222:2,7,18 225:6,17,25 226:6,20

**overpayments** 223:4

**overrule** 18:25

**oversight** 18:15,19 168:3

**owed** 87:5 92:16,18 110:11 146:22 147:6 180:8 184:8

**owes** 145:22 205:6

**owing** 52:13 86:23 93:14 98:4,17 110:14

**owned** 205:2

**ownership** 15:17 26:7

**owns** 121:18 186:16, 17,20

---

**P**

**p.m.** 5:8

**Pachulski** 5:20 254:19 255:3

**paid** 64:15 88:6

91:15,17 93:14 105:24 108:3 129:7 139:16,18,22 142:5 145:6 153:6 164:9 167:9 173:6 177:7 179:6 201:23 204:16 225:13 227:6,10 228:2 230:7

**palatable** 42:5,7

**paltry** 139:25

**pandemic** 27:10

**paper** 203:4

**par** 153:25

**paragraph** 51:13,17, 19 66:2 68:8

**paralegal** 69:24

**paraphrase** 136:3

**pardon** 26:24 48:4 53:8 123:20 133:10

**parentheses** 91:8

**parse** 122:25

**part** 17:15 30:6 42:3 66:18 71:21 101:2,16 105:11 108:15 114:6 116:12,14 155:19,21, 22 172:20 173:3,14, 24 174:22 176:10,23, 24 177:24 178:25 179:12 192:7 203:23 208:19 222:10

**participants** 74:19

**parties** 114:16 118:22 144:18,25 205:25 255:9

**partner** 6:3 208:6 238:14,19 239:9,12 241:15 242:8,12,13, 22 244:4

**partners** 214:6,21 215:12,25 238:15 242:15

**partnership** 14:17 15:12,15 238:16,24 239:10,19,24 240:6, 8,13 241:4 242:10, 11,15,23 243:5

**partnerships** 240:5

**parts** 22:15 102:3

**party** 59:15

**pass** 160:14 248:17

**past** 85:22

**Pat** 176:5

**path** 223:8

**pattern** 163:17 204:5 206:6 213:3

**Paul** 176:6

**pay** 28:23 29:15 31:19 57:17 58:2,4, 22 65:15 82:11,19 116:22 133:14 144:7 158:10 172:9,11,14 173:10,12 177:8,17 206:12 211:5 216:10 226:19 227:16

**pay-downs** 57:25

**payable** 25:12,16 80:25 88:22 97:14 104:18 116:23

**payee** 59:4 60:23 61:5,13 69:2,9 124:8

**paying** 45:19 116:18 139:9 145:24 204:20 205:14 215:25 229:19

**payment** 25:5 51:25 52:11,22 65:21 71:23 72:2 81:12,22 82:12 84:11,13 85:3,4,18, 21,25 86:2,16 87:20 88:12,18 90:21 91:10 92:8,9,13,23,25 94:4, 16 95:3,12,14,15,19 96:10,11,12 98:3,12, 20,21 103:20 105:4 106:6,11,21 108:5,8 109:2,6,19 110:3,9, 22 111:10 117:10,25 118:2,11,15,19 119:2,11,13 120:16 121:10 125:19 126:25 127:24 128:4, 13,15,17 130:17 131:8,10,18,24 132:6,21 133:12 134:4,21 142:4

143:19 146:3 149:19 156:4 195:10,23,25 199:18 200:10,20,24 201:5 214:25 215:6, 8,12,13,18 216:12, 19,24 218:8,11,22 219:2,12 220:4 229:15 231:5,6,16, 18,19 244:3 249:7, 11,13,17,20 250:5

**payments** 57:12 58:6 66:23 82:20,21 89:11 90:24 91:20 95:6,8,22 96:2,19 99:20 101:20 102:19 103:21,22,24 104:3,4 110:19 115:10 116:15 117:18 118:7 126:18 127:4,22 128:25 129:17,22 130:5,9,14 131:3,20 132:4,23 134:13 143:22 145:4 154:23 179:23 182:21,22 183:7,20 184:5 195:19 216:8,10,22 217:14,18 218:4 220:12 224:21,22 229:3,4,11,17 230:4, 10,19,22 249:20 250:6 251:18,23 253:7 256:18

**payoff** 59:17

**payor** 61:13

**payroll** 110:15 255:23

**pays** 116:10

**PDF** 250:23 254:11

**penalty** 247:3 259:11

**people** 13:6 19:24 20:15 132:9 133:8,9, 23 138:12 167:8 176:4 178:8,20 211:12,19 216:5 254:25

**perceive** 124:11

**perceived** 124:16

**percent** 186:17

**performance** 164:6 166:11 170:14,16

172:13,14 190:7,13

**performed** 36:17 206:8 210:10 225:13

**performing** 205:25

**period** 30:3 39:9 45:4,25 50:14 60:21

**periodic** 130:9,14

**periodically** 8:9

**periods** 27:11 235:11

**perjury** 247:3 259:11

**permeates** 244:20

**permission** 72:18 74:18,25 133:14

**permitted** 35:23 61:16 118:21 238:15

**permitting** 61:21

**person** 16:14 61:14 69:22 136:11,19,24 141:8,14 160:16 254:15

**personal** 54:14 77:17 153:20,23 220:11

**personally** 9:17 45:8 138:6

**personnel** 132:20,23 133:14

**persons** 239:18

**perspective** 18:9 35:8

**persuade** 137:17

**petition** 32:3

**ph** 14:2 176:6,7

**phone** 7:10

**phrased** 221:20

**PI** 109:9

**pick** 181:10

**picking** 235:3

**piece** 186:20 246:25

**pieces** 170:18 222:16

**pin** 37:9

**place** 37:11 44:3 74:13 104:12 148:2

**places** 161:25 185:22

**plan** 12:3,5 13:3 14:11 15:22 24:23 40:18 41:3,8,14 42:3 44:17 45:11,18 46:15 47:4 50:3,5,8,10 52:16,19 53:7 63:6 104:10 158:10 159:19 222:11

**plans** 62:25

**play** 243:21

**played** 143:4

**player** 11:17

**point** 31:6,9,13 45:7, 12 47:2 49:15 53:4,7 55:24 62:24 93:2 94:2 130:16 147:22 149:6 193:18 208:16

**pointed** 94:24

**pointing** 91:21 241:24

**points** 238:21

**policies** 104:11,17, 23 148:2

**polite** 224:4

**portfolio** 22:5,6 186:23 187:4,6,8,12, 17

**position** 49:11 191:3 232:15 233:19 234:10 239:8 242:7

**positions** 123:18

**positive** 123:24

**possibility** 199:16 210:8

**post** 16:12

**post-confirmation** 15:3

**post-payment** 200:11 219:14

**pot** 40:18 41:3,8,14, 16 42:3 44:16 45:11, 17 47:4 52:16 222:11

**potential** 77:3,23,24 168:17 175:2,8 188:6 190:4 191:22 192:2 235:13

**potentially** 54:9 118:6 125:11 176:8 178:25 191:12

**power** 184:10

**practice** 82:24 175:20 204:5 213:3

**practices** 104:14

**practitioner** 14:8

**preamble** 56:8

**precarious** 53:21

**precise** 186:15

**precondition** 234:18

**prefer** 139:8 140:12

**preferred** 154:5

**premarked** 196:7 206:23 213:23 245:16

**prepaid** 92:7,8,13, 14,18,25 93:12 98:15,19 142:7

**preparation** 148:21, 23

**prepared** 10:4 92:19 118:18,25 235:8,15 247:11

**preparing** 116:15

**prepay** 66:2,17 67:16,18,21

**prepayment** 65:25 66:16 68:2 142:20

**prepayments** 93:9 141:23

**presentment** 69:6 98:2 219:20

**press** 22:3

**pressed** 74:14

**pretty** 11:24 23:6 35:5 46:14 48:2 52:8, 9 64:8,17 74:2 98:20 131:19 147:20 166:4 207:11 221:15 224:15 232:22 237:12 242:4 252:14

**prevailing** 136:23

**previous** 93:2

**previously** 17:3 112:17 258:13

**principal** 51:25 56:23 66:18 67:2 89:7 90:25 91:17 149:3 198:17 219:2 220:4 230:9,10,21 231:18

**principals** 123:22 236:15

**print** 112:11

**printed** 196:22

**prior** 10:8 13:13 17:4, 11 22:23 32:2 39:9 42:21 46:4 55:18,20 56:4,7,12 59:2 61:3, 20 67:6 71:6 75:13 80:4,14 85:17 90:23 94:15 98:10 100:18 104:10 106:16 108:3 112:12 113:19 123:7 126:14,15,21 128:12 144:18,19,24 145:20 162:10 164:11,14,15 165:5,6 169:25 196:14 229:17 230:7

**privilege** 77:24

**privileged** 78:14,19 198:13

**problem** 42:25

**problematic** 182:12

**problems** 60:2

**procedure** 74:22

**procedures** 104:12, 17,23 148:2

**proceeding** 109:10

**proceedings** 11:10

**process** 108:12 191:20

**produce** 252:12 253:4

**produced** 79:2,11 89:22 90:3,14 199:4 231:6 250:11 251:17 252:10 253:20 256:8, 13,17

**production** 77:4,24 219:8 255:19

**productions** 251:12, 16

**professional** 54:25 138:15

**professionals** 49:3

**program** 175:6

**programs** 174:24

**prohibited** 68:23 157:14

**promissory** 25:7 50:19,23 51:2 55:12 56:11 57:4 58:11 59:4 61:6 122:2,4 124:9,10 125:3 132:6 197:12

**promoted** 153:17

**prompted** 107:16 108:25

**proper** 154:14

**properly** 35:4 236:13

**properties** 254:7

**property** 8:9

**propose** 42:4 44:16

**proposing** 41:8

**prospect** 171:11

**prospects** 187:23

**provide** 52:15 114:8 144:12 145:25 211:5 212:6 253:14

**provided** 31:25 47:17,18 76:25 78:7, 9 114:11,13 115:22 135:25 136:18 147:9

201:13 202:2 203:14 204:18 205:13 209:13 215:24 253:4

**provider** 135:16

**providers** 254:21

**providing** 115:7 144:10 147:14 204:5 210:2,17 254:3,4

**proving** 34:6

**provision** 143:2 219:10

**prudence** 136:21

**prudent** 136:23 142:18 145:6

**PST** 254:5

**Public** 6:18

**pull** 89:14 154:18 196:6

**pulled** 43:17

**pulling** 20:15

**purports** 113:3

**purpose** 60:4,5 145:12

**purposes** 21:8 68:13 132:11 179:5 182:11

**pursuant** 17:17 20:21 21:17 82:24 142:18 183:22

**put** 22:2 23:17 24:13 33:16 34:8 41:15 73:14 140:23 148:6 151:20 191:20 236:14

**puts** 117:22

**putting** 108:10

---

**Q**

**quality** 256:13

**question** 17:23 19:17,18 20:3,25 21:11,12,21 22:22 25:23 28:18 30:19,23 31:16 34:25 35:18,21 36:8 40:21 48:25

55:6,23 57:8,22 59:8 60:10,11 61:10 62:2 64:25 66:12 67:11 72:11 77:10 82:14,20 84:4 85:15 86:18 87:22 90:12 91:5 93:4 94:21 95:17 99:21,22 102:8 105:10,18 111:12,23 113:23 115:18 117:13 120:18 121:2 122:14 124:14 125:10 126:8,20 134:2,10 135:9 137:19 138:9 139:7 140:11 142:15 144:22 146:24 147:11 155:12 157:21 163:20 164:3 165:14 168:11,22 169:11 170:4,8 171:18 172:6,24 175:4 176:12 178:12 179:9 180:10 181:2 183:4,25 184:16,25 185:2,9,17 186:14 188:4,19 189:10,14, 18,23 190:2 191:2,10 192:6,23 195:13 197:15,25 199:12 200:15 201:16,19,20 202:8,22 203:17 205:9,18 209:16 210:6 212:9,11 216:3,15,17 217:4,6, 16,25 218:16 219:6 220:15 221:2,11 225:9 226:14,22 228:9 230:3 232:20 233:3,12 234:9 235:4,19 236:7 237:18 238:6 239:3 240:2,11,18 241:19 242:2 245:11 248:21 249:5

**questioner** 223:7

**questioning** 99:8 160:25 194:17

**questions** 21:8 85:16 102:5,15 235:22 248:23 249:6

**quick** 136:12 147:7 207:11

**quickly** 23:7 100:4

**Quinn** 69:24 70:6

**quip** 189:21,24

**quote** 44:7 182:6

---

**R**

**raise** 155:13

**ramifications** 137:16 140:21 141:3 143:19,21

**ran** 22:14 256:5

**range** 162:25 164:18, 21 166:4

**rare** 174:20

**rate** 54:5

**re-trades** 46:4

**read** 21:12 51:19 56:2 62:20 65:14,22 66:16,22 67:8 101:2, 11,14,16,23 102:2 110:24 113:2 136:7, 15,16 137:5 141:14 147:10 150:10 170:5, 7 185:2,7,8 229:4 234:5,8 247:16 259:11

**reading** 22:4 137:12 143:5

**real** 8:8 45:15 62:13 136:11 147:7 244:18

**reality** 222:25

**realize** 132:5

**realized** 107:25 111:18

**reason** 30:12 43:22 57:16,18 64:7 73:23 83:11 111:8 113:12 117:11,16 120:9 184:9 219:15,17 224:5 227:8,25 247:13,25

**reasonable** 117:8

**recall** 23:13,25 37:6, 10,14,18,21 38:5,17, 21,23 39:4 40:19

43:13 47:6,21 58:6 64:5 71:9,12 72:14 73:13 74:13,23 76:9, 16,20,25 80:21 81:2, 4,21,23 82:9,15 84:12,17,19,21,25 89:2 94:5,14 101:14 104:5,7,16,20,22 107:12,16 109:4,8,9, 11 110:5,23 113:24 119:23 120:4 126:24 127:21 129:20 130:19,20 131:19 145:17 150:19 151:18 152:25 153:3 157:7,11 162:6 173:2,16 182:5 188:5 195:14 198:19,21 199:2,21 201:2,11 208:2 209:23,24 216:17 217:8,9,20 218:6,19 219:23 221:4,7 222:19,21 226:15 227:14,18 228:17 230:25 246:7, 24 249:9

**receive** 174:25

**received** 81:24 108:5 115:24 176:8 177:23 203:20 215:12 216:7 217:13 225:17 243:15 251:13

**receives** 167:4 179:12

**recently** 251:14

**recess** 99:3 112:5 146:16 160:10 213:18 248:11

**recitation** 11:13

**recognize** 70:21 107:10 227:22

**recollect** 177:7 229:10

**recollection** 39:5 40:9 82:9 88:15 93:11 97:2 100:14, 17,21 102:23 134:24 151:6 164:18 211:8, 19 212:3,11 228:21 229:9 230:18

**reconsider** 138:4

**reconstituted** 14:16

**record** 8:4 23:17 24:14 38:15 53:14 73:23 74:14,25 99:2, 5,7 111:25 112:4,7 146:15,18 160:9,12 213:17,20 248:10,13 257:16

**recorded** 74:18 80:5 83:12

**recording** 99:23 100:12

**redacted** 251:21

**Redeemer** 237:2

**reduce** 110:11

**reduction** 132:15

**refer** 187:8,17 202:9, 25

**reference** 108:18 127:8 149:22

**references** 55:18

**referred** 143:16 186:23 187:4,5

**referring** 96:5 116:4 202:19,23

**refresh** 23:18 24:5 128:10 164:17

**regard** 198:16

**regular** 8:15 71:13 132:11

**reimbursed** 209:22

**reimbursement** 110:15 209:20

**reimbursements** 209:2,6

**reinstate** 157:15 159:17

**reiterated** 108:9

**relate** 226:18

**related** 32:23 80:23 95:4 103:22 104:17 114:16 124:18 129:23 174:16

182:18 209:5 223:9 227:4,5 240:5

**relation** 178:7

**relationship** 62:6 138:12 169:25

**relevant** 11:14 130:4 223:18 224:4

**relied** 48:10

**rely** 59:15 117:9

**remain** 167:15

**remember** 36:25 71:16 79:19 84:8 108:19 129:15 131:16 133:20 151:3 155:18 181:22 194:19 224:12,14

**remotely** 7:3

**removed** 17:18 21:24

**remuneration** 115:25

**renegotiating** 68:23

**renegotiation** 68:2, 4,9,20

**reorganization** 165:19

**reorganized** 15:9, 13,15,20 16:2,3 24:19,23 30:13 41:17 77:2,15 153:13

**rephrase** 7:25 19:18 218:3

**replace** 133:7,8

**report** 16:10 81:25 83:22 90:9 112:12

**reported** 22:12 143:17

**reporter** 5:11 6:9,15 18:12 19:5 21:14 29:4 37:25 46:20 62:15 76:12 82:5 86:4 87:13 90:19 94:19 99:11 100:3,7 121:14 125:7 135:5 138:11 152:10 169:9 170:7 171:8 185:7,8

190:18 234:8

**Reporting** 5:11,13

**reports** 22:4 92:20

**represent** 5:17 43:16 90:2 112:14 113:6 231:22 256:4

**representations** 58:23

**representatives** 51:22

**represented** 102:14

**representing** 5:23 6:4,12

**request** 36:17

**requested** 76:9 118:18 258:13

**requesting** 74:18

**requests** 75:23 76:5, 6,17 77:20 78:17 254:17 255:8

**required** 130:9 142:25 145:6 219:18

**requirement** 219:21

**requires** 33:4

**resignation** 23:9

**resigned** 24:6 26:11 35:16

**respect** 11:12,25 14:19 17:24 33:2 35:13,23,25 36:5,6, 14 62:3,11 77:18 84:6 85:20 101:20 104:12 106:5 120:8, 15 121:24 122:2,3 123:8 125:2,16 128:16 129:5 133:10, 12 135:10 141:7,8 143:5,11,18 144:16 148:3 154:24 155:4 156:20 175:13 176:22 210:16 218:23 219:19 232:21 236:16 238:12 243:25 246:11,17

**respective** 123:22

**respects** 133:11

**respond** 71:22 254:16

**responding** 75:22 217:12 218:13

**response** 76:16 130:2

**responsibility** 116:22

**responsible** 116:18 154:13 156:14

**responsive** 76:2,19 77:19 78:7,16 253:20 254:13 255:7

**restate** 33:23

**restated** 112:22 113:4,16

**restroom** 98:23 146:8

**restructured** 150:13 151:9

**restructuring** 39:17 161:14,23

**retail** 144:11

**retain** 153:13 175:12 179:14

**retained** 24:24

**retention** 179:13

**return** 110:6,8

**returns** 169:2

**Revenue** 182:16

**review** 77:4,17,24 136:8 141:19 203:24 247:23 253:19 255:22 256:2,11

**reviewed** 247:10

**reviewing** 7:4

**revisit** 140:18

**RIF** 132:14

**rights** 59:4 60:23 61:5

**rise** 238:25 241:5

**risen** 73:20

**risk** 147:12

**risks** 236:16

**Rober** 133:20

**Robert** 255:18,21 256:9

**role** 12:6 13:14 14:18,22 15:7 20:22 21:18 22:5 26:4 49:17 121:25 122:12 124:5 133:15 143:4 144:19 174:22 238:19 239:12 242:12,14 246:11

**roles** 21:24 23:21 242:9

**roll** 54:21

**roll-up** 53:17,18 56:12 61:21 62:11 63:13 151:24

**rolled** 54:2,22 145:10,19 151:13 152:6,17 153:8

**rolling** 60:3 144:18 236:19

**Romey** 150:9,19

**room** 54:18

**roughly** 57:11 136:4 137:6

**roughshod** 22:15

**round** 23:6 88:2,8 134:17

**RQ** 250:21 258:10

**rude** 228:12

**Rukavina** 5:16,17 6:21 8:17 9:11,14 18:17 19:11 23:15,24 33:2,10,14,19,24 34:3,11,14 38:8 43:7 46:24 55:9,16 62:17 69:11 70:19 76:15 79:4 86:9 87:16 89:13,20 90:20 98:22 99:6,16 106:23,25 107:9 111:24 112:9 146:7,10,19 148:6,9, 14 149:25 152:11

159:21,24 160:24 183:9,13 194:16 220:20 223:14 228:16 235:21 248:19,25 249:4 250:21 251:8,13,24 252:5,9,13,16 257:8, 14

**Rukavina's** 196:9

**rule** 18:8 186:7

**run** 15:23 50:15 114:7 140:22 167:7,8 185:20 212:21 238:15

**running** 21:10 27:23 239:10

**runs** 16:5

**Russ** 76:13

**Russell** 12:24

**S**

**salary** 155:14 173:11

**sales** 19:3,6,7

**sat** 188:14

**satisfy** 35:8

**satisfying** 219:3

**scam** 180:14

**schedule** 54:21 117:23 249:19,22

**scheduled** 118:3,6 131:8,10 142:4,7 146:3

**schedules** 245:24 246:4 251:17

**scheduling** 133:13

**School** 10:23,25

**Scott** 40:3

**screen** 196:18

**scroll** 89:23 90:16 91:12,18 207:21 213:25

**search** 178:14 256:5, 9

**searches** 254:16
256:6

**searching** 255:2

**secret** 212:23

**section** 56:2 65:13
66:4,15 67:7,16,24,
25 102:6 116:14
135:12,21 136:5,7
137:8 141:6 142:19
143:3 144:17

**security** 54:6

**seek** 63:8

**seeking** 72:18 74:25
209:22

**Seery** 5:1,5,24 6:1,24
7:1 8:1,23 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1,9 44:1 45:1,8
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1,24,25 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1,20 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1,7
80:1 81:1 82:1,10
83:1 84:1 85:1 86:1
87:1 88:1 89:1,22
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1,8,17 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1,15
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1

137:1 138:1,3 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1,6,14
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1,2,15,20 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1,18
170:1,10 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1,16 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1,22 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1,2,
19 224:1,23 225:1,2,
18 226:1,15 227:1,22
228:1 229:1 230:1
231:1 232:1,14
233:1,2,13 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1,22 242:1 243:1
244:1 245:1 246:1
247:1 248:1,16,21
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1,16
257:1,18 258:1
259:1,23

**Seery's** 138:21

**segment** 194:2

**Select** 18:22 22:7
27:8

**sell** 63:8

**selling** 87:8

**send** 67:21 77:23
85:10 107:17 218:24

219:7 251:4 254:11

**sending** 71:6 72:9
94:15 98:10

**senior** 11:18 173:4,
17,18 174:17,25
176:21

**sense** 35:19 229:8

**sensitive** 30:14

**sentence** 65:14,18
135:22

**separate** 30:12
155:3 223:10

**separately** 142:10

**separation** 46:16

**September** 46:3
246:10,12

**server** 77:15

**service** 82:20 117:20
127:4 129:6,22
134:13 158:11
201:17 208:19 222:3,
8 223:4 229:2,11

**services** 36:2,5,15,
16 37:11 38:19 39:2,
8 46:22 62:5 95:4
103:21 110:14
112:21,23 113:4,17
114:8,12,13 115:6
116:2,8,13 127:22
129:25 130:8 132:22
134:24 135:15
139:12,24 143:22
144:6,11,12 147:8,9,
14 153:14,24 158:7,
21 161:13,17 162:23
167:6 198:16 200:9
201:13,14,21 202:2,
3,9 203:10,14,15,21
204:6,7,8,18,19
205:2,7,13,15,22,24
206:7,10,18,19
209:5,8,12,13 210:3,
4,10,17 211:5,6
212:5,6,7,14 215:25
216:4,9 219:12
222:13,18 224:21
225:6,17,24 226:5,19
227:4

**Services'** 205:5

**set** 81:17 85:9 114:6

**settled** 27:16

**settlement** 20:21
21:17,23 44:11,18
45:9 46:13 156:7

**settlements** 156:19

**severance** 176:24

**Sevilla** 207:24 208:8,
10,13

**shady** 151:23

**shared** 35:25 36:5,
14,16 37:10 38:19
39:2,7 46:22 62:5
80:16 82:20 95:3
103:20 110:14
112:21,23 113:4,16
127:4,22 129:6,22,25
130:8 134:13,23
143:21 147:8 153:14
158:7,10,20 201:13,
17 202:2,9 204:6
206:18 209:5 212:6,
14,24 222:2,8,18
223:4 224:21 225:6,
24 226:5,19 227:4
229:2,11

**shares** 188:11

**sheet** 28:24 29:9
31:14,18 35:4,7
236:14

**sheets** 222:12

**shocks** 184:17

**shoes** 241:14

**shorting** 27:10,11

**shortly** 71:14 95:21
206:25

**show** 118:17 196:5
206:21 236:15
245:15 249:21
251:22 254:5

**showed** 99:8

**showing** 213:22
245:20 250:5 251:17
254:7

**shows** 185:22
222:15 237:13
249:20,22

**side** 8:7 48:19 64:11
125:17 225:20,23

**sides** 54:2 145:21

**sign** 91:9

**signature** 70:24
107:14 246:19

**signed** 184:8 247:3

**significant** 13:20,22
168:23 174:14
236:12

**significantly**
169:15,19 170:11,17
171:2,9,15,23,24

**similar** 77:10 80:4
126:5 143:23,25
153:8 166:24 174:24
196:3 200:4,12 206:6
216:4 236:21

**simp** 228:5

**simple** 147:11
233:12

**simply** 171:12 174:6
226:18

**simultaneous** 9:13
21:13 29:2,25 33:21
42:23 44:6 49:22
59:10 70:18 79:3
85:24 94:11,18 98:24
102:12 109:12
121:13 122:22
132:16 135:4 138:10
142:23 143:24 152:8
163:4 164:24 165:21
169:8 171:7 180:21
185:4 189:16 190:17
191:15 204:24
210:22 223:11
230:12 233:4 244:22
246:22 247:22 252:2
253:24 255:11
257:11

**simultaneously**
124:7 125:6

**single** 73:24

**sir** 6:22 8:4 9:15,23
12:23 13:10 14:22
16:11,23 24:2 28:21
33:14 43:14 49:20
51:11 56:16 61:3

65:12,13,18 66:20
68:22 69:12 88:24
90:18 91:15 92:4
106:25 107:9 112:19,
25 115:12,21 120:11
124:6,19 135:13,22
136:6 141:6 142:17
147:8 148:7,15
150:2,17 151:21
152:12 159:3 252:17

sit 164:8 165:8
228:22 247:12,20

sitting 10:9 109:15
113:11 129:15 131:5,
15 137:8

situation 175:7
196:3

sixty 38:4

sixty-day 37:24 38:2

skill 136:21

skills 26:21

Skyview 208:16

slice 245:20

sloppiness 66:10

slow 100:5

slowly 160:18

small 186:20

smart 227:23

Smith 5:12

sold 22:11 188:10

solely 13:14 182:14

solicit 63:16

solve 234:20

solvency 28:4,10,13,
19 29:21 30:7,17,24
31:5,7 34:4,5,6
232:6,17 233:23
234:15 235:5,10,16,
23

solvent 233:21
234:12 236:4

sort 43:3 48:15
111:21 188:12
204:10 244:19,20

sound 43:2 182:8

sounds 48:18

speaking 9:13 21:13
29:2,25 33:21 42:23
44:6 49:22 59:10
70:18 79:3 85:24
94:11,18 98:24 100:3
102:12 109:12
121:13 122:22 125:6
132:16 135:4 138:10
142:23 143:24 152:8
163:4 164:24 165:21
169:8 171:7 180:21
185:4 189:16 190:17
191:15 204:24
210:22 211:19
223:11 230:12 233:4
244:22 246:22
247:22 252:2 253:24
255:11 257:11

speaks 113:25

specific 20:13 39:4
46:4 47:23 76:8,21,
22 84:12 93:10 97:25
120:4 154:21 171:19
202:10 206:5 211:15,
18 212:2,10 216:18
218:21 221:4 224:12,
14 227:18,20 228:18
229:9 230:17 235:22,
24 249:10

specifically 43:15
71:12 77:8 81:23
90:5,6 97:24 118:5
122:3 133:5,7 135:25
150:24 152:25 153:3
155:19 162:12
198:21 199:2,21
201:11 208:3 209:24
210:19 219:24
227:16 228:15
230:25 246:8

specifics 217:20

speculate 111:13,
16,17

speculating 108:12,
15 111:14,15

speculation 152:3

spend 86:22

spent 13:18,20,22

spoke 177:13

spoken 208:9

spreadsheets 253:3

spring 203:25

staff 135:15

stand 107:21

standalone 203:2

standard 72:5 74:21
79:24 144:17

standards 61:7,11

Stang 5:20

start 5:3 52:20 179:3
183:15 190:20

started 46:16 160:24
213:8

starting 40:23 41:8
42:10 44:15

State 6:23 8:10,14

statement 52:4
58:18 128:25 246:2

statements 251:20
258:19

states 11:3

status 200:20,25
201:6

stayed 18:3

step 180:15 239:11
243:2

stepped 238:19
242:11

stepping 241:14,21

steps 98:9 242:22

stick 105:12

Stinson 6:2,4

stock 164:22 173:12

stooge 154:9

stop 193:18 196:23

stopped 45:7,9

story 76:23 159:2
222:10 225:15 233:8

Strand 12:16 13:14

street 140:25

strewn 140:25

strictly 60:23 225:21

strike 26:24 39:15
47:8 51:18 53:8
61:17 78:4,12 83:17
86:12 93:23 110:7
127:13 133:11
172:17 185:24
190:20 205:9 220:9
231:24 233:11 244:8

strip 140:2

stripping 53:23
144:14

structure 45:17
155:15 166:12
179:21

structured 173:6,8
177:18 181:4

structuring 182:10,
13

struggle 85:14

style 67:24

stylistic 68:13

Sub-trust 16:8

subject 10:2 18:5
54:9 145:16 182:19
184:11 188:25

subsequent 76:23
113:20 179:5 232:24
237:6

subsequently 12:8
18:10,13 19:2 120:23

substance 72:12
73:12,14 79:20 81:9
102:17 143:14

substantial 87:9
161:5

substantially 63:25
64:6,7

successful 168:6
169:5,14 191:25
192:13,18

successfully 189:6

sucked 35:14

sued 33:3

sufficient 199:14
244:6

suggest 60:22

suggests 68:22

suing 63:10 87:11

suit 64:9

Sullivan 177:15

sum 118:13,16

summarize 118:4

summary 17:16,20
242:5

superior 126:11

superseded 55:20
56:4

supplemental
251:12,16

supplied 93:16

support 43:10 58:24
115:23 147:18

supporting 147:23

supports 228:20

supposed 234:21
241:14 242:17
244:15,17,21 245:7

Surgent 16:24 17:3
40:8 153:2 211:20,22

Surgeon 17:2

surprised 193:24

surprises 184:14,22
185:14

suspect 113:12

swear 6:15

sworn 6:18

syphoned 62:9

system 254:13

systems 253:18,19

# T

**takes** 8:14 239:9,11 242:8

**taking** 7:4 73:21 123:7 140:15 166:14 236:18 244:3

**talk** 7:23 24:16 108:14 177:14 178:18 200:19,23 201:4 240:23 251:24 252:5 253:10

**talked** 27:9 41:4 71:14 106:15 177:16

**talking** 56:11 57:10 61:13 71:19 80:15 133:13 156:8,21 166:23 180:24 188:5 194:20 202:15 232:2 239:22 240:7

**talks** 66:15 68:8,12 88:21 147:11

**tangential** 62:6

**tax** 179:5 180:17,22 181:5,8,10,16,18 182:11

**taxes** 173:9 179:6,21 180:8 182:14,15

**taxi** 181:17,19

**team** 46:17 47:18 49:9 92:21 117:22 155:5 156:24 157:5,6 168:25 211:11 247:11 252:12

**technical** 183:5

**technically** 161:24

**TECHNICIAN** 5:2 6:14 98:25 99:4 112:3,6 146:14,17 160:8,11 213:16,19 248:9,12 259:2

**telephone** 106:10

**telling** 43:19 165:12

**tells** 131:2 134:3

**ten** 98:23 140:18 171:16 178:2 193:13

194:9 245:5

**tenor** 63:9

**tens** 154:23

**tentacle** 154:9

**term** 41:3,10 51:3 53:4,10,15,16,17 54:8 59:19 60:7 65:3, 6 95:8 145:10,18 178:10 179:4,5 180:17 182:22 183:18,23 194:22 195:3,6,10,11,19 198:16 199:19 214:22,25 216:11 219:14,15 222:12 229:16,25

**terminate** 37:16 144:5

**terminated** 37:20 38:7 114:20,25 158:8,22

**termination** 38:22, 25 39:7 46:18,22 113:20 115:2 153:14 158:20

**terminations** 132:11

**terms** 54:2,3,6 60:24 65:12 108:6 115:15, 23 147:18 183:22 220:6 254:22 256:5,9

**terrible** 172:14

**test** 31:14,18,21

**testified** 6:19 59:24 62:22 101:19 107:22 117:7 119:20 120:7 127:3 141:25 151:19, 22 227:17 238:17 245:5

**testify** 10:4 128:12 159:5 182:20

**testifying** 109:4

**testimony** 61:3 101:22 119:24 126:15 127:15 221:14 224:8 225:21 229:5 238:20 239:5, 21 240:3,19 241:20 259:14

**Texas** 8:10,14

**texts** 7:5

**there'll** 99:20

**thing** 7:21 42:21 65:10 73:24 99:25 111:21 130:24 153:9 162:15 181:15 196:23 225:23

**things** 18:11,14 19:13 22:13 50:8 53:19 76:24 115:9 153:10 155:3 166:14 202:12 203:3 204:13 205:2 206:4 234:19 245:4 254:11

**thinking** 249:12

**third-party** 206:7

**thirteen-week** 82:4, 6 83:22 84:6

**thirty** 38:5 54:4 62:12 138:16 165:25 236:19

**thirty-year** 53:10 87:5 161:9

**Thomas** 16:24

**thought** 27:13 50:14 52:14 59:24 65:10 78:7 144:9 195:15 199:20 219:22 235:23 244:23

**threat** 177:12

**Thursday** 259:4

**ties** 67:6

**tight** 35:12

**Tim** 176:5

**time** 13:7,18,19,21,22 19:9 23:8 27:2,12,24 40:15 44:2 45:7,25 47:2 49:15 50:14 51:3 52:7,13,17,19, 23 53:4,7,24 54:16 57:20 59:2,18 60:8 62:24 71:17 75:15 80:7 83:4 94:2,8 95:21 98:25 99:4 100:18 103:19 112:3, 6 124:17,19 126:15,

24 128:5 130:17 134:13 145:5 146:14, 17 147:4,5,18 149:6 153:11 154:22 159:13 160:8,11 188:10 195:16 201:7, 10 208:11 211:16 213:11,16,19 221:9, 19,21 227:2 228:18 233:21,22 234:12,13 235:10 248:2,9,12 255:23 259:2

**timely** 116:23

**times** 7:15 35:14 58:2 135:8 140:18 145:8,9 204:14 227:24 242:21 257:13

**timing** 127:8

**today** 5:24 9:17 10:5, 9 14:20 24:17 55:11 109:15 113:11 129:15 131:5,16 137:9 165:8 182:20 202:17 228:23 235:15 247:12

**today's** 150:15 259:3

**told** 34:21 72:17 81:14,21 82:10 84:15 96:18,21 97:2,3 99:18,19 101:19 102:18 118:2,11 119:10,16,17 140:20 156:24 157:3 211:6 229:10

**tons** 62:9

**top** 64:4 115:7 162:5 246:25

**top-level** 162:9,10

**topic** 88:9 94:25 134:18 234:2

**topics** 9:4,9 10:5,8 76:21,22 223:9

**total** 91:15 110:11 149:3 167:19 190:13 216:20,23 217:18 230:7,8,20,21 243:7

**totally** 79:4

**touched** 245:12

**traded** 18:21

**transaction** 145:21 180:18 181:3,8 182:10,13 188:24 192:3

**transcript** 101:24 102:3 110:25 259:12

**transfer** 33:4,9 34:2, 9 217:23 232:12 257:20

**transferred** 147:20

**transition** 104:2 208:14,18

**treasurer** 49:24 123:15 124:9 125:14

**treasury** 132:21

**treat** 168:25

**trial** 38:18,21

**TRO** 43:10

**true** 36:20 43:4 52:4 86:23 112:16 113:7 117:4 206:5,7 259:15

**Trussway** 186:11,19 187:5 188:2,7 190:6, 21

**trust** 6:13 15:12,22, 24 16:5 45:20 179:20

**trust-me** 179:17,19

**trustee** 15:3,5,6,8, 10,11 238:13 243:2

**truth** 43:19 224:10

**TSG** 5:10,12

**Tuesday** 81:20

**turn** 135:12

**turned** 79:14 87:18

**TWA** 161:7

**twelve** 176:17 178:2 194:9 236:8

**twelve-minute** 193:13

**twenty** 171:4,9 193:15

**twenty-five** 7:16

**twenty-plus** 88:7

**type** 166:9,20 171:12 202:23 249:17

**types** 167:2 175:11

**typical** 166:6

**typically** 65:24 74:11 83:2 145:5 167:8 170:21 173:4 216:25

**tyrant** 140:9

---

**U**

**Uh-huh** 56:9,17 94:13 116:6 141:15

**ulterior** 60:4,5

**ultimate** 35:8 192:10

**ultimately** 25:10 47:18 63:8 97:13 118:4

**unable** 29:14 224:14

**unclear** 57:24 102:7

**uncommon** 61:15

**underlaid** 241:13

**underlying** 60:24

**understand** 7:25 21:22 28:12 41:7 48:18 49:16 53:3,9, 12 58:15 61:7 65:5 94:2 132:2 138:14,20 163:11 172:4 180:18 185:5 190:6 216:16 217:6 225:18 228:17 239:21 253:25

**understanding** 14:4 20:9 25:25 26:2 44:24 108:7 114:3 115:14,20 118:14 119:6 120:12 121:6 123:21 127:13 132:19 137:8 141:3 142:2 166:5 179:10 180:6 201:12,25 215:23 220:8,10

**understood** 78:22 79:15 131:25 194:24

**221**:23 236:16

**undertaken** 97:7 174:10

**undertook** 243:25 245:8

**unfair** 59:9 60:13

**United** 161:7

**units** 14:17 15:13,15

**universe** 103:11

**university** 10:18,20, 21

**unpaid** 22:5 51:25 60:20 66:18,24 67:2

**unsecured** 64:18 88:6

**unusual** 73:14

**unwritten** 212:4,17, 23

**upcoming** 119:13 134:21

**update** 83:24

**Upper** 8:6

**upside** 170:15 188:7, 9,14 190:4,5 191:23

---

**V**

**Vague** 24:3

**vaguely** 24:3

**values** 30:9

**vehicle** 140:2

**version** 9:10

**versions** 253:6 258:13

**veteran** 7:22

**video** 5:2 6:14 98:25 99:4 101:8 112:3,6 146:14,17 160:8,11 213:16,19 248:9,12 259:2

**video-record** 74:4

**video-recorded** 5:4

**view** 34:15 45:21 146:20 147:2 215:2

**viewed** 64:12

**views** 153:23

**violation** 182:15

**virtually** 59:11 243:8

**virtue** 54:19

**vis-a-vis** 45:11 102:18 131:7

**visually** 83:12

**void** 56:5

**volunteer** 94:17

**volunteered** 98:18

---

**W**

**wait** 88:6

**waived** 98:2

**waiver** 69:5,7 219:19

**waives** 69:6

**wanted** 22:2 60:6 99:25 156:15 193:23 206:12

**warning** 213:10

**Warren** 6:7,10

**waste** 44:2

**Waterhouse** 36:20 39:6,21 47:2,12 48:20 49:8,17 81:6,9 83:3 84:18 92:12 96:23,24 97:2 99:19 100:23 101:18 102:17 103:6 106:4, 9,15 109:18 117:7 118:10,19 119:16,20 120:14 122:8,9,18 123:12 124:2,7,20 125:12 126:5,16 131:2 133:19 137:13 139:11 140:4,13,20 141:4 143:11 148:18, 25 149:12,17 153:5, 13,21 154:8 155:4,10 156:6 157:4,14 158:16 159:5 200:24 207:24 211:13,24

**Waterhouse's** 92:21 102:3 103:10 106:13 110:24 119:2 149:11 229:5

**ways** 20:16 257:2

**wearing** 122:23

**Webex** 74:10,14,21

**Wednesday** 81:20

**week** 81:17,19 109:13

**weekly** 81:15 82:25

**West** 8:6

**whatsoever** 53:25 170:2 185:19 224:24

**wherewithal** 35:7

**whomever** 247:11 248:17

**win** 64:9 237:3

**wire** 217:22 218:5,10, 20,22 257:22

**withdraw** 228:13

**withhold** 78:4,12,15, 18 79:10

**word** 43:4 45:24 50:4 66:4 67:25 130:22 154:8,13 253:5 254:6,7 258:13

**words** 14:14 44:12 99:21 108:11 137:11 151:20 152:2 220:21 221:5,7,17 224:13,15 226:16 227:12,13,15, 18,20 228:18

**wore** 123:12

**work** 8:12 117:17 138:13 142:3 174:5 203:6,8 206:2

**worked** 22:19 97:18 121:21 169:25 173:18 174:4 255:4,7

**working** 203:9 208:14,17 254:19

**works** 140:13

**world** 233:7

**worth** 164:23 165:2, 6,7 191:8,12,21 192:4,19

**write** 197:7

**writes** 150:10

**writing** 73:21 99:23 157:7

**written** 104:11 148:2 202:16 212:17,20 214:11

**wrong** 9:12 113:8 177:6 241:22

**wrote** 197:8,10,18,22 198:4

---

**Y**

**Yang** 176:5,22 177:20

**year** 19:2 65:17 163:15 164:13,14 168:8,15 169:13,20 170:12 171:16 172:3, 4,8 204:2 217:2

**year-and-a-half** 187:15

**years** 22:20 54:4 57:11 60:21 62:12 88:7 138:16 164:14 165:25 167:3,19,23 176:18 178:2 201:24 229:20 230:23 236:20

**yesterday** 108:17 119:25

**York** 8:6 10:23,24 11:5 176:23

---

**Z**

**Ziehl** 5:20

**Zoom** 27:10 74:9,14, 21 112:17

# Exhibit B

1              McGovern - 11-9-2021

2          IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
3                    DALLAS DIVISION

4    In re:                       )
                                  )
5    HIGHLAND CAPITAL             )   Case No.
     MANAGEMENT, LP,              )   19-34054 L.P.
6                                 )   Chapter 11
             Debtor,              )
7    ----------------------------)
     HIGHLAND CAPITAL MANAGEMENT, )
8    LP,                          )
                                  )
9            Plaintiff,           )  Adversary No.
                                  )  21-03003-sgi
10       vs.                      )
                                  )
11   JAMES D. DONDERO,            )
                                  )
12           Defendant.           )

13

14

15

16

17            REMOTE DEPOSITION OF

18                 BRUCE McGOVERN

19                 Houston, Texas

20       Tuesday, 9th day of November, 2021

21

22

23   Reported by:

24   Daniel J. Skur, Notary Public and CSR

25   Job No. 202067

Page 2

```
 1              McGovern - 11-9-2021
 2
 3
 4
 5
 6
 7        9th day of November, 2021
 8        10:01 a.m. - 10:34 a.m.
 9
10
11        Remote Deposition of BRUCE McGOVERN,
12   located in Houston, Texas, before Daniel J.
13   Skur, Notary Public and Certified Shorthand
14   Reporter in and for the State of Texas
15   located in Waxahachie, Texas.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              McGovern - 11-9-2021
 2   A P P E A R A N C E S:
 3        Pachulski Stang Ziehl & Jones
 4        Attorney(s) for Debtor
 5        780 Third Avenue
 6        New York, New York 10017
 7        By: John Morris, Esq.
 8
 9
10
11
12        Stinson
13        Attorney(s)for James Dondero, HCMS
14        and HCRE
15        3102 Oak Lawn Avenue
16        Dallas, Texas 75219
17        By: Michael Aigen, Esq.
18
19
20
21
22   ALSO PRESENT:
23             La Asia Canty, Paralegal
24             Haley Winograd
25
```

Page 4

```
 1              McGovern - 11-9-2021
 2
 3        IT IS HEREBY STIPULATED AND AGREED
 4   by and between the attorneys for the respective
 5   parties herein, that filing and sealing be and
 6   the same are hereby waived.
 7        IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to the form  of
 9   the question, shall be reserved to the
10   time of the trial.
11        IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be sworn to and
13   signed before any officer authorized to
14   administer an oath, with the same force and
15   effect as if signed and sworn to before the
16   Court.
17             - oOo -
18
19
20
21
22
23
24
25
```

Page 5

```
 1              McGovern - 11-9-2021
 2        P R O C E E D I N G S
 3        REMOTE ORAL DEPOSITION OF
 4        BRUCE McGOVERN
 5        (REPORTER NOTE:  This deposition is
 6   being conducted remotely in accordance with
 7   the Current Emergency Order regarding the
 8   COVID-19 State of Disaster.
 9        Today's date is the 9th day of
10   November, 2021.  The time is 10:01 a.m.
11   Daylight Savings Time.  The witness is
12   located in Houston, Texas.)
13        BRUCE ALLEN MCGOVERN,
14   having been duly cautioned sworn to tell the
15   truth, the whole truth and nothing but the
16        truth, testified as follows:
17             (10:01 a.m.)
18             EXAMINATION
19   BY MR. MORRIS:
20        Q.    Could you please state your name for
21   the record?
22        A.    My name is Bruce Allen McGovern.
23        Q.    Good morning, Mr. McGovern.  My name
24   is John Morris.  I'm an attorney at Pachulski
25   Stang Ziehl & Jones.  We are counsel to
```

Page 6

McGovern - 11-9-2021

1    Highland Capital Management, LP, a company that
2    has been reorganized following its bankruptcy
3    in Texas.
4            Are you aware of the bankruptcy?
5    A.    Yes, I am.
6    Q.    Okay. And we're here today for your
7    deposition; is that right?
8    A.    Yes, that's correct.
9    Q.    And you've been deposed on a number
10   of occasions in your professional capacity.
11           Do I have that right?
12   A.    I believe there have been three
13   occasions, yes.
14   Q.    Okay. So I'm not going to ask you
15   about those occasions. I want to try to get
16   this done as quickly as we can.
17           I'll just tell you that -- I don't
18   know if any of those occasions were remote
19   depositions, but remote depositions are
20   particularly difficult, only because we're not
21   in the same room.
22           From time to time, we'll put
23   documents on the screen. If there's anything
24   that you need to see, will you please let me
25

Page 7

McGovern - 11-9-2021

1    know that? And we'll scroll down to the
2    portions that you think you need to see.
3            Is that okay?
4    A.    Yes, I will.
5    Q.    And if there's anything that I ask
6    that you don't understand, will you let me know
7    that?
8    A.    Yes, I will.
9    Q.    Okay. You were retained by the
10   Stinson firm to provide expert testimony on
11   behalf of James Dondero; is that correct?
12   A.    Yes, that's correct.
13   Q.    Okay. And when were you retained?
14   A.    I was retained sometime at the
15   beginning of 2021, I believe. I don't recall
16   the exact date, but it was in the first few
17   months of 2021.
18   Q.    How did it come -- how did your
19   retention come about?
20   A.    I received a phone call, I believe,
21   from Michael Aigen, who is here today; and he
22   discussed with me the general nature of the
23   underlying litigation and the issue on which he
24   and his firm were seeking expert testimony.
25

Page 8

McGovern - 11-9-2021

1    And after discussing that with him, I agreed to
2    serve as an expert witness.
3    Q.    And what exactly were you asked to
4    do?
5    A.    I was asked to prepare a report on a
6    specific legal issue that has to do with the
7    structure of some loans from Highland Capital
8    Management, LP, to Mr. Dondero and subsequently
9    to -- I understand there were similar loans to
10   entities controlled by Mr. Dondero.
11   Q.    When we use the phrase "Highland"
12   today, can we agree that we're specifically
13   referring to Highland Capital Management, LP?
14   A.    Yes, that's fine.
15   Q.    Okay. When you were told about the
16   nature of the litigation, do you recall whether
17   you were informed that Mr. Dondero had already
18   filed an answer to the complaint?
19   A.    Yes. I was informed of that, and I
20   was provided with copies -- at least at that
21   time, copies of the promissory notes that he
22   had signed and also the complaint filed by Highland
23   Capital against Mr. Dondero as well as the copy
24   of the amended answer in the litigation.
25

Page 9

McGovern - 11-9-2021

1    Q.    Okay. So -- so you were given a
2    copy of the amended answer that he filed at the
3    time that you were retained? Do I have that
4    right?
5    A.    That's correct.
6    Q.    So you couldn't have been retained
7    before the time the amended answer was filed;
8    is that fair?
9    A.    I'm just thinking through your
10   question, so... That's correct. That's
11   correct.
12   Q.    Okay. Have you ever been retained
13   by the Stinson firm before your engagement in
14   this case?
15   A.    No, I have not.
16   Q.    Okay. Have you ever provided any
17   services to Highland before?
18   A.    No, I have not.
19   Q.    Have you ever met James Dondero?
20   A.    No, I have never met him.
21   Q.    Have you ever spoken with him?
22   A.    No, I have not.
23   Q.    So your report is not based in any
24   way on anything Mr. Dondero has told you; is
25

Page 10

McGovern - 11-9-2021

1  that fair?
2      A.    That's correct.
3      Q.    Okay.  And I want to go a little bit
4  broader.  I think I used the words whether
5  you -- I'd asked whether you had spoken with
6  him.
7            So let me ask a different question:
8  Have you ever communicated with Mr. Dondero by
9  email or otherwise?
10     A.    No.  I've never had any
11 communications with him.
12     Q.    Is it fair to say that all of your
13 communications relating to the work that you've
14 done in this lawsuit have been exclusively with
15 one or more lawyers from the Stinson firm?
16     A.    Yes, that's correct.
17     Q.    Okay.  Have you ever communicated
18 with anybody else regarding any of the work
19 that you've done in connection with this
20 engagement other than lawyers from the Stinson
21 firm?
22     A.    No.  I have not.
23     Q.    Okay.  I'm going to ask you --
24           MR. AIGEN:  John.

Page 11

McGovern - 11-9-2021

1      MR. MORRIS:  Yes.
2      MR. AIGEN:  I just want to point
3  something out.  The witness may not be
4  aware that one of our conversations, Dan
5  Elms was listening, I believe.
6            Actually, I apologize.  I may be
7  convincing -- confusing this with other
8  witnesses.  Dan Elms is not a lawyer at our
9  firm.  Now that I'm saying that, I actually
10 may be confusing it with conversations with
11 our other expert, so...
12     A.    I don't recall him being in any of
13 our discussions.
14     MR. AIGEN:  I apologize.  I probably
15 should just be quiet.
16 BY MR. MORRIS:
17     Q.    I'm going to ask my colleague, La
18 Asia Canty, to put on the screen a copy of your
19 report, which has been premarked as Exhibit 61.
20           (Exhibit 61 introduced.)
21 BY MR. MORRIS:
22     Q.    And can you see that, sir?
23     A.    Yes, I can.
24     Q.    Okay.

Page 12

McGovern - 11-9-2021

1      MR. MORRIS:  And if we could just
2  scroll to the last page, the signature
3  line.
4  BY MR. MORRIS:
5      Q.    And that's your signature, sir?
6      A.    Yes, it is.
7      Q.    And did you sign this on or around
8  May 28th, 2021?
9      A.    Yes, I did.
10     MR. MORRIS:  You can go back to the
11 top.
12 BY MR. MORRIS:
13     Q.    As you sit here today, is there
14 anything that you believe is inaccurate about
15 your report?
16     A.    No.
17     Q.    Is there anything that you believe
18 should be modified to state more clearly the
19 opinions and the bases for them, as set forth
20 in this report?
21     A.    No.
22     Q.    Your report has not been amended or
23 supplemented in any way, correct?
24     A.    That is correct.

Page 13

McGovern - 11-9-2021

1      MR. MORRIS:  If we can scroll down a
2  little bit.
3  BY MR. MORRIS:
4      Q.    You reviewed five documents for
5  purposes of preparing your report.  Do I have
6  that right?
7      A.    Yes, that's correct.
8      Q.    Okay.  And it's those five documents
9  that are listed in the first page of your
10 report, right?
11     A.    Yes, that's correct.
12     Q.    Okay.  Since signing this report on
13 May 28th, 2021, have you been provided with any
14 additional documents that relate in any way to
15 your opinions?
16     A.    I've been provided with copies of
17 the promissory notes that were executed on
18 behalf of some of the entities controlled by
19 Mr. Dondero in favor of Highland Capital, and I
20 believe I also have a copy of the complaint in
21 the adversary proceeding filed against the
22 entities.
23     Q.    When were you given those documents?
24     A.    I was provided those documents, I

Page 14

McGovern - 11-9-2021

1 believe, sometime last week.

2     Q.    And to confirm, those documents

3 haven't caused you to change your opinions as

4 set forth in your report in any way, correct?

5     A.    That's correct.

6     Q.    Did you have any discussion with

7 anybody about why you weren't given those

8 documents before you completed your report on

9 May 28th?

10     A.    No. I was not provided any

11 explanation of that. What did occur is that I

12 met with attorneys from the Stinson law firm to

13 discuss the deposition today; and following

14 that conversation, I was sent by email copies

15 of the additional documents.

16     Q.    Okay. But you don't recall having

17 any discussion about why you hadn't been given

18 copies of those documents before you completed

19 your report on May 28th, 2021, correct?

20     A.    That's correct.

21     Q.    Okay. Were you ever given any

22 information concerning Highland's treatment of

23 the loans on Highland's books and records?

24     A.    No, I was not.

Page 15

McGovern - 11-9-2021

1     Q.    Did you ever ask for any information

2 concerning Highland's treatment of the loans in

3 its books and records?

4     A.    No, I did not.

5     Q.    Is Highland's treatment of the loans

6 in its books and records relevant at all to

7 your opinions as set forth in Exhibit 61?

8     A.    No, I don't believe it is.

9     Q.    Were you given copies of Highland's

10 audited financial statements?

11     A.    No, I was not. I've discussed

12 already all of the documents that I was

13 provided to you, both to prepare the report and

14 that I was provided subsequent to the report.

15     Q.    Did you ask to see Highland's

16 audited financial statements?

17     A.    No, I did not.

18     Q.    Is it fair to say that the treatment

19 of the loans in Highland's audited financial

20 statements is irrelevant to your opinions as

21 set forth in Exhibit 61?

22     A.    Yes. I think that's a fair

23 assessment.

24     Q.    Did you ask for any documents that

Page 16

McGovern - 11-9-2021

1 are not listed in your report?

2     A.    No, I did not.

3     Q.    So is it fair to say that you never

4 looked at any documents that were filed in

5 Highland's bankruptcy case?

6     A.    The only documents I've looked at

7 that were filed in the bankruptcy case are the

8 complaint and the amended answer.

9     Q.    And you never asked for any

10 documents that were filed in the bankruptcy

11 case other than the documents set forth in your

12 report, correct?

13     A.    That's correct.

14     Q.    As a general matter, is Highland's

15 treatment of the loans relevant at all to your

16 opinions?

17     A.    No, it's not, because I was asked to

18 make certain assumptions in connection with

19 preparing my report.

20     Q.    Okay. Can you identify any of the

21 promissory notes that you were given in the

22 last week or so?

23     A.    Off the top of my head, I can't.

24 I'd have to look in my files, but I recall, for

Page 17

McGovern - 11-9-2021

1 example, that there were promissory notes

2 signed by a few different entities controlled

3 by Mr. Dondero that were organized in different

4 forms.

5     One, I believe, was HCE, but I can't

6 recall off the top of my head if that was a

7 limited partnership or a corporation.

8     Q.    I take it that you have never seen

9 any of Mr. Dondero's written responses to

10 Highland's discovery requests?

11     A.    That is correct.

12     Q.    Have you ever seen any transcripts

13 from any depositions that have been given in

14 these adversary proceedings?

15     A.    No, I have not.

16     Q.    Have you ever asked to see any

17 transcripts of any depositions that were given

18 in these adversary proceedings?

19     A.    No, I have not.

20     Q.    Okay. So your opinions don't take

21 into account any of the testimony that was

22 adduced in any depositions that were given in

23 these adversary proceedings, correct?

24     A.    That's correct.

Page 18

McGovern - 11-9-2021

2  Q.   Okay.
3        MR. MORRIS:  If we could turn to the
4  assumptions.
5        Okay.  Right there is fine.
6  BY MR. MORRIS:
7  Q.   So you were asked to assume the
8  facts that are set forth in the five numbered
9  paragraphs on this page, correct?
10 A.   Yes, that's correct.
11 Q.   Okay.  And, in fact, you satisfied
12 yourself, have you not, that Assumed Fact
13 Number 1 is actually true, correct?
14 A.   That is an assumption.
15       MR. AIGEN:  Objection, form.
16 A.   I don't have any basis for -- for
17 example, identifying that that's actually
18 Mr. Dondero's signature; but I was asked to
19 assume that for purposes of the report, that he
20 had signed these promissory notes.
21 BY MR. MORRIS:
22 Q.   Did anybody tell you that
23 Mr. Dondero disputed his execution of the three
24 promissory notes that were given to you?
25 A.   No.

Page 19

McGovern - 11-9-2021

2  Q.   Okay.  Let's look at the second
3  assumed fact.
4        It says, quote:  Subsequent to
5  Mr. Dondero's execution of the notes, but
6  before Highland Capital made demand for payment
7  of the notes, Highland Capital and Mr. Dondero
8  entered into an oral agreement, which I think
9  you're defining there as "the subsequent
10 agreement."
11       Have I read that correctly?
12 A.   Yes, that is correct.
13 Q.   Have you been given any document --
14 withdrawn.
15       Have you been given any documentary
16 evidence concerning the subsequent agreement?
17 A.   No, I have not.
18 Q.   Do you know whether -- has anybody
19 ever informed you whether such documentation
20 exists?
21 A.   Nobody has ever suggested that to
22 me.
23 Q.   Okay.  Did you ask to see any
24 documents concerning the existence of the
25 subsequent agreement?

Page 20

McGovern - 11-9-2021

2  A.   No, I did not.
3  Q.   And that's because you were just
4  asked to assume that the subsequent agreement
5  existed, correct?
6  A.   It's because I was asked to assume
7  that there was an oral agreement, and normally
8  there would be no documentation of an oral
9  agreement.
10 Q.   Okay.  It's possible that after
11 somebody enters into an oral agreement,
12 somebody makes a note to -- to write down the
13 terms that were agreed to; isn't that fair?
14 A.   Yes, that's possible.
15 Q.   Okay.  And in your expertise, would
16 you expect somebody to -- withdrawn.
17       Do you know when the subsequent --
18 withdrawn.
19       I'm going to use the phrase
20 "subsequent agreement" to refer to the
21 agreement that's described in Assumption Number
22 2.  Is that okay?
23 A.   Yes, that's fine.
24 Q.   Okay.  Do you know when the
25 subsequent agreement was entered into?

Page 21

McGovern - 11-9-2021

2  A.   I don't know the exact date.  I was
3  asked to assume only that it had occurred after
4  the execution of the original promissory notes.
5  Q.   Were you asked to make any
6  assumptions concerning the number of subsequent
7  agreements that were entered into between
8  Mr. Dondero and Highland Capital?
9  A.   I'm sorry, could you -- could you
10 restate that?
11 Q.   Were you asked to assume that there
12 was one subsequent agreement between Highland
13 Capital and Mr. Dondero or more than one
14 subsequent agreement between Highland Capital
15 and Mr. Dondero?
16 A.   My assumption has been that there
17 was only a single oral agreement; however,
18 given that there were multiple promissory
19 notes, it's conceivable that there could have
20 been separate oral agreements for each note.
21 But, in general, I've been assuming a single
22 oral agreement that applied to all of the
23 notes.
24 Q.   And you don't have any personal
25 knowledge regarding the number of subsequent

Page 22

McGovern - 11-9-2021

1    agreements that may exist, correct?
2        A.    That's correct.
3        Q.    And you weren't asked to assume that
4    more than one subsequent agreement existed,
5    correct?
6        A.    That's correct.
7        Q.    And when you prepared your report,
8    the assumption that you made was that there was
9    only one subsequent agreement, correct?
10       A.    Yes, the subsequent agreement to
11   which I refer in my report.
12       Q.    Okay.  Do you know who entered the
13   subsequent agreement on behalf of Highland
14   Capital?
15       A.    No, I do not.
16       Q.    Do you know if the subsequent
17   agreement was ever disclosed to Highland
18   Capital's outside auditors?
19       A.    No, I do not.
20       Q.    Is it fair to say that the
21   circumstances surrounding the entry into the
22   subsequent agreement are not relevant to your
23   opinions as set forth in Exhibit 61?
24       A.    Yes, that's correct, because I'm
25

Page 23

McGovern - 11-9-2021

1    assuming only that there was a subsequent
2    agreement that occurred after the execution of
3    the notes, but before demand for payment on the
4    notes had been made.
5        Q.    So you're not offering any opinion
6    that the subsequent agreement actually exists,
7    correct?
8        A.    That's correct.
9        Q.    And you're not offering any opinion
10   that the terms of the subsequent agreement were
11   reasonable, correct?
12       A.    That's correct.
13       Q.    You're not offering any opinion that
14   the subsequent agreement was fair to both
15   parties, correct?
16       A.    That's correct.
17       Q.    And you're not offering any opinion
18   that the person who entered into the subsequent
19   agreement on behalf of Highland Capital
20   fulfilled his or her or its duties, correct?
21       A.    That's correct.
22       Q.    Are you offering any opinion at all
23   about the subsequent agreement?
24            MR. AIGEN:  Objection, form.
25

Page 24

McGovern - 11-9-2021

1        A.    I'm offering an opinion only about
2    the effect of the subsequent agreement,
3    assuming that the subs- -- subsequent agreement
4    is as I described in my report.
5    BY MR. MORRIS:
6        Q.    Okay.  What if I asked you to assume
7    that there was no subsequent agreement?  Would
8    that change your opinions?
9            MR. AIGEN:  Objection, form.
10       A.    It -- it would not change my
11   ultimate opinion, which is that there is no
12   cancellation of indebtedness income for
13   Mr. Dondero.
14   BY MR. MORRIS:
15       Q.    And your opinion today is that
16   there's no taxable income to Mr. Dondero
17   because the conditions subsequent that you were
18   asked to assume have not yet been satisfied; is
19   that fair?
20       A.    That's correct.  My opinion is that
21   there was no income for him at the time of the
22   original loans because of his obligation to
23   repay, and that assuming the subsequent
24   agreement occurred, that the subsequent
25

Page 25

McGovern - 11-9-2021

1    agreement did not change the outcome for him,
2    that it -- it would not cause him to have
3    income from the -- the loans.
4        Q.    And so if there is no subs- -- if I
5    ask you to assume that there is no subsequent
6    agreement, would your opinion be that
7    Mr. Dondero therefore owes any unpaid principal
8    and interest due under each of the notes that
9    you've reviewed?
10       A.    Based on the -- my review of the
11   promissory notes, yes, that the notes are
12   demand notes in favor of Highland Capital.
13       Q.    Okay.  Let's go to Assumed Fact
14   Number 3.  It states, quote:  In the subsequent
15   agreement between Highland Capital and
16   Mr. Dondero, Highland Capital agreed that it
17   would not collect on the notes unless certain
18   conditions defined as "the conditions," could
19   not be satisfied.  In other words, Highland
20   Capital agreed that the loans will be forgiven
21   only if the conditions are satisfied.
22            Do I have that right?
23       A.    Yes, that's correct.
24       Q.    Okay.  And -- and -- and that -- all
25

McGovern - 11-9-2021

1  of that -- everything in Number 3 is -- is an
2  assumption that you were asked to make in
3  rendering your opinion, correct?
4      A.  Yes, that's correct.
5      Q.  Do you know what the conditions
6  were?
7      A.  I don't know the details of the
8  conditions.  I was asked to assume only that
9  the conditions related to things beyond
10 Mr. Dondero's control, such as the sale of
11 certain assets above cost.
12     Q.  Okay.  That bleeds into the fourth
13 assumption, but I just want to stick with
14 Number 3 for the moment.  Do you have any other
15 information about what the conditions were,
16 other than the sale of an asset above cost?
17     A.  No, I do not.
18     Q.  Did you ask any questions about the
19 nature, extent, and scope of the conditions?
20     A.  Only if whether the conditions were
21 things beyond his control, but other than that,
22 I did not ask for details.
23     Q.  Were you given any information
24 concerning the likelihood that the conditions

McGovern - 11-9-2021

1  would be satisfied?
2      A.  No, I was not.
3      Q.  Did you ask any -- did you ask for
4  any information concerning the likelihood that
5  the conditions would be satisfied?
6      A.  No, I did not.
7      Q.  Is it fair to say that the opinions
8  set forth in Exhibit 61 do not take into
9  account the likelihood that the conditions
10 would be satisfied?
11     A.  I think that's an accurate
12 statement.  The -- the only assumption is that
13 these conditions are things that will be beyond
14 Mr. Dondero's control and subject to
15 influences, such as market values.
16     Q.  So the likelihood that the
17 conditions would be satisfied was not relevant
18 to your analysis, correct?
19     A.  As far as probability, that's
20 correct.
21     Q.  Okay.  And you're not offering any
22 opinion as to the likelihood that any of the
23 conditions would be satisfied, correct?
24     A.  That's correct.

McGovern - 11-9-2021

1      Q.  Okay.  Let's move on to the fourth
2  assumed fact.  It states, quote:  Whether the
3  conditions are satisfied was not and is not
4  within Mr. Dondero's control because they
5  included the condition that certain portfolio
6  company assets be sold above cost or in a
7  manner outside of Mr. Dondero's control.
8          Have I read that correctly?
9      A.  Yes, you did.
10     Q.  What if the satisfaction of the
11 conditions was within Mr. Dondero's control?
12 If you make that assumption, how does your --
13 how do your opinions change, if at all?
14     A.  I'm just thinking through your
15 question.  If the conditions are within his
16 control, then that could potentially change the
17 outcome as to whether there was income from the
18 discharge of indebtedness, but in order to
19 provide an opinion on that, I would have to
20 know the details of the conditions; that is,
21 exactly what they are and how it is that he has
22 control over them.
23     Q.  Okay.  So are you aware that
24 Mr. Dondero controlled Highland prior to the

McGovern - 11-9-2021

1  bankruptcy?
2      A.  Yes, I am.
3      Q.  Are you aware that he had -- I'll --
4  I'll ask you to assume that he had the
5  authority to buy and sell assets on behalf of
6  Highland.  Can you -- can you accept that
7  assumption?
8      A.  Yes.
9      Q.  Okay.  If you -- if you accept that
10 assumption for purposes of my hypothetical, and
11 you also assume that the portfolio company
12 assets that are the subject of the conditions
13 were valued above cost at the time the
14 subsequent agreement was entered into, would
15 that impact your opinions if you assumed -- so
16 I'm asking you to really make just two
17 assumptions:  Number one, Mr. Dondero had the
18 ability to sell the portfolio company assets
19 any time he wanted, and number two, that at the
20 time he entered into the subsequent agreement,
21 the value of the portfolio company assets was
22 above cost.  How did those two assumptions, if
23 you -- if you accept them, how do they change
24 your analysis, if -- if at all?

Page 30

McGovern - 11-9-2021

1
2     A.    Assuming those two facts, they could
3  change the analysis of the issue of whether
4  Mr. Dondero had income from the cancellation of
5  indebtedness.  The key question really is
6  whether Highland Capital, at the time of the
7  subsequent agreement, was actually agreeing to
8  cancel the loans at that time, or was it
9  agreeing in the future to cancel the loans if
10 certain conditions occurred?
11         If those conditions are within the
12 control of Mr. Dondero and in effect already in
13 place, then it's quite possible that he would
14 have had income from the discharge of
15 indebtedness at that time because the loans in
16 fact had been forgiven.
17     Q.    But you weren't ass- -- you weren't
18 asked to assume that Highland placed any
19 condition on the timing of the forgiveness,
20 correct?
21     A.    That's correct.
22     Q.    And -- and you, in fact, were asked
23 to assume that if the portfolio company assets
24 were sold above cost, the loans would be
25 forgiven, correct?

Page 31

McGovern - 11-9-2021

1
2     A.    That's correct.  Although in -- in
3  fairness, as I've said, I don't know the
4  details of all the conditions, but was asked to
5  assume that they included the condition that
6  these assets be sold above cost.
7     Q.    Yeah, I just want to focus on -- on
8  the assumptions that you were asked to make, so
9  let me give you a hypothetical.  Let's say one
10 of the company assets was valued at $50 million
11 on the date the subsequent agreement was
12 entered into, but that Highland's cost for
13 acquiring its interest in that asset was only
14 $10 million, and Mr. Dondero had the ability to
15 sell that asset at -- at any time prior to the
16 bankruptcy filing.
17         Under that hypothetical, would
18 Mr. Dondero have to realize the income?
19     A.    If he actually sold the assets, then
20 -- then yes.
21     Q.    And what about if he didn't sell the
22 assets, but that it was within his control to
23 do so at any time?
24     A.    It's possible that that could change
25 the outcome, as far as whether he had income

Page 32

McGovern - 11-9-2021

1
2  from the cancellation of indebtedness, but if
3  that's true, that means that the loans actually
4  had been forgiven at that time.
5     MR. MORRIS:  I have no further
6         questions.
7     MR. AIGEN:  I have one thing to
8  clear up, I think.
9             EXAMINATION
10 BY MR. AIGEN:
11    Q.    Early on in the deposition, when
12 asked what your assignment was, you mentioned
13 that you were providing an opinion on a legal
14 issue.  I just want to make sure, you we- --
15 you're not sitting here today opining on the
16 law.  You're applying certain facts to the law;
17 is that correct?
18    A.    That's correct.  I am taking an
19 assumed set of facts, and I've been asked to
20 provide an opinion on what is the outcome on a
21 particular legal issue as app- -- applying the
22 law to those facts, that's correct.
23    MR. AIGEN:  Okay.  That's all I
24 have, John.
25    MR. MORRIS:  Okay.  Thank you,

Page 33

McGovern - 11-9-2021

1
2  professor.  I appreciate your time and --
3  and -- and your attention.
4     THE WITNESS:  All right.  Thank you
5  so much.
6     MR. MORRIS:  Okay.  Have a good day.
7     THE WITNESS:  Thank you.
8     MR. MORRIS:  Bye, now.
9     THE REPORTER:  Mr. Aigen, do you
10 need a copy of this deposition?
11    MR. AIGEN:  If we can just get a
12 rough when one's available, and then we'll
13 take the original whenever it's due.
14    (Time Noted:  10:34 a.m.)
15
16
17
          BRUCE McGOVERN
18
19 Subscribed and sworn to before me
   this _____ day of _____, 2021.
20
21
22
23
24
25

Page 34

```
 1              McGovern - 11-9-2021
 2          C E R T I F I C A T E
    STATE OF TEXAS    )
 3                    )
    COUNTY OF ELLIS   )
 4
             I, Daniel J. Skur, a Notary Public
 5      within and for the State of Texas, do
        hereby certify:
 6           That BRUCE McGOVERN, the witness
        whose deposition is hereinbefore set forth,
 7      was duly sworn by me and that such
        deposition is a true record of the
 8      testimony given by such witness.
             That pursuant to Rule 30 of the Federal
 9      Rules of Civil Procedure, signature of the
        witness was not reserved by the witness or
10      other party before the conclusion of the
        deposition;
11           I further certify that I am not
        related to any of the parties to this
12      action by blood or marriage; and that I am
        in no way interested in the outcome of this
13      matter.
             IN WITNESS WHEREOF, I have hereunto
14      set my hand this 9th day of November,
        2021.
15
16
17
        _____
18      Daniel J. Skur
        Notary Public, State of Texas.
19      My Commission Expires 7/7/2022
        TSG Reporting, Inc.
20      228 East 45th Street, Suite 810
        New York, New York
21      (877) 702-9580
22
23
24
25
```

Page 35

```
 1              ERRATA SHEET
 2  Case Name:
 3  Deposition Date:
 4  Deponent:
 5  Pg.  No. Now Reads   Should Read  Reason
 6  ___  ___ _____   _____   _____
 7  ___  ___ _____   _____   _____
 8  ___  ___ _____   _____   _____
 9  ___  ___ _____   _____   _____
10  ___  ___ _____   _____   _____
11  ___  ___ _____   _____   _____
12  ___  ___ _____   _____   _____
13  ___  ___ _____   _____   _____
14  ___  ___ _____   _____   _____
15  ___  ___ _____   _____   _____
16  ___  ___ _____   _____   _____
17  ___  ___ _____   _____   _____
18  ___  ___ _____   _____   _____
19  ___  ___ _____   _____   _____
20
                      _____
21                    Signature of Deponent
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2021.
24  _____
25  (Notary Public)  MY COMMISSION EXPIRES:_____
```

Page 36

```
 1              McGovern - 11-9-2021
 2          -------I N D E X-------
 3  WITNESS:      EXAMINATION BY        PAGE:
 4  BRUCE McGOVERN
 5          Mr. Morris            5
 6          Mr. Aigen             32
 7
 8              *****
 9  -------------------EXHIBITS-------------------
10                          PAGE/LINE
11  Exhibit 61   Expert Report of      11/21
                 Bruce McGovern
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Index: $10..Dan

**$**

**$10** 31:14

**$50** 31:10

**1**

**1** 18:13

**10:01** 5:10,17

**10:34** 33:14

**11-9-2021** 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1

**2**

**2** 20:22

**2021** 5:10 7:16,18 12:9 13:14 14:20 33:19

**28th** 12:9 13:14 14:10,20

**3**

**3** 25:15 26:2,15

**6**

**61** 11:20,21 15:8,22 22:24 27:9

**9**

**9th** 5:9

**A**

**a.m.** 5:10,17 33:14

**ability** 29:19 31:14

**accept** 29:7,10,24

**accordance** 5:6

**account** 17:22 27:10

**accurate** 27:12

**acquiring** 31:13

**additional** 13:15 14:16

**adduced** 17:23

**adversary** 13:22 17:15,19,24

**agree** 8:13

**agreed** 8:2 20:13 25:17,21

**agreeing** 30:7,9

**agreement** 19:8,10, 16,25 20:4,7,9,11,20, 21,25 21:12,14,17,22 22:5,10,11,14,18,23 23:3,7,11,15,20,24 24:3,4,8,25 25:2,7,16 29:15,21 30:7 31:11

**agreements** 21:7,20 22:2

**Aigen** 7:22 10:25 11:3,15 18:15 23:25 24:10 32:7,10,23 33:9,11

**Allen** 5:13,22

**amended** 8:25 9:3,8 12:23 16:9

**analysis** 27:19 29:25 30:3

**apologize** 11:7,15

**app-** 32:21

**applied** 21:22

**applying** 32:16,21

**Asia** 11:19

**ass-** 30:17

**assessment** 15:24

**asset** 26:17 31:13,15

**assets** 26:12 28:7 29:6,13,19,22 30:23 31:6,10,19,22

**assignment** 32:12

**assume** 18:7,19 20:4,6 21:3,11 22:4 24:7,19 25:6 26:9 29:5,12 30:18,23 31:5

**assumed** 18:12 19:3 25:14 28:3 29:16 32:19

**assuming** 21:21 23:2 24:4,24 30:2

**assumption** 18:14 20:21 21:16 22:9 26:3,14 27:13 28:13 29:8,11

**assumptions** 16:19 18:4 21:6 29:18,23 31:8

**attention** 33:3

**attorney** 5:24

**attorneys** 14:13

**audited** 15:11,17,20

**auditors** 22:19

**authority** 29:6

**aware** 6:5 11:5 28:24 29:4

**B**

**back** 12:11

**bankruptcy** 6:3,5 16:6,8,11 29:2 31:16

**based** 9:24 25:11

**bases** 12:20

**basis** 18:16

**beginning** 7:16

**behalf** 7:12 13:19 22:14 23:20 29:6

**bit** 10:4 13:3

**bleeds** 26:13

**books** 14:24 15:4,7

**broader** 10:5

**Bruce** 5:4,13,22

**assignment** 33:17

**buy** 29:6

**Bye** 33:8

**C**

**call** 7:21

**cancel** 30:8,9

**cancellation** 24:13 30:4 32:2

**Canty** 11:19

**capacity** 6:11

**Capital** 6:2 8:8,14,24 13:20 19:6,7 21:8,13, 14 22:15 23:20 25:13,16,17,21 30:6

**Capital's** 22:19

**case** 9:15 16:6,8,12

**caused** 14:4

**cautioned** 5:14

**change** 14:4 24:9,11 25:2 28:14,17 29:24 30:3 31:24

**circumstances** 22:22

**clear** 32:8

**colleague** 11:18

**collect** 25:18

**communicated** 10:9,18

**communications** 10:12,14

**company** 6:2 28:7 29:12,19,22 30:23 31:10

**complaint** 8:19,23 13:21 16:9

**completed** 14:9,19

**conceivable** 21:19

**condition** 28:6 30:19 31:5

**conditions** 24:18 25:19,22 26:6,9,10,

33:17 16,20,21,25 27:6,10, 14,18,24 28:4,12,16, 21 29:13 30:10,11 31:4

**conducted** 5:6

**confirm** 14:3

**confusing** 11:8,11

**connection** 10:20 16:19

**control** 26:11,22 27:15 28:5,8,12,17, 23 30:12 31:22

**controlled** 8:11 13:19 17:3 28:25

**conversation** 14:15

**conversations** 11:5, 11

**convincing** 11:8

**copies** 8:21,22 13:17 14:15,19 15:10

**copy** 8:24 9:3 11:19 13:21 33:10

**corporation** 17:8

**correct** 6:9 7:12,13 9:6,11,12 10:3,17 12:24,25 13:8,12 14:5,6,20,21 16:13, 14 17:12,24,25 18:9, 10,13 19:12 20:5 22:2,3,6,7,10,25 23:8,9,12,13,16,17, 21,22 24:21 25:24 26:4,5 27:19,21,24, 25 30:20,21,25 31:2 32:17,18,22

**correctly** 19:11 28:9

**cost** 26:12,17 28:7 29:14,23 30:24 31:6, 12

**counsel** 5:25

**COVID-19** 5:8

**Current** 5:7

**D**

**Dan** 11:5,9

**date** 5:9 7:17 21:2 31:11

**day** 5:9 33:6,19

**Daylight** 5:11

**defined** 25:19

**defining** 19:9

**demand** 19:6 23:4 25:13

**deposed** 6:10

**deposition** 5:3,5 6:8 14:14 32:11 33:10

**depositions** 6:20 17:14,18,23

**details** 26:8,23 28:21 31:4

**difficult** 6:21

**Disaster** 5:8

**discharge** 28:19 30:14

**disclosed** 22:18

**discovery** 17:11

**discuss** 14:14

**discussed** 7:23 15:12

**discussing** 8:2

**discussion** 14:7,18

**discussions** 11:14

**disputed** 18:23

**document** 19:13

**documentary** 19:15

**documentation** 19:19 20:8

**documents** 6:24 13:5,9,15,24,25 14:3, 9,16,19 15:13,25 16:5,7,11,12 19:24

**Dondero** 7:12 8:9, 11,18,24 9:20,25 10:9 13:20 17:4 18:23 19:7 21:8,13, 15 24:14,17 25:8,17 28:25 29:18 30:4,12 31:14,18

**Dondero's** 17:10 18:18 19:5 26:11 27:15 28:5,8,12

**due** 25:9 33:13

**duly** 5:14

**duties** 23:21

E

**Early** 32:11

**effect** 24:3 30:12

**Elms** 11:6,9

**email** 10:10 14:15

**Emergency** 5:7

**engagement** 9:14 10:21

**entered** 19:8 20:25 21:7 22:13 23:19 29:15,21 31:12

**enters** 20:11

**entities** 8:11 13:19, 23 17:3

**entry** 22:22

**evidence** 19:16

**exact** 7:17 21:2

**EXAMINATION** 5:18 32:9

**exclusively** 10:15

**executed** 13:18

**execution** 18:23 19:5 21:4 23:3

**exhibit** 11:20,21 15:8,22 22:24 27:9

**exist** 22:2

**existed** 20:5 22:5

**existence** 19:24

**exists** 19:20 23:7

**expect** 20:16

**expert** 7:11,25 8:3 11:12

**expertise** 20:15

**explanation** 14:12

**extent** 26:20

F

**fact** 18:11,12 19:3 25:14 28:3 30:16,22

**facts** 18:8 30:2 32:16,19,22

**fair** 9:9 10:2,13 15:19, 23 16:4 20:13 22:21 23:15 24:20 27:8

**fairness** 31:3

**favor** 13:20 25:13

**filed** 8:19 9:3,8 13:22 16:5,8,11

**files** 16:25

**filing** 31:16

**financial** 15:11,17,20

**fine** 8:15 18:5 20:23

**firm** 7:11,25 9:14 10:16,22 11:10 14:13

**focus** 31:7

**forgiven** 25:21 30:16,25 32:4

**forgiveness** 30:19

**form** 18:15 23:25 24:10

**forms** 17:5

**fourth** 26:13 28:2

**fulfilled** 23:21

**future** 30:9

G

**general** 7:23 16:15 21:21

**give** 31:9

**good** 5:23 33:6

H

**HCE** 17:6

**head** 16:24 17:7

**Highland** 6:2 8:8,12, 14,23 9:18 13:20 19:6,7 21:8,12,14 22:14,18 23:20 25:13,16,17,20 28:25 29:7 30:6,18

**Highland's** 14:23,24 15:3,6,10,16,20 16:6, 15 17:11 31:12

**Houston** 5:12

**hypothetical** 29:11 31:9,17

I

**identify** 16:21

**identifying** 18:17

**impact** 29:16

**inaccurate** 12:15

**included** 28:6 31:5

**income** 24:13,17,22 25:4 28:18 30:4,14 31:18,25

**indebtedness** 24:13 28:19 30:5,15 32:2

**influences** 27:16

**information** 14:23 15:2 26:16,24 27:5

**informed** 8:18,20 19:19

**interest** 25:9 31:13

**introduced** 11:21

**irrelevant** 15:21

**issue** 7:24 8:7 30:3 32:14,21

J

**James** 7:12 9:20

**John** 5:24 10:25 32:24

**Jones** 5:25

K

**key** 30:5

**knowledge** 21:25

L

**La** 11:18

**law** 14:13 32:16,22

**lawsuit** 10:15

**lawyer** 11:9

**lawyers** 10:16,21

**legal** 8:7 32:13,21

**likelihood** 26:25 27:5,10,17,23

**limited** 17:8

**listed** 13:10 16:2

**listening** 11:6

**litigation** 7:24 8:17, 25

**loans** 8:8,10 14:24 15:3,6,20 16:16 24:23 25:4,21 30:8,9, 15,24 32:3

**located** 5:12

**looked** 16:5,7

**LP** 6:2 8:9,14

M

**made** 19:6 22:9 23:5

**make** 16:19 21:5 26:3 28:13 29:17 31:8 32:14

**makes** 20:12

**Management** 6:2 8:9,14

**manner** 28:8

**market** 27:16

**matter** 16:15

**Mcgovern** 5:1,4,13, 22,23 6:1 7:1 8:1 9:1

10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1, 17

**means** 32:3

**mentioned** 32:12

**met** 9:20,21 14:13

**Michael** 7:22

**million** 31:10,14

**modified** 12:19

**moment** 26:15

**months** 7:18

**morning** 5:23

**Morris** 5:19,24 11:2, 17,22 12:2,5,11,13 13:2,4 18:3,6,21 24:6,15 32:5,25 33:6, 8

**move** 28:2

**multiple** 21:18

**N**

**nature** 7:23 8:17 26:20

**note** 5:5 20:12 21:20

**Noted** 33:14

**notes** 8:22 13:18 16:22 17:2 18:20,24 19:5,7 21:4,19,23 23:4,5 25:9,12,13,18

**November** 5:10

**number** 6:10 18:13 20:21 21:6,25 25:15 26:2,15 29:18,20

**numbered** 18:8

**O**

**Objection** 18:15 23:25 24:10

**obligation** 24:23

**occasions** 6:11,14, 16,19

**occur** 14:12

**occurred** 21:3 23:3 24:25 30:10

**offering** 23:6,10,14, 18,23 24:2 27:22

**one's** 33:12

**opining** 32:15

**opinion** 23:6,10,14, 18,23 24:2,12,16,21 25:7 26:4 27:23 28:20 32:13,20

**opinions** 12:20 13:16 14:4 15:8,21 16:17 17:21 22:24 24:9 27:8 28:14 29:16

**oral** 5:3 19:8 20:7,8, 11 21:17,20,22

**order** 5:7 28:19

**organized** 17:4

**original** 21:4 24:23 33:13

**outcome** 25:2 28:18 31:25 32:20

**owes** 25:8

**P**

**Pachulski** 5:24

**paragraphs** 18:9

**parties** 23:16

**partnership** 17:8

**payment** 19:6 23:4

**person** 23:19

**personal** 21:24

**phone** 7:21

**phrase** 8:12 20:19

**place** 30:13

**point** 11:3

**portfolio** 28:6 29:12, 19,22 30:23

**portions** 7:3

**potentially** 28:17

**premarked** 11:20

**prepare** 8:6 15:14

**prepared** 22:8

**preparing** 13:6 16:20

**principal** 25:8

**prior** 28:25 31:15

**probability** 27:20

**proceeding** 13:22

**proceedings** 17:15, 19,24

**professional** 6:11

**professor** 33:2

**promissory** 8:22 13:18 16:22 17:2 18:20,24 21:4,18 25:12

**provide** 7:11 28:20 32:20

**provided** 8:21 9:17 13:14,17,25 14:11 15:14,15

**providing** 32:13

**purposes** 13:6 18:19 29:11

**put** 6:23 11:19

**Q**

**question** 9:11 10:8 28:16 30:5

**questions** 26:19 32:6

**quickly** 6:17

**quiet** 11:16

**quote** 19:4 25:15 28:3

**R**

**read** 19:11 28:9

**realize** 31:18

**reasonable** 23:12

**recall** 7:16 8:17 11:13 14:17 16:25 17:7

**received** 7:21

**record** 5:21

**records** 14:24 15:4,7

**refer** 20:20 22:12

**referring** 8:14

**relate** 13:15

**related** 26:10

**relating** 10:14

**relevant** 15:7 16:16 22:23 27:18

**remote** 5:3 6:19,20

**remotely** 5:6

**rendering** 26:4

**reorganized** 6:3

**repay** 24:24

**report** 8:6 9:24 11:20 12:16,21,23 13:6,11, 13 14:5,9,20 15:14, 15 16:2,13,20 18:19 22:8,12 24:5

**REPORTER** 5:5 33:9

**requests** 17:11

**responses** 17:10

**restate** 21:10

**retained** 7:10,14,15 9:4,7,13

**retention** 7:20

**review** 25:11

**reviewed** 13:5 25:10

**room** 6:22

**rough** 33:12

**S**

**sale** 26:11,17

**satisfaction** 28:11

**satisfied** 18:11 24:19 25:20,22 27:2,6,11, 18,24 28:4

**Savings** 5:11

**scope** 26:20

**screen** 6:24 11:19

**scroll** 7:2 12:3 13:2

**seeking** 7:25

**sell** 29:6,19 31:15,21

**separate** 21:20

**serve** 8:3

**services** 9:18

**set** 12:20 14:5 15:8, 22 16:12 18:8 22:24 27:9 32:19

**sign** 12:8

**signature** 12:3,6 18:18

**signed** 8:23 17:3 18:20

**signing** 13:13

**similar** 8:10

**single** 21:17,21

**sir** 11:23 12:6

**sit** 12:14

**sitting** 32:15

**sold** 28:7 30:24 31:6, 19

**specific** 8:7

**specifically** 8:13

**spoken** 9:22 10:6

**Stang** 5:25

**state** 5:8,20 12:19

**statement** 27:13

**statements** 15:11, 17,21

states 25:15 28:3

stick 26:14

Stinson 7:11 9:14 10:16,21 14:13

structure 8:8

subject 27:15 29:13

subs- 24:4 25:5

Subscribed 33:19

subsequent 15:15 19:4,9,16,25 20:4,17, 20,25 21:6,12,14,25 22:5,10,11,14,17,23 23:2,7,11,15,19,24 24:3,4,8,18,24,25 25:6,15 29:15,21 30:7 31:11

subsequently 8:9

suggested 19:21

supplemented 12:24

surrounding 22:22

sworn 5:14 33:19

**T**

taking 32:18

taxable 24:17

terms 20:13 23:11

testified 5:16

testimony 7:11,25 17:22

Texas 5:12 6:4

thing 32:7

things 26:10,22 27:14

thinking 9:10 28:15

time 5:10,11 6:23 8:22 9:4,8 24:22 29:14,20,21 30:6,8, 15 31:15,23 32:4 33:2,14

timing 30:19

today 6:7 7:22 8:13

12:14 14:14 24:16 32:15

Today's 5:9

told 8:16 9:25

top 12:12 16:24 17:7

transcripts 17:13,18

treatment 14:23 15:3,6,19 16:16

true 18:13 32:3

truth 5:15,16

turn 18:3

**U**

ultimate 24:12

underlying 7:24

understand 7:7 8:10

unpaid 25:8

**V**

valued 29:14 31:10

values 27:16

**W**

wanted 29:20

we- 32:14

week 14:2 16:23

withdrawn 19:14 20:16,18

witnesses 11:9

words 10:5 25:20

work 10:14,19

write 20:12

written 17:10

**Z**

Ziehl 5:25

# Exhibit C

Privileged and Confidential - Work Product

**Notes Payable to Highland**

**8-Apr-21**

| Maker | Term | Amount Owed Per Lawsuit | Original Loan Amount | Loan Date | Adversary Proceeding |
|---|---|---|---|---|---|
| Nexpoint Advisors | 30 yr | 23,071,195 | $30,746,812 | 5/31/2017 | 21-3005 |
| HCM Services | 30 yr | 6,757,249 | $20,247,628 | 5/31/2017 | 21-3006 |
| HCM Services | Demand | 947,519 | 150,000.00 | 3/26/2018 | 21-3006 |
|  |  |  | 200,000.00 | 6/25/2018 | 21-3006 |
|  |  |  | 400,000.00 | 5/29/2019 | 21-3006 |
|  |  |  | 150,000.00 | 6/26/2019 | 21-3006 |
| JD | Demand | 9,004,013 | $3,825,000 | 2/2/2018 | 21-3003 |
|  |  |  | $2,500,000 | 8/1/2018 | 21-3003 |
|  |  |  | $2,500,000 | 8/13/2018 | 21-3003 |
| HCRE | 30 yr | 6,145,467 | $6,059,832 | 5/31/2017 | 21-3007 |
| HCRE | Demand | 5,012,261 | 100,000.00 | 11/27/2013 | 21-3007 |
|  |  |  | 2,500,000.00 | 10/12/2017 | 21-3007 |
|  |  |  | 750,000.00 | 10/15/2018 | 21-3007 |
|  |  |  | 900,000.00 | 9/25/2019 | 21-3007 |
|  |  | 50,937,704 |  |  |  |

**App. 202**

Confidential

DEFENDANTS-0000434

# Exhibit D

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** RE: Wires for today
**Date:** Wed, 25 Nov 2020 10:01:23 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

ok

**From:** Kristin Hendrix
**Sent:** Wednesday, November 25, 2020 10:01 AM
**To:** Frank Waterhouse
**Subject:** Wires for today

**HCM**

| | | | |
|---|---|---|---|
| AT&T | USD | 2,845.06 | |
| Grubhub | USD | 1,422.24 | |

**HCMFA**

| | | | |
|---|---|---|---|
| HCM Insurance Acct | USD | 17,373.85 | Dec premiums |

**NPA**

| | | | |
|---|---|---|---|
| HCM Insurance Acct | USD | 38,453.01 | Dec premiums |
| UMB Bank | USD | 355.31 | |

**HCFD Operating**

| | | | |
|---|---|---|---|
| HCMFA | USD | 61,691.00 | Shared Services |
| HCM Insurance Acct | USD | 51,779.84 | Dec premiums |

**Eagle Equity**

| | | | |
|---|---|---|---|
| HCM Insurance Acct | USD | 2,323.63 | Dec premiums |

Okay to release?

**Kristin Hendrix, CPA | Assistant Controller**

HIGHLAND CAPITAL
M A N A G E M E N T

300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4127 | F: 972.628.4147

khendrix@highlandcapital.com | www.highlandcapital.com



**Exhibit A1**

**App. 204**

ACL-019692

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** RE: Wires for today
**Date:** Mon, 30 Nov 2020 10:45:44 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

ok

**From:** Kristin Hendrix
**Sent:** Monday, November 30, 2020 10:46 AM
**To:** Frank Waterhouse
**Subject:** Wires for today

**HCM**

| | | | |
|---|---|---|---|
| Arris Western | USD | 11,000.00 | |

**HCMFA**

| | | | |
|---|---|---|---|
| HCM | USD | 308,374.00 | Shared Services |
| HCFD Oper | USD | 250,000.00 | Equity Contribution |

**NPA**

| | | | |
|---|---|---|---|
| HCMFA | USD | 325,000.00 | one day loan |
| HCFD Oper | USD | 120,762.09 | Transfer Pricing |

**HCFD Oper**

| | | | |
|---|---|---|---|
| Sea Island | USD | 23,511.90 | Final Presidents Club bill |

**HCFD 12B-1**

| | | | |
|---|---|---|---|
| HCMFA | USD | 37,822.00 | 12B-1 Reimbursement |

**Falcon GP**

| | | | |
|---|---|---|---|
| HCM | USD | 15,000.00 | Shared Services |

**NREA**

| | | | |
|---|---|---|---|
| HCM | USD | 80,000.00 | Shared Services |

Okay to release?

**Kristin Hendrix, CPA | Assistant Controller**



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4127 | F: 972.628.4147

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** RE: Wires for today
**Date:** Tue, 1 Dec 2020 12:04:49 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

ok

**From:** Kristin Hendrix
**Sent:** Tuesday, December 1, 2020 12:00 PM
**To:** Frank Waterhouse
**Subject:** Wires for today

**HCM**

| | | |
|---|---|---|
| Crescent TC | USD | 158,695.74 |
| Seery | USD | 150,000.00 |
| Nelms | USD | 30,000.00 |
| Dubel | USD | 30,000.00 |
| Simek | USD | 42,598.52 |

**HCMNY**

| | | |
|---|---|---|
| Times Sq | USD | 27,454.67 |

**HCMFA**

| | | | |
|---|---|---|---|
| NPA | USD | 325,000.00 | 11/30/2020 Loan Repayment |
| HIGHLAND TOTAL RETURN | USD | 72,912.75 | Advisory Fees |
| HIGHLAND FIXED INCOME | USD | 55,287.79 | Advisory Fees |
| HIGHLAND/IBOXX SRLOAN ETF | USD | 25,004.95 | Advisory Fees |
| HIGHLAND SMALL CAP EQUITY | USD | 19,293.59 | Advisory Fees |

**HCFD**

| | | | |
|---|---|---|---|
| Paul DeMaio | USD | 2,000.00 | Return of IT Holdback |

Okay to send?

**Kristin Hendrix, CPA** | Assistant Controller



300 Crescent Court | Suite 700 | Dallas, Texas 75201

**From:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>
**Subject:** FW: HCM - HCMFA/NPA
**Date:** Mon, 21 Dec 2020 12:30:25 -0600
**Importance:** Normal

FYI

**From:** Jack Donohue
**Sent:** Monday, December 21, 2020 12:15 PM
**To:** Kristin Hendrix
**Cc:** Fred Caruso
**Subject:** HCM - HCMFA/NPA

Kristin,

Has NPA paid the December payments $168k and 252k payments for shared service and subadvisor? The last payment I see was 11/2/2020. Has HCMFA paid the December payment of $416k? The last payment I see was on 11/2/2020.

Thanks,

Jack

Jack M. Donohue, CPA

Development Specialists, Inc.

10 South LaSalle Street, Suite 3300| Chicago, Illinois 60603

**Phone:** (312) 263-4141| **Fax:** (312) 263-1180

http://DSIconsulting.com/

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** Re: Wires for today
**Date:** Wed, 23 Dec 2020 11:05:46 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

Ok

On Dec 23, 2020, at 11:00 AM, Kristin Hendrix wrote:

### HCM
| | | | |
|---|---|---|---|
| HCM Ins | USD | 49,213.01 | health insurance premium funding |
| EAC | USD | 36,000.00 | Retainer Invoice; approved by Seery |

### HCMFA
| | | | |
|---|---|---|---|
| HCM Ins | USD | 8,686.93 | health insurance premium funding |
| ACA | USD | 375.00 | |
| Principal Life | USD | 71.53 | |

### NPA
| | | | |
|---|---|---|---|
| HCM Ins | USD | 20,079.46 | health insurance premium funding |

### HCFD
### Oper
| | | | |
|---|---|---|---|
| HCM Ins | USD | 26,339.40 | health insurance premium funding |

### EEA
| | | | |
|---|---|---|---|
| HCM Ins | USD | 1,161.82 | health insurance premium funding |

Okay to release?

**Kristin Hendrix, CPA** | Assistant Controller

300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4127 | F: 972.628.4147

khendrix@highlandcapital.com | www.highlandcapital.com



# Exhibit E

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** Re: Wires for today
**Date:** Thu, 31 Dec 2020 12:13:42 -0600
**Importance:** Normal

---

Ok

On Dec 31, 2020, at 12:11 PM, Kristin Hendrix wrote:

**HCM**

| | | | |
|---|---|---|---|
| Meta-e | USD | 360,384.10 | approved by Seery |
| Houlihan Lokey | USD | 41,460.00 | approved by Seery |
| Bloomberg Finance LP | USD | 16,491.04 | approved by Seery |
| Arris Western Corp. | USD | 11,000.00 | approved by Seery |
| TW Telecom Holdings, llc | USD | 6,182.17 | approved by Seery |
| Mauro Staltari | USD | 3,299.50 | final Garden leave payment (processed outside of payroll) |
| Canteen Vending Services | USD | 2,243.84 | approved by Seery |
| Shawn Raver | USD | 1,984.95 | approved by Seery |
| Four Seasons Plantscaping | USD | 481.71 | approved by Seery |
| Action Shred of Texas | USD | 450.00 | approved by Seery |
| ProStar Services, Inc | USD | 367.38 | approved by Seery |
| UPS Supply Chain Solutions | USD | 164.31 | approved by Seery |

**HCMFA**

| | | |
|---|---|---|
| Shawn Raver | USD | 4,631.55 |
| DTCC ITP LLC | USD | 892.88 |

**NPA**

| | | |
|---|---|---|
| Bloomberg Finance LP | USD | 26,177.78 |
| DST Asset Manager Solutions | USD | 17,152.20 |
| Dallas Zoological Society | USD | 9,404.00 |
| AnchorsGordan, PA | USD | 1,605.75 |
| Dow Jones & Company, Inc. | USD | 1,599.00 |
| UPS Supply Chain Solutions | USD | 521.37 |
| CHASE COURIERS, INC | USD | 24.48 |

**HCFD Oper**

| | | | |
|---|---|---|---|
| Highland Capital Management Fund Advisors | USD | 64,562.00 | Nov shared services |
| DST Technologies, Inc. | USD | 5,741.59 | |
| UPS Supply Chain Solutions | USD | 114.68 | |

**Falcon**
**E&P**

| | | | |
|---|---|---|---|
| HCM | USD | 15,000.00 | Dec shared services |



**App. 210**
ACL-026166

# Exhibit F

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | Adversary Proceeding No. |
| DONDERO, NANCY DONDERO, AND | § | 21-03005 |
| THE DUGABOY INVESTMENT | § | |
| TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| HIGHLAND CAPITAL | § | Adversary Proceeding No. |
| MANAGEMENT SERVICES, INC., | § | 21-03006 |
| JAMES DONDERO, NANCY | § | |
| DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| HCRE PARTERS, LLC (N/K/A/ | § | Adversary Proceeding No. |
| NEXPOINT REAL ESTATE | § | 21-03007 |
| PARTNERS, LLC), JAMES DONDERO, | § | |
| NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## EXPERT REPORT OF
## STEVEN J. PULLY, CPA, CFA, ESQ.

### December 10, 2021

*Confidential*

# TABLE OF CONTENTS

I.    BACKGROUND AND QUALIFICATIONS ........................................................................ 3

II.   ENGAGEMENT ........................................................................................................... 6

III.  BRIEF SUMMARY OF OPINIONS .................................................................................. 7

IV.  ASSUMPTIONS ........................................................................................................... 7

V.    SERVICES AGREEMENTS GENERALLY ....................................................................... 13

VI.  OPINIONS................................................................................................................. 15

VII. CONCLUSION .......................................................................................................... 21

2

# I.  BACKGROUND AND QUALIFICATIONS

1.  My professional background includes over thirty-six years of experience as an investment banker, corporate board member, corporate executive, hedge fund executive, attorney, consultant, and expert witness.

2.  I graduated with honors from Georgetown University in 1982 with a BSBA in Accounting, and I graduated from The University of Texas at Austin in 1985 with a Doctor of Jurisprudence degree.  I hold the Chartered Financial Analyst (CFA) designation and am a licensed CPA and attorney in the State of Texas.  I also hold the Series 7, 63, and 79 FINRA securities licenses[1]. My CFA designation and my law, CPA, and FINRA licenses are all current.

3.  I currently work as a corporate executive, as a corporate board member, as an investment banker, and as an expert witness.

   a.  I work on a part-time basis as the Chief Executive Officer of Harvest Oil & Gas, a former public company that is in the process of dissolving.  I was Chairman of the Board of Harvest before assuming the Chief Executive Officer role.  Until recently, Harvest was largely managed by another company pursuant to a services agreement.  When the services agreement was entered into, the services provider and the predecessor of Harvest were affiliates, which they ceased to be during the term of the agreement.  Services provided under the agreement included treasury, accounting, and operating functions.  One of my roles as Chief Executive Officer is to replace the former service provider by bringing most business functions in-house.

   b.  I currently serve on the boards of seven private companies. I am typically appointed to boards by large shareholders.  In total, I have been on the boards of thirty-two public and private companies. Those companies have operated in a broad cross section of industries, including agriculture, aviation, energy, entertainment, manufacturing, real estate, refining, retail, restaurants, technology, and telecom.  I have served on the boards of companies that have outsourced most of their corporate functions or provided outsourcing services for other companies.

   c.  I conduct my investment banking work through Speyside Partners, LLC ("Speyside Partners"), an entity that I co-founded.[2]  At Speyside I work on mergers, acquisitions and divestitures, financings, and restructurings.

4.  Through the end of 2014, I spent thirteen years working for two different hedge funds.  I was the General Counsel and a partner of Carlson Capital, the most recent hedge fund for which I worked.  Carlson Capital managed approximately $9 billion across a number of different funds during much of my tenure and followed a multi-strategy investing approach.  Prior to working at Carlson Capital, I worked for Newcastle Capital Management, a hedge fund that pursued a deep value and activist investment strategy.  I was the President of Newcastle Capital

---

[1] I formerly held the Series 24 FINRA license.
[2] The website for Speyside Partners is www.speysidepartners.com.

**App. 214**

Management and worked there for almost six years.  Newcastle Capital Management managed as much as $650 million across a variety of funds while I was employed there.  During my tenure, I served as the Chief Executive Officer of two companies controlled by the firm.  Both Carlson Capital and Newcastle Capital Management had "shared-services" arrangements, where a separate entity provided a variety of back office, mid-office, and front office services to an affiliated party.

5.  Prior to becoming a hedge fund executive, I was an investment banker for approximately twelve years at various large firms, including as a Managing Director for Bank of America Securities and as a Senior Managing Director for Bear Stearns.  I also worked as an investment banker at Kidder Peabody, PaineWebber, and Wasserstein Perella. Over the course of my work at large investment banking firms, I focused on mergers, acquisitions, divestitures, capital raising, and restructurings.

6.  Prior to becoming an investment banker, I was a securities and corporate lawyer for almost four years at Baker Botts.

7.  Based on the work that I have done over the past thirty-six years, I have developed a deep understanding of services agreements and outsourcing generally as well as corporate governance-related matters.  I applied the knowledge and experience that I have gained over the past thirty-six years to my analysis in this report.

8.  I have previously served as a testifying and/or consulting witness in the following actions:

   a.  Ascent Resources – *Utica, LLC (f/k/a American Energy – Utica, LLC); Ascent Resources, LLC (f/k/a American Energy Appalachia Holdings, LLC); Ascent Resources Utica Holdings, LLC (f/k/a American Energy Ohio Holdings, LLC); The Energy & Minerals Group Fund III, LP; EMG Fund III Offshore Holdings, LP; FR AEU Holdings, LLC and FR AE Marcellus Holdings, LLC v. Duane Morris LLP*, in the 165th Judicial District Court of Harris County, Cause No. 2015-46550) — Consulting and Testifying witness for Plaintiffs.

   b.  *In re Paladin Energy Corp.*, Case No. 16-13590, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division — Consulting and Testifying witness for Debtor.

   c.  *In re:  Potential Complaint Against Larry Noble, Noble Operating, LLC, Noble Natural Resources, L.L.C. and Javier Urias to Avoid Transfers* — Testifying witness for Potential Defendants.

   d.  *James D. Sallah, not individually but solely in his capacity as Corporate Monitor for OM Global Investment Fund LLC and OM Global LP, Plaintiff, v. BGT Consulting, LLC, d/b/a BGT Fund Administration, and Lara Goldberg, Defendants* — Testifying witness on behalf of Defendants BGT Consulting, LLC, d/b/a BGT Fund Administration and Lara Goldberg.

   e.  *Kenneth A. Kristofek, Gruene Interests, LLC and Gruene Interests Services, LLC, Gran Toro Rojo, LLC, and Gruene USFC, LLC, v. David Gunderson, Horace Winchester, Stan*

4

**App. 215**

*Bradshaw, and Jerry Williamson, Gruenepointe Holdings, LLC, Adora 8, LLC, Adora 9, LLC, Adora 10, LLC, Adora 14 Realty, LLC, Onpointe Healthcare Development, LLC, U.S. Freedom Capital Holdings, LLC, Lake Ohana, LLC, U.S. Freedom Capital, LLC, and Encantado Investments, LLC*, in the District Court of Dallas County, Texas, No. DC-16-07674 — Testifying witness on behalf of Plaintiffs.

f.  *In re SunEdison Securities Litigation,* in the U.S. District Court for the Southern District of New York, 16-md-2742-PKC — Testifying witness on behalf of Plaintiffs.

g.  *Avid Controls, Inc. v. GE Energy Power Conversion Technology, Ltd.; General Electric Company; and Current Power Solutions, Inc*., In the United States District Court for the Southern District of Texas - Houston Division, Civil Action No. 4:19-CV-01076 — Testifying witness on behalf of Plaintiff.

h.  *Lumos Partners, LLC, Claimant v. VAC-TRON EQUIPMENT, L.L.C., Respondent,* In Arbitration before the American Arbitration Association — Testifying witness on behalf of Claimant.

i.  *Lord Abbett Affiliated Fund, Inc., et al., Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. Navient Corporation, et al., Defendants*, Case No. 1:16-cv-112-GMS, in the United States District Court for the District of Delaware, Case No. 1:16-cv-112-MN — Testifying witness on behalf of Plaintiff.

j.  *Southland National Insurance Corporation in Rehabilitation, Bankers Life Insurance Company in Rehabilitation, Colorado Bankers Life Insurance Company in Rehabilitation, and Southland National Reinsurance Corporation in Rehabilitation, Plaintiffs, v. Greg E. Lindberg, Academy Association, Inc., Edwards Mill Asset Management, LLC, New England Capital, LLC and Private Bankers Life and Annuity Co., Ltd., Defendants*, in the General Court of Justice Superior Court Division, 19 CV 13093 —Testifying witness on behalf of Defendants.

k.  *Baylor University and Southwestern Baptist Theological Seminary, Plaintiffs, v. Harold E. Riley Foundation and Mike C. Hughes, Defendants*, in the District Court of Tarrant County, Texas, 67th Judicial District — Testifying witness on behalf of Defendants.

l.  *Advsr, LLC, Plaintiff, v. Magisto, Ltd. And Yahal Zilka, Defendants,* in the United States District Court, Northern District of California, San Francisco Division, Case No. 3:19-cv-2670 — Testifying witness on behalf of Defendants.

m.  *Lumos Partners, LLC, Claimant v. Altavian, Inc.,* In Arbitration before the American Arbitration Association — Testifying witness on behalf of Claimant.

n.  *Fouad Saade; and Kobi Electric, LLC, Claimants, v. Woodbridge International LLC, f/k/a Woodbridge Group, LLC; and Texender "Tex" Sekhon, Respondents,* In Arbitration before the American Arbitration Association - Testifying witness on behalf of Claimant.

9.  I have attached a copy of my curriculum vitae as <u>Exhibit A</u> to this expert report ("Report").

## II. **ENGAGEMENT**

10. Highland Capital Management, L.P., is the debtor in the bankruptcy proceeding, *In re: Highland Capital Management, L.P., Debtor,* and is referred to herein as the "Debtor" or the "Plaintiff." I have been engaged in the matters related to the bankruptcy proceeding that are listed below (collectively referred to as the "Actions").

   a. *HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff, vs. NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, Defendants,* Adversary Proceeding No. 21-03005, as a consulting and testifying expert witness on behalf of NexPoint Advisors, L.P. ("NexPoint"), and James Dondero ("Dondero" and NexPoint are collectively referred to as the "NexPoint Defendants").

   b. *HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff, vs. HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, Defendants,* Adversary Proceeding No. 21-03006, as a consulting and testifying expert witness on behalf of Highland Capital Management Services, Inc. ("HCMS"), and Dondero (Dondero and HCMS are collectively referred to as the "HCMS Defendants").

   c. *HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff, vs. HCRE PARTERS, LLC (N/K/A/ NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,* Defendants, Adversary Proceeding No. 21-03007, as a consulting and testifying expert witness on behalf of HCRE Partners, LLC ("HCRE"), and Dondero (Dondero and HCRE are collectively referred to as the "HCRE Defendants").

   d. The NexPoint Defendants, the HCMS Defendants, and the HCRE Defendants are collectively referred to as the "Defendants."

11. The Plaintiff has made claims against the Defendants for breach of contract, turnover of property, fraudulent transfer, and breach of fiduciary duty.

12. My engagement is through the law firms of Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt") and Stinson LLP ("Stinson"), which are acting as counsel to the Defendants. I am being compensated for my time at the rate of $750.00 per hour. My compensation is not in any way contingent on (i) the opinions I express in this Report or any additional report, (ii) the content of any testimony I may give, or (iii) the outcome of the Action.

13. I have met with Dondero as well as D. J. Sauter, who is the General Counsel of NexPoint. I have also met with attorneys from counsel to the Defendants: Munsch Hardt, and Stinson.

14. I was asked to provide my opinion regarding whether it was appropriate for the Plaintiff to not pay the interest and principal on the Notes (as hereinafter defined) on behalf of NexPoint, HCMS and HCRE (collectively, the "Makers") by December 31, 2020.

6

## III. BRIEF SUMMARY OF OPINIONS

15. I believe that the Plaintiff did not act reasonably by failing to pay amounts due on the Notes on behalf of the Makers by December 31, 2020, and otherwise in how it comported itself with respect to the Notes. Section 6.01 of the NexPoint Services Agreement (as hereinafter defined) sets forth a standard of care that the Plaintiff was supposed to comply with in paying the NexPoint Term Note; I also believe that each of the services agreements between the Plaintiff and the Makers required the Plaintiff to act in a reasonable way.

16. In forming my opinions and preparing this Report, I relied on all the materials listed in Exhibit B or otherwise cited herein as well as my background and personal experiences.

17. In offering my opinions, I am not opining on the legal enforceability of any agreements between the parties to the Actions.

18. I reserve the right to amend my Report should new information become available, including any assertions of the parties, witnesses, or any experts made in response to this Report.

## IV. ASSUMPTIONS

19. The Debtor filed for bankruptcy on October 16, 2019. During the Debtor's bankruptcy, James Seery ("Seery") served as the Chief Executive Officer and/or Chief Restructuring Officer of the Debtor.

20. The Debtor was formerly managed by Dondero, who was the firm's co-founder and was its President until January 9, 2020, at which time he resigned all positions with the Debtor and also relinquished control of the Debtor.[3] As of October 9, 2020, Dondero ceased to have any involvement as an officer or director of the Debtor.[4] Dondero also testified that there was tension between Seery and him as well as Seery and others at Highland.[5]

21. During 2020, the relationship between Dondero and the Plaintiff became increasingly adversarial. For example, in addition to Dondero ceasing to have any involvement as an officer or director of the Plaintiff, there were various adversarial proceedings between the parties.[6]

22. NexPoint, HCMS and HCRE executed certain notes in favor of the Debtor as described below:

   a. NexPoint executed a promissory note in the original principal amount of $30,746,812.33, and payable in thirty annual installments beginning by December 31, 2017 (the "NexPoint Term Note").[7] The NexPoint Note was fully payable in

---

[3] Dondero Deposition, Volume 2, Page 291, lines 9 – 12.
[4] Id. at Page 374, lines 8 – 10.
[5] Id. at page 87, lines 8 – 14.
[6] See, e.g., Id. at page 374, lines 6 – 9.
[7] Amended Complaint dated August 27, 2021 (the "NexPoint Amended Complaint"), filed by Highland Capital Management, L.P. as plaintiff against defendants, NexPoint Advisors, L.P., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust at 2.

**App. 218**

the event of default.[8]  As of December 31, 2020, $23,610,194.59 of principal remained outstanding on the NexPoint Term Note.[9]

    b.   HCMS executed a term note in the original principal amount of $20,247,628.02 and payable in thirty annual installments beginning on December 31, 2017 (the "HCMS Term Note").[10]  The HCMS Term Note was fully payable in the event of default.[11]

    c.   HCRE executed a term note in the original principal amount of $6,059,831.51 and payable in thirty annual installments beginning on December 31, 2017 (the "HCRE Term Note").[12]  The HCRE Term Note was fully payable in the event of default.[13]

23. The Debtor and the Makers were all involved in the investment management business, collectively managing billions of dollars on behalf of investors at various points over the course of their relationship with each other. At the time that the NexPoint Term Note, the HCMS Term Note, and the HCRE Term Note (collectively, the "Notes") were entered into, the Plaintiff, NexPoint, HCMS, and HCRE were all related parties as a result of overlapping equity ownership of the entities.  As of December 31, 2020, NexPoint, HCMS, and HCRE ceased to have any overlapping equity ownership with the Plaintiff but continued to have overlapping ownership with each other.

24. The Plaintiff and NexPoint are parties to an Amended and Restated Shared Services Agreement dated January 1, 2018 (the "NexPoint Services Agreement") pursuant to which Plaintiff provided a broad array of services to NexPoint.[14]  NexPoint operated its business with a small number of employees, relying on Plaintiff's much larger workforce to provide many key services for NexPoint to run its business.  The NexPoint Services Agreement details numerous areas where the Plaintiff was to provide services to NexPoint, with the Plaintiff essentially providing the entire workforce for most areas of NexPoint's business.  The areas that the Plaintiff provided services to NexPoint were detailed under the following headings in the NexPoint Services Agreement: Back- and Middle-Office, Legal Compliance/Risk Analysis, Tax, Management of Clients and Accounts, Valuation, Execution and Documentation, Marketing, Reporting, Administrative Services, Ancillary Services, and Other.[15]  The NexPoint Services Agreement essentially covered all functional areas of NexPoint's business other than the executive and investment functions.

---

[8] NexPoint Amended Complaint, Exhibit 3.  Additionally, I am informed that there was the potential for forgiveness of the Notes in certain circumstances that had also not occurred by December 31, 2020.

[9] D-NNI -074142.

[10] Amended Complaint dated August 27, 2021 ("HCMS Amended Complaint"), filed by Highland Capital Management, L.P. as plaintiff against defendants, Highland Capital Management Services, Inc., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust at 2.

[11] HCMS Amended Complaint, Exhibit 6.

[12] Amended Complaint dated August 27, 2021 ("HCRE Amended Complaint"), filed by Highland Capital Management, L.P. as plaintiff against defendants, HCRE Partners, LLC, James Dondero, Nancy Dondero, and The Dugaboy Investment Trust at 2.

[13] HCRE Amended Complaint, Exhibit 6.

[14] Amended and Restated Services Agreement dated January 1, 2018, Exhibit 9 to Seery Deposition.

[15] *Id.* at pages 3 – 5.

25. The NexPoint Services Agreement contains several provisions relating to the Plaintiff's obligation to make interest and principal payments on the NexPoint Term Note, including the following:

    a. Section 2.02(a) details various "Back and Middle Office" tasks that the Plaintiff was responsible for performing on behalf of NexPoint.[16] Those services included "payments,"[17] which encompassed payments of interest and principal on the NexPoint Term Note.

    b. Section 2.02 (b) provided for the Plaintiff to provide "[a]ssistance and advice with respect to legal issues…".[18]

    c. Section 6.01 describes the standard of care that the Plaintiff was supposed to provide to NexPoint.[19] The provision provides that the Plaintiff "shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

    d. Section 8.01 required that any amendments or modifications to the agreement were required to be in writing and signed by each party.[20]

    e. Section 8.07 provided that any "condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties."[21]

26. The Plaintiff first sought to provide notice of termination of the NexPoint Services Agreement in November of 2020, however, the termination date was extended[22] and the NexPoint Services Agreement was still in effect as of December 31, 2020.

27. While there was no written agreement between either HCMS or HCRE, on the one hand, and the Plaintiff, on the other hand, relating to services that the Plaintiff was to supply to either party, the services that the Plaintiff provided to HCMS and HCRE were essentially the same services that the Plaintiff provided to NexPoint[23] and involved a comprehensive array of services that were necessary in the day-to-day operations of the business of HCMS and HCRE. Like with NexPoint, by December 31, 2020, there was a long history of the Plaintiff having provided services to HCMS and HCRE.[24]

---

[16] *Id.* at pages 3 - 4.
[17] *Id.,* Section 2.02(a) provided, "Back- and Middle Office. Assistance and advice with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, payments, operation, bookkeeping, cash management . . . accounts payable . . ."
[18] *Id.* at page 4.
[19] *Id.* at 11.
[20] *Id.* at 14.
[21] *Id.* at 16.
[22] Dondero Deposition, Volume 2, page 375, lines 3-10.
[23] *See, e.g.,* Dondero Deposition, Volume 2, page 335, line 19 to page 336, line 13; Waterhouse Deposition, page 353, lines 6 – 10, page 357, lines 19 – 24.
[24] Dondero Deposition, Volume 2, page 94, lines 20 – 22; page 95, lines 4 – 9.

28. When asked about whether the Plaintiff had a services agreement with HCMS, Dondero replied as follows during his deposition[25]:

> My answer would be the advisors like NexPoint and HFAM that had to have by law and regulatory statute have to have formal sub advisors and shared services agreements had formal shared services agreement. Entities that didn't need to have formal written shared services agreements were often serviced similarly or -- or exactly the same as those entities, but without a written agreement, but with a verbal shared services agreement providing, again, all the same similar services, and the entities that didn't have a written shared services agreement · weren't getting shared services or support from any other entities other than Highland doing the same thing for them that it did for the mutual funds.

29. Dondero had a similar response with regard to there being an oral agreement for the Plaintiff to provide services to HCRE.[26]

30. There was extensive testimony about the services that the Plaintiff provided to HCMS and HCRE:

   a. Under the oral agreements to provide services to HCMS and HCRE, the Plaintiff was responsible for making payments of interest and principal on the HCMS Notes and the HCRE Notes, which had previously been made by December 31, 2017, 2018, and 2019.[27]

   b. HCMS and HCRE relied on the Plaintiff to provide services because HCMS and HCRE, like NexPoint, did not have the employees or infrastructure to run its business without the services provided by the Plaintiff.[28]

   c. According to Frank Waterhouse ("Waterhouse"), the Chief Financial Officer of the Plaintiff throughout 2020[29], the Plaintiff provided the same services to HCRE and HCMSS that it did for NexPoint.[30] He also specifically testified that Plaintiff's services included timely paying of bills and loan payments for HCMS[31] and the same bill paying for HCRE that it did for HCMS and NexPoint.[32]

31. Interest and principal were due on the Notes by December 31, 2020. Neither interest nor any principal payments were paid on any of the Notes by December 31, 2020. The Plaintiff was supposed to facilitate these payments even though the payments were supposed to be to itself.

---

[25] Dondero Deposition, Volume 2, page 335, line 19 to page 336, line 13.
[26] *Id.* at page 381, lines 10 – 23.
[27] Waterhouse Deposition, page 354, lines 2 – 23, page 357, lines 2 – 18.
[28] Dondero Deposition, Volume 2, page 371, lines 5-9.
[29] Waterhouse Deposition, page 28, lines 15-16.
[30] *Id.,* page 353, 6-10; 357: 19 – 24.
[31] *Id.* at page 354, lines 2 to page 357, line 18.
[32] *Id.* at page 358, lines 12 – 24.

32. On January 7, 2021, the Debtor delivered a letter to each of the Makers (the "Acceleration Letters") indicating that a default had occurred on each of the Notes and demanding the immediate full payment of "all principal, interest, and any other amounts due on the Note…".[33] The effect of the Acceleration Letters was that millions of dollars of principal payments were suddenly due; had the Acceleration Letters not been sent, principal on the Notes would have amortized ratably through 2047.

33. In addition to being the Plaintiff's Chief Financial Officer, Waterhouse was also an officer of two of the three Makers as of December 31, 2020.

    a. He was the Treasurer of NexPoint, an officer-level role, during all periods relevant to my Report. Waterhouse reported at his deposition, "I still manage the finance and accounting function for NexPoint."[34]

    b. He was the treasurer and acting treasurer of HCMS.[35]

34. Plaintiff alleges that Dondero orally instructed Waterhouse to not pay the interest and principal on the NexPoint Term Note that was due on December 31, 2021.[36] No evidence has been presented that suggests that Dondero's alleged instructions for the Plaintiff to not pay interest and principal on the NexPoint Term Note was in writing. The apparent rational for the alleged instruction was that NexPoint believed that there had been substantial overcharges totaling in the millions of dollars by the Plaintiff under the NexPoint Services Agreement. The overcharges related to charges for employees who were no longer working for the Plaintiff but that were still being charged to NexPoint, which was a violation of the NexPoint Services Agreement. Furthermore, Dondero denies that he instructed Waterhouse not to pay the NexPoint Term Note.[37]

    a. Dondero denies that he instructed that no interest and principal be paid on the NexPoint Term Note, testifying, "There is no logical reason, nor would I have ever authorized or suggested no payment to put us…in default due to a *deminimis* amount of money….even if I was highly annoyed with Seery, even if we knew that Seery and Highland had overcharged NexPoint by whatever it was, 14, 16, million bucks, I would not have let a small amount cause a…breach."[38]

    b. Dondero also testified that the Plaintiff made the payments due on the Notes by December 31 of 2017, 2018 and 2019 without any specific authorization from any of the Makers.[39]

35. No evidence was presented suggesting that Dondero, HCMS or HCRE instructed the Plaintiff not to make payments on the HCMS Term Note or the HCRE Term Note. HCMS and HCRE had a reasonable expectation that interest and principal on the HCMS Notes and HCRE Notes

---

[33] Exhibit 6 to Seery Deposition taken on October 21, 2021.
[34] Waterhouse Deposition, page 28, lines 15-16.
[35] *Id.*, at page 30, lines 9 – 16.
[36] *Id.*, at page 390, lines 4 – 13.
[37] Dondero Deposition, Volume 2, page 391:18-25.
[38] *Id.*
[39] *Id.* at page 463, lines 10-25.

would be paid by December 31, 2020, given past practices and the Plaintiff's obligation to do so.

36. Mr. Waterhouse testified about his responsibility in connection with making the payments on the Notes that were due by December 21, 2020[40]:

> Q:  Did you approve of each payment that was made against principal and interest on the notes that were given by the affiliates of Mr. Dondero?
>
> A:  Did I approve the payments?  I approve  -  I approve  -  if there was cash  -  if there was cash being repaid on a note payment, yes, I approved in the general sense of being made aware of the payment and the amount."
>
> Q:   And are you the person who authorized Highland's employees to effectuate those payments?
>
> A:  Yes.

37. No evidence has been presented of any discussions that the Plaintiff had with Dondero or any of the Makers prior to December 31, 2020, with regard to payments on the Notes other than the alleged discussion between Dondero and Waterhouse described above relating to the NexPoint Term Note.  Specifically, the evidentiary record reflects that there was no follow-up by Waterhouse or anyone else at the Plaintiff confirming that it was Dondero's intent for there not to be any payments made on the NexPoint Term Note.[41]

> a.  A number of Plaintiff's employees knew about Dondero's alleged instructions prior to December 31, 2020, with respect to the NexPoint Term Note, yet no effort was undertaken to investigate Dondero's instructions by speaking with him or otherwise confirming what NexPoint's intent was regarding the NexPoint Term Note.
>
> b.  Deposition testimony by Kristin Hendrix ("Hendrix"), who was the assistant controller of the Plaintiff at the time, revealed that she knew by November 30, 2020, or December 1, 2020, that the Plaintiff was not going to pay the interest and principal on the NexPoint Term Note that was due by December 31, 2020.[42]
>
> c.  Waterhouse testified that he did not follow-up with Dondero about whether NexPoint should make the payments required by December 31, 2020.[43]

38. Waterhouse also testified that there had not been any instructions from anyone to the Plaintiff to not make the required payments on the HCMS Term Note or the HCRE Term Note by December 31, 2020.[44]  When asked about Dondero's tone when he talked to him about the fact that the payments had not been made on the HCMS Term Note and the HCRE Term Note,

---

[40] Waterhouse Deposition, page 56, line 21 to page 57, line 10.
[41] *Id*., at page 391, lines 18 – 21.
[42] Hendrix Deposition, page 12, lines 4 – 7.
[43] Waterhouse deposition, pages 391: line 18 to page 392, line 2.
[44] Waterhouse Deposition, pages 393, line 21 – 25 to page 394, line 4.

Waterhouse said that the tone was very negative and that Dondero's reaction was consistent with the fact that Dondero was surprised that the payments had not been made.[45]

## V. <u>SERVICES AGREEMENTS GENERALLY</u>

39. Companies seeking to conduct operations more efficiently frequently outsource various operational, accounting, treasury, and other functions to a service provider. By outsourcing such functions, the customer of the services provider can avoid costly employee and infrastructure investments that would otherwise be required to conduct the outsourced functions.

40. The agreement between the party receiving the services and the party providing the services is often referred to as a "services agreement," an "outsourcing agreement," or a "shared services agreement." These terms have the same meaning for purposes of this Report although the term "shared services" is often used in the context of a company sharing services with an affiliated party.

41. The parties to a services agreement are sometimes related and other times are completely separate with no prior business relationship.

42. The actual agreement that comprises the services to be provided under a services agreement varies in form. Some services agreements are comprehensive, others provide limited written direction, and still others are oral.

43. Smaller companies are often more likely to outsource a broad set of business functions, typically because they are growing rapidly and do not have the financial resources or time to build out various important business functions.

44. Virtually every company outsources some type of business function to a third-party. For example, many companies outsource limited functions such as payroll processing or IT services to various vendors. There is a distinct difference, however, between outsourcing limited functions to a vendor that provides services for many clients versus the more fulsome relationship that is embodied by the typical services agreement involving the services provider managing major aspects of a company's operational and back-office functions.

    a. Providers of more fulsome services have additional duties relative to a provider that is responsible for limited services. Those additional duties generally emanate from the level of responsibility that the services provider takes on and the services provider's more intimate knowledge of its customer's business.

    b. Said another way, a provider of a straightforward and often outsourced service such as payroll processing has no reason to understand the underlying business issues of its customers or the perspectives of the employees for which it processes payroll. On the other hand, a provider of more fulsome services has an intimate knowledge

---

[45] *Id.* at page 394, lines 12 – 21.

of the goals, objectives, and capabilities of its customers and in discharging its obligations, cannot ignore that knowledge.

45. In the case of services agreements that cover a fulsome set of activities for the customer, even if there is a comprehensive agreement between the parties, it is difficult to enumerate with specificity each individual task that the services provider is expected to perform. Tasks are therefore often described in broad terms as opposed to specific detail (i.e., the service provider is required to handle accounting functions for its customer as opposed to saying that a trial balance is required 15 days after month-end, or the annual audit must be completed by a specified date).

   a. Despite the difficulty in describing each task with specificity that the services provider is required to perform, the specific tasks become apparent as the services provider performs functions on behalf of its customer. In the ordinary course, practices develop that inevitably are deemed acceptable to the services provider and its customer. Such practices are generally fully clarified within one year of the inception of the services agreement because that timeframe allows the parties to interact with each other over the course of a full accounting cycle.

   b. Following the initial cycle of activities, those previously performed practices are often referred to as "past practices" and such past practices become an important piece in gauging whether the services provider has met it obligations in future periods. Having been affiliated with companies that are customers of services providers, I think of past practices as having virtually the same effect as a written document provided that the services agreement is not written in a way that prohibits such an interpretation.

46. Services agreements between related parties often present complicated issues, especially if the relationship changes between the parties during the term of the services agreement. For example, at the beginning of the term of the services agreement, two related parties might constructively work together, almost obviating the need for a detailed agreement between the parties. If there is a change in the relationship between the parties that leads to less cooperation, the original agreement may not be comprehensive enough to optimally deal with the change in circumstances.

   a. In such situations, past practices can become an even more important factor in determining the services provider's obligations and the reasonable expectations that the customer should have if the contract language is not explicit on the point.

   b. While the services provider and a customer that is related at the outset of an agreement may cease to be related at some point during the term of the agreement, the services provider's knowledge of the customer's business objectives does not necessarily become stale immediately upon the change in affiliate status. Consequently, any higher duty that comes about from the knowledge that the services provider has about its customer is not necessarily impacted if the affiliate status of the services provider and its customer changes.

14

**App. 225**

## VI. <u>OPINIONS</u>

**A. *The Plaintiff was obligated to pay interest and principal on the NexPoint Term Note by December 31, 2021, on behalf of NexPoint. Despite the alleged instruction from Dondero that the Plaintiff should not make any payments on NexPoint's behalf, the Plaintiff's obligations to make the payments did not end. At a minimum, the Plaintiff had a duty to investigate whether the payments should have been made, which it did not do. In not making the payments on the NexPoint Term Note and not undertaking steps to further investigate whether the payments should have been made, the Plaintiff did not act reasonably.***

47. The payment terms of the NexPoint Term Note required that interest and principal was due to the Plaintiff from NexPoint on or before December 31, 2020. It is undisputed that interest and principal were not paid on the NexPoint Term Note by the required date.

48. The Plaintiff was obligated to make the payment of interest and principal on behalf of NexPoint on or before December 31, 2020, under the NexPoint Services Agreement.

49. The Plaintiff has taken the position that the interest and principal that was due on the NexPoint Term Note by December 31, 2020, was not paid because of Dondero's alleged directive to Waterhouse to not make the payments.[46]

50. The evidentiary record highlights several noteworthy facts:

    a. The Plaintiff had conflicting roles because it was the payee of the NexPoint Term Note and also had the obligation to cause the payments to be made on the NexPoint Term Note. The conflicting roles were also heightened because of the increasingly adversarial role that had developed between the Plaintiff and Dondero.

    b. The Plaintiff stood to benefit mightily if NexPoint defaulted on the payment of interest or principal, given the Plaintiff's ability to immediately accelerate the payment of the NexPoint Term Note. Without a default, some of the principal of the Notes could have been outstanding until 2047.

    c. Waterhouse was an officer of the Plaintiff and was also an officer of NexPoint, creating a conflict beyond the conflicts that the Plaintiff had that are described above. Given his dual roles, he had knowledge of the business objectives and financial condition of NexPoint, which should have made it clear to him that NexPoint would not welcome a default on the NexPoint Term Note.

    d. NexPoint allegedly made overpayments to the Plaintiff that Dondero wanted to be offset against the required interest and principal payments on the NexPoint Term Loan.[47] The overpayments related to workers that the Plaintiff was charging to NexPoint that no longer worked for the Plaintiff, which violated the terms of the

---

[46] Waterhouse Deposition, page 390, lines 4 – 13.
[47] Seery Deposition, page 226, lines 2 – 4; Dondero Deposition, Volume 2, page 392, lines 3 – 7.

NexPoint Services Agreement. There were ongoing discussions between Dondero and Seery leading up to the end of 2020 relating to the topic.

 e. There is no evidentiary record describing any effort by the Plaintiff to warn NexPoint of the implications of Dondero's alleged request for the payments on the NexPoint Term Note to not be made. For example, despite the fact that the NexPoint Services Agreement required the Plaintiff to provide NexPoint with legal services, the Plaintiff failed to provide NexPoint with legal advice that failing to pay interest and principal could result in an acceleration of the NexPoint Term Loan.

51. In my opinion, Dondero's alleged statement to Waterhouse that the Plaintiff should not make payments on the NexPoint Term Note on December 31, 2020, did not provide a basis for the Plaintiff to not make the payments on the Notes given its obligations to NexPoint under the NexPoint Services Agreement. Several reasons support my opinion:

 a. There is no evidence that the Plaintiff took any reasonable steps to address the myriad of conflicts that it faced.

  i. The Plaintiff's obligations regarding the required payments of the Notes involved the conflict-ridden task of authorizing and making a payment to itself. Additionally, the Plaintiff stood to benefit significantly by putting the NexPoint Term Note into default given that a default would allow the Plaintiff to realize the proceeds from repayment of the note far earlier than it otherwise would have; had the NexPoint Term Loan not been accelerated, it would have remained outstanding until 2047. While the evidence is silent on whether the Plaintiff was considering the repayment benefit of the NexPoint Term Loan to itself, from an appearance standpoint, the conflict was glaring.

  ii. The Plaintiff apparently took no steps to address these conflicts either by conferring with NexPoint or Dondero. Conferring with NexPoint or Dondero would have helped in establishing that NexPoint and Dondero really did not want the Plaintiff to transfer funds to pay interest and principal on the NexPoint Term Loan.

  iii. The Plaintiff also has presented no evidentiary record reflecting how any internal steps were taken to address the conflict. Such steps might have included conducting meetings internally with minutes to reflect discussion regarding the conflict or any efforts to seek guidance from counsel to assist with the conflict.

  iv. According to deposition testimony by Hendrix, who was the assistant controller of the Plaintiff at the time[48], she recalled receiving a phone call from Waterhouse on either November 30, 2020, or December 1, 2020, where Waterhouse indicated that no payments would made by the Plaintiff

---

[48] Hendrix Deposition, page 12, lines 4 – 7.

on behalf of NexPoint.[49]   Accordingly, it seems that Plaintiff decided as early November 30, 2020 or December 1, 2020, to not make the payments on the NexPoint Term Note.  Given the apparent time frame of the decision to not make the payment, the Plaintiff had ample time to confirm in writing with Dondero that the payments should not be made or to otherwise take reasonable steps to ensure that a mistake was not being made and that the Plaintiff was acting reasonably.

b.  The Plaintiff had an obligation to act reasonably in discharging its obligations to make the payments on the NexPoint Term Note on behalf of NexPoint.  In addition to not properly addressing conflicts as set forth above, the evidentiary record further reflects that the Plaintiff did not act reasonably.

   i.  No effort was undertaken to inform Dondero that the Plaintiff disagreed with his assumption that there were offsets to the required interest and principal payment requirements on the NexPoint Term Note. Absent any communication from the Plaintiff, Dondero simply had no way of knowing that the Plaintiff disagreed with his perspective that a right of offset did exist, so it was reasonable for him to think that discussion of an offset was on the table.

   ii.  Waterhouse had worked for or with Dondero for many years, making him very familiar with Dondero's management style.   Dondero is a decisionmaker who is willing and does change his mind when presented with new facts, something that Waterhouse should have been aware of yet did nothing to address.

   iii.  Given the massive implications of a default of the NexPoint Term Loan to NexPoint, which the Plaintiff should have understood given the robust services that it was providing to NexPoint and the dual financial responsibilities that Waterhouse had to both organizations, the Plaintiff should have acted more responsibly by engaging with NexPoint and Dondero to confirm NexPoint's intent.

   iv.  The NexPoint Services Agreement provides that the Plaintiff was supposed to provide NexPoint with legal advice. In effect, the Plaintiff was NexPoint's law firm.  Had the Plaintiff met its commitment, it would have had its internal counsel consult with NexPoint to point out the legal ramifications of the interest and principal payments not being made.  There is no evidence suggesting that the Plaintiff took any steps to meet its obligation to provide legal advice as required under the NexPoint Services Agreement.

c.  Waterhouse had a conflict separate from the conflicts that the Plaintiff otherwise had given that he was an officer of both the Plaintiff and the NexPoint.  Among

---

[49] *Id*. at 71, lines 4 – 7.

other things, Waterhouse's officer role for NexPoint must have provided him with insights into NexPoint's business objectives, which could not have included any appetite for having the Notes accelerated. Yet there is no evidence that Waterhouse's knowledge was utilized in Plaintiff's decision making regarding the required payments of the Notes. It is inapposite to argue that because Waterhouse had knowledge about NexPoint from a source other than the Plaintiff, that he was entitled to ignore that knowledge. In discharging its duties under the NexPoint Services Agreement, the Plaintiff should have been using all information that it had available in its work on behalf of NexPoint.

d. The NexPoint Services Agreement provided that any amendment to the agreement needed to be in writing[50] and any consent to a change in the agreement needed to be in writing.[51] No such effort to comply with the writing requirement was undertaken and highlights the fact that any oral statement by Dondero regarding the NexPoint Term Loan not being paid was insufficient under the express terms of the NexPoint Services Agreement.

e. Section 6.01 of the NexPoint Services Agreement also describes the standard of care that the Plaintiff was supposed to provide to NexPoint in the discharge of its obligations under the agreement.[52] The provision provides that the Plaintiff "shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." For reasons already described herein, the Plaintiff did not discharge its duties with such care.

52. For the foregoing reasons, any alleged default under the NexPoint Term Note was the result of the Plaintiff's own negligence and misconduct, which underscores that Plaintiff did not act reasonably in the discharge of its obligations to NexPoint.

***B. Based on the oral agreement that the Plaintiff had with HCMS and HCRE and consistent with the services that the Plaintiff had previously provided, HCMS and HCRE had a reasonable expectation that the Plaintiff would continue paying interest and principal on behalf of those entities absent explicit direction to the contrary. As there was no directive from anyone affiliated with HCMS or HCRE to relieve the Plaintiff of that responsibility, the Plaintiff did not act reasonably by not meeting its obligations to make payments of interest and principal on behalf of HCMS and HCRE.***

53. While the services agreements between Plaintiff, on the one hand, and HCMS and HCRE, on the other hand, were oral, the existence of an oral services agreement between affiliated parties involved in the investment management business is common and is something that I have regularly observed.

---

[50] Amended Services Agreement, Section 8.01.
[51] *Id.* at Section 8.07.
[52] *Id.* at Section 6.01.

54. Like with NexPoint, the Plaintiff provided HCMS and HCRE with a comprehensive array of services that were necessary to the day-to-day operation of their businesses. There was a lengthy history of the Plaintiff providing HCMS and HCRE with such services. The broad array of services provided by the Plaintiff to NexPoint were the same as the scope of work performed by the Plaintiff for HCMS and HCRE.

55. The evidentiary record highlights several noteworthy facts:

   a. The evidentiary record reflects that the Plaintiff historically made payments on behalf of the HCMS Term Note and HCRE Term Note in addition to providing an array of other critical services to HCMS and HCRE not dissimilar from many of the services that the Plaintiff provided to NexPoint under the NexPoint Services Agreement.[53]

   b. No evidence has been presented suggesting that there was any communication from HCMS, HCRE, or Dondero suggesting that the payments on the HCMS Term Note and the HCRE Term Note should not continue.

   c. No evidence has been presented suggesting that on payment dates in years prior to 2020 HCMS or HCRE had to notify the Plaintiff that it wanted the Plaintiff to make the required payments on the HCMS Term Note or the HCRE Term Note. Accordingly, it would not have been reasonable for the Plaintiff to expect that HCMS or HCRE were required to take any affirmative steps to have payments made on their notes.

   d. The Plaintiff had conflicting roles because it was the payee of the HCMS Term Note and the HCRE Term Note and also had the obligation to cause the payments to be made of those notes. The conflicting roles were also heightened because of the increasingly adversarial role that had developed between the Plaintiff and Dondero.

   e. The Plaintiff stood to benefit mightily if HCMS and HCRE defaulted on the payment of interest or principal, given the Plaintiff's ability to immediately accelerate the payment of those notes. Without a default, some of the principal of the HCMS Term Note and the HCRE Term Note could have been outstanding until 2047.

   f. Waterhouse was an officer of the Plaintiff and was also an officer of HCMS, creating a conflict beyond the conflicts that the Plaintiff had that are described above. Given Waterhouse's dual roles, he had knowledge of HCMS's business objectives and financial condition, which should have alerted him that HCMS would not welcome a default on the HCMS Term Note.

---

[53] *See, e.g.,* Dondero Deposition, Volume 2, pages 335:19 to 336:13; page 381, lines 10-23.

g. The Plaintiff made no effort to warn HCMS or HCRE of the implications of the Plaintiff not making payments on the HCMS Term Note or HCRE Term Note by December 31, 2020.

56. Dondero testified about the payments that were required on the HCMS Term Note by December 31, 2020, indicating that there was an expectation by HCMS that the payments were going to be made, regardless of whether there were specific instructions by HCMS to do so:[54]

> Q: Okay. Do you know whether anybody acting on behalf of HCMS ever instructed or authorized Highland to make a payment on account of HCMS's term note to Highland?
>
> A. Well, again, and maybe I didn't say it clearly enough. I think there was a reliance in the due course aspect, especially on small amounts, and it would have been done by Highland personnel on behalf of Services.
>
> * * * * *
>
> Q. And I'm going to ask you, Mr. Dondero, to be patient with me and to listen carefully to my question. Are you aware of anybody acting on behalf of HCMS, whoever instructed Highland to make a payment in satisfaction of any payment that was due at the year-end of 2020 under the term note?
>
> A. Not specifically, but I'm saying I don't think it needed to be made specifically.

57. The Plaintiff was required to act reasonably in the performance of its obligations to HCMS and HCRE given the record of past practices and the precedent created by similar work done by the Plaintiff for NexPoint. With respect to the payments required under the HCMS Term Note and the HCRE Term Note by the Plaintiff, HCMS and HCRE had a reasonable expectation that they would continue receiving such payment services absent a clear termination by Plaintiff of its obligations to HCMS and HCRE. Given that there is no evidence suggesting that any of the parties had terminated the Plaintiff's obligations to provide services to HCMS and HCRE as of December 31, 2020, especially given that the Plaintiff continued to perform other services on behalf of those entities as of such date, the Plaintiff did not act reasonably by not making the payments on the HCMS Term Note and the HCRE Term Note by December 31, 2021. Likewise, it was also not reasonable for the Plaintiff to not discuss with HCMS and HCRE that payments were not going to be made on the HCMS Term Note and the HCRE Term Note given that payments had been made in prior years without any request by HCMS or HCRE.

58. Hendrix testified that the instruction to her not to make the NexPoint Term Loan payment by December 31, 2020, did not apply to the payments required on the HCMS Term Note and the HCRE Term Note by December 31, 2020.[55] She also testified that she made no attempt or effort to determine whether Dondero wanted the payments required on the HCMS Term Note

[54] Dondero Deposition, Volume 2, pages 371:23 – 372:18.
[55] Hendrix Deposition, page 100, lines 20 – 23; page 101, lines 8 – 12.

and the HCRE Term Note to be paid by December 31, 2020.[56] Finally, Hendrix made no attempt to check with anyone whether the payments should be made.[57] Hendrix's testimony underscores that Plaintiff did not act reasonably in discharging its obligations to HCMS and HCRE.

59. For the foregoing reasons, any alleged default under the HCMS Term Note and the HCRE Term Note was the result of the Plaintiff's own negligence and misconduct, which underscores that Plaintiff did not act reasonably in the discharge of its obligations to HCMS and HCRE.

## VII.   CONCLUSION

60. In summary, based on the evidence that I have reviewed and relied upon, as well as my training and experience, it is my opinion that the Plaintiff did not act reasonably in choosing not to pay the interest and principal due under the Notes. As a result of Plaintiff's failures to act reasonably, it should not have accelerated payment of the principal amount of the Notes.

Respectfully submitted,

_____

Steven J. Pully, CPA, CFA, ESQ.

---

[56] *Id*. at page 102, lines 10 – 13.
[57] *Id*. at page 105, lines 8 – 11.

21

**Exhibit A**

## STEVEN J. PULLY
**4564 Meadowood Road, Dallas, Texas**
**(214) 587-6133**
**sjpully@yahoo.com**

---

### *Employment History*

---

| | |
|---|---|
| October 2014 – Present | **SPEYSIDE PARTNERS/INVESTMENT BANKER/CONSULTANT/BOARD DIRECTOR/CORPORATE EXECUTIVE**<br>• *Investment banker/consultant to companies, investors and creditors on matters including capital raising, distressed debt restructurings, asset dispositions, activist investing defense, strategic opportunities, and expert witness matters*<br>• *Chief Executive Officer and Chairman, Harvest Oil & Gas (post-reorg)* |
| January 2008 – Sept. 2014 | **CARLSON CAPITAL, L.P.,** General Counsel and Partner, Dallas, Texas<br>• *Responsible for legal affairs of hedge fund with over $9.0 B of AUM; worked closely with affiliated oil and gas private equity fund with $700 of AUM beginning in 2010*<br>• *Member of Management, Operating and Valuation Committees (Chair)* |
| Dec. 2001 – October 2007 | **NEWCASTLE CAPITAL MANAGEMENT, L.P.,** President, Dallas, Texas<br>• *Activist fund with $650 MM of assets under management*<br>• *Operating positions for portfolio companies: CEO of Pinnacle Frames, Jan. 2003 – June 2004 (largest domestic picture frame manufacturer with 600 employees; involved in multiple visits to Wal-Mart, visited China and identified new CEO for company); CEO of New Century Equity Holdings, June 2003 – Oct. 2007 (cash shell seeking to acquire business)* |
| May 2000 – Dec. 2001 | **BANC OF AMERICA SECURITIES**, Managing Director, Investment Banking - M&A/ Energy & Power Groups; Houston and Dallas, Texas |
| January 1997 – May 2000 | **BEAR STEARNS & CO. INC.,** Senior Managing Director - Investment Banking Department; Dallas, Texas |
| April 1996 – Dec. 1996 | **CONVERGENT ASSOCIATES, INC.,** President, Dallas, Texas.<br>• *Private equity firm that controlled three technology-oriented companies involved in travel, media and software; affiliated with EDS* |
| January 1996 - April 1996 | **WASSERSTEIN PERELLA & CO., INC.,** Vice President - Investment Banking Department; Dallas, Texas<br>• *Left after brief association because supervisor announced departure plans* |
| July 1989 - Dec. 1995 | **PAINEWEBBER INCORPORATED/ KIDDER, PEABODY & CO.,** First Vice President - Investment Banking Department; New York City and Houston, Texas |
| October 1985 - July 1989 | **BAKER & BOTTS, Attorneys,** Associate – Corporate Department; Houston, Texas |

---
### *Board Experience*
---

**Board Leadership** - Experience as Lead Director, Chairman of the Board, Executive Committee member and Chairman of Audit, Compensation, Governance and Strategic Committees

**Accounting/Finance** - CPA and CFA certifications, significant experience with financial statements and analysis, member of several audit committees including chair role

**Strategic Transactions/Capital Raising** - Substantial history with successful strategic transactions and efficient capital raising, including debt restructurings

**Governance/Activist Investing Expertise** - Extensive experience with shareholder governance and activist investing/defense; positive reputation with shareholders as a value creator

**Legal/Regulatory** - Licensed attorney, extensive experience managing legal/compliance department

### Public Company Directorships

**Previous:** Bellatrix Exploration, Energy XXI (Chair – Comp and Strategic), EPL Oil & Gas Inc. (Lead Director, Chair - Comp), Ember Resources, Cano Petroleum, Goodrich Petroleum, Harvest Oil and Gas (Chairman of the Board, Chair – Audit), Peerless Systems (Chair – Audit), New Century Equity Holdings, MaxWorldwide, Geoworks Corporation, Pizza Inn (Chair – Governance), Titan Energy, VAALCO Energy (Chair – Governance, Comp), Whitehall Jewelers (Chairman)

### Private Company Directorships

**Current:** Harvest Oil & Gas (Chairman of the Board and Chief Executive Officer, formerly public company), Limetree Bay Energy, Heritage Power, Response Team 1, Wild Rivers, OWS, ExpressJet
**Previous:** Fox & Hound, GenCanna Global, Pinnacle Frames & Accents, Aspire Holdings (Chair – Comp), PermianLide, Tribune Resources (Chair – Audit), PGi, Southland Royalty, Greylock Energy, Karya Properties, PRIMEXX Energy, Titan Energy

---
### *Professional Certifications, Education and Other Interests*
---

**CHARTERED FINANCIAL ANALYST,** 2004 (Active member), **CERTIFIED PUBLIC ACCOUNTANT,** Texas, 1985 (Active member), **STATE BAR OF TEXAS,** 1985 (Active member), **FINRA** Series 7, 63 and 79 (Current)

**The University of Texas School of Law, 1985**
International Law Journal, Moot Court, Board of Advocates

**Georgetown University, BSBA with honors, 1982, Major in accounting with 3.90 GPA in major**
President of Student Government Senate, National Model U.N. Team
**Centre for Management Studies, Oxford University, England**, **Summer 1981**

Sailing, golf, writing, biking and travel; married with two adult daughters

Board of Advisors, Georgetown McDonough School of Business, 2015 - 2018

**Documents Reviewed**

Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate (Dkt. No. 1, Adv. Proc. No. 21-03004)

Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty (Dkt. No. 63, Adv. Proc. No. 21-03005)

Defendant NexPoint Advisors, L.P.'s Answer to Amended Complaint (Dkt. No. 64, Adv. Proc. No. 21-03005)

Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty (Dkt. No. 68, Adv. Proc. No. 21-03006)

Highland Capital Management Services, Inc.'s Answer to Plaintiff's Complaint (Dkt. No. 6, Adv. Proc. No. 21-03006)

Defendant Highland Capital Management Services, Inc.'s Answer to Amended Complaint (Dkt. No. 73, Adv. Proc. No. 21-03006)

Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty (Dkt. No. 63, Adv. Proc. No. 21-03007)

Defendant HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)'s Answer to Amended Complaint (Dkt. No. 68, Adv. Proc. No. 21-03007)

Defendant James Dondero's Answer to Amended Complaint (Dkt. No. 83, Adv. Proc. No. 21-03003)

Remote Videotaped Deposition of Frank Waterhouse, taken October 19, 2021 and Exhibits

Video Deposition of James P. Seery, Jr., taken October 21, 2021 and Exhibits

Deposition of Kristin Hendrix, taken October 27, 2021 and Exhibits

Deposition of David Klos, taken October 27, 2021

Remote Deposition of James Dondero, Volume II, taken October 29, 2021 (Rough draft) and Exhibits

Remote Deposition of James Dondero, Volume III, taken November 4, 2021 (Rough draft) and Exhibits

# Exhibit G

STRICTLY CONFIDENTIAL

```
------------------------------------------------------------x
                                                            :
                                                            :
                                                            :
                                                            :
                                                            :
                                                            :
RE: Highland Capital Management, L.P.                       :
                                                            :
                                                            :
                                                            :
                                                            :
                                                            :
                                                            :
------------------------------------------------------------x
```

## EXPERT REPORT OF ALAN M. JOHNSON

**MAY 28, 2021**

STRICTLY CONFIDENTIAL

# TABLE OF CONTENTS

**Page**

Introduction                                                                        3

Background                                                                          4 – 5

Summary of Opinions                                                                 6 – 7

Statement of Opinions                                                               8 – 15

Conclusion                                                                          16

Exhibit A:  Work History and Education                                              17

Exhibit B:  Alan M. Johnson Prior Expert Testimony Since 2016                        18

Exhibit C:  Actual Compensation vs. Estimated Market Compensation Range             19

Exhibit D:  Select Public Peer Comparators                                          20

Exhibit E:  Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)     21 – 23

Exhibit F: Discussions of Investment Management Compensation in the Public Domain   24

Documents Reviewed                                                                  25

Bibliography                                                                        26

App. 238

STRICTLY CONFIDENTIAL

## INTRODUCTION

I have been retained by Stinson LLP ("Stinson"), counsel to Mr. James Dondero, to provide expert opinions based on my knowledge and experience advising asset management and other financial service firms on compensation over the period 2013 to 2019. Specifically, I have been asked to independently analyze the competitiveness of compensation provided to Mr. Dondero compared to compensation received by executives and senior employees with similar experience and roles. In addition, I was asked to opine on and provide information on the use of loans in the marketplace as a form of compensation. Mr. Dondero is the Founder and, throughout the period, was the CEO, and head portfolio manager of Highland Capital Management LP ("HCM") and in that role, performed the same services for related companies and companies managed by HCM, including Highland Capital Management Financial Advisors ("HCMFA") and NexPoint Advisors ("NPA"). Market competitive compensation for Mr. Dondero during this period is relevant based on the apparent shortfall in annual compensation to Mr. Dondero. Throughout this period, he received loans in lieu of additional current compensation. Consistent with company practice, the loans were considered a form of deferred compensation that could be realized over time as the loans were forgiven and the income recognized by the individuals.

My opinions in this report are based on my experience consulting on executive compensation since 1980, my review of certain materials produced on Highland and its affiliates, and my perspectives on compensation programs for comparable senior executives and key employees in the industry.

**App. 239**

STRICTLY CONFIDENTIAL

# BACKGROUND

## Professional Experience

The issues I have been asked to provide opinions on are topics I have regularly encountered during many years of advising financial services firms, including asset management firms.  I am an executive compensation consultant, and my firm, Johnson Associates, is a prominent boutique compensation consulting firm.  My firm has specialized for many years in analyzing and advising the financial services industry, including major investment and asset management firms, hedge funds and other alternative investment firms, advisory firms, commercial banks, insurance companies, and brokerage firms.

I have extensive experience reviewing and assessing appropriate market levels of compensation for clients.  I have worked as a compensation consultant since 1980.  In 1992, I founded my own compensation consulting firm, Johnson Associates in New York City.  Johnson Associates, where I am currently Managing Director, is a boutique firm specializing in compensation consulting for the financial services industry.  We routinely consult on and have a strong understanding of market compensation levels for senior professionals and executives. Prior to founding my own firm, I was a consultant at several leading compensation advisory firms.

Our clients have included many of the world's most significant financial institutions, asset managers and alternative investment firms across a broad range of issues.  A summary of my work history and education is attached as Exhibit A.  I am regularly quoted on compensation issues in major publications, including *The Wall Street Journal*, *Business Week*, *The New York Times*, *Fortune*, *The Washington Post*, *Bloomberg* and many others.

**App. 240**

STRICTLY CONFIDENTIAL

Over the past 20 years, I have provided expert testimony in more than 40 cases and have been qualified as an expert in the field of executive compensation 30+ times since founding my firm in 1992 (both on the employee and employer side). A list of cases in which I have rendered expert testimony since 2016 is attached as Exhibit B.

**Compensation**

I am being compensated at my normal hourly rate of $715 per hour for preparing this report. My compensation is not contingent on the content of my opinions. I have been assisted in this engagement by my associate, Michael Perniciaro. Michael's normal hourly rate is $225 per hour. All opinions in this report are my own.

**Facts and Data Considered**

In preparing this report, I considered certain documents provided to me, interviews with Mr. Dondero and former Highland or affiliate employees. The documents include information about Highland and its related entities, Mr. Dondero's compensation history, and financial statements over the period. Importantly, given the state of document production in this case, I did not receive all the documents typical for an assessment of compensation. The result of which could lead to a conservative bias in my assessment of market competitive compensation. I have evaluated publicly disclosed proxy statements of a select group of Highland peer firms, as well as information from news sources. The information is consistent with the data and outcomes across our client studies.

STRICTLY CONFIDENTIAL

### SUMMARY OF OPINIONS

Based on my experience as an executive compensation consultant and my review of the compensation and other documents, it is my opinion that:

- Reasonable compensation for Mr. Dondero's role is positioned well above the market median, toward the market high end. Based on analysis and market research, it is apparent that Mr. Dondero was the key leader of the firm and deeply involved in all its operations, with contributions well beyond the traditional CEO / Chief Investment Officer role at comparators. Competitive market high-end for Mr. Dondero's role is about $6.0M per year while his actual compensation over the period was an average of about $3.0M per year. Therefore, the aggregate shortfall in compensation provided to Mr. Dondero against reasonable compensation levels in the market is at least $21M over the period I examined. Market compensation figures strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder. Founders are often paid significantly more in the market.

- I understand from Mr. Dondero that the 2018 loans that are the subject of this suit were modified by an agreement in late 2018 or early 2019 under which the loans would be forgiven upon the sale at over cost of substantially all of any of three portfolio company assets held in the Highland platform, MGM, Cornerstone and/or Trussway. Based on interviews from prior employees, the use of forgivable loans was a known business practice at Highland and there was a clear expectation similar loans would be forgiven. Loans are often used both in private firms and more broadly in the market, both as a perk without forgiveness and also with forgiveness as deferred compensation.

6

STRICTLY CONFIDENTIAL

- While I do not have sufficient data to know the capital in the firm at year end 2018,[1] the substantial amount of capital remaining in the firm at the time of bankruptcy (i.e., ≅ $399.6M) includes undistributed earnings to its Founders and primary shareholders, Mr. Dondero and Mr. Okada. For asset management firms, it is market practice to distribute most earnings annually to the firm's equity holders. The retention of the earnings in the business, further illustrate the shortfall in payments made to Mr. Dondero over the period.

---

[1] I have been told that the Debtor has not produced much of what was requested by Mr. Dondero and that Mr. Dondero no longer has access to the Highland server.  Therefore, I understand, what information he provided was from his own accountants, recollections, and/or from companies over which he still has control.

**App. 243**

STRICTLY CONFIDENTIAL

## STATEMENT OF OPINIONS

### Factual Background

From my review and analysis of available materials and research, I understand the consolidated Highland business ("Highland") is a multi-strategy asset management firm focused on CLOs, hedge funds, and several private investments. Prior to the financial crisis, in 2008, Highland was very successful, reaching its peak revenue and assets under management levels. Looking at the post financial crisis period from 2013 to 2019, Highland continued to operate under the leadership of Mr. Dondero. During this period, several loans were made to Mr. Dondero. Part of my mandate was to assess market compensation levels during this period relative to firms with similar size and earnings. To do so, an assessment of Highland's financial information is necessary. I did not receive all of the financial information for HCM that I would have liked to have had because, I was told, HCM refused to produce most of the documentation requested from it. However, I was able to review the actual financials of HCMFA and NPA, and to obtain information Mr. Dondero possessed and/or recollected. The revenues for HCMFA and NPA ranged from $30.5M to $65.9M over the period with assets under management of $4.7B to $7.5B. To complete my analysis, Mr. Dondero provided his best recollection of the size and structure of the consolidated three entities stating assets under management from 2013 to 2019 ranging from $10.0B to $20.0B, with a primary focus on CLOs and an average of about $1.0B being in hedge funds. Based on the incomplete nature of my data review, there is a possibility that the market figures provided in this report could be understated based on my conservative approach, relying primarily on the documented data for HCMFA and NPA but only the recollection of Mr. Dondero for HCM, not the actual documentation, such as audited financial statements.

**App. 244**

STRICTLY CONFIDENTIAL

When examining Mr. Dondero's role at Highland relative to others in the market, it is apparent that his contributions and responsibilities exceeded the traditional duties of executive officers and lead investors who are paid significant amounts elsewhere. Mr. Dondero was the key man running daily business and operations, attracting clients, and overall investments. Given his outsized role, it would be reasonable to expect his compensation to be well above the market median. The sources utilized to ascertain specifics of his role and arrive at this conclusion include interviews with former Highland or Highland affiliate employees, as well as articles in the public domain and discussions with Mr. Dondero.

The total annual compensation for Mr. Dondero from 2013 - 2019 was $3.0M on average and the aggregate compensation over the period was $21.0M (source: W-2 filings). To assess the compensation in the market and determine the final market range, I utilized three methodologies including: (1) proxy analysis of CEOs at similarly sized, publicly traded asset management firms, (2) market research on Portfolio Manager compensation, (3) top-down analysis of typical percent of revenue allocated to CEO and/or top portfolio managers. Market compensation figures provided in this report strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder.

To opine on the use of the loans as a form of compensation, I relied on market research, industry expertise, and interviews. My findings from this assessment are the use of forgivable loans was a normal business practice for Highland and there was a clear expectation they would be forgiven over time, based on varying performance criteria, depending on the employee.

An important additional consideration is the Founders, Mr. Dondero and Mr. Okada, did not receive the typical amount of distribution payments from their equity ownership. Based on the financials filed in connection with the bankruptcy, there was a significant amount of capital

**App. 245**

STRICTLY CONFIDENTIAL

in the business amounting to $399.6M. This amount includes undistributed earnings to the original equity shareholders, primarily Mr. Dondero.

**Market Assessment of Executive and Investor Compensation**

During my career as a compensation expert, I have had significant experience assessing and designing annual compensation awards across the financial services industry, including comparable asset management firms.  Accordingly, I am familiar with typical annual compensation levels for senior executives and senior portfolio managers at comparable asset management firms.  I would expect pay levels for a key individual such as Mr. Dondero to be substantial, given his contributions, responsibilities, and the competitive market for investment management pay.

To assess reasonable compensation across the competitive market range, it is important to determine Mr. Dondero's responsibilities and contributions relative to others in the industry. It is my understanding that Mr. Dondero worked tremendously long hours, was involved in all aspects of the business including investment decisions, fundraising, business management / administration and the operation of portfolio companies. An article published in the *Dallas Morning News* states, "Mr. Dondero works 70 hours weeks… his days are filled with board and investor meetings, company strategy sessions and constant monitoring and adjusting of the firm's portfolios."[2] In my opinion, Mr. Dondero's role as CEO and head portfolio manager clearly exceeds the traditional duties of executive officers who are paid significant amounts elsewhere. Based on his significant responsibilities and key man status for the firm, it would be reasonable to expect annual compensation significantly above the market median.

---

[2] "High Intensity Pays Off For Highland," The Dallas Morning News, September 3, 2003, https://www.pressreader.com/usa/the-dallas-morning-news/20060903/283218733648003.

**App. 246**

STRICTLY CONFIDENTIAL

The appropriate positioning for Mr. Dondero is further accentuated by the assessment of "replacement cost". If Mr. Dondero departed Highland in the period of 2013 to 2019, the cost of replacing him as CEO / head investor with a similar level of contribution across all functions would be multiples of his annual compensation. In assessing and providing market compensation for Mr. Dondero's role, I considered how his skillsets and contributions are valued in the market. My assessment of market compensation considers the cost of replacing Mr. Dondero with an outside hire.

The final market range provided in Exhibit C reflects my industry experience and expertise as well as three methodologies for determining competitive compensation magnitudes. These methodologies include: (1) proxy analysis of CEOs at similarly sized, publicly traded asset management firms over the period, (2) market research on Portfolio Manager compensation, (3) top-down analysis of typical percent of revenue allocated to CEO and/or top Portfolio Managers. Several methodologies utilized to capture Mr. Dondero's specific role as CEO and head portfolio manager. The market figures do not include any premium for being a Founder. In the market, Founders can be, and generally are, paid substantially more.

As shown below and in Exhibit E, the average annual compensation of public company asset management CEOs from 2013 to 2019 ranges from $2.1M - $4.1M. Importantly, in the market it is common for some senior investment professionals to earn more than the CEO or other corporate officers. Incorporating firm leadership functions into the investment role is a savings of sorts, as someone must still do this job.

| Proxy Analysis CEO Total Compensation (Asset Management) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Average |
| 25th Percentile | $1,515 | $1,680 | $2,405 | $1,845 | $2,370 | $2,310 | $2,220 | $2,049 |
| Median | $2,600 | $2,490 | $2,600 | $2,080 | $3,380 | $3,080 | $2,670 | $2,700 |
| 75th Percentile | $3,210 | $2,805 | $3,130 | $3,815 | $3,945 | $3,285 | $3,435 | $3,375 |
| 90th Percentile | $4,510 | $3,760 | $3,840 | $4,690 | $4,125 | $3,720 | $3,990 | $4,091 |

**App. 247**

STRICTLY CONFIDENTIAL

While we examined the disclosed compensation of a select group of public peers (Exhibit D), few of Highland's direct competitors are public and disclose the pay of their top investment professionals (see Exhibit F for some discussions about investment management compensation in the public domain). Instead, firms are either 1) private, or 2) if public, disclosed officers most often are not highly paid portfolio management professionals.

Specifics of individual portfolio management pay are closely guarded for competitive reasons. That said, there are some articles quoting portfolio manager pay in the public domain showing compensation for portfolio managers can be well above the competitive range for public asset management CEOs (see Exhibit F). For example, according to an article published by "efinancialcareers" top performing portfolio managers at the average Hedge Funds with greater than $4.0B assets under management earned $6.8M in total compensation.[3] While Highland's structure differs from a pure hedge fund, the skills and role responsibilities are comparable to Mr. Dondero. Another example is the CEO of the Harvard Endowment, Mr. Narvekar, earned $6.25M in 2019.[4] The McLagan "Highland Capital CEO Compensation Analysis" (April 2020) produced by HCM, shows 2018 total compensation for the Head of Alternative Credit Strategy / CIO of $4.1M at the 75th percentile and 2018 total compensation for CEO With/Without CIO Responsibilities making $5.4M at the market median and $9.6M at the market 75th percentile.

The final method for assessing compensation in the market is a top-down analysis of competitive percentages of revenue attributed to portfolio managers or their teams in the market. Based on competitive market research and industry knowledge, 10% to 12% of revenue would

---

[3] Dan Butcher, "Here Are the Salaries and Bonuses at Hedge Funds in the U.S.," eFinancialCareers, May 5, 2018, https://www.efinancialcareers.com/news/finance/the-salaries-and-bonuses-of-investment-professionals-at-large-hedge-fund-compensation.

[4] Janet Lorin, "Harvard Endowment Chief Narvekar $6.25 Million for 2019," Bloomberg.com (Bloomberg, May 14, 2021), https://www.bloomberg.com/news/articles/2021-05-14/harvard-paid-endowment-chief-narvekar-6-25-million-for-2019.

**App. 248**

STRICTLY CONFIDENTIAL

be within the competitive market range for someone in Mr. Dondero's role. One public example of a dual CEO and CIO sharing directly in profitability is Mario Gabelli; he earns a fixed 10% of aggregate pre-tax profit every year per his employment agreement.[5]

The final competitive range below (Exhibit C) reflects the market competitive annual total compensation range. This competitive range was determined based on my interactions with asset management firms and over 30 years of industry experience and the insights gained from the three methodologies for determining competitive market compensation outlined above. Market compensation figures strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder.

| Figures in 000s | 2013 - 2019 Total Annual Market Range | | |
|---|---|---|---|
| Market Match | Market Median | Market 75th Percentile | Market 90th Percentile / High-End |
| CEO / Portfolio Manager | $3,000 | $4,250 | **$6,000** |

Based on the market research and the insights gained through my extensive experience advising on compensation in the industry, reasonable annual compensation for Mr. Dondero's extensive role as CEO and portfolio manager is positioned at the market high-end at **$6.0M per year**. This figure takes into account firm size, profitability, asset class, and both the investment functions, as well as responsibilities for running the firm.  In summary, given his outsized role, his compensation should be positioned toward the market high-end.  If the comparison was directly to hedge fund portfolio managers, the figures would be far higher (i.e., often $10M+

---

[5] "Schedule 14A GAMCO INVESTORS, INC.," SEC.gov, April 29, 2020,
https://www.sec.gov/Archives/edgar/data/0001060349/000106034920000009/gblproxyfinal2020.htm

**App. 249**

STRICTLY CONFIDENTIAL

annually). Additionally, market figures do not include any premium for being a Founder. In the market, Founders are often paid substantially more than the market figures shown.

Mr. Dondero's aggregate compensation during the period of 2013 to 2019 is well below the reasonable market compensation level. Mr. Dondero's aggregate actual compensation from 2013 - 2019 was $21.0M (source: W-2 filings). Reasonable competitive compensation for Mr. Dondero based on our analysis of his role is $6.0M per year or $42.0M in aggregate over the period. The shortfall in actual compensation to Mr. Dondero versus reasonably expected competitive compensation levels over the period is about **$21.0M** (Exhibit C). Market figures provided do not include any premium as a Founder, which further broadens the shortfall to market. An important additional consideration is the relative lack of typical equity distributions to Mr. Dondero for his historic ownership of the firm.

**Use of Loans as Compensation**

In my expert opinion, the use of loans from a company to its senior professionals continues to be a common practice for private businesses. At Highland, the use of loans was a common practice with the clear expectation among senior professionals that the loans would be forgiven over time based on performance, particularly of success in specified projects. I heard from former Highland or Highland affiliate employees that similar loans were used at Highland as deferred incentive compensation and intended to be forgiven over time or on the occurrence of particular achievements.

While, for public companies, Sarbanes Oxley Section 402 explicitly prohibits publicly traded companies from making loans to executive officers it is still a common practice at private

**App. 250**

companies.[6] The use of these loans at private companies is beneficial for retention by allowing the firm to provide annual or periodic or other forgiveness for a portion the loan and eventually forgiving the full amount. The amount of loan forgiveness is considered income to the professionals and is taxable when forgiven. This was the case at Highland as well. In a publicly available article for the *Dow Jones Private Equity Analyst – Global Compensation Study*, two Proskauer partners outline the tax regulations for similar loans to professionals.[7]

## Market Practices on Equity Distributions

It is the standard practice in the market to distribute the majority of earnings to equity owners each year for asset management businesses. Based on the financials filed in connection with the bankruptcy, there was a significant amount of capital in the business equaling $399.6M. This amount included undistributed earnings to the primary equity holders, Mr. Dondero and Mr. Okada. Highland did not distribute these earnings based on their philosophy of "delayed gratification". This policy has been in place since the inception of the firm, including the peak years prior to the financial crisis. Very recently, the "delayed gratification" approach paid off in connection with Highland's private direct investment in MGM which was announced to be acquired by Amazon with significant economics attached.[8]

---

[6] Sarbanes-Oxley Act (2002).

[7] Michael J Album and James E Gregory, "Human Capital Considerations For Maturing Private Equity Firms," Dow Jones Private Equity Analyst-Global Compensation Study, 2012, pp. 84-96, https://www.proskauer.com/insights/download-pdf/1930.

[8] Annie Palmer, "Amazon to Buy MGM Studios for $8.45 Billion," CNBC (CNBC, May 26, 2021), https://www.cnbc.com/2021/05/26/amazon-to-buy-mgm-studios-for-8point45-billion.html.

STRICTLY CONFIDENTIAL

## CONCLUSION

It is my opinion that Mr. Dondero's aggregate compensation from 2013 to 2019 is significantly below the reasonable competitive compensation level for his role relative to similarly situated firms. In aggregate, the total shortfall in Mr. Dondero's actual compensation versus reasonable competitive compensation is at least $21.0M. This shortfall does not include any premium as a Founder, which could be considerable. Additionally, it is my opinion that the loans provided to Mr. Dondero should be considered potential deferred compensation as they were similar to loans given to other professionals at the firm. Lastly, the significant amount of capital in the business at the time of bankruptcy is at least partially attributable to Mr. Dondero as un-recognized payments as a prior equity holder, and indicates the rationale for having the potential for considerable deferred compensation.

*      *      *

I reserve the right to supplement this report and/or to supplement or modify my opinions in light of any additional facts or data that may come to my attention.

Dated:  May 28, 2021

Respectfully submitted,

Alan Johnson
Johnson Associates, Inc.
19 West 44th Street, Suite 511
New York, NY 10036
Phone: (212) 221-740

**App. 252**

STRICTLY CONFIDENTIAL

## Exhibit A: Work History and Education

**Alan M. Johnson**
Johnson Associates, Inc.
19 West 44th Street, Suite 511
New York, NY 10036
(212) 221-7400

### Professional Experience

- Entire career as executive compensation consultant

| Years | Firm | Title or Equivalent | Duties |
|---|---|---|---|
| 1980 – 1983 | Hewitt Associates | Consultant | Executive Compensation Consultant |
| 1983 – 1986 | Sibson & Company | Principal | Executive Compensation Consultant |
| 1986 – 1989 | Frederic W. Cook & Co. | Partner/Shareholder | Executive Compensation Consultant |
| 1989 – 1990 | Handy Associates | Managing Director | Executive Compensation Consultant |
| 1990 – 1992 | GKR | Managing Director | Executive Compensation Consultant |
| 1992 – Present | Johnson Associates, Inc. | Managing Director | Executive Compensation Consultant |

### Education

| | |
|---|---|
| 1973 – 1975 | U.S. Naval Academy |
| 1975 – 1977 | University of Florida, B.A. (History/Economics) |
| 1977 – 1978 | University of Virginia, Graduate Economics |
| 1978 – 1980 | University of Chicago, M.B.A. (Finance) |

**Consulting focus:**
- Since about 1990 the bulk of my consulting efforts have involved advising major financial and professional service firms.  I consult on the design and magnitudes of compensation programs for senior executives on a regular basis.  I am quoted extensively in the press on compensation issues related to major financial service firms.

**App. 253**

## Exhibit B: Alan M. Johnson Prior Expert Testimony for Previous Five Years

| LAW FIRM: | CASE: | COURT: | |
|---|---|---|---|
| Schulte Roth & Zabel LLP | Mark Rohman and Sean Cunningham v. Capstone Advisory Group, LLC. | Arbitration | (April 2016) |
| Gibson Dunn & Crutcher LLP | United States v. Greebel | Eastern District of NY | (December 2017) |
| Cohen Tauber Spievack & Wagner P.C. | Jeffry Brown v. Neuberger Berman Group LLC, and NB Alternatives Advisers LLC | Arbitration | (January 2018) |
| Gibson Dunn & Crutcher LLP | Robert Emerson Mulholland v. UBS Financial Services Inc. | FINRA Dispute Resolution Arbitration | (December 2018) |
| Proskauer Rose LLP | Damian Dalla-Longa v. Magnetar Capital LLC | Arbitration | (September 2019) |
| Skadden, Arps, Slate, Meagher & Flom LLP | Isaly v. OrbiMed | Arbitration | (January 2020) |
| Pachulski Stang Ziehl & Jones LLP | RTI Holding Company vs. Debtors | Delaware Bankruptcy Court | (December 2020) |

**App. 254**

STRICTLY CONFIDENTIAL

## Exhibit C: Actual Compensation vs. Estimated Market Compensation Range

### Mr. Dondero Actual Compensation (2013 - 2019)

**Notes:** Mr. Dondero's compensation reflects amounts disclosed in W-2 filings for 2013 to 2019

- Does not include equity distributions over the period; typically, not included in competitive assessments of compensation.

| James Dondero Compensation | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Income | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Average |
| Highland Capital Management W-2 Income | $1,911,538 | $3,282,693 | $2,875,058 | $772,904 | $566,370 | $566,370 | $568,542 | $10,543,475 | $1,506,211 |
| Nexpoint Residential Trust W-2 Income | -- | -- | -- | -- | -- | $893,262 | | $893,262 | -- |
| NextPoint Advisors W-2 Income | -- | -- | -- | $1,628,736 | $3,118,250 | $2,870,278 | $1,953,455 | $9,570,718 | $2,392,679 |
| **Total W-2 Income (Source: W-2)** | **$1,911,538** | **$3,282,693** | **$2,875,058** | **$2,401,639** | **$3,684,620** | **$4,329,910** | **$2,521,996** | **$21,007,455** | **$3,001,065** |

### Estimated Market Compensation Range

**Notes:** Market annual total compensation range reflecting my direct interactions with asset management firms and over 30 years of industry experience

- We have factored in Mr. Dondero's out-sized role / contributions on both the investment management and firm-stewardship responsibilities where applicable.
- Greater than findings from public proxy analysis reflecting higher compensation to portfolio managers in the market / alternatives space.
- Represents finding from the 3 methodologies outlined for determining market compensation.
- Market compensation figures strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder

| *Figures in 000s* | 2013 - 2019 Total Annual Market Range | | |
|---|---|---|---|
| Market Match | Market Median | Market 75th Percentile | Market 90th Percentile / High-End |
| CEO / Portfolio Manager | $3,000 | $4,250 | **$6,000** |

### Compensation Shortfall

**Notes:** In my opinion, reasonable competitive annual compensation for Mr. Dondero over the period is $6.0M, positioning him toward the market high-end to reflect his out-sized role and contribution to the firm

| | |
|---|---|
| Aggregate Reasonable Competitive Compensation | $42,000,000 |
| Less: Actual Total Compensation | $21,007,455 |
| **Shortfall in Compensation** | **$20,992,545** |

**App. 255**

STRICTLY CONFIDENTIAL

## Exhibit D: Select Public Peer Comparators

**Notes:**

- Industry consolidation continues to shrink pool of publicly available compensation data for the asset management industry, even at much larger firms than Highland
- Group intended to represent a range of firms that are relevant but not perfectly similar
- Disclosure of Portfolio Manager positions limited as typically not included in publicly filed data (no compulsion to disclose as with executive officers)
- Highland data includes good faith estimate of consolidated entities assets under management during the period. Actual financials not assessed due to the non-disclosure of Highland Capital Management ("HCM") information. Data for "HCMFA" and "NPA" reviewed.

| Peers | Assets Under Management ($B) | | | | | | | Revenue ($M) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
| **Asset Management** | | | | | | | | | | | | | | |
| Cohen & Steers | $72 | $55 | $62 | $60 | $53 | $53 | -- | $411 | $381 | $378 | $350 | $329 | $314 | $298 |
| Pzena Investment | $41 | $33 | $39 | $30 | $26 | $28 | $25 | $151 | $154 | $141 | $108 | $117 | $113 | $96 |
| Silvercrest | $25 | $19 | $21 | $19 | $18 | $18 | $16 | $102 | $99 | $91 | $80 | $75 | $69 | $60 |
| Diamond Hill | $23 | $19 | $22 | $19 | $17 | $16 | $12 | $137 | $146 | $145 | $136 | $124 | $105 | $81 |
| Manning & Napier | $19 | $20 | $25 | $32 | $35 | $48 | $51 | $136 | $161 | $202 | $249 | $328 | $405 | $376 |
| Westwood Holdings | $15 | $17 | $24 | $21 | $21 | $20 | $19 | $84 | $122 | $134 | $123 | $131 | $113 | $92 |
| Hennessy Advisors | $5 | $6 | $7 | $7 | $6 | $6 | $4 | $43 | $55 | $53 | $51 | $45 | $35 | $24 |
| Main Street Capital | $4 | $3 | $3 | -- | -- | -- | -- | $173 | $214 | $235 | -- | -- | -- | -- |
| **Consolidated Highland\*** | -- | $10.0 | $14.0 | $15.0 | $18.0 | $20.0 | $19.0 | -- | -- | -- | -- | -- | -- | -- |
| **Highland Hedge Fund\*** | | $1.9 | $1.0 | $0.9 | $1.3 | $1.0 | $0.7 | -- | -- | -- | -- | -- | -- | -- |
| **HCMFA & NP (only)** | $7.5 | $6.1 | $5.1 | $4.8 | $5.2 | $5.7 | $4.7 | $66 | $52 | $42 | $41 | $50 | $31 | $31 |

*Represents estimated for the consolidated three entities. Financial for Highland Capital Management ("HCM") not provided by the debtor

**App. 256**

STRICTLY CONFIDENTIAL

## Exhibit E: Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)

**Notes:**
- Reflects disclosed senior executive officer compensation in $ thousands
- CEO not necessarily the highest paid employee at any given firm
- Senior investment professionals' pay often not disclosed and can be greater than CEO
- GAMCO not included; Mr. Gabelli receives 10% of aggregate pre-tax profit annually
- Indicates awards granted for performance each, not outstanding or fully vested compensation
- Where applicable, partial year salaries annualized. One-time awards annualized over appropriate vesting periods. Performance share values reflects target award values; does not reflect payouts from past cycles

## Summary of Proxy Analysis

| Proxy Analysis CEO Total Compensation (Asset Management) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Average |
| 25th Percentile | $1,515 | $1,680 | $2,405 | $1,845 | $2,370 | $2,310 | $2,220 | **$2,049** |
| Median | $2,600 | $2,490 | $2,600 | $2,080 | $3,380 | $3,080 | $2,670 | **$2,700** |
| 75th Percentile | $3,210 | $2,805 | $3,130 | $3,815 | $3,945 | $3,285 | $3,435 | **$3,375** |
| 90th Percentile | $4,510 | $3,760 | $3,840 | $4,690 | $4,125 | $3,720 | $3,990 | **$4,091** |

## Proxy Analysis by Year and Individual

| Chief Executive Officer - 2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
| Cohen & Steers | Steers, R. | CEO | $750 | $835 | **$1,585** | $0 | $2,915 | $0 | **$2,915** | $0 | **$4,500** |
| Manning & Napier | Mayer, M. | CEO | $500 | $2,250 | **$2,750** | $145 | $755 | $0 | **$900** | $0 | **$3,650** |
| Silvercrest | Hough, R. | Pres & CEO | $700 | $1,000 | **$1,700** | $800 | $475 | $0 | **$1,275** | $240 | **$3,215** |
| Main Street Capital | Hyzak, D. | CEO | $625 | $650 | **$1,275** | $0 | $1,395 | $0 | **$1,395** | $0 | **$2,670** |
| Pzena Investment | Pzena, R. | Chairman, CEO, & Co-CIO | $365 | $685 | **$1,055** | $0 | $1,425 | $0 | **$1,425** | $0 | **$2,480** |
| Hennessy Advisors | Hennessy, N. | Chairman & CEO | $350 | $1,455 | **$1,805** | $0 | $155 | $0 | **$155** | $0 | **$1,960** |
| Westwood Holdings | Casey, B. | President & CEO | $650 | $0 | **$650** | $0 | $0 | $0 | **$0** | $0 | **$650** |
| 25th Percentile | | | $435 | $670 | $1,165 | $0 | $315 | $0 | $530 | $0 | $2,220 |
| 50th Percentile | | | $625 | $835 | $1,585 | $0 | $755 | $0 | $1,275 | $0 | $2,670 |
| 75th Percentile | | | $675 | $1,230 | $1,755 | $75 | $1,410 | $0 | $1,410 | $0 | $3,435 |
| 90th Percentile | | | $720 | $1,775 | $2,185 | $405 | $2,020 | $0 | $2,020 | $95 | $3,990 |

**App. 257**

## Exhibit E: Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)

### Chief Executive Officer - 2018

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cohen & Steers | Steers, R. | CEO | $750 | $650 | $1,400 | $0 | $2,355 | $0 | $2,355 | $0 | $3,755 |
| Westwood Holdings | Casey, B. | President & CEO | $650 | $1,065 | $1,715 | $0 | $0 | $1,995 | $1,995 | $0 | $3,710 |
| Pzena Investment | Pzena, R. | Chairman, CEO, & CIO | $365 | $995 | $1,360 | $0 | $1,925 | $0 | $1,925 | $0 | $3,285 |
| Main Street Capital | Hyzak, D. | CEO | $555 | $1,400 | $1,955 | $0 | $1,275 | $0 | $1,275 | $0 | $3,230 |
| Silvercrest | Hough, R. | CEO | $700 | $1,600 | $2,300 | $500 | $40 | $0 | $540 | $240 | $3,080 |
| Hennessy Advisors | Hennessy, N. | CEO | $350 | $2,420 | $2,770 | $0 | $220 | $0 | $220 | $0 | $2,990 |
| Diamond Hill | Bingaman, C. | President & CEO | $300 | $500 | $800 | $0 | $1,000 | $0 | $1,000 | $510 | $2,310 |
| Manning & Napier | Coons, J. | Co-CEO & President | $400 | $520 | $920 | $0 | $0 | $0 | $0 | $0 | $920 |
| Manning & Napier | Goldberg, R. | Co-CEO & Director | $750 | $0 | $750 | $0 | $155 | $0 | $155 | $0 | $905 |
| 25th Percentile | | | $365 | $520 | $920 | $0 | $40 | $0 | $220 | $0 | $2,310 |
| 50th Percentile | | | $555 | $995 | $1,400 | $0 | $220 | $0 | $1,000 | $0 | $3,080 |
| 75th Percentile | | | $700 | $1,400 | $1,955 | $0 | $1,275 | $0 | $1,925 | $0 | $3,285 |
| 90th Percentile | | | $750 | $1,765 | $2,395 | $100 | $2,010 | $400 | $2,065 | $295 | $3,720 |

### Chief Executive Officer - 2017

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | CEO | $650 | $1,540 | $2,190 | $0 | $0 | $1,995 | $1,995 | $0 | $4,185 |
| Cohen & Steers | Steers, R. | CEO | $750 | $735 | $1,485 | $0 | $2,615 | $0 | $2,615 | $0 | $4,100 |
| Main Street Capital | Foster, V. | Chairman, CEO | $610 | $1,500 | $2,110 | $0 | $1,780 | $0 | $1,780 | $0 | $3,890 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $3,240 | $3,590 | $0 | $245 | $0 | $245 | $0 | $3,835 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $365 | $2,560 | $2,925 | $0 | $0 | $0 | $0 | $0 | $2,925 |
| Silvercrest | Hough, R. | CEO | $700 | $1,500 | $2,200 | $0 | $40 | $0 | $40 | $240 | $2,480 |
| Diamond Hill | Bingaman, C. | President & CEO | $300 | $550 | $850 | $0 | $0 | $0 | $0 | $1,180 | $2,030 |
| Manning & Napier | Stamey, C. | Co-CEO, Sales / Distribution | $300 | $1,140 | $1,440 | $0 | $135 | $0 | $135 | $0 | $1,575 |
| 25th Percentile | | | $340 | $1,040 | $1,475 | $0 | $0 | $0 | $30 | $0 | $2,370 |
| 50th Percentile | | | $490 | $1,500 | $2,150 | $0 | $90 | $0 | $190 | $0 | $3,380 |
| 75th Percentile | | | $665 | $1,795 | $2,380 | $0 | $630 | $0 | $1,835 | $60 | $3,945 |
| 90th Percentile | | | $715 | $2,765 | $3,125 | $0 | $2,030 | $600 | $2,180 | $520 | $4,125 |

### Chief Executive Officer - 2016

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | CEO | $650 | $1,350 | $2,000 | $0 | $0 | $3,955 | $3,955 | $0 | $5,955 |
| Cohen & Steers | Steers, R. | CEO | $750 | $675 | $1,425 | $0 | $2,425 | $0 | $2,425 | $0 | $3,850 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $3,075 | $3,425 | $0 | $350 | $0 | $350 | $0 | $3,775 |
| Diamond Hill | Bingaman, C. | President & CEO | $300 | $600 | $900 | $0 | $0 | $0 | $0 | $1,180 | $2,080 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $365 | $1,600 | $1,965 | $0 | $0 | $0 | $0 | $0 | $1,965 |
| Silvercrest | Hough, R. | CEO | $700 | $725 | $1,425 | $0 | $55 | $0 | $55 | $240 | $1,720 |
| Manning & Napier | Manning, W. | CEO | $1,400 | $0 | $1,400 | $0 | $0 | $0 | $0 | $0 | $1,400 |
| 25th Percentile | | | $360 | $640 | $1,415 | $0 | $0 | $0 | $0 | $0 | $1,845 |
| 50th Percentile | | | $650 | $725 | $1,425 | $0 | $0 | $0 | $55 | $0 | $2,080 |
| 75th Percentile | | | $725 | $1,475 | $1,985 | $0 | $205 | $0 | $1,390 | $120 | $3,815 |
| 90th Percentile | | | $1,010 | $2,190 | $2,570 | $0 | $1,180 | $1,580 | $3,035 | $615 | $4,690 |

**App. 258**

STRICTLY CONFIDENTIAL

## Exhibit E: Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)

### Chief Executive Officer - 2015

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | President, CEO | $600 | $2,065 | $2,665 | $0 | $0 | $2,090 | $2,090 | $0 | $4,755 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $2,515 | $2,865 | $0 | $370 | $0 | $370 | $0 | $3,230 |
| Cohen & Steers | Steers, R. | CEO | $750 | $485 | $1,235 | $0 | $1,790 | $0 | $1,790 | $0 | $3,025 |
| Diamond Hill | Dillon, R. | CEO | $360 | $640 | $1,000 | $0 | $0 | $1,600 | $1,600 | $0 | $2,600 |
| Manning & Napier | Cunningham, P. | CEO | $500 | $0 | $500 | $0 | $0 | $2,000 | $2,000 | $0 | $2,500 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $380 | $605 | $980 | $0 | $0 | $1,330 | $1,330 | $0 | $2,310 |
| Silvercrest | Hough, R. | CEO | $700 | $725 | $1,425 | $0 | $240 | $0 | $240 | $0 | $1,665 |
| 25th Percentile | | | $370 | $545 | $990 | $0 | $0 | $0 | $850 | $0 | $2,405 |
| 50th Percentile | | | $500 | $640 | $1,235 | $0 | $0 | $1,330 | $1,600 | $0 | $2,600 |
| 75th Percentile | | | $650 | $1,395 | $2,045 | $0 | $305 | $1,800 | $1,895 | $0 | $3,130 |
| 90th Percentile | | | $720 | $2,245 | $2,745 | $0 | $940 | $2,035 | $2,035 | $0 | $3,840 |

### Chief Executive Officer - 2014

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | President, CEO | $600 | $1,995 | $2,595 | $0 | $0 | $2,060 | $2,060 | $0 | $4,650 |
| Cohen & Steers | Steers, R. | CEO | $750 | $460 | $1,210 | $0 | $1,660 | $0 | $1,660 | $0 | $2,870 |
| Diamond Hill | Dillon, R. | CEO | $360 | $640 | $1,000 | $0 | $0 | $1,600 | $1,600 | $0 | $2,600 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $1,750 | $2,100 | $0 | $280 | $0 | $280 | $0 | $2,380 |
| Silvercrest | Hough, R. | CEO | $650 | $725 | $1,375 | $0 | $70 | $0 | $70 | $0 | $1,445 |
| Manning & Napier | Cunningham, P. | CEO | $500 | $495 | $995 | $0 | $0 | $0 | $0 | $0 | $995 |
| 25th Percentile | | | $395 | $530 | $1,055 | $0 | $0 | $0 | $125 | $0 | $1,680 |
| 50th Percentile | | | $550 | $685 | $1,295 | $0 | $35 | $0 | $940 | $0 | $2,490 |
| 75th Percentile | | | $640 | $1,495 | $1,920 | $0 | $230 | $1,200 | $1,645 | $0 | $2,805 |
| 90th Percentile | | | $700 | $1,875 | $2,350 | $0 | $970 | $1,830 | $1,860 | $0 | $3,760 |

### Chief Executive Officer - 2013

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Manning & Napier | Cunningham, P. | CEO | $500 | $1,500 | $2,000 | $0 | $4,020 | $0 | $4,020 | $0 | $6,020 |
| Westwood Holdings | Casey, B. | President, CEO | $600 | $1,505 | $2,105 | $0 | $0 | $1,395 | $1,395 | $0 | $3,500 |
| Cohen & Steers | Steers, R. | CEO | $750 | $365 | $1,115 | $0 | $1,800 | $0 | $1,800 | $0 | $2,915 |
| Diamond Hill | Dillon, R. | CEO | $360 | $640 | $1,000 | $0 | $0 | $1,600 | $1,600 | $0 | $2,600 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $1,170 | $1,520 | $0 | $90 | $0 | $90 | $0 | $1,610 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $280 | $1,145 | $1,420 | $0 | $0 | $0 | $0 | $0 | $1,420 |
| Silvercrest | Hough, R. | CEO | $500 | $600 | $1,100 | $0 | $70 | $0 | $70 | $0 | $1,170 |
| 25th Percentile | | | $355 | $620 | $1,110 | $0 | $0 | $0 | $80 | $0 | $1,515 |
| 50th Percentile | | | $500 | $1,145 | $1,420 | $0 | $70 | $0 | $1,395 | $0 | $2,600 |
| 75th Percentile | | | $550 | $1,335 | $1,760 | $0 | $945 | $700 | $1,700 | $0 | $3,210 |
| 90th Percentile | | | $660 | $1,500 | $2,040 | $0 | $2,690 | $1,475 | $2,690 | $0 | $4,510 |

**App. 259**

STRICTLY CONFIDENTIAL

**Exhibit F: Discussions of Investment Management Compensation in the Public Domain**

Butcher, Dan. "Here Are the Salaries and Bonuses at Hedge Funds in the U.S." eFinancialCareers, May 5, 2018. https://www.efinancialcareers.com/news/finance/the-salaries-and-bonuses-of-investment-professionals-at-large-hedge-fund-compensation.

"Eight Hedge Fund Managers Earned More Than $1 Billion Each in 2019. Cue the Questions." *Institutional Investo*r.  March 25, 2020. https://www.institutionalinvestor.com/article/b1kwjngp2rnp9y/Eight-Hedge-Fund-Managers-Earned-More-Than-1-Billion-Each-in-2019-Cue-the-Questions

Langlois, Shawn. "Think celebrities and CEOs make way too much money? Check out this chart" *MarketWatch.com*. November 29, 2019. https://www.marketwatch.com/story/hedge-fund-managers-to-taylor-swift-and-disneys-bob-iger-hold-my-beer-2019-11-26

Lorin, Janet. "Harvard Endowment Chief Narvekar $6.25 Million for 2019." Bloomberg.com. Bloomberg, May 14, 2021. https://www.bloomberg.com/news/articles/2021-05-14/harvard-paid-endowment-chief-narvekar-6-25-million-for-2019.

Moore, Heidi.  "Bill Gross reportedly earns $290m bonus even as investors withdraw billions from Pimco funds" *The Guardian.*  November 14, 2014. https://www.theguardian.com/business/2014/nov/14/pimco-paid-15bn-bonus-pool-executives-according-to-disputed-report

Rosenburg, John S.  "Harvard Discloses Leaders' Annual Compensation" *Harvard Magazine*. May 11, 2018 https://www.harvardmagazine.com/2018/05/harvard-endowment-manager-and-administrator-pay

STRICTLY CONFIDENTIAL

## Documents Reviewed

**Data Items Reviewed from Debtor**
- Bates Label Range: D-JDNL-017439 to D-JDNL-017441

**Data Items Reviewed:**
- Bates Label Range: EXPERT 0000001 to EXPERT 0002316

**Individual Documents - Starting Bates Label**
- Expert 1 – EXPERT 0000001
- Expert 1 – EXPERT 0000003
- Expert 1 – EXPERT 0000004
- Expert 1 – EXPERT 0000024
- Expert 1 – EXPERT 0000026
- Expert 1 – EXPERT 0000028
- Expert 1 – EXPERT 0000030
- Expert 1 – EXPERT 0000365
- Expert 1 – EXPERT 0000367
- Expert 1 – EXPERT 0000372
- Expert 1 – EXPERT 0000383
- Expert 1 – EXPERT 0000384
- Expert 1 – EXPERT 0000385
- Expert 1 – EXPERT 0000387
- Expert 1 – EXPERT 0000389
- Expert 1 – EXPERT 0000679
- Expert 1 – EXPERT 0000703
- Expert 1 – EXPERT 0000928
- Expert 1 – EXPERT 0000929
- Expert 1 – EXPERT 0000931
- Expert 1 – EXPERT 0000933
- Expert 1 – EXPERT 0000935
- Expert 1 – EXPERT 0000937
- Expert 1 – EXPERT 0000940
- Expert 1 – EXPERT 0000942
- Expert 1 – EXPERT 0000944
- Expert 1 – EXPERT 0000968
- Expert 1 – EXPERT 0000970
- Expert 1 – EXPERT 0000972
- Expert 1 – EXPERT 0000974
- Expert 1 – EXPERT 0000979
- Expert 1 – EXPERT 0001003
- Expert 1 – EXPERT 0001021
- Expert 1 – EXPERT 0001023
- Expert 1 – EXPERT 0001324
- Expert 1 – EXPERT 0001578
- Expert 1 – EXPERT 0001579
- Expert 1 – EXPERT 0001580
- Expert 1 – EXPERT 0001581
- Expert 1 – EXPERT 0001881
- Expert 1 – EXPERT 0001897
- Expert 1 – EXPERT 0001898
- Expert 1 – EXPERT 0001900
- Expert 1 – EXPERT 0001902
- Expert 1 – EXPERT 0001903
- Expert 1 – EXPERT 0001905
- Expert 1 – EXPERT 0001928
- Expert 1 – EXPERT 0001935
- Expert 1 – EXPERT 0001957
- Expert 1 – EXPERT 0001975
- Expert 1 – EXPERT 0001998
- Expert 1 – EXPERT 0002233
- Expert 1 – EXPERT 0002234
- Expert 1 – EXPERT 0002253
- Expert 1 – EXPERT 0002260
- Expert 1 – EXPERT 0002267
- Expert 1 – EXPERT 0002285
- Expert 1 – EXPERT 0002304

**App. 261**

STRICTLY CONFIDENTIAL

## Bibliography

"High Intensity Pays Off For Highland." *The Dallas Morning News*, September 3, 2003. https://www.pressreader.com/usa/the-dallas-morning-news/20060903/283218733648003.

Butcher, Dan. "Here Are the Salaries and Bonuses at Hedge Funds in the U.S." eFinancialCareers, May 5, 2018. https://www.efinancialcareers.com/news/finance/the-salaries-and-bonuses-of-investment-professionals-at-large-hedge-fund-compensation.

Lorin, Janet. "Harvard Endowment Chief Narvekar $6.25 Million for 2019." Bloomberg.com. Bloomberg, May 14, 2021. https://www.bloomberg.com/news/articles/2021-05-14/harvard-paid-endowment-chief-narvekar-6-25-million-for-2019.

"Schedule 14A GAMCO INVESTORS, INC." SEC.gov, April 29, 2020. https://www.sec.gov/Archives/edgar/data/0001060349/000106034920000009/gblproxyfinal2020.htm.

Sarbanes-Oxley Act (2002). https://www.friedfrank.com/siteFiles/Publications/681A0950DF7BC8CF412DF4C4A4805E09.pdf.

Album, Michael J, and James E Gregory. "Human Capital Considerations For Maturing Private Equity Firms." Dow Jones Private Equity Analyst-Global Compensation Study, 2012. https://www.proskauer.com/insights/download-pdf/1930.

Palmer, Annie. "Amazon to Buy MGM Studios for $8.45 Billion." CNBC. CNBC, May 26, 2021. https://www.cnbc.com/2021/05/26/amazon-to-buy-mgm-studios-for-8point45-billion.html.

**App. 262**

# Exhibit H

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | Adversary No. 21-03003-sgj |
| | § | |
| JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03006-sgj |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| SERVICES, INC., JAMES DONDERO, NANCY | § | |
| DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03007-sgj |
| HCRE PARTNERS, LLC (n/k/a NEXPOINT | § | |
| REAL ESTATE PARTNERS, LLC), JAMES | § | |
| DONDERO, NANCY DONDERO AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## HIGHLAND'S RESPONSES AND OBJECTIONS TO
## DEFENDANTS' JOINT DISCOVERY REQUESTS

Highland Capital Management, L.P., the reorganized debtor[1] ("Highland" or, as may be

temporally required, the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy

Case") and plaintiff in the above-captioned adversary proceedings (the "Adversary Proceedings"),

hereby responds to *Defendants' Joint Discovery Requests To Highland Capital Management, L.P.*

(the "Requests")[2] served by defendants James Dondero ("Mr. Dondero"), Nancy Dondero, ("Ms.

---

[1] On February 22, 2021, the Bankruptcy Court entered the *Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order") which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital* Management, *L.P.*, as modified (the "Plan"). The Plan went Effective (as defined in the Plan) on August 11, 2021, and Highland is the Reorganized Debtor (as defined in the Plan) since the Effective Date. *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 2700].

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Requests.

**App. 265**

Dondero"), The Dugaboy Investment Trust ("Dugaboy"), NexPoint Advisors, L.P. ("NexPoint"), Highland Capital Management Services, Inc. ("HCMS"), and NexPoint Real Estate Partners, LLC ("NREP") (collectively, "Defendants"). Highland's responses and objections to the Requests (the "Responses") are made pursuant to Federal Rules of Civil Procedure ("FRCP") 26, 33, and 34 as made applicable in bankruptcy cases pursuant to Federal Rules of Bankruptcy Procedure 7026, 7033, and 7034.

## GENERAL OBJECTIONS

Unless otherwise specified, the following general objections and caveats are applicable to each and every Response and are incorporated into each Response as though set forth in full:

1. The Responses contained herein are based upon information presently known and ascertained by the Highland and Highland reserves the right to amend, supplement, or modify these Responses during depositions or otherwise.

2. Highland objects to the Requests to the extent they seek information or documents that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other privilege or immunity. The inadvertent disclosure or production of any document that is protected from discovery by any privilege or immunity shall not constitute a waiver of any such privilege or immunity. All references in these objections and responses to Highland's agreement to produce documents shall be construed to mean non-privileged documents.

3. Highland objects to the Requests to the extent they request information that is not reasonably or readily available to it, in its possession, custody or control, or is more readily available to the Defendants from another source or for which the burden of obtaining such information is not substantially greater for the Defendants than it is for Highland.

4.      Highland objects to the Requests to the extent they call for legal conclusions and/or analyses.

5.      All specific responses to the Requests are provided without waiver of, and with express reservation of (a) all objections as to competency, relevancy, materiality, and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceedings in this matter; (b) all privileges, including the attorney-client privilege and work product doctrine; (c) the right to object to the use of such responses, or the subject matter thereof, on any ground in any further proceeding in this action; and (d) the right to object on any ground at any time to a demand or request for further responses to these or any other discovery requests or other discovery proceedings.

6.      Highland objects to the Requests to the extent they seek to expand on or conflict with Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and/or the Local Rules of the Bankruptcy Court for the Northern District of Texas.

7.      Highland's agreement to produce documents with respect to a specific Request shall not be construed as a representation that such documents actually exist or are within Plaintiff's possession, custody or control.

8.      Notwithstanding Highland's production of certain documents that were lodged on the main docket or in one or more of the Adversary Proceedings, Highland has not reviewed all documents lodged therein and reserves the right to use, reply upon, or offer into evidence any such documents.

9.      Unless indicated otherwise, Highland's search for responsive documents and communications covers the period December 1, 2018 to the present.

10.     These General Objections and Responses shall be deemed to be incorporated by reference into the Specific Responses and Objections set forth below.

**SPECIFIC OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS**

**REQUEST FOR PRODUCTION NO. 1**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the notes."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 1, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 2**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against James Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 2, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 3**:

Produce all documents and communications supporting or related to your Declaratory Relief claims (Count 5 of the Amended Complaint) made against Dugaboy and Nancy Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 3, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 4**:

Produce all documents and communications supporting or related to your Breach of Fiduciary Duty claims (Count 6 of the Amended Complaint) made against Dugaboy and Nancy Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 4, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 5**:

Produce all documents and communications supporting or related to your Aiding and Abetting a Breach of Fiduciary Duty claims (Count 7 of the Amended Complaint) against James Dondero and Nancy Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 5, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 6**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against NPA.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 6, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 7**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against HCMS.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 7, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 8**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against HCRE.

**RESPONSE:**

Subject to the General Objections and this specific objection, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 8, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information. Highland reserves its right to supplement its Response to this Request in light of ongoing discovery.

**REQUEST FOR PRODUCTION NO. 9**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against James Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 9, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 10**:

Produce all documents and communications supporting or related to any damages that you are seeking pursuant to your Amended Complaints.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 10, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 11**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that, "At all relevant times, Mr. Dondero controlled the Debtor."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 11, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 12**:

Produce all documents and communications related to the Alleged Agreement referenced in the Amended Complaints.

**RESPONSE:**

In response to Request for Production No. 12, Highland states that it is not aware of any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 13**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "the Debtor's books and records do not reflect the Alleged Agreement."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 13, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 14**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement.)"

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 14, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 15**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 15, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 16**:

Produce all communications between the Debtor and Debtor's outside auditor.

**RESPONSE:**

Highland objects to Request for Production No. 16 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 16, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information concerning or relating to the Notes.

**REQUEST FOR PRODUCTION NO. 17**:

Produce all communications between the Debtor and Debtor's outside auditor related to any allegations in the Amended Complaints.

**RESPONSE**:

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 17, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 18**:

Produce all communications between Mr. Dondero and Debtor's CFO (as that term is used in the Amended Complaints) related to the Notes.

**RESPONSE**:

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 18, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 19**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Nancy Dondero also lacked the authority to enter into the Alleged Agreement or to otherwise bind the Debtor."

**RESPONSE**:

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 19, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 20**:

Produce all communications between Nancy Dondero and James Dondero.

**RESPONSE:**

Highland objects to Request for Production No. 20 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it asks for "all" communications between Nancy Dondero and James Dondero. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 20, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information concerning or relating to the allegations in the Amended Complaint or the Notes or the Amended Answer.

**REQUEST FOR PRODUCTION NO. 21**:

Produce all communications between Nancy Dondero and James Dondero related to the allegations in the Amended Complaints.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 21, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 22**:

Produce all communications between Nancy Dondero and James Dondero related to James Dondero's compensation from the Debtor.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 22, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 23**:

Produce all documents and communications supporting or related to the allegations in the Amended Complaints that each of the Defendants entered into the "Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 23, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 24**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that the "Alleged Agreement was not subject to negotiation."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 24, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 25**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "the value of the consideration received by the Debtor for the transfers was not reasonably equivalent value."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 25, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 26**:

Produce all documents and communications evidencing the value of the Notes.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 26.

**REQUEST FOR PRODUCTION NO. 27**:

Produce all documents and communications evidencing the value of the consideration received by the Debtor related to the Notes.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 27, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 28**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that James Dondero and Nancy Dondero "were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 28, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 29**:

Produce all documents and communications supporting any damages you are seeking related to the Amended Complaints.

**RESPONSE:**

Highland objects to Request for Production No. 29 on the ground that it is duplicative of Request for Production No. 10.  Subject to the General Objections and this specific objection, Highland incorporates by reference its Response to Request for Production No. 10.

**REQUEST FOR PRODUCTION NO. 30**:

Produce all documents and communications relating to the solvency and financial condition of the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 30 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 30.

**REQUEST FOR PRODUCTION NO. 31**:

Produce all monthly balance sheets of the Debtor for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 31 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 31.

**REQUEST FOR PRODUCTION NO. 32**:

Produce all of the Debtor's internal monthly reporting packages for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 32 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 32.

**REQUEST FOR PRODUCTION NO. 33**:

Produce all of the Debtor's financial statements for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 33 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 33.

**REQUEST FOR PRODUCTION NO. 34**:

Produce all "loan summaries" of the Debtor for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 34 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 34.

**REQUEST FOR PRODUCTION NO. 35**:

Produce all of the Debtor's audited financial statements for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 35 on the ground that Highland has previously produced documents responsive to this Request and does not intend to produce all such documents again.

**REQUEST FOR PRODUCTION NO. 36**:

Produce all valuation reports, including all annual and/or periodic valuation reports, and all other documents reflecting the enterprise value and/or asset value of the following entities:

Trussway Holdings, LLC, Trussway Industries, LLC, MGM Holdings, and Cornerstone Healthcare for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 36 on the grounds that it is overly broad,

unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

Subject to the General Objections, Highland will conduct a reasonable search for, and produce,

documents responsive to Request for Production No. 36.

**REQUEST FOR PRODUCTION NO. 37**:

Produce all valuation reports, including all annual and/or periodic valuation reports, and all other documents reflecting the enterprise value and/or asset value of all entities and assets owned, directly or indirectly, by the following entities and in which the Debtor has an interest: Highland Select Equity Fund, L.P., Highland Restoration Capital Partners, L.P., Highland CLO Funding, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Capital Management Korea Limited, and Cornerstone Healthcare.

**RESPONSE:**

Highland objects to Request for Production No. 37 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).  .

**REQUEST FOR PRODUCTION NO. 38**:

Produce all documents showing the financial performance of the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 38 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 39**:

Produce all financial statements for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE**:

Highland objects to Request for Production No. 39 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 40**:

Produce all monthly balance sheets for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE**:

Highland objects to Request for Production No. 40 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 41**:

Produce all internal monthly reporting packages for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE**:

Highland objects to Request for Production No. 41 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 42**:

Produce all documents reflecting the assets under management for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 42 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 43**:

Produce all documents reflecting the investment results and/or performance for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 43 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 44**:

Produce all documents reflecting marketing materials for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 44 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 45**:

       Produce all documents related to any employment and/or shareholder or partnership agreement between Dondero, on the one hand, and any of the following entities on the other hand, for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE**:

       Highland objects to Request for Production No. 45 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 46**:

       Produce all documents related to any compensation (including, without limitation, base salary, annual bonus, long-term incentives, equity distributions, equity interests, perks, long-term awards, loans, forgiveness of debt, or otherwise) received by Dondero from any of the following entities for the period from January 1, 2010 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE**:

       Highland objects to Request for Production No. 46 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to this Request to the extent they relate to (i) the Debtor.

**REQUEST FOR PRODUCTION NO. 47**:

       Produce all documents related to any compensation (including, without limitation, base salary, annual bonus, long-term incentives, equity distributions, equity interests, perks, long-term awards, loans, forgiveness of debt, or otherwise) received by any Related Entity for Dondero or on Dondero's behalf, from any of the following entities for the period from January 1, 2010 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries,

both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 47 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 48**:

Produce all documents reflecting and/or relating to any organizational charts for any of the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 48 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1). Subject to the forgoing objection, Highland refers the

Defendants to documents filed on this main docket in the above-referenced bankruptcy case.

**REQUEST FOR PRODUCTION NO. 49**:

Produce all documents reflecting and/or relating to Dondero's employment, investment, and/or managerial role(s) in any of the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 49 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 50**:

Produce the Debtor's "books and records" referred to in paragraph 66(j) of the Amended Complaint filed against Defendant James Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 50.

**REQUEST FOR PRODUCTION NO. 51**:

Produce all documents and communications evidencing any action taken by any limited partner of the Debtor to (i) take part in the control (within the meaning of the Delaware Act) of the Partnership's business; (ii) transact any business in the Partnership's name; and/or (iii) sign any documents or otherwise bind the Partnership in accordance with the LPA.

**RESPONSE:**

Highland objects to Request for Production No. 51 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 52**:

Produce all documents and communications evidencing the value of the HCRE Notes.

**RESPONSE:**

Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 52.

**REQUEST FOR PRODUCTION NO. 53**:

Produce all documents and communications evidencing the value of the HCMS Notes.

**RESPONSE:**

Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 53.

**REQUEST FOR PRODUCTION NO. 54**:

Produce all documents and communications evidencing the value of the NPA Note.

**RESPONSE:**

Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 54.

**REQUEST FOR PRODUCTION NO. 55**:

Produce all documents and communications evidencing the value of the Dondero Notes.

**RESPONSE:**

Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 55.

**REQUEST FOR PRODUCTION NO. 56**:

Produce the loan documentation for all loans made by Debtor to any then-current executive, consultant, or employee of Debtor or any related Person.

**RESPONSE:**

Highland objects to Request for Production No. 56 on the grounds that (a) it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense, *see* Fed. R. Civ. P. 26(b)(1), and (b) the phrases "loan documentation," "consultant," and "any related Person" are vague and ambiguous. Subject to the General Objections and these specific objections, Highland states that loans made by Debtor to any then-current executive, employee, or related party are identified and described in Highland's audited financial statements previously produced to James Dondero.

**REQUEST FOR PRODUCTION NO. 57**:

Produce all documents reflecting the payment status of all loans identified in response to the above (No. 56) Request for Production, and if forgiven, all documents reflecting the conditions for forgiveness.

**RESPONSE:**

Highland objects to Request for Production No. 57 on the grounds that (a) it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defenses, *see* Fed. R. Civ. P. 26(b)(1), and (b) the phrases "loan documentation," "consultant," and "any related Person" in Request for Production No. 56 are vague and ambiguous. Subject to the General Objections and these specific objections, Highland states that loans made by Debtor to any then-current executive, employee, or related party are identified and described in Highland's audited financial statements previously produced to James Dondero.

**REQUEST FOR PRODUCTION NO. 58**:

Produce all documents related to any audits of the Debtor from 2013 forward, including, but not limited to, any management letters, audit notes, and audit files.

**RESPONSE:**

Highland objects to Request for Production No. 58 on the grounds that  it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).  Subject to the General Objections and these specific objections, Highland and PricewaterhouseCoopers previously produced documents responsive to Request for Production No. 58.

**REQUEST FOR PRODUCTION NO. 59**:

Produce all documents related to the sale or potential sale of any portfolio companies of the Debtor or interests in any portfolio companies owned by the Debtor, including, but not limited to, MGM, Trussway, and Cornerstone.

**RESPONSE:**

Highland objects to Request for Production No. 59 on the grounds that (a) it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defenses, *see* Fed. R. Civ. P. 26(b)(1), and (b) the phrase "potential sale" is vague and

ambiguous.  Subject to the General Objections and these specific objections, Highland states that it has no documents responsive to Request for Production No. 59.

## RESPONSES TO REQUESTS FOR ADMISSIONS

### REQUEST FOR ADMISSION NO. 1:

Admit that Highland Capital Management, L.P. entered into the Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. (the "LPA"), on or about December 24, 2015.

### RESPONSE:

Deny.  Highland Capital Management, L.P. did not enter into, and is not a party to, the

LPA.

### REQUEST FOR ADMISSION NO. 2:

Admit that the LPA provided that the Majority Interest of Highland Capital Management, L.P. could approve compensation for the General Partner and its Affiliates (as those terms are defined in the LPA).

### RESPONSE:

Deny.  Request for Admission No. 2 inaccurately summarizes Section 3.10 of the LPA,

which speaks for itself.

### REQUEST FOR ADMISSION NO. 3:

Admit that James Dondero was an Affiliate of the General Partner in 2017 (as those terms are defined in the LPA).

### RESPONSE:

Admit.

### REQUEST FOR ADMISSION NO. 4:

Admit that James Dondero was an Affiliate of the General Partner in 2018 (as those terms are defined in the LPA).

### RESPONSE:

Admit.

### REQUEST FOR ADMISSION NO. 5:

Admit that James Dondero was an Affiliate of the General Partner in 2019 (as those terms are defined in the LPA).

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 6:**

Admit that James Dondero was an Affiliate of the General Partner in 2020 (as those terms are defined in the LPA).

**RESPONSE:**

Admit that James Dondero was an Affiliate of the General Partner from January 1 through January 9, 2020, and otherwise deny Request for Admission No. 6 on the basis of the corporate governance settlement that Mr. Dondero entered into and that was approved by the Court. See Docket Nos. 338 and 339.

**REQUEST FOR ADMISSION NO. 7:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2017 (as those terms are defined in the LPA).

**RESPONSE:**

Deny. "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 8:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2018 (as those terms are defined in the LPA).

**RESPONSE:**

Deny. "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 9:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2019 (as those terms are defined in the LPA).

**RESPONSE:**

Deny. "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 10:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2020 (as those terms are defined in the LPA).

**RESPONSE:**

Deny. "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 11:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2017.

**RESPONSE:**

HCMLP objects to Request for Admission No. 11 on the ground that "Dugaboy Family Trust" is not defined in the LPA. HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 11. HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2017.

**REQUEST FOR ADMISSION NO. 12:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2018.

**RESPONSE:**

HCMLP objects to Request for Admission No. 12 on the ground that "Dugaboy Family Trust" is not defined in the LPA. HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 12. HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2018.

**REQUEST FOR ADMISSION NO. 13:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2019.

**RESPONSE:**

HCMLP objects to Request for Admission No. 13 on the ground that "Dugaboy Family Trust" is not defined in the LPA. HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 13. HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2019.

**REQUEST FOR ADMISSION NO. 14:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2020.

**RESPONSE:**

HCMLP objects to Request for Admission No. 14 on the ground that "Dugaboy Family Trust" is not defined in the LPA. HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 14. HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2020.

**REQUEST FOR ADMISSION NO. 15:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2017.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 15. HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 16:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2018.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 16. HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 17:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2019.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 17. HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 18:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2020.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 18. HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 19:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities as of December 31, 2017.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2017.

**REQUEST FOR ADMISSION NO. 20:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities in January 2018.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2018.

**REQUEST FOR ADMISSION NO. 21:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities as of December 31, 2018.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2018.

**REQUEST FOR ADMISSION NO. 22:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities as of December 31, 2019.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2019.

## REQUEST FOR ADMISSION NO. 23:

Admit that within Highland each of MGM, Cornerstone and Trussway were referred to as "Portfolio Companies."

## RESPONSE:

Highland objects to Request for Admission No. 24 on the ground that the phrase "within Highland" is vague and ambiguous.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

Identify all damages that you are seeking against each of the Defendants, including, how those damages are calculated.

### RESPONSE:

Against each maker of each Notes, HCMLP seeks damages in an amount equal to (a) all unpaid principal under each Note, (b) all accrued and unpaid interest under each Note, and (c) all actual expenses of collection, including court costs, and reasonable attorneys' fees in connection with each of the Adversary Proceedings. HCMLP incorporates by reference its prior written responses to discovery and refers the defendants to the Notes and the invoices of Pachulski Stang Ziehl & Jones, LLP other documents being produced in this adversary proceeding.

Against Nancy Dondero and Dugaboy, HCMLP seeks damages in an amount equal to (a) all unpaid principal under each Note, and (b) all accrued and unpaid interest under each Note.

Against James Dondero for aiding and abetting Nancy Dondero's and Dugaboy's breach of fiduciary duty, HCMLP seeks damages in an amount equal to (a) all unpaid principal under each Note, and (b) all accrued and unpaid interest under each Note.

Damages will continue to increase as interest continues to accrue and Highland continues to incur additional costs of collection.

### INTERROGATORY NO. 2:

Provide the factual basis for your allegation in the Amended Complaints that Dugaboy owed a fiduciary duty to the Debtor.

### RESPONSE:

Assuming that a court of competent jurisdiction finds that Dugaboy entered into an agreement on behalf of HCMLP pursuant to which HCMLP agreed to forgive collection on all or any of the Notes, then Dugaboy will have owed a fiduciary duty to the Debtor because, among

other things, (a) Dugaboy would have been acting on the Debtor's behalf, (b) Dugaboy would have bound the Debtor, and (c) Dugaboy would have been required to act reasonably under the circumstances.

**INTERROGATORY NO. 3:**

Provide the factual basis for your allegation in the Amended Complaints that Nancy Dondero owed a fiduciary duty to the Debtor.

**RESPONSE:**

HCMLP incorporates by reference its response to Interrogatory No. 3 and further notes that Ms. Dondero would have caused Dugaboy to enter into the Alleged Agreement.

**INTERROGATORY NO. 4:**

Identify all acts or omissions by each of the Defendants that breached any alleged fiduciary duties owed to the Debtor.

**RESPONSE:**

Assuming that a court of competent jurisdiction finds that Dugaboy entered into an agreement pursuant to which HCMLP agreed to forgive collection on the Notes, then Dugaboy and Nancy would have breached their fiduciary duties by acting unreasonably by (a) agreeing to forgive Notes with an aggregate principal amount in excess of $70 million for $1 in value, (b) agreeing to forgive Notes with an aggregate principal amount in excess of $70 million at a time when they had no obligation to do so and received woefully inadequate consideration in return, and (c) otherwise acting unreasonably under the circumstances, including failing to perform reasonable diligence, failing to document and otherwise disclose the "agreement" to the Debtor's management and auditors, and by failing to disclose the "agreement" to the Bankruptcy Court at any time.

**INTERROGATORY NO. 5:**

Identify all acts or omissions by each of the Defendants that aided and abetted the breach of any alleged fiduciary duties owed to the Debtor.

**RESPONSE:**

Highland incorporates by reference its response to Interrogatory No. 5 and further states - that James Dondero would have further aided and abetted in the breach of fiduciary duties by using undue influence to persuade Ms. Dondero to enter into the Alleged Agreement on behalf of Dugaboy.

**INTERROGATORY NO. 6:**

Provide the factual basis for your allegation in the Amended Complaints that "At all relevant times, Mr. Dondero controlled the Debtor."

**RESPONSE:**

The evidence that Mr. Dondero controlled the Debtor is extensive and HCMLP objects to Interrogatory No. 6 on the grounds that it is overly broad, unduly burdensome, and has been admitted to at various points in the Bankruptcy Case. Subject to the General Objections, the evidence that Mr. Dondero controlled the Debtor through at least January 9, 2020, includes his admissions, his control of Strand Advisors, Inc., his role as President of HCMLP, his authorization of the commencement of the Bankruptcy Case on behalf of HCMLP, and his agreement to the corporate governance settlement as embodied in Docket Nos. 338 and 339.

**INTERROGATORY NO. 7:**

Provide the factual basis for your allegations in the Amended Complaint that James Dondero controlled NPA.

**RESPONSE:**

The evidence that Mr. Dondero controlled NPA is extensive and HCMLP objects to Interrogatory No. 7 on the grounds that it is overly broad, unduly burdensome, and has been admitted to at various points in the Bankruptcy Case. Subject to the forgoing objection, the

evidence that Mr. Dondero controls NPA includes, among other things, his admissions, the admissions of DC Sauter and Jason Post at various points in this case, and prior judicial findings, holdings, rulings, and orders.

**INTERROGATORY NO. 8:**

Provide the factual basis for your allegations in the Amended Complaint that James Dondero controlled HCRE.

**RESPONSE:**

The evidence that Mr. Dondero controlled HCRE is extensive and HCMLP objects to Interrogatory No. 8 on the grounds that it is overly broad, unduly burdensome, and has been admitted to at various points in the Bankruptcy Case. Subject to the forgoing objection, the evidence that Mr. Dondero controls HCRE includes, among other things, his own admissions, his direct or indirect ownership interest in HCRE, and the positions he holds and has with respect to HCRE..

**INTERROGATORY NO. 9:**

Provide the factual basis for your allegations in the Amended Complaint that James Dondero controlled HCMS.

**RESPONSE:**

The evidence that Mr. Dondero controlled HCMS is extensive and HCMLP objects to Interrogatory No. 9 on the grounds that it is overly broad, unduly burdensome, and has been admitted to at various points in the Bankruptcy Case. Subject to the forgoing objection, the evidence that Mr. Dondero controls HCMS includes, among other things, his own admissions, his direct or indirect ownership interest in HCMS, and the positions he holds and has with respect to HCMS.

**INTERROGATORY NO. 10:**

Provide the factual basis for your allegation in the Amended Complaints that "the Alleged Agreement is a fiction."

**RESPONSE:**

Highland incorporates by reference and refers the Defendants to (a) the purported terms of the Alleged Agreement, (b) the purported purpose of the Alleged Agreement, (c) Mr. Dondero's prior sworn testimony in Adv. Pro. 21-03003; (d) documents identified on Docket Nos. 31 and 35, respectively, in Adv. Pro. 21-3004; (e) Mr. Dondero's Rule 26 disclosures in Adv. Pro. 21-03003; (f) the deposition testimony of PricewaterhouseCoopers and the exhibits marked during that deposition; (g) the lack of any documentation memorializing the terms of the Alleged Agreement, and (h) the lack of disclosure of the alleged "agreement" to the Bankruptcy Court .at any time prior to confirmation, including in connection with that objection to the Debtor's Plan.

**INTERROGATORY NO. 11:**

Provide the factual basis for your allegation in the Amended Complaints that "Mr. Dondero entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor."

**RESPONSE:**

Highland contends that the evidence will prove that the Alleged Agreement is a fiction but if a court of competent jurisdiction finds otherwise, that the evidence will prove that Mr. Dondero entered into the Alleged Agreement when he knew that certain creditors, including the Redeemer Committee and Joshua Terry, were on the verge of obtaining substantial judgments against Highland and as he had at various times in the face of adverse litigation, sought to fraudulently transfer assets to limit (if not eliminate) judgment creditors' ability to collect.

**INTERROGATORY NO. 12:**

Identify the "value of the consideration received by the Debtor for the transfers," as that term is used in the Amended Complaint, and provide the basis for how that value was calculated.

**RESPONSE:**

Highland made the payments reflected in each Note in exchange for a promise by each maker that payment would be made on the terms set forth therein, including the payment of all principal and interest and all costs of collection, including attorneys' fees.

**INTERROGATORY NO. 13:**

Identify any portfolio companies that Debtor owns (wholly or partially).

**RESPONSE:**

Highland objects to Interrogatory No. 13 on the grounds that (a) "portfolio companies" is undefined, and (b) it is overly broad, unduly burdensome and is not relevant to any party's claim or defense nor is it proportional to the needs of this case.

**INTERROGATORY NO. 14:**

Identify any sale or potential sale of any portfolio companies (or a portion of such portfolio companies) owned (wholly or partially) by the Debtor, including, but not limited to, Trussway, MGM and Cornerstone, including the date of the sale, the buyer, and the amount paid.

**RESPONSE:**

Highland objects to Interrogatory No. 14 on the grounds that (a) "portfolio companies" is undefined, (b) the phrase "potential sale" is vague and ambiguous, (c) it is overly broad, unduly burdensome and is not relevant to any party's claim or defense nor is it proportional to the needs of this case, and (d) "potential sales" are not a term of the Alleged Agreement and otherwise constitute proprietary and confidential information. Subject to the forgoing objections, Highland has not sold Trussway, MGM or Cornerstone as of this time.

Dated:  September 27, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
           ikharasch@pcszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com
           hwinograd@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110
Email:    MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*