# EXHIBIT 7

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
|  | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | Monday, January 10, 2022 |
|  | ) | 9:30 a.m. Docket |
|     Debtor. | ) |  |
|  | ) |  |
|  | ) |  |
| HIGHLAND CAPITAL | ) | **Adversary Proceeding 21-3004-sgj** |
| MANAGEMENT, L.P., | ) |  |
|  | ) |  |
|     Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | DEFENDANT'S SECOND MOTION TO |
|  | ) | AMEND ANSWER [82] |
| HIGHLAND CAPITAL MANAGEMENT | ) |  |
| FUND ADVISORS, L.P., | ) |  |
|  | ) |  |
|     Defendant. | ) |  |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor-Plaintiff:   John A. Morris
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7700

For the Defendant:          Davor Rukavina
                            Julian Preston Vasek
                            MUNSCH HARDT KOPF & HARR, P.C.
                            500 N. Akard Street, Suite 3800
                            Dallas, TX  75201-6659
                            (214) 855-7587

Recorded by:                Michael F. Edmond, Sr.
                            UNITED STATES BANKRUPTCY COURT
                            1100 Commerce Street, 12th Floor
                            Dallas, TX  75242
                            (214) 753-2062

1    Transcribed by:                Kathy Rehling
                                    311 Paradise Cove
2                                   Shady Shores, TX   76208
                                    (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
                Proceedings recorded by electronic sound recording;
24                 transcript produced by transcription service.

25

1        <u>DALLAS, TEXAS - JANUARY 10, 2022 - 10:19 A.M.</u>

2            THE COURT:  I will now take appearances in the

3   Highland Capital Management versus HCMFA adversary.  This is

4   Adversary 21-3004.  We have Defendant's Second Motion to Amend

5   Answer.  Who do we have appearing for the Defendant?

6            MR. RUKAVINA:  Your Honor, good morning.  Davor

7   Rukavina and Julian Vasek for the Defendant.

8            THE COURT:  Good morning.  Who do we have appearing

9   for Highland?

10            MR. MORRIS:  Good morning, Your Honor.  This is John

11   Morris from Pachulski Stang Ziehl & Jones for Highland

12   Capital, for the Reorganized Debtor Highland Capital

13   Management, LP.

14            THE COURT:  All right.  Thank you.  I know we have

15   many observers.  Is there anyone else who wanted to appear?

16        (No response.)

17            THE COURT:  All right.  Well, we had lots of paper

18   filed on this matter.  Mr. Rukavina, how did you want to

19   proceed?

20            MR. RUKAVINA:  Your Honor, I'd like to give an

21   opening.  Well, I'd like to give my argumentation.  There is a

22   disagreement.  I understand Mr. Morris would like to call D.C.

23   Sauter as a witness.  It's my position that that's not

24   possible under the Local Rules.  But perhaps the Court wants

25   to rule on that matter first, because that would then affect

1    the manner of presentation.

2          THE COURT:  Okay.  So you say it's not allowed under

3    Local Rules for the Debtor to call a witness?  What Local Rule

4    do you mean?

5          MR. RUKAVINA:   Yes, Your Honor.  I'm referring to

6    the Local Rule 7007(g), which talks about that a party who

7    relies on exhibits, evidence, et cetera, does so through an

8    appendix.  In fact, the Debtor filed its appendix.  I filed my

9    appendix.

10     And I think certainly the Court has discretion, but I

11    think in twenty years of practicing before this Court, unless

12    it's a sanctions issue or unless it's a preliminary injunction

13    issue, it's been my understanding that motions are always

14    adjudicated based on the appendices.

15     And I believe that Your Honor has indicated or even stated

16    that the District Court rules should applies to this

17    proceeding, and the District Court rules, I think, are even

18    clearer, because they provide that there is not even a hearing

19    on the motion.  But, and they again require that any evidence

20    in support or opposition to a motion be by a declaration or by

21    deposition transcripts, again, in an appendix.

22     So I really have nothing more to add than that.  It's just

23    a matter of Local Rules.  Mr. Sauter is available should the

24    Court require him to be cross-examined.  And I'll -- I'll just

25    rely on Rule 7007(g).

1          MR. MORRIS:  If I may, Your Honor?

2          THE COURT:  Yes.  I'm pulling it up, since I don't

3   have every Local Rule memorized.  So, appendix requirement.

4   Isn't this just a rule whenever you have -- do an appendix,

5   here are the requirements?  I don't know.  What did you --

6          MR. RUKAVINA:  Well, Your Honor, --

7          THE COURT:  Go ahead.

8          MR. RUKAVINA:  It says a party who relies on

9   documentary or nondocumentary evidence to support or oppose a

10  motion shall include such evidence in an appendix.  I've

11  always taken that to mean that -- we don't have many hearings

12  with live testimony, with cross-examination, on pure motion

13  practice, especially procedural motion practice.

14     But I don't have a case for you.  I don't have, you know,

15  this isn't -- this isn't a U.S. Supreme Court matter.  This is

16  just a matter of local practice.

17         MR. MORRIS:  May I be heard, Your Honor?

18         THE COURT:  Okay.  Mr. Morris, go ahead.

19         MR. MORRIS:  Just briefly.  It's exactly why I raised

20  this issue last week.  I raised it with Mr. Rukavina.  He told

21  me his position.  He's never given me any authority that says

22  I can't do this.

23     We wrote to the Court.  We copied him.  The Court told the

24  parties last Thursday that it's the Court's practice to allow

25  litigants to cross-examine witnesses who put forth

1    declarations.  Mr. Sauter has put forth a substantive

2    declaration.  This is not an attorney's declaration that

3    attaches documents.  It's testimony.  And that testimony is

4    going to be put in the record to support a motion, and

5    Highland respectfully requests the opportunity to cross-

6    examine Mr. Sauter on his statements.

7            THE COURT:  Okay.  I remember the question coming to

8    me through the courtroom deputy last week, and so I understand

9    she communicated an answer.  This should be no surprise.  I

10   mean, we generally allow the opportunity for cross-examination

11   wherever there's a declarant submitting evidence.  And, I

12   mean, I see the rule you're talking about, Mr. Rukavina, but I

13   don't think there should have been any doubt because of the

14   communication through my courtroom deputy that I was going to

15   allow cross-examination for any declarant.

16       And, frankly, I mean, this is a pretty important motion.

17   You know, for crying out loud, it was an 800-page-plus

18   appendix, I think, with all the documentation.  I think that

19   was yours, Mr. Rukavina.  So the ruling is we will allow

20   cross-examination of Mr. Sauter.

21       All right.  Mr. Rukavina?

22           MR. RUKAVINA:  Then, Your Honor, then I'll propose --

23   I propose that I just give you my argumentation based on Mr.

24   Sauter's declaration as his direct testimony, and then, of

25   course, Mr. Morris will cross-examine him.  I don't know that

1  we need an opening, evidence, then closing.

2          MR. MORRIS:  I'd like the opportunity to make a brief

3  opening, Your Honor.

4          THE COURT:  Okay.  I'll --

5          MR. MORRIS:  If Mr. Rukavina doesn't want to do that,

6  that's fine.

7          THE COURT:  I'll allow opening statements.  Again, I

8  think this is a pretty big deal.  So I'll allow it if you want

9  to make an opening statement.

10          MR. RUKAVINA:  Okay, Your Honor.  Thank you.

11          OPENING STATEMENT ON BEHALF OF THE DEFENDANT

12          MR. RUKAVINA:  So, as the Court is certainly aware,

13  this is our second motion to amend our answer.  The amended

14  answer would more specifically and expressly deny that Mr.

15  Waterhouse signed the two promissory notes at issue in this

16  lawsuit.

17      I don't think that we've had a contested hearing in this

18  adversary, Your Honor, although it is one of the note cases.

19  So I think it would help the Court just to give you a very

20  quick summary of what the issues in this adversary are.

21      We, the Defendant, deny that they are -- that there are

22  valid promissory notes here.  This isn't an issue where we

23  have the potential forgivable promissory notes.  This isn't an

24  issue where we have other defenses like in the other cases.

25  Here, our defense -- really, our only defense -- goes to the

1    core of whether there are enforceable contractual promises

2    here.

3         In May of 2019, it is true that the Debtor transferred

4    $7.4 million to HCMFA.  That is not disputed.  What is

5    disputed is whether that transfer was for compensation to

6    HCMFA or whether it was to be a loan to be repaid.

7         That defense has already been pled.  We're not here today

8    to try that defense.  We're not here to prove that defense.

9    But it is important context because how and why Mr. Waterhouse

10   would have or did sign these promissory notes goes to the core

11   of this mistake.

12        What the evidence is is that Mr. Dondero told Mr.

13   Waterhouse to transfer $7.4 million.  Mr. Dondero, in his

14   mind, was doing that because the Debtor caused a misstate

15   which cost $7.4 million of liability for HCMFA.  Mr. Dondero

16   never told Mr. Waterhouse to paper it up as a loan.  Mr.

17   Waterhouse doesn't remember being told to paper it up as a

18   loan.  Mr. Waterhouse told his team to transfer the funds.

19   That team then implemented its standard operating procedure,

20   which is that when it sees intercompany transfers going back

21   and forth it papers them as loans.

22        Mr. Waterhouse confirmed that only Mr. Dondero would have

23   had authority to create this loan.

24        In any event, Mr. Vasek, if you'll please share the

25   promissory note with the Court, one of them, Your Honor will

1  see what these notes look like.  And, again, I'm not here

2  today to try the underlying merits, but it's important to see

3  that everything regarding these notes is a mistake, really.

4      So here's one of these two promissory notes.  And

5  obviously, HCMFA is defined as the maker here, but Mr. Vasek,

6  if you'll scroll to the second page, you'll see, Your Honor,

7  that the note is signed by Frank Waterhouse.  And he's not

8  signing it as a CFO.  He's not signing it as a treasurer.  And

9  I know that Your Honor has extensive experience, both as a

10 judge and in private practice, with promissory notes and

11 corporate obligations.  The UCC is very clear.  When someone

12 signs a note like this, he is signing it in order to be

13 jointly and severally liable with the maker.

14     So immediately here, when this case was filed, we saw

15 something that you don't have in the other cases, you have

16 something that's very strange, you have maker Frank

17 Waterhouse.  Clearly, it was not the intent of the parties

18 that Frank Waterhouse would be personally liable for $7.4

19 million.  But it just shows how the mistakes kept happening.

20     So, Mr. Vasek, if you'll please share with the Court my

21 request for production.

22     Your Honor, what Mr. Vasek is going to show you is my May

23 28, 2021 request for production.  It's my second request for

24 production.

25     And if you'll scroll down, Mr. Vasek, I believe it's

1  Request #2.

2       Okay.  Your Honor -- oh, I'm sorry, it's Request #9.  Your

3  Honor can see I'm requesting all Microsoft Word copies of the

4  notes, including metadata.

5       So, again, the manner in which the note is signed

6  certainly -- certainly raised our eyebrows.  It certainly made

7  us think.  And we did what we are supposed to do.  We

8  requested through discovery the originals and metadata so that

9  we can see what happened.  Because Your Honor will see, and

10 I'm sure Mr. Sauter will testify about it, by this time Mr.

11 Sauter had asked Mr. Waterhouse, what are these notes?  Did

12 you sign these notes?  And Mr. Waterhouse told Mr. Sauter,

13 well, it looks like my signature so I must have signed them.

14 So, so as of this time in May, we still did not have any real

15 reason to say that Mr. Waterhouse didn't sign the notes except

16 we had a reasonable suspicion based on the way that the notes

17 are signed that something happened here.

18      Mr. Vasek, if you'll please share the Debtor's response to

19 the RFP.  And if you'll scroll down to the answer to RFP #9.

20      So, Your Honor, this is in July now.  I'm sorry, this is

21 in June.  And the Debtor makes a limited objection to Request

22 #9.  But the Debtor basically says it'll conduct a reasonable

23 search for and produce documents responsive to this request.

24      You can pull that down.

25      So, so I did not file a motion to compel.  There was no

1   need to file a motion to compel.  The Debtor's objection based

2   on metadata was limited.  And I expected that the Debtor would

3   produce the originals of the notes.

4       It didn't.  It didn't.  It did, in late July, produce some

5   Word documents that had all metadata scrubbed.  It was not

6   obvious what those were.  The Debtor is now saying that those

7   were the originals of the notes.  But that was not my

8   understanding.  There were not -- there was no metadata.  And

9   it wasn't the Debtor's understanding.  And I'll show you why

10  the Debtor also believed that it did not produce the originals

11  of the notes.

12      If you'll pull up the October 15th email, Mr. Vasek.

13      So, remember, Judge, we just stopped in late June when the

14  Debtor answers my RFPs.  Here we are now in mid-October.

15  We're about to go into two weeks of depositions.  Your Honor

16  knows who Ms. Deitsch-Perez is.  She's my co-counsel.

17      Scroll down a little bit, Julian, please, to my -- to Ms.

18  Deitsch-Perez's email.  So, stop right there.

19      So, Judge, this is a long email string.  The Court can

20  certainly look over it if it needs to.  The only relevant

21  portions are these top two emails, where Ms. Perez says, John,

22  please have Debtor produce the Word versions of all the notes

23  at issue.  We have searched and it does not appear that they

24  were produced.  Can you do that today?  Thanks.

25      And if you'll scroll up, Mr. Vasek, Mr. Morris writes

1   back, I'll look into it, Deborah.

2       You can -- you can close this document.

3       And, again, this is important because we're about to

4   depose Mr. Waterhouse.  Ms. Perez, Deitsch-Perez and I, we're

5   waiting for the notes.  We're waiting for the metadata.  I'm

6   starting to think, well, they can't find the notes, there are

7   no notes.  But we go forward.

8       And if you'll pull up the next -- the transcript, Mr.

9   Vasek.

10      So now, Your Honor, we are on October the 19th, 2021.  Now

11  we are deposing Mr. Waterhouse.  Mr. Waterhouse, recall, is

12  the person that purportedly signed these notes.  Mr.

13  Waterhouse is the key witness.  Only he and Mr. Dondero know

14  what was said.  And Ms. Deitsch-Perez, you can see here, she

15  asks on the record, John, I also asked you for the Word

16  versions of these notes so we can look at the properties and

17  you have not provided them.  Are you intending to?  Mr. Morris

18  answers, No.

19      So this is October 19th now.  This is during the

20  Waterhouse deposition.

21      You can close this document, Mr. Vasek, and pull up the

22  October 23rd email.

23      Now, after this, after this deposition, Mr. Morris and I

24  talk and we continue to negotiate.  And ultimately Mr. Morris

25  and I reach an agreement.  Mr. Morris wanted certain documents

1    of my clients that I'm sure he'll go through today.  They're

2    what we, I guess, call Rule 15(c).  Not Civil Practice Rules,

3    but SEC Rule 15(c)'s.  And I wanted these notes.  So, so this

4    is an October 23rd email.

5         Scroll down, Mr. Vasek.  Please scroll down some more.

6         And, again, the Court can read all this.  A lot of this

7    deals with ordinary discovery issues.

8         Stop right there.  Scroll down.  You have to scroll up

9    now.  Okay.  Stop right there.

10        Okay.  So this is Mr. Morris writing to me:  We also

11   expect to produce you the Word versions of each of the notes

12   in advance of the depositions.

13        And here, the depositions we're talking about are those of

14   Mr. Klos and Ms. Hendrix.

15        Please let us know whether we'll challenge the

16   authenticity, et cetera.  Highland has a potential expert, if

17   needed, et cetera.  And then you'll see Mr. Morris continues:

18   Davor, based on Highland's willingness to produce the Word

19   versions of the notes, please confirm that HCMFA and NexPoint

20   will produce those -- those 15(c) response.

21        So, again, this -- this is -- this is reflective of our

22   October 23rd agreement to produce these documents to each

23   other, remembering that I requested these notes in May.  And,

24   really, I don't understand why the Debtor would have not

25   produced those right away with all metadata.

1      And then Mr. Vasek, if you'll please pull up the October

2  26th email.

3      And this, Your Honor -- and Mr. Morris, almost immediately

4  after that, on October the 25th, sends me an email, copying my

5  associate, with -- with the promissory notes.  But Mr. -- I

6  think that Mr. Morris's email system, just like mine, it

7  automatically scrubs metadata from attachments until you --

8  unless you tell it not to.

9      So if you'll scroll up, Mr. Vasek, so this is October the

10 25th.  Mr. Morris sends it.  My associate tells him, We still

11 don't have the metadata.  Please check.

12     Keep scrolling up.

13     And Mr. Morris says, in transit, he will respond.  And he

14 did respond.  He sent, on October the 26th, the promissory

15 notes in Word with all metadata intact.  So Mr. Morris did

16 what he said he would, he got it to us, and we had the

17 originals for the Klos, and far more importantly, the Hendrix

18 deposition.

19     You can close that, Mr. Vasek, please.  And pull up one of

20 the notes.

21     So now Mr. Vasek, Your Honor, is going to pull up for you

22 one of the promissory notes in its original Word.  And you

23 will see hopefully why this is of importance to me.  Only when

24 we got this did we see that these notes are electronically

25 signed.

1      Go ahead and show Her Honor how -- how you can move it

2   around.

3      You see, Your Honor?  So these are not even electronically

4   signed in the way that there's all these sophisticated systems

5   that have identification and receipts for when you've signed.

6   This is a picture of Mr. Waterhouse's signature that was

7   affixed to this promissory note.

8      More importantly -- if you'll go the metadata, Mr. Vasek

9   -- and I'm sure Your Honor knows what metadata is.  But now,

10  now we see, for the first time, we see that, in fact, this

11  document was created by Strasburger by a lawyer there named

12  Mr. Forsay (phonetic).  I don't know how to pronounce that; I

13  apologize.  But that Ms. Kristin Hendrix actually modified

14  this document and created the document and printed the

15  document on May 3rd and May 2nd, 2019.  In fact, she never

16  printed this document.  She just closed it onto the system,

17  affixing Mr. Waterhouse's picture of his -- of his signature.

18      So this is what spurred the motion.

19      You can close this now, Mr. Vasek.

20      So now we know for a fact, Your Honor, that Mr. Waterhouse

21  didn't sign these notes.  That's a fact.  The only question

22  is, did he authorize Ms. Hendrix to sign the notes for him?

23  And here, the evidence is contradictory.  Mr. Waterhouse --

24  you have it in my brief; I can walk you through the appendix

25  -- Mr. Waterhouse says that in May 2019, May 2019, he very

1    rarely authorized anyone to sign anything for him

2    electronically and that it would have been his administrative

3    assistant.  He testified that he would not have signed notes

4    like this unless they were approved by the Debtor's legal

5    department with a little piece of paper on the front and a

6    stamp that said, Approved by blah-blah-blah.  And he -- he

7    testified that if he were to authorize someone to sign a

8    document for him electronically, that he would have done so by

9    an email.

10       Ms. Hendrix testified the opposite.  Ms. Hendrix testified

11   that in May 2019 she was or Mr. Waterhouse was signing almost

12   everything electronically.  She testified that these notes

13   would have been created by her or someone in her department,

14   not by the Debtor's legal department.  And she testified that,

15   well, she would not have signed the notes for Mr. Waterhouse

16   if he had not authorized her to.  But neither she nor Mr.

17   Waterhouse could remember any such authorization.  Neither she

18   nor Mr. Waterhouse have any email communication to that

19   effect.  And the Debtor has not produced any emails such as

20   Mr. Waterhouse said would exist had he authorized this

21   electronic signature.

22       So it appears that Ms. Hendrix deduced or concluded that

23   she was authorized to sign Mr. Waterhouse's name because Mr.

24   Waterhouse, as part of many people in the accounting group,

25   was copied on emails by which she created these notes.  In

1    other words, she's told, transfer money from the Debtor to

2    HCMFA.  She does that.  Mr. Klos tells her -- Mr. Klos was her

3    boss then -- prepare notes, because that's standard operating

4    procedure.  And then when she prepares the notes, she

5    circulates them and copies Mr. Waterhouse.  And that's it.

6    From that, she believes that she was authorized to sign his

7    name.

8        Those are questions for the jury.  Those are questions for

9    the jury as to whether there is an estoppel issue, whether Ms.

10   Hendrix was right to conclude that she was authorized, whether

11   Mr. Waterhouse, through a course of conduct and pattern, had

12   authorized her.  I will just say that I analogize it in my

13   mind with our Local Rules and our practices and procedures.  I

14   frequently sign proposed orders for other lawyers, as they do

15   for me, with approval, and we are required to keep an email or

16   fax proof of that.

17       So, where this leaves us is that there is no question Mr.

18   Waterhouse didn't sign the notes.  There is a question as to

19   whether he authorized Ms. Hendrix to sign the notes.  That's a

20   question for the jury.  If in fact he did not sign the notes,

21   there is a material defense under the Uniform Commercial Code

22   that strips the notes of their prima facie validity.

23       We have denied in our prior answer that we signed the

24   notes.  That is potentially ambiguous.  We deny that we've

25   signed the notes because Mr. Waterhouse didn't sign them in a

1   representative capacity.  We now want to more clearly assert

2   that, in fact, the notes were not signed at all, because

3   that's how we read the UCC requirement here.

4        Your Honor, this is a Rule 15 motion.  This is not a Rule

5   16 motion.  Leave should be freely given unless there's a

6   substantial reason not to.  There has been no undue delay.

7   Your Honor can see very clearly that it was not until late

8   October that the notes were produced with metadata.  It was

9   not until Mr. Waterhouse was deposed on October 19th that he

10  first raised the issue of, well, it looks like that's my

11  electronic signature.  These signatures are too perfect to be

12  made by me.  I think he used the word chicken scratch for his

13  writing.

14       So there is no undue delay.  I requested these very early

15  in this lawsuit.  For whatever reason, they were not produced

16  until late.

17       There is no futility, Your Honor.  The Debtor seeks to try

18  the actual merits of the defense.  As I've briefed, the Fifth

19  Circuit is very clear.  On a Rule 15 motion, you apply a

20  reverse 12(b)(6) analysis.  The Court does not look at the

21  merits.  The only question is, is the person seeking to amend

22  its answer asserting an affirmative defense that has a basis

23  in law?  It's a 12(b)(6) standard, and we have demonstrated

24  both legally that failure to sign a note is a defense and

25  we've demonstrated factually, to the extent that factual

1  demonstration is even required, that there is substantial

2  evidence, although it's disputed, admittedly, that the Debtor

3  -- I'm sorry, that HCMFA did not sign these notes nor

4  authorize their signature.  So there is no futility issue,

5  Your Honor.

6      There's no bad faith.  There's no dilatory -- there's no

7  -- nothing like that.  This is not going to delay any trial.

8  If they want more discovery, they can have it.  But Waterhouse

9  and Klos and Hendrix have been deposed about these very, very

10  issues.  And they were deposed at length.  This is -- but

11  ultimately, whenever trial is going to be, whenever the MSJ

12  rulings are going to be, none of this should have to delay any

13  of that, unless the Debtor wants to delay it.

14      And, again, if the Debtor wants more discovery -- it's

15  suggested it wants discovery of D.C. Sauter and James Dondero

16  and others -- it can have it.  But I'm telling you that only

17  Hendrix, who prepared these notes, only Klos, who instructed

18  her to prepare these notes, and only Waterhouse, who allegedly

19  signed them or authorized them to be signed, are relevant, and

20  they have been deposed at length.  And by the way, Your

21  Honor, Klos and Hendrix are still employed by the Debtor.  The

22  Debtor doesn't need to depose them to get whatever additional

23  information it may need.  And Your Honor, so there is no undue

24  prejudice.

25      And Your Honor, finally, there have not been repeated

1  failures to cure prior omissions.  Yes, this is our second

2  motion, that is true, but we did not have any cause or

3  reasonable cause to seek such relief before the end of

4  October.

5      And Your Honor, I think that we are entitled to a little

6  bit of understanding here, that it was not until several

7  months after we were sued that we were even allowed to talk to

8  our CFO about this lawsuit.  Your Honor has in the record

9  communications from Mr. Seery forbidding Mr. Waterhouse or us

10  -- perfectly rationally so; I'm not here to criticize Mr.

11  Seery -- but he forbade Mr. Waterhouse from discussing these

12  matters with us, and it was not until Mr. Waterhouse was

13  terminated, which would have been in March of this year, and

14  it wasn't until sometime later that we were actually able to

15  talk to our CFO and the person who purportedly signed these

16  notes.

17      So the fact that this is our second motion to amend really

18  should not bear any weight to these issues, especially under

19  the facts of this case.

20      Your Honor, that is both my opening, I guess, and my

21  closing.  I have -- I have nothing more except to, I guess,

22  address any issues that Mr. Morris raises.  And I'll rest,

23  really, on our appendices and my argumentation.

24          THE COURT:  Well, I'll ask you this question, since

25  you said that was your opening and closing:  I almost always

1   create a timeline in situations like this.  And you said it

2   was several months before your client could talk to Mr.

3   Waterhouse.  And my timeline shows that December 3, 2020,

4   Highland made a demand on these notes.  And then January 22,

5   2021, this adversary was filed to collect on the notes.  And

6   then in February, I don't have the exact date, sometime in

7   February Waterhouse was terminated from the Debtor.  And then

8   he said in his 400-page deposition that I read yesterday

9   afternoon March 1st was when he started with Skyview, which

10  obviously serves in the same role that Highland did as far as

11  shared services for HCMFA.

12       So my point is it wasn't really several months, right?  It

13  was just about a month --

14            MR. RUKAVINA:  Well, I think, Your Honor, --

15            THE COURT:  The original answer was filed on March

16  1st, I guess the same day Mr. Waterhouse started with his

17  employment.  And so it wasn't really months before your client

18  had access to Mr. Waterhouse, correct?

19            MR. RUKAVINA:  I think -- I think Your Honor is

20  correct on a technical reading of that, but Your Honor has to

21  take into context Mr. Sauter's declaration and the facts here

22  that on March 1 all of these employees were being

23  transitioned.  Mr. Waterhouse was the CFO.  He had a thousand

24  and one things going on, as did my clients, the Advisors here.

25  And yes, of course, having a lawsuit for $7.4 million filed

1  against you is important, and we took it seriously.  We didn't

2  -- we didn't fail to file an answer.  But it's not like this

3  lawsuit was first and foremost on Mr. Waterhouse's mind.

4      Mr. Sauter took a little bit of time before he got Mr.

5  Waterhouse's attention.  So I would say it was, according to

6  his declaration, would have probably been early April, if

7  memory serves -- I don't have it right in front of me --

8  before he was able to discuss the matters with Mr. Waterhouse,

9  which is why I said it was several months before we were able

10  to really talk to him.

11          THE COURT:  Okay.  Mr. Morris, your opening

12  statement?

13          OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

14          MR. MORRIS:  Good morning, Your Honor.  John Morris;

15  Pachulski Stang Ziehl & Jones; for the Reorganized Debtor.

16      Before I get to my prepared remarks, I do want to follow

17  up on the observation you just -- Your Honor just made with

18  respect to timeline.  Mr. Rukavina showed the document request

19  that set forth a demand that the Debtor produce the metadata.

20  And if you look at the last exhibit in the Movant's appendix,

21  you will find Highland's response.  And as he showed you,

22  Highland objected to the phrase metadata as vague.  And that

23  was back in June.

24      No motion to compel, no follow up in the month of July.

25  No motion to compel, no follow up in the month of August.  And

1   mind you, this is at a time that Mr. Rukavina has told you

2   that they knew -- they thought that there might be a problem

3   with the notes.

4       So they sit on their hands in July.  They sit on their

5   hands in August.  They sit on their hands in September.  They

6   sit on their hands in the first two weeks of October.  And

7   within ten days of the follow up request, we produced the

8   documents.

9       I think it's very important for the Court to consider the

10  almost hundred-day delay between the time the Defendant was

11  specifically told that the Debtor objected to the production

12  of metadata and the time they followed up.

13      I'd also like to put into context the notes in their

14  entirety.  These notes were created at a time -- and there is

15  no dispute about this -- that Mr. Dondero controlled both the

16  borrower and the lender.  He controlled both Highland as well

17  as the maker of the note.  There is no dispute about that.

18  This is not an arm's-length negotiation.  This is not a deal

19  between two strangers.  These are all people wearing multiple

20  hats, doing multiple things, at the same time, as Mr. Rukavina

21  just said, in the ordinary course of business.

22      And I think it's really important, when Your Honor hears

23  the technicalities that Mr. Rukavina is raising, to put them

24  in the context of who these people are.  Because as we've

25  cited in our brief, Mr. Dondero has signed notes on behalf of

 1  Mr. Rukavina's clients in exactly the same way.  So is Mr.

 2  Dondero now personally liable?  It's ridiculous.

 3      There's also evidence in the record, unobjected to, there

 4  are notes in other litigations that have Mr. Waterhouse's

 5  electronic signature.  Silence from that Defendant.  Right?

 6  These are all people who were working together under the same

 7  roof for the same master.  I think the context is very

 8  important.

 9      Let me spend a moment on the elephant that is not in the

10  room.  You do not have any evidence in the form of testimony

11  or a declaration from anybody with personal knowledge.  Where

12  is Mr. Dondero's declaration?  Where is Mr. Waterhouse's

13  declaration?  He is still the treasurer of the Movant.  Where

14  is Dustin Norris?  Dustin Norris is the executive vice

15  president of the Movant.  Instead, we have two lawyers'

16  declarations, two people who have absolutely no personal

17  knowledge of any of the underlying facts.

18      You have a substantive investigation conducted by D.C.

19  Sauter.  Mr. Sauter has no official relationship to the

20  Movant.  He is not the general counsel.  He is not employed by

21  them.  He never has been.  He simply is the general counsel of

22  NexPoint.  And because the Movant is an affiliate of Mr.

23  Dondero's, he was told, do this.  And he's doing it.  And this

24  is what he did.

25      And we're going to spend a lot of time with Mr. Sauter on

1   what Mr. Waterhouse told him last spring that neither he nor

2   HCMFA told this Court. And he missed the opportunity in the

3   spring and he missed the opportunity again when he submitted a

4   second declaration. And what Mr. Waterhouse told Mr. Sauter

5   that he declined to share with you proves that this is just

6   nonsense.

7       There are three issues that we're going to address today,

8   two specifically with Mr. Sauter: undue delay and futility.

9   And the evidence that we have put into the record goes to both

10   issues. And I'd like to begin just to show you a couple of

11   documents, Your Honor. And the first one would be Exhibit 7,

12   if we can put that on the screen. And scroll down, please.

13       This is the genesis, Your Honor. I think -- wants to

14   know, where did the notes come from? This is the first note

15   that's created. It was created on May 2, 2019. There's no

16   dispute about that. Nor is there any dispute that Highland

17   transferred to HCMFA $2.4 million on that day. And this is an

18   email from David Klos to Corporate Accounting. There will

19   never be a dispute that the corporate accounting group email

20   included Frank Waterhouse.

21       And Mr. Klos's email, look at the subject: HCMLP to HCMFA

22   Loan. And he instructs a member of his group to send $2.4

23   million from Highland to HCMFA. And he says, "This is a new

24   interco loan." And he asks Ms. Hendrix or another member of

25   the group to prepare a note for execution.

1      Mr. Water -- there is no dispute again.  These are just

2  undisputed facts, Your Honor.  Mr. Waterhouse is the treasurer

3  of HCMFA at the same time he's the CFO of Highland.  He wears

4  at least those two hats.  Those are the only two hats we have

5  to talk about today.  He's included on this email because he's

6  in the corporate accounting group.  And I agree with Mr.

7  Rukavina:  We don't have to resolve today what the discussion

8  between any of these people were, because we know it is an

9  undisputed fact that Frank Waterhouse and therefore HCMFA was

10 told on May 2, 2019 that this $2.4 million transfer was being

11 treated as a loan and that the accounting group was going to

12 prepare it.

13     Can we go to the next exhibit, please?  Number 8?

14     This is the next day.  This is the $5 million loan.  And

15 here's another email, this one from Ms. Hendrix.  She again

16 sends it to the corporate accounting group.  Again, Mr.

17 Waterhouse and therefore HCMFA are told by Ms. Hendrix that

18 there was going to be a new $5 million loan and that she

19 specifically says, I will paper the loan.  HCMFA knew on May

20 3, 2019 that Kristin Hendrix was going to prepare a promissory

21 note to support the transfer of $5 million from Highland to

22 HCMFA.  There is no dispute about any of these facts.

23     If Mr. Waterhouse had any question as to what she or Mr.

24 Klos were doing at this moment in time, if he believed that he

25 hadn't given the instruction, that was his moment to speak up.

 1  Well, that was his first in dozens and dozens of moments to
 2  speak up.  But he didn't.
 3       Where is the evidence that Mr. Waterhouse -- because this
 4  is all out in the open now.  He's still the treasurer of
 5  HCMFA.  Where's the declaration from Mr. Waterhouse saying, I
 6  didn't see that email?  It never occurred to me what they were
 7  doing.  It'll -- there will never be that evidence, Your
 8  Honor.
 9       So this is just -- this is the beginning.  And, again,
10  this -- these emails, these two documents alone establish both
11  undue delay, because here you're on notice that those pesky
12  Highland accounting folks are running amok here and doing
13  something they shouldn't be doing.  That's what we're told.
14  They shouldn't have -- this was all a grave mistake.  HCMFA
15  knows it.  And you know what they do in less than 30 days?
16  They report these notes in their audited financial statements.
17  I don't want to go through all of my evidence right now, but
18  this is just such incredible evidence.
19       If we can go to the next document, which is the Highland
20  audited financial statements, Exhibit 3.  And this is dated
21  June 3, 2019.  It is literally one month after the notes are
22  executed.  And if we can just flip to Page 39, please.
23       Page 39, you may have seen this referenced in our papers,
24  Your Honor, is the Subsequent Events section.  I apologize.
25  If we could go just to the top of the section so the Court can

1  see the section of the financial statements.  Yeah.  Thank

2  you.

3      So, Section 15 is Subsequent Events.  And continued on to

4  the next page, it says, "Over the course of 2019 through the

5  report date, HCMFA issued promissory notes to the partnership

6  in the aggregate amount of $7.4 million."  And it notes the

7  interest rate.

8      So this notion of mutual mistake, it's contradicted by the

9  plain and unambiguous words of Highland's audited financial

10  statements.  And Mr. Sauter is going to confirm what the Court

11  probably already knows and that Mr. Waterhouse is responsible

12  for the oversight of the completion of the audit.

13      But it wasn't just Highland who disclosed the existence of

14  these notes.  HCMFA did it itself.

15      Can we go to Exhibit 6?

16      Now, Your Honor, Exhibit 6 was filed under seal.  We're

17  only going to put up the one piece of Exhibit 6 that relates

18  to the notes.  So on the screen now is the mirror image of the

19  Subsequent Events section, and this is -- Exhibit 6.  This is

20  HCMFA's notes.  Again, this audited financial statements, both

21  audited financial statements are audited by

22  PricewaterhouseCoopers at a time when Mr. Dondero is in

23  control of both entities, at a time when Mr. Waterhouse is

24  serving as both the chief financial officer of Highland as

25  well as the treasurer of HCMFA, and HCMFA's audited financial

1    statements also show the recording of these promissory notes.

2         HCMFA knew that the notes existed, and therefore could

3    have and should have began to investigate if they thought

4    those notes were mistakenly created.  But they did nothing.

5    There will never be any evidence to explain why HCMFA included

6    the notes in their audited financial statements and did

7    nothing.  There will never be an explanation for that.

8         There is so much more, Your Honor, that's set forth in our

9    papers.  I'll just summarize that Mr. Waterhouse, wearing both

10   hats, prepared dozens of monthly operating reports that he

11   filed with this Court in which these notes were included as an

12   asset of Highland's bankruptcy estate, that all creditors

13   relied upon those monthly operating reports.  The evidence is

14   going to be in the record now that Mr. Dondero was told

15   multiple times that HCMFA owed Highland over $10 million.  I

16   don't have to get into the details here, Your Honor, because

17   we know from the audited financial statements that the only

18   other obligations to Highland were the $5 plus million in

19   other notes.  The only way you get over $10 million is with

20   these notes.

21        Mr. Dondero -- there will never be any evidence that Mr.

22   Dondero said, hey, how come there's $10 million of notes

23   there?  I thought there was only five.  There will never be

24   any evidence that any of the officers of HCMFA said, hey, how

25   come we're reporting to the Retail Board that there's almost

1  $12 million in obligations to Highland?  I thought there was

2  only $5 million of notes.

3      They actually did that, Your Honor.  The Retail Board is a

4  critical piece of evidence here because, as Mr. Norris has

5  testified, it is the reason for the Advisors' existence.

6  These advisory agreements between the Advisors and the retail

7  funds are the reasons the Advisors exist.  And they're subject

8  to annual review.  And the Retail Board specifically asked the

9  Advisors, how much do you owe on notes?

10      And this has nothing to do with Highland employees at this

11  point.  The only people involved in this are HCMFA officers.

12  It's Lauren Thedford, who's the secretary of HCMFA, and it's

13  Frank Waterhouse, who's the treasurer of HCMFA.  And you've

14  got Mr. Norris who's copied on the email, and he's the

15  executive vice president.  And you've got Justin Post, who is

16  the chief compliance officer.  And they're all working --

17  they're Highland employees, including Klos and Kristin

18  Hendrix, frankly, who are copied on this stuff, but they say

19  nothing.  This is the Advisors' own officers who are relying

20  on HCMFA's own balance sheet to report to the Retail Board, in

21  response to their specific question, that these notes are

22  valid obligations.  And they're going to come to court to you

23  today and say they don't think they were signed properly?

24  Seriously?  It's not right.

25      There is no gotcha moment, Your Honor.  HCMFA has known

1   for years of the existence of these notes.  Mr. Rukavina may

2   be doing his investigation in October.  I don't know why it

3   wasn't done in May 2019.  I don't know why it wasn't done in

4   June 2019 when the audited financial statements are prepared.

5   I don't know why it's not done in October, November, December

6   of 2019, postpetition, when Mr. Dondero's entities are filing

7   documents with the Bankruptcy Court signed by Mr. Waterhouse

8   that say, these are valid notes.  Why aren't they

9   investigating?  They're not.  They're telling you and all of

10  the interested parties and all of the stakeholders these notes

11  are there.

12      It's not good faith, Your Honor.  It's bad faith.  And

13  what's worse, and we'll get to it in just a moment, is D.C.

14  Sauter.  Mr. Waterhouse told him exactly why the notes were

15  prepared.  He told it to him three different ways.  And he

16  didn't tell the Court that when he filed his first declaration

17  and he didn't tell the Court that when he filed his second

18  declaration.  Instead, what he actually told the Court is that

19  Frank Waterhouse knows little, if -- little, if anything,

20  about these notes.  And that's just not true.

21      So let's call Mr. Sauter, let's put his declaration into

22  evidence, and let's see what he has to say about what Mr.

23  Waterhouse actually told him that he never disclosed to the

24  Court.

25              THE COURT:  All right.  We'll go to the evidence now.

 1   And as I understand, HCMFA is resting on the declaration for

 2   the direct testimony.  So, Mr. Sauter, I need you to turn on

 3   your audio and video so I can swear you in and we'll allow

 4   cross-examination.  Could you say, "Testing, one, two,"

 5   please?

 6           MR. SAUTER:  Testing, one, two.

 7           THE COURT:  All right.  Are others picking up the

 8   video?  I don't see it yet, but my device is slower.

 9           MR. RUKAVINA:  Yes, Your Honor.  I see Mr. Sauter.

10           THE COURT:  Okay.  All right.  Could you say

11   "Testing, one, two" one more time, Mr. Sauter?

12           MR. SAUTER:  Testing, one, two.

13           THE COURT:  All right.  Please raise your right hand.

14   Do you solemnly swear or affirm that the declaration as well

15   as the testimony you give today was and will be the truth, the

16   whole truth, and nothing but the truth, so help you God?  If

17   so, say, "I do."

18           THE WITNESS:  I do.

19           THE COURT:  All right.  Thank you.  Mr. Morris, you

20   may proceed.

21                         CROSS-EXAMINATION

22   BY MR. MORRIS:

23   Q   Good morning, Mr. Sauter.  Can you hear me okay?

24   A   Yes, sir.

25   Q   Okay.  You're an attorney admitted to practice law in the

1  State of Texas, correct?

2  A    Yes, sir.

3  Q    And you've held your license for about 20 years; is that

4  right?

5  A    Yes, sir.

6  Q    And from 2014 through February 2020, you were affiliated

7  with the law firm of Wick Phillips, correct?

8  A    Yes, sir.

9  Q    And while at Wick Phillips, you provided legal services to

10  NexPoint Advisors and its wholly-owned subsidiaries, correct?

11  A    Yes, sir.

12  Q    And in February 2020, you left Wick Phillips to become

13  NexPoint's general counsel of real estate, correct?

14  A    Not exactly.  I was hired at NexPoint.  I didn't become

15  general counsel until some point in 2021.  I think April,

16  probably.

17  Q    Okay.  I apologize.  But I -- this is difficulty, but I

18  appreciate the clarification, but my question was you became

19  the general counsel of real estate when you first joined

20  NexPoint; is that right?

21  A    That's correct.

22  Q    Okay.  And it wasn't until April or May 2021 that you were

23  promoted to general counsel at NexPoint, correct?

24  A    I was appointed general counsel in April or May, yes.

25  Q    Okay.  And you hold that position today, correct?

1    A    That's correct.

2    Q    And you submitted a declaration in support of Highland

3    Capital Management Fund Advisors' motion for leave to amend

4    their answer in this matter, correct?

5    A    Yes, sir.

6    Q    Okay.

7              MR. MORRIS:  Can we put on the screen Docket #83,

8    which is Exhibit 1, Mr. Sauter's declaration?

9    BY MR. MORRIS:

10   Q    If you'll recall, Mr. Sauter, when we did this in your

11   declaration, if at any time there's anything you need to see

12   in the document, will you let me know that?

13   A    I will.

14   Q    Okay.  And do you understand that this is the declaration

15   that you filed at the end of November in support of HCMFA's

16   motion for leave to amend its answer?

17   A    If that's what you say.  I would need to see the date, but

18   --

19   Q    Okay.

20   A    -- I'll take your --

21   Q    Can you see up top?

22   A    Yes.  Yes, sir.  That looks accurate.

23   Q    Okay.  Who wrote this document?

24             MR. RUKAVINA:  Objection, Your Honor.  It's attorney-

25   client privilege.

1           THE COURT:  Attorney-client privilege?

2   BY MR. MORRIS:

3   Q   Did you write this document, sir?

4           THE COURT:  Okay.  You can rephrase the question, Mr.

5   Morris.

6   BY MR. MORRIS:

7   Q   Did you write this document, sir?

8   A   I worked with my attorneys in drafting the document.

9   Q   Can you tell me which portions you wrote?

10  A   I can't recall exactly which portions I wrote.

11  Q   Can you recall any aspect of this document that reflects

12  your personal edits?

13  A   I did review and edit the document.  I don't recall

14  exactly which portion.

15  Q   Okay.  Did you receive a draft of the document in the

16  first instance?

17  A   Yes, I believe I did.

18  Q   And how many -- how many drafts of this document were

19  created before you signed your name to it?

20  A   I don't know.

21  Q   Was it more than two?

22  A   I don't recall.  I would think it's probably one.

23  Q   Okay.

24  A   After my review.

25  Q   Okay.  So you got the document, you provided some

1   comments, and then you have the final version.  Do I have that

2   right?  To the best of your recollection?

3   A    That's my recollection.  Yes, sir.

4   Q    Okay.  Can you identify any issue on which you provided

5   substantive comments to your declaration?

6   A    I don't recall what those substantive comments were at

7   this time.

8   Q    Okay.  In Paragraph 2 --

9        MR. MORRIS:  If we can go down to Paragraph 2.

10  BY MR. MORRIS:

11  Q    Do you see it says, "I am in-house counsel for both HCMFA

12  and NexPoint, and have been since at least January 1, 2001

13  [sic].  Do you see that?

14  A    Yes, sir.

15  Q    Have I read that accurately?

16  A    Yes, sir.

17  Q    That's not really a true statement, is it?

18  A    I -- I wouldn't have said it if I didn't agree with it.

19  Q    You're not the general counsel of HCMFA, are you?

20  A    I am not the general counsel of HCMFA.

21  Q    In fact, you don't have any official role with HCMFA;

22  isn't that correct?

23  A    I do not have any title with HCMFA.

24  Q    You're not an employee of HCMFA, correct?

25  A    That is correct.

1    Q    And you never have been, right?

2    A    That is correct.

3    Q    You're not an officer of HCMFA, correct?

4    A    That is correct.

5    Q    And you never have been; isn't that right?

6    A    That is correct.

7    Q    You're not compensated by HCMFA, correct?

8    A    That is correct.

9    Q    And you never have been; isn't that right?

10   A    Yes, sir.

11   Q    Instead, you just perform work for HCMFA from time to

12   time, as requested.  Isn't that right?

13   A    That is correct.

14   Q    And that's because HCMFA is affiliated with Mr. Dondero,

15   correct?

16   A    I suppose that's part of the reason.

17   Q    Even though you're not employed -- withdrawn.  Even though

18   you're employed by NexPoint, you perform legal services for

19   other entities affiliated with Mr. Dondero whenever called

20   upon, even though you have no formal role.  Correct?

21   A    That's correct.

22   Q    And that's all you're doing here, correct?

23   A    That's correct.

24   Q    And you admit that for all intents and purposes Mr.

25   Dondero is the controlling person at both NexPoint and HCMFA,

1  correct?

2  A    That's correct.

3  Q    You're aware that about a year ago Highland commenced an

4  action against HCMFA to recover under two promissory notes

5  bearing Mr. Waterhouse's signature?

6  A    That's correct.

7  Q    Okay.  You have no personal knowledge about the origin of

8  those promissory notes, correct?

9  A    I do not.

10 Q    You have no personal -- you had no personal involvement in

11 the TerreStar matters referred to in your declarations,

12 correct?

13 A    I did not.

14 Q    And that's because you were working at Wick Phillips at

15 the time, right?

16 A    That's correct.

17 Q    And even though you had no formal affiliation with HCMFA

18 and no knowledge about any of the facts, you were asked to

19 investigate the origin of the notes that are the subject of

20 the lawsuits, correct?

21 A    That's correct.

22 Q    Who asked you to do that?

23 A    Outside counsel asked me to do an investigation and figure

24 out where the notes came from and what they were for.

25 Q    Is there any particular reason that you know of that

1    outside counsel didn't make those inquiries?

2            MR. RUKAVINA:  Your Honor, I object to the extent

3    that calls for the attorney-client privilege.  I don't know if

4    Mr. Sauter can answer that without invading the privilege.

5            THE COURT:  Mr. Sauter, no communications revealed

6    between you and your lawyer.  If you can answer without doing

7    that.

8            THE WITNESS:  I don't know.

9    BY MR. MORRIS:

10   Q    Okay.  After completing your investigation, you submitted

11   a declaration in support of HCMFA's first motion for leave to

12   amend, correct?

13   A    Yes, sir.

14   Q    Okay.  And your second declaration that you submitted in

15   support of this motion contains a fair portion of what was in

16   the first declaration; do I have that right?

17   A    I believe so.

18   Q    Okay.  Let's look at your first declaration, if we could.

19           MR. MORRIS:  It's -- yeah, there you go.  Exhibit 15.

20   And so if we could scroll down a little bit, perhaps, to the

21   date.

22   BY MR. MORRIS:

23   Q    Oh, actually, you can see at the top.  Do you see it's

24   from May 2021?

25   A    Yes, sir.

1  Q    Okay.  And is that around the time that you signed your

2  declaration?

3  A    I believe so.

4  Q    And your declaration set forth the factual basis for

5  HCMFA's motion for leave to amend its answer, correct?

6  A    Yes, sir.

7  Q    And your declaration describes two phases of your

8  investigation, correct?

9  A    I don't recall.

10 Q    Well, the first phase took place between the time the

11 complaint was filed and March 1, 2021, when HCMFA filed its

12 first original answer, right?

13 A    That's correct.

14 Q    Okay.  And during that first phase, you spoke with Mr.

15 Dondero, correct?

16 A    Yes.

17 Q    And Mr. Dondero told you that he couldn't recall the

18 genesis of the notes, correct?

19 A    That's my recollection.  Yes, sir.

20 Q    But he didn't say anything to you that caused you to

21 believe he was unaware of the notes, right?

22 A    Not that I recall.

23 Q    In fact, when you spoke to him, Mr. Dondero had high-level

24 details concerning the notes.  Isn't that right?

25 A    I mean, I think he generally knew what the notes were

1   about, yes.

2   Q    And so it's not like he -- it's not like he told you he

3   never heard of the notes?  He knew what they were about,

4   right?

5   A    He was aware of the notes.

6   Q    Okay.  And he suggested that you speak with Mr.

7   Waterhouse.  Do I have that correct?

8   A    That's correct.

9   Q    And you did that as part of the second phase of your

10  investigation, correct?

11  A    Yes, sir.

12  Q    We'll get to that shortly.  But your declaration --

13         MR. MORRIS:  If we can go to Paragraph 13, please.

14  Okay.

15  BY MR. MORRIS:

16  Q    The second sentence of Paragraph 13 says, "I had no

17  knowledge of them since I had not been employed by HCMFA, and

18  the few employees of HCMFA had no knowledge of the notes."

19  Have I read that correctly?

20  A    Yes, sir.

21  Q    And the people that you're referring to there specifically

22  are Dustin Norris and Jason Post, right?

23  A    They actually were not employees of HCMFA.  It would have

24  been Joe Sowin.  Joe was not aware of the notes.  And I can't

25  recall whether I spoke with any other HCMFA employees, but I

1    did speak with Mr. Norris and Mr. Post about the notes as

2    well.

3    Q    Okay.  And when you used the phrase the employees at that

4    time you were referring to Norris and Post, correct?

5    A    I'm sorry.  Can you restate that question?

6    Q    Well, you knew Mr. Norris was a vice president of HCMFA;

7    isn't that right?

8    A    I believe he was, yes.

9    Q    Yeah.  And until he recently left, Mr. Post, to the best

10   of your knowledge, was the chief compliance officer for both

11   NexPoint and HCMFA, correct?

12   A    Yes, sir.

13   Q    Okay.  And those two gentlemen told you at that time

14   during Phase I that they didn't know the origin of the notes,

15   correct?

16   A    That's correct.

17   Q    So, because everybody associated with HCMFA at that time

18   told you you were -- they were unaware of the notes, HCMFA

19   served and filed an answer to the complaint that contained no

20   affirmative defenses; isn't that right?

21   A    I don't recall what the -- the answer said, but if you say

22   there were no affirmative defenses, I'll take your word for

23   it.

24   Q    Okay.  I don't want you to take my word for it.  Let's

25   take your word for it.

1           MR. MORRIS:  Can we go to Paragraph 18, please?

2    BY MR. MORRIS:

3    Q    Do you see you wrote in your declaration, or somebody

4    wrote in your declaration, "That original answer did not

5    contain any affirmative defenses because, as explained above,

6    no one at HCMFA knew any of the facts that might give rise to

7    an affirmative defense."

8         That's what you wrote, right?

9    A    Okay.  Yes, you are correct.  There were no affirmative

10   defenses asserted in our answer.

11   Q    All right.  And all of that changed in mid-April 2001

12   [sic]; isn't that right?

13   A    Yes, sir.

14   Q    And that's because Mr. Waterhouse and other former

15   employees of Highland had migrated over to Skyview so you had

16   access to them, correct?

17   A    That's correct.

18   Q    So Mr. Seery's instructions about not speaking to

19   Highland's employees in ways that were inimical to Highland's

20   interests and the Court's TRO were no longer impediments to

21   your ability to speak with Mr. Waterhouse, correct?

22   A    Yes and no.  But for the most part, I would agree with

23   that.

24   Q    You could ask them anything in the world you wanted at

25   that time.  Is that fair?

Sauter - Cross                              44

1   A   That's not entirely fair.

2   Q   Yeah.  Is there anything about the notes that you thought

3   you couldn't ask them?

4   A   Um, I suppose not.  I guess the better question is whether

5   they would be willing to answer.

6   Q   I -- okay.  Is there any question that Mr. Waterhouse ever

7   refused to answer?

8   A   I think he's referred me to his outside counsel when I've

9   asked him questions from time to time.

10  Q   Okay.  But that never occurred during the period when you

11  were doing your investigation, correct?

12  A   I think there may have been some hesitancy from Mr.

13  Waterhouse early on, and I think once he showed that hesitancy

14  -- I try to be respectful of his concerns.

15          MR. MORRIS:  Your Honor, I apologize for this, but my

16  transcript is in another room.  Can we just -- can you just

17  give me thirty seconds, please?

18          THE COURT:  Certainly.  Do you literally need thirty

19  seconds, or do we need to take a five-minute break?

20          MR. MORRIS:  Hopefully less than thirty.

21     (Pause.)

22          MR. MORRIS:  Okay.  Can you scroll down to Paragraph

23  19, please?  Okay.

24  BY MR. MORRIS:

25  Q   So, the last sentence of Paragraph 19, you wrote, "Thus,

Sauter - Cross                        45

1  as of March 2021, I was able to communicate with most former

2  Debtor employees and to access the books and records of

3  Highland -- of HCMFA without fear of violating any court

4  order."

5      Have I read that correctly?

6  A   Yes, sir.

7  Q   And there's nothing in your declaration -- there's nothing

8  in either declaration that suggests you were impeded in any

9  way in speaking to Mr. Waterhouse during your investigation in

10 the spring.  Correct?

11 A   I would say that I wasn't impeded by the court order.

12 That's correct.  And, yes, I -- I don't recall anything

13 specific in either declaration that mentions any impediment to

14 my discussions with Mr. Waterhouse.

15 Q   There's nothing general in either of your declarations

16 either; isn't that correct?

17 A   Yes, sir.  I don't think there is.

18 Q   Okay.  So you didn't think that it was important to tell

19 the Court that there was anything that you were unable to

20 learn from Mr. Waterhouse, correct?

21 A   That's fair.

22 Q   Okay.  And so, with access to Mr. Waterhouse and the other

23 employees and HCMFA's books and records, you conducted the

24 second phase of your investigation, correct?

25 A   Yes, sir.

1  Q    And during the second phase, you reviewed certain

2  documents relating to the TerreStar NAV error, correct?

3  A    Eventually, yes.

4  Q    And specifically, you reviewed three to five documents

5  that included a memo that was submitted to the board of the

6  retail fund as well as maybe some communications with the SEC,

7  correct?

8  A    Yes, sir.

9  Q    And those are the only documents that you were directed to

10 review, correct?

11 A    That's correct.

12 Q    And none of those documents stated that Highland was

13 responsible for the NAV error, correct?

14 A    That's correct.

15 Q    During the two-phased investigation that you conducted,

16 you never saw a document that stated that Highland Capital

17 Management, LP was responsible for the TerreStar NAV error,

18 correct?

19         MR. RUKAVINA:  Your Honor, I'll object.  This is

20 irrelevant.  The only relevance to this motion today is any

21 alleged delay in us asserting the defense that Mr. Waterhouse

22 did not sign the notes.  Counsel here is trying to try the

23 underlying merits, which we are not here to do today.  It's

24 inappropriate.  And frankly, it's trial by ambush.  The only

25 issue that Mr. Sauter is presenting evidence on today is that

1   in April or May Mr. Waterhouse told him that he signed the

2   notes.  That should be the only topic of legitimate

3   questioning.

4              THE COURT:  I overrule.

5              MR. MORRIS:  If I may, Your Honor?

6              THE COURT:  I overrule.

7              MR. MORRIS:  Oh.  Okay.

8   BY MR. MORRIS:

9   Q    So, my question, Mr. Sauter, is that during your two-

10  phased investigation you never saw any document that stated

11  that HCMLP was responsible for the TerreStar NAV error,

12  correct?

13  A    That's correct.  I never saw a document signed by HCMLP

14  that said, we are responsible.

15  Q    And so, notwithstanding your review of the first

16  declaration, you didn't tell the Court that there were no

17  documents that corroborated your conclusion that the payment

18  was supposed to be made on account of Highland's culpability

19  in connection with the NAV error, correct?

20             MR. RUKAVINA:  Your Honor, objection.  That's --

21  that's argumentative and that's not a fair question.  Why

22  would he tell the Court something like that?  It's an

23  argumentative question, not a question of fact.

24             THE COURT:  Mr. Morris?

25             MR. MORRIS:  Your Honor?

1              THE COURT:  Go ahead.  Response?

2              MR. MORRIS:  Yeah.  I would say that -- I would say

3    that we have a declaration on the screen, most of which is

4    mimicked in the current declaration on this motion, that

5    discusses in detail his investigation, his review of

6    documents, and his conclusion that the notes were -- were

7    prepared by mistake because the transfer of funds was supposed

8    to be made for the purpose of compensating HCMFA for

9    Highland's error.  This goes to everything from futility to

10   credibility.

11             THE COURT:  Okay.  I overrule the objection.

12   BY MR. MORRIS:

13   Q    You never disclosed to the Court that there were no

14   documents that supported your conclusion that the notes were

15   prepared by mistake because the payments were supposed to be a

16   form of compensation, correct?

17   A    I don't agree with that statement.

18   Q    Can you show me where in your declaration there's a

19   reference to any documents that support your conclusion that

20   the payment was intended to be compensation and not a loan?

21   A    Say that again, please.

22   Q    We can scroll through your declaration -- withdrawn.  Let

23   me start over, Mr. Sauter.  The question is whether you ever

24   told the Court that your investigation didn't uncover any

25   documentary -- any document -- withdrawn.  The question is

Sauter - Cross                              49

1    whether, during -- you ever disclosed to the Court whether

2    there was ever any documentary evidence that corroborated your

3    conclusion that the payment was intended as compensation and

4    not a loan.

5    A    I'm sorry, I'm having trouble because I think you're

6    asking me to affirmatively state a negative.  And if I can

7    expand, I'll tell you why I'm having trouble.  If you don't

8    want me to expand, then I won't.

9    Q    I appreciate that, Mr. Sauter, and I don't want you to

10   expand.  The only question is whether you need to review more

11   of your declaration than is on the screen.  The only question

12   is whether you ever told the Court that there were no

13   documents that corroborated your conclusion.

14   A    You're asking me to tell you whether there's anything in

15   my declaration that says there's no evidence to support my

16   conclusion, and I'm telling you I would not say that.

17   Q    Okay.  And that's not my question, so I'm sure that it's

18   my fault, Mr. Sauter, and I apologize.

19        Are you aware of anything in your declaration that

20   discloses to the Court that there is no document, that you

21   uncovered no document that stated that Highland Capital

22   Management was responsible for the TerreStar NAV error?

23   A    The only way I can answer it is -- is to answer the

24   question you asked me before, which is I am not aware of any

25   document where HCMLP said, I am responsible for the NAV error.

1  Q   Okay.  I appreciate that.  And in fact, that was true

2  during the investigation and it's true today, eight months

3  later, correct?

4  A   Correct.

5  Q   Okay.  During the second phase of your investigation, you

6  spoke with Mr. Waterhouse, right?

7  A   Yes, sir.

8  Q   And you knew that Mr. Waterhouse was the chief financial

9  officer or the treasurer of HCMFA, correct?

10  A   Yes, sir.

11  Q   And you spoke with a gentleman named Will Mabry.  Do I

12  have that right?

13  A   Yes, sir.

14  Q   And you spoke again with Mr. Norris and Mr. Post.

15  Correct?

16  A   Yes, sir.

17  Q   And based on those discussions and your review of the

18  three to five documents, you concluded "The notes were signed

19  by Mr. Waterhouse" -- withdrawn.

20         MR. MORRIS:  Can we go to Paragraph 22?

21  BY MR. MORRIS:

22  Q   You concluded that "The notes were signed by mistake by

23  Waterhouse and without authority from HCMFA."  That was your

24  conclusion based on your investigation, correct?

25  A   That's correct.

1              MR. MORRIS:  And if we can go to Paragraph 30.

2    BY MR. MORRIS:

3    Q    You also wrote in your declaration, towards the bottom,

4    "It therefore appears that Waterhouse prepared the notes for

5    some internal accounting or other purpose."

6         Did I read that correctly?

7    A    Yes, sir.

8    Q    And that was also part of the conclusions that you reached

9    after conducting this investigation, right?

10   A    Yes, sir.

11   Q    And you interviewed Mr. Waterhouse three times, correct?

12   A    I spoke with him three times, yes.

13   Q    And two of those interviews were face-to-face and one was

14   on the phone, correct?

15   A    Yes, sir.

16   Q    And nobody else participated in those discussions,

17   correct?

18   A    Correct.

19   Q    And you don't recall taking any notes of those interviews,

20   correct?

21   A    I don't.

22   Q    And you don't recall sending any emails summarizing your

23   discussions with Mr. Waterhouse, correct?

24   A    I would not have sent those to Mr. Waterhouse.  I may have

25   sent something to my counsel.

Sauter - Cross                          52

1    Q    Okay.

2    A    But I don't recall them.

3    Q    You don't recall taking -- you don't recall sending any

4    emails to anybody summarizing your discussions with Mr.

5    Waterhouse, correct?

6    A    I don't.

7    Q    Okay.  You don't recall actually showing the promissory

8    notes to Mr. Waterhouse, do you?

9    A    I don't recall.  You're correct.

10   Q    Okay.  But you had the notes with you at the time, right?

11   A    I don't know if I had the notes with me at the time.  I

12   may have.

13   Q    You certainly had access to them; is that fair?

14   A    That's fair.

15   Q    Nothing prevented you from showing the notes to Mr.

16   Waterhouse, right?

17   A    No, sir.

18   Q    You never asked Mr. Waterhouse to confirm his signature on

19   the notes, right?

20   A    I never presented him with the notes and asked him to

21   confirm that those signatures were his.

22   Q    Okay.  But if you had, he may have told you right then and

23   there that that was his electronic signature, correct?

24            MR. RUKAVINA:  Objection.

25            THE WITNESS:  I actually --

1          MR. RUKAVINA:  Objection, Your Honor.  Speculation.

2          THE COURT:  Overruled.

3          THE WITNESS:  I actually asked him whether he signed

4    them and whether they were electronic signatures, and he

5    indicated that he would not have used an electronic signature

6    at that time, so if they were signed they were his signature.

7    BY MR. MORRIS:

8    Q    But you didn't show him the notes to let him make the

9    determination as to whether or not the signature was his ink

10   signature or whether it was an electronic signature?  He

11   didn't have that opportunity, correct?

12   A    I don't recall doing that.

13   Q    Okay.  And there's no -- but there's no reason you

14   couldn't have done that back in April or May, correct?

15   A    I suppose you're correct, yes.

16   Q    Okay.

17          MR. MORRIS:  Can we flip to the first declaration and

18   go to Paragraph 23?

19   BY MR. MORRIS:

20   Q    Okay.  So, in the middle of this Paragraph 23, it says --

21   it's referring to Mr. Waterhouse.  Do you see that?

22   A    Yes, sir.

23   Q    And you write, "Although he did not remember many, if any,

24   of the facts concerning -- of the facts and circumstances

25   concerning the HCMFA notes," -- do you see that there?

1    A    Yes, sir.

2    Q    That's not accurate, is it?

3    A    It's -- it's accurate.

4    Q    Mr. Waterhouse remembered a lot about the notes, didn't

5    he?

6    A    I suppose that's your opinion.  He didn't have a good

7    recollection of the notes and seemed to be guessing at what

8    had happened and why they were executed.

9    Q    All right.  Let's spend some time looking at what Mr.

10   Waterhouse told you.  Even though you did not show him the

11   promissory notes that are at issue, Mr. Waterhouse made it

12   perfectly clear to you that he was fully familiar with the

13   notes, correct?

14   A    Actually, in the previous sentence, it says the signatures

15   on the notes looked like they were his, so that would indicate

16   that I did show him copies of the notes and he indicated that

17   those were his signatures.

18   Q    That's what it says in this declaration.  That's not what

19   it said in your first declaration, correct?

20   A    I think --

21         MR. RUKAVINA:  That's argumentative.  That's a false

22   logical argument, and it's argument.  It's not a question.  He

23   can -- he can make these arguments in his closing.  Why would

24   Mr. Sauter in his first declaration go through every single

25   thing that he did or didn't do?

1          MR. MORRIS:  Your Honor, I'll just ask him --

2          THE COURT:  Response?

3          MR. MORRIS:  I'll just ask him the -- yeah.  I'll

4    just ask him the question again.

5    BY MR. MORRIS:

6    Q    At the time of your deposition, you had no recollection of

7    ever showing the promissory notes to Mr. Waterhouse, correct?

8    A    I -- it's correct that I don't recall whether I showed him

9    the notes.

10   Q    Okay.  That's all I needed.  Who wrote this declaration?

11   Did you write this declaration?

12   A    Isn't -- isn't this the first declaration?

13   Q    No.  This is the second one.  Who wrote the second

14   declaration?

15   A    It would have been the same process.

16   Q    Where it was presented to you in the initial draft?

17   A    Yes, sir.

18   Q    And how many -- how many drafts do you recall this one

19   going through?  One or more than one?

20   A    One, maybe two.  I don't recall exactly.

21   Q    Can you recall any substantive point in your declaration

22   that you provided a comment on?

23   A    I -- I did provide substantive comments.  I don't recall

24   exactly what they were.

25   Q    Can you identify one?

1  A    I really -- I don't recall.

2  Q    Okay.  So even though you did not -- you have no

3  recollection of showing the promissory notes to Mr.

4  Waterhouse, Mr. Waterhouse made it perfectly clear to you that

5  he was fully aware of the notes, correct?

6           MR. RUKAVINA:  Objection, Your Honor.  That assumes

7  facts not in evidence.

8           THE COURT:  Overruled.

9           THE WITNESS:  Would you repeat the question, Mr.

10  Morris?

11  BY MR. MORRIS:

12  Q    Even though you did not show Mr. -- withdrawn.  Even

13  though you have no recollection of showing Mr. Waterhouse the

14  notes, he made it clear to you that he knew exactly what you

15  were talking about when you referred to the notes, correct?

16  A    Yes, sir.

17  Q    The notes were not a surprise to him, right?

18  A    No, sir.

19  Q    Mr. Waterhouse never told you that he was unaware of the

20  existence of the notes, correct?

21  A    No, sir.

22  Q    You knew when you signed both of your declarations that

23  Mr. Waterhouse was HCMFA's CEO and/or treasurer at the time

24  his signature was put on the notes, correct?

25  A    Yes, sir.

1   Q    Now, notwithstanding your conclusions in your first

2   declaration, Mr. Waterhouse never admitted to signing the

3   notes by mistake, correct?

4   A    Meaning he never said that he signed the notes by mistake?

5   Q    Correct.  He never told you that, right?

6   A    Correct.

7   Q    And that's why there's no reference in either of your

8   declarations to Mr. Waterhouse admitting that he signed the

9   notes by mistake, correct?

10  A    That's right.

11  Q    There's nothing in either of your declarations that

12  suggests Mr. Waterhouse didn't sign or authorize the signing

13  of his signature on the notes, correct?

14  A    I don't think that that's accurate.

15  Q    Mr. Waterhouse did not ever tell you that he's sure he

16  didn't authorize the signing of the notes on his behalf,

17  correct?

18  A    He did not.

19  Q    And the declaration never says that Mr. Waterhouse

20  admitted to having his signature affixed without authority,

21  correct?

22  A    He never said that to me.

23  Q    Now, you specifically asked Mr. Waterhouse, who approved

24  the notes and what was the process?  Correct?

25  A    I did.

Sauter - Cross                                58

1    Q    And this is something that you asked him way back in April

2    or May, right?

3    A    That's correct.

4    Q    And Mr. Waterhouse was very clear to you back in April or

5    May that he couldn't describe the process.  Correct?

6    A    That's correct.  Correct.

7    Q    But he also told you, "The money was transferred, so we

8    signed the notes."  Correct?

9    A    I don't -- I don't know if those were his exact words, but

10   yes, conceptually, that was his statement.

11   Q    And that's how you personally recall his statement,

12   correct?

13   A    Yes.  I personally recall that he said if the money was

14   transferred there had to be a note to document the transfer of

15   funds.

16   Q    You didn't put that in your declaration, correct?

17   A    I -- I don't know that I did, but I don't know that I

18   didn't.  I don't have my declaration committed to memory.

19   Q    I'm sure if it's in there Mr. Rukavina will point it out.

20        So you knew back before HCMFA first sought leave to amend

21   its complaint that Mr. Waterhouse couldn't describe the

22   process by which the notes were created, correct?

23   A    That's correct.

24   Q    And even though you had no personal knowledge of the

25   circumstances surrounding the creation of the notes, you're

Sauter - Cross                                59

1   the only person in the world that you know of that told Mr.

2   Waterhouse he made a mistake in signing the notes.  Correct?

3   A    I'm sorry.  Say that again?

4   Q    Even though you have no personal knowledge of any of the

5   facts or circumstances surrounding the creation of the notes,

6   you told Mr. Waterhouse that he made a mistake when his

7   signature was put on them.  Correct?

8   A    I -- I don't think I ever said to Mr. Waterhouse, you made

9   a mistake.  I certainly asked him that question.

10  Q    Well, you recall during your investigation you told Mr.

11  Waterhouse that he made a mistake, correct?

12  A    I -- I asked him whether he made a mistake and whether it

13  had gone through legal and ethical (garbled) analysis.

14         MR. MORRIS:  Can we call up Mr. Sauter's deposition

15  transcript?  I'm sorry, La Asia, I forget what the deposition

16  -- what the exhibit number is.  And go to Page 57.  I'm sorry.

17  Page 56 at the bottom.

18  BY MR. MORRIS:

19  Q    Mr. Sauter, were you asked these questions and did you

20  give these answers, starting on Page 56, Line 24:

21         "Q    Okay.   But did you tell him that he made a

22         mistake?

23         "A    I think I implied it.

24         "Q    Do you have a recollection of actually telling

25         him that he made a mistake?

Sauter - Cross                          60

1        "A    That would be my recollection.    Obviously,  he

2        disagrees with me."

3        Were you asked those questions and did you give those

4   answers in your deposition?

5   A    Yes, sir.

6   Q    Okay.  And you concluded that Mr. Waterhouse made a

7   mistake, even though you have no personal knowledge of

8   anything that happened in connection with the TerreStar

9   valuation issue.  Correct?

10  A    That's correct.

11  Q    And you concluded that Mr. Waterhouse made a mistake, even

12  though you were not involved in any of the decisions that were

13  made in connection with the TerreStar valuation issue,

14  correct?

15  A    I was not involved in the decisions.  That's -- that's

16  correct.

17  Q    And you concluded that Mr. Waterhouse made a mistake even

18  though you weren't involved and had no responsibility for

19  formulating HCMFA's response to the SEC, correct?

20  A    That's correct.

21  Q    And you concluded that Mr. Waterhouse made a mistake even

22  though you had no responsibility or involvement in the

23  decision as to how HCMFA was going to fund the NAV losses,

24  correct?

25  A    That's correct.

1  Q    And you concluded that Mr. Waterhouse made a mistake even

2  though you had no responsibility or involvement in formulating

3  HCMFA's report to GAF, the fund, the Global Allocation Fund.

4  Correct?

5  A    That's correct.

6  Q    And, again, despite not having any of that personal

7  knowledge, you told Mr. Waterhouse or you implied that he made

8  a mistake in executing the notes, correct?

9  A    That's correct.

10 Q    And Mr. Waterhouse obviously disagreed with you.  Correct?

11 A    That's correct.

12 Q    But you didn't inform the Court last spring that you

13 interviewed Mr. Waterhouse, the treasurer of HCMFA, the person

14 whose signature appears on the notes, you didn't tell the

15 Court that Mr. Waterhouse disagreed with your conclusion,

16 correct?

17 A    That was -- that would have been supposition on my part,

18 but no, I did not.

19 Q    What would be supposition?

20 A    Stating that Mr. Waterhouse disagrees with my conclusions.

21 Q    He obviously disagreed with your conclusions, correct?

22 Those are your words, correct?

23 A    I believe he disagreed with my conclusions, yes.

24 Q    But you didn't tell the Court that back in the spring, did

25 you?

1  A    No, sir, I did not.

2  Q    And Mr. Waterhouse didn't just disagree with you, did he?

3  A    I'm sorry?

4  Q    Mr. Waterhouse didn't just disagree with the notion that a

5  mistake was made, correct?  He actually told you exactly why

6  the notes were created.  Isn't that right?

7  A    I -- I don't agree with that.

8  Q    During these private interviews that you had with Mr.

9  Waterhouse, Mr. Waterhouse told you exactly why he believed

10  the notes were created, correct?

11  A    He told me why he believed the notes were created, yes.

12  Q    And so he did, in fact, remember the facts and

13  circumstances concerning the notes, correct?

14  A    I would stand by my earlier comment that he told me why he

15  believed the notes were signed.  I don't know that his memory

16  of the events is crystal clear.

17  Q    But it certainly was his belief, right?

18  A    Yes, sir.  I would agree with that.

19  Q    And he's the person whose signature appears on the notes,

20  correct?

21  A    Yes, sir.

22  Q    And he was the treasurer of HCMFA at the time the notes

23  were created, correct?

24  A    He was.

25  Q    Mr. Waterhouse specifically told you, "We transferred the

1    money so I executed the notes.  HCMFA didn't have the money to

2    pay GAF and so we transferred it from HCMLP and I executed the

3    notes."  That's what he told you, correct?

4    A    Something along those lines, yes.

5    Q    That's exactly what he told you, right?

6    A    I don't know that that's verbatim, but yes, that's my

7    recollection of what he said.

8    Q    And Mr. Waterhouse went even further in describing the

9    facts and circumstances concerning the notes, including an

10   explanation to you of why the notes were prepared.  Correct?

11   A    Could you expand on that?

12   Q    Sure.  Mr. Waterhouse specifically told you that the notes

13   were prepared for accounting purposes, right?

14   A    That was one of the reasons, yes.

15   Q    Uh-huh.  And he told you -- it's your specific

16   understanding that both HCMFA and Highland disclosed the

17   existence of the notes to their respective outside auditors

18   within thirty days of their execution, correct?

19   A    Yes, sir.

20   Q    In fact, it's your understanding that the notes were

21   prepared for the audit, correct?

22   A    I -- no, I don't know for certain that they were prepared

23   for the audit.  But I don't disagree that they were disclosed

24   to the auditors.

25          MR. MORRIS:  Can we go to Page 71, please?

1      Your Honor, there's an objection that Mr. Rukavina lodged

2   that I would ask the Court to rule on before I examine Mr.

3   Sauter once we put it up on the screen.  So, it's Page 71,

4   Lines 4 through 9.  Yes.

5           THE COURT:  Okay.  Overrule the objection.

6   BY MR. MORRIS:

7   Q   It's your understanding that the notes were prepared for

8   the audit, correct?

9   A    In reading my testimony, yes, I think that's -- that's

10  part of the reason that they were prepared.

11  Q   Okay.  And -- but you never told the Court that, right?

12  You never told the Court of your understanding as to the

13  purpose of the preparation of the notes?

14  A    I don't believe I mentioned the audit in my declaration.

15  No, sir.

16  Q   You didn't mention to the Court in either declaration that

17  it was your understanding that the notes were prepared for the

18  audit, correct?

19  A    I don't think I mentioned the audits in my declarations.

20  That's -- that's correct.

21  Q   Okay.  Now, the preparation of the audit, that is right in

22  Mr. Waterhouse's wheelhouse, correct?

23  A   Yes, sir.

24  Q   You know that Mr. Waterhouse is responsible for overseeing

25  the preparation of HCMFA's audited financial statements,

1    correct?

2    A    Yes, sir.

3    Q    And Mr. Waterhouse, the person responsible for the audit,

4    the person whose name appears on the notes, the person who was

5    the treasurer of HCMFA at the time, he specifically told you,

6    quote, if the money was transferred, he had to have a note to

7    go with it.  Correct?

8    A    Yes.  That's what he told me.

9    Q    And the money was transferred, correct?

10   A    That's my understanding.

11   Q    You don't -- you have no reason to believe -- in fact, Mr.

12   Rukavina, if you heard in his opening, acknowledged that the

13   money was transferred, correct?

14   A    Yeah.  I have no reason to deny that.

15   Q    But you did not inform the Court that the person whose

16   signature appears on the notes explained to you the purpose

17   and origin of them, correct?

18   A    I believe I did have some explanation for the purpose and

19   origin as it was conveyed to me by Mr. Waterhouse.

20   Q    Well, you told the Court in your declaration that's on

21   file right now that Mr. Waterhouse, "did not remember many, if

22   any, of the facts and circumstances concerning the HCMFA

23   notes."  Isn't that right?

24   A    I believe that's -- that's in my declaration.  Yes, sir.

25   Q    Okay.  And you signed that declaration and you filed it

1   with the Court, even though you knew that the notes were

2   prepared in connection with the audit, correct?

3   A    I believe that's one of the reasons the notes were

4   prepared.  Yes, sir.

5   Q    There are other statements in your declarations that Mr.

6   Waterhouse also specifically disagreed with, correct?

7   A    I don't know that I've ever spoken with Mr. Waterhouse

8   regarding my declaration.

9   Q    Okay.

10        MR. MORRIS:  If we can go back to the first

11  declaration, Paragraph 30.

12  BY MR. MORRIS:

13  Q    Okay.  Do you see the third point, towards the end of the

14  paragraph?  It says, "It therefore appears that Waterhouse

15  prepared the notes for some internal accounting or other

16  purpose."  Do you see that?

17  A    Yes, sir.

18  Q    And you raised that issue with Mr. Waterhouse, correct?

19  A    I'm sorry.  We discussed that the notes were prepared

20  because, as I said, the money was transferred and so Mr.

21  Waterhouse was of the opinion, if the money is transferred,

22  there had to be a note.

23  Q    Okay.  And then the second point that you make, --

24        MR. MORRIS:  If we could just go up a little bit.

25  BY MR. MORRIS:

1  Q    It says, "Second, it appears that Mr. Waterhouse assumed

2  incorrectly that the funds being paid by the Debtor were a

3  loan to HCMFA."  Did I read that part correctly?

4  A    You did.

5  Q    And you specifically raised that issue that I just raised

6  with Mr. Waterhouse.  Isn't that right?

7  A    I did.

8  Q    And Mr. Waterhouse would not agree that he made any

9  mistaken assumption, correct?

10  A    That's correct.

11  Q    Mr. Waterhouse refused to admit that he incorrectly

12  assumed that the funds being paid by the Debtor were a loan to

13  HCMFA.  Isn't that right?

14  A    I'm sorry, could you say that one more time?

15  Q    Mr. Waterhouse refused to admit that he made an incorrect

16  assumption concerning the funds being paid by the Debtor to

17  HCMFA.

18  A    Yes, sir.  That's correct.

19  Q    Okay.  And you didn't tell that to the Court in May

20  either, correct?

21  A    I did not.

22  Q    Let's talk about some things that you didn't cover during

23  your investigation that led you to conclude that Mr.

24  Waterhouse signed the notes by mistake and without authority.

25  You never asked Mr. Waterhouse how Highland treated the notes

1    on its books and records, correct?

2    A    That's correct.

3    Q    So when you concluded that the notes were signed based on

4    a mutual mistake, you were unaware that Highland carried the

5    notes at all times as assets on its balance sheet, correct?

6    A    That's correct.

7    Q    You never asked Mr. Waterhouse how HCMFA treated the notes

8    in its books and records, correct?

9    A    That's correct.

10   Q    So when you concluded that the notes were signed based on

11   a mutual mistake, you did not know that HCMFA carried those

12   notes at all times as liabilities on its balance sheet,

13   correct?

14   A    That's correct.

15   Q    We've talked about the audited financial statements, but

16   you never reviewed those as part of your investigation,

17   correct?

18   A    That's correct.

19   Q    So when you concluded that the notes were mistakenly

20   signed, you were unaware that HCMFA had disclosed the

21   existence of the notes in its own audited financial

22   statements, correct?

23   A    That's correct.

24   Q    But you know that now, right?

25   A    I do know that now.

1    Q    And you can't tell me whether HCMFA made yet another

2    mistake by including the notes in its audited financial

3    statements, correct?

4    A    I'm sorry.  You said yet another mistake?

5    Q    Yeah.  You can't tell me that the inclusion of the notes

6    in the audited financial statements was a mistake.  Isn't that

7    right?

8    A    That -- that's correct.  That's not a decision that I

9    make.

10   Q    And you would agree that your assertion that the notion

11   that the notes were signed by mistake is contradicted by

12   HCMFA's own audited financial statements, correct?

13   A    I would agree that -- that the notes are shown on the

14   audited financial statements without any qualification.

15   Q    All right.  Let's talk about some other things that -- now

16   that you did know last spring, in addition to the stuff we

17   talked about.  In your first declaration, --

18            MR. MORRIS:  If we could go to the first declaration,

19   Paragraph 27.

20   BY MR. MORRIS:

21   Q    You told the Court that HCMFA accepted responsibility for

22   the NAV error and paid approximately $5.2 million on February

23   15, 2019.  Correct?

24   A    Yes, sir.

25   Q    But the money used to pay the Global Allocation Fund

1  didn't come from Highland, did it?

2  A    I don't know that.

3  Q    Well, the money came from insurance proceeds and HCMFA's

4  funding of their deductible, correct?

5  A    I believe that that's what's indicated in the memo that

6  I've read.

7  Q    And you read that memo before you submitted your first

8  declaration; isn't that right?

9  A    Yes, sir.  I believe so.

10 Q    And that memo -- and we'll look at it in a moment -- that

11 memo specifically discloses HCMFA's receipt of approximately

12 $5 million of insurance proceeds in connection with the NAV

13 error, correct?

14 A    Yes, sir.

15 Q    But you didn't tell the Court that you had a document in

16 your possession that showed that HCMFA received $5 million in

17 connection with the NAV error, did you?

18 A    I did not.

19 Q    Instead, you speculated that Highland may have tapped into

20 its insurance.  Isn't that right?

21 A    Yeah, I -- the fact of the matter is I don't know much

22 about the settlement of the insurance claim.

23 Q    Well, but before signing your declaration, you reviewed a

24 document that specifically described how the NAV losses were

25 being financed by HCMFA; isn't that right?

1  A    I don't know that I would say financed, but yes, the NAV

2  losses were being paid by HCMFA to Global Allocation Fund.

3  Yes, sir.

4  Q    Okay.

5        MR. MORRIS:  Can we put up Exhibit 31?

6  BY MR. MORRIS:

7  Q    All right.  This is a memo from HCMFA to the board of the

8  Highland Global Allocation Fund dated May 28, 2019.  Do you

9  see that?

10  A    Yes, sir.

11  Q    And what's the memo entitled?

12  A    Resolution of the Fund's Net Asset Value Error.

13  Q    Okay.  And this is one of the three to five memos that you

14  reviewed before signing your first declaration, correct?

15  A    Yes, sir.

16  Q    And this memo -- in this memo, HCMFA is describing for the

17  board the resolution of the NAV error, correct?

18  A    Yes, sir.

19  Q    Okay.

20        MR. MORRIS:  Before we get to the insurance issue,

21  can we just scroll down to the second paragraph?  Okay.

22  BY MR. MORRIS:

23  Q    And let me know if I'm reading this correctly.  The second

24  paragraph of the memo that HCMFA sent to the board of the

25  Highland Global Allocation Fund says, "The Advisor and

1   Houlihan Lokey, an independent third-party expert valuation

2   consultant approved by the board, initially determined that

3   the March transactions were non-orderly and should be given

4   zero weighting for purposes of determining fair value.  As

5   reflected in the consultation, the Advisor ultimately

6   determined that both March transactions should be classified

7   as orderly.  The fair valuation methodology adopted, as

8   addressed in the consultation, weights inputs -- weights

9   inputs and does not reflect last sales transaction pricing

10  exclusively in determining fair value.  The orderly

11  determination and adoption of the weighted fair value

12  methodology -- fair value -- fair valuation methodology

13  resulted in NAV errors in the Fund."  And they define that as

14  the NAV error.

15       Have I read that correctly?

16  A   Yes, sir.

17  Q   Okay.  Highland Capital Management, LP is not mentioned in

18  that paragraph, correct?

19  A   No, sir.

20  Q   In fact, there is nothing anywhere in this memo that tells

21  the board that Highland is responsible for the NAV error.

22  Correct?

23  A   That's correct.

24  Q   But Houlihan Lokey is mentioned, correct?

25  A   Yes.  Because Houlihan is -- was retained or authorized to

1    be retained in connection with valuation services by the

2    board.

3    Q    Okay.  They're a third-party valuation firm, right?

4    A    That's correct.

5    Q    And they were approved by the board, as you just

6    mentioned, correct?

7    A    Yes, sir.

8    Q    And it's your understanding that Houlihan Lokey did the

9    valuation of TerreStar, correct?

10   A    I think Houlihan Lokey would have had input on TerreStar

11   valuation, but they would have done so in conjunction with the

12   valuation team at Highland.

13   Q    It's your understanding that Houlihan Lokey did the

14   valuation of TerreStar, correct?

15   A    No, sir.  I think Houlihan Lokey would have worked in

16   conjunction with the valuation team at Highland to prepare the

17   valuation.

18   Q    Okay.

19          MR. MORRIS:  Can we go to Page 87 of Mr. Sauter's

20   transcript, please?

21          THE COURT:  Mr. Morris, after you're through with

22   this subject matter, we're going to have to take a break.  How

23   much more do you have on this particular line of questioning?

24          MR. MORRIS:  I would -- just a moment.  And I don't

25   think I have more than ten minutes after that.  But I'm happy

1   to take a break, Your Honor.

2          THE COURT:  Okay.  Let's take a ten-minute break.

3   And I'll let you all know, I have a 1:30 matter, and it's

4   about ten after 12:00 now.  So we need to be thinking about --

5   when we come back, I need to know about how much more we need

6   collectively, okay?

7          MR. MORRIS:  Yes, Your Honor.

8          THE CLERK:  All rise.

9       (A recess ensued from 12:05 p.m. until 12:15 p.m.)

10         THE CLERK:  All rise.

11         THE COURT:  All right.  Please be seated.  All right.

12  We're back on the record in Highland.  Mr. Morris, you may

13  proceed with your questions of Mr. Sauter.  Mr. Sauter, you're

14  still under oath.

15         MR. MORRIS:  All right.  And in response to your

16  question, Your Honor, I don't think I'll have more than about

17  ten or twelve minutes.  And I don't expect to need more than

18  five or ten minutes in my closing.

19         THE COURT:  Okay.

20  BY MR. MORRIS:

21  Q   Mr. Sauter, if you could take a look, please, at Page 87,

22  Lines 2 through 9.  Were you asked these questions and did you

23  give these answers:

24      "Q   Okay.  Who's Houlihan Lokey?  Do you know who

25      Houlihan Lokey is?

1          "A    It's a third-party valuation firm.

2          "Q    Do they have a good reputation?

3          "A    Yes.

4          "Q    And did they do the valuation of TerreStar?

5          "A    That's my understanding.

6          Did you give those answers to those questions, sir?

7    A    Yes, sir.

8    Q    Okay.  And you don't know if anyone's ever suggested that

9    Houlihan Lokey was responsible for the valuation error,

10   correct?

11   A    I don't know whether anybody ever suggested that or not.

12   Q    And that's because -- and that's because you never asked.

13   Fair?

14   A    I suppose that's fair.

15   Q    Okay.

16          MR. MORRIS:  Now, if we could go back to Exhibit 31,

17   please, that second paragraph.

18   BY MR. MORRIS:

19   Q    You would agree with me that the second paragraph, to the

20   best of your knowledge -- withdrawn.  You would agree with me

21   that in the second paragraph HCMFA accurately defined NAV

22   error for the GAF board, correct?

23   A    Based upon my understanding of the NAV error, yes, I would

24   say that is correct.

25   Q    In fact, at the time of your deposition, you had no reason

Sauter - Cross                              76

1    to believe that HCMFA had inaccurately defined NAV error for

2    the GAF board, correct?

3    A    That's correct.

4    Q    But when you signed your first declaration, you didn't use

5    HCMFA's definition of NAV error, did you?

6    A    I don't recall.  I mean, if you could show me, I think

7    that would help me.

8    Q    Sure.

9          MR. MORRIS:  Can we put back the first declaration

10   and go to Paragraph 25?

11   BY MR. MORRIS:

12   Q    In Paragraph 25, you define NAV error as, "The Debtor made

13   a mistake in calculating the NAV."

14         Have I read that correctly?

15   A    You did.

16   Q    That's pretty different than the way HCMFA described the

17   NAV error in its memo to the GAF board, correct?

18   A    I think we're talking about two different things.  But

19   yes, I would agree that they are different --

20   Q    And you knew --

21   A    -- definitions.

22   Q    And you knew when you signed this declaration that HCMFA

23   had defined NAV error in the manner set forth in its

24   memorandum to the GAF board, correct?

25   A    I suppose so.  But, again, I think we're talking about two

1    different things.

2    Q    Okay.  You didn't use HCMFA's definition of NAV error in

3    your declaration, correct?

4    A    I don't believe I described the nature of the NAV error.

5    No, I did not.

6    Q    And you didn't -- you didn't make the Court aware of

7    HCMFA's definition of NAV error at the time you submitted this

8    declaration, correct?

9    A    I did not.

10   Q    All right.  Let's go back to the insurance issue and the

11   source of funding.  You wrote in Paragraph 27 of your

12   declaration that the first payment was made in February 2019,

13   correct?

14        MR. MORRIS:  We can go back.  Yeah.  Right there at

15   the bottom.

16        THE WITNESS:  Yes.  Based upon the records that were

17   available to me, yes, I think that's accurate.

18   BY MR. MORRIS:

19   Q    And that was -- that was just over $5 million, right?

20   A    Correct.

21   Q    All right.  Now let's go back to the memo to the board

22   that you had in your possession at the time you signed your

23   declaration.  And if we could look at the second page.  This

24   second page is entitled, NAV Error Breakdown and Make Whole

25   Payments.  Do you see that?

1  A    Yes, sir.

2  Q    And you understand that the first row shows that the total

3  estimated net loss resulting from the NAV error was

4  approximately $7.44 million, correct?

5  A    Yes, sir.

6  Q    And you understood that the chart depicts the sources that

7  were going to be called upon to fund the $7.44 million payment

8  from HCMFA to the GAF, correct?

9  A    Yes.  That's what it purports to state.

10  Q    And you understood before you signed your declaration that

11  the GAF board was told in this chart that about $5 million of

12  the total loss was being funded through HCMFA's insurance,

13  correct?

14  A    I don't know whose insurance it was, but yes, it states

15  that there's $4.939 million in insurance proceeds.

16  Q    Did you ask anybody whose insurance proceeds those were?

17  A    I don't recall.

18  Q    But this also says that the deductible was paid by the

19  Advisor, correct?

20  A    That's what it says.  Yes, sir.

21  Q    Okay.  Does that lead you to conclude that it's the

22  Advisor's insurance?  If they were paying the deductible?

23  A    Not necessarily.

24  Q    Okay.  But despite having a document that showed $5

25  million coming from insurance, you didn't ask anybody about

1  whose insurance policy that was being tapped, right?

2  A    At the time, I did not.  No, sir.

3  Q    And you never disclosed to the Court, either last spring

4  or in connection with this motion, that there were insurance

5  proceeds of $5 million that were used to pay about two-thirds

6  of the total net loss for the NAV error, correct?

7  A    No, sir.

8  Q    You have no reason to believe that the source of the

9  funding of the $7.44 million was anything other than what's on

10  this page, correct?

11  A    No, sir, I don't -- I wouldn't know beyond what's on this

12  page.

13  Q    Okay.  And this memo was dated at the end of May 2019; is

14  that right?

15  A    I'll take your word for it, or you can show me, but --

16  Q    Yeah.  No problem, Mr. Sauter.

17       MR. MORRIS:  Let's go back to the top.

18  BY MR. MORRIS:

19  Q    Okay.  Do you see it's May 28, 2019?

20  A    Yes, sir.

21  Q    And that's --

22  A    I agree.  Yes.

23  Q    And that's weeks after Highland's transfer of the $7.4

24  million, correct?

25  A    Yes, sir, I believe so.

1  Q    Okay.  But there's nothing in this report to the board

2  that discloses that Highland made any payment towards the

3  funding of the net losses arising from the NAV error, correct?

4  A    No, nothing in this document indicates that Highland paid

5  for the net losses, the NAV error.

6  Q    And you don't know if HCMFA ever returned the insurance

7  proceeds to the carrier after receiving the $7.4 million from

8  Highland, correct?

9  A    I do not.

10  Q    And that's because you never asked, correct?

11  A    That -- correct.

12  Q    Okay.  Now, after completing your investigation last

13  spring, you learned that on May 3, 2019 HCMFA needed another

14  $5 million for a matter completely unrelated to the NAV error.

15  Correct?

16  A    I'm sorry.  Say that again?

17  Q    After your investigation was completed, you learned that

18  on May 3, 2019 HCMFA needed $5 million for a purpose

19  completely unrelated to the NAV error, correct?

20  A    I can't specify the date, but yes, I did learn that there

21  was a need for additional -- additional funding.

22  Q    And in fact, Mr. Norris told you that Highland transferred

23  $5 million on May 3, 2019 because HCMFA needed that money to

24  pay what is known as a consent fee.  Correct?

25  A    Again, I'm not sure about the exact dates, but yes, that's

1  correct.

2  Q    Your declaration -- neither of your declarations disclose

3  anything about the $5 million consent fee that Mr. Norris told

4  you about, correct?

5  A    No, sir.

6  Q    Neither of your declarations discloses that Mr. Norris

7  specifically told you that the $5 million transferred by

8  Highland on May 3rd was to enable HCMFA to pay a consent fee,

9  correct?

10 A    I don't know that Mr. Norris ever said that to me.

11 Q    Well, -- (pause).

12        MR. MORRIS:  Can we go to Page 104 of Mr. Sauter's

13 transcript, please?

14 BY MR. MORRIS:

15 Q    I'm going to read from Page 104, Line 19, through Page

16 105, Line 6.  Sir, were you asked these questions and did you

17 give these answers:

18      "Q    During  your  discussions  as  part  of  your

19       investigation with Mr. Norris and Mr. Post and Mr.

20       Dondero and Mr. Waterhouse, did anybody tell you why

21       Highland paid HCMFA $5 million on May 3, 2019?

22      "A    Yes.

23      "Q    And why did -- what did they tell you?

24      "A    It was a payment for a consent fee.

25      "Q    All right.  Okay.  Who told you that?

1      "A    Mr. Norris."

2         Did you give those questions -- answers to my questions,

3    sir?

4    A    You read it correctly.

5    Q    Okay.  But you never told the Bankruptcy Court what Mr.

6    Norris told you about the -- about the May 3, 2019 payment,

7    correct?

8    A    No, sir.

9    Q    Before preparing your declaration, you spent time

10   reviewing the Debtor's bankruptcy filings, correct?

11   A    Yes, sir.

12   Q    And it's your understanding that the documents on the

13   docket are publicly available; is that right?

14   A    Yes, sir.

15   Q    And based on the documents on the docket, you were aware

16   that throughout the bankruptcy case the Debtor disclosed the

17   HCMFA promissory notes as assets of the bankruptcy estate,

18   correct?

19   A    Yes, sir.

20   Q    And you'll agree that Highland's view of the notes is

21   reflected in its audited financial statements, its books and

22   records, and its court filings, correct?

23   A    Yes, sir.

24   Q    One other thing you learned during your investigation is

25   that Mr. Waterhouse expressly told you that he did not prepare

Sauter - Cross                                83

1   the notes, correct?

2   A    That's correct.  He said he would not have prepared the

3   notes.

4   Q    So you didn't need metadata to know that Mr. Waterhouse

5   didn't prepare the notes because you knew that last spring,

6   correct?

7   A    I wouldn't necessarily agree with that statement.

8   Q    Well, the metadata may show you who prepared the notes,

9   but you didn't need the metadata to know that it wasn't Mr.

10  Waterhouse, correct?

11  A    That is correct.

12  Q    And Mr. Waterhouse also specifically told you that no

13  formal process was followed to create the notes, correct?

14  A    That's not accurate.  Or at least not entirely accurate.

15  Q    Mr. Waterhouse told you, in response to your question, he

16  couldn't -- he couldn't describe any process that was filed --

17  followed in creating the notes.  Correct?

18  A    He couldn't recall specifically what happened, but he told

19  me what he thought would have happened --

20  Q    Um, --

21  A    -- in the creation of the notes.

22  Q    During your conversations with Mr. Waterhouse, he also

23  told you that the legal department was not involved, correct?

24  A    That's not accurate.

25  Q    Okay.

 1          MR. MORRIS:  Can we put up on the screen, please, Mr.

 2   Sauter's testimony from Page 63?

 3   BY MR. MORRIS:

 4   Q    I'm reading from Line 12 through -- let's just go to Line

 5   3 at Page 64 for the moment.

 6          "Q    What's the basis for your statement that it

 7          appeared the Debtor had no intention that there would

 8          be notes or that there would be a loan transaction?

 9          "A    If you're talking about a $7.4 million

10          obligation, I would assume there would be a process

11          internally on who was responsible for the payment of

12          the fees for the -- or the expenses for the NAV

13          error.    Based  on  my  discussions  with  Frank

14          Waterhouse, there was no process or the legal

15          department was not involved in making a determination

16          as to whether there should be notes.  It was merely a

17          ministerial act that Accounting performed when they

18          transferred the funds to pay GAF."

19          Have I read that correctly?

20   A    Yes, sir.

21   Q    So you knew, based on your interviews with Mr. Waterhouse

22   last April and May, that Mr. Waterhouse couldn't describe any

23   process for the creation of the notes, correct?

24   A    I think you're asking a separate question.  So I can't say

25   yes or no to that answer without expanding upon it.

 1  Q    Okay.  Mr. Waterhouse didn't describe for you any process
 2  that was followed for the creation of the notes, correct?
 3  A    Again, he couldn't tell me the exact process that
 4  occurred, but he told me what he thought would have occurred.
 5  Q    Okay.  And during your private conversations with Mr.
 6  Waterhouse, he also told you that the legal department was not
 7  involved, correct?
 8  A    That's not accurate.
 9  Q    Did he tell you that the legal department was involved?
10  A    His statement to me was that if the notes were drafted,
11  they would have been drafted by the legal department.
12  Q    So when he told you that, did you ever talk to anybody?
13  Did you talk to Mr. Leventon or Mr. Ellington or any of the
14  other lawyers who had migrated?  Did you follow up with them,
15  --
16  A    Yes, sir.
17  Q    -- ask them -- to ask them what they did?
18  A    Yes, sir.
19  Q    How come you don't mention that anywhere in any of your
20  declarations?
21  A    Because that didn't give me any clarity to what -- what
22  transpired with the notes.
23  Q    It's not -- sir, as you sit here right now, you don't know
24  whether the legal department is involved in all of the notes
25  that are signed by Mr. Dondero and his affiliates; isn't that

 1  right?

 2  A    In a note of this size, I would fully expect the legal

 3  department to have reviewed and approved a note of -- of this

 4  nature.

 5  Q    And that's just your opinion; isn't that right?

 6  A    Yes.  Based upon having worked at NexPoint for the last

 7  three years, yes, sir.

 8  Q    Yeah.  It's your testimony -- but you cannot tell me, as

 9  the general counsel of NexPoint, that the law department or

10  the legal department is involved in every note that's executed

11  by one of Highland's affiliates, correct?

12  A    I can't say definitively one way or another.  That's

13  correct.

14  Q    Okay.  Thank you very much.

15          MR. MORRIS:  Your Honor, I have no further questions.

16          THE COURT:  All right.  Redirect?

17          MR. RUKAVINA:  Yes.

18      Mr. Vasek, please pull up Mr. Waterhouse's deposition

19  transcript.  Go to Page 145.  Do you want to zoom in a little

20  bit, Julian?  Scroll down to the bottom.  Okay.

21                    REDIRECT EXAMINATION

22  BY MR. RUKAVINA:

23  Q    Now, Mr. Sauter, you are familiar with Mr. Waterhouse's

24  deposition transcript?

25  A    Actually, I've never read it.

Sauter - Redirect                          87

1   Q    Okay.  Well, then this might be interesting to you.  So,

2   at the bottom here on 25, I start asking, "Did you ask someone

3   to draft" --

4              MR. RUKAVINA:  Please scroll down.

5   BY MR. RUKAVINA:

6   Q    -- "draft notes?"  And Mr. Waterhouse answers, "I don't

7   specifically ask people to draft notes, really.  I mean,

8   again, you know, the legal group at Highland is responsible

9   and has always been responsible for drafting promissory

10  notes."

11       So did you -- did you not know that's how Mr.

12  Waterhouse testified until today?

13             MR. MORRIS:  Objection to the form of the question,

14  Your Honor.  He just said that he hasn't read the transcript.

15             THE COURT:  Sustained.

16             MR. MORRIS:  If Mr. --

17             MR. RUKAVINA:  Okay.

18             MR. MORRIS:  If Mr. --

19  BY MR. RUKAVINA:

20  Q    Well, does what Mr. Waterhouse testified to in this

21  transcript that you haven't read comport almost exactly with

22  what he told you in April or May of that year?

23  A    Yes.  That's exactly what he told me, is he would not have

24  signed a promissory note if it had not been prepared and

25  signed off by Legal.

1   Q   Okay.

2           MR. RUKAVINA:  And scroll down a little bit more,

3   Julian, please.

4   BY MR. RUKAVINA:

5   Q   So, so I ask --

6           MR. RUKAVINA:  Sure.  We'll go to 22.  So I'm asked

7   to re-ask the question, Your Honor.  And I ask the question of

8   Mr. Waterhouse:  "Sure, Mr. Waterhouse.  Based on the practice

9   that you have described in your understanding, do you believe

10  that these notes would have been drafted by someone in the

11  legal department?"  And there's an objection from my co-

12  counsel, which I'll withdraw.  And Mr. Waterhouse answers yes.

13  BY MR. RUKAVINA:

14  Q   Does that also, Mr. Sauter, comport with what Mr.

15  Waterhouse told you when you interviewed him in April or May?

16          MR. MORRIS:  Objection to the form of the question,

17  Your Honor.  He hasn't seen the transcript.  Mr. Rukavina is

18  free to make this argument in his closing, but he shouldn't be

19  crossing his own witness with testimony that his witness has

20  never seen.  He's free to make the argument.  I'm not trying

21  to preclude him from making the argument.  But what I don't

22  want is an evidentiary record created by a witness with no

23  knowledge.

24          MR. RUKAVINA:  Your Honor, this transcript is in the

25  record from both of us.  And Mr. Morris was given great leeway

1    to take this witness through all kinds of questions,

2    insinuating that this witness was wrong or that he was

3    fabricating issues.  And I think it's perfectly legitimate for

4    me to present him with the actual person's testimony and ask

5    whether that testimony comports with what that person told Mr.

6    Waterhouse earlier in the year.

7            THE COURT:  I overrule the objection.

8    BY MR. RUKAVINA:

9    Q    Mr. Sauter, you just saw Mr. Waterhouse's answer.  Does

10   that answer comport with what Mr. Waterhouse told you last

11   spring about these notes?

12   A    Yes, it does.

13   Q    Okay.  So when you talked in your declarations about Mr.

14   Waterhouse's expectation that things would have gone through

15   Legal, that wasn't just supposition or, I'm sorry, speculation

16   on your part, was it?

17   A    No.  That's -- that's what he told me would have happened,

18   although he again indicated that he doesn't have any specific

19   recollection of the drafting of the notes or any emails --

20           MR. MORRIS:  Your Honor, I renew my objection.  Why

21   isn't the witness here?  He is an officer of HCMFA.  Why isn't

22   he here?  I didn't -- I would have had an opportunity now to

23   cross-examine him on these new issues.

24           THE COURT:  Okay.

25           MR. RUKAVINA:  Your Honor, he's not here because --

1        MR. MORRIS:  So I'm objecting based on the best

2   evidence rule.

3        MR. RUKAVINA:  He's not here, Your Honor, because

4   we're not trying the merits of the underlying lawsuit.  We're

5   trying the sole question of why we took ten months to assert

6   this defense.  That's why I objected earlier when Mr. Morris

7   took this witness on a two-hour trip down cross-examination on

8   irrelevant facts.

9        THE COURT:  Okay.

10       MR. RUKAVINA:  And I think he's opened the door --

11       THE COURT:  I overrule the objection.  Continue.

12       MR. RUKAVINA:  Thank you.

13  BY MR. RUKAVINA:

14  Q    Do you recall my question, sir?

15  A    I'm sorry.  Could you repeat it?

16  Q    Actually, I think you were just answering the question

17  when Mr. Morris objected.

18       MR. RUKAVINA:  Mr. Vasek, go to Page -- oh, hold on a

19  sec, Mr. Vasek.

20  BY MR. RUKAVINA:

21  Q    Mr. Sauter, when you spoke to Mr. Waterhouse in April or

22  May, did you ask him whether he signed these notes?

23  A    I did.

24  Q    And what did he say?

25  A    He said, if my signature's on it, I would have signed it,

1    because at the time I was not using electronic signatures.

2    Q    Okay.  Thank you.

3    A    And he was unequivocal on that.

4    Q    Okay.

5            MR. RUKAVINA:  Go to Page 139, please, Mr. Vasek.

6    BY MR. RUKAVINA:

7    Q    Did you discuss with Mr. Waterhouse whether he would have

8    been -- strike that.  Did you discuss with Mr. Waterhouse who

9    in the organization would have had the authority to bind

10   anyone on notes of this size?

11   A    I did.

12   Q    Okay.  How did he respond?

13   A    He said that he would not have signed any promissory notes

14   unless they'd been signed off by Legal and signed off by Mr.

15   Dondero.

16   Q    Okay.  Now, when Mr. Morris was asking you some questions,

17   he asked you about whether you ever told Mr. Waterhouse that

18   he had made a mistake.  I think the implication was that, who

19   are you after the fact to tell him that he made a mistake?

20   So, so we'll look very quickly here on Page 139.  I'm asking

21   Mr. Waterhouse, I apologize if I asked you this already, but

22   has anyone ever told you at any time that you were not

23   authorized to sign the promissory notes that are the subject

24   of the sentence we're looking at?  And you see his answer is,

25   Not that I recall.

1        MR. RUKAVINA:  Yeah.  And scroll down a little bit.

2   And Your Honor can read it for herself, but it goes on:  Let

3   me ask the question again.  Did anybody ever tell you at any

4   time that you made a mistake?

5        Scroll down a little bit.

6        Not that I recall.

7        And I apologize, Your Honor.  That was not me asking those

8   questions.  That was Mr. Morris asking those questions.

9   BY MR. RUKAVINA:

10  Q   So does that refresh your memory, Mr. Sauter, as to

11  whether you actually ever told Mr. Waterhouse that he made a

12  mistake?

13  A   Yeah.  I -- apparently, I never stated to Mr. Waterhouse

14  that -- that he made a mistake in executing the notes.

15  Q   Can you think of any reason why you -- why you would have

16  told him that?

17  A   No.  I -- I wouldn't.

18  Q   Okay.

19       MR. RUKAVINA:  Go to Page 317, please, Julian.

20  Scroll down a little bit.

21       Your Honor, actually, we will pull this down.  I'll argue

22  it at closing.  Go ahead, Mr. Vasek, pull that down, just to

23  hurry this up.  Okay.  Mr. Vasek, please pull up that SEC

24  memorandum.

25  BY MR. RUKAVINA:

1   Q   Mr. Sauter, are you familiar with this memorandum to the

2   SEC --

3              THE COURT:  Can you say for the record what we're

4   looking at, what exhibit?

5              MR. RUKAVINA:  Your Honor, yes.  I have not

6   introduced this one into evidence yet, so I want him to

7   authenticate it first.

8              THE COURT:  Okay.

9   BY MR. RUKAVINA:

10  Q   Are you familiar with this document, Mr. Sauter?

11  A   I am.

12  Q   Okay.  Is this a document that you relied on in giving Her

13  Honor your first and your second declarations?

14  A   Yes.  It's one of the documents I reviewed.

15  Q   Okay.

16             MR. RUKAVINA:  Your Honor, I'd move to admit this

17  document.  I have not filed an exhibit list because, again,

18  we're proceeding with appendices, so I don't know how to

19  describe it.  Maybe Rebuttal A.

20             THE COURT:  Is it on the docket attached to your

21  appendix?

22             MR. RUKAVINA:  No, Your Honor.  We'll have to --

23  we'll have to upload it or file it after this hearing.

24             THE COURT:  Well, okay.  I first ask, do we have an

25  objection to this because it wasn't disclosed?

1          MR. MORRIS:  I do, for that very reason.  I don't --

2     I don't understand -- I don't -- I don't understand what's

3     happening.  It's his witness.  It's his motion.  He put forth

4     his evidence.  I don't know --

5          MR. RUKAVINA:  Your Honor, all that I can say is

6     that, again, this motion relates to whether Mr. Waterhouse

7     signed these notes.  Mr. Morris took this witness through

8     question upon question about this NAV error.  Mr. Morris did

9     not present -- just as he accuses this witness of not giving

10    the Court all the relevant information -- he has not presented

11    the Court with this relevant information, which is a document

12    where the Debtor's own employees, the Debtor's employees, are

13    saying we are responsible for this NAV error.  So I think that

14    it is a proper rebuttal.  It's -- I know it's weird to offer

15    an exhibit to rebut my own witness, but this is being done in

16    response to what Mr. Morris was asking him about earlier

17    today.

18          THE COURT:  All right.  Well, if it really indicates

19    what you --

20          MR. MORRIS:  Go ahead.

21          THE COURT:  -- say it indicates, then I guess it

22    would be rebuttal evidence.  So, --

23          MR. MORRIS:  Go right ahead, Your Honor.  No -- no

24    objection.

25          THE COURT:  Okay.  It'll be admitted.  And I guess we

Sauter - Redirect                        95

1    need to call this -- we're going to call it HCMFA's R-1 for

2    Rebuttal 1.  Okay.  File it on the docket that way.

3              MR. RUKAVINA:  Thank you, Your Honor.

4          (HCMFA's Rebuttal Exhibit 1 is received into evidence.)

5              THE COURT:  Go ahead.

6              MR. RUKAVINA:  Scroll down a little bit, Julian,

7    please.  Okay.  Stop there.

8    BY MR. RUKAVINA:

9    Q    So you see, Mr. Sauter, where it says the Advisor

10   representatives, Thomas Surgent, Frank Waterhouse, Jason Post,

11   and Lauren Thedford?  Do you see that?

12   A    Yes, sir.

13   Q    Whose employees were those at that time?

14   A    They were all employees of Highland Capital Management,

15   LP.

16   Q    Okay.

17             MR. RUKAVINA:  Scroll down a little bit more, please.

18   Do you see -- stop there.

19   BY MR. RUKAVINA:

20   Q    Do you see where NAV error is defined?

21   A    Yes, sir.

22   Q    Okay.  So obviously it speaks for itself, but define --

23   tell the Judge how you understood NAV error to be defined when

24   you were undertaking your investigation and when you were

25   preparing your declarations.

1   A    In preparing my declaration, I was simply referring to the

2   mistake that occurred.  The NAV error resulted from some

3   trades that occurred that I would call, you know, outside of

4   the ordinary course of business or -- or not necessarily at

5   arm's length, and so they were determined to be, quote, non-

6   orderly.

7       I think when the SEC became involved, they made a

8   determination that they believed that the excluded trades were

9   orderly and should have been included in the calculation of

10  the NAV, which ultimately resulted in the NAV error.

11  Q    And is it fair to -- or, did the valuation of the

12  underlying fund have -- or its assets have any role in that?

13  A    No.  It would have been Houlihan Lokey and then the

14  valuation committee and I think the individuals listed above

15  and maybe a few others were on the valuation committee, but

16  it's my understanding that all of the employees on the

17  valuation committee were Highland Capital Management

18  employees.

19  Q    Okay.

20          MR. RUKAVINA:  Mr. Vasek, please pull up the shared

21  services agreement.

22      Your Honor, this agreement is in the record as part of Mr.

23  Sauter's declaration.  This is the HCMFA shared services

24  agreement.

25  BY MR. RUKAVINA:

Sauter - Redirect                                97

1   Q    Are you familiar with this document?

2   A    Yes, sir.

3   Q    Okay.  And is this a document that you would have

4   consulted as well in reaching your conclusion?

5   A    Yes, sir.

6   Q    Okay.

7            MR. RUKAVINA:  And if you'll scroll to the bottom two

8   pages, Mr. Vasek.

9        Your Honor, this is Annex A.  This shows the services that

10  the Debtor was to be providing.

11       Zoom in a little bit.

12  BY MR. RUKAVINA:

13  Q    Do you see Compliance, General Compliance?  Do you see

14  that, sir?

15  A    Yes, sir.

16           MR. RUKAVINA:  And scroll down, Mr. Vasek.  The top

17  of the next page.

18  BY MR. RUKAVINA:

19  Q    Do you see Valuation Committee?  Do you see that, Mr.

20  Sauter?

21  A    Yes, sir.  Yes, sir.

22  Q    Were compliance and valuation committee, as part of your

23  understanding and investigation, did those services have

24  anything to do with the NAV error?

25  A    Yes, it does.  The Valuation Committee was primarily

1  responsible for setting the valuation, with the input of

2  Houlihan Lokey, and that's what ultimately resulted in the NAV

3  error.

4  Q    Did you discuss this NAV error with Mr. Dondero?

5  A    I'm sure I did at some point.

6  Q    Okay.  Well, did you -- did you discuss with Mr. Dondero

7  why he told Mr. Waterhouse to transfer $7.4 million to HCMFA?

8  A    I did, after the fact, after discussing it with Mr.

9  Waterhouse.

10 Q    Okay.  And did -- what did Mr. Dondero tell you?

11 A    I mean, generally speaking, you know, he wouldn't have

12 been involved in the determination of the NAV error.  And, you

13 know, I don't know that he recalled any authorization to

14 execute notes from HCMFA to HCMLP in connection with the --

15 with the NAV error.

16 Q    But did he tell you that this was intended by him to be a

17 loan?

18 A    I don't know that he ever said that.

19 Q    Did he indicate to you any surprise that this was carried

20 as a loan?

21 A    I don't know that he would have indicated any surprise.  I

22 think he relied upon Accounting and Legal to make these

23 determinations and provide input to him.

24 Q    Okay.

25           MR. RUKAVINA:  Mr. Vasek, if you'll pull up, please,

1  the Debtor's -- in the Debtor's appendix, it's Exhibit 59.

2  Zoom in, please.  All right.

3  BY MR. RUKAVINA:

4  Q    Are you familiar with this document?

5  A    Yes, sir.

6  Q    And what is this document?

7  A    It's a memo from what I call the Advisors and the broker-

8  dealer to the retail funds, the boards of the retail funds.

9          MR. RUKAVINA:  Mr. Vasek, can you go to the second

10 page, Question 2, where it says, Response?  Okay.

11 BY MR. RUKAVINA:

12 Q    So, in the middle there, Mr. Sauter, it says the earliest

13 the note between HCMLP and HCMFA could come due is in May

14 2021.  Did I read that correctly?

15 A    Yes.  Yes, sir.

16          MR. MORRIS:  Objection to the form of the question.

17 Have we established any foundation that Mr. Sauter saw this

18 memo in connection with his review of the -- with -- in

19 connection with his investigation?

20          THE COURT:  I don't think we have.  So, --

21          MR. RUKAVINA:  Well, Your Honor, this exhibit --

22          MR. MORRIS:  So I object, Your Honor.

23          THE COURT:  Sustained.

24          MR. RUKAVINA:  Again, Your Honor, I apologize.  This

25 is an exhibit introduced by the Debtor in its appendix.  Is

1  the Court telling me that every exhibit in the appendix has to

2  be individually offered and admitted as though it was a trial?

3         THE COURT:  Well, I don't know if it was foundation

4  or a personal knowledge objection that was being asserted.

5  Mr. Morris, maybe I was hearing something you weren't saying.

6         MR. MORRIS:  Yeah, no, it -- it was both.  I mean,

7  Mr. Rukavina is right.  We -- we have offered this document

8  into evidence.  But there is no -- there is no personal

9  knowledge.  Let him, if he can, let him testify that he's ever

10  seen this before.

11     You know, these are leading questions.  I haven't been

12  objecting.

13     Again, Mr. Rukavina can make whatever arguments he wants,

14  but I'm very wary about just spoon-feeding them to a witness

15  when there's been absolutely no -- and you'll hear this on my

16  recross, when there's been no foundation established that this

17  witness has any knowledge about this document.

18         THE COURT:  Okay.  Well, I sustained -- Mr. Rukavina,

19  you're going to have to establish some personal knowledge on

20  the part of the witness before you start questioning him about

21  it.

22  BY MR. RUKAVINA:

23  Q    Well, let me ask you this, Mr. Sauter.  Obviously, it's

24  our position today that Mr. Waterhouse didn't sign these

25  notes, correct?

1    A    Yes, sir.

2    Q    Before we filed this motion, had you seen this document?

3    A    I -- I have seen this document.  I can't say for certain

4    when I first saw it.

5    Q    Do you recall whether -- whether this is one of those

6    documents that you would have reviewed in concluding that

7    perhaps Mr. Waterhouse didn't sign the notes?

8    A    I don't recall that.

9    Q    Okay.

10           MR. RUKAVINA:  Well, let's -- let's try a different

11   exhibit here, Julian.  It'll be the Debtor's Exhibit 36.

12   Scroll down a little bit.  Zoom in.

13   BY MR. RUKAVINA:

14   Q    Have you seen this email exchange?  I know you're not on

15   it, but have you seen this email exchange in the course of

16   this litigation?

17   A    I -- I don't recall specifically seeing this, the email

18   communication.  No, I don't.

19   Q    Okay.

20           MR. RUKAVINA:  Very well, then, Your Honor.  I'll

21   move on and I'll just argue these matters at closing.

22           MR. MORRIS:  Just very short recross, Your Honor.

23           THE COURT:  All right.

24           MR. RUKAVINA:  Oh, I'm not -- I'm not done.

25           THE COURT:  Oh, he hasn't passed the witness.

1           MR. MORRIS:  Oh, I apologize.

2           MR. RUKAVINA:  Just -- just this exhibit, Your Honor.

3           THE COURT:  Okay.

4           MR. RUKAVINA:  In light of the Court's --

5           THE COURT:  Just for my staff and my planning

6    purposes, how much longer do we think this is going to go?

7    This was a one-hour time estimate, and we're now three hours

8    or so into this.  How much longer?  Because I have a 1:30

9    docket and other things this afternoon, including a conference

10   call at 3:00 and -- et cetera, et cetera.

11          MR. RUKAVINA:  I'm almost done, Your Honor, with this

12   witness.  And as I mentioned, I have no other evidence other

13   than what's in my appendix.

14          THE COURT:  Okay.  I'll take "almost done" to being

15   ten minutes or so.

16          MR. RUKAVINA:  Yeah.  I'll beat that, Your Honor.

17      Mr. Vasek, please pull up the Sauter -- Mr. Sauter's

18   deposition.  Go to Page 63.

19          MR. MORRIS:  Your Honor, I don't understand.  He's

20   going to cross his own witness with his own transcript when

21   he's -- is he impeaching him?

22          MR. RUKAVINA:  No.  No.  You would not let him answer

23   a question, and I want to ask him to answer the question.

24          MR. MORRIS:  Well, why don't you just ask him the

25   question?

1          MR. RUKAVINA:  Please pull up Mr. Sauter's deposition

2    to Page 63.

3          THE COURT:  Oh, --

4          MR. MORRIS:  I object.

5          THE COURT:  -- okay.  Well, I object.  I sustained

6    the objection.  You can use, you know, prior inconsistent

7    statements in a depo or, you know, or a depo to refresh, but

8    you've got the live witness here, so what are we doing?

9    BY MR. RUKAVINA:

10   Q    Do you recall, Mr. Sauter, Mr. Morris just a little bit

11   about taking you through your deposition testimony where he

12   was asking you about whether Mr. Waterhouse told you that the

13   note would have to go through Legal or not?

14   A    I do.

15   Q    Okay.  And I believe you testified something like there

16   were two different things that were being discussed there.

17   A    Correct.

18   Q    Okay.  I would like to give it up -- put up the document

19   so you can read it, but we can't do that, so explain why Mr.

20   Morris was wrong in implying that Mr. Waterhouse was telling

21   you about the promissory notes.

22         MR. MORRIS:  Objection to the form of the question.

23         MR. RUKAVINA:  Well, again, Your Honor, I can't -- I

24   can't present -- he was just asked about this testimony, he

25   said I have an explanation but it's not a yes or no answer,

1   and I want -- I have the right --

2               THE COURT:  Okay.  Overruled.  He can answer.

3               THE WITNESS:  Thank you, Your Honor.  There were two

4   issues with the notes.  Mr. Waterhouse was adamant that the

5   notes had been prepared by Legal.  I worked with Tim Cournoyer

6   and Lauren Thedford.  They're both good lawyers, and they

7   would not have prepared a note that listed Mr. Waterhouse

8   individually as the maker on the note.  It's an incorrect

9   signature block, and I just didn't believe that they would

10  have done that.

11      But the real issue was whether there was any actual

12  determination of who was responsible for the payment of the

13  NAV error to the GAF, and I asked specifically whether there

14  was a process that involved Mr. Surgent, Mr. Waterhouse, Mr.

15  Dondero, and Mr. Cournoyer in determining who was responsible

16  for that -- that payment.

17      And so those were the two issues.  Mr. Waterhouse was

18  adamant that it had gone through Legal.  So, yes, he did say

19  it had gone through Legal.  But he did not ever say that there

20  was any process in making a determination as to who was

21  responsible for the NAV error vis-à-vis Highland Capital

22  Management and Highland Capital Management Fund Advisors.

23              MR. RUKAVINA:  And Mr. Vasek, will you please pull up

24  Page 162 from the Debtor's appendix?  It's Appendix 162.

25  There it is.  Zoom in a little bit.

1    BY MR. RUKAVINA:

2    Q    Mr. Sauter, you were asked about this email before, the

3    one from Mr. Klos.  And do you see, sir, where it says:  This

4    is a new interco loan.  Kristin, can you or Hailey please prep

5    a note for execution?

6        Do you see that, sir?

7              MR. MORRIS:  Object --

8              THE WITNESS:  I do.

9              MR. MORRIS:  -- to the form of the question, Your

10   Honor.  I did not examine this witness with this document.  I

11   used it in my opening, but I certainly did not examine this

12   witness with this document.

13             THE COURT:  Wait, wait.  What is the objection?  I do

14   remember this exhibit and him being asked questions.

15             THE WITNESS:  Correct.

16             THE COURT:  What are you saying?

17             MR. MORRIS:  I'm just saying Mr. Rukavina's lead-in,

18   I mean, --

19             MR. RUKAVINA:  I might be wrong.  I might be wrong.

20             MR. MORRIS:  I used -- I used this document in my

21   opening, Your Honor, but this contradicts everything Mr.

22   Sauter has ever said in his life about these matters, and I

23   don't recall ever cross-examining him with this document.

24             THE COURT:  Okay.

25             MR. MORRIS:  If he's ever seen it before, he can --

1    he can testify, but --

2              THE COURT:  Okay.

3              MR. MORRIS:  But I don't think there's any

4    foundation.

5              THE COURT:  I don't remember specifically whether it

6    was your opening or in questioning; I just remember seeing it

7    here on my screen.  So if you could rephrase the question.

8              MR. RUKAVINA:  Sure.  No, my only first -- first,

9    just to set up the question, I just asked the witness whether

10   he just read the same thing that I did.  I can't imagine that

11   being objectionable.

12   BY MR. RUKAVINA:

13   Q   Now, Mr. Sauter, my question is, as a transactional lawyer

14   of over twenty years, what does prepare a note for execution,

15   what does execution mean?

16             MR. MORRIS:  Objection to the form of the question.

17   He's not here as an expert.  He -- there's no foundation that

18   he ever saw this document.  If he had, I think it would be

19   even worse for him --

20             THE COURT:  Okay.  Sustained.

21             MR. MORRIS:  -- than it is right now.

22             THE COURT:  Sustained.

23             MR. RUKAVINA:  Okay.  I'll pass the witness, Your

24   Honor.  Thank you.

25             THE COURT:  Recross?

1            MR. MORRIS:  Just a couple of very brief questions.

2            THE COURT:  Okay.

3                         RECROSS-EXAMINATION

4    BY MR. MORRIS:

5    Q    Mr. Sauter, you made reference to the shared services

6    agreement before, right?

7    A    Yes, sir.

8    Q    You didn't describe that as one of the documents you ever

9    reviewed in your deposition, correct?

10   A    Perhaps I didn't, but I've reviewed it a number of times.

11   Q    And you didn't review it in connection with your

12   investigation, correct?

13   A    I actually reviewed it extensively from January until

14   March with the transition of shared services.

15   Q    There's no argument in your first declaration that relates

16   to the shared services agreement, correct?

17   A    I -- no, I did not mention --

18            MR. RUKAVINA:  Objection, Your Honor.  Let's put up

19   the -- let's put up the document.  I don't remember it being

20   in there.  I don't remember it being attached as an exhibit.

21            MR. MORRIS:  All right.  I stand corrected.

22            THE COURT:  Okay.

23            MR. MORRIS:  I'll move on.  Um, --

24            THE COURT:  Do we want to pull it up, or no?

25            MR. MORRIS:  No, we'll pass.  I'll take Mr.

1  Rukavina's word for it.

2  BY MR. MORRIS:

3  Q    But when you -- when you testified in your deposition, you

4  weren't able to recall having ever looked at that, correct?

5  A    I don't know that I was asked that question.  I'm a

6  hundred percent certain that I probably reviewed it --

7  Q    Okay.

8  A    -- a dozen times --

9  Q    And --

10 A    -- before that declaration.

11 Q    And I think you testified that you don't recall, you --

12 based on what Mr. Waterhouse said, you now want to retract

13 your testimony that you told Mr. Waterhouse he made a mistake,

14 correct?

15 A    I think my initial statement was it was implied, and I

16 think eventually I said that, yes, I probably said something

17 to him that it was a mistake.

18 Q    Okay.  So Mr. Waterhouse's transcript didn't refresh your

19 recollection at all?  That's what you truly believe, correct?

20 A    Truly believe what, sir?

21 Q    That he made a mistake.  Correct?

22 A    I do.  Yes.

23 Q    And whether implicitly or explicitly, you conveyed that

24 message to Mr. Waterhouse, correct?

25 A    That was my view, yes.

1   Q   And it's certainly what you said in your declaration

2  multiple times, correct?

3   A   What's that?

4   Q   That he made a mistake.

5   A   Correct.

6   Q   And you said in your declaration multiple times that he

7  signed the notes, correct?

8   A   Correct.

9   Q   Okay.

10        MR. MORRIS:  I have no further questions, Your Honor.

11        THE COURT:  All right.  Thank you, Mr. Sauter.  That

12  concludes your testimony.

13        THE WITNESS:  Thank you, Your Honor.

14    (The witness is excused.)

15        THE COURT:  What evidence do you all want to have in

16  the record here?

17        MR. RUKAVINA:  Well, Your Honor, again, in reliance

18  on the Local Rules, I filed an appendix.  I think Your Honor

19  mentioned it's an extensive appendix.  It has -- I filed a

20  redacted version, but it's not redacted much.  It has the

21  declaration of Mr. Sauter, which has the shared services

22  agreements, an email from Mr. Seery forbidding communications

23  with the Debtor's employees.  It has the depositions of Mr.

24  Waterhouse, Hendrix, and Klos.  And it has my declaration

25  authenticating certain documents.

1       Then I filed a supplemental declaration on Friday in my

2   reply authenticating certain other documents.

3       I believe that those are part of the record under our

4   Local Rules as being in the appendix, but if they're not then

5   I guess I'll move for their admission.

6           THE COURT:  All right.  Let's talk about where on the

7   docket they appear.

8           MR. RUKAVINA:  Okay.  Mr. Vasek might have to help me

9   here.  The redacted appendix -- you see, I don't have an ECF

10  number on the top for some reason.  Sometimes that happens

11  when I'm downloading documents.  Mr. Vasek, maybe you can

12  quickly tell the Court what docket my appendix is at.

13          THE COURT:  Okay.

14          MR. VASEK:  Sure.  It's 87.

15          THE COURT:  86 or 87.  The unredacted is 87.  Okay.

16  This --

17          MR. VASEK:  87.

18          THE COURT:  Say again?

19          MR. VASEK:  Yes, Your Honor.  87.

20          THE COURT:  Okay.  Mr. Morris?

21          MR. RUKAVINA:  That's right.  I'm remembering now,

22  Your Honor -- yeah.  I'm remembering now, Your Honor, that Mr.

23  Morris and I agreed I could file it publicly in unredacted

24  form, so it's 87.  And then my supplemental declaration is at

25  112/1.

1          THE COURT:  Okay.  Is there any objection to that

2   being in the record, Mr. Morris?

3          MR. MORRIS:  Yes, Your Honor.  I move to strike from

4   Mr. Sauter's declaration Paragraphs 6 through 10 and 22 to 31

5   as lacking any basis in personal knowledge.  Highland

6   otherwise has no objection to the admission into evidence of

7   the balance of the Movant's exhibits.

8          THE COURT:  Okay.  So --

9          MR. RUKAVINA:  Your Honor, I'll --

10          THE COURT:  -- all those 800-plus pages attached, you

11   have no objection to?

12          MR. MORRIS:  Only -- only if they are described in

13   one of the -- I mean, I can do it that way, Your Honor, if

14   you'll just give me a moment.  But, again, we've got -- we've

15   got a witness here who has no personal knowledge of the shared

16   services agreement he's --

17          MR. RUKAVINA:  John, can you repeat for me the

18   paragraphs that you mentioned you're objecting to?

19          MR. MORRIS:  Yes.  6 through 10 and 22 to 31.

20      (Pause.)

21          MR. RUKAVINA:  Is the Court prepared for my response?

22          THE COURT:  I'm prepared.  I'm looking at it.

23          MR. RUKAVINA:  I don't think that 6 through 10

24   matter.  The rest does matter because it goes exactly to Mr.

25   Sauter's investigation and the reason for why this motion was

1   not filed until it was filed.

2        So I think that, again, that these are -- these -- this --

3   he doesn't need -- what are we talking about here?  Are we

4   talking about the underlying facts, that he does not have

5   personal knowledge of?  That's true.  These are not offered

6   for the truth of the underlying facts.  Or are we talking

7   about his investigation and hence the reason why this motion

8   wasn't filed back in April or May?  He does have personal

9   knowledge of that.  He does have personal knowledge of what he

10  relied on.

11           THE COURT:  Okay.  I overrule the objection.  I think

12  this goes to weight, not admissibility.  So, --

13           MR. MORRIS:  All right.  I --

14           THE COURT:  -- everything is admitted.

15           MR. MORRIS:  Just to preserve my record real quick,

16  Your Honor?

17           THE COURT:  Okay.

18           MR. MORRIS:  I'm sorry.  Like, Paragraph 24 is a

19  paraphrase of deposition testimony.  Paragraph 26 is a

20  paraphrasing of deposition testimony.  It has nothing to do

21  with the investigation.  And Highland objects to the inclusion

22  of that stuff in the record.

23           THE COURT:  Okay.  Again, I think this goes to --

24           MR. RUKAVINA:  I don't --

25           THE COURT:  -- weight.

113

1        MR. RUKAVINA:  I don't see --

2        THE COURT:  I admit it.

3        MR. RUKAVINA:  Okay.

4        THE COURT:  I admit it.  Okay.  What else am I going

5    to put in the record here?

6        MR. MORRIS:  I think -- I think, subject to that

7    objection -- is the Movant withdrawing Paragraphs 6 through

8    10?

9        MR. RUKAVINA:  That's fine.

10       MR. MORRIS:  Okay.

11       THE COURT:  Okay.  Well, --

12       MR. MORRIS:  And my -- my --

13       THE COURT:  -- then that is excluded.

14       MR. MORRIS:  -- other objection will be overruled?

15       THE COURT:  I think the only exhibits referenced were

16   the shared services agreements, right, in that bundle of

17   paragraphs?

18       MR. MORRIS:  Yes.

19       THE COURT:  Okay.

20     (Defendant's exhibits contained in Dockets 87 and 112/1

21   are received into evidence as specified.)

22       THE COURT:  So, --

23       MR. MORRIS:  And then, Your Honor -- I'm sorry.

24       THE COURT:  -- as far as Debtor's exhibits?

25       MR. MORRIS:  They appear on Docket #111 as amended by

1   113.  They were noted on the witness and exhibit list as

2   Exhibits 1 through 31, although they can also be found on the

3   appendixes at Exhibit 109 -- at Docket #109.  And the Debtor

4   would respectfully move into evidence all 31 exhibits

5   appearing on those three docket entries.

6           THE COURT:  Any objection?

7           MR. RUKAVINA:  Your Honor, so long as it's clear that

8   we're not agreeing that these are admissible at trial and that

9   they're limited to this hearing, no objection.

10          THE COURT:  All right.

11          MR. MORRIS:  As long as it goes both ways, I'm good

12  with that, Your Honor.

13          MR. RUKAVINA:  Yeah.  That's fine.

14          THE COURT:  With that proviso, --

15          MR. RUKAVINA:  I understand.

16          THE COURT:  -- they're admitted.

17      (Plaintiff's Exhibits 1 through 31 are received into

18  evidence.)

19          THE COURT:  All right.  Closing arguments?

20           CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

21          MR. RUKAVINA:  I'll be very brief, Your Honor, again.

22  We're here on whether Waterhouse signed the note.  We're not

23  here on whether the underlying NAV error occurred.  We're not

24  here on whether that's what the money was for.  We're here on

25  whether Waterhouse signed the note.  He did not.  He did not

1  sign the notes and we did not learn that until October the

2  26th of this year.

3  The question of whether the notes were authorized to be

4  signed, guess what, that's all Debtor employees.  They messed

5  it up.  And now the Debtor wants to blame my client because

6  its own employees can't have a clear trail of where a note is

7  authorized to be signed.

8  So what does the Debtor do?  It calls my in-house counsel

9  and spends an hour and a half trying to character-assassinate

10  him, when, again, the only issue is whether Waterhouse signed

11  these notes, which he did not.

12  There was no undue delay.  The defense is valid under the

13  law, so it's not futile.  The Court cannot try the underlying

14  facts.  It's a 12(b)(6) standard.  There is no dilatory or bad

15  faith motive.

16  This is a Rule 15 motion.  Relief should be freely granted

17  unless there is substantial reason not to grant it.  The

18  Debtor has given you no substantial reason to deny this

19  motion.  The only reason the Debtor gives you to deny this

20  motion, Your Honor, is its view that our defense has no merit,

21  that the mistake, the mutual mistake defense has no merit.

22  And that cannot be tried in the context of this motion.

23  The only other thing that I've heard today, Your Honor,

24  that has any weight under Rule 15 is Mr. Morris's statement

25  that, well, I objected to your request for this promissory

1  note.  I objected to it; therefore, you know, you sat -- I

2  think he said exactly that I sat on my hands and did nothing,

3  and I think he took you through June and July and August and

4  September.

5      But look at that objection, Your Honor.  His objection is

6  as follows:  The Debtor objects to the extent the term

7  metadata is vague.  Subject to the general objections and this

8  objection, the Debtor will conduct a reasonable search for and

9  produce documents responsive to this request.

10     The Debtor never says we're not going to produce that.

11  The Debtor never says the term metadata is vague.  The Debtor

12  says that, to the extent it's vague, we object.  That's

13  gamesmanship, Your Honor.  Don't let them get away with such

14  gamesmanship.

15     If I came here with a motion to compel a day after I got

16  served with this, Your Honor would laugh me out of court and

17  Your Honor would sanction me, because Your Honor would say,

18  well, it's just a form objection to the extent something is

19  vague.  And Mr. Morris would come in here and say, oh, whoa,

20  whoa, whoa, whoa, whoa, Davor is completely wrong, of course

21  we're going to -- we're just preserving our rights.  We're

22  going to -- we're going to produce this promissory note.

23     Don't let them get away with that after-the-fact

24  gamesmanship.  That's not a valid objection.  They said they

25  would produce the note with metadata, and they did, in late

1  October.  And that's their fault and their fault alone.

2       Your Honor, there is no substantial reason to deny this

3  motion, the one and half hours of cross-examination of my in-

4  house counsel notwithstanding.  We ask that you grant this

5  motion.  Thank you.

6       THE COURT:  All right.  Let me ask you a couple of

7  questions that go to the undue delay factor that courts are

8  supposed to consider in this context.  I'm looking at May 22,

9  2021, when HCMFA filed its first motion for leave to amend

10  answer.  And on May 22nd, Paragraph 1 of that motion states,

11  "Now that the Defendant has access to former employees of the

12  Plaintiff and to various books and records, the Defendant has

13  learned that the notes were unauthorized, represent a mutual

14  mistake, and were never intended as debt, but rather that the

15  Plaintiff was compensating the Defendant for the Plaintiff's

16  own liability to the Defendant for causing a serious valuation

17  error."  And then, "Accordingly, we seek leave to assert this

18  affirmative defense," et cetera, et cetera.

19       Paragraph 14 states, "Waterhouse was not authorized to

20  execute the notes on behalf of the Defendant and he was not

21  authorized to lend funds by the Plaintiff."

22       And then we have Paragraph 22, similar:  It appears that

23  what happened is that Waterhouse, either for some internal

24  accounting purpose or because funds were flowing from the

25  Plaintiff to the Defendant, believed that some document was

1   necessary or that what was being funded was a loan, so he

2   unilaterally and in mistake prepared and signed the notes.  In

3   short, Waterhouse made a mistake.  There was no loan.  There

4   was no return consideration for the loan.  And the notes, if

5   anything, are mutual mistakes.  Void.

6        Paragraph 29 says, Waterhouse was CFO of both Debtor and

7   HCMFA at the time he signed the notes.

8        Okay.  So the Court grants leave to HCMFA to file the

9   amended answer.  The Court ruled on July 2, 2021.  The amended

10  answer was filed July 6, 2021.  And the amended answer that

11  was filed on July 6, 2021, Paragraph 43:  At this time, Frank

12  Waterhouse was the chief financial officer to both the

13  Plaintiff and the Defendant.  Waterhouse signed the two

14  promissory notes.  He did not sign the notes in any

15  representative capacity for the Defendant.  The Defendant did

16  not authorize Waterhouse to sign the notes or to bind the

17  Defendant in any way to the note.  Waterhouse made a mistake,

18  da, da, da, in signing the notes.

19       I guess what I'm getting at is I'm seeing that, as early

20  as May, this theory of the case, if you will, had evolved, and

21  it seems like a heck of a long time, five months later, to

22  say, oh, everything we said, yeah, except he didn't even sign

23  the notes.  That feels like what we have here.

24            MR. RUKAVINA:  Well, Your Honor, respectfully, I

25  disagree.  I disagree entirely.  Because whether he physically

1    signed the note or whether he was authorized to sign the note

2    are two different things.  We've always said he's not

3    authorized to sign the note.  We've always said that.  And

4    that's going to be perhaps a question of fact.  But that's

5    separate from whether he actually signed the note or

6    authorized Ms. Hendrix to sign the note.  That was not learned

7    until late October.  That is a separate defense under the UCC.

8    And, again, that's -- that flows from him telling Mr. Sauter

9    -- basically; I'm paraphrasing -- well, if it's got my

10   signature, I must have signed it.

11       Not until we saw that these were electronically signed and

12   not until we saw that Ms. Hendrix signed them in late October

13   did we realize that not only was there a mistake all around,

14   but the notes weren't even signed, which makes all the more

15   sense because there was a mistake all around.  Even that

16   smoking gun email from Mr. Morris where Mr. Waterhouse is

17   copied that he referenced in his argument, it says, prepare

18   the notes for execution.  Well, they were not -- they were not

19   executed.

20       So, respectfully, Your Honor, it is wrong to suggest that

21   we knew or should have known about this failure-to-sign

22   argument in May.  That's separate from whether he was

23   authorized to sign.

24           THE COURT:  All right.  My last question is this.

25   Well, maybe it's my last question.  I'm troubled we don't have

1  Mr. Waterhouse here today.  As I said in the beginning, this

2  is a very serious motion.  And if it's not obvious, the reason

3  why I say it's a very serious motion is basically what you're

4  telling me is that HCMFA and Mr. Waterhouse and maybe Debtor

5  officers and directors -- I think it all boils down to Mr.

6  Waterhouse, really -- they either lied or made a mistake in

7  about 42 filed documents, including audited financial

8  statements, the 15(c) report, and the monthly operating

9  reports.  I mean, that's about as serious as it gets, right?

10  And Mr. Waterhouse isn't here to say, look, Judge, here's what

11  happened, to the best of my memory.  Here's what happened.

12  Why isn't he here?

13          MR. RUKAVINA:  Your Honor, that's two questions and

14  two answers.  He's not here because, again, I had understood

15  and the practice was always that we don't have live testimony

16  on motions.  If the Court believes that his testimony for

17  whatever reason is necessary, I'll subpoena him.

18          THE COURT:  You don't have a declaration.  You had

19  800 pages worth of testimony --

20          MR. RUKAVINA:  But Your Honor, I had his --

21          THE COURT:  -- and documents.

22          MR. RUKAVINA:  I had his deposition.  I had his eight

23  hours of deposition.  What would be better than his deposition

24  cross-examining under oath in which he -- again, and let's --

25  let me make it clear.  I am not alleging that he or anyone

1  lied. I am not alleging that Debtor representatives lied. I

2  thought I made it very clear in my motion that all of these

3  mistakes are the result of an initial good faith mistake, a

4  good faith assumption. So, so I think it's very -- and

5  recall, it's in my motion, --

6          THE COURT: But --

7          MR. RUKAVINA: -- recall, Your Honor, --

8          THE COURT: -- the mistake has resulted in dozens of

9  erroneous reports to stakeholders.

10         MR. RUKAVINA: That may be. That may be. You know,

11 but that is -- that is something that the jury will decide

12 whether it's erroneous or not.

13         THE COURT: Well, it may go beyond a jury trial just

14 in this adversary, right? It's pretty serious stuff.

15         MR. RUKAVINA: It -- it is pretty serious stuff, Your

16 Honor. The fact -- but, again, I think -- I think all of us

17 -- and I'm being -- please understand, I'm being very

18 respectful and humble here. I think all of us are going far

19 farther than the narrow actual issue before the Court right

20 now, which is whether Frank Waterhouse signed these notes.

21 All of these issues of mistake, all of these other issues, we

22 don't have evidence on today because we're not trying that

23 today. I'm sure Mr. Waterhouse, Ms. Hendrix, Mr. Klos, they

24 all acted in good faith. I am sure. And as Mr. Klos and as

25 Ms. Hendrix confirmed, over the years they would get hundreds

1  of these notes, hundreds of these transfers. And it was a

2  standard practice to paper them up as a promissory note. And

3  then of course they'd be carried on books and records as

4  promissory notes.

5      The people that made the initial error, by assumption --

6  not by bad faith; by assumption, or misassumption -- would

7  carry it as an asset on the books and records. But only Mr.

8  Dondero and perhaps only Mr. Waterhouse know or could have

9  known what the actual purpose of the $7.4 million transfers

10 was.

11     And recall, Your Honor, there were two other promissory

12 notes at about the same time in very similar amounts. Those

13 promissory notes are valid. They are valid. But that, that's

14 why I wanted to walk you through -- it's actually been

15 admitted into evidence now -- Mr. Waterhouse's own emails and

16 Mr. Waterhouse's own Rule 15(c) statement -- it's in my reply

17 brief, Your Honor -- when Mr. Waterhouse refers to these notes

18 as the note and where he says -- Your Honor, it's -- this is

19 his language -- the HCMFA note is a demand note. There was an

20 agreement between HCMLP and HCMFA the earliest they could

21 demand is May 2021.

22     I say that because again it's clear that everyone was

23 confused about this. How can the CFO be talking about one

24 note that's not collectable until May 2021, how can he be

25 talking about that unless he truly didn't know about these

1   notes and was confused about them?  In good faith?  Because

2   his employees, his -- what's the polite word?  His subservient

3   employees created these notes based on a mistaken assumption

4   and never gave the notes to him to sign.  He never signed

5   them.  And when he or Mr. Dondero would see financials

6   disclosing promissory notes payable by HCML -- HCMFA to HCMLP,

7   they would assume that it's those prior notes that had been

8   extended.

9           THE COURT:  Okay.  Well, --

10          MR. RUKAVINA:  That -- that's -- that's how all this

11  -- Mr. Waterhouse is not lying about not having signed these

12  notes.  Because we have that.  He didn't sign them, the notes.

13  Mr. Waterhouse is not lying, nor is Ms. Hendrix lying, about

14  whether he authorized her to sign these notes for him.  No one

15  is lying to the Court.  The fact is he didn't sign the notes

16  and the fact is the Debtor has no evidence that he authorized

17  --

18          THE COURT:  He didn't -- he didn't ink-sign the

19  notes.  But we have --

20          MR. RUKAVINA:  Right.

21          THE COURT:  -- a dispute, you will acknowledge, about

22  authority.

23          MR. RUKAVINA:  Absolutely.  That is a -- that is a

24  legitimate bona fide dispute, where I understand that there is

25  evidence against me on that.  There's also evidence for me on

1  that.

2          THE COURT:  All right.  Mr. Morris, your closing?

3          CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

4          MR. MORRIS:  Your Honor, I think this discussion just

5  highlights the absurdity of all of this.  Mr. Rukavina keeps

6  ignoring the overwhelming evidence here of undue delay,

7  futility, and prejudice.  These notes were described for the

8  treasurer of HCMFA at the moment they were created.  He was

9  told they were being created by the accounting department, he

10 was told that the transactions were being booked as a loan,

11 and he didn't say boo.

12     A month later, they're on HCMFA's audited financial

13 statements.  That is the -- the undue delay clock started on

14 May 2nd and May 3rd, 2019.  How do you have $7.5 million of

15 notes sitting on your balance sheet and nobody asks a

16 question?  Mr. Rukavina says, oh, they thought they were the

17 old notes.  Not possible.  It's an assumption that he's

18 making.  There's no evidence to support it.  And it makes

19 absolutely no sense.

20     How do we know that?  Because those prior notes were $5

21 million.  So how come every single time HCMFA's obligations

22 reported to Highland are more than $10 million?  Where's the

23 evidence to explain that?  They do it to the Retail Board.

24 Mr. Dondero is personally told multiple times during the case,

25 when he's trying -- with his pot plan, it's more than $10

1   million.  And you're right, Mr. Waterhouse signed monthly

2   operating reports both before and after Mr. Dondero ceded

3   control that had more than $10 million of assets.

4       For them now to try to run away from that, to try to get

5   to a jury to believe it, is a waste of everybody's time and a

6   waste of everybody's money.  They could have conducted this

7   investigation two and half years ago.  They could have

8   conducted this investigation in June of '19.  They could have

9   conducted the investigation when they were preparing their

10  schedules and their monthly operating reports at the

11  commencement of the case.  They could have conducted this

12  investigation in the fall of 2020 when the Retail Board asks

13  the question, tell me all of the notes that you own.  And the

14  officers of HCMFA tell them it's more than $10 million.  How

15  are you confusing the old notes when you're telling your

16  patron that there's $12 million of notes outstanding, and they

17  tell this Bankruptcy Court dozens of times and they tell

18  stakeholders dozens of times?

19      This is not right, Your Honor.  It's both undue delay --

20  every single time they sign another document, every single

21  time they tell their auditors, every single time they put it

22  on their balance sheet, every single time they tell the Retail

23  Board is an opportunity to say, hey, wait a minute, why are

24  these notes there?  And they never do it.

25      It doesn't even start with Mr. Sauter.  All of this

1   happens before Mr. Sauter ever has anything to do with this.

2   Where was the leadership?

3       Mr. Rukavina has the audacity to blame the Debtor's

4   employees?  I have news for him.  The Debtor's employees were

5   under the direction and control of Mr. Dondero and Mr.

6   Waterhouse at all times when this happened.  At all times.

7       This is gaslighting, Your Honor.  It is really not right.

8   The prejudice would be overwhelming.  Mr. Rukavina says I have

9   the transcript.  I didn't know what he was doing.  I didn't

10  know he was trying to create some new record of a defense that

11  had never been pleaded.  That transcript, I would -- I would

12  welcome the opportunity, and I'm going to have it, we can

13  revisit these issues in the context of the existing defenses,

14  but they shouldn't be -- how many bites at the apple can they

15  get?  How many times do they get to try to make it right?

16  They're now trying to convince the Court that they should have

17  the opportunity to do exactly the opposite of what Mr. Sauter

18  found.  He wrote in his declaration that he filed under oath

19  with this Court that Mr. Waterhouse signed the notes and that

20  he did so on mistake, and now he wants to say he didn't sign

21  the notes.  He never put it in front of Mr. Waterhouse.

22      And all of this is really just -- it's just irrelevant,

23  because the one -- the most important evidence that the Court

24  should consider today, the most important evidence that the

25  Court should consider is that Mr. Waterhouse told Mr. Sauter

1   multiple times why the notes were created.

2       So we can sit here and talk about metadata if you want,

3   but Mr. Sauter knew, he just didn't tell the Court, he knew in

4   April and May that Mr. Waterhouse told him multiple times that

5   he needed the notes to paper the transfer.  There's no dispute

6   the transfer was made.  He told Mr. Sauter multiple times he

7   needed the notes for the auditors.  There's no dispute about

8   why Mr. Waterhouse -- why he knows the notes were created.

9   It's undisputed.

10      And I just want to finish with this notion that somehow,

11  somehow this is my fault.  It's offensive.  When somebody

12  sends me a document request and I send an objection, you need

13  to follow up.  I'm not -- I don't care what you think.  You

14  wouldn't -- Mr. Rukavina wouldn't have gotten sanctioned if he

15  made a motion, unless he did it without meet-and-conferring.

16  But you know what happened?  When they finally got around to

17  asking for the stuff, not in -- not in May, not in June, not

18  in July, not in August, not in September, but within ten days

19  of his asking I produced them.

20      The one piece of evidence that's missing from this whole

21  frolic and detour is one follow up between May and October:

22  Hey, I haven't gotten the metadata.  Or, hey, you objected,

23  you said the metadata was vague, what do you mean by that?

24  Can we meet and confer?

25      They dropped the ball, Your Honor, and my client shouldn't

1  have to pay the price for their negligence.

2      I have nothing further.

3      THE COURT:  I want to ask another question about

4  prejudice.  You know, that's another factor courts are

5  supposed to consider.  I know there's this dispute about

6  motion for summary judgment, was it filed before or after this

7  motion to amend answer?  And I know the obvious answer you're

8  going to tell me is we're ready to go forward on our motion

9  for summary judgment.  If you grant leave to amend, you know,

10  maybe we're going to have to take new discovery, slow down

11  that train.

12      Let me ask you something more -- well, it's nagging at me.

13  I don't know if I want to say it's troubling.  If HCMFA's

14  theory of the case is correct that these notes were not

15  supposed to be created, this was not supposed to be a loan,

16  this was a transfer intended to compensate HCMFA for the

17  losses it incurred that were Highland's fault, blah, blah,

18  blah, okay, this happened in May 2019.  The bankruptcy was

19  October 2019.  To me, that's a -- it's a bombshell morphing of

20  the case, because if that is the reality, then it sets things

21  up for the Plaintiff to argue, well, that was an insider

22  preference, then.  Right?  I don't know.  Am I going down the

23  wrong trail?  It seems like the obvious way this would morph.

24  Except, I guess, the 546 deadline for that ran October 19,

25  2021, which, by the way, is when all of this all kind of came

1  out that we went to.  And then to say he didn't sign it, null

2  and void notes.

3      Anyway, am I going down a crazy trail here?  I guess I'm

4  thinking prejudice to the Debtor.  The Debtor has been

5  deprived of the opportunity to assert a preference -- what

6  would seem like an obvious insider preference cause of action

7  if this theory of the case is true.  Am I all wet on that?

8          MR. RUKAVINA:  Your Honor, I'm not going to say those

9  words.  I'm going to say that Your Honor is wrong because the

10  Debtor knew about this defense since May.

11      Now, the primary defense here is that the payment was

12  compensation.  Whether Waterhouse signed the notes or not

13  doesn't matter to that defense.  That defense has been around

14  since May.  Or if I'm -- if I'm wrong, I apologize.  It's

15  whenever I filed the motion to amend.  We just looked that

16  that motion, and I don't have it in front of me right now.

17          THE COURT:  May 22nd.

18          MR. RUKAVINA:  My memory was -- May 22nd.  Since May

19  22nd, the Debtor has known -- and recall the other cases where

20  other Defendants said, well, the notes were forgivable.  And

21  I'm not involved with that, so my knowledge might be a little

22  bit off.  But as I understand it, the Court said, okay, well,

23  I'm going to grant you leave to state that the notes are

24  forgivable, but I'm going to grant the Plaintiff leave to

25  assert a 548.

1    As soon -- as soon as I filed this motion here, the Debtor

2    knew that, if I'm right, then these notes are illegitimate and

3    the $7.4 million in transfers was compensation to a creditor.

4    The Debtor could have likewise said, Judge, as part of giving

5    Mr. Rukavina leave, give us leave to assert an insider

6    preference, and the Court would have certainly granted it.

7        So, and honestly, the thought had not crossed my mind, I

8    doubt it crossed the Debtor's mind, about the potential 546(e)

9    and the 547(b) issues until the Court mentioned them.

10       So I do think that the Court is -- and I don't know,

11   again, what being all wet means, but I think the Court is

12   being a little bit over-paranoid in thinking that somehow the

13   Defendant here delayed to let limitations run.  That was

14   absolutely not the case.

15           MR. MORRIS:  If I may, Your Honor?

16           THE COURT:  You may.

17           MR. MORRIS:  Just briefly.  This is going to be *part*

18   *deux*.  Right?  We had litigations for six months, and then we

19   were presented with the condition subsequent defense that all

20   of the obligors instead of HCMFA asserted, and therefore we

21   had to amend our complaint to add new causes of action and we

22   had another three month delay.

23       If they're permitted to do this, we will again have to

24   amend our pleading to assert breach of fiduciary duty causes

25   of action against Mr. Dondero and Mr. Waterhouse, at a

1   minimum.  Okay?  This is going to open up yet another can of

2   worms.

3     And there is no basis for it.  I do not understand how

4   HCMFA has the audacity to run away from notes that they

5   carried on their own balance sheet, that they reported to

6   their own auditors, that they told the Retail Board that they

7   owed, that their treasurer signed and certified to this Court

8   that they were valid obligations for the benefit of the

9   Debtor.  I don't understand how they have the audacity to even

10   do this.

11      MR. RUKAVINA:  But Your Honor, Your Honor, what Mr.

12   Morris says again goes to the merits of a defense that's been

13   on file since May.  If the Court grants the current motion,

14   it's not going to slow down summary judgment proceedings.

15   Whether the note was signed or not does not change the

16   question of whether the note is valid or not, of whether there

17   was a mutual mistake or not.

18     So it's not going to slow down the MSJ proceedings.  And,

19   again, the Debtor has had since May to amend its complaint to

20   assert breach of fiduciary duty, to assert insider preference,

21   to assert whatever it wants.  Frankly, the Debtor could have

22   sued Mr. Waterhouse, having signed the note.  It hasn't.

23     Mr. Morris is arguing that this motion is this qualitative

24   difference in this case.  It's not.  The qualitative

25   difference was when we asserted our primary affirmative

1  defense in May.  And since then, the Debtor has done nothing.

2       MR. MORRIS:  I have nothing further, Your Honor.

3       THE COURT:  Let me ask you one last question.  I

4  think this really is the last one, Mr. Rukavina.  Whether I

5  allow the amendment or not, even under the existing amended

6  answer, the fact-finder is going to have to get into details

7  about the shared services agreement, correct?

8       MR. RUKAVINA:  I believe so.  Yes, Your Honor.

9       THE COURT:  So here's something else nagging at me.

10 Back when I did the Report and Recommendation to the District

11 Court on the Motion to Withdraw the Reference -- which I

12 notice from the docket they still have not -- the District

13 Court still has not ruled on.  Correct?  Is anyone seeing it?

14 I'm not seeing it.

15      MR. MORRIS:  Your Honor, I think all four -- I think

16 four out of the five have been signed and approved.  I think

17 the only one that has not is the one that was originally in

18 the adversary with Mr. Dondero.

19      THE COURT:  Really?

20      MR. RUKAVINA:  Your Honor, I think Mr. Morse is

21 right.  For some reason, the District Court's orders in some

22 of these adversaries have not been filed on the bankruptcy

23 docket.  I don't understand why, but I've had to go to the

24 District Court docket to see the orders.

25      THE COURT:  Okay.  Well, I'm just getting a little

1    bugged that it was represented to me in the motion to withdraw

2    the reference, which I accepted and put in my report, that not

3    only did the note litigation not have anything to do with the

4    proofs of claim or any claims asserted by HCMFA, but "The

5    proofs of claim involve two wholly separate nonintegrated

6    agreements."  That is, the shared service agreement and sub

7    advisory agreement.  Any consideration of the notes is

8    irrelevant to proofs of claim.  They'd already been

9    disallowed.  Here, the Plaintiff's claims arise under a

10   promissory note.  The Defendant's disallowed claims arose

11   under separate contracts having nothing to do with the notes.

12   The two sets of claims share no common set of facts, and

13   resolution of one is not necessary legally, factually, or

14   logically to the resolution of the other.

15       Anyway, what my monologue up here is aiming at:  I made a

16   representation, HCMFA made a representation that the basis for

17   our claims that we filed in the Bankruptcy Court are these

18   shared services agreements, they have nothing to do with

19   notes, they're not inextricably intertwined, which, you know,

20   you have to find that for there to be constitutional authority

21   to adjudicate a matter.

22       This is kind of not the case, right?  As the case has

23   evolved, we actually have -- I mean, I don't know.  I don't

24   know when the administrative expense claim is set for trial,

25   but it kind of feels like we're going to get all wrapped up

1    into performance and interpretations under those agreements,

2    just like apparently we are now under the new theory of the

3    case.

4        What do you have to say to that?

5        MR. RUKAVINA:  Your Honor, I think, respectfully,

6    Your Honor is wrong.  This is not a new theory of the case.

7    This theory of the case was around since May 22nd.  The Court

8    entered its Report and Recommendation on July the 8th.  The

9    Debtor didn't point out at that time the matter that Your

10   Honor is now thinking should have mattered, and it doesn't

11   matter, because the fact of the shared services agreement is

12   --

13       THE COURT:  Well, I'm just, I'm going to split hairs

14   with you on the dates.  I had the hearing on the motion to

15   withdraw the reference May 25th.  Okay?  So I was looking at

16   the original answer at that point in time.  And then,

17   actually, you had filed the motion to amend the answer three

18   days before that hearing, on May 22nd, but I didn't have a

19   hearing on that until July, and I think it was agreed at that

20   point.

21       So, my point is, at the point in time that I was thinking

22   about this, hearing the lawyers' arguments, and I think I even

23   announced orally my ruling, and then we just papered it up

24   with the Report and Recommendation, the case hadn't really

25   evolved.  And I'm just wondering if that is a problem now.

1          MR. RUKAVINA:  Your Honor, I don't -- I don't think

2    it's a problem.  If the Debtor wants to try to change those

3    orders, it can.  But let me remind Your Honor that under the

4    -- the claim that my client has under the shared services

5    agreement and the claim that the Debtor has going back, which

6    are set for trial reasonably soon, are purely postpetition

7    matters for postpetition amounts.  Anything that has to do

8    with the shared services agreement as relates to this

9    adversary proceeding would have related to prepetition

10   actions.

11        Nor is my client seeking a claim under the -- a

12   prepetition claim, a general unsecured claim, against the

13   Debtor for having caused the TerreStar NAV error.

14        So I don't agree with Your Honor that the facts here are

15   inextricably intertwined.  There's a promissory note, and the

16   only question is, was the promissory note intended to be a

17   loan or was it intended to be compensation?

18        And yes, the fact-finder will have to understand the

19   existence of the shared services agreement, but the fact-

20   finder will not be asked to construe the shared services

21   agreement.  It won't be asked to quantify any monies under the

22   shared services agreement.  Again, the only question will be

23   what was the intent, a loan or a compensation?

24        That is not a core matter, especially because all this

25   happened prepetition.

1          MR. MORRIS:  If I may, briefly, Your Honor?

2          THE COURT:  Okay.

3          MR. MORRIS:  The notion that this is not a new theory

4   of the case is mindboggling.  If it weren't, there would be no

5   need for a motion.

6       The issue that was presented and that we were prepared to

7   try is whether or not these were loans or compensation.  Now

8   we're told that somehow the debt -- the -- HCMFA isn't going

9   to be obligated.  Well, let me tell you, if they took our

10  money and Mr. Waterhouse and Mr. Dondero want to take the

11  stand and swear that all of this was a gross mistake and that

12  the two of them, when they were in control, filed dozens of

13  documents with the Court that were wrong, that they should

14  have investigated and they didn't, it will require us to

15  assert new claims for breach of fiduciary duty.

16      I do not know how the person in control of an enterprise

17  and the treasurer and the CFO of a debtor in bankruptcy, I

18  don't know how they can in good faith at this point assert

19  that they -- that the notes are not binding on their company.

20  I just don't know how they can do that.  It is an entirely new

21  theory of the case.  It will require not just discovery but an

22  amendment of our complaint, because we will go after Mr.

23  Waterhouse, we will go after Mr. Dondero with new claims.  And

24  that's part of the prejudice that would result.

25          THE COURT:  All right.  Well, let me say right off

1   the bat that this went a lot longer than any hearing I have

2   ever had on a Rule 15 motion to amend.

3       My law clerk warned me last Thursday, oh, this is a little

4   bit more involved than maybe you were anticipating, which

5   means I ended up spending a great part of my weekend, among

6   other things, looking at the deposition of Frank Waterhouse,

7   which Mr. Sauter had not reviewed.  That alone was 400 pages.

8   That was my Sunday afternoon activity.  So that sounds like

9   whining.  I suppose it is, a little bit.  But my point is this

10  is not your garden-variety motion to amend under Rule 15

11  because never have I had a hearing on such a motion that went

12  on for four hours and that each side submitted 800 pages of

13  evidence.  But such is life in this unique case of Highland, I

14  suppose.

15      As I've said a couple of times today, I do consider this a

16  very serious matter, which I suppose is one reason why I

17  indulged so much evidence and argument.  Because, again, as I

18  interpret the arguments and what's been presented in the

19  record, the proposed second amended answer would essentially

20  mean HCMFA is arguing that Frank Waterhouse and perhaps others

21  within both the Highland and HCMFA organization either lied or

22  made a $7.4 million mistake in dozens of reports to interested

23  stakeholders.

24      Again, we have monthly operating reports, signed at least

25  electronically, purportedly, by Frank Waterhouse.  We have the

1    15(c) reports.  We have audited financial statements.  Okay.

2    So that's why I say this is really serious and this was worth

3    indulging a lot of evidence and argument, because, wow, this

4    is really a bombshell.  You're saying all of this information

5    that certain individuals floated out there, allowed to be

6    floated out there, had reason to know was floating out there,

7    was erroneous.

8         Shocking to me, but I heard what I heard.  And what I

9    heard was somewhat surprising.  They didn't have Mr.

10   Waterhouse coming in here saying, as treasurer of HCMFA -- of

11   course, the pleadings at one time said he was CFO -- CFO of

12   Debtor and treasurer of HCMFA, I realize now I, you know, I

13   made a huge mistake.  We didn't have him falling on his sword

14   saying that.  And in fact, in the 400-page deposition that I

15   spent all Sunday afternoon reading, he's -- I would say the

16   closest he comes to being supportive of this theory that HCMFA

17   is now asserting is "I don't recall," "I don't recall," "I

18   think it would have been this way," "I think this," "I think

19   probably that."  But he basically -- again, sophisticated

20   individual, CFO of a billion-dollar company, treasurer of

21   HCMFA, you know, a lot of -- I had a lot of documents that

22   were put in front of me on any daily basis.  I just can't

23   recall.

24        The person, the so-called subordinate who would have been

25   responsible, I think it's agreed, for obtaining Frank

1   Waterhouse's authorization to sign the document, she appears,

2   according to what I saw in the appendix, to be a CPA, who was

3   an accounting major, you know, not a first-year administrative

4   assistant.

5       So these are, again, disturbing things to have presented

6   to me, especially when no documents have been shown to me to

7   support the new theory of the case.  So, well, I guess you can

8   argue about responsive documents, but I certainly don't have

9   anything in the nature of a compromise and settlement

10  agreement, we agree Highland is liable for this and is

11  therefore compensating, reimbursing HCMFA.  We don't have

12  anything of that nature.

13      So, anyway, I think I've made it very clear that I'm very

14  disturbed about the evolving theory of the case.  But the

15  issue before me, of course, is Rule 15.  And what does the

16  case law say about Rule 15?  We all know very well that the

17  Court "should freely give leave when justice so requires."

18  And Rule 15 "evinces a bias in favor of granting leave to

19  amend."

20      The five considerations that the Fifth Circuit has

21  outlined in making this evaluation under Rule 15 is, is there

22  undue delay?  Is there bad faith or dilatory motive?  Is there

23  a repeated failure to cure deficiencies by previous

24  amendments, undue prejudice to the opposing parties, and

25  futility of the amendment?

1      I cannot help but conclude there is unreasonable, undue

2   delay when I look at this timeline.  It's a long timeline.

3   But, again, we have a transaction -- transactions, plural --

4   the notes that were or were not authorized to be signed by Mr.

5   Waterhouse.  They were executed May 2nd and May 3rd, or they

6   were purportedly executed May 2nd and May 3rd, 2019.  Not

7   forever ago, about five months before the Highland bankruptcy.

8      We had Highland making demand on the notes December 3,

9   2020, saying, pay up by December 11, 2020.  It didn't happen.

10  January 22, 2021 was when the adversary was filed to collect

11  on the notes.

12     At some point in February, Mr. Waterhouse and numerous

13  other Highland employees ended their employment or were

14  terminated with Highland.  And so, as far as I can tell, even

15  under the terms of prior injunctions of this Court at that

16  point, very shortly after the complaint was filed, HCMFA was

17  free to talk to Mr. Waterhouse as much as they wanted.  But in

18  any event, he testified, Mr. Waterhouse, in his deposition

19  that March 1, 2021 he began working at Skyview with the former

20  Highland employees who now were providing services to HCMFA,

21  and that was the same day as the original answer was filed.

22     And then May 22, 2021, HCMFA files its motion to amend its

23  answer with this evolving theory of the case, that these notes

24  were not supposed to be created, a loan was not intended, and

25  questioning irregularities, I think was the word used, with

1   regard to Mr. Waterhouse's signature.  And, again, it was not

2   until it looks like October 28th HCMFA told Debtor it will

3   assert a defense of non-signature.  And then November 30,

4   2021, the second motion to amend answer was filed.

5       I'm being clear for the Court of Appeals which is no doubt

6   going to look at this one day.  I've spent hours looking at

7   this.  Okay?  Again, not a garden-variety motion to amend

8   under Rule 15.  I read a 400-page deposition of Frank

9   Waterhouse.  I looked at other items in each 800-page

10  appendix.  And under the totality of what has been submitted

11  here, I find undue delay.  It is an evolving theory of the

12  case, and I'm not a hundred percent clear on why, when these

13  notes, copies of the notes were attached to the original

14  complaint filed on January 22nd.  I mean, the Defendant would

15  have been on notice day one, here are the documents that we're

16  suing under, and yet ten months later they want to argue for

17  the first time he didn't actually sign them.  And, again, I

18  guess they're saying he didn't ink-sign them.  There still

19  would remain a question, which was raised in the previous

20  amended answer, as far as his authority.

21      So undue delay.  I do find prejudice.  We're many, many,

22  many, many, many months down the road in what started over a

23  year ago, making a demand under these notes.  I've got motions

24  for summary judgment teed up.

25      You know, I'm a little bit troubled, as I said, that I did

1 a Report and Recommendation to the District Court based on a

2 simpler lawsuit, and maybe even under the first amended answer

3 I should be looking at this a little differently.

4 And again, I'm just, I'm thinking out loud on that. I

5 have an old opinion that may or may not be relevant, but it

6 was in a case called *Margaux Ventures* and it dealt with the

7 ability to raise a preference defensively if a preference

8 recipient is making a claim against the estate, and even if

9 the bar date, the 546 bar date has passed for affirmatively

10 filing a preference action. I think that was even an insider

11 preference in *Margaux Ventures*. The Plaintiff can still argue

12 defensively preference liability. And what I can't remember

13 for sure is, in *Margaux Ventures*, if it was an administrative

14 expense claim that the preference target was asserting, or was

15 it a prepetition claim. It might make more sense if it was a

16 prepetition claim.

17 But anyway, all this to say I'm mentioning this because it

18 factors into the undue delay and the prejudice. I mean, the

19 lawsuit is just going to keep morphing. I've already heard

20 that it would morph into a breach of fiduciary duty against

21 Mr. Waterhouse and others, but I think it could morph in other

22 ways. And I've got to go back and look at that *Margaux*

23 *Ventures* case to see if I think this is intertwining -- well,

24 anyway, I don't need to go back and look because I'm denying

25 the motion. But it's just, it's just way too late to make an

143

1  argument that should have been apparent many months ago if in

2  fact it's a legitimate argument.

3      And I guess the last thing I want to say is having a

4  witness today that is the general counsel for NexPoint,

5  another entity -- not HCMFA, not the Debtor -- someone who

6  didn't have personal knowledge that was contemporaneous with

7  the actions involved, someone who just after the fact for

8  NexPoint goes back and looks at the evidence, this has been a

9  significant factor here for me today.  The witness just seems

10  like someone who could not make a compelling case regarding

11  the bona fides, shall we say, of the amendment, which in my

12  mind links to the futility of the amendment.

13      All right.  Mr. Morris, please upload an order.  And we

14  are adjourned.  And for the people on WebEx who are here for

15  the 1:30 hearing, we need a short break.  I'll be back in ten

16  minutes.

17          THE CLERK:  All rise.

18          MR. MORRIS:  Thank you very much.

19      (Proceedings concluded at 2:01 p.m.)

20                      --oOo--

21                     CERTIFICATE

22      I certify that the foregoing is a correct transcript from the
   electronic sound recording of the proceedings in the above-entitled matter.

23
    **/s/ Kathy Rehling**                        **01/13/2022**

24
   _____        _____

25
   Kathy Rehling, CETD-444                          Date
   Certified Electronic Court Transcriber

144

INDEX

PROCEEDINGS                                              3

OPENING STATEMENTS

- By Mr. Rukavina                                        7
- By Mr. Morris                                         22

WITNESSES

Defendant/Movant's Witnesses

Dennis C. "D.C." Sauter, Jr.
- Direct Testimony by Declaration                       32
- Cross-Examination by Mr. Morris                       32
- Redirect Examination by Mr. Rukavina                  86
- Recross-Examination by Mr. Morris                    107

EXHIBITS

HCMFA's Rebuttal Exhibit 1                    Received  94
Defendant's Exhibits (Dockets 87, 112/1)     Received 113
Plaintiff's Exhibits 1 through 31            Received 114
    (Dockets 111, 113)

CLOSING ARGUMENTS

- By Mr. Rukavina                                      114
- By Mr. Morris                                        124

RULINGS                                               136

END OF PROCEEDINGS                                    143

INDEX                                                 144