PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., § § § | |
| Plaintiff, § § | |
| vs. § § | Adv. Proc. No. 21-03003-sgj |
| JAMES DONDERO, NANCY DONDERO, AND THE § DUGABOY INVESTMENT TRUST, § § | Case No. 3:21-cv-01010-E |
| Defendants. § § § | |

---

HIGHLAND CAPITAL MANAGEMENT, L.P.,

§
§
§

                  Plaintiff,

§    Adv. Proc. No. 21-3005-sgj

vs.

§
§

NEXPOINT ADVISORS, L.P., JAMES
DONDERO, NANCY DONDERO, AND
THE DUGABOY INVESTMENT TRUST,

§    Case No. 3:21-cv-00880-C
§
§
§
§

                 Defendants.

§

---

HIGHLAND CAPITAL MANAGEMENT, L.P.,

§
§

                  Plaintiff,

§    Adv. Proc. No. 21-3006-sgj

vs.

§
§

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC., JAMES DONDERO,
NANCY DONDERO, AND THE DUGABOY
INVESTMENT TRUST,

§    Case No. 3:21-cv-01378-N
§
§
§
§

                 Defendants.

§

---

HIGHLAND CAPITAL MANAGEMENT, L.P.,

§
§
§

                  Plaintiff,

§    Adv. Proc. No. 21-3007-sgj
§
§

vs.

§
§    Case No. 3:21-cv-01379-X

HCRE PARTNERS, LLC (n/k/a NexPoint
Real Estate Partners, LLC), JAMES
DONDERO, NANCY DONDERO, AND
THE DUGABOY INVESTMENT TRUST,

§
§
§
§
§

                 Defendants.

§
§

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................... 1

    A.    The Alleged Agreement Defendants admit to Plaintiff's Prima Facie Case ......... 3

    B.    Summary Judgment Should be Granted Dismissing the Alleged Agreement Defendants' Defense based on the Alleged Agreements ................... 4

        1.    No Reasonable Jury Could find that the Alleged Agreements Actually Existed ........................................................ 5

            (i)    The Undisputed Facts in Support of Summary Judgment ............................................................................... 5

            (ii)    The Alleged Agreement Defendants purport to contest Plaintiff's assertion that Nancy Dondero was not competent to enter into the Alleged Agreements (Compare Motion ¶¶ 96-97 with Opposition ¶ 69-79). ............................................................ 8

            (iii)    The Alleged Agreement Defendants purport to contest Plaintiff's assertion that Highland did not have a "standard practice" of forgiving loans (Compare Motion ¶¶ 103-104 with Opposition ¶ 7)........ 10

            (iv)    The Alleged Agreement Defendants purport to contest Plaintiff's assertion that the Alleged Agreements were "secret" (Compare Motion ¶ 98 with Opposition ¶ 11-13, 45). ......................................... 11

            (v)    The Alleged Agreement Defendants purport to contest Plaintiff's assertion that Mr. Dondero failed to specifically identify the Notes at issue (Compare Motion ¶ 93 with Opposition ¶¶ 14-15).......................... 11

            (vi)    The Alleged Agreement Defendants' Contentions of "waiver" and that they only made "periodic interest payments" are false ...................................................... 12

        2.    The Alleged Agreements are not support by Consideration........ 14

    C.    Summary Judgment Should be Granted Dismissing the Alleged Agreement Defendants' defense that Plaintiff Had an Obligation to Make the Payments Due under the SSAs without instruction or authority ................... 16

    D.    Summary Judgment Should be Granted Dismissing the Alleged Agreement Defendants' pre-payment defense.................................................... 18

CONCLUSION.................................................................................................................. 20

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST THE ALLEGED AGREEMENT DEFENDANTS[1]**

Highland Capital Management, L.P., the reorganized debtor and the plaintiff in the above-captioned adversary proceedings ("Highland" or "Plaintiff"), hereby files its *Reply Memorandum of Law in Further Support of its Motion for Partial Summary Judgment Against the Alleged Agreement Defendants* (the "Reply") in response to *Defendants' Memorandum of Law in Response to Plaintiff's Motion for Partial Summary Judgment* (the "Opposition")[2] filed by defendants James Dondero, NexPoint Advisors, L.P. ("NexPoint"), Highland Capital Management Services, Inc. ("HCMS"), and HCRE Partners, LLC ("HCRE") (collectively, the "Alleged Agreement Defendants"). In further support of its Motion, Plaintiff states as follows:

## I.    PRELIMINARY STATEMENT

1.    In their Opposition, the Alleged Agreement Defendants (i) ignore substantial portions of the undisputed evidence supporting the Motion, (ii) unilaterally deem other material portions "irrelevant" solely because they cannot be disputed, and (iii) otherwise attempt to fabricate "disputes" on the basis of uncorroborated, self-serving declarations and snippets of testimony taken out of context. Applying long-standing Fifth Circuit precedent, the Opposition is so "weak [and] tenuous on [the] essential fact[s]" and Plaintiff's undisputed, admissible evidence "is so overwhelming," that the Motion should be granted.

2.    The Opposition is noteworthy for at least three other reasons that cast considerable doubt on the veracity of the defenses being asserted and that evince utter disregard for this process.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

[2] *See* Adv. Pro. No. 21-03003 [Docket No. 154], Adv. Pro. No. 21-03005 [Docket No. 156], Adv. Pro. No. 21-03006 [Docket No. 157], and Adv. Pro. No. 21-03007 [Docket No. 152].

3.     ***First***, Mr. Dondero is so desperate to avoid repaying the money that he and his corporate affiliates indisputably borrowed from Highland that he and his sister have (if their testimony were to be believed) admitted to a litany of bankruptcy violations.  Specifically, they swear that they secretly entered into one of the Alleged Agreements (a) after the Petition Date, (b) while Mr. Dondero controlled the Debtor, (c) without seeking (let alone obtaining) this Court's permission, and (d) without disclosing the secret, unwritten Alleged Agreement to the Court or anyone else until after the commencement of litigation and confirmation of Highland's Plan.[3]  This tale is as brazen as it is unsurprising and unbelievable given Mr. Dondero's conduct throughout this case.  Either the Alleged Agreements are a complete fiction (as Plaintiff believes the admissible evidence conclusively proves) or Mr. Dondero and his sister have admitted to engaging in bankruptcy fraud by purportedly entering into a secret, post-petition agreement intended to divest the Debtor of millions of dollars in assets.

4.     ***Second***, in another audacious act intended to create chaos, the Corporate Obligors defiantly ignored multiple court Orders and did exactly what this Court told them they could not:  (a) offer expert opinions concerning Plaintiff's alleged duties under a written (and allegedly unwritten) Shared Services Agreement, and (b) press an affirmative defense that the Court prohibited after an evidentiary hearing.  Defendants' obstinate decision to ignore this Court's Orders is the subject of a separate motion being filed simultaneously with this Reply.[4]

---

[3] *See Declaration of James Dondero* ¶ 26, identified as Exhibit 1 to the *Appendix In Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment* (the "Defendants' Appendix"), Adv. Pro. No. 21-03003, Docket No. 155 (citations to Defendant's Appendix are noted as "Def. Ex. __ at __, Def. Appx. at __"); and *Declaration of Nancy M. Dondero* ¶ 8, identified as Exhibit 2 in Defendants' Appendix.

[4] *See Plaintiff's Omnibus Motion (A) to Strike Certain Evidence and Arguments, (B) for Sanctions and (C) for an Order of Contempt* (the "Sanctions Motion") being filed simultaneously with this Reply.

5.      **Finally**, the Opposition is noteworthy for its omissions. Defendants offer **no** probative documents of any kind nor have they submitted **any** declarations in support of any affirmative defense from any disinterested person. Frank Waterhouse -- Mr. Dondero's hand-picked Chief Financial Officer who simultaneously served (and continues to serve) as an officer of HCMFA and NexPoint and who remains responsible for accounting and finance -- is nowhere to be found. In the end, the limited and self-serving evidence relied upon by the Alleged Agreement Defendants, including a handful of deposition citations, does nothing to create genuine disputes of material facts.

6.      Taken as a whole, the admissible evidence shows that the Alleged Agreements are fictitious. Even if they weren't, they cannot be enforced due to a complete lack of consideration. The "Shared Services Agreement" defense also fails (a) as a matter of law because NexPoint's Shared Services Agreement did not authorize (let alone require) Highland to make payments against the Term Notes without direction or instruction from the applicable makers, and (b) as a matter of fact because there is no dispute that the applicable makers **never** provided any such direction or instruction. Finally, the "Pre-Payment" defense fails (i) as a matter of law based on the unambiguous provisions of the Term Notes, and (ii) as a matter of fact based on the undisputed documentary evidence and the facts set forth in Mr. Klos' Declarations.

7.      For the reasons set forth in the Motion, and those set forth herein, the Motion should be granted in its entirety.

**A.      The Alleged Agreement Defendants admit to Plaintiff's Prima Facie Case**

8.      In its Motion, Plaintiff cited to admissible evidence establishing (i) the existence of the Notes in question, (ii) that the Alleged Agreement Defendants signed each applicable Note, (iii) that Plaintiff is the legal owner and holder of each Note, and (iv) that a

certain balance is currently due and owing on each Note. Plaintiff also established that, except for the date, the amount, the maker, and the interest rate, each of the Demand Notes and each of the Term Notes is identical. Motion ¶¶ 19-37 (citing evidence).

9. The Alleged Agreement Defendants do not dispute *any* of the foregoing facts. Indeed, Mr. Dondero has admitted that each of the Alleged Agreement Defendants borrowed funds from Highland in exchange for each of the applicable Notes. J. Dondero Dec. ¶¶ 5-18, Def. Appx. at 4-12.[5]

10. On the basis of the foregoing, the Court should recommend and report that Plaintiff has proven its prima facie case against the Alleged Agreement Defendants.

**B.** **Summary Judgment Should be Granted Dismissing the Alleged Agreement Defendants' Defense based on the Alleged Agreements**

11. In its Motion, Plaintiff offered a mountain of admissible evidence in support of its contentions that (a) no reasonable jury could find that the Alleged Agreements actually existed, and (b) even if one could, the Alleged Agreements cannot be enforced as a matter of law due to a lack of consideration. Motion ¶¶ 39-53, 66-104 (citing evidence).

12. In response, the Alleged Agreement Defendants fail to dispute any of the key facts cited by Plaintiff and instead attempt to create "disputed facts" largely by relying on the self-serving, unsupportable declarations of Mr. Dondero and his sister. Those efforts are for naught.

---

[5] Mr. Dondero contends that each Note is an unsecured "soft note" that was not subject to a personal guaranty. *See generally* J. Dondero Dec. ¶¶ 5-18, Def. Appx. at 4-12. Whatever a "soft note" may be, these facts (even if credited) do nothing to void or mitigate the Alleged Agreement Defendants' obligations under their respective Notes.

### 1. **No Reasonable Jury Could find that the Alleged Agreements Actually Existed**

13. Notwithstanding Mr. and Ms. Dondero's protests to the contrary, no reasonable jury could find that the Alleged Agreements actually exist or ever existed.

14. Context is critical. According to Mr. Dondero's expert, Alan Johnson, Highland paid Mr. Dondero approximately $1.7 million during the three-year period 2017-19 as Highland was hurtling towards bankruptcy. Def. Ex. G at 19, Def. Appx. at 255. During that same period, the Alleged Agreement Defendants tendered to Highland promissory notes with an aggregate face amount of more than $70 million in exchange for loans of equal value, all of which are purportedly subject to the Alleged Agreements entered into for the supposed purpose of motivating and potentially compensating Highland's allegedly underpaid executive, Mr. Dondero. Dondero Dec. ¶¶ 5-18, Def. Appx. at 4-12; N. Dondero Dec. ¶ 10, Def. Appx. at 81-83.

#### (i) The Undisputed Facts in Support of Summary Judgment

15. Thus, the face amount of the Notes subject to the Alleged Agreements was more than *40 times* Mr. Dondero's direct cash compensation from Highland. Given the enormity of Mr. Dondero's personal interest in the Alleged Agreements, a jury would reasonably expect Mr. Dondero to have (i) contemporaneously taken steps to make sure those Alleged Agreements were documented and disclosed to remove any impediment to enforcement, and (ii) immediately and accurately recited the relevant facts if enforcement was ever questioned.[6]

---

[6] Ms. Dondero and Dugaboy should have also been motivated to memorialize and disclose the terms and existence of the Alleged Agreements in order to protect themselves from second-guessing or claims of breach of fiduciary duty; to ensure that all stakeholders were aware of Highland's alleged obligations; and to increase the likelihood that Ms. Dondero's brother would reap the benefits of the alleged bargain. But there is no dispute that Ms. Dondero **never** put anything in writing and **never** told a soul about the Alleged Agreements. Ex. 25 (Responses to RFAs 1-6, 9-16,

16.     Yet, the evidence conclusively proves that the ***exact opposite*** occurred such that, except as described below, the Alleged Agreement Defendants are forced to ignore or deem "irrelevant" the following undisputed facts that plainly constitute admissions:

- All of the Notes (including the HCMFA Notes) were fully described in Highland's audited financial statements without discount or reference to the Alleged Agreements or any other defense, and those financial statements relied on Mr. Dondero's representation letters (Motion ¶¶ 39-55 (citing evidence));

- Highland carried all of the Notes (including the HCMFA Notes) as assets on its balance sheet without discount or reference to the Alleged Agreements or any other defense. (*Id.* ¶¶67, 70-72 (citing evidence));

- NexPoint and HCMFA informed the Retail Board in October 2020 that they were obligated to pay Highland under their respective Notes without discount or reference to the Alleged Agreements or any other defense.  (*Id.* ¶¶ 56-65 (citing evidence));[7]

- Highland included the Notes (including the HCMFA Notes) in every one of its Schedules and MORs filed with the Bankruptcy Court without discount or reference to the Alleged Agreements or any other defense. (*Id.* ¶¶ 66-72 (citing evidence));

- None of the Alleged Agreement Defendants objected to the Debtor's projected recovery on the Notes even though the Notes were described as substantial sources of recovery for creditors, and Mr. Dondero and his affiliated companies otherwise lodged myriad objections to the Plan. (*Id.* ¶¶ 73-78 (citing evidence));

- Even though Plaintiff had already commenced the Adversary Proceedings, the Alleged Agreement Defendants remained silent about the Alleged Agreements and all other defenses during the confirmation hearing, despite the fact that Mr. Dondero's counsel cross-examined

---

responses to Interrogatories 1-2, Appx. 538-542; Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 554-558); Motion ¶ 99 (citing evidence).

[7] Notably, on September 21, 2020, a month before the Advisors responded to the Retail Board (Ex. 59, Appx. 885), Plaintiff filed its *Disclosure Statement for the First Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1080] (the "Disclosure Statement").  The Disclosure Statement provided for the anticipated Reorganized Debtor to purse an asset monetization plan.  Docket No. 1080 at 7.  Thus, if approved, and the Alleged Agreements actually existed, Mr. Dondero stood to gain tens of millions of dollars because the assets were certain to be sold by a third-party, one of the so-called "conditions subsequent."  A reasonable jury would expect Mr. Dondero and NexPoint to have informed the Retail Board that the obligations under the NexPoint Term Note were likely to be forgiven pursuant to the Alleged Agreements.

Mr. Seery about the Notes and offered arguments concerning them. (*Id*.);

- As described in detail below, Mr. Dondero, HCMS, and NexPoint paid nearly $40,000,000 to Highland from 2017-2019 on account of obligations due under promissory notes, something that would never happen if the Alleged Agreements actually existed;

- Even though they are all indisputably controlled by Mr. Dondero, HCMS, HCRE, and NexPoint all failed to disclose or rely upon the Alleged Agreements in their Original Answers. (*Id.* ¶ 81 (citing evidence));

- In his Original Answer, Mr. Dondero asserted that Plaintiff had already agreed that it "would not collect on the Notes" rather than assert that the Alleged Agreements were subject to "conditions subsequent." (*Id*.);

- After amending his Original Answer to adopt the "conditions subsequent" provision of the Alleged Agreements, Mr. Dondero failed to identify his sister as a person "likely" to have discoverable information even though he named fifteen (15) other people. (*Id.* ¶¶ 82-83 (citing evidence));

- Mr. Dondero initially swore that *he* entered into the Alleged Agreements on behalf of Highland, not Nancy. (*Id.* ¶¶ 84-85 (citing evidence));

- Mr. Dondero failed to initially identify his sister as someone he believed had "actual knowledge of each [Alleged] Agreement." (*Id.* ¶ 86 (citing evidence));

- Nancy Dondero failed to make any inquiry into any fact relevant to the Alleged Agreements, and simply accepted the few "facts" her brother fed her without question. (*Id.* ¶96 (citing evidence); N. Dondero Dec. ¶¶ 4-5, 9, Def. Appx. at 80-81, 83).

- With two legally irrelevant exceptions addressed below, Mr. and Ms. Dondero failed to disclose the terms or existence of the Alleged Agreements to *anyone*. (Motion ¶ 98 (citing evidence)).

- Mr. and Ms. Dondero failed to create *any* document, or even send a confirming e-mail, reflecting the terms or existence of the Alleged Agreements. (*Id.* ¶ 99 (citing evidence)); and

- Ms. Dondero made *no* attempt to negotiate any aspect of the Alleged Agreements with Mr. Dondero. (*Id.* ¶ 102 (citing evidence)).

7

17.     The Alleged Agreement Defendants do not (and cannot) contest any of the foregoing facts, every one of which was (i) directly contrary to Mr. Dondero's self-interest, and (ii) within Mr. Dondero's control to alter.  Instead, the Alleged Agreement Defendants either ignore the foregoing facts or deem them "irrelevant" on the ground that Plaintiff did not cite to any "legal authority" that any of them are dispositive or that the Alleged Agreement Defendants were required to take, or refrain from taking, any particular action.

18.     Predictably, the Alleged Agreement Defendants miss the point.  Viewed in isolation, none of the foregoing undisputed facts singularly proves that the Alleged Agreements are a fiction (although many, individually, come close).  Yet, when viewed together, there is only one reasonable conclusion: the Alleged Agreement Defendants will never be able to carry their burden of persuading a reasonable jury that the Alleged Agreements actually exist, particularly given the enormous stakes for Mr. Dondero, and the fact that the only evidence supporting their story is their own self-serving statements.

19.     While the foregoing undisputed admissions are more than enough to support Plaintiff's motion for summary judgment, the Alleged Agreement Defendants' attempts to fabricate genuine disputes of material fact fail.

(ii)     <u>The Alleged Agreement Defendants purport to contest Plaintiff's assertion that Nancy Dondero was not competent to enter into the Alleged Agreements (*Compare* Motion ¶¶ 96-97 *with* Opposition ¶ 69-79).</u>

20.     Relying on (a) Ms. Dondero's extensive admissions proving that she had neither the skillset nor the experience to enter into the Alleged Agreements without obtaining professional advice, and did ***nothing*** to educate herself about ***any*** issue concerning the Alleged Agreements, and (b) the expert testimony of Mr. Johnson confirming why her failure

to do so is fatal, Plaintiff established that Ms. Dondero was not competent to enter into the Alleged Agreements. Motion ¶¶ 96-97 (citing evidence).

21. In a vain attempt to create a "disputed fact," the Alleged Agreement Defendants rely *exclusively* on Ms. Dondero's conclusory and thread-bare Declaration. In her Declaration, Ms. Dondero purports to disclose *everything* her brother told her (N. Dondero Dec. ¶ 4, Def. Appx. at 80-81), and *everything* she otherwise knew (N. Dondero Dec. ¶¶ 9-10, Def. Appx. at 83-84). No reasonable jury could ever consider those disclosures and conclude that Ms. Dondero was sufficiently informed to enter into Alleged Agreements worth over $70 million or that there is any basis for her self-serving and conclusory statements that she had "all of the facts and information [she] considered necessary, reasonable, and appropriate" to enter into the Alleged Agreements and that she "appreciated the effect of what [she] was doing." (N. Dondero Dec. ¶¶ 11-12, Def. Appx. at 84).[8]

22. Ms. Dondero's Declaration is notable for one other thing: she does not dispute a single fact set forth in paragraph 96 of the Motion, only Plaintiff's reasonable conclusions based on those facts. The Alleged Agreement Defendants have failed to create a genuine dispute of material fact and will never be able to convince a reasonable jury that anyone in Ms. Dondero's position could have or would have entered into a series of agreements worth over $70 million under the circumstances.

---

[8] As described in detail below, if Ms. Dondero had done *any* due diligence, she would have learned, among other things, that (a) each of the three portfolio companies was already "*in the money*" when she supposedly entered into the Alleged Agreements thereby eliminating the supposed "motivation" that constituted the "consideration" Highland allegedly received; (b) Highland did not have a "standard practice" of forgiving loans; had not forgiven any loan in almost a decade; had never forgiven an affiliate loan; and had never forgiven a loan of more than $500,000; (c) Mr. Dondero earned millions of dollars per year from the Highland enterprise even though only a portion was allocated to Highland; and (d) had she consulted a compensation expert such as Mr. Johnson, Mr. Dondero was allegedly "undercompensated" by only $10-20 million for the seven-year period 2013-2019 (Def. Ex. G at 19, Def. Appx. at 255) rendering *completely gratuitous* a loan forgiveness program worth (at the time of entry) over $70 million. This is in addition to the indisputable fact that Ms. Dondero simply did not have the authority to bind Highland.

        (iii)   <u>The Alleged Agreement Defendants purport to contest Plaintiff's assertion that Highland did not have a "standard practice" of forgiving loans (*Compare* Motion ¶¶ 103-104 *with* Opposition ¶ 7).</u>

23.     In its Motion, Plaintiff cited to audited financial statements and the undisputed testimony of Mr. Dondero and his expert, Mr. Johnson, to establish that (a) Highland has not forgiven a loan to anyone in the world since 2009, (b) the largest loan Highland has forgiven since 2008 was $500,000, (c) Highland has not forgiven a loan to Mr. Dondero since at least 2008, and (d) Highland has never forgiven in whole or in part any loan that it extended to any affiliate. Motion ¶¶ 103-04 (citing evidence).

24.     The Alleged Agreement Defendants purport to contest these facts, relying on (a) Mr. Dondero's uncorroborated assertions (Opposition ¶ 7; J. Dondero Dec. ¶ 23, Def. Appx. at 13-14); and (b) snippets of transcripts from the depositions of David Klos and Kristin Hendrix. Notably, the Alleged Agreement Defendants do not cite to *any* documents to support their contentions and the transcript citations actually support Plaintiff's assertions.[9] In sum, the Alleged Agreement Defendants have failed to come forward with any admissible evidence to create a genuine dispute of a material fact.[10]

---

[9] The cited testimony of Ms. Hendrix and Mr. Klos (Opposition ¶ 7, n. 11) is consistent with Plaintiff's Motion on this point; indeed, Plaintiff urges the Court to review that testimony together with other portions of their testimony that the Alleged Agreement Defendants ignore. Ex. 194 (Hendrix) at 133:5-23, Appx. 3160 (to Ms. Hendrix's knowledge going back fifteen years, Highland has *never* forgiven an affiliate loan; and any forgiven loan was *required* to be disclosed in HCMLP's audited financial statements); Ex. 195 (Klos) at 122:18-123:24, Appx. 3212 (to Mr. Klos' knowledge, Highland has *never* forgiven an affiliate loan; *no* loan has been forgiven for at least seven (7) years; and *no* loan was forgiven for more than $500,000). *See also* Ex. 98 (Dondero) at 423:9-14, Appx. 1776 (Mr. Dondero could not identify a single intercompany loan that was ever forgiven as part of compensation). The Court can also note from its own prior orders that Highland did not forgive the loan of Mr. Okada that was satisfied post-petition.

[10] The Alleged Agreement Defendants contend that Plaintiff has "recognize[ed]" or "conceded" that HCMLP "has forgiven loans to Jim Dondero in the past." Opposition ¶¶ 7, 47. Sadly, this is another fabrication. In the quoted language, Plaintiff obviously referred to the year 2008 as the starting point because it only used audited financial statements in its examination of Mr. Johnson going back that far. *See* Ex. 101 at 119:14-189:21, Appx. 1988-2005. Indeed, even Mr. Dondero does not contend that he ever received a loan from Highland that was forgiven in whole or in part.

(iv)   <u>The Alleged Agreement Defendants purport to contest Plaintiff's assertion that the Alleged Agreements were "secret" (*Compare* Motion ¶ 98 *with* Opposition ¶ 11-13, 45).</u>

25.    With two irrelevant "exceptions," Defendants do not dispute that neither Mr. Dondero nor his sister nor Dugaboy ever told ***anyone*** about the existence or terms of the Alleged Agreements. *Compare* Motion ¶ 98 *with* Opposition ¶¶ 11, 45.

26.    The two "exceptions" are irrelevant because they are vague, self-serving statements insufficient to create a genuine dispute of material fact. *See* Def. Ex. 1-D, Def. Appx. at 74 (letter sent ***after*** the commencement of litigation that expressed Mr. Dondero's "views" but omitted the words "agreement," "forgiveness," "contingency," "conditions subsequent," "Nancy," and "Dugaboy"); Opposition ¶11, n.28 (even accepting Mr. Dondero's statements as true, Mr. Dondero spoke to Mr. Waterhouse only in the context of settlement discussions and failed to say "agreement," "forgiveness," "contingency," "conditions subsequent," "Nancy," or "Dugaboy").[11]

(v)   <u>The Alleged Agreement Defendants purport to contest Plaintiff's assertion that Mr. Dondero failed to specifically identify the Notes at issue (*Compare* Motion ¶ 93 *with* Opposition ¶¶ 14-15).</u>

27.    In its Motion, Plaintiff cited to evidence proving that Mr. Dondero never identified the Notes that were subject to each Alleged Agreement during his discussions with his sister. Mr. Dondero's attempt to "correct the record" with his self-serving testimony should be rejected. *Compare* Ex. 99 at 79:6-81:23, Appx. 1832 *with* Opposition ¶¶ 14-15. The relevant question and answer are unambiguous:

Q:    Mr. Dondero, during your discussions with the Dugaboy Trustee, did you identify the Promissory Notes that were going to be the subject of each Agreement?

---

[11] Given Mr. Dondero's own words, his assertion that he "did not discuss every detail of the Agreements" with Mr. Waterhouse is (to be quite charitable) an extraordinary understatement; he admittedly did not discuss ***any*** detail of the Alleged Agreements with him. *See* Ex. 99 at 167:10-168:3, Appx. 1854; Dondero Dec. ¶ 28, Def. Appx. at 15.

MS. DEITSCH-PEREZ: Object to form.

A:      No, not that I recall.

Ex. 99 at 79:6-12, Appx. 1832.

28.      Indeed, under continued questioning, Mr. Dondero **never** testified that he identified the Notes subject to the Alleged Agreements. *Id*. at 80:8-17, Appx. 1832 ("She was aware that they were notes due to Highland from a variety of entities."), 81:11-23, Appx. 1832 ("I can't sit here as I remember – as I sit here today and remember whether or not I specifically identified HCRE or not, you know; but she knew they were related entities.").

29.      Mr. Dondero's testimony speaks for itself.   His inability to provide unequivocal testimony on this issue is fatal given the undisputed facts that (i) Nancy Dondero never saw any Note signed by her brother or on behalf of an affiliate, (ii) no writing exists memorializing the terms of the Alleged Agreements, and (iii) no one contemporaneously created a list of the Notes subject to the Alleged Agreements. *See* Motion ¶¶ 96 (fourth bullet point), 99 (citing evidence).

(vi)      <u>The Alleged Agreement Defendants' Contentions of "waiver" and that they only made "periodic interest payments" are false</u>

30.      Mr. Dondero's assertions that Highland "waived" its right to collect on the Notes and that he only "intended to make periodic interest payments … until forgiveness actually occurred" is, once again, demonstrably false.  *See* J. Dondero Dec. ¶ 31, Def. Appx. at 16.  Between December 2017 and December 2019 (when Mr. Dondero supposedly entered into the Alleged Agreements), he and NexPoint and HCMS paid Highland nearly $40,000,000 on account of certain of the Notes at issue and other notes that Mr. Dondero tendered to Highland in exchange for loans:

| Borrower | Date | Amount | Exhibit |
|---|---|---|---|

| | | | |
|---|---|---|---|
| HCMS | 03/05/19 | $1,015,000 | 120 |
| HCMS | 08/09/19 | $550,000 | 121 |
| HCMS | 08/21/19 | $5,600,000 | 121 |
| HCMS | 12/30/19 | $65,360 | 122 |
| NexPoint | 03/29/19 | $725,000 | 120 |
| NexPoint | 04/16/19 | $1,300,000 | 117 |
| NexPoint | 06/04/19 | $300,000 | 123 |
| NexPoint | 06/19/19 | $2,100,000 | 118 |
| NexPoint | 07/09/19 | $630,000 | 119 |
| NexPoint | 08/13/19 | $1,300,000 | 121 |
| NexPoint | 12/09/19 | $1,518,575 | 122 |
| NexPoint | 12/30/19 | $530,112 | 122 |
| Dondero | 12/08/17 | $677,501 | 106 |
| Dondero | 12/18/18 | $2,000,000 | 107 |
| Dondero | 12/19/19 | $782,623 | 107 |
| Dondero | 02/14/19 | $3,000,000 | 108 |
| Dondero | 03/13/19 | $5,000,000 | 109 |
| Dondero | 05/02/19 | $2,400,000 | 110 |
| Dondero | 05/03/19 | $4,400,000 | 110 |
| Dondero | 05/07/19 | $600,000 | 110 |
| Dondero | 05/23/19 | $1,500,000 | 110 |
| Dondero | 06/17/19 | $3,000,000 | 111 |
| Dondero | 12/23/19 | $783,012 | 112 |
| | | **$39,777,183** | |

*See also* Ex. 38, Appx. 798, Ex. 73, Appx. 1337.

31.     These payments (a) prove that the Alleged Agreements are fictitious because they cannot be reconciled with Mr. Dondero's claim that he only intended to make "periodic interest payments" (which themselves were not required under the Demand Notes) or the existence of the Alleged Agreements, (b) show that Mr. Dondero actually paid off in full two other Notes (making even more important Mr. Dondero's failure to identify the Notes to his sister or to recall the Notes subject to each Alleged Agreement), and (c) the Court cannot credit any "course of dealing" defense because Mr. Dondero clearly used Highland and its related entities as piggybanks, shifting money from one pocket to another as he wished prior to the Petition Date.

32.     All of that changed with Highland's bankruptcy filing.  Mr. Dondero still apparently has not come to grips with the fact that when he caused Highland to file, he lost control of Highland, others assumed responsibility for its operations, and business could no longer be carried on "as usual" with Mr. Dondero's personal interests carrying the day.

### 2.     The Alleged Agreements are not support by Consideration

33.     According to the Alleged Agreement Defendants, all of the Notes were to be forgiven if either (a) Mr. Dondero sold one of three "portfolio" companies "for greater than cost" (the "<u>Dondero Sale Contingency</u>") or (b) the portfolio companies were sold "on a basis outside of Defendant James Dondero's control" (the "<u>Third Party Contingency</u>").  *See, e.g.*, Ex. 31 ¶ 82, Appx. 655.

34.     Plaintiff cited to admissible evidence establishing that even if a fact-finder found that the Alleged Agreements existed, they are unenforceable as a matter of law due to a lack of consideration.  ¶¶ 100-101.

35.     In response, Alleged Agreement Defendants repeat their contention that the Alleged Agreements were intended to serve as "an incentive for Jim Dondero to work particularly diligently" and to otherwise "motivate and retain" him.  Opposition ¶ 10; J. Dondero Dec. ¶ 24, Def. Appx. at 14; N. Dondero Dec. ¶ 10, Def. Appx. at 83-84. [12]  Not only is this facially absurd, it is also irrelevant because the Dondero Sale Contingency will ***never*** occur. [13]

---

[12] Significantly, even Defendants' "incentive" concept of consideration is completely illusory.  Had Ms. Dondero bothered to ask, her brother would have told her that the value of each of the portfolio companies was either "substantially higher" or "moderately higher" than Highland's cost of acquisition at the time the Alleged Agreements were entered into.  Unsurprisingly, Mr. Dondero could not recall sharing this information with his sister.  Ex. 99 at 74:4-75:19, Appx. 1831.

[13] The Alleged Agreement Defendants also contend that Highland "benefitted from the Agreements by not paying Jim Dondero higher base compensation, something Jim Dondero thought was 'great for the [Plaintiff] at the time,'" and "reduces other compensation [that he would have otherwise taken]."  Opposition ¶ 10.  The Alleged Agreement Defendants have it backwards.  The loans were a benefit to Mr. Dondero, not Highland, because they ostensibly

36. Instead, the portfolio companies will be sold by the Reorganized Highland and (assuming the Alleged Agreements actually exist) the Third Party Contingency would apply. However, there is *no* evidence in the record establishing that Highland will receive anything of value in that scenario. Indeed, Ms. Dondero testified as follows:

> Q: Did you expect Highland to benefit if the portfolio companies were sold on a basis outside of Mr. Dondero's control?
>
> A: I have no idea, John.
>
> Q: Did you have any idea – did you or Dugaboy have any idea when you entered into the agreement if Highland would benefit from the sale of the portfolio companies on a basis outside of Mr. Dondero's control?
>
> A: I wouldn't know that.

Ex. 100 at 203:7-18, Appx. 1925.

37. In short, the Alleged Agreement Defendants have failed to come forward with *any* admissible evidence showing the consideration Highland received in exchange for forgiving over $50 million in Notes when the portfolio companies are sold in accordance with Highland's confirmed Plan of Reorganization (*i.e.,* the Third Party Contingency) (because there is no conceivable benefit).

38. Separately, Mr. Dondero's expert, Mr. Johnson, again supports Plaintiff's position, this time that the Alleged Agreements fail due to a lack of consideration. Mr. Johnson initially concluded that for the seven-year period from 2013 through 2019, Mr. Dondero's alleged "compensation shortfall" was approximately $21 million – or only about (i) 30% of the original aggregate face amount of the Notes ($70 million) or (ii) 40% of the

---

allowed him to defer the realization of income and the concomitant payment of personal income taxes. Highland, on the hand, still transferred over $70 million in capital in the form of loans and was forced to defer the realization of the expense that would have reduced its taxable income. This whole scheme was for Mr. Dondero's sole benefit.

current principal due on the Notes ($50 million). *See* Def. Ex. G at 19, Def. Appx. 255.[14] But even Mr. Johnson's initial conclusion was grossly overstated because Mr. Dondero failed to disclose to Mr. Johnson millions of dollars in compensation he received from the Highland, largely in the form of stock options.

39.     The Alleged Agreement Defendants offer no argument, let alone admissible evidence, showing that Highland received fair consideration in forgiving $50-70 million in loans (depending on the timing) when Mr. Dondero's own expert calculated that his alleged compensation "shortfall" was only between $10-20 million.

**C.     Summary Judgment Should be Granted Dismissing the Alleged Agreement Defendants' defense that Plaintiff Had an Obligation to Make the Payments Due under the SSAs without instruction or authority**

40.     In its Motion, Highland established that (a) its Shared Services Agreement with NexPoint did not authorize, let alone require, Highland to make payments under the NexPoint Term Note without receiving instruction or direction from an authorized representative of NexPoint, and (b) Highland never received and such instruction or direction in December 2020.  Motion ¶¶ 123-126 (citing evidence).

41.     In response, Mr. Dondero insists that Highland was "responsible" for making the payment due on December 31, 2020, and he "fully expected" Highland to make the payment, but there is absolutely nothing to corroborate these self-serving statements.

---

[14] Mr. Johnson prepared his report in the spring of 2021 before the corporate affiliates adopted Mr. Dondero's "conditions subsequent" defense.  As a result, Mr. Johnson was never told that the affiliate notes were part of the Alleged Agreements.  Mr. Johnson's report thus provides further confirmation that the Alleged Agreements are completely fictitious because the Alleged Agreement Defendants will never be able to credibly explain to a jury (a) why they failed to disclose the affiliate loans to Mr. Johnson, or (b) why there is a gap of tens of millions of dollars between the face value of the Notes subject to the Alleged Agreements (*i.e.*, more than $70 million when issued) and Mr. Johnson's conclusion (*i.e.*, Mr. Dondero was undercompensated by $21 million), let alone after his conclusion is properly adjusted downwards by the millions of dollars of compensation Mr. Dondero failed to disclose to him.

Dondero Dec. ¶¶ 32-39, Def. Appx. at 16-19. And the overwhelming, objective and undisputed facts show that his "expectations" are misplaced, at best:

- Try as they might, the Term Note Defendants have yet to identify any provision under NexPoint's Shared Services Agreement that required (or even authorized) Highland to make the payments required under the Term Notes;

- Mr. Waterhouse was NexPoint's Treasurer who also oversaw Highland's accounting department, yet he offers nothing on the topic and remains gainfully employed on behalf of Mr. Dondero's enterprise; and

- Ms. Hendrix testified without qualification that while she made "overhead" payments in the ordinary course, she would never effectuate an intercompany transfer without direction or instruction from Mr. Dondero or Mr. Waterhouse.

42.     But the best evidence that Mr. Dondero's statements are false is Highland's contemporaneous conduct. On December 3, 2020, Highland sent letters demanding that HCMS, HCRE, and HCMFA pay, in the aggregate, over $13.5 million under the applicable Demand Notes. Ex. 1 (Exhibit 3); Ex. 3 (Exhibit 5); Ex. 4 (Exhibit 5). If Highland believed that it had the right, let alone the obligation, to make payments on behalf of the Term Note Defendants, it surely would have grabbed the money while it could. And had it done so, Mr. Dondero surely would have protested loudly. But none of that occurred because Highland did not have the right, let alone the obligation, to take money for itself without direction or instruction from the maker.

43.     By December 30, 2020, (a) Mr. Dondero had been terminated from Highland, (b) Highland had obtained a TRO against Mr. Dondero, (c) Highland was managed by an Independent Board and was no longer affiliated with NexPoint, HCRE, or HCMS, (d) Highland had already made demands under all of its Demand Notes, and (e) Highland had given notice of termination of the Shared Services Agreements.

44.     Given that the Term Notes Defendants cannot identify any provision in the Shared Services Agreement requiring Highland to effectuate the payments under the Term Notes, no jury could reasonably credit Mr. Dondero's "expectations" that Highland would do anything more than required under the circumstances.[15]

### D.     Summary Judgment Should be Granted Dismissing the Alleged Agreement Defendants' pre-payment defense

45.     Plaintiff offered overwhelming evidence to establish that the "pre-payment" defense is meritless as a matter of law and as a matter of fact.  Motion ¶ 128 (citing evidence). In response, NexPoint and HCMS attempt to create ambiguities where none exist and rely on a "course of conduct" that is not supported by any admissible evidence and could not serve to amend the Term Notes in any event.

46.     NexPoint and HCMS go to great lengths to try to impose ambiguities in the Notes.  Opposition ¶¶ 103-112.  But if the plain and ordinary terms are given their plain and ordinary meanings, those efforts fail.  There is no dispute that the makers (a) were required to make Annual Installments and (b) had the right to make "prepayments."  *See, e.g.,* Klos Dec. Ex. A § 2.1, 3.  The only question is how "prepayments" were to be applied.  Section 3 of the Term Notes provides the answer:

> 3.   Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  **Any payments on this Note shall be applied first to**

---

[15] Mr. Dondero's self-serving contention that HCMS and HCRE had "oral" or "unwritten" shared services is shameful. Why would that be the case?  Why would Highland obligate itself to provide free services to those entities when NexPoint and HCMFA were paying millions of dollars for the same services?  Why didn't HCMS and HCRE file an administrative claim against Highland like HCMFA and NexPoint?  Or did Highland continue to service HCMS and HCRE but not HCMFA or NexPoint?  Was Highland's "oral agreement" assumed or rejected?  When did Highland give notice of termination, if it ever did?  No document exists reflecting the terms or existence of these "oral agreements" because they do not exist.  Highland's employees may have performed services for these entities when Mr. Dondero controlled them; but that does not prove an enforceable agreement existed, let alone one that authorized and required Highland to pay itself at a time they were in an adversarial position.

> **unpaid accrued interest hereon, and then to unpaid principal hereof.**

*Id.*

47. This section unambiguously provides that (a) "Prepayment[s] [are] Allowed;" (b) "Renegotiation [is] Discretionary;" (c) prepayments of "unpaid principal or accrued interest" are permitted; and (d) payments "shall be applied first to unpaid accrued interest hereon, and then to unpaid principal."

48. NexPoint's attempt to create an ambiguity out of the words "accrued interest" fails for the simple reason that it is used in the past tense; it cannot possibly be interpreted to apply to future interest.[16] And while the parties' "course of dealing" is consistent with Section 3, it cannot serve as an "amendment" to the plain terms of the Notes – particularly after the Petition Date when Mr. Dondero ceded control to an Independent Board, Highland was no longer formally affiliated with NexPoint, HCRE, or HCMS, and there is no evidence that any understanding was reached on these matters.

49. NexPoint's "pre-payments" were previously addressed by Mr. Klos (Klos Dec. ¶¶ 8-14), and NexPoint comes forward with _no_ evidence to rebut his sworn and admissible Declaration.[17]

50. HCMS fares no better. When Mr. Dondero controlled both HCMS and Highland, he exercised the right under Section 3 to "renegotiate" the application of

---

[16] Because there is no ambiguity, the litany of cases cited by NexPoint are simply inapplicable.

[17] NexPoint has no admissible evidence to support its defense but it does create multiple strawmen. Plaintiff does not dispute that Prepayments are possible, nor does it dispute that at year end 2017, 2018, and 2019, NexPoint "never made the full" Annual Installment payment in December. Opposition ¶ 106. The question is why NexPoint made any payment at all. And the answer is simple: applying the unambiguous terms of Section 3, NexPoint's prepayments were "applied first to unpaid accrued interest thereon, and then to unpaid principal." Thus, the payments made in December of each year equaled all interest that *accrued* between the date each prepayment was made and year end. That is the indisputable course of dealing; neither NexPoint nor HCMS had any basis to believe that it could forego paying interest.

prepayments.  But even then, ***under his watch***, HCMS ***still*** made its interest payment at year end 2019 -- even though HCMS had paid off millions of dollars in principal just months earlier.

51.     If Mr. Dondero and HCMS truly believed that HCMS's pre-payments applied to eliminate ***all*** future obligations of principal and interest, they never would have paid (a) $65,360.49 on 12/31/19 (when Mr. Dondero was in control of both entities), (b) $181,226.83 on January 21, 2021 (in an effort to "cure" the default even though the HCMS Term Note provides no cure rights); or (c) the payment due at year end 2021 (Klos Reply Dec. ¶¶ 1-7).  And that eliminates any dispute of fact.

## <u>CONCLUSION</u>

For the foregoing reasons, and for those set forth in the Motion, the Memorandum of Law in support of the Motion, and Plaintiff's Appendix, Plaintiff respectfully requests that the Court (a) grant the Motion in all respects, (b) provide Plaintiff with a reasonable opportunity to present all of its costs and fees incurred in connection with collection, and (c) grant such other and further relief as the Court deems just and proper.

Dated: February 7, 2022         **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

DOCS_NY:45091.5 36027/003